UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VALENCIA AG, LLC,

                                        *Plaintiff*,

          -against-
                                                        5:24-CV-116
                                                        (GTS/TWD)

NEW YORK STATE OFFICE OF CANNABIS
MANAGEMENT; CHRISTOPHER ALEXANDER;
TREMAINE WRIGHT; ADAM PERRY;
JESSICA GARCIA; JENNIFER JENKINS; HOPE KNIGHT;
 and DAMIAN FAGON,

                                        *Defendants*.
_____


**MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELMINARY INJUNCTION**

                    LETITIA JAMES
                    Attorney General of the State of New York
                    *Attorney for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iiii

PRELIMINARY STATEMENT ............................................................................... ......1

STATEMENT OF FACTS……………………………………………………………..3

    A.  Statutory and Regulatory Framework under the Cannabis Law…………………………..3

    B.  Prioritized Consideration of SEE Applications Submitted Between October 4, 2023 and December 18, 2023…………………………………………………………………… 7

    C.  Plaintiff's Application and the Randomized Review Process……………………………9

STANDARD OF REVIEW……………………………………………………………...12

ARGUMENT……………………………………………………………………………14

POINT I:        PLAINTIFF FAILS TO ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD THAT IT IS LIKELY TO SUCCESSED ON THE MERITS OF ITS EQUAL PROTECTION CLAIM……………………………………………14

    A.  Plaintiff lacks standing to challenge New York's licensing requirements………………14

          1.  Plaintiff lacks standing to challenge the Office's pre-application efforts to encourage SEE applicants because it alleges no cognizable risk of injury resulting from those efforts……………………………………………………………………..15

          2.  Plaintiff lacks standing because it would not be considered for a license even absent the existence of minority-owned business and women-owned business applicants for microbusiness licenses…………………………………………………18

          3.  Plaintiff lacks standing to seek an injunction except related to microbusiness licenses in the November Queue……………………………………………………19

    B.  Plaintiff cannot show a likelihood of succeeding on its Equal Protection Clause claim…20

          1.  Defendants did not give preference or extra weight to applications from minority-owned or women-owned businesses, and the Equal Protection Clause is not implicated………………………………………………………………………...23

          2.  Plaintiff has not demonstrated that defendants' acts to reduce barriers to SEE applicants applying for cannabis licenses violates the Equal Protection Clause….27

POINT II:     PLAINTIFF FAILS TO SHOW IT WILL SUFFER IRREPARABLE HARM
              ABSENT THE DRASTIC RELIEF IT SEEKS…………………………………….30


POINT III.    THE EQUITIES BALANCE IN FAVOR OF THE DEFENDANTS, AND
              ISSUANCE OF AN INJUNCTION IS NOT IN THE PUBLIC INTEREST…...36


CONCLUSION..............................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)…..21

Andre-Rodney v. Hochul, No. 121CV1053BKSCFH, 2022 WL 3027094 (N.D.N.Y. Aug. 1, 2022)……………………………………………………………………………………22

Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42 (2d Cir. 1983)………………...30

Bill & Ted's Riviera, Inc. v. Cuomo, 494 F. Supp. 3d 238 (N.D.N.Y. 2020)………………..13

Cacchillo v. Insmed, Inc., 638 F.3d 401(2d Cir. 2011)………………………………………...13, 15

Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253 (S.D.N.Y. 2019)……………………………………………………………………………………..21, 22, 24

Citibank, N.A. v. Citytrust, 756 F.2d 273 (2d Cir. 1985)…………………………………………..32

City of Los Angeles v. Lyons, 461 U.S. 95 (1983)……………………………………………17, 39

Connecticut State Police Union v. Rovella, 494 F. Supp. 3d 210 (D. Conn. 2020)……..31, 32, 33

Dandridge v. Williams, 397 U.S. 471 (1970)……………………………………………..22

DeGroat v. Buck, No. 3:22-CV-507 (LEK/ML), 2023 WL 4763806 (N.D.N.Y. July 26, 2023)………………………………………………………………………………………..38

Doe v. Franklin Square Union Free Sch. Dist., 568 F. Supp. 3d 270 (E.D.N.Y. 2021)…………21

Does 1-2 v. Hochul, 632 F. Supp. 3d 120 (E.D.N.Y. 2022)………………………………………..22

Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110 (2d Cir. 2009)………………..31, 32

FCC v. Beach Communications, Inc., 508 U.S. 307 (1993)…………………………………..22

Ferrelli v. Unified Ct. Sys., No. 122-cv-0068, 2022 WL 673863 (N.D.N.Y. Mar. 7, 2022)…….13

Finch v. Treto, 82 F.4th 572 (7th Cir. 2023)………………………………………………………..40

Gaudette v. Saint-Gobain Performance Plastics Corp., No. 11-cv-932, 2014 WL 1311530 (N.D.N.Y. Mar. 28, 2014)………………………………………………………………..21

Giraldo v. Kessler, 694 F.3d 161 (2d Cir. 2012)………………………………………4, 38

Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150 (2d Cir. 2006)………....38

Hayden v. County of Nassau, 180 F.3d 42 (2d Cir. 1999)……………………………………28

Honadle v. Univ. of Vermont, 56 F. Supp. 2d 419 (D. Vt. 1999)……………………………29

Hunt v. Cromartie, 526 U.S. 541 (1999)……………………………………………………21

Kamerling v. Massanari, 295 F.3d 206 (2d Cir. 2002) …………………………………….30

Kane v. De Blasio, 19 F.4th 152 (2d Cir. 2021)……………………………………………20

Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356 (1973)………………………….22

Litwin v. OceanFreight, Inc., 865 F. Supp. 2d 385 (S.D.N.Y. 2011)……………………36

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990)……………………………………13, 15

Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992)…………………………………………..14

Maniscalco v. New York City Dep't of Educ., 563 F. Supp. 3d 33 (E.D.N.Y. 2021)………....22

Mastrio v. Sebelius, 768 F.3d 116 (2d Cir. 2014)………………………………………..13

New Orleans v. Dukes, 427 U.S. 297 (1976)2………………………………………………..22

New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42 (2d Cir. 2020)……………………15, 36

Nken v. Holder, 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)………………………36

Nuss v. Sabad, No. 10-cv-0279, 2016 WL 4098606 (N.D.N.Y. July 28, 2016)………………...21

Oakland Trib., Inc. v. Chron. Pub. Co., Inc., 762 F.2d 1374 (9th Cir. 1985)………………32

People ex. Rel. Schneiderman v. Actavis PLLC, 787 F.3d 638 (2d Cir. 2015)……………...13, 14

Peridot Tree WA Inc. v. Washington State Liquor & Cannabis Control Bd., No. 3:23-CV-06111-TMC, 2024 WL 69733 (W.D. Wash. Jan. 5, 2024)……………………………….....32, 33, 40

Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256 (1979)…………………………..……..22

Person v. United States, No. 19 Civ. 154, 2019 WL 258095 (S.D.N.Y. Jan. 18, 2019)…..……15

Regents of the University of California v. Bakke, 438 U.S. 265 (1978)……………….…..……24

*SM Kids, LLC v. Google LLC*, 963 F.3d 206 (2d Cir. 2020)…………………………………...15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)………………………………………………………………………………...21, 24

*Variscite NY One, Inc. v. State of New York*, No. 22-3128 (2d Cir. Mar. 28, 2023)…………...20

*Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, No. 23-cv-01599, 2024 WL 406490 (N.D.N.Y. Feb. 2, 2024)………………………………………...19, 31, 32, 33, 34, 35, 39

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)………………..21

*Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, 2013 WL 12131305 (N.D.N.Y. 2013)…………………………………………………………………………………………..31

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137 (2d Cir. 2005)……………………31

*Weser v. Glen*, 190 F. Supp. 2d 384 (E.D.N.Y. 2002) ……………………………….....……29

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008)…………………………………………...12, 13, 36

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101 (2d Cir. 2003)…………..………31

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)……………………………………………………21

**STATUTES**

9 NYCRR § 120.4(c)……………………………………………………………………..6, 8

9 NYCRR § 121.1(d)-(k)…………………………………………………………………….5

42 U.S.C.§ 1983……………………………………………………………………………...1

N.Y. Canbs. § 2……………………………………………………………………….....3, 29

N.Y. Canbs. § 3………………………………………………………………………...1, 4

N.Y. Canbs. §§ 7-11……………………………………………………………………….1

N.Y. Canbs. § 13(1)…………………………………………………………………………4

N.Y. Canbs. § 15(3)…………………………………………………………………………6

N.Y. Canbs 61-89………………………………………………………………………..1, 4

N.Y. Canbs. § 63(3)……………………………………………………………...…..6

N.Y. Canbs. § 64(a)……………………………………………………………….5

N.Y. Canbs.§ 73(3)………………………………………………………………..6

N.Y. Canbs. § 74(1)………………………………………………………………..6

N.Y. Canbs. §75(1)………………………………………………………………..6

N.Y. Canbs. § 87……………………………………..1, 4, 5, 7, 9, 10, 11, 16, 23, 25, 26, 27, 31

N.Y. Canbs. § 88………………………………………………………………..5

U.S. Const. art. III, § 2……………………………………..…………………………14


## SESSION LAWS AND LEGISLATIVE MATERIALS

McKinney's 2021 Session Law News of N.Y., Ch. 92………………..…………………………31


## MISCELLANEOUS AUTHORITIES

Women in Cannabis: Jenny Argie, Syracuse.com (Feb. 29, 2024),

https://www.syracuse.com/marijuana/2024/02/women-in-cannabis-jenny-argie.html.................29

Defendants, New York State Office of Cannabis Management, Christopher Alexander, Tremaine Wright, Adam Perry, Jessica Garcia, Jennifer Jenkins, Hope Knight, and Damian Fagon (collectively, "Defendants"), respectfully submit this memorandum of law, together with the accompanying Declarations of Aimee Cowan, Jodi Bryon, Damian Fagon and John Kagia, and attached exhibits, in opposition to Plaintiff's motion for a preliminary injunction.

