UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

VALENCIA AG, LLC

                                          Plaintiff,       Docket No. 24-00116

v.                                               **DECLARATION OF CHIEF EQUITY OFFICER IN OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION**

NEW YORK STATE CANNABIS CONTROL BOARD; NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT; TREMAINE WRIGHT; CHRIS ALEXANDER; ADAM PERRY; JESSICA GARCIA; JENNIFER JENKINS; HOPE KNIGHT; AND DAMIAN FAGON,

                                          Defendants.

Damian Fagon, on the date noted below and pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under the penalty of perjury under the laws of the United States of America:

1.    I am currently employed by the New York State ("NYS") Office of Cannabis Management ("Office") and my position is Chief Equity Officer. In this position, my duties and responsibilities include, but are not limited to, developing and implementing the social and economic equity plan ("SEE Plan") required to be established by the Cannabis Law.

2.    My statements herein are based on my personal knowledge, deriving from my position as Chief Equity Officer at the New York State Office of Cannabis Management, and relevant materials consisting of the exhibits and authorities cited herein.

3.    I submit this Declaration in support of the Defendants' opposition to Plaintiff's request for a Preliminary Injunction.

Cannabis Law and Regulations for Social and Economic Equity

4. The Cannabis Law requires "the board, in consultation with the chief equity officer and executive director, and after receiving public input," to create the SEE Plan. Cannabis Law § 87(1).

5. As discussed more fully below, the Cannabis Law provides the framework and the goals for the SEE Plan, but leaves the creation of the specifications, operation, and implementation of the SEE Plan to the Office and Board. Cannabis Law § 87.

6. In this context of the SEE Plan, the Office and Board are required to "actively promote" certain applicants by, among other things:

> prioritizing consideration of applications by applicants who are from communities disproportionately impacted by the enforcement cannabis prohibition or who qualify as a minority or women-owned business, distressed farmers, or service-disabled veterans.

Cannabis Law § 87(1).

7. These five groups of applicants are referred to in the Cannabis Law as social and economic equity applicants ("SEE applicants"). Cannabis Law § 87(1)-(2).

8. In addition, the SEE Plan must give extra priority to a SEE applicant if it:

   a. is a member of a community disproportionately impacted by the enforcement of cannabis prohibition;
   b. has an income lower than eighty percent of the median income of the county in which the applicant resides; and
   c. was convicted of a marihuana-related offense prior to the effective date of this chapter, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of this chapter, was convicted of a marihuana-related offense.

Cannabis Law § 87(3).

9. The Cannabis Law leaves it to the Board to create regulations regarding the qualifications for each SEE applicant group. Cannabis Law § 87(1). The Board adopted Part 121 of the Adult-Use Regulations which lays out the qualifications for applicants to demonstrate they

are part of one of more of the SEE applicant groups, and also those eligible for extra priority as set forth in Cannabis Law § 87(3). *See* 9 NYCRR § 121.1(d)-(k).

10. Neither the Cannabis Law nor the Adult-Use Regulations state that applicants who qualify as SEE applicants on the basis that they are from communities disproportionately impacted by the enforcement of cannabis prohibited ("CDI"); minority or women-owned businesses; distressed farmers; service-disabled veterans; or that they qualify as receiving extra priority under Cannabis Law section 87(3) on the basis they are from a CDI, have certain income and had a prior conviction for marijuana (or had a relative that had such a conviction), may not include Caucasian individuals or male individuals.

11. The Cannabis Law also leaves to the Board to create regulations for the selection of applications that should receive a license based on an applicant being a social and economic equity applicant. Cannabis Law § 64(a).

