**Table of Contents:  Adult Use Cannabis**

**Part 118 – Definitions**

**Part 119 - Municipal Rulemaking**

**Part 120 – Application and Licensure**

**Part 121 - Social and Economic Equity Rules**

**Part 123 - License Specific Authorizations, Requirements and Prohibitions**

**Part 124 - General Business Requirements and Prohibitions**

**Part 125 - General Operating Requirements and Prohibitions**

**Part 131 - Severability and Reference Materials.**

Pursuant to the authority vested in the Cannabis Control Board by Sections 13, 85, 87, 89, 91, and 131 of the Cannabis Law, Chapter II of Subtitle B of Title 9 of the Official Compilation of Codes, Rules and Regulations of the State of New York is hereby amended, and a new title to Chapter II, and new Parts 118, 119, 120, 121, 123, 124, 125 and 131 are added to be effective upon publication of a Notice of Adoption in the New York State Register, to read as follows:

Chapter II of Subtitle B of Title 9 of the Official Compilation of Codes, Rules and Regulations of the State of New York is hereby amended to read as follows:

Chapter II.  Rules of Adult-Use Cannabis, Medical-Use Cannabis, and Cannabinoid Hemp and Hemp Extract.

A new Part 118, titled Definitions, is added to read as follows:

**Part 118 – Definitions**

**§ 118.1 Definitions.**

(a)     For the purposes of this Chapter the following terms shall have the following meaning:

(1)     *Act* means the Marihuana Regulation and Taxation Act, Chapter 92 of the Laws of 2021.

(2)    *Advertising* means advertising as defined in Part 128 of this Title.

(3)    *Aggregate ownership interest* means the total ownership interest held by the following, or any combination of the following:

(i)    a legal entity and any legal entity or individual in its multilevel ownership structure;

(ii)    an individual and the spouse, domestic partner, civil union partner, child, sibling, or parent of such individual; or

(iii)    a legal entity and any individual with control over such legal entity.

(4)    *Applicant* means applicant as defined in Article 1 of the Cannabis Law.

(5)    *Artificially derived phytocannabinoid* means a phytocannabinoid that is created by a chemical reaction that changes the molecular structure of any chemical substance derived from Cannabis sativa. Artificially derived phytocannabinoid does not include: (i) a naturally-occurring chemical substance that is separated from Cannabis sativa by a chemical or mechanical extraction process; (ii) phytocannabinoids that are produced by decarboxylation of the phytocannabinoid's respective naturally-occurring carboxylic acid form without the use of a chemical catalyst; (iii) any other chemical substance identified by the Board; and (iv) synthetic tetrahydrocannabinols not derived from the cannabis plant already prohibited as a Schedule I Controlled Substance in Public Health Law Section 3306 and prohibited in section 123.6(f)(5) of

3

this Title.

(6)     *Attractive to individuals under twenty-one* means attractive to individuals under 21 years of age as defined in Part 128 of this Title.

(7)     *Biodiversity* means the variety of animals, plants, fungi, microorganisms and other living structures that make up our natural world.  Each of these species and organisms work together in ecosystems to maintain balance and support life.

(8)     *Board* means the New York State Cannabis Control Board as defined in Article 1 of the Cannabis Law.

(9)     *Bona fide labor organization* means bona fide labor organization as defined in Part 116 of this Title.

(10)    *Brand or Branding* means brand or branding as defined in Part 128 of this Title.

(11)    *Cannabis Advisory Board* means the State Cannabis Advisory Board as established in section 14 of the Cannabis Law.

(12)    *Cannabis flower product* means any form of cannabis product consisting of the flower, buds, and leaves of the cannabis plant, including trimmings thereof, intended for retail sale to

consumers with minimal processing. A cannabis flower product shall not include any cannabis product requiring the blending, infusing, or extraction of cannabis.

(13)    *Cannabis merchandise* includes, but is not limited to, clothing, hats, pencils, pens, keychains, mugs, water bottles, beverage glasses, notepads, lanyards, or cannabis accessories which include or display a brand of a licensee and comply with Parts 128 and 129 of this Title.

(14)    *Cannabis paraphernalia* means any equipment, product or material of any kind which is primarily intended or designed for use in vaporizing, ingesting, inhaling or otherwise introducing cannabis product into the human body, or preparing, storing, or containing cannabis.

(15)    *Cannabis waste* means all cannabis byproduct, scrap, harvested cannabis and cannabis-infused products not intended for sale to a consumer or distribution to an entity licensed or registered under the Cannabis Law.

(16)    *Canopy or cultivation canopy* means an area to be calculated in square feet and measured using clearly identifiable boundaries of all areas(s) that will contain non-immature cannabis, which shall be vegetative or flowering plants, excluding seedlings or small clones, including the space(s) within the boundaries. Canopy may be noncontiguous, but each unique area included in the total canopy calculations shall be separated by an identifiable boundary including, but not limited to: interior walls, shelves, greenhouse walls, hoop house walls, garden benches, hedge rows, fencing, garden beds, or garden plots.

5

(17)     *Canopy tier, or tier* means the level of cultivation canopy in which a licensee is permitted to cultivate within minimum and maximum square footage ranges as defined for each license type.

(18)     *Cash* means U.S. currency, certified check, money order, electronic funds transfer, bank officer's check or draft, or a check drawn on an account.

(19)     *Certificate of analysis* means certificate of analysis as defined in Part 130 of this Title.

(20)     *Civil Practice Law and Rules* or *CPLR* means Chapter 8 of the Consolidated Laws of New York.

(21)     *Community facility* means a facility that may include, but not be limited to, a facility that provides day care to children; a public park; a playground; a public swimming pool; a library; or a center or facility where the primary purpose of which is to provide recreational opportunities or services to children or adolescents. A municipality may issue a local law regarding community facilities that are not unreasonably impracticable.

(22)     *Concentrate or "Concentrated cannabis"* means: (a) the separated resin, whether crude or purified, obtained from cannabis; or (b) a material, preparation, mixture, compound or other substance which contains more than three percent by weight or by volume of total THC.

(23)    *Control* or *controlling interest* means the authority to order or direct the management, operation, managers, or policies of a person, including, but not limited to, the ability or authority, expressed or reserved, to:

(i)    amend or change the corporate or operating identity (e.g., joint venture agreement or unincorporated business status) of a person;

(ii)    approve operating and capital budgets for the person;

(iii)    adopt, approve, or direct fiscal operating policies and procedures;

(iv)    approve debt necessary to finance the person's costs of compliance with operational or facility standards required by law;

(v)    approve contracts for management of facility services;

(vi)    hire or dismiss executive personnel;

(vii)    maintain and control the books and financial records of the person;

(viii)    control any of the assets of the person;

(ix)    encumber the assets of the person by way of mortgage or other indebtedness; and

(x)     dissolve the person or arrange for sale or transfer of the person to new ownership or control.

(24)    *Corrective action plan* means a corrective action plan as defined in Part 133 of this Title.

(25)    *Craft product* means a flower or pre-roll cannabis product, or any cannabis product as established by the Office in guidance, which is hand-trimmed, hand-dried, and hand-packaged by one or more individuals and receives a "craft designation" from, and shall be processed and manufactured exclusively by:

(i)     a licensed Tier 1 cultivator with a set canopy tier as set forth under subparagraph (i) of paragraph (2) of subdivision (b) of section 120.3 of this Title, and shall only use cannabis or cannabis material that is cultivated by said licensee, and not sourced from another cultivator, processor or any other licensee; or

(ii)    a licensed microbusiness of any type.

(26)    *Cultivation* means the agricultural production practices of soil preparation, planting, growing, cloning, harvesting, drying, curing, grading, and trimming of cannabis plants for sale to certain other categories of cannabis license and permit holders.

(27)    *Cultivation cycle* means entirety of the growing period, including germination, seedling, cloning, vegetative and flowering stages of cannabis growth.

(28)    *Date of expiration* means date of expiration as defined in Part 128 of this Title.

(29)    *Debarment* means debarment as defined in Part 133 of this Title.

(30)    *Edible* means a product, containing either cannabis or concentrated cannabis and other ingredients, intended for use or consumption through ingestion, including sublingual or oral absorption.

(31)    *Employee in charge* means an individual twenty-one (21) years of age or older at management level designated by a retail dispensary to be responsible to perform or oversee the performance of the tasks in section 123.10 of this Title and any other tasks required by the retail dispensary.

(32)    *Energy report* means a benchmarking, self-assessment, utilizing a reporting tool approved by the Office, including, but not limited to, a licensee's energy consumption, costs and greenhouse gas emissions, and identifies energy efficiency measures.

(33)    *Extracting* means the process of concentrating or isolating one or more phytocannabinoids from cannabis.

(34)    *Exit package* means exit package as defined in Part 128 of this Title.

(35)    *Financial institution* means any bank, mutual savings bank, consumer loan company, credit union, savings and loan association, trust company, or other lending institution under the jurisdiction of the Department of Financial Services.

(36)    *Financial interest* means any actual or future right to ownership, investment or compensation arrangement with another person, either directly or indirectly, through business, investment, spouse, parent or child where the compensation exceeds the greater of: (i) 10% of revenue, (ii) 50% of net profit, or (iii) $100,000. Person with a financial interest does not include a passive investor.

(37)    *Financier* means any person, other than financial institution or government or governmental subdivision or agency, that provides capital as a gift, provides a grant, or lends capital pursuant to a secured or unsecured financing agreement. Agreements will be assessed based on current and future right to ownership or interest on the licensee, including, but not limited to, interest in the event of default, bankruptcy, or reorganization. A financier may not receive an ownership interest; control of the business; or a share of revenue in excess of the greater of: (i) 10% of gross revenue, (ii) 50% of net profit, or (iii) $100,000, gross profits or net profits, a profit-sharing interest, or a percentage of the profits in exchange for a gift, grant or loan.

(38)    *Goods and services agreement* means goods and services agreement as defined in part 124 of this Title.

(39)    *Greenhouse* means structure or thermally isolated enclosed area that maintains a specialized conditioned and sunlit environment used for and essential to the cultivation, protection, or maintenance of plants. It can include additional artificial lighting and climate controls based on cultivation techniques used.

(40)    *Ground transport* means transportation that is over land and not on water or in the air with the exception of, and for the purposes of this Chapter, a ferry.

(41)    *Harvest batch* means a unit of cannabis produced during a period of time under similar conditions, identifiable by a lot unique identifier that allows traceability.

(42)    *Hoop house* means specialized unconditioned agricultural equipment having a framework covered with demountable polyethylene or polypropylene materials or materials of a polyethylene or polypropylene nature which is specifically designed, constructed, and used for agricultural production. A hoop house may include up to 20 artificial lights for the propagation of seedlings or clones. Lights shall meet photosynthetic photon efficacy (PPE) requirements as determined by the Office.

(43)    *Horticultural lighting equipment (HLE)* means any lighting equipment (e.g., fixtures, bulbs, ballasts, controls, etc.) that uses energy for the cultivation of plants at any stage of growth.

11

(44)     *House of Worship* means a whole building owned or leased by a religious corporation as described by New York State Religious Corporation Law or used by a religious corporation or association of any denomination pursuant to the written permission of the owner thereof, which is used by members exclusively as a meeting place for divine worship or other religious observances presided over by a member of the clergy.

(45)     *Immature cannabis plant* means a non-flowering female cannabis plant or a cannabis plant which does not have flower that may be observed by visual examination. In seedling or small clone stage, the immature cannabis plant cannot exceed twelve (12) inches in height.

(46)     *Indoor cultivation* means the cultivation of cannabis within an enclosed climate-controlled structure using only artificial light, heat, and dehumidification.

(47)     *Integrated pest management (IPM) principles* means the following: (i) identifying pests, their hosts, and beneficial organisms before acting; (ii) establishing monitoring guidelines for each pest species; (iii) establishing an action threshold for the pest; (iv) evaluating and implementing control tactics; and (v) monitoring, evaluating, and documenting the results.

(48)     *License* means a written authorization as provided under the Cannabis Law permitting persons to engage in a specified activity authorized pursuant to the Cannabis Law.

(49)     *Licensee* means an individual or an entity who has been granted a license under the Cannabis Law.

(50)    *Local law* means a local rule or local regulation or local ordinance or action which is adopted by the municipality on matters otherwise not preempted by the Cannabis Law, provided however, that such local law shall not be unreasonably impracticable as determined by the Board.

(51)    *Lot unique identifier* (also referred to as lot number or bar code) means any distinctive combination of letters, numbers, or symbols, or any combination of them, from which the complete history of cultivation, manufacturing, processing, testing, custody, distribution or recall of a lot of a cannabis or cannabis product can be determined.

(52)    *Management services provider* means any person who is a party to a management services agreement, which is an agreement, contract, arrangement, or other type of formal understanding between a vendor, consultant, or contractor and an applicant for a license or a licensee where the provider engages in (i) professional services related to administrative and professional staffing, business operations, and business strategy; or (ii) consulting related to the growing, processing distributing, and selling of the plant or other core business functions under a licensee's authorization.

(53)    *Manufacturing* means to prepare, treat, modify, compound, package or otherwise manipulate cannabis or cannabis extract into a cannabis product. Manufacturing shall not include cultivation, as defined in Article 1 of the Cannabis Law, or extracting as defined in this Part.

(54)    *Marihuana-related offense* means an offense defined in former sections 220.03 and 220.06 of the Penal Law where the sole controlled substance involved was concentrated cannabis, in former sections 221.05, 221.10, 221.15, 221.20, 221.35, or 221.40 of the Penal Law, in section 105.05 of the Penal Law prior to the effective date of chapter ninety-two of the laws of two thousand twenty-one and the sole conduct involved was an offense defined in former sections 221.35 or 221.40 of the Penal Law, in former section three thousand three hundred eighty-two of the Public Health Law prior to the effective date as prescribed in subdivision nine of section 222.15 of the Penal Law, and the cultivation of such cannabis plants was solely for personal possession and use, in article two hundred twenty or section 240.36 of the of the Penal Law.

(55)    *Mature cannabis plant* means a flowering female cannabis plant or a cannabis plant which does have flower that may be observed by visual examination. In seedling or small clone stage, a mature cannabis plant exceeds twelve (12) inches in height.

(56)    *Mechanical extraction* means extraction using pressure, heat or cold to extract cannabinoids, and includes rosin presses, dry ice or other similar processes, without employing solvents or gases, approved by the Office.

(57)    *Mixed Light* means cultivation of mature cannabis in a greenhouse, hoop-house with cannabis cultivation lights, glasshouse, conservatory, hothouse, or similar structure, using a combination of sunlight and lighting with all lighting requirements meeting the photosynthetic photon efficacy standards for the mixed-light tier set out in section Part 125.1 of this Title.

14

(58)     *Municipality or municipalities* means an administrative or governing body or official of counties with the authority to enact any local regulations, towns, cities, and villages, respectively, of New York State.

(59)     *Non-consumer package* means non-consumer package as defined in Part 128 of this Title.

(60)     *Outdoor cultivation* means the cultivation of cannabis under natural sunlight and weather conditions with no artificial light and includes hoop house cultivation with fans and no additional climate controls or lighting elements, provided however, an outdoor cultivation is permitted to use artificial lighting as authorized by the Office for propagation of cannabis, seedlings and mother plants.

(61)     *Passive investor* means a person that is a true party of interest of a licensee with an aggregate ownership interest of no more than 5% percent of the outstanding shares of an applicant or licensee whose shares are publicly traded, or 20% of the outstanding shares or interest of any other entity, whether such shares or interest are current voting shares, future voting shares, current equity shares or future equity share of the applicant or licensee, and does not otherwise have any control or influence over the applicant or licensee. The total shares outstanding of future equity or future voting share classes shall be calculated as the entity's fully diluted share count (inclusive of all restricted stock units, options, warrants, or any other units of ownership that can be converted into a share of voting stock or equity), less contingent or future shares owned by persons whose financial or controlling interest in an entity is active.

15

(62)    *Person* means an individual, institution, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity.

(63)    *Pests* means weeds, rodents, birds, insects, or other animals or organisms that present the threat of contamination to cannabis and cannabis products, especially drying, curing or processing of cannabis flower.

(64)    *Photosynthetic photon efficacy (PPE)* means photosynthetic photon flux divided by input electric power. In horticultural lighting equipment, efficacy refers to micromoles of photon output per second, per watt of input power.

(65)    *Phytocannabinoids* refers to any of the chemical compounds, excluding terpenes or any other compounds determined by the Office, that are the active principles of the cannabis sativa, including, but not limited to, tetrahydrocannabinol (THC) and CBD, and does not include synthetic cannabinoids as that term is defined in subdivision (g) of schedule I of Section 3306 of the Public Health Law.

(66)    *Plant protection products* means products applied during the cultivation of cannabis including insecticides, fungicides, herbicides, rodenticides, and plant growth regulators.

(67)    *Processing* means blending, extracting, compounding, infusing, making, preparing, manufacturing, packaging, labeling, or branding cannabis products.

(68)    *Processor* means a licensee that extracts concentrated cannabis or compounds, blends, extracts, infuses, or manufactures concentrated cannabis or cannabis products, but not the cultivation of the cannabis contained in the cannabis product.

(69)    *Public convenience and advantage standards* mean standards used to determine whether or not the Board will grant a license to a licensee which will not result in over saturation of adult-use cannabis licensees, including, but not limited to:

(i)     the number, classes, and character of other licenses in proximity to the premises and in the particular municipality or subdivision thereof;

(ii)    evidence that all necessary licenses and permits have been obtained from the state and all other governing bodies;

(iii)   whether there is a demonstrated need for such license;

(iv)    effect of the grant of the license on pedestrian or vehicular traffic, and parking, in proximity to the premises;

(v)      the existing noise level at the premises and any increase in noise level that would be generated by the proposed premises; and

(vi)     any other factors specified by law or regulation that are relevant to determine that granting a license would promote public convenience and advantage and the public interest of the community.

(70)     *Record* means books, ledgers, documents, writings, photocopies, correspondence, electronic storage media, electronically stored records, money receptacles, equipment in which records are stored, or any other document that is used for recording information.

(71)     *Registered Organization with Dispensing* (ROD) means a registered organization adult-use cultivator processor distributor retail dispensary licensed pursuant to Cannabis Law section 68-a.

(72)     *Registered Organization Non-Dispensing* (ROND) means a registered organization adult-use cultivator, processor and distributor licensed pursuant to Cannabis Law section 68-b.

(73)     *Retail package* means retail package as defined in Part 128 of this Title.

(74)     *Road* means any wide way leading from one place to another, including, but not limited to, an alley, avenue, boulevard, causeway, court, crescent, drive, lane, loop, place, plaza, promenade, street, terrace, or way.

(75)    *School grounds* means any building, structure and surrounding outdoor grounds, including entrances or exits, contained within a public or private pre-school, nursery school, elementary or secondary school's legally defined property boundaries as registered in a county clerk's office as defined by Section 409 of the Education Law.

(76)    *Secondary school* means a school between the elementary school and the college or university.

(77)    *Serious adverse event* means serious adverse event as defined in Part 113 of this Title.

(78)    *Social and Economic Equity Applicant* means an individual or an entity that:

(i)     is an applicant for an adult-use license pursuant to Part 120 of this Title; and

(ii)    who is eligible for priority licensing pursuant to the criteria established in article four of the Cannabis Law based upon the applicant's status as an individual from a community disproportionately impacted, a minority-owned business, a women-owned business, a distressed farmer, or a service-disabled veteran.

(79)    *Social and Economic Equity Licensee* means an individual or an entity that:

(i)     applied for licensure as a social and economic equity applicant;

(ii)    has been granted an adult-use license subject to Part 121 of this Title; and

(iii)   maintains their status as an individual from a community disproportionately impacted, a minority-owned business, women-owned business, a distressed farmer, or service-disabled veteran as described in Part 121 of this Title.

(79)    *Sole Control* means:

(i)     is independently owned, operated and controlled;

(ii)    has real, substantial, and continuing ownership;

(iii)   exercises the authority to independently materially influence the day-to-day business decisions, operations, strategic priorities, capital allocations, acquisitions and divestments;

(iv)    has an ability to direct decisions, voting or otherwise, and an interest in the capital, assets, and profits and losses of the business, at least proportionate to percentage of ownership;

(v)    has the right to execute significant (in aggregate of $10,000 or greater) or exclusive

contracts;

(vi)    that there are no timed or triggered recusal provisions related to the individual with sole

control; and

(vii)    that there are no other person or persons in the aggregate who may exercise or have the

ability to control the majority of voting rights or appoint or remove the majority of director seats

or their equivalent or corporate officers or their equivalent on the governing body.

(80)    *Tincture* means a non-potable edible cannabis product that is a cannabis extract solution,

intended for human consumption or ingestion, dissolved in alcohol, glycerin, or plant-based oil

that shall include a calibrated dropper or other similar device capable of accurately measuring

servings.

(81)    *True Party of Interest:*

(i)    includes, but is not limited to, the following:

*(a)*    applicant or licensee's sole proprietor, partner (whether limited or general), member,

manager, president, vice president, secretary, treasurer, officer, board member, trustee, director,

or a person with equivalent title to each of the foregoing;

*(b)*     stockholder of applicant or licensee;

*(c)*     each person that makes up the ownership structure of each level of ownership for an applicant or licensee that has a multilevel ownership structure, including, but not limited to, subsidiaries, affiliates, parents, shells, and holding companies;

*(d)*     person with a right to receive aggregate payments in a calendar year, as part of a risk sharing or services agreement, that exceeds the greater of: 1) 10% of gross revenue, 2) 50% of net profit of a licensee, 3) $100,000 from the licensee in a calendar year;

*(e)*     person with a financial interest in the applicant or licensee;

*(f)*     person that has authority to or exercises control over the applicant or licensee;

*(g)*     person that assumes responsibility for the debts of the applicant or licensee; or

*(h)*     spouse of any individual in clause *(a)* and *(b)* herein; and

(ii)     does not include a person, without limitation who:

*(a)*     receives payment for rent on a fixed basis under a lease or rental agreement relating to applicant or licensee. The Office may investigate a landlord in situations where a rental payment has been waived or deferred;

(b)      receives a bonus or commission from the applicant or licensee based on the individual's sales, so long as the commission does not exceed ten percent of the sales of the applicant or licensee in any given bonus or commission period, unless otherwise determined by the Office. Commission-based compensation agreements shall be in writing;

(c)      contracts with the applicant or licensee to receive a commission for the sale of the business or real property;

(d)      consults receiving a flat or hourly rate of compensation from the applicant or licensee under a contractual agreement, unless such compensation exceed the limits set forth in this Chapter;

(e)      is a goods and services contractor, as long as the applicant or licensee retains the right to and controls the business;

(f)      is a financial institution;

(g)      is a financier; or

(h)      others as may be determined by the Office.

(82)      *Use by date* means use by date as defined in Part 128 of this Title.

23

(83)    *Working stock* means part of the inventory available for average demand in a given period.

A new Part 119, titled Municipality Rulemaking, is added to read as follows:

Part 119

Municipality Rulemaking

**Part 119- Municipality Rulemaking**

**§ 119.1 Preemption and Prohibitions on Municipality Rulemaking.**

**§ 119.2 Authorizations for Municipality Rulemaking.**

**§ 119.3 Notifications to Municipalities.**

**§ 119.4 Measurement of Distance from School Grounds, Houses of Worship, Community Facilities and Between Adult-Use Retail Dispensaries and On-Site Consumption Sites**

**§ 119.5 Unreasonably Impracticable; Review and Determination.**

**§ 119.6 Severability.**

**§119.1 Preemption and Prohibitions on Municipality Rulemaking.**

(a)      Pursuant to section 131(2) and 85(12) of the Cannabis Law, the governing body of a county, town, city and village are preempted from adopting any law, rule, ordinance, regulation or prohibition pertaining to the operation or registration, licensure, or permitting of a registered organization, adult-use cannabis license or cannabinoid hemp license. The Board prohibits municipalities to pass local laws and regulations governing the following activities:

25

(1)    adopting local laws that impose a special fee that is specific to cannabis businesses on the approved licensee that intends to operate within their jurisdiction;

(2)    adopting local laws that impose a fee on adult-use retail dispensary or on-site consumption licenses, except where the fees are also applicable to off-premises liquor establishments licensed under the State Liquor Authority prior to the thirty first of March two thousand twenty-one, and such law does not conflict with the Cannabis Law or this Part.

(3)    adopting local laws that impose a tax or a fee on the cultivation, processing, manufacturing, distribution or sale of cannabis or cannabis product in this State other than any usual and customary fees associated with similarly situated businesses.

(4)    adopting local laws that prohibit a premises, for which an adult-use cannabis retail dispensary or on-site consumption license has been issued, from being located within a distance, to be measured in accordance with section 119.5 of this Title, that is:

(i)    no less than a 1,000 foot radius of another premises for which a license of the same type has been issued in a city, town or village having a population of 20,000 or more; and

(ii)    no less than a 2,000 foot radius of another premises for which a license of the same type has been issued in a city, town or village having a population of 20,000 or less.

(5)     adopting or executing any agreement where the municipality, community organization or association affiliated with such municipality, otherwise receives any additional benefit outside of general operation from or imposes any duty or obligation on any applicant, registrant, licensee or permittee of the Board;

(6)     adopting a local law that would deny any right, privilege, permit, variances, approvals to any licensed adult-use retail dispensary premises that has been in existence continuously from a date prior to the date when a building on the same road or street within:

(i)     500 feet of said licensed adult-use retail dispensary premises has been occupied exclusively as school grounds;

(ii)     200 feet of said licensed adult-use retail dispensary premises has been occupied exclusively as a house of worship; or

(iii)      500 feet of said licensed adult-use retail dispensary premises has been occupied as a community facility, if the municipality has passed such ordinance.

(b)     A retail dispensary shall be in a location consistent with public convenience and advantage standards as determined by the Board.

(c)     The Board may issue a license pursuant to this section for a premises which shall be within a 2,000 foot radius of an existing premises licensed and operating in a city, town, or

village having a population of 20,000 or less, pursuant to this section, after it determines that granting such license would be in the public interest.

## § 119.2 Authorizations for Municipality Rulemaking.

(a)      All municipalities and counties are hereby preempted from adopting any law, rule, ordinance, regulation or prohibition pertaining to the registration, licensing, permitting or operation of registered organizations, adult-use cannabis businesses, or, or cannabinoid hemp businesses, provided however, such municipality may enact local laws and regulations governing the time, place and manner of the operation of licensed adult-use cannabis retail dispensaries and/or on-site consumption sites, provided that such law or regulation shall not make the operation of such licensed retail dispensaries or on-site consumption sites unreasonably impracticable as determined by the Board. To the extent the following is not unreasonably impracticable, the Board authorizes municipalities to pass local laws and regulations governing the time, place, and manner, which shall mean and apply to the following activities:

(1)      the hours of operation for adult-use retail dispensary, during which cannabis products can be sold at retail, which:

(i)      shall not be allowed to operate from 2:00 ante meridiem to 8:00 ante meridiem, unless given express written permission by such municipality, or the municipality passes a local ordinance, authorizing it to operate beyond such hours; and

(ii)     shall not restrict operations to less than 70 hours a week, provided however, this provision shall not be construed as removing the licensees' discretion to operate for less hours of operation.

(2)     the hours of operation for on-site consumption site, during which cannabis products can be sold at retail, which:

(i)     shall not be allowed to operate from 4:00 ante meridiem to 8:00 ante meridiem.

(ii)     shall not restrict operations to less than 70 hours a week provided however, this provision shall not be construed as removing the licensees' discretion to operate for less hours of operation.

(3)     business operations within historical districts;

(4)     parking;

(5)     traffic control including, but not limited to, pedestrian and vehicular traffic;

(6)     odor, consistent with the Public Health Law Article 13-E and the Clean Indoor Air Act;

(7)     noise; and

(8)      distance requirements between a licensed premises and a community facility, provided

however, that such distance requirement is no greater than 500 feet from the licensed premises

and the community facility. This provision shall not apply to licensees operating pursuant to Part

116 of this Title.

## § 119.3 Notifications to Municipalities.

(a)      Pursuant to section 76 of the Cannabis Law, notifications to municipalities regarding

adult-use retail dispensary or on-site consumption licenses shall be in a form provided by the

Office, and contain the following information:

(1)      applicant contact information;

(2)      trade name or "doing business as" name;

(3)      full name of the applicant;

(4)      street address of the establishment, including the floor location or room number, if

applicable;

(5)      the mailing address of the establishment, if different than the street address;

(6)      the name, address and telephone number of the attorney or representative of the

applicant, if any;

(7)    a statement indicating whether the application is for:

(i)    a new establishment;

(ii)    a transfer of an existing licensed business;

(iii)    a renewal of an existing license; or

(iv)    an alteration of an existing licensed premises;

(8)    if the establishment is a transfer or previously licensed premises, the name of the old establishment and such establishment's registration or license number;

(9)    in the case of a renewal or alteration application, the registration or license number of the applicant; and

(10)    the type of license.

(b)    A municipality shall have 30 days from the receipt of the notification from an applicant to express an opinion for or against the granting of such registration, license or permit application and any such opinion shall be part of the record upon which the Office makes its recommendation to the Board to grant or deny an application; Provided however, a municipality

may request additional time in writing and upon showing a reasonable documented effort for an extension.

## § 119.4 Measurement of Distance from School Grounds, Houses of Worship, Community Facilities and Between Adult-Use Retail Dispensaries and On-Site Consumption Premises

(a)    No adult-use retail dispensary or on-site consumption license shall be granted for any premises which shall be:

(1)    on the same road and within 200 feet of a building occupied exclusively as a house of worship;

(2)    on the same road and within 500 feet of school grounds;

(3)    on the same road of a community facility if the municipality has enacted an ordinance in accordance with section 119.2 of this Title;

(4)    in a city, town or village having a population of 20,000 or more within a 1,000 foot radius of another premises for which a license of the same type has been issued;

(5)    in a city, town or village having a population of 20,000 or less within a 2,000 foot radius of another premises for which a license of the same type has been issued;

(6)    The measurements in subdivision (a) of this section are to be taken in a straight line from the center of the nearest entrance of such house of worship or the nearest point of school grounds to the center of the nearest entrance of each such premises licensed and operating pursuant to this section 72 and section 77 of the Cannabis Law; except, however that no renewal license shall be denied to any premises at which a license under this Chapter has been in existence continuously from a date prior to the date when a building on the same road and within  200 feet of said premises has been occupied exclusively as a house or worship or 500 feet of said premises has been occupied by schoolgrounds.

(i)    Within the content of this paragraph, the "entrance" shall mean a main door of a house of worship, or of premises licensed and operating pursuant to this section, regularly used to give ingress to the students of the school, to the general public attending the house of worship, and to patrons or guests of the premises licensed and operating pursuant to this section or of the premises sought to be licensed, except that where a school or house of worship or premises licensed and operating pursuant to this section or the premises sought to be licensed is set back from a public thoroughfare, the walkway or stairs leading to any such door shall be deemed an entrance; and the measurement shall be taken to the center of the walkway or stairs at the point where it meets the building line or public thoroughfare. Such definition shall not include cellars, back and side doors, delivery entrances, or emergency exits.

(ii)    If the school or house of worship or premises licensed and operating pursuant to this section or the premises sought to be licensed is located in a multi-story building, the building "entrance" at the road level is used.

33

(iii)    If the school or house of worship or premises licensed and operating pursuant to this section or the premises sought to be licensed is situated on a corner lot, such establishment is considered to be on both roads of the intersection, whether or not there is an entrance to the building on both roads.