## PRELIMINARY STATEMENT

The New York Cannabis Law legalizes adult-use cannabis and regulates the production, manufacturing, distribution, and sale of cannabis within the State. See, New York Cannabis Law ("N.Y. Canbs.") §§ 3, 61-89. Under the Cannabis Law, the Cannabis Control Board ("the Board") and the Office of Cannabis Management ("the Office") are responsible for both implementing and enforcing the law within the State. See, N.Y. Canbs. §§ 7-11. As part of the Cannabis Law, the Board was required to create a social and economic equity plan ("SEE Plan") to "actively promote" and "prioritize[e] consideration of applications by applicants who are from communities disproportionately impacted by the enforcement of cannabis prohibition or who qualify as a minority or women-owned business, distressed farmers, or service-disabled veterans." N.Y. Canbs. § 87(1). The law vests broad discretion in the Board and Office to determine how to operate and implement the SEE Plan. N.Y. Canbs. § 87.

Plaintiff Valencia AG, LLC is a limited liability company that has applied for a microbusiness cannabis license. ECF No. 1, ¶¶ 1, 49. It brings this suit alleging that the Office's licensing requirements violate the Equal Protection Clause of the United States Constitution and 42 U.S.C.§ 1983 ("Section 1983") because defendants enacted regulations and procedures that "provide favor and preference to persons of a selected race or gender to the exclusion of Caucasian or white men for applications for cannabis licenses." Id. ¶ 64.

1

Plaintiff fundamentally misunderstands how the Board and Office operate the SEE Plan, which does not provide any preference on the basis of race or gender in the ordering, review, or granting of license applications. Rather, the Board and Office accomplished the SEE Plan's goals through front-end measures to remove obstacles that might prevent SEE applicants from applying for licenses. These efforts included outreach, creating low-burden applications that do not require providing an excessive number of documents, creating a team to help applicants correct deficiencies in their applications rather than rejecting those applications, and funding community programs to help answer questions that potential applicants might face when completing their applications. Plaintiff does not, and cannot, challenge the constitutionality of these voluntary outreach efforts, which had no effect on plaintiff's ability to apply for a license and do not impact plaintiff's likelihood of receiving a license. And plaintiff's claim that its application was treated differently or was given lower priority than the applications of minority-owned or women-owned businesses is factually wrong.

Plaintiff's motion for a preliminary injunction should be denied. Plaintiff has failed to carry its burden of demonstrating that it meets the requirements for a preliminary injunction. First, plaintiff cannot show a likelihood of success on the merits. As an initial matter, plaintiff lacks standing to bring this action. Further, even if plaintiff did have standing, its equal protection claim is meritless because plaintiff's application was treated identically to the applications of minority-owned and women-owned businesses. Plaintiff had the exact same chance as SEE applicants, including minority-owned and women-owned businesses, of being randomly assigned an early position in the application queue to be considered for the available licenses. Plaintiff's application and the applications of minority-owned businesses and women-owned businesses were randomly assigned positions in the queue the same way and will be evaluated for a license in the same way.

2

Second, plaintiff has not shown that it will suffer irreparable injury absent the requested injunction. Plaintiff's delay in bringing this motion underscores its failure to show irreparable harm. And plaintiff's decision to lease a retail space without any guarantee that its application would be reviewed and granted in short order – or at all – is an injury of its own making that is not fairly attributable to defendants' actions. Plaintiff's other bare assertions of irreparable injury are similarly unavailing.

Third, plaintiff has not established that the balance of the equities weighs in its favor, or that the requested injunction is in the public interest. To the contrary, the balance of equities tips decidedly in defendants' favor. An injunction that prevents defendants from continuing to process and award licenses in the assigned and announced order would cause substantial harm to the blossoming adult-use cannabis industry, including the thousands of prospective licensees and cultivators who have already invested hundreds of millions of dollars in their aspiring cannabis businesses. Such a halt to the cannabis market threatens the financial solvency of a significant number of cannabis-related businesses and would allow the illicit cannabis market to flourish, undermining public safety.

## STATEMENT OF FACTS

### A.  Statutory and Regulatory Framework under the Cannabis Law

In 2021, the New York Legislature concluded that the State's existing laws criminalizing marihuana and their enforcement had "resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit an otherwise law-abiding citizen's ability to access housing, employment opportunities, and other vital services." N.Y. Canbs. § 2. To correct these effects, the Legislature passed the Marihuana Regulation and Taxation Act ("MRTA"), which codified New York's Cannabis Law. The Cannabis Law legalizes adult-

use cannabis and regulates the growing, processing, distribution, and sale of cannabis within the State. N.Y. Canbs. §§ 3, 61-89.

Article II of the Cannabis Law establishes the Cannabis Control Board and the Office of Cannabis Management, which are responsible for implementing and enforcing the Cannabis Law within the State. N.Y. Canbs. §§ 7-11. The Cannabis Law vests broad authority in the Board, authorizing it to "perform such acts, prescribe such forms and propose such rules, regulations and orders as it may deem necessary or proper to fully effectuate the provisions" of the Cannabis Law. N.Y. Canbs. § 13(1). The Cannabis Law requires the Board to create a social and economic equity plan ("SEE Plan"). Cannabis Law § 87(1). The law sets a non-mandatory "goal" of awarding 50% of available licenses to five[1] groups identified by statute:

> (a) individuals from communities disproportionately impacted by the enforcement of cannabis prohibition;
> (b) minority-owned businesses;
> (c) women-owned businesses;
> (d) minority and women-owned businesses, as defined in paragraph (d) of subdivision five of this section;
> (e) distressed farmers, as defined in subdivision five of this section; and
> (f) service-disabled veterans.

N.Y. Canbs. § 87(2). These five groups of applicants are referred to in the Cannabis Law as social and economic equity applicants ("SEE applicants"). Cannabis Law § 87(1)-(2). The legislators made clear that the fifty percent goal is not a requirement. See, Declaration of Attorney Aimee Cowan ("Cowan Dec."), Ex. A at p. 58[2]; Declaration of Damian Fagon ("Fagon Dec."), ‖ 22. Nor does the law mandate how licenses should be allocated between the five groups of SEE applicants.

---

[1] Although there are six groups listed, group (d) is simply a combination of groups (b) and (c), and not a distinct group.

[2] Judicial notice may be taken of the Assembly debate, as a matter of public record. See Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).

The Cannabis Law requires the Board to collect demographic data on cannabis business owners and to publish the data in its annual report. N.Y. Canbs. § 88; Fagon Dec. ℗ 14.

In this context of the SEE Plan, the Office and the Board are required to "actively promote" certain applicants by, among other things:

> prioritizing consideration of applications by applicants who are from communities disproportionately impacted by the enforcement of cannabis prohibition or who qualify as a minority or women-owned business, distressed farmers, or service-disabled veterans.

Cannabis Law § 87(1).

In addition, the SEE Plan must give extra priority to any applicant that:

> a.  is a member of a community disproportionately impacted by the enforcement of cannabis prohibition;
> b.  has an income lower than eighty percent of the median income of the county in which the applicant resides; and
> c.  was convicted of a marihuana-related offense prior to the effective date of this chapter, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of this chapter, was convicted of a marihuana-related offense.

Cannabis Law § 87(3).

The Cannabis Law leaves it to the Board to create regulations regarding the qualifications for each SEE applicant group. Cannabis Law § 87(1). The Board adopted Part 121 of the Adult-Use Regulations which lays out the qualifications for applicants to demonstrate they are part of one or more of the SEE applicant groups, and also those eligible for extra priority as set forth in Cannabis Law § 87(3). See Fagon Dec. ℗ 9; see also 9 NYCRR § 121.1(d)-(k).

The Cannabis Law also authorizes the Board to create regulations for the selection of applications that should receive a license based on an applicant being a SEE applicant. Id. ℗ 11, citing N.Y. Canbs. § 64(a). Part 120 of the Adult-Use Regulations provides broad discretion to the Office and the Board with respect to how applications will be reviewed and selected for licenses

(which include SEE applications and licenses). Id. ℙ 12. Further, the Cannabis Law requires the board to "waive or reduce fees" for SEE applicants (N.Y. Canbs. § 63(3)) and provides that fees for SEE applicants "be assessed to accomplish the goals of this chapter." Id. ℙ 13, citing N.Y. Canbs. § 15(3). Consistent therewith, the Adult-Use Regulations allow applicants to pay a reduced fee by 50% if the applicant qualifies as a SEE group applicant, a reduced fee if the applicant demonstrates need for financial assistance, and a reduced fee by 40% if the applicant contracts with another licensee who is a SEE applicant. Id., citing 9 NYCRR § 120.4(c).

The Cannabis Law establishes specific objectives for the SEE Plan, such as to "promote applicants from communities disproportionately impacted by cannabis prohibition, and promote racial, ethnic, and gender diversity when issuing licenses." Id. ℙ 19. This goal can be achieved by "mentoring potential applicants" and "prioritizing consideration of applications" by SEE applicants. Id. The Cannabis Law also provides for granting microbusiness licenses (N.Y. Canbs. § 73(3), delivery licenses (N.Y. Canbs. § 74(1)), and nursery licenses (N.Y. Canbs. §75(1)) to promote SEE applicants. Id.  While the Cannabis Law provided goals for the SEE Plan and some examples of how to achieve them, it left broad discretion to the Board to determine how to implement those goals. Id. ℙℙ 23-26.

Section 87 of the Cannabis Law requires that the SEE Plan be created with the input of the public. Id. ℙ 28. The SEE Plan details the public engagement and input that informed the SEE Plan and the implementation of the goals stated, discussing the organization of equity community roundtables that were used to gather information from the various community groups that were most likely representative of the communities disproportionately impacted ("CDI"s), minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans. Id. ℙ 29. With this input from the public, the SEE Plan explains that "Social and economic equity

refers specifically to policies made by the Office to achieve the goals laid out in the Cannabis Law." Id. ⁋ 30.