12. Part 120 of the Adult-Use Regulations provides broad discretion to the Office and the Board with respect to how applications will be reviewed and selected for licenses (which include SEE applications and licenses):

| | |
|---|---|
| § 120.7(a)(1) | An applicant shall provide information in a form and manner as prescribed by the Board |
| § 120.7(b) | An applicant… shall be reviewed and evaluated in an order and manner determined by the Board, based on provisional, social and economic equity status or any additional criteria to be set by the Board |
| §120.7(c) | The Board may approve licenses using mechanisms, including, but not limited to, scoring, compliance-based evaluation, qualified lottery, randomized ordering, or any combination thereof |
| 120.7(c)(2) | The Board may prioritize application submission, review, selection and issuance by region, license type, provisional status, social and economic equity status, or any other criteria the Board may determine |

3

    120.7(c)(3)    Application submission, review, selection, and issuance may be prioritized by groupings…such as:

        (i) A group consisting only of …applicants [that] are eligible for extra priority
        \*\*\*
        (v) A group consisting of all other applications

    120.7(c)(4)    Applications may be considered in multiple groups

13. Further, the Cannabis Law requires the board to "waive or reduce fees" for SEE applicants (Cannabis Law § 63(3)), and provides that fees for SEE applicants "be assessed to accomplish the goals of this chapter" (Cannabis Law § 15(3)). Consistent therewith, the Adult-Use Regulations allow applicants to pay a reduced fee by 50% if the applicant qualifies as SEE group applicant, a reduced fee if the applicant demonstrates need for financial assistance, and a reduced fee by 40% if the applicant contracts with another licensee who is a SEE applicant. 9 NYCRR § 120.4(c).

14. Last, the Cannabis Law requires the Board to collect demographic data on cannabis business owners and to publish the data in its annual report. Cannabis Law § 88.

15. The Adult-Use Regulations were published for public comment in November 2022, which included the above outlined regulations detailing how applications may be reviewed and licenses issued, and also, how to describe, identify and certify the five SEE categories and the section 87(3) Extra Priority applicants. *See* proposed AU Regulations, attached hereto as **Exhibit A**[1] at Part 120 and 121.

---

[1] https://cannabis.ny.gov/system/files/documents/2022/12/adult-use-cannabis-proposed-regulations.pdf

16. In May 2023, the proposed AU Regulations were revised and still included the provisions regarding application review and licensing, and SEE and Extra Priority provisions. *See* revised AU Regulations, attached hereto as **Exhibit B**.[2]

17. In September 2023, the revised AU Regulations, with some further non-material revisions, were adopted as final. *See* final AU Regulations, attached hereto as **Exhibit C**.[3]

SEE Plan – Providing Priority and Extra Priority

18. As previously stated, the Cannabis Law tasks the Board and Chief Equity Officer to develop the SEE Plan; promote and prioritize SEE applicants, draft regulations outlining the qualifications for each such group, and promote certain goals within the SEE Plan. Cannabis Law § 87(1).[4] *See* SEE Plan, attached hereto as **Exhibit D**.[5]

19. The Cannabis Law establishes specific objectives for the SEE Plan, such as to "promote applicants from communities disproportionately impacted by cannabis prohibition, and promote racial, ethnic, and gender diversity when issuing licenses." This goal can be achieved by "mentoring potential applicants" and "prioritizing consideration of applications" by SEE applicants. *Id.* The Cannabis Law also provides for granting microbusiness licenses (Cannabis Law § 73(3), delivery licenses (Cannabis law § 74(1)), and nursery licenses (Cannabis Law §75(1)) to promote SEE applicants.

---

[2] https://cannabis.ny.gov/system/files/documents/2023/05/revised-adult-use-regulations-5-11-2023_0.pdf
[3] https://cannabis.ny.gov/system/files/documents/2023/09/exprs-trms-adopt-au-regs-9-12_0.pdf
[4] "The chief equity officer shall assist with the development and implementation of, and ensure the cannabis control board and the office of cannabis management's continued compliance with, the social and economic equity plan..." Cannabis Law § 12(1). The advisory board shall also make recommendations regarding the social and economic equity plan. § 14(5).
[5] https://cannabis.ny.gov/system/files/documents/2023/09/nys-see-plan-english.pdf

20. Another goal of the SEE Plan, according to the Cannabis Law, is to "promote diversity in commerce, ownership and employment, and opportunities for social and economic equity in the adult use industry." Cannabis Law § 87(2).