(iv)    A door which has no exterior hardware, or which is used solely as an emergency or fire exit, or for maintenance purposes, or which leads directly to a part of a building not regularly used by the general public or patrons, is not deemed an "entrance."

(v)    Within the context of this section, a building occupied as a house of worship does not cease to be "exclusively" occupied as a house of worship by incidental uses that are not of a nature to detract from the predominant character of the building as a house of worship, such uses including, but not limited to:

*(a)*    the conduct of legally authorized games of bingo or other games of chance held as a means of raising funds for the not-for-profit religious organization which conducts services at the house of worship or for other not-for-profit organizations or groups;

*(b)*     use of the building for fund-raising performances by or benefitting the not-for-profit religious organization which conducts services at the house of worship or other not-for-profit organizations or groups;

*(c)*      the use of the building by other religious organizations or groups for religious services or other purposes;

*(d)*      the conduct of social activities by or for the benefit of the congregants;

*(e)*      the use of the building for meetings held by organizations or groups providing bereavement counseling to persons having suffered the loss of a loved one, or providing advice or support for conditions or diseases including, but not limited to, alcoholism, substance use disorder, cancer, cerebral palsy, Parkinson's disease, or Alzheimer's disease; the use of the building for blood drives, health screenings, health information meetings, yoga classes, exercise classes or other activities intended to promote the health of the congregants or other persons; and

*(f)*      use of the building by non-congregant members of the community for private social functions.

(vi)      The building occupied as a house of worship does not cease to be "exclusively" occupied as a house of worship where the not-for-profit religious organization occupying the house of worship accepts the payment of funds to defray costs related to another party's use of the building.

**§119.5 Unreasonably Impracticable; Review and Determination.**

(a)      Pursuant to section 131(2) of the Cannabis Law and in accordance with this Part, no rules, regulation, ordinance, or actions of the municipality shall be effective or enforceable if

such action otherwise impedes on duties and obligations of the Board as set forth under the Cannabis Law, violates any provision of the Cannabis Law or this Part, or discriminates against or frustrates the registrant, licensee, or permittee's ability to carry out the operation of such registration, license, or permit as issued by the Board.

(b)    Should an unreasonable impractical claim be brought before the Office by a claimant contesting the validity of such local law or regulation, the Board may conduct a review of such law and issue an advisory opinion as to whether the law is "unreasonably impracticable".

(c)    Upon review and determination of an application to the Board, the Office shall send a copy of the advisory opinion to claimant and the municipality from where the local law originates.  Should the local law:

(1)    be adopted prior to the advisory opinion, the claimant can use the advisory opinion as prima facie evidence of the Board's opinion that the local law violates Cannabis Law section 131(2); or

(2)    be proposed but not adopted, the municipality shall be preempted from adopting the local law as the local law, if adopted, would be unreasonably impracticable, as determined by the Board, pursuant to Cannabis Law section 131(2).

**§ 119.6 Severability**.  If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

A new Part 120, titled Application and Licensure, is added to read as follows:

Part 120

Application and Licensure

**Part 120 – Application and Licensure.**

**§ 120.1   General Application Authorizations and Requirements.**

**§ 120.2   Application for an Adult-Use Cannabis License.**

**§ 120.3   License Specific Tiers and Options.**

**§ 120.4   Fees.**

**§ 120.5   Filing an Application.**

**§ 120.6   Processing of an Application.**

**§ 120.7   Application Eligibility and Evaluation.**

**§ 120.8   Application for an Additional License or License Type.**

**§ 120.9   Issuance of a License.**

**§ 120.10   License Duration.**

**§ 120.11   License Renewal.**

**§ 120.12   License Denials.**

**§ 120.13   Reapplication after License Denial.**

**§ 120.14   Voided Applications.**

**§ 120.15   Withdrawal of an Application.**

**§ 120.16   Standard of Reviewing Disqualified Offenses**

**§ 120.17 Notification and Reporting of Business Changes and Amendments for Applicants.**

**§ 120.18  Notification and Reporting of Business Changes and Amendments of Licensees.**

**§ 120.19 Opportunity to Cure**

**§ 120.20  Severability.**

**§ 120.1 General Application and License Authorizations and Requirements.**

(a)      Applications for new license types and for additional licenses of existing license types may be accepted from time to time as may be deemed appropriate or necessary.

(b)      Licensing applications shall be accepted, reviewed, approved, and issued on a continuous rolling basis.

(c)      Limitations may be imposed on the acceptance of licensing applications, including, but not limited to, the total number of licenses; location or authorized region of operation; size of operation or output; and operating conditions, such as sustainability, public health and safety, and social and economic equity factors.

(d)      A licensing application shall be accompanied by an application fee in the amount required by this Chapter for such a license in the form and manner prescribed by the Office.

(e)      An applicant may use an electronic signature on an application which shall be deemed intended by the applicant to have the same force and effect as the use of a signature affixed by hand. An electronic signature shall be an electronic sound, symbol, or process, attached to or

logically associated with an electronic record and executed or adopted by an individual with the intent to sign the record, in accordance with the Cannabis Law, and this Chapter.

(f)     Licenses authorizing the cultivation, processing, distribution and retail sale of cannabis and cannabis products may be granted, suspended, cancelled, revoked, or otherwise limited as may be deemed appropriate or necessary.

(g)     An applicant and licensee shall have an obligation to ensure that the information, documentation, attestations and assurances submitted to the Office are not fraudulent, false, or misleading.

(h)     An applicant shall identify any conflict of interest, including, without limitation, any relationship or affiliation of the applicant, or its true parties of interest, that currently exists with any member, employee, consultant, or agent of the Office, the Cannabis Advisory Board or the Cannabis Control Board. The conflict of interest may be actual or perceived.  If any conflict of interest should arise during the term of the application process, the applicant shall notify the Office in writing of such conflict.

(i)     A person shall hold a valid license or permit issued pursuant to the Cannabis Law to cultivate, process, distribute, deliver, dispense, offer on-site use, test, research, sell, or any other licensed activity for adult-use cannabis and cannabis products within New York State.

(j)      The information furnished in an application and in any supplemental statement related thereto shall be presumed correct and shall be binding upon a licensee as if correct.  All information furnished in an application or supplemental statement shall be deemed material in:

(1)      any prosecution for perjury;

(2)      any proceeding to suspend, cancel or revoke a license or impose a fee or other penalty; and

(3)      in the approval or denial of a license.

## § 120.2 Application for an Adult-Use Cannabis License

(a)      An applicant and each true party of interest in an applicant shall provide information in a form and manner as prescribed by the Board, which may include, but is not limited to the following:

(1)      Identity of the applicant or true party of interest.

(i)      If the applicant or true party of interest is an individual, the individual's:

*(a)*      name;

*(b)*      date of birth, corroborated by a copy of a valid photo identification containing the individual's date of birth issued by a local, state or federal government, which identification shall indicate the individual to be at least twenty-one years of age;

*(c)*      name of spouse, if any;

*(d)*      social security number;

*(e)*      contact information; and

*(f)*      any other aliases or names by which they have been known or conducted business at any time.

(ii)      If the applicant, or true party of interest, is an entity, including, but not limited to, a partnership, limited liability company, corporation, trust or estate, for each entity, the following information shall be provided:

*(a)*      name;

*(b)*      address of the principle place of business;

*(c)*      telephone number;

*(d)*      all websites, social media sites, internet presence, and digital applications or platforms owned, operated or controlled by or registered to the applicant;

*(e)*      if not a sole proprietor, state of incorporation or organization;

*(f)*      contact information of the designated individuals upon whom service shall be made;

*(g)*      federal employer identification number;

*(h)*      other names by which it has been known or has conducted business at any time; and

*(i)*      for each individual partner, member, member-manager or nonmember-manager, director, officer, trustee, certain shareholder, and each individual true party of interest of the applicant and of each level of ownership of the applicant:

*(1)*      name;

*(2)*      age, corroborated by a copy of a valid photo identification containing the individual's date of birth, issued by a local, state or federal government, of which shall indicate the individual to be at least twenty-one (21) years of age;

*(3)*      citizenship or permanent residence status;

*(4)*      home addresses; and

*(5)*      the name under which the person will conduct business if different than the legal name of the applicant, including, but not limited to, the assumed name.

(2)      Applicant ownership and financial disclosures.

(i)      the percentage of ownership interest, financial interest, or any other interest held in the applicant by persons, and the applicant's true parties of interest;

(ii)      a list of all parent companies, subsidiaries, affiliates, predecessors, and successors of the applicant, including, but not limited to, all individuals of each of the foregoing and of each level of ownership of the foregoing;

(iii)      a description of any and all ownership changes between the original application and the date of submission, including, but not limited to, events such as asset sales and purchases, stock sales and purchases, mergers, business combinations, or consolidations involving the applicant, including all former names of the applicant;

(iv)      copies of business formation and organizational documents, such as a certificate of incorporation, certificate of limited partnerships, certificates of authority, articles of organizations, charters, bylaws, partnership agreements, operating agreements, agreements between any two or more persons of the applicant that relate in any manner to the assets,

44

property or profit of the applicant, and any other comparable documents and agreements that sets forth the legal structure of the applicant or relate to the formation, organization, management or control of the business and all amendments and changes thereto;

(v)      personal histories or an entity history, as applicable, disclosure forms including, but not limited to, a person's residence, employment, licensure and conviction history;

(vi)     all proposed or executed contracts, term sheets, agreements, or side letters between the applicant or its true parties of interest of the applicant and a goods and services provider, other than those exempted under section 124.3(a)(1) of this Title, or another party that relates to the ownership and control structure; assets; liabilities; real or intellectual property; administrative, operational, financial, advisory, or management services; revenue; funding or capitalization; royalties; or profit or future profit, of the applicant or proposed licensee or comparable documents;

(vii)    capitalization tables showing ownership above ten percent of an interest in the applicant, including owners of all parent and holding entities relating back to all individual persons involved, including any person with any vested future rights to ownership or revenue, except passive investors as defined in Part 118 of this Title;

(viii)   documents relating to the ownership structure of the applicant, showing all holding and parent companies, subsidiaries, and affiliates;

(ix)    financial documents, including financial statements and tax documents of the applicant

for the most recent fiscal year ending prior to the date the application is submitted, or any other

comparable documents as may be reasonably required;

(x)    if the applicant was formed within the year preceding the application for licensure,

provide financial statements for the period of time the applicant has been in existence and any

pro forma financials used for business planning purposes;

(xi)    an organizational chart indicating the ownership structure of the applicant and all persons

who have decision making authority, control and management over the applicant entity or its

assets, including any board members, officers, and directors of the entity and any parent,

holding, or management companies of the applicant.  If the business entity has a parent company,

include the name of each parent company's principal officers and the percentage of ownership

interest of each principal officer;

(xii)    a description of any license or authorization in any other state or jurisdiction, currently or

previously, to cultivate, process, manufacture, distribute, deliver, or sell cannabis or cannabis

products in any form, held by the applicant or any true parties of interest of the applicant, and the

following which may include, but not be limited to:

*(a)*    a copy of each license or authorizing document verifying licensure in that state or

jurisdiction;

*(b)*      a statement granting permission to contact the appropriate regulatory agency that granted the license or authorization, or to authorize the Office to confirm the information contained in the application is true and accurate at its discretion; and

*(c)*      if the license or authorization, was ever denied, suspended, cancelled, revoked or otherwise sanctioned, a copy of documentation so indicating, or a statement that the applicant or true party of interest of applicant was so licensed and was never sanctioned;

(xiii)    details of any administrative proceeding or any governmental agency action in any jurisdiction during the past ten years in which the applicant or any of the true parties of interest of applicant:

*(a)*      were fined, disciplined, sanctioned, or the equivalent, came to a settlement agreement regarding a potential violation, or had a registration or license cancelled, suspended or revoked; or

*(b)*      managed or served on the board of a business or nonprofit organization that was fined, disciplined, sanctioned, or the equivalent, or had a registration or license cancelled, suspended or revoked;

(xiv)    information relating to a business continuity plan which shall mean a plan, in case the applicant, its owners, or its true parties of interest decide to leave the business; there is a material

change in the applicant's ability to operate the business; or the applicant becomes otherwise unable to operate the business;

(xv)     a certificate of status or good standing from the governing state agency of the state of formation, certificate of assumed name, a certificate of authority to do business in New York from the New York Department of State if the applicant is a foreign business, where applicable;

(xvi)    information regarding any relationship, agreement, or arrangement that may exist between *(a)* the applicant or true parties of interest and *(b)* any official or any other individuals with control over the approval of an application, including, but not limited to, employees of the Office and members of the Board;

(xvii)   whether the applicant or any true party of interest of applicant:

*(a)*     is out of compliance with the General Obligations Law Section 3-503(2);

*(b)*     has been disciplined or sanctioned by a state or federal agency; or

*(c)*     has had any state or federal tax liens against any of their property;

(xviii)  a list of any charitable contributions by the applicant in the last five (5) years;

(xix)    designation of each portion of the application that the applicant considers to be exempt from disclosure under the New York State Freedom of Information Law including, but limited to certain trade secrets or commercial information;

(xx)    a copy of the labor peace agreement between the applicant and a bona fide labor organization and an attestation that the applicant understands that the maintenance of such a labor peace agreement shall be an ongoing material condition of the license; and

(xxi)    any other additional information requested by the Office.

(3)    Criminal history and legal proceedings.  For the applicant and its true party of interest, other than its passive investors or otherwise determined by the Office:

(i)    fingerprints in a form and manner as specified by the Office for purposes of obtaining a criminal history report from the division of criminal justice services. Fingerprints submitted shall be transmitted to the division of criminal justice services and may be submitted to the federal bureau of investigations for state and national criminal history information checks;

(ii)    information regarding legal actions, including, but not limited to:

(a)    any pending legal actions, whether civil, criminal or administrative in nature, and a brief description of any such actions;

*(b)*      any settled or closed legal actions, whether civil, criminal or administrative in nature, against the applicant over the past ten years;

*(c)*      any judgments within the past ten years including the court, case name, case number, a summary of the facts, the cause of action and what the final ruling or determination was from the court, administrative body or other tribunal;

*(d)*      any judgments within the past ten years including the court, case name, case number, a summary of the facts, the cause of action and what the final ruling or determination was from the court, administrative body or other tribunal;

*(e)*      any order, judgment, or decree of any court, administrative body or other tribunal of competent jurisdiction permanently or temporarily enjoining it from or otherwise limiting its participation in any type of business, practice, or activity within the last ten years;

*(f)*      information on any bankruptcies, voluntary or involuntary, assignments for the benefit of creditors, appointments of a receiver or custodian or similar insolvency proceedings made, commenced or pending during the past ten years by or involving any applicant;

*(g)*      a description of any delinquencies in the payment of any fees or tax required under any federal, state, or municipal law within the past ten years and description of the circumstance for any payment not made because of a dispute regarding the payment of those fees or taxes;

(iii)    evidence regarding good moral character, which may include, but not be limited to the applicants':

*(a)*    criminal history information;

*(b)*    court documents;

*(c)*    arrest reports;

*(d)*    accusatory instruments; and

*(e)*    fingerprint responses.

(4)    Premises. Upon receiving provisional license approval, the applicant may be required to provide additional information regarding its premises, including, but not limited to:

(i)    information identifying any person that receives payment for rent under a lease or rental agreement relating to the applicant or the premises to be licensed;

(ii)    information identifying the premises to be licensed which may include, but is not limited to, the street name and number, photographs, GPS coordinates, architectural drawings or other items related to the appearance of the interior or exterior of such premises, and floor plans of the interior of any structures being utilized on the premises;

(iii)    the nature of the applicant's interest in the premises, whether leased or owned, and the name of any other person interested as a partner, joint venturer, investor or lender, mortgage holder or mortgage guarantor, or by any other means, with the applicant in the premises;

(iv)    a statement that the location and layout of the premises to be licensed does not violate any requirement of the Cannabis Law and this Chapter relating to the location and layout of the licensed premises;

(v)    a statement from the applicant that they have complied with any requirements, including notification requirements, under the Cannabis Law, relating to a municipality in which the applicant intends to locate the licensed premises, where applicable;

(vi)    a copy of a certificate of occupancy or its equivalent for the licensed premises;

(vii)    copies of all applicable executed and proposed deeds, leases, rental agreements or executed option contracts related to the licensed premises, provided before the applicant begins operations, the documents shall demonstrate the applicant possesses or has the right to use sufficient land, buildings, and other premises as specified in the application to properly carry on the activities for which licensure is sought;

(viii)    documentation acceptable to the Office, that the applicant will be able to obtain insurance sufficient to indemnify and hold harmless the state and its officers and employees;

(ix)    information relating to applicant's eligibility and the criteria used in evaluation of applicants; and

(x)    any other information as determined by the Office.

(5)    Social and Economic Equity.  An applicant seeking to qualify as a social and economic equity applicant shall provide information proving their qualification as described in Part 121.

## § 120.3 License Specific Tiers and Options.

(a)    Nursery License.

(1)    All nursery applicants shall obtain a Nursery Grower Certificate of Registration from the New York State Department of Agriculture and Markets Division of Plant Industry prior to submitting their application to the Office.

(2)    An applicant for a nursery license shall indicate the type of nursery license it seeks to operate based on the size of the cultivation area and the type of cultivation as set forth below:

(i)    Nursery Outdoor – for outdoor cultivation, a maximum area of 100,000 square feet;

(ii)    Nursery Mixed-Light – for mixed light type cultivation, a maximum area of 10,000 square feet; or

(iii)    Nursery Indoor – for indoor cultivation, a maximum area of 10,000 square feet.

(b)    Cultivator License. An applicant for a cultivator license shall indicate the license tier in which it seeks to operate based on the size of the cultivation canopy and the type of cultivation as set forth below.

(1)    There are four different license types for cultivation: (i) outdoor, (ii) mixed light, (iii) combination of outdoor with mixed light, or (iv) indoor.  A cultivator may only have one cultivator license which will authorize the cultivator to cultivate within a specified type and canopy tier as approved on the cultivator's application.

(2)    A cultivator that is authorized to cultivate indoor, mixed-light, or outdoors is authorized to cultivate cannabis in one of the following canopy tiers as authorized on the licensee's application:

(i)    Tier I. Not exceeding 5,000 square feet;

(ii)    Tier II. Greater than 5,000 square feet, not exceeding 12,500 square feet;

(iii)    Tier III. Greater than 12,500 square feet, not exceeding 25,000 square feet;

(iv)    Tier IV. Greater than 25,000 square feet, but not exceeding 50,000 square feet; or

(v)    Tier V. Greater than 50,000 square feet, but not exceeding 100,000 square feet.

(3)    A cultivator is authorized to cultivate outdoors with mixed light in one of the following canopy tiers:

(i)    Tier I Combination Cultivator. Not exceeding 5,000 square feet of outdoor and 2,500 square feet of mixed light;

(ii)    Tier II Combination Cultivator.  Greater than 5,000 square feet, but not exceeding 12,500 square feet of outdoor, and greater than 2,500 square feet but not exceeding 6,250 square feet of mixed light;

(iii)    Tier III Combination Cultivator.  Greater than 12,500 square feet, but not exceeding 25,000 square feet of outdoor, and greater than 6,250 square feet but not exceeding 12,500 square feet of mixed light;

(iv)    Tier IV Combination Cultivator. Greater than 25,000 square feet, but not exceeding 50,000 square feet of outdoor, and greater than 10,000 square feet but not exceeding 15,000 square feet of mixed light; or

(v)    Tier V Combination Cultivator. Greater than 50,000 square feet, but not exceeding 100,000 square feet of outdoor, and greater than 15,000 square feet but not exceeding 30,000 square feet of mixed light.

(4)      A cultivator shall not expand or reduce its cultivation canopy outside the bounds of its licensed cultivation tier unless it has applied to the Office and received prior written approval of the Office.

(5)      In determining whether to approve a cultivator to change its canopy tier, the following factors may be considered including, but not limited to, the licensee's:

(i)      cultivation history, including whether the licensee sold more than 85% of the cannabis it harvested in the preceding six months;

(ii)      whether the licensee's plants or inventory suffered a catastrophic event during the licensing period;

(iii)      cannabis transfers and sales history;

(iv)      existing inventory and a licensees inventory history;

(v)      adhearance to any plan required in this Chapter, including, but not limited to, the licensee's operating plan, environmental plan, and community impact plan; and

(vi)      any other factors determined by the Board.

(6)      At the time of license renewal, cultivators shall provide inventroy and production records requested by the Office during the six months prior to the application for renewal. As part of the license renewal process, the Board may reduce a cultivator's maximum cultivation canopy to a lower tier if the cultivator sold less than 50% of what it harvested in the previous six months.

(c)      Microbusiness License. An applicant for a microbusiness license shall indicate on the application for licensure the activities in which the applicant intends to engage.

(1)      The microbusiness shall also indicate the license tier in which it seeks to operate based on the size of the cultivation canopy and the type of cultivation as set forth below:

(i)      Indoor canopy not to exceed 3,500 square feet;

(ii)     Mixed light canopy not to exceed 5,000 square feet; or

(iii)    Outdoor canopy not to exceed 10,000 square feet.

(2)      In determining whether to approve a microbusiness licensee to transition to a cultivator license, the Board may consider the factors set forth in section 120.3(b)(5) of this Title.

(d)      Processor License. An applicant for a processor license shall indicate on the application for licensure the processing activities in which the applicant intends to engage in, including:

(1)     extraction;

(2)     blending and infusing;

(3)     packaging and labeling; and

(4)     branding, including for the exclusive performance of white labeling agreements;

(e)     Cooperative License. An applicant seeking to qualify for a cooperative license shall:

(1)     be formed as a cannabis cooperative under one of the following:

(i)     the Cooperative Corporations Law, or

(ii)     approval from the Office based on one of the following two methods:

(a)     certification and recommendation by a national and well-established worker-cooperative trade association, or by a local chapter of a national and well-established worker-cooperative trade association, or

*(b)*    an opinion rendered by an independent CPA or other similarly credentialed professional, that the applicant would meet the criteria to qualify under Subchapter T, as per the United States Internal Revenue Service.

(2)    at minimum, meet the business authorizations and prohibitions set out in section 123.13 of this Title; and

(3)    indicate on the application for licensure the number of members in the cooperative, the facility type, the size of the cultivation canopy, and the type of cultivation as set forth below.

| Sq ft (000's) per Number of Members in the Cooperative | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Facility Type** | Number of Members | | | | | | | | | | |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | >15 |
| **Indoor** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 100 | 100 | 100 | 100 | 100 |
| **Mixed-Light** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 112.5 | 125 | 125 | 125 | 125 |
| **Combination Mixed-Light & Outdoor** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 112.5 | 125 | 125 | 125 | 125 |
| **Outdoor** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 112.5 | 125 | 137.5 | 150 | 150 |

(4)    At the time of license renewal, the cooperative shall provide records requested by the Office during the six months prior to the application for renewal. The Board may reduce the cooperative's maximum cultivation canopy to a lower tier if the cooperative sold less than 50% of what it harvested in the previous six months.

(5)     The applicant shall indicate the types of processing activities that will be performed, pursuant to subdivision (d) of this section.


**§ 120.4 Fees.**

(a)     Application Fees. All applications shall be accompanied by a non-refundable application fee of $1,000 unless otherwise set forth in this section.


(1)     Applications for an ROD and ROND license shall be accompanied by a non-refundable application fee of $10,000.


(b)     Licensing Fees. Prior to final issuance of a license, an applicant shall pay a licensing fee for the specific license type as follows:


(1)     Adult-Use Nursery License:


(i)     Maximum outdoor area of 100,000 square feet - $750


(ii)    Maximum mixed light area of 10,000 square feet - $1,000


(iii)   Maximum indoor area of 10,000 square feet - $2,000


(2)     Adult-Use Cultivator License:

(i)  Outdoor Tier 1 - $1,000 + $150/500 square feet of cultivation canopy;

(ii)  Outdoor Tier 2 - $2,500 + $250/500 square feet of cultivation canopy greater than 5,000 square feet;

(iii)  Outdoor Tier 3 - $6,250 + $350/500 square feet of cultivation canopy over 12,500 square feet;

(iv)  Outdoor Tier 4 - $15,000 + $500/500 square feet of cultivation canopy over 25,000 square feet;

(v)  Outdoor Tier 5 - $40,000 + $800/500 square feet of cultivation canopy over 50,000 square feet;

(vi)  Mixed Light Tier 1 - $1,500 + $290/500 square feet of cultivation canopy;

(vii)  Mixed Light Tier 2- $4,380 + $440/500 square feet of cultivation canopy over 5,000 square feet;

(viii)  Mixed Light Tier 3- $10,940 + $615/500 square feet of cultivation canopy over 12,500 square feet;

(ix)    Mixed Light Tier 4- $26,250 + $875/500 square feet of cultivation canopy over 25,000 square feet;

(x)    Mixed Light Tier 5- $70,000 + $1,400/500 square feet of cultivation canopy over 50,000 square feet;

(xi)    Indoor Tier 1- $1,750 + $450/500 square feet of cultivation canopy;

(xii)    Indoor Tier 2 - $6,250 + $625/500 square feet of cultivation canopy over 5,000 square feet;

(xiii)    Indoor Tier 3- $15,630 + $880/500 square feet of cultivation canopy over 12,500 square feet;

(xiv)    Indoor Tier 4 - $37,500 + $1,250/500 square feet of cultivation canopy over 25,000 square feet;

(xv)    Indoor Tier 5 -  $100,000 + $2,000/500 square feet of cultivation canopy over 50,000 square feet;

(xvi)    Combination Tier 1 – $1,250 + $150/500 square feet of cultivation canopy;

(xvii)   Combination Tier 2 -  $3,500 + $235/500 square feet of cultivation canopy over 5,000 square feet;

(xviii)  Combination Tier 3 -  $8,750 + $375/500 square feet of cultivation canopy over 12,500 square feet;

(xix)    Combination Tier 4 -  $21,000 + $585/500 square feet of cultivation canopy over 25,000 square feet; and

(xx)     Combination Tier 5 - $56,000 + $860/500 square feet of cultivation canopy over 50,000 square feet.

(3)     Adult Use Cooperative Cultivation License:

(i)      Cooperative Outdoor Tier 1- $15,000 + $0.25/square foot of cultivation canopy up to 25,000 square feet;

(ii)     Cooperative Outdoor Tier 2 - $20,000 + $0.25/square foot of cultivation canopy greater than 25,000 and less than 50,000 square feet;

(iii)    Cooperative Outdoor Tier 3 - $25,000 + $0.25/square foot of cultivation canopy greater than 50,000 square feet and less than 100,000 square feet;

(iv)     Cooperative Outdoor Tier 4 - $30,000 + $0.25/square foot of cultivation canopy greater than 100,000 square feet;

(v)     Cooperative Mixed Light Tier 1 - $20,000 + $0.25/square foot of cultivation canopy up to 25,000 square feet;

(vi)     Cooperative Mixed Light Tier 2 - $25,000 + $0.25/square foot of cultivation canopy greater than 25,000 square feet but less than 50,000 square feet;

(vii)     Cooperative Mixed Light Tier 3 - $30,000 + $0.50/square foot of cultivation canopy greater than 50,000 square feet but less than 100,000 square feet;

(viii)     Cooperative Mixed Light Tier 4 - $35,000 + $0.50/square foot of cultivation canopy greater than 100,000 square feet;

(ix)     Cooperative Indoor Tier 1- $30,000 + $0.75/square foot of cultivation canopy up to 25,000 square feet;

(x)     Cooperative Indoor Tier 2 - $35,000 + $0.75/square foot of cultivation canopy greater than 25,000 but less than 50,000 square feet;

(xi)     Cooperative Indoor Tier 3 - $50,000 + $0.75/square foot of cultivation canopy greater than 50,000 square feet up to 100,000 square feet;

(xii)    Cooperative Combination Tier 1- $20,000 + $0.25/square foot of cultivation canopy up to 25,000 square feet;

(xiii)    Cooperative Combination Tier 2 - $25,000 + $0.25/square foot of cultivation canopy greater than 25,000 and less than 50,000 square feet;

(xiv)    Cooperative Combination Tier 3 - $30,000 + $0.25/square foot of cultivation canopy greater than 50,000 square feet and less than 100,000 square feet; and

(xv)    Cooperative Combination Tier 4 - $35,000 + $0.25/square foot of cultivation canopy greater than 100,000 square feet.

(4)    Adult-Use Processor License:

(i)    Adult-Use Processor License – Extraction, Infusing and Blending, and Packaging, Labeling and Branding: $7,000 per processing premises;

(ii)    Adult-Use Processor License – Infusing and Blending, and Packaging, Labeling and Branding: $4,000 per processing premises;

(iii)    Adult-Use Processor License – Packaging, Labeling and Branding, including for the exclusive performance of white labeling agreements: $2,000 per processing premises, provided

however, if applying as a Tier 1 or Tier 2 Cultivator Licensee of any cultivation type, the processor license fee shall be $500.

(5)      Cooperative Processor Licenses: $5,000 per processing premises.

(6)      Adult-Use Distributor License: $7,000 per operating premises.

(7)      Cooperative Distributor License: $3,500 per operating premises.

(8)      Adult-Use Retail Dispensary License: $7,000.

(9)      Adult-Use Microbusiness License: $4,500.

(10)     Adult-Use Delivery License: $4,500.

(11)     ROND Licensing fee:

(i)      Cultivation – The fees associated with the tier (v) indoor, outdoor, mixed-light or combination cultivation tier for which the ROND is licensed;

(ii)     Processing - $75,000;

(iii)    Distribution - $100,000;

66

(iv)    For the first year, prior to conducting the first adult-use cannabis sale by the licensee, a one-time initial license fee of $5 million; and

(v)    For the first five years after the first adult-use cannabis or cannabis product sale by the licensee, the lesser of:

*(a)*    2% of all gross revenue generated by the licensee's New York State adult-use cannabis operations; or

*(b)*    $1 million.

(13)    ROD License. In addition to the license fees set forth in paragraph 11 of this subdivision for a ROND, the ROD shall pay $100,000 per co-located retail dispensary and a one-time special license fee of $3 million per co-located adult-use retail dispensary.

(c)    Reduced, Waived or Deferred fees.  An applicant may pay a reduced, waived or deferred application and license fee as follows:

(1)    if the applicant qualifies as a social and economic equity applicant as set forth in section 121.2 of this title, then a 50% reduction, waiver or deferred fee; or

(2)     any other supplemental reduction, waiver or deferred fee as determined by the Board for the purposes of providing financial assistance to an applicant who demonstrates sufficient need.

(d)     An applicant shall pay any fees for amendments or changes to an application as determined by the Board.

(e)     Upon application for license renewal, a licensee shall pay renewal fees equivalent to the fees paid for the initial license, or as otherwise determined by the Board; provided however a ROND shall only pay the license fee set out in subparagraph (11)(iv) of this subdivision upon initial licensure.

## § 120.5 Filing of an Application.

(a)     No application for a license shall be deemed complete for filing with the Office pursuant to this Part until the following:

(1)     all information conforming to all requirements relating to format, signature, oath or affirmation have been properly submitted, and all copies of documents provided, as the Office may require;

(2)     all requested and required disclosures have been properly submitted;

(3)     all required consents, waivers, fingerprint responses, and photographs have been properly submitted;

68

(4)    all information, documentation, attestations and assurances and other materials required have been submitted with the application; and

(5)    all required fees have been paid.

## § 120.6 Processing of an Application.

(a)    Only completed applications may be processed.  The processing of an application shall not constitute an acknowledgment that the requirements of the Cannabis Law and this Chapter have been satisfied.