Additionally, the Office provides "extra priority" of consideration to those applicants who indicated they qualified for such treatment based on prior cannabis conviction, income and CDI status, as required by Cannabis Law §87(3). Id. ⁋ 49. Microbusiness license applicants who are graduates of a 10-week mentorship and training program, the Cannabis Compliance Training and Mentorship Program ("CCTM"), also receive a guaranteed chance of having their application reviewed. Id. ⁋⁋ 50-51.

**B. Prioritized Consideration of SEE Applications Submitted Between October 4, 2023 and December 18, 2023.**

Based on the legislators' intent, as well as the broad authority the Board and the Office have pursuant to the Adult Use Regulations regarding application and licensure, the Office and the Board have prioritized consideration of SEE applications submitted between October 4, 2023 to December 18, 2023 in the following ways.

First, the Office conducted outreach. As an initial matter, the SEE Plan recognized that the lack of access to information, excessive paperwork and documentation specifically required for SEE individuals to prove their SEE status when applying for licensure, and restrictions imposed solely on SEE licensees, may discourage SEE individuals from participating in the cannabis marketplace as business owners. Fagon Dec. at ⁋ 42. The SEE Team held community roundtable events with SEE stakeholders across New York State from October 2022 to December 2023 to encourage and increase submissions of SEE applications for the Office's consideration. Id. The SEE Team also conducted significant outreach through educational events regarding applications and licensure. Id. Specifically, the SEE team conducted several public-facing SEE application sessions from October through December 2023. The team prepared online and print materials

aimed at educating applicants about how to apply for licenses, as well. Id. Although the outreach was geared towards potential SEE applicants, all potential applicants were welcome to attend. The SEE Team also collaborated with community-based organizations and academic institutions to offer technical assistance providers to applicants through the Cannabis Hub & Incubator Program ("CHIP"). Id. ¶ 44.

Second, the Office created low-burden applications. The SEE Plan recognized that cannabis licensing regimes that required applicants to submit various plans for evaluation, such as standard operating procedures, technical documents, financial plans, or personnel experience, are often prohibitively expensive and favor applicants who can afford to pay third-party consultants to produce top-scoring documents. Id. ¶ 43. Such applications often result in inequitable outcomes for other applicants, particularly SEE applicants. Id. As such, New York's adult-use application platform was designed to be accessible and easy for applicants to use, rather than require applicants to hire and pay consultants to draft numerous plans for an application. Id. These low-burden applications are given to all applicants, although they were specifically created to eliminate obstacles that would disproportionately impact SEE applicants.

Third, the Office offered lowered application fees. To further assist all interested SEE applicants in filing applications, the Board reduced application fees for all SEE applicant groups consistent with the requirements of the Cannabis Law and Regulations discussed above. Id. ¶ 45. In addition to SEE applicants, reduced fees are available to anyone who needs financial assistance and any applicant that partners with a SEE applicant. 9 NYCRR § 120.4(c).

The Office's intent in creating these procedures was to eliminate barriers that would disproportionately prevent certain groups of potential cannabis business owners from applying for licenses, thereby ensuring that individuals who would qualify as SEE applicants were able to apply

8

for licenses in the first place and would likely be qualified candidates for licenses. The Office did
<u>not</u> implement any measures that would cause SEE applicants to be processed or awarded licenses
before non-SEE applicants, measures that would give SEE applicants higher or quicker chances in
being considered for licenses, measures that would make a SEE applicant more likely to qualify
for a license (e.g., a "thumb on the scale" or bonus points), or any other measures that would
impact how SEE applications were reviewed and analyzed relative to non-SEE applications. In
other words, every application filed (except for those based on N.Y. Canbs. § 87(3) extra priority
or CCTM applications), whether from a SEE applicant or non-SEE applicant, was treated
identically by the Office, with an identical chance of being selected for review for a license and
with identical chances of being awarded a license.

### C. Plaintiff's Application and the Randomized Review Process

The application window for all license types (retail, microbusiness, cultivator, distributor,
etc.) and for all applicant types (non-SEE, SEE, and extra priority) opened on October 4, 2023.
<u>See</u>, Declaration of Jodi Bryon ("Bryon Dec."), at ⁋ 5. The application window for applicants
seeking a microbusiness or retail license with proof of control over a proposed premises from
which they intend to operate closed on November 17, 2023 ("November Applications"). <u>Id</u>. The
application window for applicants who applied after November 17, 2023, or for a provisional
license without proof of control over a premises, closed on December 18, 2023 ("December
Applications"). <u>Id</u>. Applicants that are part of the November Applications are only competing
against one another, they are not competing against applicants that are part of the December
Applications, and vice versa. <u>Id</u>. In addition, November Applications for microbusinesses do not
compete against November Applications for retail dispensaries since each license type has their
own number of licenses anticipated to be issued. <u>Id</u>. ⁋ 5.

On December 7, 2023, the Office used a computer program to randomly sequence the November Applications for microbusiness and retail dispensary licenses to create the order in which the Office reviews the applications. Id. ¶ 6. The queueing program, or code, randomly sequenced all microbusiness applications regardless of whether they were SEE applications or non-SEE applications. Id. ¶ 7.[3] Said another way, applications for a microbusiness license (or retail dispensary license) did not receive any particular treatment in the review order on the basis that such applications indicated that they were seeking SEE certification. Id. A SEE application and a non-SEE application had equal chances of being selected first (or second, or third, or two hundredth) in the queue.

The November Applications are reviewed in the order they were assigned in the queue until the number of licenses that the Office intends to issue is reached, which is currently anticipated to be 110 licenses for microbusinesses. Id. ¶ 11. As such, the applications are not reviewed until after the randomized ordering has been completed. Id. Because there were more applications for microbusiness licenses than the number of licenses the Office intends to issue for the November Applications, it is possible that not all applications will be reviewed before all licenses are issued. Id.

Although the Office gives different treatment for applicants based on prior cannabis conviction, income and CDI status (as required by Cannabis Law §87(3)) and graduates of CCTM, (Fagon Dec. ¶¶ 49-50), all other microbusiness applications, whether submitted by an applicant

---

[3] Applicants that qualify for "extra priority" under the Cannabis Law—individuals from geographic communities disproportionately impacted by cannabis prohibitions, who have an income lower than 80% of the median income of their county, and who were previously convicted of a marihuana offense under New York law—were given different treatment by having their application appear early in the review queue. Fagon Decl. ¶ 49. Likewise, applicants that graduated from a 10-week CCTM training and mentorship program were also given different treatment. Bryon Decl. ¶ 8. Plaintiff does not challenge the treatment given to these groups, which in any event do not consider the applicant's race or gender as criteria to qualify.

who indicated that they qualify as one or more SEE applicant groups or by an applicant who indicated no qualification underwent the same randomized queuing process as every other applicant and received no additional weight. Id. ¶ 52. Indeed, the queue does not classify applicants based on race and gender, nor does it treat SEE applicants differently from non-SEE applicants. Bryon Dec. at ¶ 12. Except for the extra priority (Cannabis Law § 87(3)) applicants and CCTM applications for microbusiness license, **all** SEE and non-SEE microbusiness applications are randomly disbursed throughout the queue with exactly the same probability of being selected for consideration in the first round of licenses. Id.

Plaintiff's application was part of the November Applications and was submitted as a non-SEE microbusiness application. Id. at ¶ 14. Plaintiff's application position is number 2042 in the November Queue. Id. at ¶ 16. Because the November Queue includes microbusiness applications and retail applications, adjusting the queue to reflect only microbusiness applications results in Plaintiff being in position 373 in the November Queue relative to only other microbusiness applicants. Id.

Of the microbusiness applications ahead of Plaintiff in the review order, 246 are SEE applicants. Id. at ¶ 17. Of those applicants, 127 indicated that they qualify as minority or women-owned businesses ("MWOB") only and no other SEE group. Id. Significantly, even if all such 127 applications were removed, Plaintiff would only advance to position 246. Id. Consequently, it is unlikely that Plaintiff's application would reach the review threshold even if there were no minority- or women-owned businesses in the queue, given that the Office anticipates issuing only 110 licenses for microbusinesses from the November Applications. Id. ¶ 18. Notably, of the first 110 microbusiness positions in the review queue (i.e. those most likely to get the 110 licenses

being made available initially), only 21 of those positions are applications in which the applicant indicated that they qualify as MWOB only and no other SEE group. Id. ⁋ 19.

Immediately after the queue for November Applications became final, the Office began reviewing applications in numerical order from the queue, identifying complete applications that satisfied the criteria for a license, informing applicants of deficiencies in their applications and giving applicants an opportunity to correct those deficiencies, and compiling a list of applications that should be granted licenses.  Fagon Dec. ⁋ 63. On February 16, 2024, the Board issued 26 microbusiness licenses from the November Applications. Id. ⁋ 64. After having recommended such licenses to the Board for approval, the Office's analysis of the composition of the licensees indicated that a little over half of such licensees (60%) were awarded to SEE applicants. Id. Of the 26 microbusiness applications that were issued a license to date, ten were issued to applicants who did not indicate that they qualified as a SEE group applicant, an extra priority applicant or were a graduate of the CCTM program (i.e. are similarly situated to plaintiff). Id. at ⁋ 66. Only one application was issued a license where the applicant indicated that they qualified as a women- or minority- owned business only, and did not indicate that it qualified for any other SEE groups.  Id. That application, however, indicated that the applicant was a graduate of the CCTM program and as such was guaranteed review of its application on the basis of the CCTM program. Id.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter v. NRDC, Inc., 555 U.S. 7, 24 (2008).  Where "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." Id. at 20; see also

Ferrelli v. Unified Ct. Sys., No. 122-cv-0068, 2022 WL 673863, at *4 (N.D.N.Y. Mar. 7, 2022). The standard that governs a request for a temporary order is the same as that governing a request for a preliminary injunction. Id. (citations omitted). On a motion for preliminary injunction, plaintiff bears a burden "no less than that required on a motion for summary judgment" to prove that it satisfies the standard for a preliminary injunction without resting on "mere allegations," but instead setting forth "by affidavit or other evidence specific facts." Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 907 n.8 (1990)).