21. To that end, a "goal shall be established to award fifty percent of adult-use cannabis licenses to social and economic equity applicants and ensure inclusion of" those seeking to participate as SEE licensees. *Id.*

22. The legislators made clear, however, that the fifty percent goal is not a requirement.

> MRS. PEOPLES-STOKES: Yes. As mentioned earlier, colleague, there are ten different licenses that businesses can get and there is a goal in this legislation, not a requirement, not a mandate, but a goal that, you know, 50 percent of the businesses be equity for minorities or Minority- and Women-Owned Businesses, for disabled veterans, and/or for distressed farmers, including perhaps people who live in communities where there are these underground areas being sold. So yes, that is in place, and it is a workforce goal attached to this as well, so that, you know, people actually have access to some of the many jobs that are available.

NY Assembly Debate on 2021 NY Assembly Bill A1248-A, Mar. 30, 2021 at 58.

23. While the Cannabis Law provided the above goals for the SEE Plan and some examples of how to achieve them, it left broad discretion to the Board to determine how to implement those goals.

24. For example, the Cannabis Law contemplates that the Board will develop and implement "specific programs" to achieve the aforementioned goals because the law requires the Board to report on such programs. Cannabis Law § 10(17)(c).

25. The Cannabis Law also contemplates that such programs and/or the means of achieving the SEE Plan goals may need to be revised from time to time with various application windows, as the law requires that the Board make recommendations regarding changes to

6

"improve registration, licensing and permitting" and "promoting and encouraging social and economic equity applicants." Cannabis Law § 10(17)(h).

26. Another example of the Cannabis Law giving the Board the discretion to fill out the framework provided by the law for the SEE Plan and SEE applicants is the Board being given the "sole discretion to limit, or not to limit, the number of registrations, licenses and permits of each class to be issued within the state or any political subdivision thereof, in a manner that prioritizes social and economic equity applicants..." Cannabis Law §10(2).

27. The SEE Plan summarizes the outside parameters set out in the Cannabis Law and intended subsequent work by the Board as follows:

> The design of this market was included in that bill. The MRTA laid out an approach that tried to incorporate lessons learned from other states who have ended prohibition in their own jurisdictions but left to this team the heavy work of filling out the true blueprint to making New York's cannabis market the most equitable, and successful, cannabis market in the nation. This living document represents the path forward for New York. It is a strategic plan to realize the goals of the MRTA, to bring economic activity to every corner of the State, and to set a new example of what intentional policymaking looks like. This Social and Economic Equity Plan does not run from New York's past relationship with cannabis. It contextualizes it and provides the State with achievable steps to repair the harm that has been done and prepare the State to be a national leader in the space.

**Exhibit D**, Letter from Executive Director, p 3.

28. This SEE Plan and the goals therefor were not, however, the product of the ideas of the Board and Office alone. Section 87 requires that the SEE Plan be created with the input of the public. As such, the SEE Plan "was developed with stakeholder engagement. The Office consulted community partners in New York as well as industry experts with extensive experience supporting cannabis social equity initiatives across the country." *Id*, Acknowledgments, p 5.

29. Specifically, the SEE Plan details the public engagement and input that informed the SEE Plan and the implementation of the goals stated for it as follows:

7

> In carrying out the responsibility to ensure relevant public input, the Office's NYSEE and External Affairs teams organized a series of equity community roundtables to gather information from the various community groups that are most likely representative of the CDIs, minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans. The team engaged with community stakeholders representing each SEE group in both upstate and downstate regions of the state. Community organizations recruited participants for roundtable sessions to ensure the integrity of the process. Roundtables consisted of discussions regarding representation, equity, and approaches the Office could use to increase cannabis industry participation from target populations.

*Id*, Equity Community Roundtables, p 20.

30. With this input from the public, the SEE Plan explains that "Social and economic equity refers specifically to policies made by the Office to achieve the goals laid out in the Cannabis Law." *Id*, Applying an Equity Framework, p 10.