## § 120.7 Application Eligibility and Evaluation.

(a)    Eligibility for adult-use cannabis licenses. An applicant for an adult-use cannabis license pursuant to Article 4 of the Cannabis Law, shall satisfy the following minimum requirements to be eligible for a license:

(1)    An applicant shall provide information in a form and manner as prescribed by the Board, which shall demonstrate the eligibility for the license type being sought; and

(2)    In order to apply for a ROND or a ROD license, a registered organization shall be in good standing with the Office and have four medical dispensing sites dispensing to patients and submit the following:

(i)      a community impact plan as described in section 121.4 of this Title;

(ii)      an energy and environmental plan as described in section 125.1(c) of this Title;

(iii)      a medical patient prioritization plan, including the requirements set forth in section 123.16 of this Title;

(iv)      a co-location retail dispensary operating plan if a ROD; and

(v)      any other information required by the Office.

(b)      Evaluation of applications. An applicant for an adult-use cannabis license shall be evaluated, in a manner determined by the Board, based on criteria to be set by the Board at the time of the opening of the licensing window. Such criteria may include, but is not limited to:

(1)      the selection criteria detailed in Article 4, section 64 of the Cannabis Law;

(2)      the applicant's community impact plan, as defined in section 121.4 of this Title, highlighting the applicant's proposed strategy for community engagement;

(3)      the applicant's energy and environmental plan, as defined in section 125.1(c) of this Title, demonstrating planned compliance with standards and regulations, and highlighting

technologies, techniques, and strategies to protect the surrounding environment, limit carbon footprint, and leverage sustainable energy sources;

(4)     completion of any workforce or training programs offered by the Office and completed by the applicant;

(5)     the applicant's history in creating or maintaining an equitable workplace environment through the review of previous business and management practices including, but not limited to:

(i)     wages, including, but not limited to:

(a)     starting hourly rates for hourly workers;

(b)     starting salary for salaried workers; and

(c)     average annual wage percent increases in the last three years by classification of employee;

(ii)     benefits, including, but not limited to:

(a)     number of hourly employees with 100% employer paid medical premiums;

(b)     number of hourly employees receiving Family, Single +1 coverage;

(c)　　number of hourly employees with employee co-contributions for medical coverage; or

(d)　　employer paid retirement benefits such as 401K match or direct contributions;

(iii)　　training, including, but not limited to, health and safety training;

(iv)　　retention rates; and

(v)　　diversity in hiring and promotion.

(6)　　history in creating or delivering culturally and linguistically competent services to diverse and underserved populations including, but not limited to:

(i)　　training programs;

(ii)　　multilingual services;

(iii)　　published materials and curricula;

(iv)　　community outreach;

(v)　　administrative and organizational accommodations; and

(vi)     any other qualifications deemed necessary by the Office;

(7)     serving in community leadership roles within established and licensed businesses, nonprofits, religious organizations, educational institutions, philanthropic organizations, community clubs, neighborhood associations and any other qualifications deemed sufficient by the Office;

(8)     supporting evidence that demonstrates the applicant's ability, capacity, and any initial steps taken to meet the Board's standards for the plans in paragraphs (2) and (3) of this subdivision;

(9)     the relative performance of applicants based on such criteria;

(10)     for applications from entities with twenty-five or more employees, the Office shall give consideration to whether applicants have entered into an agreement with a statewide or local bona-fide building and construction trades organization for construction work on its licensed facilities; and

(11)     any other information requested by the Office.

(c)      Selection. During the evaluation of an application, the Office may use evaluation mechanisms included but not limited to scoring, compliance, qualified lotteries, and a randomized selection process or any combination thereof.

(1)      The Board will determine the eligibility criteria for each license type.

(2)      The Board may prioritize application submission, review, selection and issuance by, including, but not limited to, region, license type, and social and economic equity status.

(3)      Application submission, review, selection, and issuance may be prioritized by groupings consistent with section 87 of the Cannabis Law, such as:

(i)      A group consisting only of applications that demonstrate the applicant is eligible for extra priority as defined in section 121.2 of this Title provided the applicant is seeking to qualify as a social and economic equity licensee and:

(a)      is a member of a community disproportionately impacted by the enforcement of cannabis prohibition,

(b)      has an income lower than 80% of the median income of the county in which the applicant resides, and

(c)     was convicted of a marihuana-related offense prior to the effective date of the Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Act, was convicted of a marihuana-related offense.

(ii)     A group consisting only of applications that meet the definition of distressed farmer as described in paragraph (3) of subdivision (h) of section 121.1 of this Title;

(iii)     A group consisting only of applications that meet the definition of service-disabled veteran as described in subdivision (i) of section 121.1 of this Title;

(iv)     A group consisting only of applications that demonstrate the applicant is from a community disproportionately impacted by the enforcement of cannabis prohibition as described in subdivision (d) of section 121.1; and

(v)     A group consisting of all other applications not included in the categories in subparagraphs (i) through (iv) of this paragraph.

(4)     Applications may be considered in multiple groups pursuant to their eligibility for such groups.

(d)     Upon submitting a final license application, an applicant shall submit the required license fee as set out in section 120.4.

(e)      If an applicant is approved by the Board, the applicant shall be subsequently issued a

provisional license. Such provisional license shall be subject to reasonable conditions specified

by the Board.

(f)      If a provisionally approved applicant fails to satisfy the conditions determined by the

Board, the application will be deemed incomplete and the provisional approval will be revoked;

provided however, that the applicant may request additional time and shall have the opportunity

to demonstrate to the Board a reasonable documented effort to complete the conditions required

by this section in a timeframe set out by the Board. If the applicant fails to satisfy the conditions

and is unable to demonstrate a reasonable documented effort, the applicant will not be refunded

the licensing fee.

### § 120.8 Application for an Additional Licenses or License Type.

(a)      A licensee seeking to apply for any additional licenses or license types shall do so in a

form and manner required by the Board and remit the required application and license fees set

out in section 120.4:

(1)      for an additional license type authorized by the Cannabis Law and this Chapter, different

than the one a licensee currently holds, the licensee shall file an application for the additional

license sought and shall pay the application and license fee for each additional license type

sought;

(2)      for an additional license of the same type as the licensee currently holds and is authorized pursuant to this Chapter and the Cannabis Law, with no amendments or changes to the business information, ownership, or true parties of interest, the licensee may file an abridged application in a form and manner required by the Board for the additional license; or

(3)      to amend or change a current license type to another license type, the licensee shall submit an application for the new license type while maintaining their current license type.

(b)      A licensee may maintain its current license type during the processing of the application for a new license. If the licensee is prohibited by the Cannabis Law from holding simultaneously their current license and the new license sought, then the licensee shall be required to provide notice to the Office in writing that the licensee is surrendering its current license prior to the issuance of the new license. Any licensee providing such notice of surrender to the Office shall provide a copy of such notice to its workforce no later than 30 days prior to notifying the Office of its intention to surrender the license, provided however, if the licensee has more than 50 employees, the licensee must notify their workforce 60 days prior to notifying the Office.

(c)      If the application pursuant to this section is denied or non-selected for a license, the non-selection or denial shall not affect the licensee's current license.

(d)      The Office may prioritize the review of an applicant's request for an additional license provided that applicant already has a license.

77

**§ 120.9 Issuance of a License.**

(a)     No license shall be considered, issued, or effective without final approval of the Board.

(b)     An application for licensure under this Part shall only be approved by the Board if:

(1)     a complete application has been submitted to the Office along with all necessary fees;

(2)     the application demonstrates, to the satisfaction of the Board, that the applicant will operate in accordance with Article 4 of the Cannabis Law and this Chapter;

(3)     the applicant is ready, willing and able to properly carry on the activities set forth in the application; and

(4)     the applicant is of good moral character.

(c)     The Board may provisionally approve an applicant, which shall convert into a final approval upon the Board's receipt, to its satisfaction, of all necessary documents to meet outstanding conditions and contingencies resulting from the application process; provided, the Board may deny any applicant that has not submitted all necessary documentation to the satisfaction of the Board in a timeline prescribed by the Board.  After receiving provisional approval, the applicant shall be given twelve months to fulfill and submit any outstanding information required to obtain final license approval, unless otherwise approved by the Board.

(d)    Licenses issued under this Chapter shall be effective upon the date the provisional license approval converts to a final approval and shall specify the following information:

(1)    name of the licensee;

(2)    address of the real property, or if applicable the online retailer website, where the licensed activities may take place;

(3)    name of the contact person;

(4)    the license type and a list of the activities permitted to be performed under the license for each licensed premises;

(5)    date of issuance;

(6)    date of expiration; and

(7)    the license number.

(e)    Licenses shall not be transferable or assignable without prior written approval of the Board including, without limitation, to another licensee. A change in majority ownership or controlling interest in the license or person holding the license, shall constitute a transfer of the license.

(f)     To obtain approval from the Board for the transfer of a license, a transferee shall submit an application to the Office, in a manner prescribed by the Board, demonstrating an ability to operate the license in compliance with this Chapter, along with an application fee pursuant to section 120.4 of this Title.

(g)     The Board may deny an application for transfer of a license if the application fails to demonstrate that the transferee will comply with all the requirements of this Chapter, or if the licensee has a record of poor performance, meaning two or more Category 1 and 2 Violations pursuant to Part 133 of this Title, within the past two years.

(h)     A licensee may amend a license to add or delete permitted activities or change the location of a licensed premises by submitting a written request to the Office along with an application fee pursuant to section 120.4 of this Title.

(i)     A request to add permitted activities shall be reviewed by the Office in accordance with section 120.7 of this Title.

(j)     Verification. The Office may conduct random or scheduled verification inspections after a license has been issued to determine if the plans submitted to the Office meet or met the minimum requirements as described in this Chapter or in guidance as may be issued by the Office.

(1)    In the event the Board determines that plans or evidence submitted under this Part did not meet such minimum requirements at the time of application, the Board may deny renewal of, suspend, cancel or revoke the license in accordance with Part 133 of this Title.

(2)    In the event the Board determines that a licensee fails to adhere to the minimum requirements described in any plan or evidence submitted under this section, the Board may deny renewal of, suspend, cancel or revoke the license in accordance with Part 133 of this Title.

## § 120.10 License Duration.

(a)    A license shall expire two years after the date it is issued.

(b)    A licensee may surrender its license prior to the expiration date of such license; however, the surrender of the license shall not automatically invalidate or terminate any pending violations, charges, fines, or proceedings commenced against the licensee.

## § 120.11 License Renewal.

(a)    An application to renew any license issued under this Part shall be filed with the Office not more than 120 days nor less than 90 days prior to the expiration thereof. If a renewal application is not filed at least 60 days prior to the expiration thereof, the Office may determine that the license shall expire and become void on such expiration date.

(b)    Renewal applications shall be accompanied by a non-refundable application fee and license fee as set out in section 120.4 of this Title.

(c)    The application for renewal shall be submitted to the Office, in a manner prescribed by the Board, and include such information as the Board may require including, but not limited to, the following evidence or information showing:

(1)     the licensee's contributions to communities and individuals disproportionally harmed by marihuana prohibition laws;

(2)    the licensee has an executed labor peace agreement with a bona-fide labor organization;

(3)    the racial, ethnic, and gender diversity of the licensee's employees and owners;

(4)    the licensee has adhered to the social responsibility framework set forth by the Office;

(5)    compliance with building and fire codes, zoning ordinances, and business licensing requirements or any other as code, ordinance or requirement determined by the Office;

(6)    an update on the information as outlined in paragraph (5) of subdivision (b) of section 120.7 of this Title;

(7)     the licensee has no outstanding filings, reports, fines or other deficiencies with the Office in the operations of its adult-use license; and

(8)     any other information requested by the Office.

(d)     The Board shall determine whether to renew an applicant's license based on the relevant factors in this section and section 120.7 of this Title.

(e)     If applicable, the licensee shall provide a statement that there have been no amendments or changes to the licensed premises since the license was issued, excepting any amendments or changes that previously received approval from the Office or Board as applicable; and

(f)     An applicant may not apply to renew a license if the license has been cancelled, suspended, or revoked.

## § 120.12 License Denials.

(a)     The Board may deny an application for a license, including renewal applications, if:

(1)     the application does not meet the eligibility requirements in section 120.7 of this Title;

(2)     the applicant or their true parties of interest, have a history of violations relating to its operation of owning or operating a business;

(3)     the source of funds identified by the applicant to be used for the acquisition, startup, or operation of the business is determined by the Office to be questionable, unverifiable, or gained in a manner which is in violation by law;

(4)     the applicant fails to submit information or documentation requested by the Office during the application and evaluation process, including any supplemental documentation, subject to the applicable cure period set forth in section 120.19 of this Title;

(5)     the applicant makes false representation or fails to disclose a material fact to the Office, and therefore may be subject to prosecution under section 190.25 of the Penal law, during the application process;

(6)     the applicant, or any true party of interest of the applicant, is prohibited from trafficking cannabis pursuant to section 137 of the Cannabis Law;

(7)     the applicant, or any true party of interest of the applicant, is a person determined to be not of good moral character;

(8)     the applicant, or any true party of interest of the applicant, has outstanding violations, fines, fees, payments or other indebtedness assessed against them by state, or federal regulatory authorities or any local municipalities;

(9)     the applicant, or any true party of interest of the applicant, has a history of giving away or selling cannabis or cannabis products in an unlicensed and unauthorized manner since the passage of the Act, through a brick and mortar retail store front, vehicle, or "membership club" that sells cannabis or cannabis products or charges customers a membership or admittance fee, or otherwise poses as a legitimate business.

(10)     the applicant, or any true party of interest of the applicant, has or previously had unapproved interest in a license issued by the Board, other than an interest exempt from disclosure pursuant to this Chapter.

(11)     the proposed licensed premises is located in a location prohibited by Cannabis Law or state laws or regulations; except with respect to licensed premises previously approved;

(12)     the applicant fails a pre-licensure inspection of the premises by the Office unless the applicant shows good cause for the Office to perform an additional inspection;

(13)     the applicant demonstrates a pattern of deficiencies, including, but not limited to:

(i)     refusal or inability to produce records or reports as requested by the Office;

(ii)     failure to correct deficiencies or violations in accordance with an approved corrective action plan;

(iii)     deviation from regulations or standard operating procedures so as to jeopardize the quality of cannabis or cannabis products; and

(iv)     refusal to provide Office employees with access to the licensed premises;

(14)     knowledge of sale of cannabis or cannabis products not meeting the requirements of this Chapter;

(15)     general failure to comply with the requirements of this Chapter; and

(16)     any other grounds for denial as determined by the Board.

(b)     In addition to the aforementioned, the Board may specifically deny any renewal application based on additional criteria, including, but not limited to, if:

(1)     the applicant fails to maintain a labor peace agreement with a bona-fide labor organization;

(2)     the applicant fails to provide documentation of the racial, ethnic, and gender diversity of the applicant's employees and owners;

(3)     the applicant fails to submit a renewal application not less than 60 days prior to expiration of license term;

(4)     the applicant fails to provide evidence of the execution of their plan for benefiting communities and individuals disproportionally impacted by enforcement of marihuana prohibition; and

(5)     any other grounds for denial as determined by the Board.

## § 120.13 Reapplication after License Denial.

(a)     An applicant whose application was denied or a licensee whose license was cancelled, suspended, revoked or not renewed, due to one or more of the provisions in paragraphs (1) through (4) of this subdivision, may reapply at any time after the failure or disqualification is cured:

(1)     failure to satisfy the age requirement of the Cannabis Law, after which reapplication is permitted only upon attaining the requisite age;

(2)     determination that the applicant was a person prohibited from trafficking cannabis, after which reapplication is permitted only upon a change in circumstances whereby the applicant no longer meets the standards as a person prohibited to traffic cannabis under section 137 of the Cannabis Law;

(3)     any statutory or regulatory provision that is subsequently repealed or modified, after which reapplication is permitted only upon a showing that the subsequent repeal or modification

87

of the statutory or regulatory provisions obviates the grounds for denial or revocation and justifies the conclusion that the prior determination should not have been a basis for denying an application; or

(4)    the chosen premises was in a location that violated the Cannabis Law or local ordinances, after which reapplication is permitted upon securing a new location.

(b)    An applicant seeking to reapply pursuant to subdivision (a) of this section shall file with the Office a petition stating with particularity how the failure or basis for disqualification has been cured.

(c)    Except as otherwise set forth in this Part or the Cannabis Law, an applicant whose application has been denied or licensee whose license has been cancelled, suspended, revoked, or not renewed may reapply after one year.  No application whose license has been cancelled, suspended, revoked, or not renewed within one year, that is substantially the same as a previous applicant by way of their true parties of interest, ownership and control structure, or any other consideration the Office determines to be of interest, shall be considered for another license. The new application shall include submission of sufficient evidence demonstrating that the factual circumstances upon which the denial or cancellation, suspension or revocation was based have been cured to the satisfaction of the Office.

(d)    Notwithstanding subdivision (c) of this section, if an applicant that has qualified as a social and economic equity applicant is denied for a license but is otherwise eligible, the

applicant may be considered by the Office for admission into the social and economic equity incubator program, as articulated in the Social and Economic Equity Plan, and subsequently reapply after completion of the incubator.

**§ 120.14 Voided Applications.**

(a)    Upon failure by an applicant to respond to the Office's requests for information or documentation pertaining to their application within the time required by the Office, the application may be deemed void.

**§ 120.15 Withdrawal of an Application.**

(a)    Prior to the Board issuing or denying a license, an applicant may withdraw an application by providing the Office written notice of such withdrawal. Upon the receipt of such notice the Office will cease processing such application.

(b)    If an applicant has previously withdrawn an application, the Office may refrain from processing any application submitted by such applicant within one year from the date of such withdrawal.

(c)    No fee or other payment relating to an application shall become refundable by reason of withdrawal of the application, unless the Office determines otherwise.

**§ 120.16 Standard for Reviewing Disqualifying Offenses**

(a)     For purposes of determining whether an applicant qualifies or is suitable for a license under the Cannabis Law, including, but not limited to, with respect to section 137 of the Cannabis Law, this Part, the following shall apply with respect to offenses of an applicant and any of its true parties of interest as that term is defined in Part 118 of this Title:

(1)     All conditions, offenses, violations and conduct are construed to include New York State law or similar laws of other jurisdictions, provided however, this shall not be applicable to marihuana-related offenses;

(2)     All criminal disqualifying conditions, offenses, violations and conduct include the crimes of attempt, accessory, conspiracy, and solicitation;

(3)     Juvenile dispositions shall not be considered as a factor for determining qualification or suitability;

(4)     Where applicable, all look back periods for criminal conditions, offenses, violations and conduct commence on the date of disposition provided, however, that if disposition results in incarceration in any institution, the look back period shall commence on release from incarceration; and

(5)     Unless otherwise specified in Cannabis Law section 137, a conviction, offense, violation or conduct shall include convictions, guilty pleas and pleas of *nolo contendere.*

(b)      A licensee and its true parties of interest shall remain qualified or suitable at all times that a license remains in effect. An applicant, licensee or true party of interest shall notify the Office, in writing, of any offense or incident, including, but not limited to, offenses set forth in section 137 of the Cannabis Law, that would result in a denial of a license within ten (10) days of such offense or incident. Failure to notify the Office may result in a revocation, suspension, cancellation, debarment from a license or any other penalty or fine set forth in this Part or the Cannabis Law.

(c)      If the conviction or disposition record was sealed, the Office may require the individual to provide proof from a court evidencing the sealing of the case or any other information as determined by the Office.

**§ 120.17 Notification and Reporting of Business Changes and Amendments for Applicants.**

(a)      An applicant may update their application before it has been approved in a manner determined by the Office.

(b)      If an applicant is issued a license, the duty of ongoing disclosures for the licensee and its true party of interests, pursuant to this Chapter, shall continue throughout the licensed period.

**§ 120.18      Notification and Reporting of Business Changes and Amendments of Licensees.**

(a)    Duty to Report.  Licensees have an ongoing duty to report any changes or amendments to their operations to the Office.  A licensee has a continuing duty to provide the Office with up-to-date contact information and shall notify the Office in writing of any amendments or changes to the mailing addresses, phone numbers, electronic mail addresses, and other contact information they provide the Office.  A licensee shall report to the Office:

(1)    any amendments or changes to the cannabis business operations that are required in regulation and law.

(2)    any proposed material amendments or changes to the cannabis business before making a material amendment or change. Material amendments or changes include, but are not limited to, the following:

(i)    amendment or change in any true parties of interest, not including passive investors;

(ii)    amendment or change in processing extraction method(s);

(iii)    amendment or change in an entity name or doing business as name; any amended or changed name shall comply with all requirements set forth in Part 128 of this Title;

(iv)    amendment or change to the cannabis business before or after licensure that was not part of the cannabis business application or site plan including, but not limited to, all of the following:

*(a)*    operational or method amendments or changes requiring inspection or pre-approval from the Office under this Chapter;

*(b)*    increase or decrease in the size or capacity of the licensed premises and the authorized operations of the licensee;

*(c)*    alterations of ingress or egress; and

*(d)*    amendments or changes that impact security, fire safety, and employee safety.

(b)    Authorized amendments and changes.  A licensee may make the following amendments or changes in a manner prescribed by the Board and shall remit any additional fees as required for the amendments or changes, including:

(1)    any change in agreement or new agreement between a licensee and an existing or new true party of interest;

(2)    any change in control, where an individual, corporation or entity will be able to control the decision-making of a licensee, including, but not limited to:

(i)    contracting away the rights to control the organization or the right to exercise control over the business, or other rights as determined by the Board, to a person or entity that is not a member of the governing body of the organization;

93

(ii)    granting the right to make material business decisions or veto significant events which may include, but are not limited to, any sale of all or substantially all of the business's assets, a merger or consolidation, a change in ownership or control, liquidation, dissolution of an organization, or other events as determined by the Board;

(iii)    any mergers and acquisitions, applications for additional licenses, hiring and firing of executive level officers; or

(iv)    other determinations made by the Board;

(3)    for licensees with less than 10 owners with an equity interest:

(i)    anytime there is a new person with an equity interest in the licensee, the licensee shall submit, within ten days, an updated entity disclosure, in the form and manner prescribed by the Office, with all holders of equity in the license; and

(ii)    an attestation of such owners' eligibility to hold a cannabis license and an attestation that such owners have no statutory disqualifications that would bar them from being licensed.

(4)    licensees seeking to materially change their composition pursuant to paragraph (2) of this subdivision, shall submit an application to the Office at least 60 days prior to the proposed date of execution, acquisition, or transfer. In determining whether to approve such application, the

Office may set terms or conditions under which it may allow the continued operation of the licensee.

(c)     Amendments and Changes requiring Board Approval.  The following changes require Board approval:

(1)     changes to the controlling interest of an entity, ability to control at least 50% of the voting shares of an entity, or the board voting shares or the board's decision-making power of the entity.

(d)     Amendments and Changes requiring Office Approval.  The following changes require Office approval:

(1)     any time a new true party of interest is added to the entity, not including a passive investor;

(2)     changes requiring background checks of the altered parties, which includes any time a new true party of interest is added to the entity, not including a passive investor; and

(3)     a change in the location of a licensees licensed activities.

(e)     Amendments and Changes Requiring Notification to the Office within Ten Days.  The following changes require notification to the Office within ten days after the change occurring:

(1)     when a non-shareholder true party of interest no longer maintains the position of true party of interest;

(2)     when a shareholder true party of interest who is not a passive investor becomes a passive investor;

(3)     when a person lends greater than 10% of a licensee's capital; and

(4)     upon the death or removal from the license of a true party of interest, who is not also a passive investor.

(f)     Circumstances Requiring Notification to the Office within Three Business Days.  A licensee shall notify the Office within three business days of becoming aware of or within three (3) business days of when the licensee should have been aware of any of the following:

(1)     criminal convictions, charges, or civil judgments against the licensee or its true parties of interest in New York State or any other state, federal, or foreign jurisdiction;

(2)     disciplinary action taken against the licensee or its true parties of interest by this state or any other state, federal, or foreign jurisdiction, including any pending action; and

(3)      the initiation or conclusion of any new judgments, lawsuits, legal proceedings, charges, or government investigations, whether initiated, pending, or concluded, that involve the applicant or its true parties of interest.

(g)      Failure to provide notifications or reports to the Office pursuant to this section may result in fines and/or suspension, cancellation or revocation of a license.

(h)      If the licensed premises is damaged by a fire, flood or other natural disaster, or other situations of local, state, or national emergency, or by a security breach, the licensee shall notify the Office within a period of twenty-four hours, and the Office shall have the authority to quarantine all cannabis or cannabis products for analysis and, if appropriate, disposal, if found unfit for use.

(i)      A licensee shall not change the composition of a licensee, including, but not limited to, a transfer in ownership, structure or control, without notification to the Board and prior written approval of the Board. Failure to do so may result in penalties, including, but not limited to, civil penalties or a suspension or revocation of the license.

(j)      Removing a party from a License.  Upon a request to remove a party from a license, such request shall be accompanied by the following:

(1)      A notarized letter, signed by both parties, acknowledging the change, and explicitly detailing that the party losing ownership is aware of the effects of that change;

(2)      a corporate resolution of the licensee authorizing the licensee to change the ownership of the licensee pursuant to and consistent with articles of incorporation, LLC agreement, operating agreement, bylaws, partnership agreement, or similar governing document and the laws of the state of formation of the licensee, and an affidavit, of a member of the licensee's board of directors, a managing member, general partner, or sole member, as may be applicable, attesting that the undersigned is authorized to act on behalf of the licensee and that the submission of the change of ownership application premised on the corporate resolution constitutes a valid corporate action; or

(3)      A determination by a court of competent jurisdiction or a decision by an Arbiter, agreed upon by both parties.

## § 120.19 Opportunity to Cure.

(a)      If all material, documentation, and information required by the application form is not submitted, the applicant shall receive a deficiency notice from the Office.

(b)      The applicant shall then have the stipulated number of calendar days, as described in the deficiency notice, to cure such deficiency, as stipulated in the deficiency notice.  Such stipulated options to cure may include, but not be limited to:

(1)     resubmitting the application in its entirety;

(2)     providing all material documentation and information required in the deficiency notice; or

(3)     any other requirements as set forth by the Office.

(c)     Applications that are still deficient after this opportunity to cure will not be considered. Upon receipt of an application deemed to be complete, the Office will engage in no further communication with the applicant until after the selection process is completed.

**§ 120.20 Severability.**

(a)     If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

A new Part 121, titled Social and Economic Equity Adult-Use Cannabis, is added to read as follows:

Part 121

Social and Economic Equity Adult-Use Cannabis

**Part 121 – Social and Economic Equity Adult-Use Cannabis**

**§ 121.1  Qualifications for a Social and Economic Equity Applicant.**

**§ 121.2  Ownership and Sole Control Minimums**.

**§121.3  Continuing Duty to Disclose and Failure to Disclose Notification**.

**§ 121.4  Commitment to Social and Economic Equity.**

**§ 121.5  Severability**

**§ 121.1 Qualifications for a Social and Economic Equity Applicant.**

(a)      General Qualifications. To qualify as a social and economic equity applicant, an applicant shall demonstrate, through the mandatory production of documents and other information described in this Part:

(1)      that sole control of the applicant is held by:

(i)      an individual from a community disproportionately impacted by the enforcement of cannabis prohibition;

100

(ii)     a minority-owned business;

(iii)     a women-owned business;

(iv)     a distressed farmer; or

(v)     a service-disabled veteran owned business.

(b)     If sole control of the applicant is held by a woman who is also a minority-group member or women who are also all minority group members, the applicant may qualify as a minority-owned business, a women-owned business, or both.

(c)     Request for information.  The Office may request any information necessary for determining eligibility of a social and economic equity applicant.

(d)     Individuals from communities disproportionately impacted by the enforcement of cannabis prohibition.  An applicant seeking to qualify as an individual from a community disproportionately impacted shall provide:

(1)     proof of ownership and sole control over the applicant by one or more of such members that qualify as individuals from communities disproportionately impacted as set forth in this Part; and

(2)      documentation to show that one or more members that have an ownership interest in the business have resided in a community disproportionately impacted for an aggregate of three of the first 18 years of their life or an aggregate of five of the ten years preceding the timeframe designated for a community disproportionately impacted, provided that the community disproportionately impacted was so designated a community disproportionately impacted for a majority of those years. The Office may take into consideration a break in residency due to incarceration, education, illness, foster care, custodial matters, homelessness, and other circumstances in determining whether an applicant meets the residency requirement.

(e)      For the purposes of determining whether an area is a community disproportionately impacted, the Office may review geographic areas such as, precincts, zip codes, neighborhoods, political subdivisions, and any other geographic area for:

(1)      history of arrests;

(2)      number of convictions;

(3)      law enforcement procedures, protocols and practices;

(4)      allocation of law enforcement resources;

(5)     economic and socio-economic factors including, but not limited to, unemployment, median household income, children removed from the home by Child Protective Services, or equivalent for out-of-state jurisdictions, due to a parent/caretaker's marihuana use or arrest, school suspension records, and high school attainment;

(6)     deportation records for marihuana offenses; and

(7)     any other impacts as determined by the Office reflecting relative disparate enforcement of cannabis prohibition laws during a certain period of time.

(f)     Minority-Owned Business. An applicant seeking to qualify as a minority-owned business shall provide:

(1)     proof of ownership and sole control by one or more minority group members who have an ownership interest in the business as set forth in this Part; and

(2)     at least one of the following:

(i)     proof of a state MWBE certification, on the basis of being a minority-owned business; or

(ii)     a sworn declaration that reports information relating to its business enterprise to be true and accurate and made under the penalties provided by law that:

*(a)*     one or more members of a minority group who are citizens or permanent resident aliens of the United States of America:

*(1)*     have an ownership interest in the business; and

*(2)*     qualify as minority group members as defined in the Cannabis Law or as the Office may determine; and

*(b)*     includes a statement that providing false information shall be grounds for action against the applicant or licensee including, but not limited to, the denial, suspension, cancellation or revocation of a license.

(g)     Women-owned Business. An applicant seeking to qualify as a women-owned business shall provide:

(1)     proof of ownership and sole control by one or more women group members who have an ownership interest in the business as set forth in this Part; and

(2)     at least one of the following:

(i)     proof of a state MWBE certification, on the basis of being a women-owned business; or

(ii)    a sworn declaration that reports information relating to its business enterprise to be true and accurate and made under the penalties provided by law that:

*(a)*    one or more members of a woman group who are citizens or permanent resident aliens of the United States of America:

*(1)*    have an ownership interest in the business; and

*(2)*    qualify as women members as defined in the Cannabis Law or as the Office may determine; and

*(b)*    includes a statement that providing false information shall be grounds for action against the applicant or licensee including, but not limited to, the denial, suspension, cancellation or revocation of a license.

(h)    Distressed Farmer. An applicant seeking to qualify as a distressed farmer shall provide:

(1)    proof of ownership and sole control by one or more members who have an ownership interest as set forth in this Part;

(2)    proof that the applicant:

(i)    meets the small farm classification as developed by the Economic Research Service of the United States Department of Agriculture;

(ii)    filed a Schedule F tax return; and

(iii)    filed other tax form(s) demonstrating revenues below the qualifying threshold as established therein;

(3)    one of the following:

(i)    documentation of operating losses during the last three years; or

(ii)    proof of membership in a group historically underrepresented in farm ownership as such group or groups may be defined by the Board, as provided by a sworn declaration that one or more of the members qualify as member of a group or groups identified by the Board and that shall include a statement that providing false information shall be grounds for action including, but not limited to, the denial, suspension, cancelation or revocation of a license.