The Second Circuit has "held the movant to a heightened standard" where, as here, an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it). People ex. Rel. Schneiderman v. Actavis PLLC, 787 F.3d 638, 650 (2d Cir. 2015); see also Bill & Ted's Riviera, Inc. v. Cuomo, 494 F. Supp. 3d 238, 244 (N.D.N.Y. 2020). As this Court has indicated, see Text Order of Feb. 8, 2024, ECF No. 12, this heightened standard applies in the present case. The status quo at the time of the filing of this lawsuit was one in which the Cannabis Law and the Board's regulations were in effect, the November Applications had been randomly ordered in a queue that was made public, and the Office was already reviewing license applications to be recommended to the Board for approval[4]. License applicants, as well as cannabis growers and processors, had already begun acting in reliance on that list and the promise that licenses would be granted imminently. See infra, Point III. Accordingly, "the last actual, peaceable uncontested status which preceded the pending controversy" was one in which the Board's regulations were in effect and the Office was preparing to issue licenses in accordance with the SEE Plan. See Mastrio v. Sebelius, 768 F.3d 116, 120 (2d Cir. 2014) (citation omitted); see also ECF No. 9-2 at 4 (requesting a preliminary injunction to prevent defendants from "continuing to implement or enforce the

---

[4] In fact, the Board has already begun issuing licenses as of February 12, 2024.

regulations and procedures that favor or prefer persons of any particular race/ethnicity or gender in connection with applications for cannabis licenses in New York State" (emphasis added)).

Plaintiff must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. Actavis, 787 F.3d at 650. As discussed below, Plaintiff cannot meet this rigorous standard.

## ARGUMENT

**POINT I:     PLAINTIFF FAILS TO ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD THAT IT IS LIKELY TO SUCCESSED ON THE MERITS OF ITS EQUAL PROTECTION CLAIM**

Plaintiff fails to establish a clear or substantial likelihood of success on the merits. Plaintiff cannot show likelihood of success on the merits, let alone a clear or substantial one, because: (1) Plaintiff lacks standing, and thus the case is unlikely to even proceed to the merits; and (2) the SEE Plan's review lottery process does not violate the Equal Protection Clause.

### A. Plaintiff lacks standing to challenge New York's licensing requirements

Article III, Section 2, Clause 1 of the Constitution limits federal court jurisdiction to "cases" and "controversies."  U.S. Const. art. III, § 2. Standing to sue is "an essential and unchanging part of the case-or-controversy requirement." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  Article III standing consists of three elements.  Lujan, 504 U.S. at 560. First, a plaintiff must have suffered an actual injury to a cognizable interest.  Id.  An injury in fact is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent.  Id.  Second, the plaintiff must show a causal link between the harm and the conduct at issue.  Id.  This means that the injury must be fairly traceable to the challenged action and not the result of the independent action of some third party.  Id.  And third, it must be probable that a

favorable verdict will redress the harm.  Id. A federal court lacks jurisdiction to consider an action in which the plaintiff cannot demonstrate standing.  See SM Kids, LLC v. Google LLC, 963 F.3d 206, 210 (2d Cir. 2020).

"The specificity required to establish standing to seek a preliminary injunction 'will normally be no less than that required on a motion for summary judgment.'" Person v. United States, No. 19 Civ. 154, 2019 WL 258095, at *1 n.2 (S.D.N.Y. Jan. 18, 2019) (quoting Lujan, 497 U.S. at 907 n.8). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561.  "[T]o establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts that establish the three familiar elements of standing: injury in fact, causation, and  redressability." New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42, 58-59 (2d Cir. 2020)(internal quotation marks and citation omitted); see also, Cacchillo, 638 F.3d at 404  (quoting Lujan, 497 U.S at 907 n.8).

Plaintiff lacks standing in at least three ways. First, plaintiff cannot demonstrate, and indeed has not even alleged, that it was injured by any actions actually taken by the Office and the Board as part of the SEE Plan. Second, plaintiff's alleged injuries are not redressable because plaintiff's position in the queue is too low to be considered even if no minority- or women-owned SEE applicants had even applied for microbusiness cannabis licenses. Third, plaintiff only applied for a microbusiness license and only in the November Application window, and it therefore has no standing to enjoin the review and processing of any other type of license in any other window.

1. **Plaintiff lacks standing to challenge the Office's pre-application efforts to encourage SEE applicants because it alleges no cognizable risk of injury resulting from those efforts**

15

Plaintiff has not alleged, much less met its evidentiary burden, that it has suffered an injury traceable to any action actually taken by the Office or Board to prioritize SEE applicants. Plaintiff's complaint and memorandum in support of its motion for a preliminary injunction allege injury because defendants supposedly "gave favor and preference in the queueing process to applicants based on their race and gender." ECF No. 1, ¶ 47; see also id. ¶ 6; ECF No. 9-2, at 8 (alleging that the Office's queue was "'randomized,' but prioritized and weighted" in favor of minority- and women-owned businesses). Plaintiff is incorrect. As discussed at length elsewhere in this memorandum, the Office did not give any extra weight to SEE applicants on the basis of race or gender. The only groups that received extra weight in their position in the queue were two groups totally unrelated to the applicants' race or gender: "extra priority" applicants as defined in Cannabis Law § 87(3), and applicants who completed a ten-week CCMT course. See supra, p. 7-9.

The only actions that were taken to prioritize SEE applicants—a group that includes not only women-owned and minority-owned businesses, but also distressed farmers, service-disabled veterans, and individuals from geographic communities disproportionately impacted by cannabis prohibition—were pre-application measures, including the creation of informational materials to help people apply for licenses, community outreach events, creation of relatively unburdensome applications, creation of the CHIP to give guidance on how to apply, and a reduction of fees for SEE applicants. Fagon Dec. ¶¶ 42-46. Plaintiff does not claim that it was harmed by any of these measures. Indeed, plaintiff benefited from many of these measures, such as low-burden applications, because they did not exclude any applicant. See id. ¶ 43. And plaintiff does not suggest anywhere in its complaint or memorandum that it was injured because the Office held community outreach events or offered application assistance to SEE applicants. Instead, plaintiff

has only alleged injury based on its low position in the queue (essentially a lottery) as a result of alleged favor being given to SEE applicants—an injury wholly unrelated to the Office's creation of information guides or the application form used.

To be sure, plaintiff challenges the 50% reduced application fee (and mentions, although does not specifically request an injunction of, the 50% reduced annual license fee) that apply to SEE applicants and licensees who qualified as SEE applicants. But plaintiff lacks standing to seek prospective injunctive relief, much less the extraordinary remedy of preliminary injunctive relief, to enjoin defendants from reducing either application or license fees. With respect to the application fee, plaintiff has already paid its fee and will not be subject to that fee again, so plaintiff lacks standing to seek prospective relief. ECF No. 1, ¶¶ 49, 71. It is well established that a plaintiff only has standing to seek prospective injunctive relief if it can show "a real and immediate threat" that it will be subjected to the challenged practice again in the future. City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983). Plaintiff has not, and could not, demonstrate a real and immediate threat that it will be forced to pay an application fee again in the future because plaintiff has already applied for a license and paid the application fee. There is no real or immediate risk that plaintiff will have to re-apply for a cannabis license or pay a second license fee. Accordingly, plaintiff lacks standing to enjoin defendants' application fee.[5]

With respect to defendants' practice of reducing the yearly licensing fee of SEE applicants, plaintiff does not have standing to sue because he is not likely to be awarded a license in the near future, and he is therefore not at concrete, imminent risk of being subjected to the alleged harm of

---

[5] This does not mean that plaintiff has no possible redress. Plaintiff has standing to seek retrospective relief. If plaintiff were to succeed in proving that defendants' practice of reducing fees for SEE applicants violated the Equal Protection Clause, this Court could order defendants to refund to plaintiff the difference between its application fee and the application fee paid by minority- and women-owned businesses. But the possibility of a retrospective refund does not confer standing for plaintiff to seek prospective injunctive relief. Notably, plaintiff could have applied for a fee reduction based on financial need if the price of the fee was at issue.

paying higher licensing fees. Plaintiff has not received a microbusiness license. And as discussed further below, plaintiff is unlikely to receive one in the near future. Indeed, based on plaintiff's low number in the queue, it may never receive a microbusiness license. Accordingly, it is unlikely to be subjected to a yearly license fee and cannot assert injury on the basis of that fee. Further, even if plaintiff was granted a license, it could contract with a SEE licensee to receive a reduced yearly fee.

### 2. Plaintiff lacks standing because it would not be considered for a license even absent the existence of minority-owned business and women-owned business applicants for microbusiness licenses

Even if plaintiff could demonstrate (which it cannot) that it has suffered some injury as a result of defendants' actions, plaintiff would still lack standing for injunctive relief, including a preliminary injunction. That is because plaintiff cannot demonstrate that its injury would be redressed by the proposed injunctive relief sought.

Plaintiff's alleged injury is that it will not get a microbusiness cannabis license. See, e.g., ECF No. 9-2 at 2 ("Because of the favor and preference given to Race/Gender Applicants, Valencia will virtually certainly not receive a license in the foreseeable future."); id. at 11 ("Valencia has been effectively excluded from participating in the New York cannabis market."). But plaintiff will not get a microbusiness license even if a preliminary injunction were put in place. Indeed, even if every minority-owned and women-owned business were removed from the queue, plaintiff would still rank too far down in the queue to receive a license in the near future. As defendants' declarations indicate, plaintiff is currently in position 373 in the November Queue among microbusiness license applicants with only 110 licenses expected to be made available. Bryon Dec. ¶¶ 16-18. There are 127 minority-owned or women-owned businesses who applied for microbusiness licenses and were randomly selected to a higher position in the November Queue

than plaintiff. <u>Id.</u> Thus, even if all of these businesses were excluded from the November Queue, plaintiff would only advance to position 246 among the microbusiness license applicants in the November Queue, which is still too low to realistically be awarded one of the first 110 licenses. <u>Id.</u> In other words, plaintiff's alleged injury—the inability to get a microbusiness license in the foreseeable future—is inevitable notwithstanding defendants' alleged treatment of SEE applicants. There are simply more applicants than available licenses, and plaintiff was randomly assigned a position very low in the queue relative even to businesses majority-owned by men that do not qualify as minority-owned businesses. Plaintiff's claims are thus not redressable in this suit, and plaintiff lacks standing.