31. Further, the SEE Plan explained its approach to achieving the goals in the SEE Plan, including promoting and prioritizing SEE applicants. In this regard, the SEE Plan states "The Board and the Office recognize that to truly achieve our social equity objectives, those objectives must be directly connected to the ways in which we do our work. To ensure an equitable cannabis industry, the Board and the Office are committed to the following equity pillars:

- Bringing to life an industry that gives small, independent businesses an opportunity to compete.
- Building relationships and trust within the communities most impacted through educational and social programming.
- Investing resources including grants, loans, and technical assistance to equip SEE groups with the support needed to thrive in the New York State cannabis market.
- Educating communities on their rights in accordance with the Cannabis Law and regulations.
- Collecting data and evolving programming to adapt to the equity needs of the industry.

*Id.*

8

32. With respect to providing extra priority to applicants satisfying the parameters of Cannabis Law section 87(3), extra priority is provided to applicants impacted by prior cannabis prohibition because that is one of the primary goals of the Cannabis Law -- to stop the harm from criminalization and to restore justice. Cannabis Law § 10(17)(c) (requiring the Office to report on the effectiveness of the restorative justice goals of the Cannabis Law).

33. The legislature made clear, in enacting the Marihuana Regulation and Taxation Act ("MRTA") which created the Cannabis Law, that "Existing laws ... have resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit ... the ability to access housing, employment opportunities, and other vital services." Cannabis Law § 2. Indeed, the legislature stated that the passage of the MRTA was "based on the recognition that New York's existing marihuana policies have failed to protect the welfare of our communities" and have "thrust thousands of New Yorkers into the criminal justice system for non-violent offenses, denying many the fundamental right to participate in the democratic process of voting and inhibiting otherwise law-abiding citizens' ability to access housing, student loans, employment opportunities, and other vital services." *See* Senate Introducer's Mem in Support, Bill Jacket, L 2021, ch 92 at 7.

34. As such, the SEE Plan aims to ameliorate the harms caused by prior cannabis criminalization in New York – the very reason why the MRTA was passed.

35. The SEE Plan advises that "between 1980 and 2021, cannabis offenses were the primary charge in over 1.3 million arrests, 245,000 convictions, and 345,000 violations in the state," that the "Marijuana Reform Act of 1977 was New York's first recognition that the collateral consequences of a cannabis conviction were too far reaching and were not proportionate to the crime of cannabis use," and that consequences of an arrest and conviction typically mean "loss of

9

employment, housing, access to education, difficulty maintaining a professional license, or even adopting a child." **Exhibit D**, Legacy of Cannabis Prohibition in New York, pp 31-32.

36. The SEE Plan further advised that minorities were most effected by marijuana criminalization in New York. Based on the New York State Division of Criminal Justice Services, Computerized Criminal History System, "Black New Yorkers were 15 times more likely to be arrested for marijuana than their White counterparts. Hispanic New Yorkers were 7.5 times more likely than their non-Hispanic White counterparts." **Exhibit D**, p 35. In addition, out of 1.3 million cannabis-related arrests, an estimated 57 percent of those arrested were Black individuals and 25 percent were Hispanic individuals. *Id.* Furthermore, out of the 245,000 cannabis-related arrests that resulted in a conviction, 62% of those convicted were Black and 21% were Hispanic. *Id.* p 36.

37. The Office further found that it is much more difficult for women and minorities to start businesses. "Minority and women-owned businesses in the United States face similar but distinct barriers to success. Community members' input underscored the numerous economic, market, and institutional barriers, many of which are associated with racial and gender discrimination. Access to capital can be particularly difficult for these groups, resulting in undercapitalized opportunities and unsatisfied market demands. Also problematic are institutional barriers, as these businesses frequently operate within systems that favor larger incumbent corporations, which are primarily owned and operated by white men." *Id.* p 21; *see* The 2021 Small Business Credit Survey, attached hereto as **Exhibit E** (finding that Black-owned firms that applied for traditional forms of financing were least likely to receive all of the financing they sought -- 40% of white-owned firms received all of the financing they sought, compared to 31% of asian-owned firms, 20% of Hispanic-owned, and only 13% of black-owned firms).