(i)    Service-disabled veteran owned business. An applicant seeking to qualify as a service-disabled veteran owned business shall provide:

(1)    proof of ownership and sole control by one or more members who have an ownership interest as set forth in this Part; and

(2)    certification from the New York State Office of General Services Division of Service-Disabled Veterans' Business Development (DSDVBD). In the event that a business does not receive certification from the DSDVBD prior to the filing of any application, the Office may temporarily accept the following documents as a conditional certification:

(i)    DD214(s) and/or NG214(s) with Line of Duty Report U.S. Veterans Administration documentation of service-connected disability rating which shall be dated within one year of the date DSDVBD receives the DSDVBD Certification Application and shall demonstrate a service-connected disability rating of at least 10%. Any such conditional certification shall be valid for 60 days pending full certification from the DSDVBD and may be extended in the Office's sole discretion.

(j)    Small Business Qualification. An applicant seeking to qualify as a minority-owned business or a women-owned business shall submit the following documents to demonstrate that it is a small business:

(1)    if it has been in operation for a time greater than or equal to three years, including, but not limited to:

(i)    quarterly payroll reports from the last three years; and

(ii)    any other information that demonstrates that the entity is a small business as requested by the Office;

(2)    if it has been in operation for a time less than three years shall submit:

(i)    a sworn declaration that reports the following information relating to its business enterprise to be true and accurate and made under the penalties provided by law that it is a small business as defined in this subdivision (j) of this section, and such declaration shall include a statement that providing false information shall be grounds for action including, but not limited to, the denial, suspension, cancelation or revocation of a license; and

(ii)    documentation of small business operations including, but not limited to:

*(a)*    any and all gross quarterly receipts;

*(b)*    by-laws; and

*(c)*    proof that the business has no more than and will not exceed 100 employees.

(k)    Extra Priority. A person whom demonstrates that they are an individual from a community disproportionately impacted by the enforcement of cannabis prohibition may receive extra priority if they have an income lower than 80% of the median income of the county in

which the applicant resides; and was convicted of a marihuana-related offense prior to the effective date of the Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Act, was convicted of a marihuana-related offense.

(1)    For purposes of this subdivision, median income is defined as the median dollar amount per household in each county, as based on the overall income distribution for the county, from lowest to highest income.

(2)    An applicant seeking to qualify for extra priority shall provide proof of residency, income, and conviction, as prescribed by the Board.

## § 121.2 Ownership and Sole Control Minimums.

(a)    An applicant seeking to qualify as an individual from a community disproportionately impact, minority-owned business, women-owned business, service-disabled veteran owned business, or distressed farmer shall submit documents sufficient to demonstrate ownership and sole control by an individual or group of individuals who are from a community disproportionately impacted, members of a minority group, women, service-disabled veterans or distressed farmers as defined in the Cannabis Law and as qualified in section 121.1 of this Title including, but not limited to, the following:

(1)     by-laws;

(2)     delegations of authority or resolutions of the Board of Directors, if applicable;

(3)     any and all incorporation documents that describe all shares of stock or other securities, statements, agreements or memoranda of understanding issued during the time of incorporation or organization or at any time thereafter that remain in full force and effect at the time of application or in response to a demand from the Office;

(4)     quarterly payroll records filed with the New York State Department of Labor, or equivalent for out-of-state jurisdictions, to demonstrate the size of the workforce;

(5)     comparison of employee and executive compensation;

(6)     comparison of executive compensation and shareholder compensation or proceeds; and

(7)     any other information requested by the Office for determining ownership and sole control.

(b)     An applicant seeking to qualify as an individual from a community disproportionately impacted, minority-owned business, women-owned business, service-disabled veteran owned business or distressed farmer, upon demonstration to the Office that they are unable to provide any documentation requested and required in subdivision (a) of this section, may be permitted to

submit separate documentation to the Office that provides proof that the business has established corporate governance policies within 30 days of submitting the application, to reflect the authority and sole control requirements stated therein, as determined by the Office.

(c)    If, at any time after a social and economic equity applicant has been granted a license, the Office determines that the sole control requirement is violated, the Office may institute an action to suspend or revoke such license, provided the Office provides an opportunity to cure.

**§121.3 Continuing Duty to Disclose and Failure to Disclose Notification.**

(a)    Social and economic equity applicants shall have a continuing duty to disclose any material changes in the information provided to the Office, as required in this Part for the duration of the license.

(b)    Any changes that would impact a social and economic equity licensee's status as an individual from a community disproportionately impacted, minority-owned business, women-owned business, service-disabled veteran owned business, or distressed farmer shall require notice to the Office and prewritten approval of the Board.

(c)    Failure to notify the Office of any material change in the information provided may provide the sole grounds for enforcement action against the licensee including, but not limited to, suspension, revocation, or denial of any license.

(d)       Whistleblower, Complaint and Recourse.

(1)       If at any time any owner, director, investor, board member or employee of a social and economic equity licensee has reason to believe that the business failed to disclose any material changes to the information provided to the Office, including changes to status as a business owned by an individual from a community disproportionately impacted, minority-owned business or women-owned business, service-disabled veteran owned business or distressed farmer, and status in ownership and control, such person may notify the Office for consideration of any enforcement action.

(2)       Any such person that notifies the Office for consideration of any enforcement action pursuant to this subdivision shall be given the full protection of Article 20-C of the Labor Law.

## § 121.4 Commitment to Social and Economic Equity.

(a)       An applicant or licensee, as defined in section 118.1 of this Title, may be required to demonstrate their commitment to the social and economic equity goals of the Cannabis Law as part of the application process. Such commitment may be demonstrated by the design and implementation of a community impact plan.

(1)       A community impact plan shall show an applicant's or licensee's plan for how the applicant or licensee will benefit communities and individuals from communities that were

112

disproportionately impacted by the enforcement of cannabis prohibition, including, but not limited to:

(i)    identification of the community or communities and/or individuals disproportionately impacted that the applicant or licensee plans to benefit;

(ii)    a description of:

*(a)*    the benefits that the applicant or licensee will provide to the community or individuals disproportionately impacted including, but not limited to, workforce opportunities, community resources, education, and other community building programs;

*(b)*    the scale or size of the disproportionately impacted target beneficiaries;

*(c)*    the plan for implementation, including, but not limited to actions, activities and engagements that will be performed by the applicant or licensee and frequency of engagement with the community or individuals disproportionately impacted;

(iii)    a demonstrated need of the proposed benefit to the community and individuals disproportionately impacted, including, but not limited to, economic and social impact;

(iv)    identifiable resources the applicant or licensee will use to execute the plan, including, but not limited to:

*(a)*     a demonstrable partnership or relationship with a community-based organization or other association;

*(b)*     estimated expenses, if any, the applicant or licensee will incur to execute the proposed plan and its activities;

*(c)*     the applicant's or licensee's demonstrated ability, knowledge, expertise or experience; and

*(d)*     any other proof of community engagement.

(v)     a description of the applicant's or licensee's strategy to measure, track, and record the performance and execution of the plan that identifies qualitative and quantitative metrics, and includes frequency of tracking such metrics;

(vi)     a statement by the applicant or licensee supporting its ability to execute on the proposed plan as described in the application based on the suitability and appropriateness of the metrics the applicant or licensee will use to measure the success of the proposed plan; and the nexus described between the plan's desired outcome, implementation strategy, and the applicant's or licensee's demonstrated ability to execute the plan; and

(vii)     any other requirements for a community impact plan as determined by the Board.

(b)      Any person, vendor, contractor, entity or individual knowingly engaged in business with an enterprise revealed to be fraudulently qualified as social and economic equity licensee may be permanently barred from receiving a license from the Office after investigation.


**§ 121.5 Severability.**

(a)      If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

A new Part 123, titled License Specific Authorizations, Requirements and Prohibitions, is added to read as follows:

Part 123

License Specific Authorizations, Requirements and Prohibitions

**Part 123 - License Specific Authorizations, Requirements and Prohibitions**

**§ 123.1 Nursery Ownership, Interests, and Business Authorizations and Prohibitions.**

**§ 123.2 Nursery Operations.**

**§ 123.3 Cultivator Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.4 Cultivator Operations.**

**§ 123.5 Processor Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.6 Processor License Facility Operations.**

**§ 123.7 Distributor Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.8 Distributor Operations.**

**§ 123.9 Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.10 Retail Dispensary Operations.**

**§ 123.11 Microbusiness Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.12 Microbusiness Operations.**

**§ 123.13 Cooperative Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.14 Cooperative Operations.**

**§ 123.15 Registered Organization Cultivator Processor Distributor Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.16 Registered Organization Cultivator Processor Distributor Operations.**

**§ 123.17 Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.18 Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Operations.**

**§ 123.19 Delivery Operation.**

**§ 123.20 Severability.**

**§ 123.1 Nursery Ownership, Interests, and Business Authorizations and Prohibitions.**

(a)    Licensed activities.

(1)    a nursery shall not hold a retail dispensary, on-site consumption, or delivery licensee.

(2)    a nursery may also hold a cultivator, cooperative, microbusiness, registered organization, ROND or ROD license.

(b)    A nursery may produce and sell clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture and cannabis seed for sale only to a duly licensed nursery, cultivator, cooperative, microbusinesses, ROND or ROD, retail dispensary or registered organization in New York State. A nursery may propagate mature cannabis plants, solely for use in the production of the aforementioned products, or for sale to other nurseries for the same purposes.

(c)    A nursery or its true party of interest may be a true party of interest in a cultivator, processor, distributor, cooperative, microbusiness, or ROND license.

(d)    A nursery may only hold one nursery license, but may cultivate at multiple premisess, and their true parties of interest are not restricted in the number of nursery licenses they can have an interest in.

(e)    A nursery or its true party of interest may be a landlord, financier, or goods and services provider to an adult-use cultivator, processor, distributor, cooperative, microbusiness, and ROND license, subject to the limitations and other ownership, control and interest requirements, and prohibitions of the Cannabis Law and this Chapter.

(f)    In addition to any other restrictions or prohibitions in this Part, including, but not limited to, Part 124 of this Title, no nursery licensee or its true party of interest shall be permitted to hold, a direct or indirect interest in, or be a true party of interest, passive investor, landlord, financier, or management services provider, or by any other means, to a retail dispensary, on-site consumption, delivery, registered organization, or cannabis laboratory licensee or permittee. Where a nursey license is held by a ROD, the licensee and its true parties of interest shall be subject to the true parties of interest prohibitions and authorizations set forth for the ROD licensees.

**§ 123.2 Nursery Operations.**

(a)     A nursery shall:

(1)     sell seeds, seedlings, clones and immature cannabis plants, or cannabis plants in vegetative stage under 2 feet in height;

(2)     use any plants in a flowering stage only for seed production and destroy or compost such plants thereafter pursuant to Part 125 of this Title;

(3)     document all information related to production and genetic sourcing, which shall be made available for review by the Office upon request;

(4)     label each immature cannabis plant or vegetative cannabis plant transferred for sale with the following:

(i)     cultivar name in bold type;

(ii)     potential cannabinoid potency, as confirmed by testing of the parent cannabis plant which at a minimum should include the total THC and CBD levels as defined in Part 128 of this Title;

(iii)     date of seed planting and germination;

(iv)     the unique identifier number that corresponds to the immature cannabis plant or vegetative plant lot;

(v)     any pesticides used in the cultivation;

(vi)     name and license number of the nursery licensee that cultivated the immature cannabis plant or vegetative cannabis plant; and

(vii)     any other information as determined by the Office.

(5)     sell clones and seedlings with a written guarantee that the clones sold do not harbor known cannabis diseases such as Hop Latent Viroid (HpLvd), Cannabis Cryptic Virus, or other common cannabis diseases and pests; and

(6)     be authorized to sell agricultural products used specifically for the planting, propagation, and cultivation of cannabis.

(b)     A nursery is prohibited from:

(1)     selling any cannabis plants in the flowering stage;

(2)     cultivating cannabis in a canopy area larger than authorized pursuant to section 120.3 of this Title; and

(3)      selling or transferring any cannabis, cannabis seeds or immature cannabis plants to a cannabis consumer.

## § 123.3   Cultivator Ownership, Interests, Business Authorizations and Prohibitions.

(a)      A cultivator may engage in the following licensed activities:

(1)      acquire, possess, cultivate, trim, harvest, dry, and cure cannabis at its licensed premises;

(2)      sell cannabis only to a licensee that authorizes the processing of cannabis, which may include a duly licensed processor, microbusiness, cooperative, ROD, ROND, or a cannabis research licensee;

(3)      send cannabis to a processor for processing without relinquishing ownership of that cannabis; and

(4)      if such cultivator also holds a processor license may purchase cannabis from another cultivator for processing.

(b)      A cultivator that has a processor license may apply for and obtain one distributor license.

(c)     No person shall be a true party of interest in more than one cultivator; provided however, a passive investor may be a passive investor in more than one cultivator if such passive investor complies with all other ownership, control and interest requirements, and prohibitions of the Cannabis Law and this Chapter.

(d)     A cultivator or its true party of interest may be a true party of interest in a processor, distributor, cooperative, microbusiness, or ROND license.

(e)     A cultivator, or its true party of interest, may be a landlord, financier, or a goods and services provider to an adult-use cultivator, processor, distributor, cooperative, microbusiness, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control and true party of interest requirements.

(f)     In addition to any other restrictions or prohibitions in this Chapter, including, but not limited to, Part 124 of this Title, no cultivator or its true party of interest is permitted to have any direct or indirect interest in, including, but not limited to, being a true party of interest, passive investor, landlord, financier, or management services provider to a retail dispensary, on-site consumption, delivery, ROD, registered organization, or cannabis laboratory licensee or permittee.

(g)     A conditional cultivator licensed pursuant to section 68-c of the Cannabis Law is subject to all rules and regulations in this Title applicable to a cultivator. Such a conditional cultivator determined to be in good standing by the Office shall, upon submitting any necessary forms

122

required by the Office and upon payment of any applicable fees, be permitted to transition to a full license in one of the following cultivator licensing tiers:

(1)      A Tier 4 outdoor license; or

(2)      A Tier 2 combination license.

(h)      A conditional cultivator shall be given priority by the Office in review of its application for a full cultivator, processor or distributor license under this Chapter.

## § 123.4 Cultivator Operations.

(a)      A cultivator may acquire cuttings, seedlings, seeds and clones from any licensee authorized as a nursery.

(b)      Immature cannabis plants.

(1)      A cultivator shall assign a tag to each established lot of immature cannabis plants. The tag shall have at a minimum the cultivar name and lot name or code. A lot of immature cannabis plants under a single plant tag shall be uniform in cultivar and contain no more than 100 individual immature cannabis plants at any one time.

(2)     A lot plant tag shall be visible and within clear view of an individual standing next to the immature cannabis plant lot and be kept free from dirt and debris.

(3)     Each immature cannabis plant in the lot shall be labeled with a lot unique identifier and placed contiguous next to one another to facilitate identification of the lot unique identifier by the Office, or instead of labeling each immature cannabis plant in the lot, the lot shall be fully separated from other lots of immature or mature cannabis plants. In such cases, an individual immature cannabis plant does not need to be labeled with the corresponding lot unique identifier.

(4)     Within three calendar days of receiving or aquiring an immature cannabis plant, a cultivator shall assign a plant tag belonging to the cultivator in accordance with paragraph (3) of this subdivision.

(5)     A plant tag shall be applied to each individual cannabis plant as specified in subdivision (b) of this section at the time the plant is moved to the designated canopy area or begins flowering.

(c)     Mature cannabis plants.

(1)     A mature cannabis plant shall be tagged with a plant tag. A plant tag shall be attached to the main stem at the base of each plant, placed in a position so it is visible and within clear view of an individual standing next to the mature cannabis plant, and kept free from dirt and debris.

(2)    A cultivator is prohibited from removing the plant tag from the mature plant to which it was attached and assigned until the plant is harvested, destroyed, or disposed of.

(d)    Harvested cannabis plants.

(1)    Harvested plants that are hanging, drying, or curing shall be assigned a unique harvest batch name, which shall be recorded in the licensees inventory tracking system and placed within clear view of an individual standing next to the batch. The assigned harvest batch name shall match the name that is in the licensees inventory tracking system, and the harvest batch name attached to the physical batch shall be the same.

(2)    Each harvest batch shall be assigned a tag or label and recorded in the inventory tracking system.

(3)    For harvested plants held in containers, the harvest batch name shall be affixed to the container holding the batch.

(4)    If harvested plants are held in multiple containers, the harvest batch name and lot unique identifier shall be affixed to each of the containers. Additionally, each unit within a container shall be labeled with the harvest batch name and applicable lot unique identifier. All containers with the same lot unique identifier shall be placed contiguous to one another to facilitate identification by the Office.

(e)      Regenerative agricultural practices. A cultivator shall take steps to further the promotion of biodiversity and shall submit evidence as determined by the Office, by implementing methods such as the following, as appropriate to the cultivation methodologies and context:

(1)      intercropping;

(2)      crop rotation;

(3)      planting, or promotion of native plants;

(4)      providing habitat for native animals;

(5)      planting or promoting specific species that promote native pollinator activities;

(6)      protecting native waterways through maintaining wild farm edges and removing invasive species;

(7)      creating on-farm compost or locally sourcing organic compost to improve soil fertility; or

(8)      other methods that promote biological diversity as approved by the Office.

(f)      Agricultural inputs. A cultivator shall:

(1)      comply with all rules and regulations of the New York State Department of Environmental Conservation applicable to pesticide use for cannabis and use only those pesticides registered by the New York State Department of Environmental Conservation or that specifically meet the United States Environmental Protection Agency registration exemption criteria for Minimum Risk Pesticides, and only in accordance with 6 NYCRR section 325.2(b) and any other requirements for pesticide use for cannabis as determined by the Board;

(2)      comply with all rules and regulations of the New York State Department of Environmental Conservation applicable to the pesticide and the directions or instructions on the label of the pesticide for all pesticides that are exempt from registration requirements under 40 CFR 152.25; and

(3)      ensure its pesticide application and storage protocols addresses:

(i)      storage of pesticides consistent with label requirements in a secure building with controlled access;

(ii)      containment of any pesticide leaks and immediate cleanup of any spills;

(iii)      application of the minimum amount of pesticide necessary, in accordance to the label;

(iv)      prevention of off-site drift;

127

(v)    prohibition of application of pesticides when pollinators are present;

(vi)    prohibition of the application of pesticides that could drift to flowering plants attractive to pollinators;

(vii)    prohibition of direct spray or application of pesticides to surface water and groundwater;

(viii)    prohibition of pesticide drifting to surface water; and

(ix)    application of pesticides only when the wind is blowing away from surface water bodies near the cannabis plants;

(4)    record any agricultural inputs used during cultivation, including, but not limited to, plant protection products including beneficial insects, pesticides, fertilizers, and soil amendments. For each input the input recording system or record keeping method of the licensee shall record:

(i)    product name;

(ii)    active ingredients;

(iii)    purpose of use;

(iv)    application rate;

(v)    application date;

(vi)    method of application;

(vii)    persons doing application;

(viii)    safety data sheet and label information;

(ix)    weather conditions at time of application; and

(x)    any other information as determined by the Office.

(g)    On premises based identification.

(1)    A cultivator shall:

(i)    have an on-premises based identification system that allows the cannabis and cannabis product to be tracked back to the licensee and specific cultivation site, to the block and bed level or similar identification, and tracked forward up the supply-chain to the next distribution point; and

(ii)      be able to link harvested cannabis by batch number or harvest date to the cultivation records. Such data shall be made available to the Office upon request and may be required in the cultivators annual cultivation report;

(iii)      have an on premises based identification system which shall be able to integrate with the seed-to-sale inventory managment tracking system used by the Office; and

(iv)      have an indoor or mixed-light cannabis cultivation facility that shall satisfy energy efficiency and equipment standards established by the Office and meet all applicable environmental laws, regulations, permits and other applicable approvals including, but not limited to, those related to water quality and quantity, wastewater, solid and hazardous waste management, and air pollution.

(2)      A cultivator shall adopt and use additional energy management practices as determined by the Board, the Office and any applicable agencies or departments. A cultivator growing cannabis indoors or in a mixed-light cultivation facility shall provide the following annually or to the Office upon request:

(i)      energy consumption by source (monthly, including consumption and demand);

(ii)    water consumption (gallons per month);

(iii)    on-site generation (monthly);

(iv)    cannabis yield by dry weight (annual) for the previous 12-month period and for each month of the 12-month period; and

(v)    any other information as determined by the Office to assist with energy usuage benchmarking.

(3)    Cultivators shall use a resource manager to audit and track energy consumption metrics, as as approved by the Office, and report utility and energy bills, together with cannabis yield data, to the Office upon request.

(4)    Certain low-energy buildings, or portions thereof separated from the remainder of the building by thermal envelope assemblies complying with this section, may be exempt from the building thermal envelope requirements set forth by the Office.

(5)    Lighting and HVAC used for indoor cannabis cultivation shall comply with all compliance requirements set forth by the Board and as set forth in Part 125 of this Title, and any other requirements of the Office.

(h)     A cultivator shall ensure the drying and minimal processing activities comport with the following requirements:

(1)     that any drying or minimal processing areas are clean, well-ventilated, and free from condensation, sewage, dust, dirt, toxic chemicals or other contaminants;

(2)     all buildings shall provide adequate environmental controls to ensure product protection and be of adequate size to properly dry the volume of cannabis produced; and

(3)     photos or diagrams of drying and processing area(s) to be used for all product drying, minimal processing and curing shall be provided to the Office in the cultivators site plan as required in Part 125 of this Title, and notes on proposed staggered harvests and harvest window shall be provided to the Office in the annual cultivation report.

(j)     Cultivation License Types and Tiers.  A cultivator may operate only in the canopy tier in which it is authorized to operate pursuant to its license.

(k)     Annual Cultivation Report. A cultivator shall submit to the Office, in a manner and format determined by the Office, an annual cultivation report, including, s but is not limited to:

(1)    data related to tracking all seeds, clones or other plant material used, which shall include, but not be limited to, the source of the seeds, clones, or other plant material, as determined by the Office;

(2)    detailed plant protection products application records for any propagation treatments;

(3)    an agricultural input list that includes all agricultural inputs used or to be used in the cultivation of cannabis;

(4)    a facility energy report as required in subdivision (c) of section 125.1 of this Title;

(5)    records of scouting or monitoring cannabis for pests and diseases;

(6)    records of plant irrigation detailing timing and appropriateness to site and cultivation methodologies including total water use per cultivation cycle;

(7)    if applicable, records of water reuse, catchment or other conservation practices;

(8)    if applicable, records of regular maintenance and calibration of irrigation equipment;

(9)    records of cultivation water analysis that include the microbiological analysis detailing total coliform present. Such water analysis shall be tested by an environmental laboratory certified by New York State Department of Health. Annual test results for all water used in

cultivation, other than water used for drip irrigation and subsurface irrigation, shall indicate levels that are consistent with 10 NYCRR Subpart 5-1;

(10)    post-cultivation water analysis results if there is any water runoff or discharge as a part of cannabis cultivation; and

(11)    any other information so required.

## § 123.5  Processor Ownership, Interests, Business Authorizations and Prohibitions.

(a)    A processor may acquire, possess, process and sell cannabis from a licensed cultivator to duly licensed processors or distributors. Authorized processing activities vary by the processing license type.

(b)    A processor may process cannabis grown by a cultivator without taking ownership over that cannabis.

(c)    A processor may only enter into a branding or white labeling agreements with its true parties of interest, or another licensee, provided that such licensee is not otherwise prohibited therefrom pursuant to this Chapter.

(d)    A processor may hold one distributor license.

(e)    A processor shall only conduct those activities specified on its application, whether on an initial or amendment application, that have been approved by the Office or Board for such processor.

(f)    A processor or its true party of interest may be a true party of interest in a cultivator, distributor, cooperative, microbusiness, or ROND license.

(g)    A processor, or its true party of interest, may be a landlord, financier, or a goods and services provider to an adult-use cultivator, processor, distributor, cooperative, microbusiness, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control and true party of interest requirements.

(h)    In addition to any other restrictions or prohibitions in this Chapter, including, but not limited to, Part 124 of this Title, no processor or its true party of interest is permitted to have any direct or indirect interest in, including, but not limited to, being a true party of interest, passive investor, landlord, financier, or management services provider to a retail dispensary, on-site consumption, delivery, ROD, registered organization, or cannabis laboratory licensee or permittee.

(i)    A conditional processor licensed pursuant to section 69-a of the Cannabis Law is subject to all rules and regulations in this Title applicable to a processor. Such a conditional processor determined to be in good standing by the Office shall, upon submitting any necessary forms

135

required by the Office and upon payment of any applicable fees, be permitted to transition to a full processor license.

(j)      A conditional processor shall be given priority by the Office in review of its application for a full processor or distributor license under this Part.

## § 123.6 Processor License Facility Operations.

(a)      Good manufacturing practices.

(1)      All cannabis and cannabis product processing shall be in accordance with good manufacturing practice (GMP) standards, pursuant to either Part 111 or Part 117 of Title 21 of the Code of Federal Regulations, as applicable for the type of cannabis or cannabis product being processed or as otherwise determined by the Office.

(2)      A licensee who is authorized to conduct certain processing activities as determined by the Office shall establish compliance with GMP standards by submitting to the Office proof of a qualified third-party GMP audit, of the licensee's extraction and/or manufacturing processes as applicable, to the satisfaction of the Office, within one year of commencing licensed operations. The Office shall determine and authorize qualified third-party GMP auditors.

(3)      A licensee who is processing and required by the Office, shall maintain proof of current GMP certification for the duration of the license and make such certification readily available to the Office upon request.

(b)    General requirements. A processor shall:

(1)    maintain all designated processing areas in accordance with general sanitary practices as set forth in section 125.6 of this Title;

(2)    assign a lot unique identifier, and batch number on all cannabis and cannabis products, which allows for complete traceability of all cannabis and cannabis products processed during a specific period of time and under similar conditions;

(3)    comply with all packaging and labeling standards in Part 128 of this Title;

(4)    maintain processing, packaging, labeling and production batch records, including records of all ingredients and materials used in the processing of each lot of cannabis or cannabis product, and any other applicable records required by Part 125 of this Title;

(5)    develop and maintain written standard operating procedures for all processing activities to ensure homogeneity and consistency of cannabis products, including, but not limited to, development of a master manufacturing record containing standards for product purity, strength, and composition for each type of cannabis product produced, common plan types include a GMP Plan, Quality Assurance Plan, or Hazard Analysis and Critical Control Points (HACCP) Plan.

(c)    Requirements for extraction.  Unless otherwise approved in writing by the Office, a processor authorized to perform extraction may only use the methods, equipment, solvents, gases, and mediums set forth in this section and approved on the processors application and must be conducted only in a manner exhibiting minimal potential for human health related toxicity.

(1)    All extraction processes and activities shall:

(i)    be conducted by employees trained in the operation of the extraction equipment to be utilized, as well as the emergency plan for incidents;

(ii)    demonstrate control of all sources of ignition, and occur in a spark-free environment where appropriate for the type of extraction method used;

(iii)    ensure proper ventilation;

(iv)    have ongoing equipment monitoring and maintain a record of regular maintenance of equipment based on equipment specifications;

(v)    follow all applicable fire, safety and building codes, regulations, laws and guidance in the use and storage of solvents, including, but not limited to, maximum quantities to be held onsite; and

(vi)    have evidence of the purity of any chemical solvents used and make any certificate of analysis or other documentation evidencing such purity readily available to employees and to the Office upon request.

(2)    Unless a processor obtains prior written approval from the Office, extraction shall only be conducted using the following methods:

(i)    mechanical extraction methods;

(ii)    a professional grade, closed-loop $CO_2$ extraction system that is of a supply equivalent to food or beverage grade of at least 99.5% purity;

(iii)    ethanol or alcohol based, provided that all ethanol or alcohol used shall be of a grade that meets or exceeds specifications of official compendiums as defined in section 321 of Title 21 of the United States Code (USC);

(iv)    a volatile solvent or hydrocarbon extraction method, provided that the method:

*(a)*    utilizes a commercial, professional grade closed-loop system designed to recover the solvent;

*(b)*      utilizes the following permissible volatile solvent-based or hydrocarbon extraction substances, which shall be accompanied by a Certificate of Analysis which establishes that said substances have a minimum purity level of 99%:

*(1)*      Butane;

*(2)*      Propane;

*(3)*      of a different volatile solvent or hydrocarbon with prior written approval by the Office prior to use;

(v)      For all proposed volatile solvent based or hydrocarbon extraction, a processor shall submit to the Office, prior to receiving approval to commence extraction operations at a processing facility, documentation which demonstrates, to the satisfaction of the Office, the following additional requirements for all designated extraction equipment, rooms, or other areas where volatile solvents used for extraction are handled or stored:

*(a)*      final certification letter from a licensed professional engineer or registered architect which certifies the completed installation of a professionally designed, commercially manufactured extraction system, that is compliant with all applicable state or local fire, safety or building codes;

*(b)*      a letter from the municipal jurisdiction's fire marshal, or their designee, stating that a final inspection of the facility has been conducted and that the processor has demonstrated compliance with all applicable fire codes and/or regulations; and

*(c)*      a certificate of occupancy, or equivalent document, from the local building official that all permits for extraction related rooms or areas have been closed as applicable.

(d)      Allowable cannabis and cannabis product types.  A processor may produce the following types of cannabis or cannabis products for sale:

(1)      topicals;

(2)      edibles, that are not in shapes considered to be attractive to individuals under twenty-one as defined in Part 128 of this Title, including, but not limited to:

(i)      capsules;

(ii)      beverages;

(iii)      tablets;

(iv)      tinctures;

(v)      baked goods;

(vi)     gummies; or

(vii)    chocolates;

(3)      vaporization cartridges or single-use pens;

(4)      concentrates such as shatters, waxes and resin;

(5)      cannabis flower products, including, but not limited to, whole flower, ground flower, shake and pre-rolls;

(6)      cannabis extracts for intermediary sale; and

(9)      any other cannabis product type or form, except for the prohibitions in subdivision (e) of this section, with prior written approval of the Office which, following written submission by the processor and a review process by the Office of the proposal, including, but not limited to, review of proposed manufacturing processes, methods of administration and any other factors which assess risk to public health and safety, is determined in writing by the Office to be suitable as a product for retail adult use sale.

(e)     Prohibitions and prohibited product types. A processor is prohibited from processing any cannabis products which:

(1)     contain liquor, wine, beer, cider or meet the definition of an alcoholic beverage as defined in Section 3 of the Alcohol Beverage Control Law;

(2)     contain tobacco or nicotine;

(3)     exceed the maximum total THC per serving and per package limits set forth in this Part;

(4)     are attractive to individuals under twenty-one years of age as set forth in Part 128 and 129 of this Title;

(5)     contain synthetic cannabinoids, as defined in subdivision (g) and subdivision (h) of schedule I of Section 3306 of the Public Health Law;

(6)     Contain any artificially derived phytocannabinoids;

(7)     require manufacture under sterile conditions;

(8)     are considered a potentially hazardous food as defined by 10 NYCRR Section 14-1.31;

(9)     contain any non-phytocannabinoid ingredient that would increase potency, toxicity, or addictive potential, or that would create an unsafe combination, known or unknown, with other psychoactive substances. This prohibition shall not apply to products containing naturally occurring caffeine, such as coffee, tea, or chocolate;

(10)     are manufactured by application of phytocannabinoid concentrate or extract to commercially available candy or snack food items without further processing of the product.