### 3. Plaintiff lacks standing to seek an injunction except related to microbusiness licenses in the November Queue

Finally, even if plaintiff could demonstrate an injury fairly traceable to defendants' actions that could be redressed by the proposed injunction (which plaintiff cannot), the relief to which plaintiff would be entitled is significantly narrower than what it requests. Plaintiff applied for a microbusiness cannabis license in the November Queue. Accordingly, it will only be considered in the November Queue and can only be awarded a microbusiness license. Bryon Decl. ¶¶ 14-17. At most, then, plaintiff would only have standing to seek injunctive relief for the type of license and application window to which it applied. Indeed, another court in this district recently reached the same conclusion, holding that an applicant for a cannabis license lacked standing to seek an injunction of the Office's consideration of November Applicants because the plaintiff, a December Applicant, could not show a concrete and particularized injury arising from an application pool that did not include the plaintiff. <u>Variscite NY Four, LLC v. New York State Cannabis Control Bd.</u>, No. 23-cv-01599, 2024 WL 406490, at *8-9 (N.D.N.Y. Feb. 2, 2024). The same analysis applies here. Plaintiff has no concrete or particularized injury arising from the Office's processing

of other types of licenses, such as retail dispensary licenses, or the Office's processing of applications from the December Queue because plaintiff did not seek one of these licenses, would not be considered for one of these licenses, and therefore has no claim arising from these licenses.

Similarly, plaintiff is not entitled to preliminary injunction with respect to any other type of license or any other window even if not treated as an issue of purely standing. Plaintiff cannot demonstrate any harm, much less an imminent risk of irreparable harm, from the Board granting licenses that plaintiff did not apply for and could not receive. It is well settled that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." Kane v. De Blasio, 19 F.4th 152, 173 (2d Cir. 2021) (citation omitted). Accordingly, the Second Circuit has found it appropriate to narrow any requested preliminary relief that disrupts New York's cannabis industry to only the specific category of applications to which plaintiff applied. See Order, Variscite NY One, Inc. v. State of New York, No. 22-3128 (2d Cir. Mar. 28, 2023), ECF No. 63 (narrowing scope of preliminary injunction to only geographic region in which plaintiff would be considered for a license).

### B. Plaintiff cannot show a likelihood of succeeding on its Equal Protection Clause claim

Plaintiff contends that defendants have "illegally discriminated against it on the basis Valencia is owned by Caucasian/white persons and male persons," which violates the Equal Protection Clause of the U.S. Constitution. ECF No. 9-2 at 4. As an initial matter, plaintiff's memorandum of law fails to raise a cognizable equal protection argument, asserting in bare conclusory language that the SEE Plan is a racial and/or sex-based classification. Id. at 13. This single line of analysis is insufficient to raise the argument, much less meet plaintiff's burden of demonstrating a clear likelihood of succeeding on the merits. Plaintiff's failure to seriously argue its claim in its motion is itself a sufficient basis to deny the extraordinary relief of a preliminary

injunction. See Nuss v. Sabad, No. 10-cv-0279, 2016 WL 4098606, at *7 (N.D.N.Y. July 28, 2016) ("It is well-settled that arguments raised for the first time in a reply memorandum are waived and need not be considered.") (quoting Gaudette v. Saint-Gobain Performance Plastics Corp., No. 11-cv-932, 2014 WL 1311530, at *22 (N.D.N.Y. Mar. 28, 2014)). In any event, plaintiff is factually wrong. The Board and Office have not discriminated or given any benefit on the basis of race or gender, and thus the Equal Protection Clause is not implicated.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 276–77 (S.D.N.Y. 2019), aff'd, 788 F. App'x 85 (2d Cir. 2019). "Government action can discriminate on the basis of race in various ways. First, a law or policy discriminates on its face if it expressly classifies persons on the basis of race." Id., citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 213 (1995). "Second, a law or policy that is facially neutral discriminates on the basis of race if it is enforced in a discriminatory way." Id., citing Yick Wo v. Hopkins, 118 U.S. 356, 373–74 (1886). "Lastly, a law or policy that is facially neutral discriminates on the basis of race if it is motivated by a discriminatory purpose and its application results in a discriminatory effect." Id., citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264–65 (1977).

Where a court concludes that the government used a racial classification or was motivated by racial discrimination, then the court must review the government action under strict scrutiny. Id., citing Hunt v. Cromartie, 526 U.S. 541, 546 (1999). A gender-based classification will be subjected to intermediate scrutiny. See, Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 308–09, 143 S. Ct. 2141, 2220, 216 L. Ed. 2d 857 (2023); Doe v. Franklin Square Union Free Sch. Dist., 568 F. Supp. 3d 270, 274 (E.D.N.Y. 2021). If the law does

not discriminate on the basis of race or gender, the government action is subject to rational basis review. McAuliffe, 364 F. Supp. 3d at 276–77, citing Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 271–72 (1979). Rational-basis review asks only whether "the challenged classification is rationally related to a legitimate governmental purpose.'" Does 1-2 v. Hochul, 632 F. Supp. 3d 120, *14 (E.D.N.Y. 2022)(citing Maniscalco v. New York City Dep't of Educ., 563 F. Supp. 3d 33, 41 (E.D.N.Y. 2021), aff'd, No. 21-2343, 2021 WL 4814767 (2d Cir. Oct. 15, 2021)). This "rational-basis" review is a "highly deferential" review which presumes that a law is constitutional. Andre-Rodney v. Hochul, No. 121CV1053BKSCFH, 2022 WL 3027094, at *4 (N.D.N.Y. Aug. 1, 2022). "The burden is on the challenger 'to negative every conceivable basis which might support' the law." Id., citing Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973) (citation omitted). Rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993); see also, e.g., Dandridge v. Williams, 397 U.S. 471, 486 (1970). Nor does it authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam).

Here, plaintiff cannot demonstrate a likelihood of success on the merits because defendants' review lottery process—the only action alleged in the complaint to be discriminatory—did not give preference on the basis of race or gender and thus does not implicate the Equal Protection Clause at all. And to the extent defendants took actions to remove barriers to allow applicants from minority-owned and women-owned businesses, plaintiff has not challenged those actions in its complaint or

motion, plaintiff lacks standing to obtain prospective injunctive relief on the basis of those actions, and defendants' actions are constitutional under binding Second Circuit precedent.

> **1. Defendants did not give preference or extra weight to applications from minority-owned or women-owned businesses, and the Equal Protection Clause is not implicated**

The only allegedly discriminatory action plaintiff identifies in its complaint or motion is that defendants provided "favor and preference" to applications on the basis of race and gender, ECF No. 9-2 at 2, specifically by creating a queue of applicants that was "'randomized,' but prioritized and weighted" in a way that put a thumb on the scale in favor of minority-owned and women-owned businesses, id. at 8; see also id. at 8 (asserting that minority-owned and women-owned businesses were "favored, preferred" and "ranked higher on the list and thus will enjoy a 'head start' in being granted a license"). But, as already explained, see supra p. 9-12, plaintiff is simply wrong. The Office treated every application from a SEE applicant—including minority-owned and women-owned businesses, along with businesses owned by distressed farmers, service-disabled veterans, or individuals from communities disproportionately impacted by cannabis prohibition, N.Y. Canbs. § 87(2)—in exactly the same way as it treated applications from non-SEE applicants like plaintiff. Each application, regardless of the race or gender of the business's owner, was entered once in the algorithmic code that would randomly assign the order in which applications would be reviewed in the queue with no extra weight given to applications of minority-owned or women-owned businesses. Fagon Decl. ¶ 52; Bryon Decl. ¶¶ 6-7, 9-10, 12. And all applications, regardless of the race or gender of the business's owners, once reached in the queue, are evaluated using the same criteria which gives no preference on the basis of race or gender.

In other words, defendants' process of assigning applicants a position in the queue and reviewing those applications does not make <u>any</u> preference on the basis of race or gender. The queueing program, or code, randomly sequenced all microbusiness applications <u>regardless</u> of whether they were SEE applications or non-SEE applications. Bryon Dec. ¶ 7. Said another way, applications for microbusiness licenses (or retail dispensary licenses) did not receive <u>any particular treatment</u> in the review order on the basis that such applications indicated that they were seeking SEE certification based on the race or gender of the business's owners. <u>Id</u>. Thus each applicant, regardless of the race and gender of its owners, had the exact same chance of being ranked high enough to be reviewed to receive one of the limited number of licenses and has the same chance of qualifying for a license during the review process. As a result, the Equal Protection Clause simply is not implicated and no further analysis is required. <u>See</u> <u>McAuliffe Intermediate Sch.</u>, 364 F. Supp. 3d at 276–77 (Equal Protection Clause is implicated by government discrimination).