38. This trend persists even among firms with good credit scores. Lee, Wonhyung & Black, Stephanie. (2017). *Small Business Development: Immigrants' Access to Loan Capital.* Journal of Small Business & Entrepreneurship. 29. 1-17. 10.1080/08276331.2017.1297106, attached hereto as **Exhibit F** (finding that higher rates of rejection and lower loan amounts typified lending to black and Hispanic-owned Minority Business Enterprises (MBE)).

39. Moreover, despite the focus on equity and diversity in recent years, funding for minorities and women was found to have declined. In 2020, a small slice - 2.6% of venture dollars went to minorities and 2.2% went to women - that's $4.2 billion out of a $87.3 billion pie. *Why Don't More Minorities Launch VC-Backed Businesses? Plus 4 Ways VCs Can Help*, Forbes.com, attached hereto as **Exhibit G**[6]; Deutsch, Waverly, *Women and Minority Investors Are Taking Matters into Their Own Hands,* Chicago Booth Review, attached hereto as **Exhibit H**[7] (finding 87% of funding from venture capital firms goes to all-male founding teams).

40. Small Business Administration Isabella Guzman warned that minority-owned small businesses' lack of access to capital is costing the U.S. economy $900 billion in economic output. Bernal, Raphael, *SBA Chief: Minority-Owned Businesses Growing, but Still Lack Access to Capital*, TheHill.com, attached hereto as **Exhibit I**.[8]

Priority and Extra Priority for October through December Applications

41. Based on the SEE Plan and as the broad authority the Board and Office have pursuant to the AU Regulations regarding application and licensure, the Office and Board have

---

[6] https://www.forbes.com/sites/columbiabusinessschool/2021/07/22/why-dont-more-minorities-launch-vc-backed-businesses-plus-4-ways-vcs-can-help/?sh=4c9968ef4ed2
[7] https://www.chicagobooth.edu/review/women-and-minority-investors-are-taking-matters-their-own-hands
[8] https://thehill.com/business/3847115-sba-chief-minority-owned-businesses-growing-but-still-lack-access-to-capital/

11

prioritized consideration of SEE applications submitted between October 4, 2023 to December 18, 2023 in the following ways.

42. As an initial matter, the SEE Plan recognized that the lack of access to information, excessive paperwork and documentation specifically required for SEE individuals to prove their SEE status when applying for licensure, and restrictions imposed solely on SEE licensees may discourage SEE individuals from participating in the cannabis marketplace as business owners. The SEE Team held community roundtable events with SEE stakeholders across New York State from October 2022 to December 2023 to encourage and increase submissions of SEE applications for the Office's consideration. The SEE Team also conducted significant outreach through educational events regarding applications and licensure. Specifically, the Office launched its "Roadmap to Adult-Use Applications" statewide tour conducting approximately twenty in-person and virtual presentations across the state discussing among other things, application and licensing process, and answering any questions in real time from potential applicants about the process. *See* Office of Cannabis Management Annual Report, attached hereto as **Exhibit J**.[9] The team prepared online and print materials such as:

- the Adult-Use Social & Economic Equity Applicant Overview which provides an easy–to–understand overview of statutory provisions pertinent to SEE applicants; SEE qualifications, SEE benefits, application tips and other resources, attached hereto as **Exhibit K**.[10]

---

[9] https://cannabis.ny.gov/system/files/documents/2023/12/annual-report-2023-final.pdf
[10] https://cannabis.ny.gov/system/files/documents/2023/12/ocm-seeapplicants.pdf

- SEE application assistance documents such as guidance on obtaining proof of a conviction, or an address, attached hereto as **Exhibit L**[11] **and Exhibit M.**[12]

43. Furthermore, the SEE Plan recognized that cannabis licensing regimes that required applicants to submit various plans for evaluation, such as standard operating procedures, technical documents, financial plans, or personnel experience, are often prohibitively expensive and favor applicants who can afford to pay third-party consultants to produce top-scoring documents. Such applications often result in inequitable outcomes for other applicants, particularly SEE applicants. **Exhibit D,** Reduce Barriers to Entry and Clear the Pathway to Licensure, p 58. As such, New York's adult-use application platform was designed to be accessible and easy for applicants to use, rather than require applicants to hire and pay consultants to draft numerous plans for an application to be able to be considered by the Office.