(i)     Commercially available candy or snack food items may be used as ingredients in a cannabis product, provided that they are used in a way that renders them unrecognizable as the commercially available items, and the label, including the ingredient list, does not note that the final cannabis product contains the commercially available item;

(11)     are in the shape of, or imprinted with the shape, either realistic or caricature, of a human being, animal, insect, or fruit, or is otherwise attractive to individuals under the age of twenty-one as defined in Part 128 of this Title; or

(12)     are in the form of an injectable, inhaler, suppository, transdermal formulations, or any other disallowed form, as determined by the Office, including a form allowed solely for medical cannabis use, unless otherwise authorized by the Office.

(f)     Requirements for all cannabis products.  All cannabis products processed for distribution for retail sale shall:

144

(1)      if in the form of an orally ingested product, conform to the product potency limit of 10 milligrams (mg) total THC per serving, and 100 mg total THC per package, provided however, that tinctures shall conform to the product potency limit of 10 mg total THC per serving, and 1,000 mg total THC per package.

(2)      accurately reflect testing results and not contain less than 90% or more than 110% of the concentration of total THC, CBD, or any other phytocannabinoid and terpene content as listed on the cannabis product label. Any cannabis product not meeting this requirement shall be relabeled with the accurate phytocannabinoid and terpene content, provided that all other laboratory testing results comply with Part 130 of this Title, and the maximum serving requirements in this Part without further product remediation, unless otherwise authorized by the Office;

(3)      be prepackaged, and not added to food or any other consumable products at the point of retail sale;

(4)      be shelf stable, unless otherwise approved in writing by the Office, provided that nothing in this provision shall prohibit a processor from storing non-cannabis components or ingredients under refrigeration until use in product manufacturing;

(5)      contain only excipients or ingredients which are appropriate for the cannabis product type manufactured and are, at a minimum, food grade or considered generally recognized as safe,

(GRAS) unless otherwise required by the Office to be pharmaceutical grade based on product type;

(6)    have a date of expiration for unopened product and a use by date for opened product established by available stability data from stability studies initiated by the licensee or from a reputable outside source, for the cannabis product form.  Each processor that is labeling cannabis products in their final form to be sold to the consumer shall possess stability data for each cannabis product being labeled which supports any unopened package date of expiration or opened package use by date on the cannabis product's respective labeling and shall be made available to the Office upon request;

(i)    Stability Testing:

(*a*)    The processor shall complete any further stability testing of a cannabis product, requested by the Office, to demonstrate the ongoing stability of the product produced over time.

(*b*)    For stability testing of unopened cannabis products, each cannabis product shall retain a total THC and CBD concentration in milligrams per single serving that is consistent with paragraph (2) of this subdivision.  If the product no longer retains a consistent concentration of total THC and CBD pursuant to paragraph one of this subdivision, the product shall be deemed no longer suitable for sale and destroyed in accordance with Part 125 of this Title.

(7)    except for cannabis flower products, have the total number of servings in the cannabis product determined and displayed. For cannabis edible products or products intended for oral ingestion, products that consist of more than a single serving shall be either:

(i)    scored or otherwise delineated by the processor to indicate one serving, if the cannabis product is in solid form to accurately identify one serving;

(ii)    if the product is not in solid form, the product shall be packaged in a manner such that a single serving is readily identifiable or easily measurable and the package is resealable; or

(iii)    if the product is a cannabis beverage product, the product shall not have more than a single serving per package, provided however, multiple cannabis beverage products can be sold together.

(8)    if such products, other than flower products, contain multiple servings which are not individually wrapped, premeasured, separated, or delineated, must include a measuring device such as a measuring cap, cup, or dropper with the product packaging, which shall be provided with the cannabis product. Hash marks on the package shall not qualify as a measuring device;

(9)    if vaporized or inhaled, meet the following additional requirements:

(i)    cannabis vaporization devices shall be a closed system with a pre-filled single-use cartridge that attaches to a rechargeable battery, or a single-use product;

147

(ii)    vaporization devices shall have internal or external temperature controls to prevent combustion and have a heating element made of inert material such as glass, ceramic or stainless steel and not plastic or rubber;

(iii)    except for botanically derived terpenes, excipients and ingredients used in vaporized or inhaled cannabis products shall be pharmaceutical grade unless otherwise approved by the Office, and shall not include:

*(a)*    synthetic terpenes;

*(b)*    polyethylene glycol (PEG);

*(c)*    vitamin E acetate;

*(d)*    medium chain triglycerides (MCT oil);

*(e)*    medicinal compounds;

*(f)*    illegal or controlled substances;

*(g)*    artificial food coloring;

*(h)*    benzoic acid;

*(i)*    diketones; and

*(j)*    any other compound or ingredient as determined by the Office;

(iv)    cannabis products cannot exceed more than ten (10) percent total terpenes; and

(v)    licensees shall maintain records of all cannabis or botanically derived terpenes used in the cannabis product with full information on the source of botanically derived-terpenes used, and provide this information to the Office upon request.

(10)    except for cannabis flower products, be homogenous, with phytocannabinoid content evenly distributed throughout the cannabis product. A cannabis product shall not be considered homogenous if the concentration of total THC and CBD in milligrams per single serving for 5 samples of a cannabis product lot/batch submitted for testing, pursuant to Part 130 of this Title, is greater than +-1 standard deviation of the mean concentration for total THC and CBD in milligrams per serving for that submitted lot/batch; and

(11)    be identified and categorized in a processor's inventory tracking system, including, but not limited, to information detailing the milligrams of total THC in the cannabis product, to ensure compliance with Article 20-c of the Tax Law.

(g)     Cannabis product quality plans, master manufacturing records and batch product records.

(1)     a processor shall implement and maintain a written product quality plan for each type of cannabis product manufactured at the licensed premises. The product quality plan shall address the risks and hazards associated with the premises and the manufacturing process that, if not properly mitigated, may cause the cannabis product to be adulterated or misbranded, or may cause the cannabis product to fail laboratory testing or quality assurance review and shall include the following:

(i)     a comprehensive assessment of the overall manufacturing process, including all steps from component intake through transfer of product from the premises;

(ii)     evaluation of the potential risks associated with each manufacturing step, which includes evaluation of potential risks to cannabis product quality that could be introduced during manufacturing operations including, but not limited to, physical, biological, microbiological or chemical hazards, or process failures that may lead to product contamination, allergen cross-contact, packaging errors, labeling errors, or other errors affecting cannabis product quality; and

(iii)     identification of preventive measures necessary to mitigate each potential risk identified, methods to evaluate the effectiveness of the preventive measure and any action to take if a preventive measure was unsuccessful.

(2)       a processor shall develop, maintain and follow a written master manufacturing protocol for each unique formulation of cannabis product manufactured, and for each batch size, to ensure uniformity in finished batches and across all batches produced. The master manufacturing protocol shall include the following:

(i)       the name and intended phytocannabinoid content of the cannabis product to be manufactured;

(ii)       a complete list of all ingredients to be used and the weight or measure of each ingredient, which may include the ability to adjust the weight or measure of phytocannabinoid-containing ingredients in order to account for the variability of phytocannabinoid content in cannabis;

(iii)       the identity and weight or measure of each ingredient that will be declared on the ingredients list of the cannabis product, if different than above;

(iv)       the expected yield of the finished manufactured cannabis product, based upon the quantity of ingredients or packaging to be used in the absence of any loss or error in actual production, and the maximum and minimum percentages of expected yield beyond which a deviation investigation of a batch will be necessary;

(v)       a description of packaging and a representative label, or a cross-reference to the location of the actual or representative label, which may be maintained electronically;

(vi)     the expected number of packages and labels to be used, if the cannabis product will leave the manufacturing premises in final form;

(vii)    written instructions for each point, step, or stage in the manufacturing process; and

(viii)   written instructions for any action to mitigate risks identified in the product quality plan.

(3)     Processors shall develop, maintain and follow, a written batch production record for every batch of a cannabis product manufactured, which shall include any batch specific remediation or relabeling. The batch production record shall:

(i)      accurately follow the appropriate master manufacturing protocol, and each step of the protocol shall be performed in the production of the batch;

(ii)     document complete information relating to the production and control of each batch, including, but not limited to:

*(a)*     lot number, or batch number as applicable, of the finished batch of cannabis product, and unique identification numbers or barcodes of all cannabis used in the batch as captured by the inventory tracking system of record;

*(b)*     specific equipment and processing lines used in producing or remediating the batch;

*(c)*      the identity and weight or measure of each component used;

*(d)*      the actual yield and the percentage difference from expected yield at appropriate phases of manufacturing as identified in the master manufacturing protocol;

*(e)*      the actual results obtained during any monitoring operation, if the product quality plan identifies any monitoring needed to ensure product safety at a specific manufacturing step;

*(f)*      the date and time of when each step of the master manufacturing protocol was performed, and the initials of the person(s) performing each step;

*(g)*      an actual or representative label or other identification of the label to be used for the cannabis product;

*(h)*      the actual quantity of the packaging and labels used, and the difference from the expected number to be used, if the cannabis product will leave the manufacturing premises as a final cannabis product;

*(i)*      documentation that quality control personnel reviewed the batch production record, including all required monitoring operations, test results for components, if applicable, and finished batches of cannabis product, and either approved and released, or rejected, the finished cannabis product, including any remediated, repackaged or relabeled cannabis product;

*(j)*      documentation, at the time of performance, of any investigation identified in the product quality plan or master manufacturing protocol, including investigations into deviations from the expected yield or package and label count.

(iii)      contain actual values and observations, as appropriate, during verification activities and be accurate and legible and be created concurrently with performance of the activity documented; and

(iv)      include sufficient detail to provide a history of work performed, including the date each step was performed, and the signature or initials of the employee performing the activity.

(4)      product quality plans, master manufacturing protocols and batch records shall be readily available for employee reference and made readily available to the Office upon request.

(h)      Cannabis product testing.

(1)      Prior to a cannabis product being distributed, a licensee authorized to process shall test a statistically significant number of cannabis products in accordance with required sampling protocols as set forth in Part 130 of this Title and determined by the Office and maintain a certificate of analysis for all lots of cannabis product tested for a period of five years from the date of expiration.

(2)      All cannabis product testing shall be consistent with acceptable limits as determined by the Office, as set forth in Part 130 of this Title.

154

(3)      The licensee shall retain a subset of each lot of cannabis product to allow for testing in the future if requested by the Office, as follows:

(i)      retained samples shall be stored unopened as indicated on the label in accordance with Part 128 of this Title and in the original packaging;

(ii)     retained samples shall be readily identifiable as belonging to its specific lot; and

(iii)    the quantity retained shall be a statistically representative number of samples to allow for complete testing of the product at least two times and shall be retained by the processor for at least thirty days following the date of expiration, or longer if directed by the Office.

(i)      Cannabis product quarantine and remediation.

(1)      any lot not meeting the minimum testing standards for contaminants, shall be rejected and destroyed by the licensed processor in accordance with Part 125 of this Title, notwithstanding a cannabis flower product lot that has not met the minimum testing standards for microbial testing and has passed all remaining contaminant testing. A licensed processor may remediate and repurpose cannabis flower products provided that;

(i)      the cannabis flower products shall be resubmitted for laboratory testing in a manner set forth in section 123.6(j) of this Title.

(ii)    after completing the required analyses of a representative sample obtained from a remediated or repurposed cannabis lot, the laboratory shall report the results to the Office in the manner set forth in Part 130 of this Title.

(2)    a cannabis flower product lot may only be remediated or repurposed for extraction once. If the lot fails to meet minimum testing standards for contaminants after the remediation or repurposing process, the entire lot shall be destroyed by the licensed processor in accordance with Part 125 of this Title.

(3)    when failed cannabis flower product lot is not remediated or reprocessed in any way it cannot be retested. Any subsequent testing results produced without remediation of the failed batch will not supersede the initial regulatory testing results.

## § 123.7  Distributor Ownership, Interests, Business Authorizations and Prohibitions.

(a)    A distributor may acquire, possess, distribute, and sell cannabis products.

(b)    A distributor may acquire cannabis products from any duly licensed processor or distributor, which may include a microbusiness, cooperative, ROD or ROND.

(c)    A distributor may sell cannabis products to another duly licensed adult-use distributor, or to a retail dispensary, which may include a ROD or on-site consumption premises. Under no

circumstances may a distributor sell cannabis products to a distributor that also holds a cultivation or processing license.

(d)     A distributor or its true party of interest may be a true party of interest in a cultivator, processor, cooperative, microbusiness, or ROND license.

(e)     A distributor, or its true party of interest, may be a landlord, financier, or a goods and services provider to an adult-use cultivator, processor, distributor, cooperative, microbusiness, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control and true party of interest requirements.

(f)     In addition to any other restrictions or prohibitions in this Chapter, including, but not limited to, Part 124, no distributor or its true party of interest is permitted to have any direct or indirect interest in, including, but not limited to, being a true party of interest, passive investor, landlord, financier, or management services provider to a retail dispensary, on-site consumption, delivery, ROD, registered organization, or cannabis laboratory licensee or permittee.

### § 123.8 Distributor Operations.

(a)      A distributor shall:

(1)     comply with Article 20-C of the Tax Law, as well as other applicable provisions of law.

(2)    only transport cannabis products:

(i)    between adult-use cannabis licensees; and

(ii)    between the licensed premises of an adult-use cannabis facility for purposes of distributing the cannabis products;

(3)    or employee thereof, or other person acting on behalf of a distributor who shall possess or transport cannabis products upon the public highways, roads or streets of the state, shall have in their possession invoices and manifests for such cannabis products. Such invoices and manifests shall show the name and address of the seller, the name and address of the purchaser, the quantity, product type and brands of the cannabis products being distributed, and the name and address of the person who has or shall assume the payment of the tax or the tax paid or payable. The absence of such invoices and manifests shall be prima facie evidence that the tax imposed by Article 20-C of the Tax Law on cannabis products has not been paid and is due and owing.

(4)    maintain transaction records of all cannabis product purchased and distributed to retail dispensaries or on-site consumption sites and send such records to the Office's inventory tracking system, real-time, in a manner determined by the Office. Such records shall provide enough detail to independently determine the taxability of each sale, the tax liability for each cannabis product sold and the amount of tax payable by the distributor.

(i)    detailed information required for each sales transaction including, but not limited to:

158

*(a)*      individual cannabis product item(s) sold;

*(b)*      selling price;

*(c)*      tax due;

*(d)*       method of payment;

*(e)*      employee completing the sales transaction:

*(f)*      a device used to complete a sales transaction that may be a combination of software and hardware;

*(g)*       sales transaction number;

*(h)*      date and time of the sale; and

*(i)*      the name, address and license number of the retail dispensary or on-site consumption premises.

(ii)      a retail dispensary and on-site consumption premises shall be offered a receipt of their purchase which shall include, but not be limited to:

*(a)*      the name, address, and license number of the distributor;

*(b)*      the date and time of sale;

*(c)*      the form and the quantity of cannabis products and any other items sold; and

*(d)*      the employee completing the sale.

(5)      keep and maintain upon the licensed premises adequate books and records to demonstrate the distributor's actual cost of doing business, using accounting standards and methods regularly employed in the determination of costs for the purpose of federal income tax reporting, for the total operation of the distributor. Such books, records, and invoices shall be kept for a period of five years and shall be available for inspection by the Office.

(6)      a distributor shall comply with any fees, maximum margins, price posting requirements, and any policies related to market competition and license availability restrictions determined by the Office.

(b)      In addition to the requirement set forth in subdivision (a) of this section, a distributor shall not:

(1)    transport cannabis products to an adult-use cannabis retail dispensary or on-site consumption premises for purposes of retail sale unless it is licensed as a distributor under the Cannabis Law and this Chapter.

(2)    transport cannabis products to a retail dispensary or on-site consumption premises unless the retail dispensary or on-site consumption premises holds a valid and current license as a retail dispensary or on-site consumption premises respectively.

(3)     accept, sell, transfer, distribute, or agree to sell, transfer or distribute, any cannabis product unless it is in a retail package and labeled pursuant to Part 128 of this Title;

(i)    any unlabeled cannabis product in the possession of a distributor shall be deemed illicit cannabis as defined in section 136 of the Cannabis Law and may be subject to the penalties described therein and any penalties or sanctions as determined by the Board, including, but not limited to, cancellation, suspension, or revocation of a license and imposition of fees, civil penalties and any other penalty.

(4)    accept, sell, transfer, distribute, or agree to sell, transfer or distribute, any cannabis product that has not been tested pursuant to Part 130 of this Title as indicated by a certificate of analysis.

(5)    furnish or cause to be furnished to any licensee, any exterior or interior sign, printed, painted, digital or otherwise, unless authorized by the Office.

161

§ 123.9  **Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.**

(a)    A retail dispensary may acquire cannabis products from any licensee authorized for distribution of such products.

(b)    A retail dispensary may acquire seedlings and immature plants from any licensee authorized as a nursery once adult-use home cultivation is authorized by the Board.

(c)    A retail dispensary may possess, sell and deliver cannabis products and cannabis paraphernalia.

(d)    A retail dispensary may sell cannabis products and cannabis paraphernalia to cannabis consumers.

(e)    A retail dispensary may operate an adjoining premises for the consumption of adult-use cannabis products sold by such retail dispensary pursuant to approval by the Board and complying with all operating requirements in this Chapter.

(f)    Sales of cannabis products shall only be executed by licensees authorized to conduct sales of cannabis to consumers. Any person found to be selling cannabis unlawfully may be subject to criminal prosecution under article two hundred twenty-two of the Penal Law.

(g)      No person, other than a passive investor in a retail dispensary license, shall be a true party of interest in more than three retail dispensary licenses.

(h)      A retail dispensary or its true party of interest may also be true parties of interest in a delivery license.

(i)      A retail dispensary or its true party of interest may be a landlord, financier, or goods and services provider to an on-site consumption or delivery license, provided the retail dispensary or its true parties of interest do not exceed authorized true party of interest ownership limits.

(j)      In addition to any other restrictions or prohibitions in this Part, no retail dispensary or its true party of interest is permitted to hold a direct or indirect interest in, or be a true party of interest, passive investor, landlord, financier, or management services provider, or by any other means, to a cultivator, processor, distributor, cooperative, microbusiness, ROD, ROND, registered organization, or cannabis laboratory licensee or permittee or any person licensed outside of New York State who are licensed to function as any of the aforementioned licensees.

## § 123.10 Retail Dispensary Operations.

(a)      A retail dispensary shall be a physical brick and mortar store in New York State with posted hours of operation to be authorized to sell cannabis products and related items to cannabis

163

consumers by in-person sale, over the internet or via a digital application as set forth in this Chapter.

(b)    The retail dispensary may operate a drive-thru service window and pre-order customer pick-up lanes with prior written approval from the Office and in compliance with all applicable state and local laws, rules, and regulations.

(c)    Retail Dispensary Supervision and Staffing Requirements. Includes, but is not limited to, the following:

(1)    No employee shall be the employee in charge of more than one retail dispensary at the same time; and

(2)    The following activities are to be performed by and overseen by the retail dispensary's employee (or designee) in charge:

(i)    the proper conduct of the employees of the retail dispensary;

(ii)    the immediate supervision and management of the retail dispensary during hours of operation;

(iii)    opening and closing the facility;

(iv)    activities of retail dispensary employees;

(v)    inventory and delivery acceptance;

(vi)    recordkeeping and maintenance of files subject to audit or inspection by the Office;

(vii)    employee training and compliance with state and local laws and regulations;

(viii)    maintaining and providing to the Office, upon request, the retail dispensary staffing plan for staff involved in activities related to the sale of cannabis products.  The staffing plan shall be updated with any change in the employment status of retail dispensaries employees within five business days of such change;

(ix)    notifying the Office of the termination of an employee for diversion of cannabis product or theft of currency within 24 hours of the termination;

(x)    notifying the Office of any change of information required to be reported to the Office; and

(xi)    any other activity determined by the Office.

(d)    Verification of identification and proof of age for retail dispensaries.

(1)     No retail dispensary shall sell, deliver, or give away or cause or permit or procure to be sold, delivered, or given away any cannabis or cannabis product to any individual, actually or seemingly under the age of 21 years of age or any visibly intoxicated individual.

(2)     Retail dispensary staff shall inspect the individual's identification and determine the individual's age to validate that the individual is 21 years of age or older.  Valid identification and proof of age shall include:

(i)     a valid driver's license or non-driver identification card issued by the department of motor vehicles, the federal government, any United States territory, commonwealth or possession, the District of Columbia, a state or local government within the United States or a provincial government of the dominion of Canada;

(ii)     a valid federal, state, or local government identification, including IDNYC, stating the customer's age and a photograph of the individual's face;

(iii)     a valid passport issued by the United States government or any other country; or

(iv)     an identification card issued by the armed forces of the United States.

(3)     The retail dispensary employee may perform a transaction scan of the customer's identification as a precondition to the sale of any cannabis or cannabis product.

(4)     On-line orders, telephone orders or other means of orders not made in person for cannabis products shall include an attestation that the individual ordering is 21 years of age or older.  The retail dispensary employee who transports the cannabis product for delivery or a curb-side pick-up order shall obtain verification of the identity and the age of the cannabis consumer at the point of delivery or curb-side pick-up by viewing or scanning a document described in this Part before providing the cannabis product to the cannabis consumer.  If the individual placing the order will not be the individual accepting the order, the individual placing the order shall attest that the individual accepting the order is over 21 years of age and that individual shall provide verification of identity and age at the time of accepting the delivery or dispensing.  Both individuals' identities shall be recorded in the licensees' point-of-sale system.

(5)     A retail dispensary may not acquire or record cannabis consumer personal information without consent, unless this information is typically acquired in a sales transaction, which can include the cannabis consumer's age.

(e)     Cannabis Product Sales Requirements.

(1)     A retail dispensary will be operational and available to sell cannabis products to cannabis consumers only during their designated hours of operation as provided in the application for a license or in the retail dispensary operating plan.  Retail dispensaries may operate within the business hours stipulated in section 119.2 of this Title, unless operating hours are otherwise specified by the jurisdiction in which the business operates.

(2)     The retail dispensary shall:

(i)      have a licensed premises that measures not less than the minimum square footage as determined by the Office;

(ii)     post, visible to consumers, its hours of operation in a conspicuous location inside each retail dispensary premises;

(iii)    post, visible to consumers, any and all signs or posted placards required by the Office, including posting of the adult-use retail dispensary license issued by the Office, in a conspicuous location inside the retail dispensary premises;

(iv)     only offer for sale cannabis products, cannabis paraphernalia intended for the storage or use of cannabis products, branded merchandise of the licensee, or any other items as determined by the Office. Retail dispensaries selling cannabinoid hemp products must obtain a license from the Office in accordance with Article 5 of the Cannabis Law;

(v)      offer for sale or provide containers to consumers for the secure storage of cannabis that lock and are child resistant pursuant to Part 128 of this Title;

(vi)     utilize an inventory tracking system pursuant to section 125.7 of this Title, with the capability of compiling a retail dispensary's cannabis product inventory, transaction data and tax liability as prescribed by the Office.  The retail dispensary's system shall be compatible and capable of reporting the data to the Office on a real time basis;

(vii)    conduct a monthly analysis of its inventory tracking system to determine that no software has been installed that could be utilized to manipulate or alter inventory or sales data and that no other methodology has been employed to manipulate or alter data.  The use of any means to willfully underreport or overreport sales or manipulate inventory is prohibited and subject to penalties in accordance with Part 133 of this Title; and

(viii)    dedicate a minimum of 40% of shelf-space available for cannabis products cultivated or processed by cultivators and processors that are not RODs for a period of five years from the first retail sale in New York.

(3)    A retail dispensary may display, in secure, locked cases, samples of each cannabis product offered for sale.  Authorized employees may remove samples from the display case and provide it to the cannabis consumer for inspection, provided the cannabis consumer may not consume or otherwise use or remove the sample from the retail dispensary.

(4)    Cannabis products shall only be sold by authorized employees of the retail dispensary who shall be 21 years of age or older if interacting with cannabis consumers.

(5)    A retail dispensary shall be in a location consistent with public convenience and advantage standards as determined by the Board.

(f)    Cannabis Product Sales Transactions Requirements.

(1)      Each sales transaction record shall be sent to the Office's inventory tracking system, real-time, in a manner determined by the Office and provide enough detail to independently determine the taxability of each sale and the amount of tax due and collected.  Detailed information required for each sales transaction includes, but is not limited to, the:

(i)      individual item(s) sold including the form and the quantity of cannabis products and any other items sold;

(ii)      selling price;

(iii)      tax due including a separate delineation for each tax imposed on adult-use cannabis pursuant to Article 20-C of the Tax Law;

(iv)      method of payment;

(v)      employee completing the sales transaction;

(vi)      device that was used to complete a sales transaction that may be a combination of software and hardware;

(vii)      unique identifier for the sales transaction; and

(viii)    date and time of the sale;

(2)      A cannabis consumer shall be offered a receipt of their purchase including, but not limited to:

(i)       the name, address, and license number of the retail dispensary;

(ii)      the date and time of sale;

(iii)     the form and the quantity of cannabis products and any other items sold;

(iv)     the employee completing the sale; and

(v)      the tax paid including a separate delineation for each tax imposed on adult-use cannabis pursuant to Article 20-C of the Tax Law;

(3)      Cannabis products purchased by a cannabis consumer may be placed into an exit package in accordance with Part 128 of this Title.

(4)      Nothing in this section shall prevent a retail dispensary employee from refusing to sell cannabis product if, in their judgment, doing so could endanger the health or safety of the cannabis consumer.

(g)    Retail Dispensary Prohibitions.  A retail dispensary shall not:

(1)    violate distance requirements as set out in section 119.4 of this Title, or the Cannabis Law;

(2)    conduct or transact business at a retail dispensary under a name which contains as a part thereof the words "drugs", "medicines", "drug store", "apothecary", "pharmacy", or similar terms or combination of terms, or in any manner by advertisement, circular, poster, sign or otherwise describe or refer to the licensed premises, or describe the type of service or class of products sold by the retail dispensary, by the terms "drugs", "medicine", "drug store", "apothecary", or "pharmacy". A retail dispensary name shall comply with the requirements in Part 129 of this Title;

(3)    display cannabis products or cannabis paraphernalia in an area that is visible from the exterior of the physical structure of the retail dispensary;

(4)    sell or otherwise dispense any cannabis product later than the product date of expiration or use by date marked on the label, however, when the cannabis product is identified as an outdated product, the secure segregation and holding of such product beyond its date of expiration or use by date for disposal shall not be deemed a violation of this paragraph;

(5)    dispense or otherwise sell cannabis products from a vending machine or allow such a vending machine to be installed at the interior or exterior of the premises of the retail dispensary;

172

(6)      abandon the licensed premises without surrendering the license to the Board and making appropriate arrangements for the disposal of cannabis products;

(7)      sell cannabis products obtained through the use of, or accept a sale of cannabis products from any business that does not hold a license in New York State pursuant to Article 4 of the Cannabis Law;

(8)      provide cannabis samples to a cannabis consumer, other than to allow inspection of the product prior to purchase;

(9)      allow employees under twenty-one (21) years of age to have direct interaction with cannabis customers inside a licensed retail dispensary;

(10)     engage in cannabis processing, manufacturing, or compounding at the retail dispensary;

(11)     knowingly sell, deliver, or give away to a cannabis consumer:

(i)      any amount of cannabis product which they know would cause the cannabis consumer to be in violation of the cannabis law or possession limits established by article two hundred twenty-two of the Penal Law;

(ii)      any cannabis product, cannabis paraphernalia, or cannabis merchandise if the cannabis consumer is unable to produce valid proof of government-issued identification and age confirming that they are 21 years of age or older;

(iii)      cannabis products if, in the opinion of the retail dispensary employee based on the information available to them at that time, the cannabis consumer or the public would be placed at risk. This includes, but is not limited to, the cannabis consumer engaging in daily transactions that exceed the legal possession limits or that create a risk of diversion;

(iv)      food, beverage, or personal care item that is not a cannabis product;

(v)      any product that contains nicotine; and

(vi)      alcohol as defined in Section 3 of the Alcohol Beverage Control Law.

(12)      make recommendations to a cannabis consumer who is also a medical cannabis patient if the patient's dosing recommendation is "Per Pharmacist Consultation" and that patient presents their patient certification, issued under the authority of Part 113 of this Title, at the retail dispensary, without disclosing to the cannabis consumer that they are not a pharmacist. Further, any patient who presents a valid medical cannabis patient certification shall be provided a list of the nearest registered organization dispensing facilities;

(13)    solicit or receive an order for, keep or expose for sale, or keep with intent to sell any

cannabis product or cannabinoid hemp product to a cannabis consumer by means of any vehicle

or wheeled frame used for transporting objects, for carrying goods and materials, including, but

not limited to a cart, car, van, truck or trailer;

(14)    place back into stock of any retail dispensary or re-dispense cannabis product which is

returned by a cannabis consumer.  The returned product shall be quarantined for disposal in

compliance with Part 125 of this Title;

(15)    sell any form or type of cannabis product not permitted by this Chapter;

(16)    sell any cannabis product that has not passed quality assurance laboratory testing

pursuant to Part 130 of this Title;

(17)    sell any cannabis product for which the required tax pursuant to Article 20-C of the Tax

Law has not been paid;

(18)    sell any cannabis product that does not meet the packaging and labeling requirements in

Part 128 of this Title;

(19)    advertise or market any cannabis or cannabis products not in compliance with Part 129 of

this Title;

(20)    allow the consumption of any cannabis product by employees, individuals or cannabis consumers inside the premises of the retail dispensary, without prior approval from the Office;

(21)    market its cannabis products through an online platform that is operated by a third-party; and

(22)    fulfill any order referred to it by a third-party platform

(h)    Exceptions.  Nothing in this section shall prohibit:

(1)    delivery of cannabis products into a town, city or village that, by local law, prohibits the establishment of a retail dispensary; and

(2)    delivery of cannabis products into a local jurisdiction beyond the prohibited hours for retail dispensary sales in such jurisdiction provided the delivery occurs within the hours of operation set forth in this section.

(i)    Cannabis Consumer Education and Resources.

(1)    A retail dispensary shall provide consumer education materials to each consumer at the time of sale that include messages about safe consumption of cannabis products, public health, and other educational messages as established in guidance by the Office. Consumer education materials may be made available in print or digital form and shall be prominently displayed. A

176

retail dispensary shall have an adequate supply of current consumer education materials available for distribution to consumers.

(2)	Consumer education materials may never make health claims regarding cannabis or cannabis products.

(3)	A retail dispensary may create their own or utilize current and relevant educational materials created from a third-party source, provided the primary purpose of the educational materials is to educate cannabis consumers about safer consumption of cannabis products. A retail dispensary that allows a third party to create educational materials on its behalf is responsible to ensure that such material complies with all applicable state and local laws, rules, and regulations. Content containing cannabis product claims or studies shall be referenced.

(4)	The retail dispensary shall be required to display or make available to cannabis consumers certain public health and other educational materials provided or required by the Office.

(5)	Consumer education materials shall be made available for inspection by the Office upon request.

(j)	Storage Requirements.  All cannabis products shall be stored in accordance with Part 125 of this Title.

(1)    A retail dispensary shall store working stock of cannabis products locked behind a counter or other barrier to ensure a cannabis consumer does not have direct access to the cannabis products.