Accordingly, plaintiff's citations to cases like <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard College</u>, 600 U.S. 181 (2023), and <u>Regents of the University of California v. Bakke</u>, 438 U.S. 265 (1978) are misplaced. <u>See</u> ECF No. 1, ¶¶ 58-59 (citing cases). These cases involved university application systems that explicitly weighed certain applications more favorably on the basis of the applicants' race. <u>See</u> <u>Students for Fair Admissions</u>, 600 U.S. at 192-95 (describing Harvard admission process); <u>Bakke</u>, 438 U.S. at 274-75 (describing University of California medical school admission process). In both cases, it was critical to the Court's decision that the challenged admissions program gave applications different weight on the basis of race. <u>See Students for Fair Admissions</u>, 600 U.S. at 208 ("These cases involve whether a university may make admissions decisions that turn on an applicant's race."). As explained above, that is not how the Office's implementation of the SEE Plan operates. No decisions about how to

order cannabis license applications for review or whether to approve cannabis license applications take into account the applicant's race or gender. These cases are thus inapt.

The early data from the Office's license grants demonstrate that race and gender have not played a role in the Office's decisions. Indeed, the resulting order of distribution of licenses confirms the lack of preference. Of the first 26 microbusiness licenses processed and awarded from the November Queue, only one business was a minority-owned or women-owned business that did not also qualify for another SEE category (such as its owners also residing in a community disproportionately impacted by cannabis prohibition). Fagon Dec. ¶ 66. And that business was entitled to extra priority for a race- and gender-neutral reason—because its owner attended a CCTM training and mentorship program. Id. At the same time, ten of those 26 licenses (38% of licenses) were awarded to applicants similarly situated to plaintiff—i.e., applicants that did not fall into any of the SEE applicant categories and were not entitled to extra priority under Cannabis Law § 87(3) or for completing a CCTM. Id. Indeed, of the first 110 microbusiness positions in the November Queue, only 21 applications are from businesses that are minority-owned or women-owned businesses and do not also fall into another SEE applicant category. Bryon Dec. ¶ 19. Considering that 224 out of 401 (55.9%) of microbusiness applications are from minority-owned or women-owned businesses, the proportion of businesses most likely to receive a license that can only claim SEE applicant-status on the basis of race or gender (21 out of 110, or 19.1%) provides no indication that applicants enjoyed special privilege in the queue order based on race or gender.[6]

---

[6] To be sure, the overall number of applicants in the top 110 queue positions owned by women and minorities is greater than 21. However, the other businesses in these top positions that are owned by women or minorities were also SEE applicants on at least one additional, gender- and race-neutral basis, such as the business owner qualifying as a service-disabled veteran, a distressed farmer, or a resident of a community disproportionately impacted by cannabis prohibition. See Bryon Decl. ¶ 13.

It is true that some license applicants were given extra priority that may have led them to receive a higher position in the queue, but this priority was given on exclusively race-neutral and gender-neutral grounds, and none of those priority categories are challenged in plaintiff's complaint or motion. Applicants for a microbusiness who receive "extra priority" under Cannabis Law § 87(3) were weighted in a manner in the queue that would ensure their position was early in the queue. Bryon Decl. ¶ 8. This "extra priority" was given to individuals residing in a community disproportionately impacted by cannabis prohibition, who make 80% or less of the median income in their county, who previously were arrested for a marihuana-related offense. N.Y. Canbs. § 87(3); Fagon Decl. ¶¶ 8, 32, 49.[7] Applicants also received different treatment if they completed the ten-week CCTM course aimed at encouraging cultivators, farmers, and food and beverage processors to enter the cannabis industry. Fagon Decl. ¶¶ 50-52. Once again, participation in the CCTM program does not depend on the race or gender of the participant, and the act of awarding different treatment to these applicants is race- and gender-neutral. Plaintiff does not allege anywhere in its complaint or memorandum in support of a preliminary injunction that either of these categories violates the Equal Protection Clause. In any event, both categories would be reviewed only under the deferential rational-basis standard. Both programs are rationally related

---

[7] The only evidence plaintiff points to in support of its argument that SEE applicants were given higher positions in the queue than non-SEE applicants is, in fact, expressly describing individuals who qualify for "extra priority." See, ECF No. 1-6 ("Applicants that qualified for SEE AND extra priority appear 3 times in this list, so OCM implemented 'extra priority' by giving folks more bites at the apple."); see also ECF No. 1, ¶ 47 (misconstruing the language in Exhibit F to assert that all SEE applicants were given three positions in the queue). By definition, all applicants entitled to "extra priority" under Cannabis Law § 87(3) are also SEE applicants because anyone residing in a community disproportionately impacted by cannabis prohibition can apply as a SEE applicant. In other words, anyone receiving "extra priority" is a SEE applicant because of their residence, not because of their race or gender. Further, extra priority applicants for a *retail* license were included three times in the queue. Extra priority applicants for microbusiness licenses were included in a way that guaranteed their review. Consequently, the treatment for extra priority applicants depends on whether they applied for a retail or for a microbusiness license.

to goals of the State, as described in defendants' declarations. <u>See, e.g.</u>, Fagon Decl. ¶¶ 32-40, 49-52.

Plaintiff asserts that defendants have set a quota of minority-owned and women-owned businesses, and that this quota violates the Equal Protection Clause. ECF No. 9-2 at 1, 5; ECF No. 1, ¶¶ 17, 20, 58. But no such quota exists. Fagon Dec. ⁋ 48. Rather, as explained above, the Legislature set a non-mandatory goal of assigning 50% of licenses to SEE applicants as a group. Canbs. Law § 87(2). Because this goal is purely aspirational, the Office and Board are not required to assign 50% of licenses to SEE applicants and have set no rigid requirements to do so. Moreover, because the legislative goal only refers to SEE applicants as a group, it does not require that any percentage be given based on applicants' race or gender. In other words, if the Office awarded 50% of available licenses to service-disabled veterans, the legislative goal would be satisfied no matter the race or gender of the licensees because service-disabled veterans are themselves SEE applicants. Put simply, no racial or gender quota exists. Nor have defendants taken any action to enforce such a supposed impermissible quota.

### 2. Plaintiff has not demonstrated that defendants' acts to reduce barriers to SEE applicants applying for cannabis licenses violates the Equal Protection Clause.

Plaintiff has not challenged the constitutionality of any of defendants' actual steps to fulfill the SEE Plan's goal, which sought to identify and remove obstacles that would disproportionately discourage potential SEE applicants from applying for cannabis licenses. The only one of these steps even mentioned in plaintiff's complaint or motion for a preliminary injunction is the reduced application fee that SEE applicants paid. But as already explained, that claim does not support a preliminary injunction against defendants' processing and awarding of licenses (which are unrelated to the fee paid), nor does plaintiff have standing to seek a prospective injunction against defendants charging reduced application fees (because plaintiff will never again be subject to that

fee). <u>See supra</u> p. 17. Accordingly, plaintiff's allegations with respect to filing fees is not discussed further in this memorandum and will be answered on the merits by defendants at the appropriate stage of litigation.

As to all of defendants' other methods of prioritizing SEE applicants—including production of informational resources, community outreach, creation of low-burden application requirements, and provision of technical assistance with applications—plaintiff has not argued that a single one of these actions caused him a cognizable injury, has any prospective impact on consideration of his application that would warrant prospective preliminary injunctive relief, or violates the Equal Protection Clause. Accordingly, the Court need not consider the constitutional implications of these actions further before deciding plaintiff's current motion. And, in any event, these actions are all consistent with the Equal Protection Clause under existing binding precedent.

The Second Circuit has held that taking steps to diminish obstacles that would disproportionately impede minorities from applying for government positions does not constitute an impermissible "racial classification" under the Equal Protection Clause and thus are not subject to strict scrutiny. <u>Hayden v. County of Nassau</u>, 180 F.3d 42, 48-49 (2d Cir. 1999). There, the court considered a police entrance exam that was formulated "to diminish the adverse impact on black applicants." <u>Id.</u> at 48. The Second Circuit concluded that impermissible racial classifications occur when a group is given preferential treatment in the distribution of benefits on the basis of a suspect characteristic such as race, or when a government employs tools "which utilize express racial classifications and which prevent non-minorities from competing for specific slots or contracts" on equal footing. <u>Id.</u> at 49 (citation omitted). Unsurprisingly, district courts in this Circuit have consistently held that recruiting and outreach efforts do not constitute racial discrimination, and thus are not subject to strict scrutiny, if they "'serve to broaden a pool of qualified applicants and

to encourage equal opportunity,' but do not confer a benefit or impose a burden" on any particular group in the selection process. Weser v. Glen, 190 F. Supp. 2d 384, 399 (E.D.N.Y. 2002) (quoting Honadle v. Univ. of Vermont, 56 F. Supp. 2d 419, 427-28 (D. Vt. 1999)); see also Honadle, 56 F. Supp. 2d at 427-28.

All of defendants' efforts constitute exactly this type of inclusive effort to encourage and enable New Yorkers to apply for cannabis licenses. These efforts did not give minority- or women-owned businesses any preference in receiving a license that other businesses did not receive. Indeed, all applicants enjoyed the benefit of several of the Office's actions, including the Office's design of an accessible platform for applicants to use and not requiring such burdensome supporting financial documentation that applicants would be required to hire and pay consultants. Fagon Dec. ¶¶ 42-43. The Office's other actions, including creation of informational materials, community outreach, and providing individuals who could answer questions about the SEE application process likewise do not implicate the actual process of ordering and reviewing license applications, and thus do not give any preference to applicants of certain races or genders.