44. Nevertheless, in the event that a current SEE applicant required additional help with an application, the SEE team collaborated with community-based organizations, municipalities, academic institutions and key community stakeholders to bring together over 75 technical assistance providers committed to streamlining the application process for SEE applicants through the Cannabis Hub & Incubator Program ("CHIP"). The CHIP program, together with grants, encouraged community organizations and academic institutions to provide application assistance. Over 700 potential SEE applicants for the October 4th application window were connected with technical assistance providers by the Office. This initiative increased the Office's ability to consider SEE applications by ensuring that SEE applicants can navigate and complete all application requirements.

---

[11] https://cannabis.ny.gov/system/files/documents/2023/09/how-to-get-proof-of-conviction-documents_0.pdf
[12] https://cannabis.ny.gov/system/files/documents/2023/09/how-to-prove-address-to-qualify-as-a-member-of-a-community-disproportionately-impacted.pdf

45. To further assist all interested SEE applicants in filing applications, the Board reduced application fees for all SEE applicant groups consistent with the requirements of the Cannabis Law and Regulations discussed above. This is also consistent with the legislators' intent who stated that the "new law will provide assistance to social equity applicants such as MWBEs, distressed farmers, and disabled veterans, providing training, lower fees, mentoring, and lost cost loans." NY Assembly Debate on 2021 NY Assembly Bill A1248-A, Mar. 30, 2021 at 7.

46. Further, when reviewing the current SEE applications, SEE Team members are focused on assisting SEE applicants in correcting any deficiencies with their applications given the additional documentation they need to submit.

47. Neither the Cannabis Law nor the regulations state that promoting or prioritizing the Office's consideration of SEE applicants must mean that SEE applications must be reviewed and processed first ahead of others, rather than devoting resources to SEE groups in the ways described above.

48. Neither the Cannabis Law nor the regulations provide for a quota for SEE applicants.

49. In addition to the means stated above in which the SEE applications submitted from October 4 through December 18 are prioritized, the Office provided extra priority of consideration to those applicants who indicated they qualified for such treatment based on prior cannabis conviction, income and CDI status (as required by Cannabis Law §87(3)). Such extra priority applications for a microbusiness license were guaranteed review when the microbusiness applications were randomly ordered for purposes of review by being weighted in a way that would cause the applications to be assigned a position early in the queue. This mechanism was a vital component to the architecture of the MRTA and regulations that seek to realize the legislature and

Governor's absolute commitment to include community members whose unjust convictions left them with significant collateral consequences such as getting a loan, buying a house, renting an apartment, attending school, and obtaining a job, among others. No person, including Plaintiffs, has denied the importance of the restorative justice goals described in this declaration and in the MRTA and regulations.

50.     In addition, applicants for a microbusiness license who were graduates of the Cannabis Compliance Training and Mentorship ("CCTM") program also received a guaranteed chance of having their application reviewed. The CCTM is a 10-week virtual training program designed to train three cohorts of trainee/mentees: legacy cultivators, traditional farmers, and a combined cohort of legacy processors and traditional food and beverage processors. **Exhibit D**, p 30. Licensed cultivators and processors served as mentors for 241 participants under a curriculum developed by the Office in collaboration with SUNY Morrisville and Cornell University professors, and the curriculum is rounded out with lectures from accountants and attorneys with cannabis experience. *Id.* Participants in the CCTM had to have advanced farming, cultivation or horticulture experience, have advanced experience in manufacturing, processing, packaging or branding products for human consumption, be eighteen years old, and have a valid identification document. *See* copy of the webpage for the Office website indicating the eligibility for the Cannabis Compliance Training & Mentorship Program, attached hereto as **Exhibit N**.[13] Participation was not based on race or gender.