(2)    Retail dispensaries shall have policies and procedures in place for the handling and storage of cash at the retail dispensary and for transportation of cash to financial institutions to prevent theft, loss and associated risks to the safety of employees, customers and the general public.

(k)    Delivery Service.  Retail dispensaries providing delivery service shall have a written delivery service plan available for inspection by the Office.

(1)    Delivery of cannabis products to a cannabis consumer:

(i)    shall be conducted in accordance with Part 125 of this Title;

(ii)    shall be limited to ground transport unless another delivery method is approved by the Office;

(iii)    may include delivery of cannabis products, cannabis paraphernalia or merchandise available at the retail dispensary;

(iv)    may only be conducted during the retail dispensary's hours of operation; and

178

(v)    may only be made to the address identified by the customer upon purchase.

(2)    The employee who delivers cannabis products to a cannabis consumer:

(i)    shall obtain verification of the identity and age of the cannabis consumer at the point of delivery to confirm that they are 21 years of age or older prior to completing the delivery transaction; and

(ii)    may not first purchase the cannabis product from the retail dispensary then obtain reimbursement from the cannabis consumer;

(3)    no retail dispensary shall have more than twenty-five employees or the equivalent thereof, providing full-time paid delivery services to cannabis consumers per week under one license.

(l)    Product Returns and Recalls.

(1)    All recalls shall be conducted in accordance with section 125.8 of this Title, unless the retail dispensary is otherwise directed by the Office.

(2)    Retail dispensaries shall establish written policies and procedures to monitor, track and resolve complaints, cannabis product returns and quality assurance concerns.

179

(m)    Pricing.

(1)    A retail dispensary shall designate the price of each cannabis product or item sold by attaching to or otherwise displaying immediately adjacent to each such item displayed in the interior of the licensed premises where sales are made a price tag, sign or placard setting forth the price at which each such item is offered for sale therein.  Pricing shall also be included on any menu accessible to cannabis consumers.

(2)    The price of all cannabis products and items offered for sale on the internet to prospective cannabis consumers shall be available on any internet website or digital application of the retailer.

(3)    No retail dispensary shall refuse or fail to make product pricing available to cannabis consumers upon request including quoting pricing to a prospective cannabis consumer by telephone or other means of communication;

(4)    When the retail dispensary displays a cannabis product price, it shall also display, separately, but in a similar font size or manner to the price, the total cost of the item which includes all taxes that would be paid by the consumer on the cannabis product or item.

(n)    Cannabinoid hemp products in an adult-use retail dispensary.

(1)    Adult-use retail dispensaries who sell cannabinoid hemp product to a cannabis consumer shall comply with the applicable requirements of Part 114 of this Title including obtaining a cannabinoid hemp retail license.

(2)    Cannabinoid hemp flower products clearly labeled or advertised for the purposes of smoking, or in the form of a cigarette, cigar, or pre-roll, or packaged or combined with other items designed to facilitate smoking may be sold at a retail dispensary.

## § 123.11  Microbusiness Ownership, Interests, Business Authorizations and Prohibitions.

(a)    A microbusiness shall engage in cultivation and at least one of the following additional activities authorized by the Cannabis Law for a microbusiness: (1) processing, (2) distribution, or (3) retail sale.

(b)    If authorized through the application process, a microbusiness may:

(1)    sell cannabis to a processor;

(2)    sell cannabis products to a distributor;

(3)    sell cannabis products it has cultivated or processed to consumers;

(4)    sell cannabis products via delivery to consumers; and

(5)    send cannabis or cannabis products to a processor for processing without relinquishing ownership of that cannabis or cannabis product.

(c)    A microbusiness shall not:

(1)    purchase cannabis cultivated by another cultivator unless the microbusiness suffered a significant crop failure, as defined by the Office, and received prior written approval of the Office.

(d)    A microbusiness or the true party of interest in a microbusiness may be a true party of interest in a cultivator, processor, distributor, cooperative, or ROND license.

(e)    No person shall be a true party of interest in more than one microbusiness; provided however, a passive investor may be a passive investor in more than one microbusiness if such passive investor complies with all other ownership, control and interest requirements and prohibitions of the Cannabis Law and this Chapter.

(f)    A microbusiness or its true party of interest may be a landlord, financier, or a goods and services provider to an adult-use cultivator, processor, distributor, cooperative, microbusiness, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control and true party of interest requirements.

(g)    In addition to any other restrictions or prohibitions in this Chapter, including, but not limited to, Part 124, no microbusiness or its true party of interest is permitted to have any direct or indirect interest in, including, but not limited to, being a true party of interest, passive investor, landlord, financier, or management services provider to a retail dispensary, on-site consumption, delivery, ROD, registered organization, or cannabis laboratory licensee or permittee.

## § 123.12 Microbusiness Operations.

(a)    A microbusiness shall:

(1)    comply with all rules, regulations, and policies applicable to a cultivator in a tier with the same canopy size as the microbusiness;

(2)    unless otherwise set forth in this section, comply with all requirements imposed by the Cannabis Law and this Chapter on licensed cultivators, processors, distributors, and retailers to the extent the microbusiness engages in such activities.

(3)    cultivate with one (1) of the following types of cultivation: outdoor, mixed light, or indoor. The microbusiness may cultivate within a specified type of cultivation as approved by the Board on the licensee's application. The maximum canopy for each type of cultivation, unless otherwise approved by the Office, shall be the canopy limits set out in section 120.3(c)(1) of this Title;

(4)      if authorized to process by the Board on the licensee's application, process no more than 1,700 pounds of biomass per year, unless the biomass is cultivated solely by the microbusiness exclusively at its licensed premises;

(5)      if authorized to distribute by the Board on the licensee's application, distribute only their own cannabis products to retail dispensaries or on-site consumption sites;

(6)      if authorized to conduct retail sales by the Board on the licensee's application, sell only their own cannabis products to consumers; and

(7)       be authorized to have its retail dispensary premises in a location separate from the premises where it is cultivating or processing cannabis, provided however:

(i)      the retail dispensary complies with all other zoning and operational requirements for retail dispensary licensees;

(ii)      for licensees in a city with over one million persons, the retail dispensary premises is located in the same county as the cultivation and if applicable processing premises; and

(iii)      for licensees outside of a city with over one million persons, the retail dispensary premises is located within 25 miles of the cultivation and if applicable processing premises.

(b)      A microbusiness may, pursuant to approval by the Board and the operating requirements in this Chapter, be authorized for on-site use of adult-use cannabis products.

## § 123.13  Cooperative Ownership, Interests, Business Authorizations and Prohibitions.

(a)      A cannabis cooperative license under section 70 of the Cannabis Law shall publicly be referred to as a Cannabis Collective.

(b)      A cooperative shall have the same authorizations and prohibitions as adult-use cultivators, processors, and distributors, as provided in Part 123 of this Title, to the extent the cooperative engages in such activities, notwithstanding that:

(1)      a cooperative may conduct activities authorized for adult-use cannabis processors at up to two premises; and

(2)      a cooperative is not limited in the number of cultivation premises it may operate, provided that for each premises over six premises, additional application and licensing fees may apply.

(c)      A member in the cooperative shall not be a member of more than one cooperative.

(d)      A member in the cooperative shall be a true party of interest of the cooperative.

(e)     In addition to any other restrictions or prohibitions in this Chapter, including, but not limited to Part 124, no collective or its true party of interest is permitted to have any direct or indirect interest in, including, but not limited to, being a true party of interest, passive investor, landlord, financier, or management services provider to a retail dispensary, on-site consumption, or delivery licensee.

(f)     A cooperative licensed under this Chapter shall be organized as either a Traditional Cooperative or a Cooperative Association.

(g)     A Traditional Cooperative shall have:

(1)     all voting rights held exclusively by members that contribute to the collective primarily with labor. Such members shall:

(i)     each have one vote;

(ii)     comprise no less than a two-thirds majority of the governing body;

(iii)     maintain a controlling interest of the Traditional Cooperative at all times;

(iv)     own no less than 51% of the equity of the Traditional Cooperative at all times;

(v)     not have their capital or interest subordinated to the capital or interest of any other member group or shareholders; and

186

(vi)    own and control the cooperative; and

(2)    its profits, earnings, and losses distributed to members based on labor and not based on capital investment.

(h)    A Cooperative Association shall:

(1)    have 51% of its voting rights in the aggregate held by members who contribute to the cooperative primarily with labor. Such members shall:

(i)    not have their capital contributions proportionately tied to voting rights;

(ii)    comprise no less than half of the governing body;

(iii)    receive distributions from the cooperative based on their labor contributions;

(iv)    receive no less than 50% of profits, provided shareholders exist and are receiving distributions;

(v)    own no less than 51% of the equity of the cooperative at all times; and

(vi)    own and control the cooperative;

(2)      permit member contributions to consist of tangible or intangible personal property, or any other benefit to the cooperative, including: money, labor, services, promissory notes, agreements to contribute, and contracts to be performed, unless otherwise provided by the cooperative's internal rules;

(3)      permit, before determining the amount of profits, its governing body to set aside a portion of profits to create or accumulate: a capital reserve; reasonable reserves for specific purposes, such as expansion or replacement of capital assets; or education, training, and information;

(4)      permit distributions to be made in any form, including cash, capital credits, and allocated patronage equities;

(5)      permit distributions to shareholders to be based on their capital contributions; and

(6)      generate returns for members and shareholders based on profitability, distributions on profitable asset sales, refinancing, or through a liquidity event.

(i)      A cooperative shall have no fewer than five members that contribute primarily with labor.

(j)      The Office may request documentation and other support evidence to verify the validity of the applicant's cooperative formation as described in the Cannabis Law, regulations, and guidance issued by the Office.

**§ 123.14 Cooperative Operations.**

(a)       A cooperative shall abide by all the operational requirements of each license type of licensed activity it performs in accordance with the Cannabis Law and this Chapter.

(b)       A cooperative shall notify the Office of any changes in its membership within 30 days of such change.

**§ 123.15  Registered Organization Cultivator Processor Distributor Ownership, Interests, Business Authorizations and Prohibitions.**

(a)       No person shall be a true party of interest in more than one ROND; provided however, a passive investor may be a passive investor in more than one ROND if such passive investor complies with all other ownership, control, and interest requirements and prohibitions of the Cannabis Law and this Chapter.

(b)       A ROND or its true party of interest may be a passive investor in a cultivator, processor, distributor, cooperative, or microbusiness license.

(c)       A ROND or its true party of interest may be a landlord, financier, or management services agreement provider to an adult-use cultivator, processor, distributor, cooperative, microbusiness, and ROND license, provided the ROND and its true parties of interest do not exceed authorized true party of interest limits set forth in the Cannabis Law and this Chapter.

189

(d)      In addition to any other restrictions or prohibitions in this Part, no ROND or its true party of interest shall be permitted to hold, a direct or indirect interest in, or be a true party of interest, passive investor, landlord, financier, or management services provider, or by any other means, to a retail dispensary, on-site consumption, delivery, ROD, registered organization, or cannabis laboratory licensee or permittee.

## § 123.16 Registered Organization Cultivator Processor Distributor Operations.

(a)      A ROND shall:

(1)      comply with all requirements set out for adult-use cultivators, processors, and distributors in this Chapter, including Part 113 of this Title.

(2)      maintain a medical patient prioritization plan, which shall be submitted to the Office every six (6) months, unless otherwise determined by the Office. The medical patient prioritization plan shall include, but is not limited to:

(i)      monthly sales volume data for each of the last 12 months, broken down by registered dispensing site;

(ii)      maintenance of sufficient medical cannabis product to support the greater of: the highest monthly sales volume generated by the applicant in the last 12 months or a minimum threshold

set annually by the Board, based on the anticipated medical cannabis demand for that year and the number of registered organizations in operation;

(iii)    an attestation that the ROND shall always have products in different concentrations and dosage forms available to certified patients at all times, including, but not limited to:

(*a*)    at least one product that has a higher ratio of tetrahydrocannabinol (THC) to cannabidiol (CBD);

(*b*)    at least one product that has a higher ratio of CBD to THC;

(*c*)    at least one product that has an equivalent ratio of THC to CBD; and

(*d*)    seeds or immature plants for medical home cultivation in accordance with Part 115 of this Title; and

(iv)    any other requirements as determined by the Office.

(b)    A ROND shall not:

(1)    have more than 100,000 square feet of canopy, unless otherwise authorized by the Board in writing;

(2)    begin new construction or major renovations on any indoor cultivation area or facility, unless authorized by the Board in writing;

(3)    process more than 55,000 pounds of biomass, or the equivalent amount of cannabis extract or cannabis product, per year, if the ROND has purchased any cannabis or cannabis product from another licensee in that calendar year;

(4)    contract with a laboratory permitted pursuant to Part 130 of this Title for voluntary testing services, unless otherwise authorized by the Office; and

(5)    substitute adult-use cannabis product, should the licensee experience an unexpected shortage of medical cannabis products.

## § 123.17  Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.

(a)    No person shall be a true party of interest in more than one ROD; provided however, a passive investor may be a passive investor in more than one ROD if such passive investor complies with all other ownership, control and interest requirements and prohibitions of the Cannabis Law and this Chapter.

(b)    A ROD or its true party of interest may be a landlord, financier, or management services agreement provider to another ROD, provided that such ROD and its true parties of interest do not exceed authorized true party of interest limits set forth in the Cannabis Law and this Chapter.

(c)      In addition to any other restrictions or prohibitions in this Chapter, no ROD or its true party of interest is permitted to hold, a direct or indirect interest in, or be a true party of interest, passive investor, landlord, financier, or management services provider, or by any other means, to an adult-use cultivator, processor, distributor, cooperative, microbusiness, retail dispensary, on-site consumption, delivery, ROND, registered organization, or cannabis laboratory licensee or permittee.

(d)      In addition to any other restrictions or prohibitions in this Part, no ROD or its true party of interest is permitted to hold a direct or indirect interest in, or be a true party of interest, passive investor, landlord, financier, or management services provider, or by any other means, to a cultivator, processor, distributor, cooperative, microbusiness, retail dispensary, on-site consumption, delivery, ROND, registered organization, or cannabis laboratory licensee or permittee or any person licensed outside of New York State who are licensed to function as any of the aforementioned licensees.

## § 123.18 Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Operations.

(a)      A ROD shall:

(1)      comply with all requirements set out for an adult-use cultivator, processor, distributor, and retail dispensary in this section, as well as Part 113 of this Title;

(2)    dedicate a minimum of 40% of shelf-space available for adult-use product cultivated and processed by licensees that are not RODs;

(3)    co-locate its medical and adult-use dispensaries;

(4)    if co-locating more than one dispensing site, have at least one co-located dispensing site outside of New York, Kings, Bronx, Queens, Richmond, Nassau, Suffolk, and Westchester counties;

(5)    be subject to the same prohibitions set forth in section 123.16(b) of this Title;

(6)    maintain a medical patient prioritization plan which shall include:

(i)    all requirements set forth in section 123.16(a)(2) of this Title; and

(ii)    maintain enough medical cannabis product at each co-located retail dispensary to support the greater of:

(*a*)    the highest sales volume generated by that dispensary in the last 12 months; or

(*b*)    a minimum threshold set annually by the board, based on the anticipated medical demand for that year and the number of registered dispensing sites in operation;

194

(7)     provide a separate medical consultation area within their dispensing sites;

(8)     have separate lines and access areas for certified patients and their caregivers; and

(9)     comply with the Americans with Disabilities Act (ADA) standards.

(b)     A ROD shall not:

(1)     have more than 100,000 square feet of canopy, unless otherwise authorized by the Board in writing.

(2)     begin new construction or major renovations on any indoor cultivation area or facility unless authorized by the Board in writing.

(3)     process more than 55,000 pounds of biomass, or the equivalent amount of cannabis extract or cannabis product, per year, if the ROD has purchased any cannabis or cannabis product from another licensee in that calendar year.

(4)     contract with a laboratory permitted pursuant to Part 130 of this Title for voluntary testing services, unless otherwise authorized by the Office.

(5)     substitute adult-use cannabis product, should the licensee experience an unexpected shortage of medical cannabis products.

(6)     have more than three co-located dispensaries;

(7)     have more than one co-located facility in the same county or borough as any of its other licensed or registered dispensing sites;

(8)     locate any co-located adult-use dispensary premises in a location prohibited under the Cannabis Law or this Chapter; and

(9)     be granted authorization to apply for adult-use retail before three years from the first date of a retail adult-use cannabis sale by a licensee authorized under the Cannabis Law.

**§ 123.19 Delivery Operations.**

Reserved.

**§ 123.20 Severability**.  If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

A new Part 124, titled General Business Requirements and Prohibitions, is added to read as follows:

Part 124

General Business Requirements and Prohibitions

**Part 124 - General Business Requirements and Prohibitions.**

**§ 124.1 Undue Influence and Incentives.**

**§ 124.2 Terms of Sale.**

**§ 124.3 Goods and Services Agreements.**

**§124.4 Agreements Creating Financial or Controlling Interest.**

**§124.5 Contracting Limitations.**

**§ 124.6 Severability.**

**§ 124.1 Undue Influence and Incentives.**

(a)      No person shall enter into any agreement which if entered into may cause undue influence over a licensee, as set forth in this Part. This rule shall not be construed as prohibiting the placing and accepting of orders for the purchase and delivery of cannabis or cannabis products that are made in accordance with usual and common business practices and that are otherwise in compliance with this Chapter.

197

(b)      No distributor, microbusiness, cooperative, ROD, or ROND shall advance, and no licensee authorized for the retail sale of cannabis or cannabis products to consumers shall receive money or a benefit equivalent to the value of money under an agreement or by means of any other business practice or arrangement such as:

(1)      gifts;

(2)      discount, except as otherwise permitted in this section;

(3)      customer loyalty programs;

(4)      loans of money;

(5)      premiums;

(6)      rebates;

(7)      royalties;

(8)      free cannabis product of any kind, except as otherwise permitted by this section;

(9)      preferential shelf space or displays; and

(10)    treats or services of any nature whatsoever, except:

(i)    a discount, not in excess of one per centum for payment on or before ten days from date of shipment of such cannabis;

(ii)    such services as are authorized in this Section or which may be authorized by a license issued pursuant to the Cannabis Law.

(c)    Licensees are prohibited from requiring the purchase of other products or services by other licensees as a condition of a transaction of cannabis or cannabis products. Products and services include, but are not limited to, other cannabis or cannabis products or brands, merchandise, paraphernalia, property, software or applications, or services.

(d)    A microbusiness, cooperative, distributor, ROD, or ROND may provide free samples of cannabis products to negotiate a sale to a retail dispensary or on-site consumption premises that does not currently carry the brand, type, or form of the cannabis product. Such licensees shall abide by any sample limits set by the Office and shall record the amount, transfer, and receipt of each cannabis product sample in the licensee's inventory tracking system in accordance with the requirements set forth in Part 125 of this Title. The sample shall be clearly labeled as a "retailer sample" and recorded and tracked on a transport manifest. The receiving licensee shall receive the "retailer sample" in the inventory tracking system prior to sampling the cannabis product. All other packaging and labeling requirements in this Chapter shall apply. The retailer sample may

be useable by the retailer and employees of a retailer but shall not be sold or given away to cannabis consumers.

(e)      A distributor, microbusiness, cooperative, ROD, or ROND may provide retailers and their employees with branded promotional items of nominal value. These items can only bear imprinted advertisements of such licensees. The items may not be forwarded on and given to retail customers, through purchase or giveaway.

(f)      Licensees are prohibited from giving away or distributing promotional items such as branded or unbranded merchandise to cannabis consumers. For the purposes of this provision, "giving away" does not include non-infused cannabis product samples of edible or topical products carried by a retailer that are offered to customers inside the licensed premises for sampling purposes only.

(g)      Any person who, under the definitions in this Title, would be considered a true party of interest in an entity, and who is permitted for activities which are authorized for a licensee under the Cannabis Law, shall be subject by the true party of interest authorizations and prohibitions for that license type.

**§ 124.2 Terms of Sale.**

(a)      Licensees shall:

(1)    sell cannabis and cannabis products, or cannabis merchandise or paraphernalia, at prices indicative of their true value when sold without any other products, terms, or services;

(2)    not discriminate, directly or indirectly, in price, payment terms, in discounts for time of payment or in discounts on quantity of merchandise sold; and

(3)    be prohibited from refusing to sell any brand of cannabis or cannabis product to any person authorized to purchase such brand of cannabis or cannabis product from such licensee at market value or based on price disclosures authorized by the Board, provided the purchaser pays cash therefor, and except as herein provided.

(b)    Persons authorized to distribute, including, but not limited to, distributors, cooperatives, microbusinesses, ROND or ROD, shall sell cannabis products to any person authorized to sell cannabis product to consumers, including, but not limited to, any retail dispensary or on-site consumption licensee willing to pay cash, provided, however:

(1)     checks shall not be from third parties;

(2)    checks drawn on the account of a retailer dispensary shall not be post-dated; and

(3)    distributors, microbusinesses, cooperatives, ROD, or ROND shall not be required except checks drawn on a retail dispensary's account.

(c)      Distributor, microbusiness, cooperative, ROD, or ROND licensees may, but are not required to, allow licensees authorized for retail sales to pay on credit, provided:

(1)      payment terms comply with this Part; and

(2)      retail dispensaries purchasing cannabis products on credit pay their balance due within 30 days.

(d)      Distributors, microbusinesses, cooperatives, RODs, or RONDs shall:

(1)      report retailers who are delinquent in payment for cannabis products to the Office; and

(2)      not sell cannabis products on credit to any retailer reported and found by the Office to have a delinquent payment due, as provided in this section.

(e)      Each such distributor, microbusiness, cooperative, ROD, or ROND is hereby required, on or before the respective notification dates, as determined by the Office, for each retail dispensary license, to give written notice of default, by first class mail, to all such licensees therein who have failed to make payment to them on or before their final payment date for cannabis products sold or delivered to them during a credit period ending on their final payment date. No retail licensee shall be placed in default if the distributors, microbusinesses, cooperatives, ROD, or ROND has issued an account credit to the licensee, which after application to all debts owed by

202

the retail dispensary licensee, is equal to or greater than the amount of the default. Any such retail dispensary licensee receiving a notice of default shall not thereafter purchase cannabis products, except for cash, until such time as the Office determines that their name shall not be published on the delinquent list as provided in subdivision (d) of this section, or until such time as the Office permits sales or deliveries to them as provided in subdivision (g) of this section. Each such distributors, microbusinesses, cooperatives, ROD, or ROND is hereby required to file with the Office, on or before each notification date, copies of the notices sent by them to all delinquent retail dispensary licensees as required in this subdivision, and in addition, if the Office shall so require, a written list setting forth the names and addresses of all such delinquent licensees. The Office, in its discretion, may extend for a period not exceeding three days the date for giving written notice of default to delinquent retail dispensary licensees and extend for three days the date for filing with the Office the copies of notices sent to such licensees and/or the written list of delinquent retail dispensary licensees as required in this subdivision. The Office, in its discretion, may limit the documents to be filed to those relating to licensees who are to be added or deleted from the default list and direct that distributors, microbusinesses, cooperatives, ROD, or ROND maintain copies of all other documents required under this section for future inspection by the Office. The Office shall, as soon as practicable after each notification date, compile and publish and furnish each distributor, microbusiness, cooperative, ROD, and ROND licensed under this Chapter a list, to be designated on the delinquent list containing the names and addresses of all retail dispensary licensees who have been reported by distributors, microbusinesses, cooperatives, ROD, or ROND pursuant to the provisions of this section as having failed to make payment as required by this section for cannabis products sold or delivered to them, and no such distributors, microbusinesses, cooperatives, ROD, or ROND, on or after the

fifth day after the receipt of such delinquent list, shall knowingly, willfully, or intentionally sell or deliver any cannabis to any such licensee whose name appears on such list, except for cash, until such time as the name of such licensee is removed therefrom, except as hereinafter permitted. The receipt of a delinquent list by a distributor, microbusiness, cooperative, ROD, or ROND shall constitute knowledge of the names of the retail dispensaries licensees who have failed to make payment for cannabis as required by this section. The failure of any distributor, microbusiness, cooperative, ROD, or ROND to comply with the foregoing provisions of this section may, at the discretion of the Office, subject the license of such distributor, microbusiness, cooperative, ROD, or ROND to suspension for not more than five days for the first offense, and not more than 30 days for a subsequent offense. The Office may publish the delinquent list on its website; provided, however, that full access shall be restricted to those distributors, microbusinesses, cooperatives, ROD, or ROND licensed under this Chapter and access to their specific status shall be provided to retail dispensaries licensed under this Chapter. Such publication shall be considered receipt thereof by all distributors, microbusinesses, cooperatives, ROD, or ROND.

(f)    In the event that any dispute shall exist between any distributor, microbusiness, cooperative, ROD, or ROND and a retail dispensary licensee to whom they shall have sold cannabis products, either as to the fact of payment or as to the amount due for such cannabis products or as to the quantity of the cannabis products sold or delivered, which dispute cannot be resolved between them, the Office is hereby authorized to receive statements from each of the parties to such dispute as to the facts and circumstances thereof and to determine whether or not

a retail dispensary licensee is delinquent and should be included on the appropriate delinquent list.

(g)    The Office, in the case of a retail dispensary licensee who has made payment for cannabis products, or on good cause shown to do it, may permit sales or deliveries to any retail dispensary licensee who has received notice of default, or who is named on any delinquent list, on terms other than for cash, but within the limitations of this section, prior to the publication of the next appropriate delinquent list.

(h)    The Board may impose any penalty or condition otherwise authorized by this section in the case of any such retail dispensary licensee who fails or refuses to liquidate and pay unpaid balance becoming due under this subdivision.

(i)    Nothing herein contained shall be construed to require any cultivator, processor, distributor, microbusiness, cooperative, ROD, or ROND to extend credit to any retail dispensary licensee nor to restrain any distributor, microbusiness, cooperative, ROD, or ROND from seeking to enforce by legal action or otherwise, payment of any sum or sums of money due or alleged to be due to any such distributor, microbusiness, cooperative, ROD, or ROND for cannabis sold or delivered to any such retail dispensary licensee.

(j)    The Office is hereby authorized to do such acts, prescribe such forms, and make such orders as it may deem necessary or proper to fully effectuate the provisions of this section,

including, but not limited to, the changing of any date on which any act or function pursuant to this section is to be performed by any licensee or by the Office.

(k)    The Board may revoke, cancel, or suspend any license issued pursuant to this Chapter for:

(1)    actions in violation of any of the provisions of this section;

(2)    for making a false statement in any disclosures filed pursuant to this section; or

(3)    for failing or refusing in any manner to comply with any of the provisions of this section.

**§ 124.3 Goods and Services Agreements.**

(a)    Exempt Agreements. The following agreements shall not be presumed to create undue influence between licensees; apparent or actual conflicts of interest; or an availing interest in the license by a non-licensee or person who is not a true party of interest in such license. A person providing may provide such agreements across licenses:

(1)    general goods and services providers.

(i)    exempt goods and services agreements, may include but are not limited to, accounting, record-keeping, non-cannabis materials and goods from unlicensed persons, office supplies, leasing equipment, architect services, construction, heating, ventilating, air conditioning,

refrigeration, plumbing, cleaning and janitorial, lighting, security, legal services, government relations (registered lobbyist), and license application preparation.

(2)    landlords.

(i)    a person may be a landlord to licensees across multiple licenses. If the landlord becomes a true party of interest in a license, they are subject to the prohibitions of true parties of interest for that license type.

(3)    financiers and financial institutions.

(i)    a person may be a financier to financial institution across multiple licenses. If the financier or financial institution becomes a true party of interest in a license, they are subject to the prohibitions of true parties of interest for that license type. Principal repayment shall be excluded from any calculation of fees paid to a financier or financial institution in a calendar year.

(b)    Non-exempt agreements.

(1)    non-exempt agreements, include but are not limited to, agreements for the provision of consulting, advisory, or strategic services related to the licensed activities.

(2)     any person providing a non-exempt goods and services agreement that is not based on a flat fee, including, but not limited to, agreements based on business performance, revenues, royalties, or profits, shall be prohibited from having any goods and services agreement with licenses in a separate licensing tier.

(c)     Management Services Agreement.

(1)     under no circumstances shall a person operate management services agreements with licensees across licensing tiers, regardless of their status as a true party of interest.

(2)     a person providing management services not based on a flat fee, including, but not limited to, agreements based on business performance, revenues, royalties, or profits, shall be a true party of interest in the licensee receiving services.

(3)     a management services agreement shall state that the services provider, its owners, principals, and staff, directly or indirectly, involved in professional services, or the consulting on behalf of the cannabis business, are supervised and compensated in such operations entirely by the licensee.

(4)     a management services agreement shall state that the licensee and the management services provider shall adhere to the licensee's labor peace agreement and are jointly liable for any workforce related violations for services.

(5)     all management service agreements shall retain the licensee's right to audit, or use a third-party to audit, the management service provider's records relating to its performance under the agreement.

(d)     Stacking Agreements. Where a person has multiple goods and services agreements with a licensee, the value of the payments made under such agreements shall be combined, and the combined agreement shall be held to the strictest prohibitions of each of those individual agreements.

(e)     A person providing goods and services under this section shall be a true party of interest to the license to which it is providing such services if, over the course of a calendar year, they receive the right to or actual payment from the licensee, exceeding the greatest of:

(1)     10% of a licensees' gross revenues;

(2)     50% of a licensees' net profits;

(3)     $100,000; or

(4)  if such person qualifies as a true party of interest by any other means in this Part.

(f)      Where a goods and services provider violates the financial interests and controlling conduct prohibitions set forth in this Part, the Office may terminate that party's interest in the license and recommend a civil penalty to be imposed by the Board and collected by the Office.

## § 124.4 Agreements Creating Financial or Controlling Interest.

(a)      Under any circumstance, the Office reserves the right to review any agreements between a licensee and a third party. A third party will be deemed to be a true party of interest with financial or controlling interest in a license where such agreement:

(1)      compels a licensee to promise not to purchase cannabis, cannabis products, or other products or materials from or sell cannabis, cannabis products, or other goods, services, or materials to specifically identified applicants, licensees, or other businesses;

(2)      imposes penalty upon a licensee for noncompliance with the agreement that requires surrender of personal assets of the licensee owners or principals;

(3)      is not bargained for between the parties in an arms-length transaction;

(4)      does not include the ability for either party to terminate the agreement with due notice; or

(5)      creates an employee-employer relationship under New York State Labor Law between the licensee and non-licensed person based on the agreed services to be performed under said agreement.

**§ 124.5 Contracting Limitations.**

(a)    Adult-use licensees are prohibited from contracting or subcontracting with a person or entity performing any function or activity directly involving the licensed activities authorized for that license type, including, but not limited to, cultivating, processing, manufacturing, distributing, or selling cannabis or cannabis products.

(b)    Adult-use licensees may contract with a person or entity performing a function or activity ancillary to the licensees licensed activities, including, but not limited to, accounting, record-keeping, architectural services, construction, heating, ventilating, air conditioning, refrigeration, plumbing, cleaning and janitorial, lighting, security, and legal services.

**§ 124.6 Severability**.  If any provision of this Title or its application to any particular person or circumstance is held invalid, the remainder of this Title and its application to other persons and circumstances shall not be affected thereby.