The Office's actions, none of which have been challenged by plaintiff expressly, would in any event satisfy rational-basis review because they are rationally related to plausible government interests, such as ensuring that all New Yorkers are afforded an opportunity to apply to join a nascent industry, to eliminate the disproportionate effect that cannabis prohibition has had on minority communities (see N.Y. Canbs. § 2), and to potentially rectify the already-emerging gender disparity in the nascent cannabis industry (see Women in Cannabis: Jenny Argie, Syracuse.com (Feb. 29, 2024), https://www.syracuse.com/marijuana/2024/02/women-in-cannabis-jenny-argie.html); see also Fagon Decl. ¶¶ 32-40, 49-52 (collecting evidence about racial and gender disparities that the State sought to eliminate in the cannabis industry). The SEE Plan

was enacted to comply with the directions of the New York State Legislature pursuant to Cannabis Law, aimed at remedying specific, well documented discriminatory practices and leveling the playing field for not only women and minority owned businesses, but distressed farmers and disabled veterans. See, Cowan Dec. Ex. A, Assembly Debate March 2021 at p. 7. The legislature acknowledged that these communities have been the most impacted by cannabis prohibition. Id. at p. 127. One assemblywoman described it: "For decades, young black and brown men and women from Bedford-Stuyvesant and Crown Heights were pushed to a system and handed long and unjust sentences in Upstate jails.  Due to this historic disenfranchisement, many of my neighbors relied on marihuana to market -- the marihuana market to feed their families and to earn a living, as poverty has often driven people who were left out of the system into underground markets.  With this bill, we, the New York State Legislature, seeks to correct this historic injustice." Id. at p. 151-52; see also Fagon Dec. ¶¶ 36-40 (recognizing racialized impacts of cannabis prohibition and difficulties for minority- and women-owned businesses).

In sum, plaintiff has not demonstrated that it has a clear likelihood of succeeding on the merits of its equal protection claim required to enter a mandatory preliminary injunction. Indeed, plaintiff's claim plainly fails.

**POINT II:    PLAINTIFF FAILS TO SHOW IT WILL SUFFER IRREPARABLE HARM ABSENT THE DRASTIC RELIEF IT SEEKS**

Plaintiff has not established that it will suffer irreparable harm in the absence of injunctive relief, which is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam) (alteration in original) (quoting Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983)).  To meet its burden, plaintiff "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual

and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). A plaintiff suffers irreparable harm when its injury cannot be adequately compensated by a monetary award. Connecticut State Police Union v. Rovella, 494 F. Supp. 3d 210, 219 (D. Conn. 2020), aff'd, 36 F.4th 54 (2d Cir. 2022) (citing Wisdom Imp. Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 113–14 (2d Cir. 2003).

First, plaintiff's unexplained delay in filing its motion until defendants had already begun reviewing and processing applications for licenses defeats any showing of irreparable harm at the outset. The MRTA, which contained the requirements for a SEE Plan and prioritization of SEE applicants, was enacted in 2021 with immediate effect. See McKinney's 2021 Session Law News of N.Y., Ch. 92; see also N.Y. Canbs. § 87(1)-(3).  The Adult Use Regulations plaintiff challenges were announced to the public in November 2022 as proposed regulations, were revised in May 2023, and were adopted on September 27, 2023. See Fagon Dec., ¶¶ 15-17. Plaintiff alleges that it filed its application with the Office on October 12, 2023. Yet plaintiff waited until January 24, 2024 to file its complaint—almost one and a half years since the regulations were proposed, four months after the regulations were adopted, and three months after plaintiff applied for a license— and even longer—until February 7, 2024—to file its motion for a preliminary injunction. See ECF Nos. 1, 9. Plaintiff's unexplained delay alone is a sufficient basis to deny their motion. See Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005) (unexplained "delays of as little as ten weeks" defeat showing of irreparable harm); Wandering Dago Inc. v. New York State Off. of Gen. Servs., 2013 WL 12131305, at *9 (N.D.N.Y. 2013) (denying injunction where "Plaintiff waited over three (3) months to file this action and seek injunctive relief"). This delay demonstrates that the alleged irreparable harm is not "actual and imminent" but simply "remote

and speculative." <u>Faiveley</u>, 559 F.3d at 118; <u>see also</u> <u>Oakland Trib., Inc. v. Chron. Pub.  Co.,  Inc.</u>, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

Another court in this district recently denied a preliminary injunction under similar circumstances. In <u>Variscite NY Four</u>, as here, plaintiffs delayed bringing their action challenging the constitutionality of New York's Adult-Use Cannabis Retail Dispensary selection criteria until more than four months had elapsed since defendants announced the program and published guidance. The Court held that even though plaintiffs offered some justification for their delay, a "delay in bringing the action implies a lack of urgency, and thus, a lack of irreparable harm." <u>Variscite NY Four</u>, 2024 WL 406490, at *14 (citing <u>Peridot Tree WA Inc. v. Washington State Liquor & Cannabis Control Bd.</u>, No. 3:23-CV-06111-TMC, 2024 WL 69733, *10 (W.D. Wash. Jan. 5, 2024); <u>see also</u> <u>Citibank, N.A. v. Citytrust</u>, 756 F.2d 273, 276 (2d Cir. 1985)(a delay in seeking a preliminary injunction "tends to indicate at least a reduced need" for a preliminary injunction). The same conclusion is appropriate here: plaintiff did not consider the purported unconstitutionality of the SEE Program urgent when the statute was enacted, when the regulations further outlining it were announced and subsequently passed, or even when plaintiff was filing a license application. Plaintiff cannot now ask this Court to urgently shut down the entire nascent cannabis industry of New York on an emergency basis because plaintiff declined to bring suit in a timely manner and waited until applications were already being processed and licenses awarded.

Second, although plaintiff contends that it will be irreparably harmed absent the requested injunction "because the challenged laws and regulations infringe on its constitutional rights, which automatically qualifies as irreparable harm," (ECF No. 9-2 at 13), a "mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm," without

a showing by plaintiff that there is a likelihood of success on the merits of its constitutional claim. Variscite NY Four, 2024 WL 406490, at *13 (quoting Conn. State Police Union, 494 F. Supp. 3d at 220, aff'd, 36 F.4th 54 (2d Cir. 2022)). Because plaintiff is unlikely to succeed on the merits of its Equal Protection Clause claim, see supra Point I, plaintiff has not demonstrated irreparable harm on this basis. See Peridot Tree WA Inc., 2024 WL 69733, at *10 (finding that because plaintiff was "unlikely to prevail on the merits of its dormant Commerce Clause claim, or at best has raised serious questions based on conflicting decisions outside [the Ninth Circuit] . . . there [was] a possibility, but not a likelihood, of irreparable harm from the alleged constitutional violation.").

Third, plaintiff contends that it has been "effectively excluded from participating in the New York cannabis market." ECF No. 9-2 at 13. However, plaintiff cannot show that with the requested injunction, it would obtain a license. As discussed above, supra at p. 9-12, plaintiff's low position in the queue for reviewing license applications is due solely to the randomized list that was created, which weighted plaintiff and SEE applicants (including women-owned and minority-owned businesses) equally with an equal chance of being selected for a top spot. What's more, even if every minority-owned or women-owned business that applied for a microbusiness license in the same application window as plaintiff were removed from the queue—relief far broader than anything plaintiff has requested or could reasonably request from this Court—plaintiff would still be too low on the queue to receive a license in the foreseeable future, ranking 246 for only 110 licenses originally made available. Bryon Dec. ¶ 17. In other words, plaintiff's allegedly imminent, irreparable harm cannot be rectified through the preliminary injunction requested, and granting such relief would be improper. See Variscite NY Four, 2024 WL 406490, at *14 (concluding

plaintiffs had failed to demonstrate irreparable harm where it was speculative whether plaintiffs would ever qualify for a license even if a preliminary injunction were entered).

Likewise, plaintiff's argument that it will be denied "advantages to early entrants in the [cannabis] market" without a preliminary injunction, ECF No. 9-2 at 11, is unavailing. Plaintiff cannot demonstrate any likelihood that it will be an "early entrant" to the market even if a preliminary injunction were in place. To the contrary, plaintiff would still be too low in the queue to qualify for an available microbusiness license from the November Queue. Moreover, any advantage to early cannabis businesses is already gone because 463 cannabis dispensaries have already received provisional licenses under a separate licensing program, and more than 70 of those cannabis dispensaries have already opened around the State. In Variscite NY Four, the court concluded that the existence of approximately 70 licensed dispensaries undermined plaintiffs' alleged harm from a delay in entering New York's cannabis market and held that plaintiffs had failed to establish a risk of irreparable injury. 2024 WL 406490, at *14. The same reasoning applies here.

Lastly, plaintiff's alleged injuries arising from its payment of rent, insurance premiums, and utilities on a space it rented, see ECF No. 9-2 at 12, are not attributable to any action of the Board or the Office, but rather to plaintiff's own extreme risk-taking, which is not a basis for a preliminary injunction. Plaintiff chose to sign a business lease despite having no guarantee that it would qualify for a cannabis license or be selected to receive a license in the near future or, indeed, ever. Contrary to plaintiff's assertions, see ECF No. 9-2 at 12, neither the Board nor the Office did anything to induce or encourage plaintiff to take such costly, speculative action. Defendants did not suggest that operationally-ready businesses would be given "priority" or "higher ranking" than other applicants. Compare Fagon Dec. ¶¶ 54-58 (explaining that defendants did not encourage businesses

to contract for leases or suggest operationally-ready businesses be guaranteed licenses); with ECF No. 9-2 at 12 (asserting without evidence that defendants encouraged businesses to enter leases). Rather, operationally-ready businesses were considered in a separate pool on only a slightly earlier timeframe than businesses that were not operationally ready. Fagon Dec. ⁋ 55. The Office cautioned in its guidance documents that it expected there to be more applicants than available licenses, id. ⁋⁋ 56-57, which would discourage reasonable business owners from making extreme financial decisions in reliance on receiving a license. Indeed, several November Applicants avoided this exact scenario by signing conditional leases that would only go into effect and require rental payment if the applicant received a high enough position in the November Queue to be awarded an initial license. See Declaration of John Kagia ("Kagia Dec."), ¶ 7; Fagon Dec. ⁋⁋ 58, 60. Some of these November Applicants called the Office to inquire whether such conditional leases would qualify the applicant as an operationally-ready business and were told that they would. Fagon Dec. ⁋ 60. The Office encourages applicants and licensees to contact it with questions and provides guidance on such issues. The Office's guidance documents provide contact information and explicitly offer guidance on any such questions. Id. ⁋ 59. In short, plaintiff's decision to immediately sign a lease based on the speculative chance that it would receive a microbusiness license was not a reasonable decision or fairly attributable to the actions of defendants and therefore does not support imposition of a preliminary injunction. And, in any event, because plaintiff will not receive a license even if a preliminary or permanent injunction were entered, see supra, the financial burden plaintiff faces in the form of rent, insurance, and utilities will not be ameliorated by injunctive relief.