51.     This treatment of microbusiness applicants who are graduates of the CCTM aligns with the goal of the MRTA, the SEE Plan, and the pillars described above for giving small businesses opportunities, giving educational and social programming, and further expanding the

---

[13] https://cannabis.ny.gov/cannabis-compliance-training-mentorship-program-0

15

pipeline of cultivators and processors preparing to participate in the State's cannabis market. *See* **Exhibit D**, p 30.

52. All other microbusiness applications, whether submitted by an applicant who indicated that they qualify as one or more SEE applicant groups or by an applicant who indicated no qualification underwent the same randomized queuing process as every other applicant and received no additional weight. *See Governor Hochul Announces Cannabis Control Board Approves More than 100 Licenses and First Nonconditional Licensing Window*, attached hereto as **Exhibit O**.[14]

Guidance for October 4, 2023 through December 18, 2023 Applications

53. In September 2023, the Office announced at its monthly Board Meeting that the application window for all license types (retail, microbusiness, cultivator, distributor, etc.) and for all applicant types (non-SEE, SEE, and extra priority) will open on October 4, 2023 and close on December 18, 2023. The Office advised that the application window for applicants seeking a retail dispensary license that already had proof of control over a proposed premises from which they intend to operate would close on November 17, 2023 ("November Applications"). The application window for applicants who applied after November 17, 2023, or for a provisional license without proof of control over a premises would close on December 18, 2023.

54. The Office also published guidance in September explaining how applications in the October-December application window will be selected for review and licensure. *See* General Licensing Application Frequently Asked Questions ("FAQ"), attached hereto as **Exhibit P**.[15]

---

[14] https://www.governor.ny.gov/news/governor-hochul-announces-cannabis-control-board-approves-more-100-licenses-and-first
[15] https://cannabis.ny.gov/system/files/documents/2024/01/current-public-universal-app-faq-1-26.pdf

55. The FAQ at Question 90 explains to applicants that they do *not* need to have control over premises in order to apply, and instead "may submit the application without premises details and gain provisional approval." In that instance a provisional licensee will have up to twelve months, if they need, to complete their licensing application to obtain a final license. *Id.* Question 90. Nevertheless, for applicants that have premises, the Office will start reviewing their applications, if they are in by November 17 (November Applications), rather than make them wait until after the window closed on December 18, 2023. *Id.* Question 9; 91.

56. In addition, Question 10 explains and warns that:

> Applications for each license type will be collected during the application windows and pooled based on the license type sought, SEE certification and provisional status ... After an application window closes, applications will be queued (ordered) in their distinct pools using a **randomized process**. Adult-use cultivators, certain processors, distributors, **microbusiness**, and retail dispensary license types **will have a limited number of licenses available for this application window**. The number of licenses available is determined by the Board with estimates of such number of licenses provided above in Question 2. **Applications will be reviewed until the number of licenses allocated for this application window have been issued**. Therefore, an applicant's queuing order is very important as those higher in the queue will be reviewed first, and **it is possible not all applications will be reviewed before all licenses have been issued**.

FAQ, question 10 (emphasis added).

57. Further, Question 99 further advises that "Applicants are **not guaranteed** licensure." *Id*, question 99; *see also* question 94 (warning that just because an application is submitted with a proposed location, "receiving a license for a proposed premises is not guaranteed").

17

58. The Office also explained that control over property can be by lease agreement, mortgage, ownership or an option to lease or buy property. *See* Adult-Use Retail Dispensary License guidance, attached hereto as **Exhibit Q**.[16]

59. In the event an applicant had questions, the Office encouraged applicants to contact the Office by emailing the info and licensing email addresses for the Office. *See* **Exhibit P**, Questions 46 and 56. The Office also routinely fields hundreds of calls and emails from applicants and potential applicants as to processes for licensure.