A new Part 125, titled General Operating Requirements and Prohibitions, is added to read as follows:

Part 125

General Operating Requirements and Prohibitions

**Part 125 - General Operating Requirements and Prohibitions**

**§ 125.1 Site, Operating, and Environmental Plans.**

**§ 125.2 Security and Storage of Cannabis.**

**§ 125.3 Employee Requirements and Obligations.**

**§ 125.4 Responsible Vendor Training.**

**§ 125.5 Worker Health and Safety Standards.**

**§ 125.6 Sanitary Facility; Equipment and Handling Standards.**

**§ 125.7 Inventory and Tracking.**

**§ 125.8 Quarantine, Remediation and Recalls.**

**§ 125.9 Transport of Cannabis and Cannabis Products.**

**§ 125.10 Management of Cannabis and Other Waste.**

**§ 125.11 Inspections and Audits.**

**§ 125.12 General Record Keeping Requirements.**

**§ 125.13 Processing Samples for Internal Quality Control.**

**§ 125.14 Severability.**

**§ 125.1 Site, Operating, and Environmental Plans.**

(a)    Site plan. A licensee shall document, implement, and maintain a site plan, which shall be submitted to the Office in a manner and format determined by the Office, consisting of the following information:

(1)    activities performed in each area of the licensed premises;

(2)    details of all parcel boundaries, including, but not limited to, physical boundaries, roads, and water crossings of the property;

(3)    sanitary facilities, as applicable;

(4)    perimeter dimensions of property and any facilites on premises where licensed activities are taking place or cannabis or cannabis products are being stored;

(5)    entrances and exits to both the property and premises;

(6)    licensees authorized for cultivation shall also include in its site plan the following additional information:

(i)    cultivation area, including aggregate canopy square footage if the areas are noncontiguous. All unique areas separated by identifiable boundaries shall be clearly described

and labeled in the premises diagram. Plant bed diagrams noting canopy square footage shall be kept up to date with the Office. Any material change to the site plan shall receive Office approval;

(ii)    areas outside of the cultivation area for immature cannabis plants, seedlings, clones, and mother plants only, if applicable;

(iii)    pesticide and agricultural chemical storage area;

(iv)    drying area;

(v)    harvest storage area;

(vi)    a list and description of any lighting used for cultivation of cannabis (with wattage and photosynthetic photon efficacy and placement); and

(vii)    other activities or other licensed areas. If applicable, a cultivator shall keep all areas used for adult-use cannabis operations, including any growing, harvesting, drying, or storage areas, separate and distinct from any area designated for hemp cultivation authorized under the Department of Agriculture and Markets; and

(7)    licensees authorized for cultivation and processing shall also include in its site plan designated areas for:

(i)      bulk packaging;

(ii)     composting, if on-site;  and

(iii)    secure cannabis waste (not including composting areas);  and

(8)      any other designated areas as determined by the Office.

(b)      Operating plan. A licensee shall document, implement, and maintain an operating plan, which shall be submitted to the Office in a manner and format determined by the Office and made available to the Office immediately upon request. The operating plan shall consist of the following information:

(1)      a security and employee training and safety plan that includes risk mitigation and accident prevention plans resulting from a risk assessment of all licensed activities, including an up-to-date list of authorized employees who have access to any surveillance room(s);

(2)      an overview of all activities the licensee is authorized to engage in, as applicable to the license type, including, but not limited to, cultivation, processing, distribution, transportation, retail sale, and delivery;

(3)      a quality assurance plan that establishes criteria to detect, identity, prevent, and track cannabis and cannabis product contamination incidents;

(4)      a cannabis recall plan that includes an annual mock recall test;

(5)      a cannabis testing plan, as applicable to the licensee, that includes sampling and laboratory testing of cannabis or cannabis product, which is based on risks associated with materials or organisms normally present during the cultivation or processing of cannabis and meets the sampling, transportation and laboratory testing requirements set forth in Part 130 of this Title;

(6)      licensees authorized for cultivation shall include in their operating plan the following additional information:

(i)      a soil or growing medium preparation plan;

(ii)      a pest management and control plan that shall meet the following minimum requirements:

*(a)*      be based on integrated pest management (IPM) principles that are adequate for the facility type and size;

*(b)*      include details on prevention, observation, and interventional steps and physical, mechanical, biological, and chemical methods utilized that are consistent;

*(c)*     demonstrate conformance with the lists of authorized and prohibited pesticides and materials as determined by the Office; and

*(d)*     use only those pesticides approved by the New York State Department of Environmental Conservation for use on cannabis; and

(iii)     emergency spill management procedures;

(7)     licensees authorized for processing shall include in their operating plan the following additional information:

(i)     if applicable, a description of the extraction method, any chemical solvents or other materials used in the extraction method, and the equipment used to perform the extraction; and

(ii)     emergency spill management procedures;

(8)     licensees authorized for retail dispensary activities shall include in their operating plan the following additional information:

(i)     the current employee in charge and standard operating procedures for the responsibilities outlined in section 123.10(c)(2) of this Title;

(ii)    documentation demonstrating the retail dispensary is in compliance with section

123.10(f)(1) of this Title;

(iii)    procedures to remain compliant with applicable local ordinances, such as those pertaining

to odor, noise, outdoor lines, and max capacity; and

(iv)    licensee's delivery plan, if applicable; and

(9)    any other information as determined by the Office.

(c)    Energy and Environmental Plan. Licensees shall document, implement, and maintain an

energy and environmental plan, explaining operational processes for sustainability and tracking

such processes in a manner and form determined by the Office, which shall include but is not

limited to:

(1)    actions to reduce or eliminate the applicant or licensee's use of single-use plastics in

accordance with the Retail Packaging Sustainability Program outlined in Part 128 of this Title;

(2)    actions that will be taken to minimize both the use and disposal of chemicals that are

considered hazardous waste when disposed;

(3)    actions that will be taken to use compost or other recycled organics as a component of

growing media;

218

(4)    areas to reduce the applicant or licensee's carbon footprint, including, but not limited to:

(i)    a sustainable energy use and conservation plan that addresses the sourcing and use of energy to include:

(a)    for new buildings or existing buildings that are going through expansions or renovations, cultivators shall be subject to minimum lighting system efficiency, building energy efficiency including ERV (energy/heat recovery ventilation), building, and equipment standards as determined by the Office;

(b)    the premises' proposed energy impact, and energy efficiency goals including timelines and benchmarks, in accordance with those put forth in guidance, as well as how a licensee will engage with energy efficiency programs;

(c)    practices to limit electricity usage or improve building insulation; and

(d)    opportunities for renewable energy generation including, where applicable, submission of site plans showing where energy generators could be placed on the premises, and an explanation of why the identified opportunities were not pursued;

(5)    submit an annual energy report which shall include energy benchmarking in a manner required by the Office;

(6)      all planned lighting and the energy impact of the planned lighting to meet all standards set forth by the Board including, but not limited to:

(i)      lighting standards for cultivation areas in all indoor and mixed-light facilities. Horticultural lighting used in a facility shall be listed on the current Design Lights Consortium Solid-state Horticultural Lighting Qualified Products List ("Horticultural QPL") or other similar list approved by the Office as of the date of license application;

(ii)      existing lighting. Existing horticultural lighting equipment can be used if already in place at the time of conditional licensure. Technical details (wattage input, Photosynthetic Photon Efficacy (PPE)) related to existing equipment shall be submitted to the Office within 30 days of licensure. For equipment that does not meet the minimum requirement of Photosynthetic Photon Efficacy $1.9\mu mol/J$, a documented transition plan to more efficient lighting equipment shall be in place by the conclusion of the first year of production for the licensee. Applicants shall have a plan to transition to a lower energy footprint system which may include, but not be limited to, a PPE of no less than $1.9 \mu mol/J$, oriented toward a net zero emissions target after the conditional licensing period is over. The plan can include onsite renewable energy production, more efficient lighting equipment, carbon offsets as approved by the Office, and demonstrable carbon sequestration practices approved by the Office;

(iii)      cultivators in Indoor and Mixed Light Tiers 1 and 2 shall be subject to a minimum lighting PPE of $1.9 \mu mol/J$;

(iv)    cultivators in Indoor and Mixed Light Tiers 3 and larger shall be subject to a minimum

lighting PPE of 2.2 μmol/J;

(v)    a facility seeking to use horticultural lighting not included on the Horticultural QPL or

other similar list approved by the Office shall seek a waiver pursuant to a third-party certification

of the energy efficiency features of the proposed lighting;

(vi)    placement of interval meters within every grow room, and at least one for the operating

space to capture entire facility footprint;

(vii)    plans for incorporating staggered peaks into lighting schedules to spread out electric

demand;

(viii)    participation in load shedding or other demand response programs like behind the meter

storage; and

(ix)    proof that the licensee has contacted their local utility to confirm expected energy draw

and impacts to local grid; and

(7)    environmental control and odor mitigation plans that meet all standards set forth by the

Office including, but not limited to:

(i)      dehumidification equipment shall be one of the following:

(*a*)      stand-alone dehumidifiers that have a minimum integrated energy factor of 1.77 L/kWh for product case volumes of 8.0 cubic feet or less, and a minimum integrated energy factor of 2.41 L/kWh for product case volumes greater than 8.0 cubic feet;

(*b*)      integrated HVAC system with on-site heat recovery designed to fulfill at least 75% of the annual energy for dehumidification reheat;

(*c*)      chilled water system with on-site heat recovery designed to fulfill at least 75% of the annual energy for dehumidification reheat; or

(*d*)      solid or liquid desiccant dehumidification system for system designs that require dewpoint of 50°F or less;

(ii)      a refrigerant emission reduction plan, including either plans to utilize HVAC and refrigeration equipment with ultra-low Global Warming Potential (GWP) and/or natural refrigerants or a plan for managing refrigerant leaks and disposal;

(iii)      indoor cultivation facilities, with the exception of microbusiness and Tier 1 and Tier 2 cultivation licensees, are required to utilize technologies for heating and cooling that do not involve on-site combustion of fossil fuels. Acceptable alternatives to fossil fuel-based systems include, but are not limited to, ground-source (geothermal) systems or air-source heat pump systems;

(iv)    an HVAC and odor inspection and maintenance plan shall include, but not be limited to:

*(a)*    description of manufacturers requirements for inspection and maintenance of mitigation systems; and

*(b)*    description of how the licensee will ensure proper operation and energy efficent operations, including, but not limited to, practices to limit or improve odor control and air filtration;

(v)    odors from all enclosed and enclosable growing operations, and all on-site processing and storage shall be mitigated to minimize objectional impacts off-site. Mitigation technology includes: activated carbon filtration, vapor-phase systems, or other technology approved by the Office; and

(vii)    heating systems that exhaust to the atmosphere and require an air permit or air facility registration from the New York State Department of Environmental Conservation, pursuant to 6 NYCRR Part 201, shall obtain an issued permit or registration before construction on the facility starts. Construction is defined in 6 NYCRR Part 201-2.1(b)(9) as "[the] initiation of physical on-site construction activities which are of a permanent nature excluding site clearing and excavation. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures."

(8)    a plan for reducing greenhouse gas emissions and reliance on fossil fuels, including, but not limited to:

(i)    pursuant to Section 7(2) of the Climate Leadership and Community Protections Act (CLCPA), a demonstration that the operations will not be inconsistent with or will interfere with the attainment of the statewide greenhouse gas emissions limits established in Article 75 of the Environmental Conservation Law (ECL);

(ii)    a fossil fuels reduction plan for motor vehicle use in the course of business that includes: annual estimates of miles driven, fuel consumed, and type of vehicle driven along with strategies to reduce fuel consumption or increase travel efficiency in the future; and

(iii)    practices to mitigate the impact of carbon dioxide used in the cultivation and production of cannabis and cannabis products;

(9)    ecological regeneration practices, including, but not limited to, those in section 123.4 of this Title;

(10)    water conservation and use, including, but not limited to:

(i)    a sustainable water-use and conservation plan that addresses water sources, quality, and use;

(ii)    environmental controls to ensure that wastewater runoff is in accordance with state and federal regulations, including, but not limited to, DEC State Pollutant Discharge Elimination Solution permitting; and

(iii)    practices to limit or improve water usage including plans to engage in water recapture or recycling; and

(11)    waste management, recycling and disposal, including, but not limited to:

(i)    a waste management program, demonstrating best practices to minimize waste generation, maximize reuse and recycling; and

(ii)    how waste materials will be labeled, separated, and either picked up or delivered to a recycling service provider in accordance with local waste rules and all applicable laws and regulations;

(12)    a description of the applicant's or licensee's strategy to measure, track, and record the applicant's or licensee's performance and execution of the plan that identifies qualitative and quantitative metrics, and includes frequency of tracking such metrics;

(13)    any other information as determined by the Office.

(d)      Licensees shall submit their energy and environmental plan in a form and manner as required by the Office or upon request. The Board may take a licensees' energy and environmental plans and actual performance implementing the plan into consideration for purposes including, but not limited to, licensee renewal, incentives programs, and certifications.

## § 125.2  Security and Storage of Cannabis.

(a)      General Requirements. A licensee shall implement sufficient security measures to deter diversion, theft, or loss of cannabis and cannabis products, theft, or loss of cash, prevent unauthorized entrance into areas containing cannabis or cannabis products, and to ensure the safety of the licensee's employees and the general public. Unless otherwise approved by the Office, such security measures taken by the licensee shall include, but not be limited to, the following:

(1)      positively identifying individuals who are not employees of the facility, and are seeking access to the facility or who are transporting cannabis or cannabis products to limit access solely to individuals twenty-one (21) years of age or older;

(2)      implementing and maintaining a security plan which shall include a description of the security measures to:

(i)      prevent unauthorized access to the licensed premises by unauthorized persons and protect the physical safety of employees;

226

(ii)    deter theft or loss of cannabis and cannabis products;

(iii)    prevent loitering and ensure that only individuals engaging in activity expressly or by necessary implication permitted by the Cannabis Law and this Chapter are allowed to remain on the premises of the licensee;

(iv)    lock all perimeter doors and windows; and

(v)    provide for safe cash storage and handling, and transportation of cash to financial institutions; and

(3)    securing all entrances to the licensed facility to prevent unauthorized access;

(4)    ensuring that both the inside, and the outside perimeter of the licensed facility are sufficiently illuminated to facilitate surveillance;

(5)    maintaining trees, bushes, and other foliage outside of the licensed premises so as to prevent a person from concealing themselves from sight;

(6)    any other requirements provided in this section, and as determined by the Office.

(b)      Storage. Cannabis and cannabis products shall be stored in a secure, locked safe, vault, or other approved equipment or location within the licensed premises to prevent diversion, theft or loss, and in such a manner, as to protect against physical, chemical and microbial contamination, and deterioration of the cannabis and cannabis products as follows:

(1)      all safes, vaults or any other approved equipment or areas used for the cultivation, processing, and/or storage of cannabis or cannabis products shall be securely locked and protected from entry, except for the actual time required to remove or replace cannabis and cannabis products;

(2)      keys shall not be left in the locks or stored or placed in a location accessible to individuals who are not authorized to access cannabis or cannabis products;

(3)      security measures, such as combination numbers, passwords or biometric security systems, shall not be accessible to individuals other than those specifically authorized to access cannabis or cannabis products;

(4)      a separate secure area shall be designated for temporary storage of any cannabis or cannabis product that requires disposal;

(5)      cannabis and cannabis products shall be kept out of plain sight and not visible from a public place, outside of the licensed premises, without the use of binoculars, optical aids, or aircraft; and

228

(6)    access to cannabis and cannabis product storage areas and areas within the licensed

facility where security equipment and recordings are stored shall be restricted to:

(i)    authorized licensee personnel;

(ii)    employees of the Office or its authorized representatives;

(iii)    emergency personnel responding to an emergency; and

(iv)    other individuals authorized by the licensee for the sole purpose of maintaining the

operations of the facility.

(c)    Security System. All facilities operated by a licensee where cannabis or cannabis

products are stored or handled shall have a security system to prevent and detect diversion, theft

or loss utilizing commercial grade equipment, which shall, at a minimum, include:

(1)    a perimeter alarm that communicates with an internal designee and a third-party

commercial central monitoring station when intrusion is detected;

(2)    video camera surveillance in all areas that may contain cannabis or cannabis products, all

surveillance areas or rooms and at all points of entry and exit, and in any parking lot, which shall

be appropriate for the normal lighting conditions of the area under surveillance. Video camera surveillance shall meet the following additional requirements:

(i)    video cameras shall be directed at all safes, vaults, sales areas, and any other areas where cannabis and cannabis product, as applicable, is cultivated, harvested, processed, prepared, stored, handled, transferred, or sold and for the purpose of securing cash;

(ii)    video cameras shall be positioned at entry and exit points, and at each point-of-sale area, to allow for the capture of clear and certain identification of any person entering or exiting the facility or at the point-of-sale;

(iii)    video cameras shall have the ability to immediately produce a clear color still photo from any camera image (live or recorded);

(iv)    video recordings shall allow for the exporting of still images in an industry standard image format (including .jpeg, .bmp, and .gif). Exported video shall have the ability to be archived in a proprietary format that ensures authentication of the video and guarantees that no alteration of the recorded image has taken place. Exported video shall also have the ability to be saved in an industry standard file format that can be played on a standard computer operating system;

(v)    video cameras shall include a date and time stamp embedded on all recordings. The date and time shall be synchronized and set correctly, measured in accordance with the United States

National Institute Standards and Technology standards and shall not significantly obscure the picture;

(vi)     video cameras shall produce continuous recordings during hours of operation and at any time that cannabis or cannabis product is handled, and motion activated recordings at all other times, from all video cameras, which the licensee shall make available via remote access or login credentials for immediate viewing by the Office or the Office's authorized representative upon request. All recordings shall be retained for at least 60 days;

(vii)     licensees shall make an unaltered copy of video camera recording(s) to the Office upon request;

(viii)     if a licensee is aware of a pending criminal, civil or administrative investigation or legal proceeding for which a recording may contain relevant information, the licensee shall retain an unaltered copy of the recording until the investigation or proceeding is closed or the entity conducting the investigation or proceeding notifies the licensee that it is not necessary to retain the recording, but in no event for less than 60 days; and

(ix)     the physical media or storage device on which surveillance recordings are stored shall be secured in a manner to protect the recording from tampering or theft;

(3)     a failure notification system that provides an audible, text, or visual notification of any failure in the security system. The failure notification system shall provide an alert to the

licensee's designated representative(s) within five minutes of the failure, either by telephone, email, or text message;

(4)     the ability for the security alarms and video surveillance system to remain operational during a power outage for a minimum of eight hours;

(5)     limiting access to any surveillance areas and keeping all on-site surveillance rooms locked. A licensee shall make available to the Office or the Office's authorized representative, upon request, a current list of authorized employees who have access to any surveillance room;

(6)     keeping all locks, storage and security equipment in full operating order and shall test and inspect such equipment at regular intervals, not to exceed 30 calendar days from the previous inspection and test.  Records of security tests shall be maintained for five years and made available to the Office upon request; and

(7)     outdoor areas designated for cannabis cultivation shall implement the video surveillance requirements set forth in this Part, which shall be operating for no less than the three-week period preceding a harvest, as well as at all times while drying, curing, storing or disposing of cannabis.  To ensure that outdoor areas are not readily accessible to unauthorized individuals and to prevent and detect diversion, theft or loss of cannabis, cultivation security measures shall include the following for outdoor cultivators based on their tier as determined by the Office:

(i)      a perimeter security fence or perimeter breach detection device, unless otherwise approved by the Office, designed to prevent unauthorized entry with signs notifying observers that it is a Limited Access Area; fencing shall:

(*a*)      be constructed of metal or another similarly secure material;

(*b*)      measure at least eight feet from the ground to the top;

(*c*)      have support posts that are securely anchored; and

(*d*)      meet the requirements of the relevant municipal code provisions;

(ii)      use commercial-grade, nonresidential locks;

(iii)      motion activated flood-lights, which may face away from the canopy; and

(iv)      controlled point of access.

(d)      Employee and Visitor Identification. Employees, visitors, and other persons at licensed premises, including persons engaged in the transportation of cannabis or cannabis products, shall be required to provide identification to the Office, or other authorized enforcement official upon request.

(1)      All licensees and employees on the licensed premises shall be required to hold and properly display an identification badge, issued by the licensee, at all times, while on the licensed premises or when engaged in the transportation of cannabis or cannabis products. The identification badge shall include, at a minimum, the following information:

(i)      employee's first and last name;

(ii)      employee's photograph;

(iii)      licensee's legal name; and

(iv)      licensee's license number as issued by the Office;

(2)      Non-employee visitors to the licensed premises, other than cannabis consumers, shall be required to hold and properly display an identification badge issued by the licensee at all times while on the licensed premises.

(3)      The licensee shall maintain a visitor log of all persons, other than employees, cannabis consumers visiting a retail dispensary, permitted cannabis laboratories or laboratory sampling firms, emergency personnel responding to an emergency, or any other persons as determined by the Office, that shall be maintained on the licensed premises for a period of five years and be made readily available to the Office upon request.  The log shall include the following information:

234

(i)      the full name of each visitor, as well as the company the individual works for entering the licensed premises;

(ii)     the time of arrival;

(iii)    time of departure; and

(iv)     purpose of the visit.

(e)      Incident Reporting. A licensee shall notify the Office in a manner prescribed by the Office, of any breach of security or other incident set forth in this section immediately and, in no instance, more than 24 hours following discovery of the security breach or incident.

(1)      Notification to the Office shall be provided for the following incidents:

(i)      discovery of inventory discrepancies;

(ii)     diversion, theft, or loss of any cannabis or cannabis product;

(iii)    any criminal action involving or occurring on or in the licensed premises;

(iv)    any suspicious act involving the cultivation, processing, distribution, or sale of cannabis or cannabis products by any person;

(v)    unauthorized destruction of cannabis or cannabis products;

(vi)    any loss or unauthorized alteration of records related to cannabis or cannabis products;

(vii)    an alarm activation or other event that requires response by public safety personnel, including, but not limited to, local law enforcement, police and fire departments, public works or municipal sanitation departments, and municipal inspectional services departments, or security personnel privately engaged by the licensee;

(viii)    the failure of any security alarm system, or video surveillance, due to a loss of electrical power or mechanical malfunction that is expected to last more than eight hours;

(ix)    a significant motor vehicle crash that occurs while transporting or delivering cannabis products and would require the filing of an accident report with the Department of Motor Vehicles;

(x)    any other breach of security; and

(xi)    any other event that may compromise public health and/or safety;

(2)     The licensee shall, within ten calendar days of any incident in paragraph (1) of this subdivision, submit an incident report in a form and manner determined by the Office which details the circumstances of the incident, any corrective action taken, and confirmation that the appropriate law enforcement authorities were notified.

(3)     All documentation related to an incident shall be maintained by a licensee for not less than five years or the duration of an open investigation, whichever is longer, and made available to the Office and law enforcement authorities within their lawful jurisdiction upon request.

## § 125.3 Employee Requirements and Obligations.

(a)     Licensees shall not employ anyone under the age of 18 years of age.  Any employee 18 years of age or older but under 21 years of age may not have direct interaction with cannabis customers inside a licensed retail dispensary.

(b)     Licensees shall use due diligence to ensure that all employees possess the necessary education and training for the duties they will be assigned.

(c)     The act, omission, or failure of an agent, officer, representative, or other person acting for or employed by a licensee, within the scope of their employment or position, shall in every case be deemed the act, omission, or failure of the licensee.

## § 125.4 Responsible Vendor Training.

(a)     Licensees shall provide all managers, employees, contractors, volunteers, or persons otherwise performing activities under a licensee's authorizations, within 30 days of engagement, and at no cost to the recipient, a Responsible Vendor Training, which shall be made available in English and the primary language of all recipients.

(b)     Trainings shall happen during the employee's work hours and the licensee shall pay the employee their usual rate of pay while completing any required training.

(c)     Licensees shall maintain an employee training manual, which shall be provided in a printed version to employees during Responsible Vendor Training and made available at the licensed premises to employees, authorized personnel, and the Office upon request.

(d)     The employee training manual include:

(1)     employee guidelines and safety procedures;

(2)     security protocols, including, but not limited to:

(i)     the physical effects of cannabis on the human body based on the phytocannabinoids present and recognizing signs of impairment, appropriate responses in the event of overconsumption, risks of cannabis use and over-use, including cannabis use disorder; and

238

(ii)     the public safety risks and legal consequences of operating any vehicle, including

watercraft, under the influence;

(3)     a brief history of cannabis prohibition, legalization, and overcoming stigma;

(4)     a basic overview of the powers and responsibilities of the Office and the Board;

(5)     additional information in accordance with this Chapter, including, but not limited to:

(i)     permitted cultivation techniques and cultivar varieties;

(ii)     permitted processing methods;

(iii)     safe storage;

(iv)     packaging, labeling, marketing, and advertising requirements;

(v)     security and surveillance of licensed premises;

(vi)     emergency procedures;

(vii)     compliance with and operation of inventory tracking systems;

(viii)    permitted investigation or inspection by the Office and law enforcement authorities;

(ix)    common violations resulting in license cancellation, suspension, revocation, and denial of a renewal, civil and criminal fees, fines, and penalties;

(x)    waste disposal;

(xi)    privacy and confidentiality;

(xii)    licensee responsibility for activities occurring on licensed premises under the Operating Plan, including:

*(a)*    for licensees authorized for retail activities:

*(1)*    an explanation of how employees will monitor and prevent sales to consumers where there is a risk to their health or safety, underage or illegal sales of cannabis products, or any other criminal activity within the licensed premises;

*(2)*    cannabis product information, including, but not limited to, serving size information, onset and duration of effects, method of administration, warnings, and information regarding secure storage and proper disposal of cannabis products; and

*(3)*    consumer and patient privacy and confidentiality requirements; and

*(i)*      for licensees authorized for processing activities:

*(ii)*      standard operating procedures for all staff involved in extracting, processing, and/or manufacturing cannabis or cannabis products, including, but is not limited to:

*(A)*      training that is specific to the duties assigned, and the safe operation of the equipment, machinery, solvents, gases, and systems to be utilized; and

*(B)*      training on the hazards presented by use of chemicals and solvents, as described in the safety data sheet for each. Safety data sheets shall be onsite, maintained, and readily available to employees, and to the Office upon request. For licensees authorized for cultivation, the training manual shall also include training on the application of any chemicals or pesticides used in the cultivation of cannabis;

*(iii)*      if extracting, best practices, including, but not limited to, safe extraction procedures and protocols, and fire prevention and fire response; and

*(iv)*      if manufacturing edible products, best practices, including, but not limited to, safe food handling training as specified in Department of Agriculture and Markets safe food handling regulations;

(xiii)      record maintenance;

(xiv)    prohibited purchases and practices;

(xv)    Implicit Bias Training;

(xvi)    relevant local ordinances, rules, and regulations; and

(xvii)    other areas of local, state, or federal regulations or training as determined by the Office; and

(6)    emergency operations, including notification to emergency personnel and shutdown procedures;

(7)    information on how to access current laws, rules, and regulations, and any guidance or policy documents issued by the Office; and

(8)    a page for signed and dated documentation demonstrating each employee's attestation of completion of the training, which shall be made readily available to the Office upon request.

(e)    Licensees shall:

(1)    provide adequate supervision of staff, including trainees, by persons familiar with standard operating procedures for the relevant roles and activities;

242

(2)      ensure all staff has demonstrated capability in the activities for which they are responsible; and

(3)      ensure all staff is fully trained on all standard operating procedures, including, but not limited to, security and emergency procedures and any procedures related to employee and public health and safety;

(4)      have policies and procedures for identifying training needs on an annual basis and providing ongoing training of personnel, for a minimum of eight hours per year, for each full-time employee.

(f)      Licensees may:

(1)      provide their own training and develop training curriculum and materials provided that the training meets the minimum core curriculum standards as outlined in this section; or

(2)      contract with third parties, pursuant to section 124.3 of this Title, providing training and education as outlined in this section or as mandated by the Board.

(i)      all trainings required to be provided by licensees to all managers, employees, contractors, volunteers, or persons otherwise performing activities under a licensee's authorizations, under this section or otherwise by the Office, shall be free of charge to the recipient.

(g)    Training Verification.

(1)    Licensees shall be able to demonstrate completion of Responsible Vendor Training by each required person.

(2)    Licensees shall keep records and shall make such records available upon request by the office, as it relates to training, containing the following information, including, but not limited to:

(i)    trainee's name;

(ii)    trainee's date of hire;and

(iii)    the name and description of all trainings satisfactorily completed by trainee; and

(3)    Failure to keep the records described in this section or failure to make such records available upon request by the Office may result in disciplinary action, including, but not limited to:

(i)    civil penalties;

(ii)    license cancellation;

(iii)    suspension,

(iv)    revocation;

(v)    denial of renewal; or

(vi)    civil or criminal fees, fines, or penalties.

## § 125.5 Worker Health and Safety Standards.

(a)    The licensee shall comply with all applicable federal, state, and local laws and regulations related to worker training, safety, health, and pay.

(b)    The licensee shall establish, maintain, and comply with a written alcohol-free, drug-free, and smoke-free workplace policy.

(c)    All employees involved in the production, cultivation, and distribution of cannabis and cannabis products shall receive safety and hygiene training as determined by the Office. Signed consent forms shall be obtained by the licensee from all employees involved in the application of chemicals as part of their work activities.

(d)    Safety data sheets shall be maintained consistent with the Occupational Safety and Health Administration (OSHA) standards pursuant to 29 CFR §1910.1200 Hazard Communication.

(e)    The licensee shall maintain an electronic record of any chemicals onsite that are used to conduct operations (such as chemicals for cleaning equipment or to perform extraction).

(f)    Personal protective equipment shall be assigned, consistent with OSHA standards pursuant to 29 CFR §1910.132, to all employees involved in the cultivation and processing of cannabis and cannabis products as applicable. Such personal protective equipment shall be in good working order as specified by the manufacturer.

(g)    Employees working with chemicals or materials that require the use of respirators, consistent with OSHA standards pursuant to 29 CFR §1910.134, shall be trained in their proper use, and respirators shall be serviced and tagged to manufacturer's specifications.

(h)    Licensees shall install informational signs that provide clear instructions for material handling, equipment operation, and general safety information for all operations.

(i)    Licensee shall install warning signs in English and other appropriate languages for the employees of the licensee that shall be posted in all potential hazard areas as a public health protective measure.

(j)    Licensees involved in the cultivation and processing of cannabis and cannabis products shall have emergency spill management procedures.

(k)    Emergency signage shall be posted in all work areas.