Plaintiff thus faces no credible threat of imminent, irreparable injury that can be solved by the requested preliminary injunction.

**POINT III.    THE EQUITIES BALANCE IN FAVOR OF THE DEFENDANTS, AND ISSUANCE OF AN INJUNCTION IS NOT IN THE PUBLIC INTEREST**

The final preliminary injunction factor asks whether the "balance of equities tips in favor of granting the injunction and whether that injunction is in the public interest." Variscite, 2024 WL 406490, at *15 (citing Dep't of Homeland Sec., 969 F.3d at 86); see also Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (considering the final two preliminary injunction factors together when the government is a party). "In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24, 129 S.Ct. 365 (citation omitted). It is well-established that a "preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant."   Litwin v. OceanFreight, Inc., 865 F. Supp. 2d 385, 401–02 (S.D.N.Y. 2011) (citation omitted). Here, the balance of the equites weighs in favor of the defendants and a preliminary injunction that prevents defendants from continuing to process and award licenses according to the established and announced queue is not in the public interest. Such an injunction will cause widespread and significant harm to New York's emerging retail cannabis industry.

First, a preliminary injunction would harm other license applicants, particularly those that have acted in reliance on their position in the November Queue that the Office has already announced. The Office received nearly 6,900 license applications during the adult use application window which ran from October 4 to December 18, 2023. Kagia Dec., ⁋ 6. Nearly 1,900 retail and microbusiness applicants in the November Queue who applied for final licenses are paying rent or mortgages (or retaining fees for leases conditioned on the award of a license). Id. A delay in processing applications will harm these businesses by subjecting them to continued rent payments while being unable to offset these losses with retail income. Id. ¶¶ 6-8. And, unlike plaintiff, many

of these individuals had a reasonable basis for entering into such leases. Some individuals signed leases because they previously received a provisional CAURD license, and they are now seeking to instead receive a permanent adult-use retail license. Others signed conditional licenses with the conditional period for three to six months, which means their conditional leases will expire at the end of the first quarter of 2024 going into the beginning of the second quarter of 2024. Id. These applicants will either need to execute final leases or give up the locations after the conditional period ends. And for applicants who signed final leases but who do not yet know whether their locations meet the requirements for licensure, a timely determination from the Office on the suitability of their location is critical to minimize their carrying costs on locations that may not work. Id. An injunction precluding the processing and awarding of licensees would keep this group of applicants in limbo as they wait to hear if they can move forward with preparing the location for cannabis operations, or if they will need to cancel their leases or find a different use for the property. Id. Without a timely determination on the suitability of their locations, these applicants will incur significant costs on locations that may not ultimately work, draining valuable resources and negatively impacting their future ability to operationalize.  Id. ¶ 8.

For applicants who received early positions in the queue, many will have begun acting in anticipation of receiving a license imminently, including hiring employees whose payroll must be paid regularly regardless of whether the store is open (or the business will lose those employees), securing insurance on their proposed storefronts, and entering into purchase agreements with proposed vendors. These recurrent costs, without the offset of regular retail income, threaten the financial solvency of these applicants who are otherwise entitled to imminently receive their licenses. Indeed, as recipients of other categories of licenses reported to courts in connection with

preliminary injunctions imposed in other litigation, such injunctions left many individuals on the brink of financial collapse and facing bankruptcy. See, e.g., Cowan Dec., Exs. B, C, and D.[8]

Second, an injunction that prevents the Office from issuing retail licenses to the ready November Applicants will have cascading implications across the supply chain. Kagia Dec. ¶¶ 10-16. In a market poised for $1 billion to $2 billion in legal retail sales in 2024, the state's cannabis suppliers are sitting on hundreds of millions of dollars of product ready to ship to the retailers and microbusinesses that are expected to come online beginning in early 2024. The carrying costs of that inventory, and the impact on growers who live off the once-a-year post-harvest sale of their product would prove a devastating financial blow to many of the state's suppliers. Id. ¶ 14; Cowan Dec., Ex. E.[9]

Third, any delays to producers' ability to sell the product can also impact product quality and value. Kagia Dec. ¶¶ 17-19. An injunction would not just impact the ability for the growers to monetize their harvest, it will also lower the earnings because their products will be less valuable over time. Id. at ¶ 18. Furthermore, the lack of capital will make it harder for these producers to invest in the 2024 growing season, the planning for which begins in the first quarter of the year, potentially impacting product availability in late 2024 going into 2025. Id.

Fourth, the legal cannabis industry presents a bright opportunity to rescue a New York commercial real estate market that was significantly damaged by the COVID-19 pandemic. Id. ¶ 20. Any injunction that would keep these businesses from being able to operationalize would introduce uncertainty to anticipated real estate agreements by making it more difficult for

---

[8] "A court may take judicial notice of a document filed in another court not for the truth of matters asserted in other litigation, but rather to establish the fact of such litigation and related filings." DeGroat v. Buck, No. 3:22-CV-507 (LEK/ML), 2023 WL 4763806, at *4 (N.D.N.Y. July 26, 2023)(citing Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006)).
[9] Judicial notice may be taken of matters of public record. See Giraldo, 694 F.3d at 164.

prospective operators to pay the rent on properties that are not operational. Id. ¶¶ 21-22. The expansion of the legal cannabis market was poised to be a bright spot in a commercial real estate sector facing acute headwinds. Id. ¶ 22. However, an injunction will create uncertainty and risk for lessors, and may fuel hesitance to lease to the cannabis industry, thereby making it more challenging for prospective licensees to secure qualifying retail properties moving forward. Id.

Fifth, an injunction against microbusinesses would negatively impact the state's commitment to addressing the illicit market that has been growing since the passage of the MRTA and would negatively impact enforcement efforts, as microbusinesses are anticipated to be key drivers of innovation in New York's legal market. Id. ¶¶ 23-29. Any injunction which delays the retail rollout would undermine the state's urgent public health priority of combatting the storefront-based illicit market. Id. ¶ 29.

Sixth, an injunction would cause harm to the State (and municipalities) in the form of uncollected tax revenue. Id. ¶¶ 30-31. Indeed, the slowdown in legal sales of cannabis is depriving the State and localities of anticipated tax revenue from sales of legal and tested cannabis, which is intended to be used for expenditures related to education, public health initiatives, and enforcement against unlicensed activities. Id. ¶ 30.

In sum, issuance of the requested injunction will cause significant and lasting damage to the adult use cannabis industry.  Such harm vastly outweighs any marginal benefit to Plaintiff from potentially receiving a nominally increased chance of having its particular application reviewed. The equities, and the public interest, require denial of Plaintiff's motion.

Notably, in Variscite NY Four, supra, the Court acknowledged that other Courts have found that the balance of equities tips in favor of a defendant when a plaintiff seeks an injunction after applicants and third parties have invested significant resources in a cannabis business.

<u>Variscite NY Four</u>, 2024 WL 406490, at *15 (citing <u>Finch v. Treto</u>, 82 F.4th 572, 579 (7th Cir. 2023)(affirming the district court's finding that the balance of equities tipped in defendants' favor in part because the harm of enjoining issuing licenses and "restarting the process—through a corrective lottery or otherwise" was "vastly outweighed by the severe harm to the reliance interests of the license holders"); <u>Peridot Tree WA Inc.</u>, 2024 WL 69733, at *11 (finding that plaintiff's "requested injunction would harm successful Social Equity Program applicants who have secured storefronts, purchased equipment, or incurred other costs"); <u>City of Los Angeles</u>, 2022 WL 18397510, at *12 (finding that the balance of equities tipped "sharply" in favor of defendants when plaintiff sought to enjoin a lottery because it would harm the 508 registered social equity applicants that "invested significant resources into getting their cannabis businesses running as soon as possible")). This Court should likewise conclude that the balance of equities and the public interest tip decidedly in defendants' favor. At the very least, plaintiff has failed to carry its burden of demonstrating that this preliminary-injunction factor tips in <u>its</u> favor as it must to receive such extraordinary relief.

## **CONCLUSION**

Defendants respectfully request that the Court deny plaintiff's motion for a preliminary injunction, and grant such other and further relief as it deems just and equitable.

Dated: Syracuse, New York  
      March 5, 2024

LETITIA JAMES  
Attorney General of the State of New York  
*Attorney for Defendants*  
300 S. State Street, Ste. 300  
Syracuse, New York 13202  
By: ____/s_____  
Aimee Cowan  
Assistant Attorney General, of Counsel  
Bar Roll No. 516178  
Telephone: (315) 448-4800  
Fax: (315) 448-4853  
Email: aimee.cowan@ag.ny.gov

40

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 5, 2024, she filed Defendants' Opposition to Plaintiff's motion for a preliminary injunction by electronically filing with the Clerk of the Court herein, using the CM/ECF system, which is understood to have sent notification of such filing electronically to the following:

Robert E. Purcell, Esq.
The Law Office of Robert E. Purcell, PLLC
211 West Jefferson Street, Suite 24
Syracuse, New York 13202

David J. Hoffa, Esq.
Pacific Legal Foundation
3241 E. Shea Blvd. - Suite 108
Phoenix, AZ 85028

Joshua P. Thompson, Esq.
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814


Dated:          Syracuse, New York
                March 5, 2024

                                  LETITIA JAMES
                                  Attorney General of the State of New York
                                  Attorney for Defendants
                                  300 S. State Street, Suite 300
                                  Syracuse, New York 13202
                                  By: _____/s_____
                                  Aimee Cowan, Esq.
                                  Assistant Attorney General
                                  Bar Roll No. 516178
                                  Telephone:     (315) 448-4800
                                  Fax: (315) 448-4853
                                  Email: aimee.cowan@ag.ny.gov