60. A number of applicants inquired whether a lease that had an effective date conditioned on the applicant receiving a license or that deferred the commencement of rent until the applicant received a license was sufficient to indicate they had control over a premises. A number of applicants submitted applications with such leases.

61. In an October 2023 press release the Office advised that it was accepting applications for review and would begin awarding licenses in early 2024. *See OCM Announces Opening of Additional Adult-Use Cannabis Dispensaries Across New York State*, attached hereto as **Exhibit R**.[17] The press release encouraged individuals to attend the application workshops to help applicants navigate the newly opened application portal, stating "Attendees of the workshops will have the opportunity to engage with experts, ask questions, and get answers in real time about various pathways to participate in the legal adult-use cannabis market in New York State." It also provided instruction on how to learn about the workshops. *Id.*

---

[16] https://cannabis.ny.gov/system/files/documents/2023/12/ocm-auretail.pdf
[17] https://cannabis.ny.gov/system/files/documents/2023/10/additional-dispensaries-press-release.pdf

62. On December 8, 2023, the Office announced that it was preparing to review applications and gearing up to issue new licenses in 2024. *See Cannabis Control Board Votes on Key Measures to Strengthen Market Infrastructure Press Release*, attached hereto as **Exhibit S**. [18]

Review of November Applications and Issuance of Licenses

63. Consistent with its announcements, immediately after the queue for November Applications became final, the Office began reviewing applications in numerical order from the queue, identifying complete applications, informing applicants of deficiencies in their applications and giving applicants an opportunity to correct those deficiencies, and compiling a list of applications that should be granted.

64. On February 16, 2024, the Board issued 26 microbusiness licenses from the November Applications. After having recommended such licenses to the Board for approval, the Office's analysis of the composition of the licensees conducting for purposes of its reporting requirement, indicated that a little over half of such licensees (60%) are SEE licensees. *Id.*

65. The analysis explained that the licensees reflected the demographics of the State and that such result was consistent with the Cannabis Law's goals (which as discussed above is explicitly a goal rather than a quota) for licensure as implemented through the SEE Plan.

> The Office successfully met the Cannabis Law's goal of 50 percent SEE licensure through a three-part strategy. First, the Office intentionally designed an application process that was accessible but simple, allowing many to complete it within a single afternoon. Second, we enlisted the support of over 60 community-based organizations, academic institutions, non-profits, and law firms, who assisted more than 800 prospective SEE applicants. Third, extensive outreach and educational efforts ensured that communities prioritized under the Cannabis Law were well-informed and adequately prepared for this historic opportunity.
>
> These efforts, coupled with an impartial lottery system, produced outcomes that closely match the present-day demographics of New York State. The vast majority of the state's residents are women, minorities, or both, and a

---

[18] https://cannabis.ny.gov/system/files/documents/2023/12/12.8.23-ccb-meeting-press-release.pdf

      sizable proportion live in communities disproportionately impacted. The SEE Plan, released by the Office in May 2023, forecasted much of this work with a thorough examination of the barriers to entry and recommendations to avoid replicating the unforeseen consequences of legal markets that came before New York.

*Id.*

66. Of the 26 microbusiness applications that were issued a license to date, ten were issued to applicants who did not indicate that they qualified as a SEE group applicant, an extra priority applicant or were a graduate of the CCTM program. Only 1 application was issued a license where the applicant indicated that they qualified as women or minority owned business only, and did not indicate that it qualified for any other SEE groups. That application, however, indicated that the applicant was a graduate of the CCTM program and as such was guaranteed review of its application on the basis of the CCTM program.

67. Plaintiff provides no basis for its interpretation of the Cannabis Law §87 and related regulations and fails to provide any support for its unfounded assertions that applicants were placed at the beginning of the review order based on their race or gender or by virtue of being in any SEE group.

Dated: New York, New York
    March 5, 2024

              /s/
              Damian Fagon