246

**§ 125.6 Sanitary Facility; Equipment and Handling Standards.**

(a)    The licensee shall be responsible for the upkeep and maintenance of all facilities, containers, tools, contact surfaces, and equipment used in the cultivation, processing, distribution, transportation, storage, and sale of cannabis and cannabis products, and shall:

(1)    have floors, walls, and ceilings constructed in such a manner that they may be adequately kept clean and in good repair;

(2)    utilize containers, tools, contact surfaces, and equipment that are designed and of such material and workmanship as to be adequately cleanable and designed, maintained, operated, and arranged as to protect against the physical, chemical, and microbial contamination and deterioration of cannabis and cannabis products;

(3)    use containers that are food-grade, or of a similar standard as approved by the Office, for the storage of cannabis and cannabis products. Containers shall be clean, in good repair, and suitable for the established use;

(4)    maintain all facilities, areas, containers, tools, contact surfaces, and equipment, in a clean and sanitary condition. Cleaning and sanitizing shall be conducted as frequently as necessary to protect against contamination, using a sanitizing agent registered by the United States Environmental Protection Agency (EPA), in accordance with labeled instructions;

(5)    maintain record of routine cleaning and sanitization of all facilities, containers, tools, contact surfaces, and equipment and make records readily available to the Office upon request;

(6)    provide adequate safety lighting in all cultivation, processing, distribution, storage, and sale areas, as well as areas where equipment, tools, containers, or contact surfaces are cleaned;

(7)    provide sufficient space on the premises for placement of equipment and storage of materials as is necessary for the maintenance of sanitary operations;

(8)    utilize appropriate environmental monitoring for temperature, ventilation, and humidity where cannabis or cannabis products are handled or stored so as to protect cannabis and cannabis products against physical, chemical, and microbial contamination and deterioration;

(9)    maintain records of pest management activities, including, but not limited to:

(i)    a map of all traps, types, and coding/numbering system for the traps, if applicable;

(ii)    a record of routine trap maintenance; and

(iii)    a record of any evidence of animal or insect presence including body parts, hair, or feces in cannabis or cannabis product handling areas;

(10)    properly remove and dispose of litter and waste so as to minimize the development of

odor and minimize the potential for the waste attracting and harboring pests;

(11)    store poisonous or toxic materials, insecticides, rodenticides, detergents, sanitizers,

caustics, acids, and other related cleaning compounds in separate areas from cannabis or

cannabis products, in prominently and distinctly labeled containers; and

(12)    establish precautions to protect cannabis, cannabis products, non-cannabis components,

contact surfaces, packaging materials, and any other equipment or materials that are used in

processing against any potential contamination, by microorganisms or foreign substances.

(b)    Sanitary handling procedures.  All licensees and their employees shall handle cannabis in

a sanitary manner and comply with general sanitary requirements, including, but not limited to:

(1)    maintaining adequate personal cleanliness; and

(2)    washing and sanitizing hands thoroughly in an adequate hand-washing area before

starting work, after each visit to a restroom, after handling contaminated material, eating, or at

any other time when hands may have become soiled or contaminated.

(c)    Licensees shall ensure that all workers have access to hand washing and toilet facilities

on the licensed premises and shall maintain such facilities in a clean and sanitary condition,

maintaining records of regular cleaning and sanitizing of such facilities.

249

(1)    Handwashing facilities on the licensed premises shall be furnished with running water at a suitable temperature and shall be located in the licensed premises in any cultivation or processing areas and where good sanitary practices require employees to wash and sanitize their hands.

(2)    Signage shall be displayed in toilet facilities to remind workers to wash and sanitize hands. Sanitary areas in this section shall be marked in the licensee's site plan.

(d)    Plumbing shall be of adequate size and design, and adequately installed and maintained to carry sufficient quantities of water to required locations throughout the premises of the licensed entity. Plumbing shall properly remove sewage and liquid disposable waste from the premises of the licensed entity. There shall be no cross-connections between the potable and wastewater plumbing.

## § 125.7 Inventory and Tracking.

(a)    Licensees shall track all physical inventory of cannabis in an electronic real-time inventory tracking system as determined by the Office. The inventory tracking system shall be capable of showing any cannabis that has been released for sale, to allow for a total recall of all cannabis if necessary. The licensee shall:

(1)    accurately record all inventory in the inventory tracking system, including identification of base material(s) used to create each batch or lot of cannabis or cannabis products;

(2)    maintain, in real-time, at a minimum, the following information, in the inventory tracking system:

(i)    batch or lot unique identifiers for cannabis and cannabis products;

(ii)    a complete cannabis and cannabis product inventory, as well as inventory adjustments, from cultivation, processing, transport, laboratory testing, distribution, waste, sale, disposal, product return, or any other activity. The complete inventory shall include, as applicable, all seeds, plant tissue, seedlings, clones, plants, lots of useable cannabis or trim, leaves, other plant material, cannabis extract, cannabis products, and cannabis waste;

(iii)    for processors, any additives or ingredients used in the processing of cannabis;

(iv)    all samples sent to an independent testing laboratory, any sample of unused portion of a sample returned to a licensee, and the quality assurance test results in accordance with Part 130 of this Title;

(v)    all samples provided to another licensee as authorized by the Office;

(vi)    samples provided to the Office or their designee for quality assurance compliance review; and

(vii)    any other information as determined by the Office.

(3)    utilize an inventory tracking system that is capable of integrating with the Office's seed-to-sale inventory tracking system of record in a form and manner as determined by the Office;

(4)    physically tag or label all cannabis, cannabis products, cannabis extract, seeds, plant tissue, clone lots, seedlings, immature cannabis plants, and cannabis waste with the unique identifier generated by the inventory tracking system;

(5)    utilize a standard of measurement that is supported by the inventory tracking system to track all cannabis and cannabis product. A scale used to weigh product prior to entry into the inventory tracking system shall be approved for commercial use in accordance with New York State Bureau of Weights and Measures;

(6)     track, at a minimum, the following data elements for each activity performed with cannabis and cannabis products:

(i)    the type of cannabis or cannabis products;

(ii)    the weight, volume, or count of the cannabis or cannabis products;

(iii)    the date of activity;

(iv)    the lot unique identifier assigned to the cannabis or cannabis products;

(v)    the identification of the employee performing the action in the inventory tracking system;

(vi)    the type of activity being performed; and

(vii)    any other information as determined by the Office.

(7)    review the licensee's authorized users and remove any users who are no longer authorized to enter information into the inventory tracking system; and

(8)    record cultivation activities as follows:

(i)    record the following cultivation activities in the inventory tracking system within three calendar days of occurrence:

*(a)*    planting of an immature cannabis plant lot;

*(b)*    moving immature cannabis plants to a designated canopy, flowering of an individual plan, or application of a plant tag to an immature cannabis plant;

*(c)*    destroying or disposing of an immature or mature cannabis plant; and

*(d)*       harvesting of a mature cannabis plant, or portion thereof;

*(ii)*      report in the inventory tracking system for each harvested plant or portion thereof, or harvest batch:

*(a)*       the wet weight of each harvested plant or portion thereof, which shall be obtained by the licensee immediately after harvest;

*(b)*       the weight of cannabis waste associated with each harvest batch;

*(c)*       the unique name of the harvest batch;

*(d)*       the initiating date of the harvest.  For purposes of this section, an initiating date of the harvest shall be the month, day, and year the first mature cannabis plants in the harvest batch were cut, picked, or removed from the soil or other growing media; and

*(e)*       the packaging and repackaging of cannabis or cannabis products.

(b)       Loss of System Access. If at any point a licensee loses access to the inventory tracking system for any reason, the licensee shall keep and maintain comprehensive records detailing all inventory tracking activities that were conducted during the loss of access.

(1)    Once access is restored, all inventory tracking activities that occurred during the loss of access shall be entered into the inventory tracking system.

(2)    A licensee shall document when access to the system was lost and when it was restored.

(3)    A licensee shall not initiate transport for, receive, transfer or deliver any cannabis or cannabis products to another licensed entity until such time as access is restored and all information is recorded into the inventory tracking system.

(4)    Within three calendar days of restored access, enter all licensed cannabis activity that occurred during the loss of access into the inventory tracking system.

(5)    Document the cause for loss of access, as well as the dates and times for when the loss occured.

(6)    Document the dates and times for when access to the inventory tracking system was restored.

(c)    Initial Inventory.  A licensee shall conduct an initial comprehensive inventory of all cannabis and cannabis product in the possession of the licensee, including cannabis available for cultivation, cannabis products for sale, immature and mature cannabis plants, and unusable

255

cannabis, at the authorized premises on the date the cannabis licensee first engages in the cultivation, processing, distribution or sale of cannabis.

(1)    Inventory shall include damaged, defective, expired, or adulterated cannabis awaiting disposal, including the name, the quantity, and the reasons for which the cannabis licensee is maintaining the cannabis.

(2)    The initial comprehensive inventory shall be reported to the Office utilizing the inventory tracking system.

(d)    Licensees shall establish inventory controls and procedures and conduct comprehensive inventories of cannabis and cannabis products which shall include the following;

(1)    maintaining real-time inventory tracking;

(2)    conducting a monthly inventory audit of all cannabis and cannabis products;

(3)    conducting an annual inventory audit at least once every year from the date of the previous inventory; and

(4)    recording at a minimum, the following, in the seed-to-sale system or inventory management tracking system;

(i)      the name(s) and signature(s) of employee(s) who conducted the inventory audit;

(ii)     the date of the inventory audit;

(iii)    summary of inventory findings; and

(iv)    any other information as determined by the Office.

(e)      A licensee, upon becoming aware of discrepancies identified during an inventory audit shall notify the Office no later than twenty-four (24) hours after discovery of the event in a manner prescribed by the Office.

(f)      A licensee, as applicable, shall maintain records identifying the source of each ingredient used in the cultivation and processing of cannabis. Records identifying the source of each ingredient shall include:

(1)      the date of receipt of the ingredient;

(2)      the vendor's name and address;

(3)      the name of the ingredient and the vendor's license, registration or other operating identification number, as applicable;

(4)      the grade and quantity of the ingredient; and

(5)      any other information determined by the Office.

## § 125.8 Quarantine, Remediation and Recalls.

(a)      A Licensee shall establish written policies and procedures to monitor and track all quality assurance concerns, and complaints from licensees and consumers, including, but not limited to, procedures for rapid notification to the licensees' supply and distribution chain to recall any lot of cannabis or cannabis product when directed by the Office, or as deemed necessary by the licensee.  Such procedures shall include notification to the Office within 24 hours of learning of a serious adverse event, quality assurance concern or initialing a recall.

(b)      Implemented written procedures for recalling cannabis product, whether initiated by the licensee or mandated by the Office, shall include:

(1)      identification of factors that necessitate recall and personnel responsible for implementing the recall procedures;

(2)      notification protocols, including a mechanism to notify the Office within 24 hours of initiating a recall and to notify any licensee that supplied or received the recalled cannabis product;

(3)     instructions to the general public and other licensees for the return or destruction of the recalled cannabis or cannabis products; and

(4)     a requirement that all recalled products held by a licensee shall be held in quarantine until the Office authorizes additional actions.

(c)     All inventories, policies and procedures and other documents required by this section shall be maintained on the licensed premises and shall be made readily available to the Office upon request.

(d)     A licensee shall not sell or transfer cannabis or a cannabis product that has been placed on administrative hold by the Office, recalled, or ordered or otherwise required to be destroyed. Such cannabis or cannabis products shall be stored securely and separate and apart from other cannabis products while awaiting final disposition.

(e)     A licensee shall not sell or a transfer cannabis product after the printed expiration date on the package.

## § 125.9 Transport of Cannabis and Cannabis Products.

(a)     Transport of cannabis and cannabis products to an authorized licensee or consumer shall only be performed by a licensee or a licensee's authorized employee(s).

(b)      A licensee shall ensure the safe and secure transport of any cannabis, or cannabis products, including the safety of those individuals transporting cannabis.

(c)      A licensed authorized employee transporting cannabis and cannabis products shall be at least 21 years of age.

(d)      Cannabis and cannabis products shall be transported in a manner that will protect the cannabis and cannabis products against physical, chemical, and microbial contamination, and deterioration.

(e)      All cannabis and cannabis products shall be transported in a secure manner, in motorized and unmotorized transportation owned and operated by the licensee, including, but not limited to, a vehicle, trailer, bicycle, and motorcycle.

(1)      All transportation shall be equipped with the following:

(i)      temperature controls designed, maintained, and equipped as necessary to prevent the cannabis and cannabis products from deteriorating during transport.

(ii)      a fully enclosed and locked box, container, or cage, which shall be used for the secure transport of cannabis and cannabis products; and

(iii)     an operational Global Positioning System (GPS) device, for identifying the geographic location of the transportation, either permanently or temporarily affixed to the transportation while in operation.  At all times, the originating licensee shall be able to identify the geographic location of all individuals transporting cannabis and cannabis products and shall provide such information to the Office upon request.

(2)     Transportation shall bear no signs, markings, advertisements or marketing that would either identify or indicate that the transportation is used to transport cannabis or cannabis products.

(3)     A licensee shall provide the Office, upon request, with information regarding any motorized or non-motorized transportation including the vehicle's make, model, color, vehicle identification number, license plate number, and vehicle registration as applicable.

(4)     Transport of cannabis and cannabis products shall not be made through the use of an unmanned transportation, which shall include a drone.

(5)     For purposes of this Chapter, any transportation utilized to transport cannabis or cannabis products shall be considered an extension of the licensed premises and subject to inspection by the Office or authorized representative of the Office. Transportation may be stopped and inspected by the Office at any licensed premises, or while en route to an authorized licensee or consumer.

(f)    Cannabis and cannabis products being transported shall be in a sealed package, which shall not be opened during transport, in accordance with the requirements set forth in Part 128 of this Title.

(g)    Shipping manifests.

(1)    Prior to transporting any cannabis or cannabis products, a licensee shall generate a shipping manifest when cannabis or cannabis products are being transported and must contain the purpose for the transport as follows:

(i)    transport to or from the laboratory permitted in accordance with Part 130 of this Title;

(ii)    transport to or from the authorized licensee;

(iii)    transport for destruction or disposal pursuant to the requirements set forth in section 125.10 of this Title; and

(iv)    for any other activity, as required pursuant to this Chapter, or by any other licensing authority recognized by the Office.

(2)    Prior to transport, the licensee shall transmit the shipping manifest to the Office, in a manner determined by the Office, as well as to the licensee, permittee or other authorized party

that will receive the cannabis, or cannabis product.  The shipping manifest shall contain, at a minimum, the following information;

(i)      the name, physical address, lot or batch number, and license or permit number of the originating licensee, permittee or other party authorized to receive cannabis or cannabis products;

(ii)     the name, physical address, and license number, if applicable, of the receiving party;

(iii)    a certificate of analysis, except for those samples being transported to a permitted laboratory for testing by a permitted sampling firm;

(iv)    the unique identification numbers for all cannabis and cannabis products being transported;

(v)     the cannabis or cannabis product name, item category and weight or count of cannabis or cannabis products associated with each package tag;

(vi)    the estimated date and time of departure from the licensed premises;

(vii)   the estimated date and time of arrival at each licensed premises or the consumer's address;

(viii)   the driver's license number of the employee transporting the cannabis or cannabis products if motorized transportation is being conducted by the licensee producing the shipping manifest;

(ix)    the make, model, and license plate number of the motorized transportation if the transport is being conducted by the licensee producing the shipping manifest; and

(x)    any other information as determined by the Office.

(3)    Licensees authorized to conduct delivery to a cannabis consumer shall generate an invoice to the consumer, which shall include:

(i)    the name, location, address, and license number of the licensee's premises;

(ii)    the name and address of the cannabis consumer;

(iii)    the name and quantity of each item to be delivered to each cannabis consumer;

(iv)    the name and signature of the consumer and each employee performing or accompanying the delivery of the cannabis products; and

(v)    any other information as determined by the Office.

(4)     Employees conducting the transport of cannabis or cannabis products shall possess a copy of the shipping manifest, and invoice for delivery to consumers, at all times when transporting cannabis products and shall produce it to the Office, the Office's authorized representative or law enforcement official upon request.

(5)     A licensee shall not void, modify or change a shipping manifest or invoice after departing from the originating licensed premises.

(6)     The licensee receiving and taking possession of cannabis or cannabis products shall ensure and verify that the cannabis or cannabis products being received and taken into possession for transport at the originating licensed premises are as described and accurately reflected in the shipping manifest.

(7)     The licensee shall not take into possession or transport:

(i)     any cannabis, cannabis products or cannabis that are not on the shipping manifest; or

(ii)     any cannabis or cannabis products that are less than or greater than the amount reflected on the shipping or delivery manifest, unless a reconciliation process determined the cause of the discrepancy.

(8)    The licensee or consumer receiving the delivery shall record acceptance or receipt of the delivery. The licensee shall record the receipt of delivery in the licensee's inventory tracking system.

(9)    The licensee conducting the transport is responsible for any discrepancies between the shipping manifest and the cannabis and cannabis products in its possession during transport, and subject to any enforcement action related to such discrepancy.

(10)    Shipping manifests and any invoices shall be made readily available to the Office, for inspection upon request, for a period of five years.

(h)    Employees of the licensee transporting cannabis and cannabis products shall:

(1)    not make any unnecessary stops in between destinations;

(2)    randomize transport times;

(3)    have the ability to communicate with employees at the licensed entity at all times that the vehicle contains cannabis and cannabis products;

(4)    only transport cannabis and cannabis products within the borders of New York State.

266

(i)      Where a transport is attempted and not completed and the cannabis item remains in the possession of the employee conducting the transport, the employee shall return the cannabis or cannabis product to the licensed premises of the employee. The returned inventory may be restocked if the inventory is in a new, unopened condition and was handled in a manner that did not compromise the integrity of the cannabis or cannabis products.

(j)      Only licensees, or employees thereof, may be in any vehicle as it is being used to transport cannabis or cannabis products.

## § 125.10 Management of Cannabis and Other Waste.

(a)      A licensee shall dispose of any cannabis or cannabis product that is outdated, damaged, deteriorated, contaminated, or otherwise deemed not appropriate for cultivation, processing, distribution, or sale. This includes any plant-based cannabis waste created as a by-product of cultivation or processing, such as plant waste contaminated with solvents, including, but not limited to butane, ethanol, propane, or any other solvent as determined by the Office.

(b)      All disposal of cannabis shall be conducted in compliance with all applicable state and local laws, rules, and regulations.

(c)      Cannabis waste, excluding stalks, stems, fan leaves, root balls, and soil media of the cannabis plant, shall be rendered unusable, by grinding and mixing the cannabis plant waste with

other ground materials, so the resulting mixture is at least 50% non-cannabis waste by volume. Any other method used to render cannabis unusable requires prior written approval of the Office.

(1)    Cannabis waste generators producing more than half a ton of non-contaminated waste per week and within 25 miles of an organic recycling facility shall not have their non-contaminated waste landfilled or combusted but shall be:

(i)    composted on or off premises;

(ii)    used to produce energy through the process of anaerobic digestion; or

(iii)    used as an input for a licensee or a licensed third party in the manufacture of other products, including, but not limited to, paper, packaging, pet bedding, or through process of fermentation; and

(2)    Cannabis waste that will be processed in a composting facility or other organics recycler (anaerobic digester, etc.) can only be mixed with other organic waste that the receiving organics recycler can process effectively. The types of waste include, but are not limited to: food scraps, yard trimmings, manure, cannabis growing materials that do not need to be rendered unusable (stems, fan leaves, etc.). An off-site organics recycling facility is a recycling facility which is approved by the New York State Department of Environmental Conservation to accept the quantity of material proposed. On-site organics recycling shall follow operational procedures acceptable to the Office.

(3)      Cannabis waste that will be disposed in a solid waste management facility such as a combustion facility or a landfill may be mixed with any nonhazardous solid waste, including, but not limited to, paper waste, cardboard waste, plastic waste, soil, or sawdust, prior to disposal.

(d)      Cannabis waste that has been rendered unusable pursuant to this Part may be disposed of using one of the following methods:

(1)      deliver cannabis waste to a New York State Department of Environmental Conservation. permitted solid waste management facility for final disposition. Examples of acceptable permitted solid waste facilities include:

(i)      compost, anaerobic digester, or other facility acting in accordance with the requirements of the New York State Department of Environmental Conservation for compostable mixed waste; or

(ii)      landfill, incinerator, or other facility acting in accordance with the requirements of the New York State Department of Environmental Conservation for noncompostable mixed waste;

(2)      manage disposal on-site by the licensee in accordance with the requirements of the New York State Department of Environmental Conservation; and

(3)    use on-premises organic waste recycling methods, which reintroduction of cannabis waste back into agricultural operation through methods including, but not limited to, tilling directly into agricultural land and no-till farming.

(e)    A licensee who is using another entity to transport cannabis waste, shall maintain and make available to the Office upon request, the business name, address, contact person, and contact phone number of the permitted or registered New York State Department of Environmental Conservation waste transporter transporting the cannabis waste; and obtain documentation from the waste transporter transporting the cannabis waste that evidences subscription to a waste collection service.

(f)    A licensee who is self-transporting cannabis waste shall be subject to the following additional requirements:

(1)    the licensee or its employees shall be registered or permitted as a waste transporter in accordance with 6 NYCRR Parts 364 and 368;

(2)    self-transported cannabis waste shall only be transported by the licensee or its employees;

(3)    self-transported cannabis waste shall only be transported to a solid waste management facility that is permitted by the New York State Department of Environmental Conservation to accept cannabis waste; and

(4)    the licensee or its employee who transports the cannabis waste shall obtain for each delivery of cannabis waste a copy of a record, indicating the amount of cannabis waste transported to the permitted solid waste management facility or receipt from the permitted solid waste management facility.

(g)    Liquid waste. Any chemical waste and wastewater generated during cannabis production and processing, including pesticides or hazardous waste, shall be disposed of in accordance with all applicable state and local laws, rules, and regulations.

(h)    Cannabis waste shall be that is to be rendered unusable maintained in a secured waste receptacle or secured area on the licensed premises until the time of disposal.

(i)    All exterior cannabis waste receptacles located on the licensed premises shall be locked and secured to prevent unauthorized access.

(j)    All cannabis waste disposed of shall be weighed, recorded, and entered into the inventory tracking system prior to, and after, mixing and disposal. Licensees shall maintain records of disposal for at least five years, and made available to the Office for inspection, which shall include:

(1)    the form (or type) of cannabis or cannabis product being disposed;

(2)      the weight of the disposed cannabis material, the number of plants, or in the case of a cannabis product, the quantity of the cannabis product;

(3)      the batch or lot number, as applicable, of the cannabis or cannabis product;

(4)      the signatures of at least two (2) of the licensee's employees who witnessed the disposal; and

(5)      any other information as determined by the Office.

(k)      Use of cannabis waste that is not required to be rendered unusable as an input by the licensee or a third party in the manufacture of other products, such as paper, packaging, or pet bedding, or through the process of fermentation is permissible.

(l)      Cannabis waste that shall be rendered unusable shall not be sold.

## § 125.11 Inspections and Audits.

(a)      Licensed or permitted premises, regardless of the type of premises, and all records, including, but not limited to, financial statements and corporate documents, shall be subject to inspection by the Office, by the duly authorized representatives of the Office, by any peace officer acting pursuant to their special duties, or by a law enforcement officer.

(b)     A licensee shall make themselves, or an agent thereof, available and present for any inspection required by the Office. Such inspection may include, but is not limited to, ensuring compliance by the licensee with all requirements of the regulations pursuant thereto, and other applicable state and local building codes, fire, health, safety, and other applicable regulations.

(c)     Any deficiencies identified by the inspection shall be documented in a statement of findings by the Office and require that the licensee submit a written plan of correction in a format acceptable to the Office within 30 calendar days of the issue date of the statement of findings.  A plan of correction shall address all deficiencies or areas of noncompliance cited in the statement of findings and shall:

(1)     contain an assessment and analysis of the events and/or circumstances that led to the noncompliance;

(2)     contain a procedure addressing how the licensee intends to correct each area of noncompliance;

(3)     contain an explanation of how proposed corrective actions will be implemented and maintained to ensure noncompliance does not recur; and

(4)      contain the proposed date by which each area of noncompliance shall be corrected.

(d)    Any inspection finding which the Office determines jeopardizes the immediate health, safety, or well-being of the public shall be deemed a critical deficiency and shall require immediate corrective action to remove the immediate risk. The licensee shall submit a preliminary corrective action plan to the Office within 24 hours of notification by the Office of the critical deficiency.

(e)    If the Office determines that the corrective action plan needs modification, the licensee shall modify the plan until it is in its final form, as accepted by the Office;

(f)    Upon written approval of the Office, the licensee shall implement the plan of correction.

(g)    Failure by the licensee to comply with these requirements may result in suspension, revocation, and/or a civil penalty in accordance with Part 133 of this Title.

(h)    Nothing herein shall limit the application of any other remedies or sanctions that are available through local, state, and federal laws, and these rules.

## § 125.12 General Record Keeping Requirements.

(a)    A licensee shall keep and maintain records required by this section, or any other applicable federal or state rule or regulation, for at least five years from the date of creation, unless a shorter time is specified by the Office.

(b)    Records shall be made readily retrievable and available to the Office upon request.

(c)    Records shall account for all activities of the licensee, including, but not limited to:

(1)    architectural diagrams and floorplans of the licensed premises, including designation of functional areas and square footage available;

(2)    financial records in accordance with generally accepted accounting principles, including, but not limited to, true parties of interest, bank statements, sales invoices, receipts, and any other records maintained for tax purposes;

(3)    personnel records, including each employee's full name, date of employment, date of termination of employment, if applicable, background check and disciplinary actions;

(4)    training records including, but not limited to, the content of the training provided and the names of the employees who received the training;

(5)    any contracts regarding cannabis activity;

(6)    all records related to advertising and marketing;

(7)    standard operating procedures;

(8)    laboratory testing results for each lot or batch of cannabis or cannabis product tested;

(9)    records of equipment used in cultivation and processing of cannabis, as well as equipment maintenance and upkeep records that include at a minimum:

(i)    the type of maintenance performed;

(ii)    the name of the mechanic who performed the maintenance; and

(iii)    the date the maintenance was completed; and

(10)    code of ethics;

(11)    policies and procedures that notify persons with disabilities of their rights under applicable federal and state laws and regulations and includes provisions prohibiting discrimination and providing reasonable accommodations;

(12)    policies and procedures demonstrating promotion of diversity in the workplace;

(13)    all other documents prepared or executed by or for the licensee in connection with the license; and

(14)    any other records required by the Cannabis Law, this Part, or as determined by the Office.

(d)    Records shall be legible and accurate. No person shall intentionally misrepresent or falsify records.

(e)    Records shall be stored in a secured area to ensure that the records are protected from debris, moisture, contamination, hazardous waste, and theft.

(f)    A licensee shall make its premises, and all books, systems and records available to the Office upon request.

(g)    The failure of the licensee to comply with the requirements set forth in this section may result in enforcement action, including, but not limited to, civil penalties and revocation of licensure.

## § 125.13 Processing Samples for Internal Quality Control.

(a)    Cultivator and processor licensees may provide quality control processing samples of cannabis or cannabis products directly to the licensee owners or designated employees who are at least 21 years old for the purpose of internal licensee quality control and product development.

(b)    The quality control processing sample may not be consumed or used on a licensed premises.

(c)      The quality control processing sample may not be provided to or resold to another licensee or cannabis consumer.

(d)      Any quality control processing sample provided under this Part shall be recorded in the licensee's inventory tracking system. When providing an owner or employee a quality control processing sample, a licensee shall record the following in their inventory tracking system;

(1)      the reduction in quantity of the total weight or item count as applicable for the cannabis or cannabis product lot;

(2)      the date and time the quality control processing sample was provided to the licensee owner or employee;

(3)      name of the owner or employee who provided the quality control sample; and

(4)      the name of the owner or employee who the sample was issued to.

(e)      A cultivator and processor licensee may provide a quality control processing sample of cannabis or cannabis product that shall not exceed:

(1)      seven grams of cannabis per cultivar harvested in a 72-hour period; or

(2)      up to six individual cannabis flower product units of sale per lot of cannabis product provided the units do not exceed an aggregate weight over 28 grams.

(f)      The licensee is responsible for disclosing to the owner or employee receiving a quality control processing sample whether or not the sample has been tested by an independent laboratory permitted pursuant to Part 130 of this Title.

**§125.14 Severability**.  If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

**Part 131. Severability and Reference Materials.**

(a)      Severability.

(1)      If any provision of this Chapter or its application to any particular person or circumstance is held invalid, the remainder of this Chapter and its application to other persons and circumstances shall not be affected thereby.

(2)      The conditional licensee shall comply with all adult-use license business and operation requirements and prohibitions as required by this Chapter. Adult-use regulations shall prevail should there be any conflict between the conditional regulations under Part 116 of this Title and adult-use business operations requirements and prohibitions.

(b)      Referenced Materials.  Regulations included in Part 119, 120, 121, 123, 124 and 125 of this Title contain references to documents for information as to the standards to be met or guidelines and methodologies to be used in meeting the requirements of specific regulations.  In addition, copies of referenced materials are available for public inspection and copying at the Albany office of the New York State Department of State.

**Table 1**

| Regulation | Referenced Material | Availability |
|:---:|:---:|:---:|
| **9 NYCRR Part/sec./etc.** | **CFR (Code of Federal Regulations) or other** | |
| 119.2(a)(6) | Public Health Law Article 13-E | **** |
| 119.2(a)(6) | 42 U.S.C. §7401 et seq., also known as The Clean | *** |

| | Air Act | |
|---|---|---|
| 121.3(d)(2) | Labor Law Article 20-c | **** |
| 123.4(f)(1) | 6 NYCRR §325.2(b) | * |
| 123.4(f)(2) | 40 CFR §152.52 | ** |
| 123.4(k)(9) | 10 NYCRR Subpart 5-1 | * |
| 123.6(a)(1) | 21 CFR Part 111 | ** |
| 123.6(a)(1) | 21 CFR Part 117 | ** |
| 123.6(c)(2)(iii) | 21 USC §321 | * |
| 123.6(e)(5) | Public Health Law §3306(h) and (g) | **** |
| 123.6(f)(8) | 10 NYRR Section 14-1.31 | * |
| 123.6(f)(11); 123.8(a)(1); 123.8(a)(3); 123.10(f)(2)(v); 123.10(f)(11) 123.10(f)(1)(iii); | Tax Law Article 20-C | **** |
| 125.1(c)(7)(vii) | 6 NYCRR Part 201 | * |
| 125.1(c)(7)(vii) | 6 NYCRR §201-2.1(6)(9) | * |
| 125.1(c)(8)(i) | Chapter 106 Laws of 2019 §7(2); also known as the New York State Climate Leadership and Community Protection Act. | ***** |

| 125.1(c)(8)(i) | Environmental Conservation Law Article 75 | **** |
| 125.5(d) | 29 CFR § 1910.1200 | ** |
| 125.5(f) | 29 CFR 1910.132 | ** |
| 125.5(g) | 29 CFR 1910.134 | ** |
| 125.10(f)(1) | 6 NYCRR Part 364 | ** |
| 125.10(f)(1) | 6 NYCRR Part 381 | ** |

\*  Electronic copies of New York Codes, Rules and Regulations (NYCRR) sections can be searched directly at:

https://govt.westlaw.com/nycrr/index?__lrTS=20190327201930309&transitionType=Default&contextData=%28sc.Default%29

\*\*  Any printed editions of the *Code of Federal Regulations* (CFR) can be obtained by calling the Superintendent of Documents, U.S. Government Printing Office, at (202) 512-1800.  Electronic copies of CFR sections may also be obtained at Government Printing Office (GPO) which contains the most recent revisions, can be searched directly at:  https://www.ecfr.gov/

\*\*\* Any printed editions of the *United States Code* (USC) can be obtained by calling the Superintendent of Documents, U.S. Government Printing Office, at (202) 512-1800.  Electronic copies of CFR sections may also be obtained at Government Printing Office (GPO) which contains the most recent revisions, can be searched directly at: https://uscode.house.gov/

\*\*\*\* Electronic copies of New York State Law, including but not limited to, Public Health Law, Vehicle and Traffic Law, Education Law, Mental Hygiene Law, Social Services Law may be

searched directly under the Laws tab (which drops down to "Laws of New York") at:

http://public.leginfo.state.ny.us/lawssrch.cgi?NVLWO:

***** Electronic copies of New York State Chapter Law, may be searched directly under the

Home tab (which drops down to allow you to select "Chapter No.") at:

http://public.leginfo.state.ny.us/navigate.cgi?NVMUO: