*Draft – Subject to Change*

## Table of Contents:

**Adult-Use Cannabis**

**Part 118 – Definitions**

**Part 119 - Municipality Rulemaking**

**Part 120 - Application and Licensure**

**Part 121 - Social and Economic Equity Rules**

**Part 122 - [Reserved]**

**Part 123 - License Specific Authorizations, Requirements and Prohibitions**

**Part 124 - General Business Requirements and Prohibitions**

**Part 125 - General Operating Requirements and Prohibitions**

**Part 126 - [Reserved]**

**Part 127 - [Reserved]**

**Part 131. Severability and Reference Materials.**

Pursuant to the authority vested in the Cannabis Control Board by Section 13, 85, 87, 89, 91, and 131 of the Cannabis Law, Chapter II of Subtitle B of Title 9 of the Official Compilation of Codes, Rules and Regulations of the State of New York is hereby amended and new Parts 118, 119, 120, 121, 123, 124, 125 and 131 are added to be effective upon publication of a Notice of Adoption in the New York State Register, to read as follows:

*Draft – Subject to Change*

The title of Chapter II of Subtitle B of Title 9 of the Official Compilation of Codes, Rules and Regulations of the State of New York is hereby amended to read as follows:

Chapter II. [[Heading Omitted]] Adult-Use Cannabis, Medical Cannabis, and Cannabinoid Hemp.

A new Part 118, titled Definitions, is added to read as follows:

**Part 118 – Definitions**

**§ 118.1 Definitions.**

(a)      For the purposes of this Title the following terms shall have the following meaning:

(1)      *Adult-use on-site consumption premises* means a place where the consumption of cannabis occurs and shall be either a consumption facility or an exception area.

(2)      *Advertisement* means advertisement as defined in Part 128 of this Title.

(3)      *Advertising* means advertising as defined in Part 128 of this Title.

(4)      *Aggregate ownership interest* means the total ownership interest held by the following, or any combination of the following:

2

*Draft – Subject to Change*

(i)      a legal entity and any legal entity or individual in its multilevel ownership structure;

(ii)     an individual and the spouse, domestic partner, civil union partner, child, sibling, or parent of such individual; or

(iii)    a legal entity and any individual with control over such legal entity.

(5)      *Applicant* means applicant as defined in Article 1 of the Cannabis Law.

(6)      *Article 13-E Smoking/Vaping Exception* means a public health law section 1399-Q exempted on-site consumption license that does not authorize the license holder to engage in the retail sale of cannabis products.

(7)      *Artificially derived phytocannabinoid* means a phytocannabinoid that is created by a chemical reaction that changes the molecular structure of any chemical substance derived from Cannabis sativa. Artificially derived phytocannabinoid does not include: (i) a naturally-occurring chemical substance that is separated from Cannabis sativa by a chemical or mechanical extraction process; (ii) phytocannabinoids that are produced by decarboxylation of the phytocannabinoid's respective naturally-occurring carboxylic acid form without the use of a chemical catalyst; (iii) any other chemical substance identified by the Board; and (iv) synthetic tetrahydrocannabinols not derived from the cannabis plant already prohibited as a Schedule I Controlled Substance in section 3306 of the public health law and prohibited in paragraph (5) of

*Draft – Subject to Change*

subdivision (e) of section 123.6 of this Title.

(8)     *Attractive to individuals under twenty-one* means attractive to individuals under twenty-one as defined in Part 128 of this Title.

(9)     *Biodiversity* means the inter and intra species variety in the natural world and within ecosystems to maintain balance and support life and sustain the resilience of biotic and abiotic systems.

 (10)     *Board* means the New York State Cannabis Control Board as defined in Article 1 of the Cannabis Law.

(11)     *Bona fide labor organization* means a local labor union:

(i)     that represents employees in this state with regard to wages, hours and working conditions;

(ii)      in which officers have been elected by secret ballot or otherwise in a manner consistent with federal law; and

(iii)     that is free of domination or interference by any employer and has received no improper assistance or support from any employer.

4

*Draft – Subject to Change*

(12)    *Brand or Branding* means brand or branding as defined in Part 128 of this Title.

(13)    *Cannabis Advisory Board* means the New York State Cannabis Advisory Board as established in section 14 of the Cannabis Law.

(14)    *Cannabis flower product* means any form of cannabis product consisting predominantly of the flower, buds, and leaves of the cannabis plant, including trimmings thereof, intended for retail sale to consumers.

(15)    *Cannabis merchandise* means a consumer good that does not contain cannabis and includes or displays a brand of a licensee. Cannabis merchandise is an advertisement and must comply with Parts 128 and 129 of this Title. Cannabis merchandise may include, but is not limited to, clothing, hats, pencils, pens, keychains, mugs, water bottles, beverage glasses, notepads, lanyards, or cannabis paraphernalia.

(16)    *Cannabis paraphernalia* means any equipment, product or material of any kind which is primarily intended or designed for use in the preparation, consumption, or storage of cannabis products.

(17)    *Cannabis waste* means all cannabis byproduct, scrap, harvested cannabis and cannabis-infused products not intended for sale to a consumer or distribution to an entity licensed or registered under the Cannabis Law.

*Draft – Subject to Change*

(18)    *Canopy or cultivation canopy or canopy area* means an area to be calculated in square feet and measured using clearly identifiable boundaries of all areas(s) that will contain non-immature cannabis, which excludes seedlings or small clones, including the space(s) within the boundaries. Canopy may be noncontiguous, but each unique area included in the total canopy calculations shall be separated by an identifiable boundary, including, but not limited to, interior walls, shelves, greenhouse walls, hoop house walls, garden benches, hedge rows, fencing, garden beds, or garden plots.

(19)    *Canopy tier or tier* means the level of cultivation canopy in which a licensee is permitted to cultivate within minimum and maximum square footage ranges as defined for each license type.

(20)    *Cash* means U.S. currency, certified check, money order, electronic funds transfer, bank officer's check or draft, or a check drawn on an account.

(21)    *Certificate of analysis* means certificate of analysis as defined in Part 130 of this Title.

(22)    *Civil practice law and rules* or *CPLR* means Chapter 8 of the Consolidated Laws of New York.

(23)    *Collective* means an applicant or license granted under section 70 of the Cannabis Law and organized pursuant to subdivision (h) and (i) of section 123.13 of this Title.

*Draft – Subject to Change*

(24)    *Community board* means an advisory body operating under the jurisdiction of the New York City government, comprised of members appointed by their respective borough president, having the primary functions of assessing the needs of and advising elected officials and local government agencies on matters affecting the social welfare of their districts.

(25)    *Concentrate or "Concentrated cannabis"* means concentrated cannabis as defined in Article 1 of the Cannabis Law.

(26)    *Consumption facility* means an adult-use on-site consumption premises at which both the consumption of cannabis products and the retail sale of cannabis products to consumers may occur and is either a limited retail consumption facility or a microbusiness.

(27)    *Consume or consumption* or *consuming* means the inhalation, which includes but is not limited to smoking and vaping; ingestion; application; or use of cannabis products, medical cannabis, and cannabinoid hemp products.

(28)    *Control* or *controlling interest* means the authority to order or direct the management, operations, managers, or policies of a person, including, but not limited to, the ability or authority, expressed or reserved, to:

(i)    amend or change the corporate or operating identity (e.g., joint venture agreement or unincorporated business status) of a person;

*Draft – Subject to Change*

(ii)     approve operating and capital budgets for the person;

(iii)    adopt, approve, or direct fiscal operating policies and procedures;

(iv)    approve debt necessary to finance the person's costs of compliance with operational or facility standards required by law;

(v)     approve contracts for management of facility services;

(vi)    hire or dismiss executive personnel;

(vii)   maintain and control the books and financial records of the person, including, but not limited to, co-signing bank accounts and the power to authorize capital outlays and spending;

(viii)  encumber the assets of the person by way of mortgage or other indebtedness; and

(ix)    dissolve the person or arrange for sale or transfer of the person to new ownership or control.

(29)    *Cooperative* means an applicant or license granted under section 70 of the Cannabis Law and organized pursuant to New York State Cooperative Law and subdivision (g) of section 123.13 of this Title.

*Draft – Subject to Change*

(30)    *Corrective action plan* means a corrective action plan as defined in Part 133 of this Title.

(31)    *Craft product* means a flower or pre-roll cannabis product, or any cannabis product that meets the "craft designation" as established by the Office in future guidance, which shall be hang-dried, processed, and manufactured exclusively by:

(i)    a licensed Tier 1 cultivator with a set canopy tier as set forth under subparagraph (i) of paragraph (2) of subdivision (b) of section 120.3 of this Title, and shall only use cannabis or cannabis material that is cultivated by said licensee, and not sourced from another cultivator, processor, or any other licensee; or

(ii)    a licensed microbusiness of any type.

(32)    *Cultivation* means the agricultural production practices of soil preparation, planting, micropropagation-tissue culture, growing, cloning, harvesting, drying, curing, grading, and trimming of cannabis plants for sale to certain other categories of cannabis license and permit holders.

(33)    *Date of expiration* means date of expiration as defined in Part 128 of this Title.

(34)    *Debarment* means debarment as defined in Part 133 of this Title.

(35)    *Edible* or *Cannabis Edible Product* means edible as defined in Part 128 of this Title.

9

*Draft – Subject to Change*

(36)    *Electronic signature* means an electronic sound, symbol, or process, attached to or logically associated with an electronic record and executed or adopted by an individual with the intent to sign the record.

(37)    *Employee in charge* means an individual twenty-one (21) years of age or older at management level designated by a retail dispensary to be responsible to perform or oversee the performance of the tasks in section 123.10 of this Title and any other tasks required by the retail dispensary.

(38)    *Exception Area* means an adult-use on-site consumption premises at which the consumption cannabis products may occur but the retail sale of cannabis to consumers may not occur.

(39)    *Extracting* means the process of concentrating or isolating one or more phytochemicals, including, but not limited to, phytocannabinoids and terpenes from cannabis.

(40)    *Exit package* means exit package as defined in Part 128 of this Title.

(41)    *Financial institution* means any bank, mutual savings bank, consumer loan company, credit union, savings and loan association, trust company, or other lending institution under the jurisdiction of the New York State Department of Financial Services.

*Draft – Subject to Change*

(42)    *Financial interest* means any actual or future right to ownership, inclusive of all restricted stock units, options, warrants, or any other interest that can be converted into a share of voting stock or equity investment, or compensation arrangement with another person, either directly or indirectly, through business, investment, spouse, domestic partner, parent or child; provided however, that with respect to a compensation arrangement the compensation exceeds the greater of: (i) 10% of revenue, (ii) 50% of net profit, or (iii) $250,000; over the course of a calendar year. A person with a financial interest does not include a passive investor or salaried employee earning income in excess of the compensation limits set herein.

(43)    *Financier* means any person, other than financial institution, that provides capital as a gift, provides a grant, or lends capital pursuant to a secured or unsecured financing agreement. Agreements will be assessed based on current and future right to ownership or interest on the licensee, including, but not limited to, interest in the event of default, bankruptcy, or reorganization. A financier may not receive an ownership interest; control of the business; or a share of revenue in excess of the greater of the following over a calendar year: (i) 10% of gross revenue, (ii) 50% of net profit, or (iii) $250,000; gross profits or net profits; a profit-sharing interest; or a percentage of the profits in exchange for a gift, grant, or loan.

(44)    *Fine Particles* mean particles or droplets present in air that are two and one-half microns (2.5μm) or less in width.

(45)    *Flavored* shall mean a cannabis product with a distinguishable taste or aroma, other than the taste or aroma of cannabis, imparted either prior to or during consumption of such product or a component part thereof, including, but not limited to, tastes or aromas relating to specific foods

11

*Draft – Subject to Change*

or beverages or any concept flavor that imparts a taste or aroma that is distinguishable from the taste or aroma of cannabis. A cannabis product shall be presumed to be flavored if a licensee or a licensee's agent or employee has made a statement or claim directed to consumers or the public, whether expressed or implied, that such cannabis product has a distinguishable taste or aroma other than the naturally occurring taste or aroma of cannabis. A cannabis product shall not be presumed to be flavored solely due to the cultivar used in the product.

(46)     *General use pesticide* means general use pesticide as defined in Article 33 of the Environmental Conservation Law

(47)     *Goods and services agreement* means goods and services agreement as described in Part 124 of this Title.

(48)     *Greenhouse* means structure or thermally isolated enclosed area with rigid walls that maintains a specialized conditioned and sunlit environment used for and essential to the cultivation, protection, or maintenance of plants. It can include additional artificial lighting and climate controls based on cultivation techniques used.

(49)     *Ground transport* means transportation that is over land and not on water or in the air with the exception of, and for the purposes of this Title, a ferry.

(50)     *Harvest batch* means a unit of cannabis produced during a period of time under similar conditions, identifiable by a lot unique identifier that allows traceability.

*Draft – Subject to Change*

(51)    *Hoop house* means specialized unconditioned agricultural equipment having a framework covered with demountable non-rigid materials unsealed from the outdoor elements, which allows for penetration of sunlight to cannabis plants, specifically designed, constructed, and used for agricultural production. A hoop house may include up to 20 artificial lights for the propagation of seedlings or clones. Lights shall meet photosynthetic photon efficacy (PPE) requirements as determined by the Office.

(52)    *Horticultural lighting equipment (HLE)* means any lighting equipment, including, but not limited to, fixtures, bulbs, ballasts, and controls that uses energy for the production of seeds, seedlings, and clones, or the cultivation of mature cannabis plants.

(53)    *House of worship* means a whole building owned or leased by a religious corporation as described by New York State Religious Corporation Law or used by a religious corporation or association of any denomination pursuant to the written permission of the owner thereof, which is used by members exclusively as a meeting place for divine worship or other religious observances presided over by a member of the clergy.

(54)    *Immature cannabis plant* or *immature plant* means a cannabis plant which does not have a flower or buds that may be observed by visual examination.

(55)    *Indoor* or *indoors* shall mean an area which is completely enclosed on all sides by solid floor-to-ceiling walls, windows, doors, or solid floor-to-ceiling partitions and which complies

13

*Draft – Subject to Change*

with all applicable Building Code and Fire Code requirements. Areas which are not completely enclosed on all sides by solid floor-to-ceiling walls, windows, or solid floor-to-ceiling partitions, but are also not easily ventilated by wind or natural air, may be deemed sufficiently similar to an indoor area by the Office after a review of the premises or site plan. Areas deemed sufficiently similar to an indoor area by the Office shall comply with requirements of this Title which pertain to indoor areas of an adult-use on-site consumption premises.

(56)    *Indoor cultivation* means the cultivation of cannabis within an enclosed climate-controlled structure using only artificial light, heat, carbon dioxide generators, and dehumidification.

(57)    *Integrated pest management (IPM) principles* means the following: (i) identifying pests, their hosts, and beneficial organisms before acting; (ii) establishing monitoring guidelines for each pest species; (iii) establishing an action threshold for the pest; (iv) evaluating and implementing control tactics; and (v) monitoring, evaluating, and documenting the results.

(58)    *License* means license as defined in Article 1 of the Cannabis Law.

(59)    *Licensee* means licensee as defined in Article 1 of the Cannabis Law.

(60)    *Limited Retail* shall mean a type of consumption facility which is a distinct area located within the licensed premises of a specific retail dispensary.

*Draft – Subject to Change*

(61)    *Local law* means a local rule or local regulation or local ordinance or action which is adopted by the municipality on matters otherwise not preempted by the Cannabis Law, provided, however, that such local law shall not be unreasonably impracticable as determined by the Board.

(62)    *Lot unique identifier or lot number or bar code* means any distinctive combination of letters, numbers, or symbols, or any combination of them, from which the complete history of cultivation, manufacturing, processing, testing, custody, distribution, or recall of a lot of cannabis, medical cannabis product or cannabis product can be determined.

(63)    *Manufacturing* means to prepare, treat, modify, compound, package, or otherwise manipulate cannabis or cannabis extract into a cannabis product. Manufacturing shall not include cultivation, as defined in Article 1 of the Cannabis Law, or extracting as defined in this Part.

(64)    *Marihuana-related offense* means an offense defined in: (i) former sections 220.03 and 220.06 of the Penal Law where the sole controlled substance involved was concentrated cannabis, (ii) former sections 221.05, 221.10, 221.15, 221.20, 221.35, or 221.40 of the Penal Law, (iii) section 105.05 of the Penal Law prior to the effective date of Chapter ninety-two of the laws of two thousand twenty-one and the sole conduct involved was an offense defined in former sections 221.35 or 221.40 of the Penal Law, (iv) former section 3382 of the Public Health Law prior to the effective date as prescribed in subdivision nine of section 222.15 of the Penal Law, and the cultivation of such cannabis plants was solely for personal possession and use, (v) Article two hundred twenty or section 240.36 of the of the Penal Law prior to the effective date of

15

*Draft – Subject to Change*

former Article two hundred twenty-one of the Penal Law and the sole controlled substance involved was marihuana and the conviction was only for a misdemeanor and/or violation, or (vi) any offense identified by the Office to be a marihuana-related offense.

(65)    *Mature cannabis plant* means a cannabis plant that has observable buds or flowers.

(66)    *Medical necessity* means factors used to determine whether or not the Board will grant a license to a licensee which will result in providing medical cannabis to an underserved geographic area.

(67)    *Mechanical extraction* means extraction using pressure, heat or cold to extract cannabinoids, and includes rosin presses, dry ice or other similar processes, without employing solvents or gases, approved by the Office.

(68)    *Mixed Light* means cultivation of mature cannabis in a greenhouse, hoop-house with cannabis cultivation lights, glasshouse, conservatory, hothouse, or similar structure, using a combination of sunlight and lighting with all lighting requirements meeting the photosynthetic photon efficacy standards for the mixed-light tier set out in section 125.1 of this Title.

(69)    *Mother plant* means an immature cannabis plant that is maintained in an immature state indefinitely and intended to be used for propagation.

*Draft – Subject to Change*

(70)    *Municipality or municipalities* means an administrative or governing body with the authority to enact any local regulations in a town, city, or village in New York State.

(71)    *Net profit* means net income according to Generally Accepted Accounting Principles (GAAP).

(72)    *Non-consumer package* means non-consumer package as defined in Part 128 of this Title.

(73)    *Nursery area* shall mean an area to be calculated in square feet and measured using clearly identifiable boundaries of all areas(s) that will be used to produce clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture and cannabis seeds, including the space(s) within the boundaries. Provided that the primary purpose of the area is to produce clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture or cannabis seeds, a nursery area may also contain mature and immature cannabis plants. A nursery area may be noncontiguous, but each unique area included in the total area calculations shall be separated by an identifiable boundary including, but not limited to, interior walls, shelves, greenhouse walls, hoop house walls, garden benches, hedge rows, fencing, garden beds, or garden plots.

(74)    *Office* means New York State Office of Cannabis Management as defined in Article 1 of the Cannabis Law

*Draft – Subject to Change*

(75)    *Outdoor cultivation* means the cultivation of mature cannabis under natural sunlight and weather conditions.

(76)    *Passive investor* means a person that is a true party of interest of a licensee with an ownership interest of no more than 5% percent of the outstanding shares or interest of an applicant or licensee whose shares are publicly traded, 10% of the outstanding shares or interest of a non-publicly traded ROD license and microbusiness license, or 20% of the outstanding shares or interest of any other entity, whether such shares or interest are current voting shares, future voting shares, current equity shares or future equity share of the applicant or licensee, and does not otherwise have any control or influence over the applicant or licensee. The total shares outstanding of future equity or future voting share classes shall be calculated as the entity's fully diluted share count (inclusive of all restricted stock units, options, warrants, or any other interest that can be converted into a share of voting stock or equity), less contingent or future shares owned by persons who's financial or controlling interest in an entity is active.  This definition of passive investor shall unequivocally become the definition of passive investor for Part 116 and supersede and replace the definition of passive investor under Part 116, effective immediately for conditional adult-use retail dispensaries, upon adoption.

(77)    *Person* means an individual, institution, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity.

*Draft – Subject to Change*

(78)    *Pests* means rodents, birds, insects, plants, fungi, bacteria, or other animals or organisms that present a potential threat or contamination to cannabis plants and cannabis products.

(79)    *Photosynthetic photon efficacy (PPE)* means the measure of photon output in micromoles per second divided by the watts needed to produce the light.

(80)    *Phytocannabinoid* means phytocannabinoid as defined in Part 128 of this Title.

(81)    *Plant protection products* means products applied during the cultivation of cannabis including insecticides, fungicides, herbicides, and rodenticides.

(82)    *Private application* means private application as defined in Article 33 of the Environmental Conservation Law.

(83)    *Processing* means, amongst other things, blending, extracting, infusing, packaging, labeling, branding or otherwise making or preparing cannabis products.

(84)    *Processor* means processor as defined in Article 1 of the Cannabis Law.

(85)    *Propagation area* means an area to be calculated in square feet and measured using clearly identifiable boundaries of all areas(s) that will contain only immature cannabis, seedlings, small clones and/or mother plants, including the space(s) within the boundaries. Propagation areas may be noncontiguous, but each unique area included in the total propagation area

*Draft – Subject to Change*

calculations shall be separated by an identifiable boundary including, but not limited to, interior walls, shelves, greenhouse walls, hoop house walls, garden benches, hedge rows, fencing, garden beds, or garden plots.

(86)    *Provisional license* means approval provided to an applicant that, notwithstanding any other outstanding requirement or condition for licensure, satisfies conditions determined by the Board to be necessary and relevant to the particular license type sought, which may be used by the applicant to secure a location in order to receive final approval by the Board. A provisional license does not authorize licensed activities under the Cannabis law.

(87)    *Provisional licensee* means someone who holds a provisional license.

(88)    *Public convenience and advantage standards* mean standards used to determine whether or not the Board will grant a license to a licensee which will not result in over saturation of adult-use cannabis licensees.

(89)    *Public youth facility* means a location or structure owned by a government or government subdivision or agency, that is accessible to the public, where the primary purpose is to provide recreational opportunities or services to children or adolescents of whom the primary population is reasonably expected to be seventeen (17) years of age or younger.

*Draft – Subject to Change*

(90)     *Record* means books, ledgers, documents, writings, photocopies, correspondence, electronic storage media, electronically stored records, money receptacles, equipment in which records are stored, or any other document that is used for recording information.

(91)     *Registered organization with dispensing* or *ROD* means a registered organization adult-use cultivator processor distributor retail dispensary licensed pursuant to section 68-a of the Cannabis Law.

(92)     *Registered organization non-dispensing* or *ROND* means a registered organization adult-use cultivator, processor and distributor licensed pursuant to section 68-b of the Cannabis Law.

(93)     *Retail advertising specialty* is cannabis merchandise that a licensee provides to a retail dispensary that is not intended for retail sale at the dispensary. Examples of retailer advertising specialties include trays, rolling papers, mats, menu cards, matches, paper napkins, filters, thermometers, clocks, shirts, hats, visors, branded signs, refrigerators, display cabinets, art, and calendars. All items shall comply with Part 129 of this Title and cannot be attractive to individuals under the age of twenty-one (21) and all apparel shall be available in adult sizes only. The manufacturer or wholesaler may add the name or address of the retailer to the retailer advertising specialty.

(94)     *Retail package* means retail package as defined in Part 128 of this Title.

*Draft – Subject to Change*

(95)    *Road* means any wide way leading from one place to another, including, but not limited to, an alley, avenue, boulevard, causeway, court, crescent, drive, lane, loop, place, plaza, promenade, street, terrace, or way.

(96)    *School grounds* means any building, structure and surrounding outdoor grounds, including entrances or exits, contained within a public or private pre-school, nursery school, elementary or secondary school's legally defined property boundaries as registered in a county clerk's office as defined by section 409 of the Education Law.

(97)    *Secondary school* means a school between the elementary school and the college or university.

(98)    *Serious adverse event* means serious adverse event as defined in Part 113 of this Title.

(99)    *Social and Economic Equity Applicant* means an individual or an entity that:

(i)    is an applicant for an adult-use license pursuant to Part 120 of this Title; and

(ii)    may be eligible for priority licensing pursuant to Article 4 of the Cannabis Law.

(100)    *Social and Economic Equity Licensee* means an individual or an entity that:

*Draft – Subject to Change*

(i)    meets the qualifications of an individual from a community disproportionately impacted, a minority-owned business, women-owned business, a distressed farmer, or service-disabled veteran of Part 120; and

(ii)    has been granted an adult-use license subject to Part 120 of this Title.

(101)    *Sole Control* means a person or persons who:

(i)    has real, substantial, and continuing ownership of 51% equity share in the business;

(ii)    has the right to execute any material contracts;

(iii)    has the ability to exercise the authority to materially influence the day-to-day business decisions, operations, strategic priorities, capital allocations, acquisitions and divestments;

(iv)    has no timed or triggered recusal provisions or side letters or side agreements related to their recusal; and

(v)    has an ability to direct decisions, voting or otherwise, such that no other person may exercise or have the ability to control the majority of voting rights or appoint or remove the majority of director seats or their equivalent or corporate officers or their equivalent on the governing body.

*Draft – Subject to Change*

(102)   *Structure* means any object constructed, installed or placed on land to facilitate land use and development or subdivision of land, including, but not limited to buildings, fences, enclosures and any fixtures, additions and alterations thereto.

(103)   *Tincture* means a non-potable edible cannabis product that is a cannabis extract solution, intended for human consumption or ingestion, dissolved in alcohol, glycerin, or plant-based oil.

(104)   *Third-party platform* or *marketplace* or *aggregator* means an entity hosting, maintaining, or otherwise providing a marketplace or aggregator service that advertises, markets, promotes, or otherwise lists cannabis products.

(105)   *True Party of Interest:*

(i)      includes the following:

*(a)*      the applicant or licensee's sole proprietor, partner (whether limited or general), member, manager, president, vice president, secretary, treasurer, officer, board member, trustee, director, or any person with an equivalent title to each of the foregoing in any entity in the applicant or licensee's ownership structure;

*(b)*      a stockholder of the applicant or licensee;

*Draft – Subject to Change*

*(c)*     each person that makes up the ownership structure of each level of ownership for an applicant or licensee that has a multilevel ownership structure;

*(d)*     a person with a right to receive aggregate payments in a calendar year, as part of a risk sharing or goods and services agreement, that exceeds the greater of the following, as measured in that calendar year:

*(1)*     10% of the gross revenue of an applicant or licensee;

*(2)*     50% of the net profit of an applicant or licensee; or

*(3)*     $250,000 from an applicant or licensee;

*(e)*     a person with a financial interest in the applicant or licensee;

*(f)*     a person that has authority to or exercises control over the applicant or licensee by controlling interest or otherwise;

*(g)*     a person that assumes responsibility for the debts of the applicant or licensee;

*(h)*     a spouse of any individual in clause *(a), (b) and (c)* herein; or

*Draft – Subject to Change*

*(i)*      any other person that may have a direct or indirect interest, as may be determined in guidance by the Office, consistent with the policies and purpose of the Cannabis Law; and

(ii)      does not include a person who:

*(a)*      receives payment for rent on a fixed basis under a lease or rental agreement relating to applicant or licensee. The Office may investigate a landlord in situations where a rental payment has been waived or deferred;

*(b)*      receives a bonus or commission from the applicant or licensee based on the individual's sales, so long as the commission does not exceed ten percent of the sales of the applicant or licensee in any given bonus or commission period, unless otherwise determined by the Office. Commission-based compensation agreements shall be in writing;

*(c)*      contracts with the applicant or licensee to receive a commission for the sale of the business or real property;

*(d)*      consults receiving a flat or hourly rate of compensation from an applicant or licensee under a goods and services agreement, unless such compensation exceeds the greater of the following, as measured in that calendar year:

*(1)*      10% of the gross revenue of such applicant or licensee;

26

*Draft – Subject to Change*

*(2)*    50% of the net profit of such applicant or licensee; or

*(3)*    $250,000 from such applicant or licensee;

*(e)*    is a goods and services provider, as long as the applicant or licensee retains the right to and controls the business and such payments for such goods or services do not exceed the greater of the following, as measured in that calendar year:

*(1)*    10% of the gross revenue of such applicant or licensee;

*(2)*    50% of the net profit of such applicant or licensee; or

*(3)*    $250,000 from such applicant or licensee;

*(f)*    is a financial institution;

*(g)*    is a financier; or

*(h)*    others as may be determined by the Office in guidance.

(iii)    shall supersede and replace all references to true party of interest for Part 116.  This definition of true party of interest shall unequivocally become the definition of true party of

*Draft – Subject to Change*

interest under Part 116, effective immediately for conditional adult-use retail dispensaries, upon adoption.

(106)    *Use by date* means use by date as defined in Part 128 of this Title.

(107)    *Working stock* means part of the inventory available for average demand in a given period which may be defined by the Office in guidance.

A new Part 119, titled Municipality Rulemaking, is added to read as follows:

Part 119

Municipality Rulemaking

**Part 119- Municipality Rulemaking**

**§ 119.1 Preemption and Prohibitions on Municipality Rulemaking.**

**§ 119.2 Authorizations for Municipality Rulemaking**

**§ 119.3 Notifications to Municipalities**

**§ 119.4 Distance Requirements and Measurement of Distance Requirements**

**§ 119.5 Unreasonably Impracticable; Review and Determination**

**§ 119.6 Severability**

*Draft – Subject to Change*

**§ 119.1 Preemption and Prohibitions on Municipality Rulemaking.**

(a)      No municipality may adopt a local law which would allow an adult-use retail dispensary, microbusiness, ROD, or on-site consumption license to be:

(1)      on the same road and within 200 feet of the entrance of a building occupied exclusively as a house of worship;

(2)      on the same road and within 500 feet of the entrance of a building occupied exclusively as a school; or

(3)      on the same road and within 500 feet of a structure and its grounds occupied exclusively as a public youth facility, if the municipality has enacted a local law pursuant to section 119.2 of this Title.

(b)      Pursuant to section 131 of the Cannabis Law, municipalities are preempted from adopting any local law, rule, or prohibition pertaining to the operation, registration, licensure, or permitting of a registered organization, adult-use cannabis license or cannabinoid hemp license, including, but not limited to:

(1)      imposing a special fee that is specific to cannabis businesses or the licensee that intends to operate within the jurisdiction of the municipality;

*Draft – Subject to Change*

(2)     imposing a fee on adult-use retail dispensary licenses; provided however that a municipality may impose such fee if the municipality imposes a fee on off-premises liquor establishments licensed under the State Liquor Authority pursuant to a local law or regulation that the municipality enacted prior to the thirty first of March two thousand twenty-one, and such law does not conflict with the Cannabis Law or this Part;

(3)     imposing a fee for on-site consumption licenses; provided however, that a municipality may impose such fee if the municipality imposes a fee for on-premises liquor establishments licensed under the State Liquor Authority pursuant to a local law or regulation that the municipality enacted prior to the thirty first of March two thousand twenty-one, and such law does not conflict with the Cannabis Law or this Part;

(4)     imposing a tax or a fee on the cultivation, processing, manufacturing, distribution or sale of cannabis or cannabis product in this state, other than any usual and customary fees associated with similarly situated businesses;

(5)     adopting or executing any agreement where the municipality, community organization or association affiliated with such municipality, receives any additional benefit outside of general operation from, or imposes any duty or obligation on, any applicant, registrant, licensee or permittee of the Board;

(6)     denying any right, privilege, permit, variance, or approval to any adult-use cannabis retail dispensary, microbusiness, ROD, or adult-use on-site consumption licensee associated with the

*Draft – Subject to Change*

premises where retail sale of adult-use cannabis to cannabis consumers occurs and for which a license under this Title has been in existence continuously from a date prior to the date when there came into existence:

(i)    a building that was occupied exclusively as a house of worship, within 200 feet;

(ii)    a building and its grounds that was occupied exclusively as school grounds, within 500 feet; or

(iii)    a structure and its grounds that was occupied exclusively as a public youth facility, if the municipality has passed such a local law pursuant to section 119.2 of this Title, within 500 feet;

(7)    setting a standard for ventilation or odor control for an indoor area of an adult-use on-site consumption premises unless such standard is also applicable to all indoor areas of any businesses which allow the smoking or vaping of tobacco; and

(8)    setting a standard for ventilation or odor control for any outdoor area of an adult-use on-site consumption premises except where such standard requires a distance no greater than 20 feet, unless a greater distance is approved by the Board, between an area of an adult-use on-site consumption premises, that is outdoors and allows smoking and vaping, and an adjacent public thoroughfare.

## § 119.2 Authorizations for Municipality Rulemaking.

*Draft – Subject to Change*

(a)      Municipalities are authorized to adopt local laws and regulations governing the time, place, and manner; provided however, that such local laws and regulations shall not be unreasonably impracticable. The following activities constitute the permissible time, place, and manner restrictions that may be imposed by a municipality:

(1)      Retail dispensary hours of operation for cities of one million (1,000,000) or more. In cities having a population of one million (1,000,000) or more, the hours of operation of when cannabis products can be sold at adult-use retail dispensaries:

(i)      shall not be from 2:00 a.m. to 8:00 a.m., unless given express written permission by such municipality, or the municipality passes a local law, authorizing it to operate during such hours; and

(ii)      shall not be restricted to less than seventy (70) hours a week;

(2)      Retail dispensary hours of operation for cities of one million (1,000,000) or less. In cities having a population of one million (1,000,000) or more, the hours of operation of when cannabis products can be sold at adult-use retail dispensaries:

(i)      shall not be from 2:00 a.m. to 8:00 a.m., unless given express written permission by such municipality, or the municipality passes a local law, authorizing it to operate during such hours; and

*Draft – Subject to Change*

(ii)    shall not be restricted to less than seventy (70) hours a week, unless the licensee agrees to do so;

(3)    On-site consumption hours of operation for cities of one million (1,000,000) or more. In cities having a population of one million (1,000,000) or more, the hours of operation of when cannabis products can be sold at that on-site consumption premises:

(i)    shall not be allowed to operate from 4:00 a.m. to 8:00 a.m.; and

(ii)    shall not restrict operations to less than seventy (70) hours a week, unless the licensee agrees to do so;

(4)    On-site consumption hours of operation for cities of one million (1,000,000) or less. In cities having a population of one million (1,000,000) or less, the hours of operation of when cannabis products can be sold at that on-site consumption premises:

(i)    shall not be allowed to operate from 4:00 a.m. to 8:00 a.m;

(ii)    shall not restrict operations to less than seventy (70) hours a week, unless the licensee agrees to do so;

(5)    the visual or architectural integrity of the building if located within historical districts;

*Draft – Subject to Change*

(6)    parking;

(7)    traffic control including, but not limited to, pedestrian and vehicular traffic;

(8)    odor, pursuant to Article 13-E of the Public Health Law and the Clean Indoor Air Act;

(9)    noise; and

(10)    distance requirements between the retail dispensary, microbusiness, or ROD and a public youth facility, provided, however, that such distance requirement is no greater than 500 feet from the retail dispensary, microbusiness, or ROD. The distance requirements for public youth facility shall not apply to licensees operating pursuant to Part 116 of this Title.

## § 119.3 Notifications to Municipalities.

(a)    Pursuant to section 76 of the Cannabis Law, an applicant for an adult-use retail dispensary, ROD, or on-site consumption license is required to notify the municipality or in New York City, the appropriate community board in which the premises is located of such applicant's intent to file such an application.

(b)    The notification shall be made between thirty (30) and two hundred seventy (270) days prior to filing such application.

*Draft – Subject to Change*

(c)    The notification shall be in a form provided by the Office, and contain the following information:

(1)    applicant contact information;

(2)    trade name or "doing business as" name;

(3)    full name of the applicant;

(4)    street address of the establishment, including the floor location or room number, if applicable;

(5)    the mailing address of the establishment, if different than the street address;

(6)    the name, address and telephone number of the attorney or representative of the applicant, if any;

(7)    a statement indicating whether the application is for:

(i)    a new establishment;

(ii)    a transfer of an existing licensed business;

*Draft – Subject to Change*

(iii)    a renewal of an existing license; or

(iv)    an alteration of an existing licensed premises;

(8)    if the establishment is a transfer or previously licensed premises, the name of the old

establishment and such establishment's registration or license number;

(9)    in the case of a renewal or alteration application, the registration or license number of the

applicant; and

(10)    the type of license.

(d)    A municipality shall have thirty (30) days from the receipt of the notification from an

applicant to express an opinion for or against the granting of a license, which shall mean, for the

purposes of this section, the issuance of a registration, license, or permit, for a new

establishment, transfer, renewal, or alteration of an existing registration, license, or permitted

premises, and any such opinion shall be part of the record upon which the Office makes its

recommendation to the Board to grant or deny an application; provided, however, a municipality

may request additional time in writing, on a form as prescribed by the Office, and may receive

no more than an additional thirty (30) days to express their opinion.

**§ 119.4 Distance Requirements and Measurement of Distance Requirements.**

*Draft – Subject to Change*

(a)    No retail dispensary license or microbusiness license shall be granted for any premises which shall be:

(1)    within a 1,000-foot radius of a registered organization, ROD, or any other premises for which a retail dispensary license or microbusiness license has been issued, in a municipality having a population of 20,000 or more, unless the Board has determined that issuing the license would promote public convenience and advantage; except that distance between a retail dispensary or microbusiness and registered organizations shall cease to be a requirement past December 2023, or

(2)    within a 2,000-foot radius of a registered organization, ROD, or any other premises for which a retail dispensary license or microbusiness license has been issued, in a municipality having a population of 20,000 or less, unless the Board has determined that issuing the license would promote public convenience and advantage; except that distance between a retail dispensary or microbusiness and registered organizations shall cease to be a requirement past December 2023.

(b)    The Board may determine that granting a license would promote public convenience and advantage as described in paragraphs (1) and (2) of subdivision (a) of this section by considering the following factors, which include:

(1)    the number, classes, and character of other licenses in proximity to the premises and in the particular municipality or subdivision thereof;

*Draft – Subject to Change*

(2)    evidence that all necessary licenses and permits have been obtained from the state and all other governing bodies;

(3)    whether there is a demonstrated need for such license;

(4)    effect of the grant of the license on pedestrian or vehicular traffic, and parking, in proximity to the premises;

(5)    the existing noise level at the premises and any increase in noise level that would be generated by the proposed premises;

(6)    the history of cannabis violations and reported criminal activity at the proposed premises; and

(7)    any other factors specified by law or regulation that are relevant to determine that granting a license would promote public convenience and advantage of the community.

(c)    No registered organization or ROD license shall be granted for any premises which shall be:

(1)    within a 1,000-foot radius of a retail dispensary, microbusiness, or ROD license issued in a municipality having a population of 20,000 or more, unless the Board has determined that

*Draft – Subject to Change*

issuing a registration or license would serve a medical necessity; provided however, if the license is issued to a ROD for medical necessity, that only medical dispensing sites of the ROD, without a retail dispensary co-location, may be placed in that area; or

(2)    within a 2,000-foot radius of a retail dispensary, microbusiness, or ROD license issued in a municipality having a population of 20,000 or less, unless the Board has determined that issuing a registration or license would serve a medical necessity; provided however, if the license is issued to a ROD for medical necessity, that only medical dispensing sites of the ROD, without a retail dispensary co-location, may be placed in that area.

(d)    The Board may determine that issuing a registration or license would serve a medical necessity as described in paragraphs (1) and (2) of subdivision (c) of this section by considering the following factors, which shall include:

(1)    the number, classes, and character of other registered organizations, RONDs and RODs in proximity to the premises and in the particular municipality or subdivision thereof;

(2)    evidence that all necessary licenses and permits have been obtained from the state and all other governing bodies;

(3)    whether there is a demonstrated certified patient need for such license;

(4)    existing health disparities in the area;

39

*Draft – Subject to Change*

(5)     effect of the grant of the license on pedestrian or vehicular traffic, and parking, in proximity to the premises;

(6)     the existing noise level at the premises and any increase in noise level that would be generated by the proposed premises;

(7)     the history of cannabis violations and reported criminal activity at the proposed premises; and

(8)     any other factors specified by law or regulation that are relevant to determine that granting a license would address medical necessity of the community.

(e)     No on-site consumption license shall be granted for any premises which shall be within five hundred (500) feet of three (3) or more existing on-site consumption premises licensed and operating pursuant to this Title, unless the Board has determined that issuing the license would promote public convenience and advantage.

(f)     Distance In-between Cannabis Sites: The measurements in subdivision (a) of section 119.1 of this Title and subdivisions (a) and (c), of this section, are to be taken in a straight line from the center of the nearest entrance of the premises licensed and operating as a retail dispensary, on-site consumption, microbusiness, or ROD to:

*Draft – Subject to Change*

(1)    the center of the nearest entrance of the house of worship; and

(2)    the center of the nearest entrance of the nearest building on the school grounds, to the licensed premises, taken in a straight line; and

(3)    the center of the nearest entrance of such adult-use on-site consumption premises; and

(4)    the center of the nearest entrance of the nearest building of such public youth facility; or

(5)    if no entrance exists, the nearest structure of such public youth facility; or

(6)    if no structure exists, the nearest point of the grounds of the public youth facility's legally defined property boundary as registered in a county clerk's office; or

(7)    if no clear delineation of grounds exists, the nearest point of equipment, the primary purpose of which is reasonably expected to be used by children seventeen (17) years of age or younger.

*Draft – Subject to Change*

(g)    The measurement in paragraph (4) of subdivision (f) of this section is only applicable to the state of the public youth facility at the time the applicant has submitted notification to the municipality or New York City community board.

(h)    For purposes of this subdivision, the "entrance" shall mean a main door of a house of worship, a building on the school grounds, or public youth facility, if applicable, or of premises licensed and operating pursuant to this Title, regularly used to give ingress to the general public attending the house of worship, a building on the school grounds, public youth facility, the premises licensed and operating pursuant to this Title, or of the premises sought to be licensed, except that where a house of worship, a building on the school grounds, or public youth facility, premises licensed pursuant to this Title, or the premises sought to be licensed is set back from a public thoroughfare, the walkway or stairs leading to any such door shall be deemed an entrance; and the measurement shall be taken to the center of the walkway or stairs at the point where it meets the building line, structure if applicable for public youth facility, or public thoroughfare. Such definition shall not include cellars, back and side doors, delivery entrances, or emergency exits.

(i)    For such premises licensed or sought to be licensed as an adult-use retail dispensary, on-site consumption, or microbusiness, or RODs that are located in a multi-story building, the entrance shall mean any building entrance at the road level to be used for measurement purposes.

(j)    If the house of worship, nearest building on the school grounds, public youth facility, premises licensed and operating pursuant to this Title, or the premises sought to be licensed, is

42

*Draft – Subject to Change*

situated on a corner lot, such structure is considered to be on both roads of the intersection, whether or not there is an entrance to the structure on both roads.

(k)      A door which has no exterior hardware, or which is used solely as an emergency or fire exit, or for maintenance purposes, or which leads directly to a part of a structure not regularly used by the general public or patrons, is not deemed an "entrance."

(l)      Within the context of this section, a building occupied as a house of worship does not cease to be "exclusively" occupied as a house of worship by incidental uses that are not of a nature to detract from the predominant character of the building as a house of worship, such uses include, but are not limited to:

(1)      the conduct of legally authorized games of bingo or other games of chance held as a means of raising funds for the not-for-profit religious organization which conducts services at the house of worship or for other not-for-profit organizations or groups;

(2)       use of the structure for fund-raising performances by or benefitting the not-for-profit religious organization which conducts services at the house of worship or other not-for-profit organizations or groups;

(3)      the use of the building by other religious organizations or groups for religious services or other purposes;

43

*Draft – Subject to Change*

(4)     the conduct of social activities by or for the benefit of the congregants;

(5)     the use of the building for meetings held by organizations or groups providing bereavement counseling to persons having suffered the loss of a loved one, or providing advice or support for conditions or diseases including, but not limited to, alcoholism, substance use disorder, cancer, cerebral palsy, Parkinson's disease, or Alzheimer's disease; the use of the structure for blood drives, health screenings, health information meetings, yoga classes, exercise classes or other activities intended to promote the health of the congregants or other persons;

(6)     use of the structure by non-congregant members of the community for private social functions; and

(7)     The structure occupied as a house of worship does not cease to be "exclusively" occupied as a house of worship where the not-for-profit religious organization occupying the house of worship accepts the payment of funds to defray costs related to another party's use of the structure.

### § 119.5 Unreasonably Impracticable; Review and Determination.

(a)     Pursuant to subdivision (2) of section 131 of the Cannabis Law and this Part, no local law, rules, or actions of the municipality shall be effective or enforceable if such action otherwise impedes on duties and obligations of the Board as set forth under the Cannabis Law, violates any provision of the Cannabis Law or this Part, or discriminates against or frustrates the

*Draft – Subject to Change*

registrant, licensee, or permittee's ability to carry out the operation of such registration, license, or permit as issued by the Board.

(b)      Should an unreasonable impractical claim be brought before the Office by a claimant contesting the validity of such local law or regulation, the Board may conduct a review of such law and issue an advisory opinion as to whether the law is unreasonably impracticable.

(c)      Upon review and determination of an application to the Board, the Office shall send a copy of the advisory opinion to the claimant and the municipality from where the local law originates. If the local law:

(1)      is adopted prior to the advisory opinion, the advisory opinion shall be presumptive evidence that the local law violates subdivision 2 of section 131 of the Cannabis Law; or

(2)      be proposed but not adopted, the municipality shall be preempted from adopting the local law because the local law, if adopted, would be unreasonably impracticable, as determined by the Board, pursuant to subdivision 2 of section 131 of the Cannabis Law.

**§ 119.6 Severability**.

If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

*Draft – Subject to Change*

A new Part 120, titled Application and Licensure, is added to read as follows:

Part 120

Application and Licensure

**Part 120 – Application and Licensure.**

**§ 120.1   General Application and License Authorizations and Requirements**

**§ 120.2   Application for an Adult-Use Cannabis License.**

**§ 120.3 License Specific Tiers and Options.**

**§ 120.4 Fees.**

**§ 120.5 Filing of an Application.**

**§ 120.6 Processing of an Application.**

**§ 120.7 Application Eligibility and Evaluation.**

**§ 120.8 Application for Additional Licenses or License Type.**

**§ 120.9 Issuance of a License.**

**§ 120.10   License Duration.**

**§ 120.11   License Renewal.**

**§ 120.12   License Denials.**

**§ 120.13   Reapplication after License Denial.**

**§ 120.14   Voided Applications.**

**§ 120.15   Withdrawal of an Application.**

**§ 120.16   Standard for Reviewing Disqualified Offenses.**

*Draft – Subject to Change*

**§ 120.17   Notification and Reporting of Business Changes and Amendments for Applicants.**

**§ 120.18      Notification and Reporting of Business Changes and Amendments of Licensees.**

**§ 120.19      Licensed Premises for Cannabis Events.**

**§ 120.20      Opportunity to Cure.**

**§ 120.21      Severability.**

**§ 120.1 General Application and License Authorizations and Requirements.**

(a)       Applications for new license types and for additional licenses of existing license types may be accepted from time to time as may be deemed appropriate or necessary.

(b)       Licensing applications shall be accepted during specific license type application periods, which shall be announced no less than thirty (30) days before the application period opens for that specific license type, as established by the Board.

(c)       Limitations may be imposed on the acceptance of licensing applications, including, but not limited to, the total number of licenses; location or authorized region of operation; size of operation or output; limitations associated with true party of interest; eligibility criteria; and operating conditions, such as sustainability, public health and safety, and social and economic equity factors.

(d)       A licensing application shall be accompanied by an application fee, in the amount required by this Title, for such a license in the form and manner prescribed by the Office.

*Draft – Subject to Change*

(e)     An applicant may use an electronic signature on an application which shall be deemed intended by the applicant to have the same force and effect as the use of a signature affixed by hand.

(f)     Licenses granted pursuant to this Part may be granted, suspended, cancelled, revoked, or otherwise limited as may be deemed appropriate or necessary.

(g)     An applicant and licensee shall have an obligation to ensure that the information, documentation, attestations and assurances submitted to the Office are not fraudulent, false, or misleading.

(h)     An applicant shall identify any conflict of interest, including, without limitation, any relationship or affiliation of the applicant, or its true parties of interest, that currently exists with any member, employee, consultant, or agent of the Office, the Cannabis Advisory Board or the Board. The conflict of interest may be actual or perceived. If any conflict of interest should arise during the term of the application process, the applicant shall notify the Office in writing of such conflict.

(i)     A person shall hold a valid license issued pursuant to the Cannabis Law in order to cultivate, process, distribute, deliver, dispense, offer on-site consumption, test, research, sell, or any other licensed activity for adult-use cannabis and cannabis products within New York State.

*Draft – Subject to Change*

(j)     The information furnished in an application or in any supplemental statement related thereto shall be presumed correct and shall be binding upon an applicant and licensee as if correct. All information furnished in an application or supplemental statement and relied upon in considering an application shall be deemed material in:

(1)     any prosecution for perjury;

(2)     any proceeding to suspend, cancel or revoke a license or impose a fee or other penalty; and

(3)     the approval or denial of a license.

(k)     It is the duty of the licensee to comply with regulations, including, but not limited to, requirements that were imposed prior to the issuance of a license, at all times after receiving a license. Any inconsistencies or violations of these regulations or Cannabis Law, by the licensee, shall constitute grounds for penalties, including but not limited to fines, as well as license suspension, revocation, and debarment, as stated under Part 133 of this Title.

(l)     Requirements of this Part may be amended, abbreviated, otherwise altered, or waived at the discretion of the Board for Article 13-E smoking/vaping exception applicants and licensees that are a government or government subdivision or agency.

## § 120.2 Application for an Adult-Use Cannabis License.

*Draft – Subject to Change*

(a)      An applicant and each true party of interest in an applicant shall provide information in a form and manner as prescribed by the Board, which may include, but is not limited to the following:

(1)      Identity of the applicant or true party of interest.

(i)      If the applicant or true party of interest is an individual, the individual's:

*(a)*      name;

*(b)*      date of birth, corroborated by a copy of a valid photo identification containing the individual's date of birth issued by a local, state or federal government, which identification shall indicate the individual to be at least twenty-one (21) years of age;

*(c)*      name of spouse or domestic partner, if any;

*(d)*      social security number;

*(e)*      contact information;

*(f)*      any other aliases or names by which they have been known or conducted business at any time; and

*Draft – Subject to Change*

*(g)*    any other information required by the Office.

*(ii)*    If the applicant or true party of interest is an entity, including but not limited to, a partnership, limited liability company, corporation, trust or estate, for each entity, the following information shall be provided:

*(a)*    name;

*(b)*    address of the principal place of business;

*(c)*    telephone number;

*(d)*    all websites, social media sites, internet presence, and digital applications or platforms owned, operated or controlled by or registered to the applicant;

*(e)*     state or country of incorporation or organization, except in the case of a sole proprietor;

*(f)*    contact information of the designated individuals upon whom service shall be made;

*(g)*    federal employer identification number; and

*(h)*    other names by which it has been known or has conducted business at any time.

*Draft – Subject to Change*

*(iii)* the ownership interest percentages as specified under subparagraph (vii) of paragraph (2) of subdivision (a) of this section for each individual partner, member, member-manager or nonmember-manager, director, officer, trustee, certain shareholder, and each individual or entity true party of interest of the entity and of each level of ownership of the applicant, any information required under this section; and

*(iv)* any other information required by the Office.

(2) Applicant ownership and financial disclosures.

(i) the percentage of ownership interest, financial interest, or any other interest held in the applicant by the applicant's true parties of interest;

(ii) a list of all parent companies, subsidiaries, affiliates, predecessors, and successors of the applicant;

(iii) a description of any and all ownership changes between the initial information provided on the application and the date of submission, including, but not limited to, events such as asset sales and purchases, stock sales and purchases, mergers, business combinations, or consolidations involving the applicant, including all former names of the applicant;

(iv) copies of business formation and organizational documents, such as a certificate of incorporation, certificate of limited partnerships, certificates of authority, articles of

*Draft – Subject to Change*

organizations, charters, bylaws, partnership agreements, operating agreements, agreements between any two (2) or more persons of the applicant that relate in any manner to the assets, property or profit of the applicant, and any other comparable documents and agreements that sets forth the legal structure of the applicant or relate to the formation, organization, management or control of the business and all amendments and changes thereto;

(v)     personal histories or an entity history, as applicable, disclosure forms including, but not limited to, a person's residence, employment, licensure and conviction history;

(vi)     all proposed or executed contracts, term sheets, agreements, or side letters between the applicant or its true parties of interest and a goods and services provider to the applicant, other than those exempted pursuant to paragraph (1) of subdivision (a) of section 124.3 of this Title or non-exempt agreement pursuant to paragraph (1) of subdivision (b) of section 124.3 for a flat fee;

(vii)     capitalization tables listing specific holders of ownership above ten (10) percent of interest if the applicant is a private entity, and five (5) percent of interest for applicants who are publicly traded entities, including true parties of interest of all parents and holding entities relating back to all persons involved that meet these thresholds and any person with any future rights to ownership or revenue, as well as total undisclosed shared held in the entity;

(viii)     documents relating to the ownership structure of the applicant, showing all holding and parent companies, subsidiaries, and affiliates;

*Draft – Subject to Change*

(ix)    financial documents, including financial statements and tax documents of the applicant for the most recent fiscal year ending prior to the date the application is submitted, or any other comparable documents as may be reasonably required;

(x)    if the applicant was formed within the year preceding the application for licensure, provide financial statements for the period of time the applicant has been in existence and any pro forma financials used for business planning purposes;

(xi)    an organizational chart indicating the ownership structure of the applicant and all persons who have decision making authority, control and management over the applicant entity or its assets, including any board members, officers, and directors of the entity and any parent, holding, or management companies of the applicant. If the business entity has a parent company, include the name of each parent company's principal officers and the percentage of ownership interest of each principal officer;

(xii)    a description of any license or authorization in any other state or jurisdiction, currently or previously, to cultivate, process, manufacture, distribute, deliver, or sell cannabis or cannabis products in any form, held by the applicant or any true parties of interest of the applicant, and the following which may include, but not be limited to:

*(a)*    a copy of each license or authorizing document verifying licensure in that state or jurisdiction;

*Draft – Subject to Change*

*(b)* a statement granting permission to contact the appropriate regulatory agency that granted the license or authorization, or to authorize the Office to confirm the information contained in the application is true and accurate at its discretion; and

*(c)* if the license or authorization, was ever denied, suspended, cancelled, revoked or otherwise sanctioned, a copy of documentation so indicating, or a statement that the applicant or true party of interest of applicant was so licensed and was never sanctioned;

(xiii) details of any administrative proceeding or any governmental agency action in any jurisdiction during the past ten years in which the applicant or any of the true parties of interest of applicant:

*(a)* information on any fines, disciplinary actions or requirements, sanctions, or the equivalent, which came to a settlement agreement regarding a potential violation, or if a registration or license was cancelled, suspended, or revoked; or

*(b)* whether an applicant or its true parties of interest managed or served on the board of a business or nonprofit organization that was fined, disciplined, sanctioned, or the equivalent, or had a registration or license cancelled, suspended or revoked;

(xiv) information relating to a business continuity plan which shall mean a plan, in case the applicant, its owners, or its true parties of interest decide to leave the business; there is a material

*Draft – Subject to Change*

change in the applicant's ability to operate the business; or the applicant becomes otherwise unable to operate the business;

(xv)    a certificate of status or good standing from the governing state agency of the state of formation, certificate of assumed name, a certificate of authority to do business in New York from the New York Department of State, if the applicant is a foreign business, where applicable;

(xvi)    information regarding any relationship, agreement, or arrangement that may exist between the applicant or true parties of interest and any official or any other individuals with control over the approval of an application, including, but not limited to, employees of the Office and members of the Board;

(xvii)    whether the applicant or any true party of interest of applicant:

*(a)*    is out of compliance with section 3-503(2) of the General Obligations Law section;

*(b)*    has been disciplined or sanctioned by a state or federal agency; or

*(c)*    has had any state or federal tax liens against any of their property;

(xviii)    a list of any charitable contributions by the applicant in the last five (5) years, exceeding $5,000 annually or greater than $250,000 collectively for the applicant's donation history;

*Draft – Subject to Change*

(xix)    designation of each portion of the application that the applicant considers to be exempt from disclosure under the New York State Freedom of Information Law including, but not limited to certain trade secrets or commercial information;

(xx)    a copy of the labor peace agreement between the applicant and a bona fide labor organization and an attestation that the applicant understands that the maintenance of such a labor peace agreement shall be an ongoing material condition of the license; and

(xxi)    any other additional information requested by the Office.

(3)    Criminal history and legal proceedings. For the applicant and its true party of interest, other than its passive investors or otherwise determined by the Office:

(i)    fingerprints, except for individuals described in clause (h) of subparagraph (i) of paragraph (105) of subdivision (a) of section 118.1 of this Title, in a form and manner as specified by the Office for purposes of obtaining a criminal history report from the New York State Division of Criminal Justice Services. Fingerprints submitted shall be transmitted to the New York State Division of Criminal Justice Services and may be submitted to the federal bureau of investigations for state and national criminal history information checks;

(ii)    information regarding legal actions, including, but not limited to:

*Draft – Subject to Change*

*(a)*     any pending legal actions, whether civil, criminal or administrative in nature, and a brief description of any such actions;

*(b)*     any settled or closed legal actions, whether civil, criminal or administrative in nature, against the applicant over the past ten (10) years;

*(c)*     any judgments within the past ten (10) years including the court, case name, case number, a summary of the facts, the cause of action and what the final ruling or determination was from the court, administrative body or other tribunal;

*(d)*     any judgments within the past ten (10) years including the court, case name, case number, a summary of the facts, the cause of action and what the final ruling or determination was from the court, administrative body or other tribunal;

*(e)*     any order, judgment, or decree of any court, administrative body or other tribunal of competent jurisdiction permanently or temporarily enjoining it from or otherwise limiting its participation in any type of business, practice, or activity within the last ten (10) years;

*(f)*     information on any bankruptcies, voluntary or involuntary, assignments for the benefit of creditors, appointments of a receiver or custodian or similar insolvency proceedings made, commenced or pending during the past ten (10) years by or involving any applicant;

*Draft – Subject to Change*

(g)    a description of any delinquencies in the payment of any fees or tax required under any federal, state, or municipal law within the past ten (10) years and description of the circumstance for any payment not made because of a dispute regarding the payment of those fees or taxes; and

(iii)    evidence regarding good moral character, which may include, but not be limited to the applicants:

(a)    criminal history information;

(b)    court documents;

(c)    arrest reports;

(d)    accusatory instruments; and

(e)    fingerprint responses.

(4)    Premises. Applicants shall be required to provide additional information regarding its premises where licensed activities will occur. The required premises information shall include, but is not limited to:

(i)    information identifying any person that receives payment for rent under a lease or rental agreement relating to the applicant or the premises to be licensed;

*Draft – Subject to Change*

(ii)     information identifying the premises to be licensed which may include, but is not limited to, the street name and number, photographs, GPS coordinates, architectural drawings or other items related to the appearance of the interior or exterior of such premises, and floor plans of the interior of any structures being utilized on the premises;

(iii)     the nature of the applicant's interest in the premises, whether leased or owned, and the name of any other person interested as a partner, joint venturer, investor or lender, mortgage holder or mortgage guarantor, or by any other means, with the applicant in the premises;

(iv)     a statement that the location and layout of the premises to be licensed does not violate any requirement of the Cannabis Law and this Title relating to the location and layout of the licensed premises;

(v)     a statement from the applicant that they have complied notification requirements pursuant to section 76 of the Cannabis Law relating to a municipality in which the applicant intends to locate the licensed premises, where applicable;

(vi)     a copy of a certificate of occupancy or its equivalent for the licensed premises;

(vii)     copies of all applicable executed and proposed deeds, leases, rental agreements or executed option contracts related to the licensed premises, provided before the applicant begins operations, the documents shall demonstrate the applicant possesses or has the right to use

*Draft – Subject to Change*

sufficient land, buildings, and other premises as specified in the application to properly carry on the activities for which licensure is sought;

(viii)    documentation acceptable to the Office, that the applicant will be able to obtain insurance sufficient to indemnify and hold harmless the state and its officers and employees;

(ix)    any other information as determined by the Board.

(5)    Social and Economic Equity. An applicant seeking to qualify as a social and economic equity applicant shall provide information proving their qualification as described in Part 121 of this Title.

(b)    The Board may grant a provisional license if the applicant submits all the same materials required to be submitted for a final license for the same adult-use license type, except the following:

(1)    requirements for information regarding a premises under paragraph (4) of subdivision (a) of this section; and

(2)    information relating to evaluation of applicants based on premises information, if applicable.

**§ 120.3 License Specific Tiers and Options.**

*Draft – Subject to Change*

(a)    Nursery License:

(1)    All nursery applicants shall obtain a Nursery Grower Certificate of Registration from the New York State Department of Agriculture and Markets Division of Plant Industry prior to licensure by the Board.

(2)    An applicant for a nursery license shall indicate the type of nursery license it seeks to operate based on the size and type of nursery area as set forth below:

(i)    Nursery Outdoor: for an outdoor nursery area with a maximum area of 100,000 square feet;

(ii)    Nursery Mixed-Light: for a mixed light nursery area with a maximum area of 10,000 square feet; or

(iii)    Nursery Indoor: for an indoor nursery area with a maximum area of 10,000 square feet.

(b)    Cultivator License. An applicant for a cultivator license shall indicate the license tier in which it seeks to operate based on the size of the cultivation canopy and the type of cultivation as set forth below.

(1)    A cultivator license may choose from the following four (4) different types of cultivation: (i) outdoor, (ii) mixed light, (iii) combination of outdoor with mixed light, or (iv) indoor. A

*Draft – Subject to Change*

cultivator may only have one (1) cultivator license which will authorize the cultivator only one (1) type of cultivation and canopy tier as approved on the cultivator's application.

(2)     Indoor, Mixed-light, or Outdoor Cultivator Cultivation Tiers: A cultivator that is authorized to cultivate indoor, mixed-light, or outdoors is authorized to cultivate cannabis in one (1) of the following canopy tiers as authorized on the licensee's application:

(i)     Tier 5. Greater than 50,000 square feet and up to but not exceeding 100,000 square feet.

(ii)    Tier 4. Greater than 25,000 square feet and up to but not exceeding 50,000 square feet;

(iii)   Tier 3. Greater than 12,500 square feet and up to but not exceeding 25,000 square feet;

(iv)    Tier 2. Greater than 5,000 square feet and up to but not exceeding 12,500 square feet; or

(v)     Tier 1. Up to, but not exceeding 5,000 square feet;

(3)     Combination Cultivator Cultivation Tiers. A cultivator is authorized to cultivate outdoors with mixed light in one (1) of the following canopy tiers:

*Draft – Subject to Change*

(i)      Tier 5 Combination Cultivator. Greater than 50,000 square feet and up to but not exceeding 100,000 square feet of outdoor, and greater than 15,000 square feet and up to but not exceeding 30,000 square feet of mixed light.

(ii)     Tier 4 Combination Cultivator. Greater than 25,000 square feet and up to but not exceeding 50,000 square feet of outdoor, and greater than 12,500 square feet and up to but not exceeding 15,000 square feet of mixed light;

(iii)    Tier 3 Combination Cultivator. Greater than 12,500 square feet and up to but not exceeding 25,000 square feet of outdoor, and greater than 6,250 square feet and up to but not exceeding 12,500 square feet of mixed light;

(iv)     Tier 2 Combination Cultivator. Greater than 5,000 square feet, and up to but not exceeding 12,500 square feet of outdoor, and greater than 2,500 square feet and up to but not exceeding 6,250 square feet of mixed light; or

(v)      Tier 1 Combination Cultivator. Up to but not exceeding 5,000 square feet of outdoor and 2,500 square feet of mixed light;

(4)      A cultivator shall not expand or reduce its cultivation canopy beyond its licensed cultivation tier unless it has applied to the Office and received prior written approval from the Office. A cultivator license pursuant to paragraph (iv) of subdivision (f) of this section shall only be eligible to expand into a Tier 3 Mixed Light license.

*Draft – Subject to Change*

(5)    At the time of license renewal, cultivators shall provide inventory and production records requested by the Office during the six (6) months prior to the application for renewal. As part of the license renewal process, the Office may recommend that the Board excerise its discretion to reduce the licensee's maximum cultivation canopy based on the same criteria pursuant to subdivison (g) of this section. Upon such recommendation and prior to Board making a determination, the licensee shall be given notice and reasonable time to appeal the Office's recommendation before the Board.

(c)    Microbusiness License. An applicant for a microbusiness license shall indicate on the application for licensure the activities in which the applicant intends to engage, including:

(1)    The license tier, which shall be limited to one, in which it seeks to operate based on the size of the cultivation canopy and the type of cultivation as set forth below:

(i)    Indoor canopy not to exceed 3,500 square feet;

(ii)    Mixed light canopy not to exceed 5,000 square feet; or

(iii)    Outdoor canopy not to exceed 10,000 square feet.

(iv)    Combination canopy not to exceed outdoor canopy of 5,000 square feet and mixed-light canopy of 2,500 square feet.

*Draft – Subject to Change*

(2)      the processing activities in which the applicant intends to engage, including:

(i)      extracting;

(ii)      blending and infusing;

(iii)      packaging and labeling; or

(iv)      branding, including for the exclusive performance of white labeling agreements.

(3)      In determining whether to approve a microbusiness licensee to transition to a cultivator license, the Board may consider the factors set forth subdivision (g) of this section.

(4)      Microbusiness licensees shall be authorized to expand their cultivation canopy subject to the same conditions and criteria as set forth for cultivator licenses in section 123.4 of this Title, however upon expanding canopy size, a microbusiness shall only be eligible to transfer to a cultivation-only license tier, pursuant to subdivision (b) of section 120.3 of this Title.

(d)      Processor License. An applicant for a processor license shall indicate on the application for licensure the processing activities in which the applicant intends to engage in, including:

(1)      extracting;

*Draft – Subject to Change*

(2)      blending and infusing;

(3)      packaging and labeling; or

(4)      branding, including for the exclusive performance of white labeling agreements.

(e)      Cooperative and collective license. An applicant seeking to qualify for a license under Section 70 of Cannabis Law shall:

(1)      be formed as an entity under one (1) of the following:

(i)      the New York State Cooperative Corporations Law;

(ii)      subdivision (h) or (i) of section 123.13 of this Title; or

(iii)      as otherwise approved by the Office.

(2)      at minimum, meet the business authorizations and prohibitions set out in section 123.13 of this Title; and

(3)      indicate on the application for licensure the number of members in the cooperative or collective, the facility type, the size of the cultivation canopy, and the type of cultivation as set forth below:

*Draft – Subject to Change*

| Sq ft (000's) per Number of Members that Contribute Primarily with Labor in the Cooperative or Collective | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Facility Type** | Number of Members | | | | | | | | | | |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15+ |
| **Indoor** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 100 | 100 | 100 | 100 |
| *Tier* | *1* | *2* | *2* | *3* | *3* | *3* | *3* | *3* | *3* | *3* | *3* |
| | | | | | | | | | | | |
| **Mixed-Light** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 112.5 | 125 | 125 | 125 |
| **Combination Mixed-Light & Outdoor** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 112.5 | 125 | 125 | 125 |
| **Outdoor** | 25 | 37.5 | 50 | 62.5 | 75 | 87.5 | 100 | 112.5 | 125 | 137.5 | 150 |
| *Tier* | *1* | *2* | *2* | *3* | *3* | *3* | *3* | *4* | *4* | *4* | *4* |

(4)    The applicant shall indicate the types of processing activities that the applicant intends to engage in, pursuant to subdivision (d) of this section.

(5)    Cooperative or Collective License Renewal. The cooperative or collective licensee shall provide records requested by the Office during the six (6) months prior to when the cooperative or collective licensee applies for renewal of their cooperative or collective license. The Office may recommend that the Board exercise its discretion to reduce the cooperative or collective licensee's maximum cultivation canopy based on cultivation canopy utilization rates and harvested product sale history over a minimum period of the previous twelve (12) months. Upon such recommendation and prior to Board making a determination, the licensee shall be given notice and an opportunity to appeal the Office's recommendation before the Board.

*Draft – Subject to Change*

(f)      Conditional Cultivator License. The Office shall approve the transition of a conditional

cultivator, determined to be in good standing by the Office.

(1)      The conditional cultivator licensee must complete any required forms, submit any

necessary information, and pay the corresponding fee, required by the Office, to one (1) of the

following license types they chose to transition into:

(i)      a Tier 1 through 4 outdoor cultivator licenses as provided in subdivision (b) of this

section;

(ii)      a Tier 1 or 2 mixed-light cultivator license as provided in subdivision (b) of this section;

(iii)      a Tier 1 or 2 combination cultivator license as provided in subdivision (b) of this section;

(iv)      an adult-use cultivator license authorized for up to 25,000 square feet of mixed light

cultivation canopy with no more than 20 lights, provided however, neither the Office nor the

Board shall authorize an increase in the number of lights for this license type without the

issuance of regulations;

(v)      a microbusiness license; or

(vi)      an outdoor or mixed light cooperative or collective license, provided the cooperative or

collective license includes at least five (5) adult-use conditional cultivators that are transitioning

69

*Draft – Subject to Change*

to adult-use cultivators and meet all other requirements to obtain a cooperative or collective license.

(2)     The Office shall prioritize review of conditional cultivator applications for a cultivator, processor, or distributor license pursuant to this Title.

(g)     The following factors may be considered in determining whether to approve a cultivator, cooperative or collective, ROND, or ROD to change its canopy tier or maximum cultivation canopy, including, but not limited to, the licensee's:

(1)     cultivation canopy utilization rates and harvested product sale history over a minimum period of the previous twelve (12) months;

(2)     whether the licensee's plants or inventory suffered a catastrophic event during the licensing period;

(3)     cannabis transfers and sales history;

(4)     existing inventory and a licensee's inventory history;

(5)     adherence to any plan required pursuant to this Title, including, but not limited to, the licensee's operating plan, energy and environmental plan, and community impact plan;

*Draft – Subject to Change*

(6)    the criteria set forth in subdivision (b) of section 120.7 of this Title; and

(7)    any other factors determined by the Board.

## § 120.4 Fees.

(a)    Application Fees. All applications shall be accompanied by a non-refundable application fee of $1,000 unless otherwise set forth in this section.

(1)    Applications for an ROD and ROND license shall be accompanied by a non-refundable application fee of $10,000.

(b)    Licensing Fees. Prior to final issuance of a license, an applicant shall pay a licensing fee for the specific license type as follows:

(1)    Adult-Use Nursery License:

(i)    Maximum indoor nursery area of 10,000 square feet - $2,000

(ii)    Maximum mixed light nursery area of 10,000 square feet - $1,000; or

(iii)    Maximum outdoor nursery area of 100,000 square feet - $750;

*Draft – Subject to Change*

(2)    Adult-Use Cultivator License:

(i)    Outdoor Tier 5 - $40,000 + $800/500 square feet of cultivation canopy over 50,000 square feet, not exceeding 100,000 square feet;

(ii)    Outdoor Tier 4 - $15,000 + $500/500 square feet of cultivation canopy over 25,000 square feet, not exceeding 50,000 square feet;

(iii)    Outdoor Tier 3 - $6,250 + $350/500 square feet of cultivation canopy over 12,500 square feet, not exceeding 25,000 square feet;

(iv)    Outdoor Tier 2 - $2,500 + $250/500 square feet of cultivation canopy greater than 5,000 square feet, not exceeding 12,500 square feet;

(v)    Outdoor Tier 1 - $1,000 + $150/500 square feet of cultivation canopy not exceeding 5,000 square feet;

(vi)    Mixed Light Tier 5- $70,000 + $1,400/500 square feet of cultivation canopy over 50,000 square feet, not exceeding 100,000 square feet;

(vii)    Mixed Light Tier 4- $26,250 + $875/500 square feet of cultivation canopy over 25,000 square feet, not exceeding 50,000 square feet;

*Draft – Subject to Change*

(viii)    Mixed Light Tier 3- $10,940 + $615/500 square feet of cultivation canopy over 12,500 square feet;

(ix)    Mixed Light Tier 2- $4,380 + $440/500 square feet of cultivation canopy over 5,000 square feet, not exceeding 12,500 square feet;

(x)    Mixed Light Tier 1 - $1,500 + $290/500 square feet of cultivation canopy not exceeding 5,000 square feet;

(xi)    Indoor Tier 5 - $100,000 + $2,000/500 square feet of cultivation canopy over 50,000 square feet, not exceeding 100,000 square feet;

(xii)    Indoor Tier 4 - $37,500 + $1,250/500 square feet of cultivation canopy over 25,000 square feet, not exceeding 50,000 square feet;

(xiii)    Indoor Tier 3- $15,630 + $880/500 square feet of cultivation canopy over 12,500 square feet, not exceeding 25,000 square feet;

(xiv)    Indoor Tier 2 - $6,250 + $625/500 square feet of cultivation canopy over 5,000 square feet, not exceeding 12,500 square feet;

*Draft – Subject to Change*

(xv)     Indoor Tier 1- $1,750 + $450/500 square feet of cultivation canopy not to exceed 5,000 square feet;

(xvi)     Tier 5 Combination - $56,000 + $860/500 square feet of cultivation canopy greater than 50,000 square feet, but not exceeding 100,000 square feet of outdoor, and greater than 15,000 square feet but not exceeding 30,000 square feet of mixed light;

(xvii)     Tier 4 Combination - $21,000 + $585/500 square feet of cultivation canopy greater than 25,000 square feet, but not exceeding 50,000 square feet of outdoor, and greater than 12,500 square feet but not exceeding 15,000 square feet of mixed light;

(xviii)   Tier 3 Combination - $8,750 + $375/500 square feet of cultivation canopy greater than 12,500 square feet, but not exceeding 25,000 square feet of outdoor, and greater than 6,250 square feet but not exceeding 12,500 square feet of mixed light;

(xix)     Tier 2 Combination - $3,500 + $235/500 square feet of cultivation canopy greater than 5,000 square feet, but not exceeding 12,500 square feet of outdoor, and greater than 2,500 square feet but not exceeding 6,250 square feet of mixed light;

(xx)     Tier 1 Combination – $1,250 + $150/500 square feet of cultivation canopy not exceeding 5,000 square feet of outdoor and 2,500 square feet of mixed light;

*Draft – Subject to Change*

(xxi)    Adult-use conditional cultivator transition (not exceeding 25,000 square feet of cultivation canopy, no more than 20 lights) - $19,000.

(3)    Adult-Use Processor License:

(i)    Extracting, Infusing and Blending, and Packaging, Labeling and Branding: $7,000 per processing premises;

(ii)    Infusing and Blending, and Packaging, Labeling, and Branding: $4,000 per processing premises;

(iii)    Packaging, Labeling, and Branding, including for the exclusive performance of written white labeling agreements: $2,000 per processing premises, provided, however, if applying as a Tier 1 or Tier 2 Cultivator Licensee of any cultivation type, the processor license fee shall be $500.

(4)    Adult-Use Cooperative or Collective Licensing Fees.

(i)    Cultivation. Fees for cooperative or collective license cultivation canopy sizes are as follows:

*Draft – Subject to Change*

*(a)*      Cooperative or Collective Outdoor Tier 4 - $120,000 + $1,000/500 square feet of cultivation canopy greater than 100,000 square feet, and up to but not to exceed 150,000 square feet;

*(b)*      Cooperative or Collective Outdoor Tier 3 - $40,000 + $800/500 square feet of cultivation canopy over 50,000 square feet, and up to but not to exceed 100,000 square feet;

*(c)*      Cooperative or Collective Outdoor Tier 2 - $15,000 + $500/500 square feet of cultivation canopy over 25,000 square feet, and up to but not to exceed 50,000 square feet;

*(d)*      Cooperative or Collective Outdoor Tier 1- $6,250 + $350/500 square feet of cultivation canopy over 12,500 square feet, and up to but not to exceed 25,000 square feet;

*(e)*      Cooperative or Collective Mixed Light Tier 4 - $210,000 + $1,500/500 square feet of cultivation canopy greater than 100,000 square feet and up to but not to exceed 125,000 square feet;

*(f)*      Cooperative or Collective Mixed Light Tier 3 - $70,000 + $1,400/500 square feet of cultivation canopy over 50,000 square feet;

*(g)*      Cooperative or Collective Mixed Light Tier 2 - $26,250 + $875/500 square feet of cultivation canopy over 25,000 square feet, and up to but not to exceed 50,000 square feet;

*Draft – Subject to Change*

*(h)*     Cooperative or Collective Mixed Light Tier 1 - $10,940 + $615/500 square feet of cultivation canopy over 12,500 square feet, and up to but not to exceed 25,000 square feet;

*(i)*     Cooperative or Collective Indoor Tier 3 - $100,000 + $2,000/500 square feet of cultivation canopy over 50,000 square feet, and up to but not to exceed 100,000 square feet;

*(j)*     Cooperative or Collective Indoor Tier 2 - $37,500 + $1,250/500 square feet of cultivation canopy over 25,000 square feet, and up to but not to exceed 50,000 square feet;

*(k)*     Cooperative or Collective Indoor Tier 1- $15,630 + $880/500 square feet of cultivation canopy over 12,500 square feet, and up to but not to exceed 25,000 square feet;

*(l)*     Cooperative or Collective Combination Tier 4 - $168,000 + $900/500 square foot of cultivation canopy greater than 100,000 square feet, and up to but not to exceed 125,000 square feet.

*(m)*     Cooperative or Collective Combination Tier 3 - $56,000 + $860/500 square feet of cultivation canopy over 50,000 square feet, and up to but not to exceed 100,000 square feet;

*(n)*     Cooperative or Collective Combination Tier 2 - $21,000 + $585/500 square feet of cultivation canopy over 25,000 square feet, and up to but not to exceed 50,000 square feet;

*Draft – Subject to Change*

*(o)*      Cooperative or Collective Combination Tier 1- $8,750 + $375/500 square feet of cultivation canopy over 12,500 square feet, and up to but not to exceed 25,000 square feet;

(ii)      Cooperative or Collective Processor Licenses: $5,000 per processing premises.

(iii)      Cooperative or Collective Distributor License: $3,500 per operating premises.

(5)      Adult-Use Distributor License: $7,000 per operating premises.

(i)      Fees for an adult-use processor licensee that is applying for an adult-use distributor license: $3,500 per operating premises.

(6)      Adult-Use Retail Dispensary License: $7,000.

(7)      Adult-Use Retail Dispensary with a limited retail consumption facility: $10,000

(8)      Adult-Use Microbusiness License: $4,500.

(9)      Adult-Use Delivery License: $4,500.

(10)      ROND Licensing Fee: Fees for the activities for which a ROND is licensed are as follows:

*Draft – Subject to Change*

(i)      adult-use cultivation: the Tier 5 indoor, outdoor, mixed-light or combination cultivation tier for which the ROND is licensed pursuant to paragraph (2) of subdivision (b) of this section;

(ii)      adult-use processing: based on the activities taking place under the license pursuant to paragraph (3) of subdivision (b) of this section; and

(iii)      adult-use distribution: fees pursuant to paragraph (5) of subdivision (b) of this section.

(11)      ROD Licensing Fees. A ROD licensee shall pay a license fee of $175,000 in addition to the fee associated with a Tier 5 adult-use cultivation canopy as set forth in paragraph (2) of subdivision (b) of this section, as well as a one-time special licensing fee of $20 million. Such special fee shall be paid as follows:

(i)       at least $5 million due at the time the ROD license is issued; and

(ii)       the remainder paid as follows:

*(a)*       $5 million paid within 180 days of the opening of the ROD's second co-located dispensary;

*(b)*       $5 million installments paid within 30 days of each $100 million in revenue generated by the ROD, up to $200 million; and

*Draft – Subject to Change*

(iii)     the balance of the $20 million special licensing fee shall be paid by December 31, 2033, unless aggregate New York State cannabis retail and wholesale revenues are less than $20 billion, in which case the ROD shall be responsible for no further payment installments of the special fee. Should the ROD license expire, or otherwise be revoked, cancelled, or abandoned, before December 31, 2033, the ROD shall be required to pay the remainder of the $20 million special fee.

(c)     Reduced, Waived or Deferred fees. An applicant may pay a reduced, waived or deferred application or license fee as follows:

(1)     if the applicant qualifies as a social and economic equity applicant as set forth in section 121.1 of this Title, then a 50% reduction, waiver, or deferred fee;

(2)     any other supplemental reduction, waiver or deferred fee as determined by the Board for the purposes of providing financial assistance to an applicant who demonstrates sufficient needs; or

(3)     for any retail dispensary, microbusiness, or ROD licensee authorized for retail sales who contracts with a delivery licensee meeting the definition of a licensee from a community disproportionately impacted, extra priority applicant, distressed farmer, and service-disabled veteran owned business, to fulfill the majority of cannabis product deliveries to cannabis consumers during the course of the expiring licensing period, then a 40% reduction in the retail dispensary licensee renewal fees.

*Draft – Subject to Change*

(d)      An applicant shall pay any fees for amendments or changes to an application as determined by the Board.

(e)      Upon application for license renewal, a licensee shall pay renewal fees equivalent to the fees paid for the initial license, or as otherwise determined by the Board; provided, however, a ROND shall only pay the license fee set out in paragraph (10) of subdivision (b) of this section upon initial licensure.

(f)      Applicants and licensees shall pay any other administrative fees imposed by the Board related to application and licensing submissions and amendments as may be determined in future guidance.

## § 120.5 Filing of an Application.

(a)      No application for a license shall be deemed complete for filing with the Office pursuant to this Part until the following:

(1)      all information conforming to all requirements relating to format, signature, oath or affirmation have been properly submitted, and all copies of documents provided, as the Office may require;

(2)      all requested and required disclosures have been properly submitted;

*Draft – Subject to Change*

(3)    all required consents, waivers, fingerprint responses, and photographs have been properly submitted;

(4)    all information, documentation, attestations and assurances and other materials required have been submitted with the application; and

(5)    all fees have been paid.

**§ 120.6 Processing of an Application.**

(a)    Only completed applications may be processed. The processing of an application shall not constitute an acknowledgment that the requirements of the Cannabis Law or this Title have been satisfied.

**§ 120.7 Application Eligibility and Evaluation.**

(a)    Eligibility for adult-use cannabis licenses. An applicant for an adult-use cannabis license pursuant to Article 4 of the Cannabis Law shall satisfy the following minimum requirements to be eligible for a license:

(1)    An applicant shall provide information in a form and manner as prescribed by the Board, which shall demonstrate the eligibility for the license type being sought; and

*Draft – Subject to Change*

(2)      In order to apply for a ROND or a ROD license, a registered organization shall be in good standing with the Office and have four (4) medical dispensing sites, located in New York State, dispensing to patients and submit the following:

(i)      a community impact plan as described in section 121.4 of this Title;

(ii)      the plans described in Part 125 of this Title as required by the Board on the application;

(iii)      any other information required by the Office.

(b)      Applicant Review. An applicant for an adult-use cannabis license shall be reviewed and evaluated in an order and manner determined by the Board, based on provisional, social and economic equity status or any additional criteria to be set by the Board at the time of the opening of the application period. Such criteria may include, but is not limited to:

(1)      the selection criteria detailed in section 64 of the Cannabis Law;

(2)      the applicant's community impact plan, as defined in section 121.4 of this Title, highlighting the applicant's proposed strategy for community engagement;

(3)      submissions of any plans pursuant to Part 125 of this Title required by the Board, demonstrating planned compliance with standards and regulations, and highlighting

83

*Draft – Subject to Change*

technologies, techniques, and strategies to protect the surrounding environment, limit carbon footprint, and leverage sustainable energy sources;

(4)      completion of any workforce or training programs offered by the Office and completed by the applicant;

(5)      the applicant's history in creating or maintaining an equitable workplace environment through the review of previous business and management practices including, but not limited to:

(i)      wages, including, but not limited to:

*(a)*      starting hourly rates for hourly workers;

*(b)*      starting salary for salaried workers; and

*(c)*      average annual wage percent increases in the last three (3) years by classification of employee;

(ii)      benefits, including, but not limited to:

*(a)*      number of hourly employees with 100% employer paid medical premiums;

*(b)*      number of hourly employees receiving Family, Single +1 coverage;

*Draft – Subject to Change*

(c)    number of hourly employees with employee co-contributions for medical coverage; or

(d)    employer paid retirement benefits such as 401(k) match or direct contributions;

(iii)    training, including, but not limited to, health and safety training;

(iv)    retention rates; and

(v)    diversity in hiring and promotion.

(6)    history in creating or delivering culturally and linguistically competent services to diverse and underserved populations including, but not limited to:

(i)    training programs;

(ii)    multilingual services;

(iii)    published materials and curricula;

(iv)    community outreach;

(v)    administrative and organizational accommodations; and

*Draft – Subject to Change*

(vi)     any other criteria deemed necessary by the Office;

(7)     serving in community leadership roles within established and licensed businesses, nonprofits, religious organizations, educational institutions, philanthropic organizations, community clubs, neighborhood associations, cooperative development and bona fide labor organization and any other qualifications deemed sufficient by the Office;

(8)     supporting evidence that demonstrates the applicant's ability, capacity, and any initial steps taken to meet the Board's standards for the plans in paragraphs (2) and (3) of this subdivision;

(9)     the relative performance of applicants based on such criteria;

(10)     for applications from entities with twenty-five (25) or more employees, the Office shall give consideration to whether applicants have entered into an agreement with a statewide or local bona-fide building and construction trades organization for construction work on its licensed facilities;

(11)     the applicant's qualifications for provisional licensing status; and

(12)     any other information requested by the Office.

*Draft – Subject to Change*

(c)      Approval. The Board may approve licenses using mechanisms, including but not limited to, scoring, compliance-based evaluation, qualified lottery, randomized ordering, or any combination thereof.

(1)      The Board will determine the eligibility criteria for each license type, including provisional licenses.

(2)      The Board may prioritize application submission, review, selection and issuance by region, license type, provisional status, social and economic equity status, or any other criteria the Board may determine.

(3)      Application submission, review, selection, and issuance may be prioritized by groupings consistent with section 87 of the Cannabis Law, such as:

(i)      A group consisting only of applications that demonstrate the applicants are eligible for extra priority as defined in section 121.1 of this Title provided the applicant is seeking to qualify as a social and economic equity applicant and:

*(a)*      is a member of a community disproportionately impacted by the enforcement of cannabis prohibition,

*(b)*      has an income lower than 80% of the median income of the county in which the applicant resides, and

87

*Draft – Subject to Change*

*(c)*    was convicted of a marihuana-related offense prior to the effective date of the Marihuana Regulation and Taxation Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Marihuana Regulation and Taxation Act, was convicted of a marihuana-related offense.

(ii)    A group consisting only of applications that meet the definition of distressed farmer as described in subdivision (h) of section 121.1 of this Title;

(iii)    A group consisting only of applications that meet the definition of service-disabled veteran as described in subdivision (i) of section 121.1 of this Title;

(iv)    A group consisting only of applications that demonstrate the applicant is from a community disproportionately impacted by the enforcement of cannabis prohibition as described in subdivision (d) of section 121.1; and

(v)    A group consisting of all other applications not included in the categories in subparagraphs (i) through (iv) of this paragraph.

(4)    Applications may be considered in multiple groups pursuant to their eligibility for such groups.

*Draft – Subject to Change*

(d)      An applicant shall submit the required license fee pursuant to section 120.4 of this Title upon Board approval. Those who receive a provisional license shall only pay the license fee upon licensure.

(e)      If an applicant is approved by the Board, the applicant shall be subsequently issued a provisional license or license. Such provisional license or license shall be subject to conditions specified by the Board.

(f)      If a provisional licensee fails to satisfy the conditions determined by the Board, the application will be deemed incomplete and a license to operate will not be issued.

## § 120.8 Application for Additional Licenses or License Type.

(a)      A licensee applying for any additional licenses or license types shall do so in a form and manner required by the Board and shall remit the required application and license fees as set forth in section 120.4 of this Title:

(1)      for an additional license type authorized by the Cannabis Law and this Title, different than the license a licensee currently holds, the licensee shall file an application for the additional license sought and shall pay the application and license fee for each additional license type sought;

(2)      for an additional license of the same type as the licensee currently holds and is authorized pursuant to the Cannabis Law and this Title, with no amendments or changes to the business

*Draft – Subject to Change*

information, ownership, or true parties of interest, the licensee may file an abridged application in a form and manner required by the Board for the additional license; or

(3)      to amend or change a current license type to another license type, the licensee may submit an application for the new license type while maintaining their current license type.

(b)      A licensee may maintain its current license type during the processing of the application for a new license. If the licensee is prohibited by the Cannabis Law from holding simultaneously their current license and the new license sought, then the licensee shall be required to provide notice to the Office in writing that the licensee is surrendering its current license prior to the issuance of the new license. Unless lawfully required otherwise, any licensee providing such notice of surrender to the Office shall provide a copy of such notice to its workforce no later than thirty (30) days prior to notifying the Office of its intention to surrender the license, provided, however, if the licensee has more than fifty (50) employees, the licensee shall notify their workforce sixty (60) days prior to notifying the Office.

(c)      If the application pursuant to this section is denied or non-selected for a license, the non-selection or denial shall not affect the licensee's current license and shall nullify the notice of surrender.

(d)      The Office may prioritize the review of an applicant's request for an additional license provided that applicant already has a license.

90

*Draft – Subject to Change*

**§ 120.9 Issuance of a License.**

(a)      No license shall be considered, issued, or effective without final approval of the Board.

(b)      An application for licensure under this Part shall only be approved by the Board if:

(1)      a complete application has been submitted to the Office along with all necessary fees pursuant to section 120.4 of this Title;

(2)      the application demonstrates, to the satisfaction of the Board, that the applicant will operate pursuant to Article 4 of the Cannabis Law and this Title;

(3)      the applicant is ready, willing and able to properly carry on the activities set forth in the application; and

(4)      the applicant is of good moral character.

(c)      Applicants may apply for and receive a provisional license as defined in section 118.1 of this Title. Such application may withhold required elements under this Title that would be required otherwise to commence licensed activities, including, but not limited to, the right to use a proposed premises, as evidenced by means of a title, deed, or signed lease operational plans, or disclosure of true parties of interest. A provisional license shall convert into a final approval upon the Board's receipt, to its satisfaction, of all outstanding information required for final approval prior to the deadline for submission of such outstanding information; as prescribed by

91

*Draft – Subject to Change*

the Board. An applicant shall submit all outstanding information required for final license

approval within twelve (12) months of receive a provisional license unless otherwise approved

by the Board.

(d)     Licenses issued under this Title shall be effective upon date that the license is issued and

shall specify the following information:

(1)     name of the licensee;

(2)     address of the real property, or if applicable the online retailer website, where the

licensed activities may take place;

(3)     name of the contact person;

(4)     the license type and a list of the activities permitted to be performed for each licensed

premises;

(5)     date of issuance;

(6)     date of expiration; and

(7)     the license number.

*Draft – Subject to Change*

(e)    Licenses shall not be transferable or assignable without prior written approval of the Board including, without limitation, to another licensee. A change in majority ownership, controlling interest in the license, person holding the license, or person with sole control over the license shall constitute a transfer of the license.

(f)    To obtain approval from the Board for the transfer of a license, a transferee shall submit an application to the Office, in a manner prescribed by the Board, demonstrating an ability to operate the license in compliance with this Title, along with an application fee pursuant to section 120.4 of this Title.

(g)    The Board may deny an application for transfer of a license if the application fails to demonstrate that the transferee will comply with all the requirements of this Title, or if the licensee has a record of poor performance, meaning two (2) or more Category 1 and 2 Violations pursuant to Part 133 of this Title, within the past two (2) years.

(h)    A licensee may amend a license to add or delete permitted activities or change the location of a licensed premises by submitting a written request to the Office along with an application fee pursuant to section 120.4 of this Title.

(i)    A request to add permitted activities shall be reviewed by the Office pursuant to section 120.7 of this Title.

*Draft – Subject to Change*

(j)      Verification. The Office may conduct random or scheduled inspections after a license has been issued to determine if the plans submitted to the Office meet or met the minimum requirements for such license.

(1)      In the event the Board determines that plans or evidence submitted under this Part does not meet such minimum requirements at the time of application, the Board may deny renewal of, suspend, cancel or revoke the license pursuant to Part 133 of this Title.

(2)      In the event the Board determines that a licensee fails to adhere to the minimum requirements described in any plan or evidence submitted under this section, the Board may deny renewal of, suspend, cancel or revoke the license pursuant to Part 133 of this Title.

## § 120.10 License Duration.

(a)      A license shall expire two (2) years after the date it is issued.

(b)      A licensee may surrender its license prior to the expiration of such license; however, the surrender of the license shall not automatically invalidate or terminate any pending violations, charges, fines, or proceedings commenced against the licensee.

(c)      A licensee surrendering its license shall provide its employees any lawfully required warnings of closures and layoffs.

## § 120.11 License Renewal.

94

*Draft – Subject to Change*

(a)      An application to renew any license issued under this Part shall be filed with the Office not more than one hundred twenty (120) days nor less than sixty (60) days prior to the expiration thereof. Unless otherwise approved by the Office, if a renewal application is not filed at least sixty (60) days prior to the expiration of the license, such application will be untimely for the purpose of review and consideration by the Office, and such license shall expire and become void on such expiration date.

(b)      Renewal applications shall be accompanied by a non-refundable application fee and license fee pursuant to section 120.4 of this Title.

(c)      The application for renewal shall be submitted to the Office, in a manner prescribed by the Board, and include such information as the Board may require including, but not limited to, providing evidence showing the following:

(1)       the licensee's contributions to communities and individuals disproportionally harmed by marihuana prohibition laws;

(2)      the licensee has an executed labor peace agreement with a bona-fide labor organization;

(3)      the racial, ethnic, and gender diversity of the licensee's employees and owners;

(4)      the licensee has adhered to the social responsibility framework set forth by the Office;

*Draft – Subject to Change*

(5)     compliance with building and fire codes, zoning ordinances, and business licensing

requirements or any other as code, local law, or requirement determined by the Office;

(6)     an update on the information as described in paragraph (5) of subdivision (b) of section

120.7 of this Title;

(7)     the licensee has no outstanding filings, reports, fines or other deficiencies with the Office

in the operations of its adult-use license; and

(8)     any other information requested by the Office.

(d)     The Board shall determine whether to renew an applicant's license pursuant to the

relevant factors in this section and section 120.7 of this Title.

(e)     If applicable, the licensee shall provide a statement that there have been no amendments

or changes to the licensed premises since the license was issued, excepting any amendments or

changes that previously received approval from the Office or Board as applicable; and

(f)     An applicant may not apply to renew a license if the license has been cancelled or

revoked or is currently suspended without a corrective action plan in place.

(g)     Provisional licenses shall not be eligible for renewal.

*Draft – Subject to Change*

**§ 120.12 License Denials.**

(a)      The Board may deny an application for a license, including renewal applications, if:

(1)      the application does not meet the applicable eligibility requirements in section 120.7 of this Title;

(2)      the applicant or their true parties of interest, have a history of violations relating to its operation of owning or operating a business;

(3)      the source of funds identified by the applicant to be used for the acquisition, startup, or operation of the business is determined by the Office to be a violation of true parties of interest restrictions or is questionable, unverifiable, or gained in a manner which is in violation of applicable federal, state and local law or regulations.

(4)      the applicant fails to submit information or documentation requested by the Office during the application and evaluation process, including any supplemental documentation, subject to the applicable cure period pursuant to section 120.20 of this Title;

(5)      the applicant makes false representation or fails to disclose a material fact to the Office, and therefore may be subject to prosecution pursuant to section 190.25 of the Penal Law, during the application process;

*Draft – Subject to Change*

(6)    the applicant, or any true party of interest of the applicant, is prohibited from trafficking cannabis pursuant to section 137 of the Cannabis Law;

(7)    the applicant, or any true party of interest of the applicant, is a person determined to be not of good moral character;

(8)    the applicant, or any true party of interest of the applicant, has outstanding violations, fines, fees, payments or other indebtedness assessed against them by state, or federal regulatory authorities or any local municipalities;

(9)    the applicant, or any true party of interest of the applicant, has a history of giving away or selling cannabis or cannabis products in an unlicensed and unauthorized manner after March 31, 2021, through a store located on a public thoroughfare, vehicle, or "membership club" that sells cannabis or cannabis products or charges retail customers a membership or admittance fee, or otherwise poses as an authorized cannabis licensed business;

(10)    the applicant, or any true party of interest of the applicant, has or previously had an unapproved interest in a license issued by the Board, other than an interest exempt from disclosure pursuant to this Title.

(11)    the proposed licensed premises is in a location prohibited by Cannabis Law or state laws or regulations, except with respect to licensed premises previously approved;

*Draft – Subject to Change*

(12)     the applicant fails a pre-licensure inspection of the premises, which shall take place at the discretion of the Office;

(13)     the applicant demonstrates a pattern of deficiencies, including, but not limited to:

(i)     refusal or inability to produce records, disclosures, or reports as requested by the Office;

(ii)     failure to correct deficiencies or violations in accordance with an approved corrective action plan;

(iii)     deviation from regulations or standard operating procedures so as to jeopardize the quality of cannabis or cannabis products and public safety; and

(iv)     refusal to provide Office employees with access to the licensed premises;

(14)     knowledge of sale of illicit cannabis as defined in section 136 of the Cannabis Law or cannabis or cannabis products not meeting the requirements of this Title

(15)     general failure to comply with the requirements of this Title;

(16)     the applicant's true parties of interest are also true parties of interest in a number of pending cannabis license applications that, if licensed, would exceed the limit on the number of

*Draft – Subject to Change*

licenses such true party of interest could be a true party of interest in at any one (1) time, in accordance with the limitations in this section, notwithstanding passive investors; and

(17)    any other grounds for denial as determined by the Board.

(b)    In addition to the aforementioned, the Board may specifically deny any renewal application based on additional criteria, including, but not limited to, if:

(1)    the applicant fails to maintain a labor peace agreement with a bona-fide labor organization;

(2)    the applicant fails to provide documentation of the racial, ethnic, and gender diversity of the applicant's employees and owners;

(3)    the applicant fails to submit a renewal application not less than sixty (60) days prior to expiration of license term;

(4)    the applicant fails to provide information required for completing their application or licensure; and

(5)    any other grounds for denial as determined by the Board.

**§ 120.13 Reapplication after License Denial.**

*Draft – Subject to Change*

(a)      An applicant whose application was denied or a licensee whose license was cancelled, suspended, revoked or not renewed, due to one (1) or more of the provisions in paragraphs (1) through (4) of this subdivision, may reapply at any time after the failure or disqualification is cured:

(1)      failure to satisfy the age requirement of the Cannabis Law, after which reapplication is permitted only upon attaining the requisite age;

(2)      determination that the applicant was a person prohibited from trafficking cannabis, after which reapplication is permitted only upon a change in circumstances whereby the applicant no longer meets the standards as a person prohibited to traffic cannabis pursuant to section 137 of the Cannabis Law;

(3)      any statutory or regulatory provision that is subsequently repealed or modified, after which reapplication is permitted only upon a showing that the subsequent repeal or modification of the statutory or regulatory provisions obviates the grounds for denial or revocation and justifies the conclusion that the prior determination should not have been a basis for denying an application; or

(4)      the proposed premises was in a location that violated the Cannabis Law or local law, after which reapplication is permitted upon securing a new location.

*Draft – Subject to Change*

(b)      An applicant seeking to reapply pursuant to subdivision (a) of this section shall file with the Office a petition stating with particularity how the failure or basis for disqualification has been cured.

(c)      Except as otherwise set forth in this Part or the Cannabis Law, an applicant whose application has been denied or licensee whose license has been cancelled, suspended, revoked, or not renewed may reapply after one (1) year. No applicant whose license has been cancelled, suspended, revoked, or not renewed within one (1) year, that is substantially the same as such previous applicant by way of their true parties of interest, ownership and control structure, or any other consideration the Office determines to be of interest, shall be considered for another license. The new application shall include submission of sufficient evidence demonstrating that the factual circumstances upon which the denial, cancellation, suspension or revocation was based have been cured to the satisfaction of the Office.

(d)      Notwithstanding subdivision (c) of this section, if an applicant that has qualified as a social and economic equity applicant is denied for a license but is otherwise eligible, the applicant may be considered by the Office for provisional licensing, admission into the social and economic equity incubator program, as articulated in the Social and Economic Equity Plan, and may subsequently reapply after completion of the incubator program.

**§ 120.14 Voided Applications.**

*Draft – Subject to Change*

(a)      Upon failure by an applicant to respond to the Office's requests for information or documentation pertaining to their application within the time required by the Office, the application may be deemed void.

**§ 120.15 Withdrawal of an Application.**

(a)      Prior to the Board issuing or denying a license, an applicant may withdraw an application by providing the Office written notice of such withdrawal. Upon the receipt of such notice the Office will cease processing such application.

(b)      If an applicant has previously withdrawn an application, the Office may refrain from processing any application submitted by such applicant within one (1) year from the date of such withdrawal.

(c)      No fee or other payment relating to an application shall become refundable by reason of withdrawal of the application, unless the Office determines otherwise.

**§ 120.16 Standard for Reviewing Disqualifying Offenses.**

(a)      For purposes of determining whether an applicant qualifies or is suitable for a license under the Cannabis Law, including, but not limited to, with respect to section 137 of the Cannabis Law, this Part, the following shall apply with respect to offenses of an applicant and any of its true parties of interest as defined in section 118.1 of this Title:

*Draft – Subject to Change*

(1)    All conditions, offenses, violations and conduct are construed to include New York State

law or similar laws of other jurisdictions, provided, however, this shall not be applicable to

marihuana-related offenses; and

(2)    All criminal disqualifying conditions, offenses, violations and conduct including the

crimes of attempt, accessory, conspiracy, and solicitation.

(3)    Juvenile dispositions shall not be considered as a factor for determining qualification or

suitability.

(4)    Where applicable, all look back periods for criminal conditions, offenses,

violations and conduct commence on the date of disposition provided, however, that if such

disposition results in incarceration in any institution, the look back period shall commence on

release from incarceration.

(5)    Unless otherwise specified in section 137 of the Cannabis Law, a conviction, offense,

violation or conduct shall include convictions, guilty pleas and pleas of *nolo contendere*.

(b)    A licensee and its true parties of interest shall remain qualified or suitable at all times that

a license remains in effect. An applicant, licensee or true party of interest shall notify the Office,

in writing, of any offense or incident, including, but not limited to, offenses set forth in section

137 of the Cannabis Law, that would result in a denial of a license within ten (10) days of such

offense or incident. Failure to notify the Office may result in a revocation, suspension,

*Draft – Subject to Change*

cancellation, debarment from a license or any other penalty or fine set forth in this Title or the

Cannabis Law.

(c)    If the conviction or disposition record was sealed, the Office may require the individual

to provide proof from a court evidencing the sealing of the case or any other information as

determined by the Office.

## § 120.17 Notification and Reporting of Business Changes and Amendments for Applicants.

(a)    An applicant may update their application before it has been approved in a manner

determined by the Office.

(b)    If an applicant is issued a license, the duty of ongoing disclosures for the licensee and its

true party of interests, pursuant to this Title, shall continue throughout the licensed period.

## § 120.18 Notification and Reporting of Business Changes and Amendments of Licensees.

(a)    Duty to Report. Licensees have an ongoing duty to report changes or amendments to their

operations to the Office as required by these regulations or future guidance.

(1)    Licensees have a continuing duty to provide the Office with up-to-date contact

information and shall notify the Office in writing of any amendments or changes to the mailing

addresses, phone numbers, electronic mail addresses, and other contact information they provide

the Office.

*Draft – Subject to Change*

(b)      Notification to the Office:

(1)      A licensee shall notify the Office within ten (10) business days of becoming aware of or within ten (10) business days of when the licensee should have been aware of any of the following:

(i)       where the licensee is a privately held entity:

*(a)*      whenever an existing or new shareholder holds at least 10% aggregate ownership interest, notwithstanding subdivision (d) requiring Office approval of shareholders who are not passive investors or their spouse;

*(b)*      when a person, other than a shareholder, ceases to be a true party of interest;

*(c)*      when a person changes their aggregate ownership interest to be less than 10%

*(d)*      when a person lends greater than 10% of a licensee's capital;

*(e)*      upon entering into a contract, term sheet, agreement, or side letter between the applicant, licensee, or its true parties of interest, and a goods and services provider, other than those exempted pursuant to paragraph (1) of subdivision (a) of section 124.3 of this Title or non-exempt agreements pursuant to paragraph (1) of subdivision (b) of section 124.3 for a flat fee; and

*Draft – Subject to Change*

*(f)*     upon the death or removal of a disclosed true party of interest from the license.

(2)     A licensee shall notify the Office within three (3) business days of becoming aware of or within three (3) business days of when the licensee should have been aware of any of the following:

(i)     criminal convictions, or civil judgments in an amount greater than five thousand dollars ($5,000), against the licensee or its true parties of interest, other than passive investors, in New York State or any other state, federal, or foreign jurisdiction;

(ii)     disciplinary action taken against the licensee or its true parties of interest, other than passive investors, by this state or any other state, federal, or foreign jurisdiction, including any pending action; and

(iii)     the initiation or conclusion of any new judgments, lawsuits, legal proceedings, charges, or government investigations, whether initiated, pending, or concluded, that involve the applicant or its true parties of interest.

(iv)     any amendments or changes to the cannabis business operations that are required in regulation and law; and

*Draft – Subject to Change*

(v)    any proposed material amendments or changes to the cannabis business.  Material amendments or changes include, but are not limited to, the following:

*(a)*    amendment or change in processing extraction method(s);

*(b)*    amendment or change in an entity name or doing business as name; any amended or changed name shall comply with all requirements pursuant to Part 128 of this Title; and

*(c)*    a change in the ability to control at least 50% of the voting shares of a licensee.

(c)    Failure to provide notifications or reports to the Office pursuant to this section may result in fines and/or suspension, cancellation or revocation of a license.

(d)    Request for Office approval:  The following changes require Office approval:

(i)    any time a new true party of interest is added to the entity, not including a passive investor and their spouse; or

(ii)    changes requiring background checks of the altered parties, which includes any time a new true party of interest is added to the entity, not including a passive investor and their spouse.

(iii)    Licensees seeking to make a change pursuant to this subdivision, shall submit an application to the Office at least sixty (60) days prior to the proposed date of the amendment or

*Draft – Subject to Change*

change. Such application shall be accompanied by a fee as determined by the Board. In determining whether to approve such application, the Office may set terms or conditions under which it may allow the continued operation of the license.

(e)     Notification and Request for Board approval:  The following changes requires notification to the Board and prior approval:

(1)     change the composition of a licensee, including, but not limited to, a transfer in ownership, structure or control;

(2)     the ability to control at least 50% of the voting shares of a licensee;

(3)     amendment or change to the cannabis business address or a change in the location of a licensee's licensed activities.

(f)     Failure to provide notifications to the Board pursuant to this section may result in fines and/or suspension, cancellation, or revocation of a license.
.

(g)     If the licensed premises is damaged by a fire, flood or other natural disaster, or other situations of local, state, or national emergency, or by a security breach, the licensee shall notify the Office within a period of twenty-four (24) hours, and the Office shall have the authority to quarantine all cannabis or cannabis products for analysis and, if appropriate, disposal, if found unfit for use.

*Draft – Subject to Change*

(h)    Removing a true party of interest from a License. Upon a request to remove a party from a license, such request shall be accompanied by the following:

(1)    A notarized letter, signed by both the licensee and the party to be removed, acknowledging the change, and explicitly detailing that the party is aware of the effects of that change;

(2)    a corporate resolution of the licensee authorizing the licensee to change the ownership of the licensee pursuant to and consistent with articles of incorporation, LLC agreement, operating agreement, bylaws, partnership agreement, or similar governing document and the laws of the state of formation of the licensee, and an affidavit, of a member of the licensee's board of directors or similar governing body, a managing member, general partner, or sole member, as may be applicable, attesting that the undersigned is authorized to act on behalf of the licensee and that the submission of the change of ownership application premised on the corporate resolution constitutes a valid corporate action, or such other evidence reasonably satisfactory to the Office; or

(3)    A determination by a court of competent jurisdiction or a decision by an arbiter, agreed upon by both parties.

**§ 120.19 Licensed Premises for Cannabis Events.**

*Draft – Subject to Change*

(a)    An on-site consumption, adult-use retail dispensary, microbusiness, or ROD licensee may, upon Office approval, temporarily include in their licensed premises the licensed premises of a different on-site consumption, adult-use retail dispensary, microbusiness, or ROD licensee to engage in a cannabis event at such temporarily added premises for a specified period.

(b)    A licensee that has received approval pursuant to subdivision (a) may sell cannabis products to consumers at such temporarily added premises during the cannabis event.

(c)    A licensee shall not include in their licensed premises added premises for a period of more than thirty (30) concurrent days.

(d)    A retail dispensary licensee shall only include in their licensed premises such added premises that have a principal entrance on the street level and on a public thoroughfare in premises which may be occupied, operated, or conducted for business, trade, or industry.

(e)    In addition to information in section 120.1 of this Title, a licensee requesting approval pursuant to subdivision (a) of this section to include in their licensed premises an additional premises shall provide information including, but not limited to the following, in a form and manner determined by the Office:

(1)    The name of the licensee that shall be the cannabis event organizer, which may be the licensee requesting approval or another licensee involved in the event, and written documentation, in a form and manner as determined by the Office, which affirms the event

*Draft – Subject to Change*

organizer has agreed to organize the event and that the event will not violate the Cannabis Law by using such added premises for activities including, but not limited to, gambling, exposing or simulating, contests, or fireworks that are prohibited by subdivision 6, 6-a, 6-b, 6-c, or 7 of section 106 of the Alcoholic Beverage Control Law, or any other similar activities which the Office may determine in future guidance.

(2)    the nature of the event, including, but not limited to:

(i)    the anticipated attendance, the maximum allowed attendance, and if the event will be open to members of the public or held for a private audience;

(ii)    the event's specific times and the day(s) on which it will occur;

(iii)    the specific areas of the licensed premises, including the temporarily added premises, that will be accessible to event attendees;

(iv)    a detailed description of how all waste generated by the sale and consumption of cannabis products will be managed by the cannabis event organizer, including, but not limited to efforts the event organizer shall undertake to encourage sustainable practices;

(v)    a list of any dates on which the event shall recur;

*Draft – Subject to Change*

(vi)    if the event is to be held in association with, or as a part of, another event that is not a cannabis event, a description of this other event and reliable evidence as determined by the Office of the age composition of the audience that is anticipated to attend this other event;

(vii)    if the event is held at an adult-use on-site consumption premises that is not a limited retail consumption facility, a description of all signs that advertise brands and are located on the exterior or interior of the premises at which the event will occur; and

(viii)    any other information as required by the Board;

(3)    an anticipated shipping manifest which describes the products the licensee anticipates bringing to the cannabis event and includes the information in paragraph (2) of subdivision (g) of section 125.10 of this Title based on the anticipated transport to the cannabis event; and

(4)    A description of efforts the cannabis event organizer will undertake to control access to the areas of the licensed premises which event attendees can access. Such efforts shall use an employee or agent of the licensee to restrict entry to the facility or another method of controlling access to the facility.

(5)    Written documentation evidencing that the licensee requesting approval to include additional premises has received permission to do so from the licensee whose premises are being used for the cannabis event.

*Draft – Subject to Change*

(f)      Unless determined otherwise by the Board or Office, all requests for approval pursuant to subdivision (a) shall be received at least thirty (30) calendar days prior to the beginning of the cannabis event.

(g)      Operations of a Cannabis Event.

(1)      Age Verification.

(i)      The cannabis event organizer shall ensure that entry to the licensed premises where the event occurs during the event's specific times is limited to individuals who are at least twenty-one (21) years of age or older.

(ii)      Prior to allowing an individual entry onto the licensed premises, the cannabis event organizer or its authorized agent shall inspect an individual's identification and determine the individual's age to validate that the individual is twenty-one (21) years of age or older. Valid identification and proof of age shall include:

*(a)*      a valid driver's license or non-driver identification card issued by the New York State Department of Motor Vehicles, the federal government, any United States territory, commonwealth or possession, the District of Columbia, a state or local government within the United States or a provincial government of the dominion of Canada;

*Draft – Subject to Change*

*(b)*    a valid federal, state, or local government identification, including IDNYC, stating the individual's age and a photograph of the individual's face;

*(c)*    a valid passport issued by the United States government or any other country;

*(d)*    a consular identification card; or

*(e)*    an identification card issued by the armed forces of the United States.

(2)    A licensee that has temporarily added premises to their licensed premises to conduct sales at a cannabis event shall only maintain a working stock of cannabis products at the added premises where the cannabis event is occurring and shall not store cannabis products at the cannabis event;

(3)    All sales of cannabis products at a cannabis event shall be conducted pursuant to subdivision (f) of section 123.10 of this Title;

(4)    Licensees conducting sales at the cannabis event shall make available cannabis consumer education and resources to all consumers in a manner as described in subdivision (i) of section 123.10 of this Title;

(5)    At no time during the cannabis event shall any licensee that has received approval pursuant to subdivision (a) of this section conduct deliveries from the added premises to any

*Draft – Subject to Change*

location outside of the event. Notwithstanding, this shall not prevent the licensee from bringing orders of cannabis products to consumers at locations within the event area.

(h) Fees.

(1)      Requests for approval pursuant to subdivision (a) of this section shall be accompanied by a non-refundable application fee of $50; and

(2)      If the approval is given, there shall be an additional event fee of $100 for the first day of the event, and $50 for each additional day. The Office may determine an additional fee schedule in future guidance for cannabis events which have an anticipated attendance greater than 100 people.

(i)      All agreements, arrangements, payments, and other activities connected with a cannabis event shall comply with Part 124 of this Title. Any agreements, arrangements, payments, or other activities associated with the event that are not clearly attributable to a specific licensee shall be attributed to the licensee that is organizing the event for purposes of determining compliance with Part 124 of this Title and the Cannabis Law.

(j)       The Office may set additional requirements in future guidance for the conduct of licensees at added premises during cannabis events.

*Draft – Subject to Change*

(k)     The Office may refuse to allow a licensee to include in their licensed premises added premises for a cannabis event which may create a risk to public health and safety, including a risk of diversion.

## § 120.20 Opportunity to Cure.

(a)     If all material, documentation, and information required by the application form is not submitted, the applicant shall receive a deficiency notice from the Office.

(b)     The applicant shall then have the thirty (30) calendar days,  to cure such deficiency, as stipulated in the deficiency notice. Such stipulated options to cure may include, but not be limited to:

(1)     resubmitting the application in its entirety;

(2)     providing all material documentation and information required in the deficiency notice; or

(3)     any other requirements as set forth by the Office.

(c)     Applications that are still deficient after this opportunity to cure will not be considered. Upon receipt of an application deemed to be complete, the Office will engage in no further communication with the applicant until after the selection process is completed.

*Draft – Subject to Change*

**§ 120.21 Severability.**        If any provision of this Part or its application to any particular

person or circumstance is held invalid, the remainder of this Part and its application to other

persons and circumstances shall not be affected thereby.

*Draft – Subject to Change*

A new Part 121, titled Social and Economic Equity, is added to read as follows:


Part 121

Social and Economic Equity


**Part 121 – Social and Economic Equity**

**§ 121.1 Qualifications for a Social and Economic Equity Applicant**

**§ 121.2 Ownership and Sole Control Minimums**

**§ 121.3 Continuing Duty to Disclose and Failure to Disclose Notification**

**§ 121.4 Commitment to Social and Economic Equity**

**§ 121.5 Social and Economic Equity Application**

**§ 121.6 Severability**



**§ 121.1 Qualifications for a Social and Economic Equity Applicant.**

(a)      General Qualifications. To qualify as a social and economic equity applicant, an applicant shall demonstrate, through the mandatory production of documents and other information described in this Part:


(1)      that sole control of the applicant is held by:


(i)      an individual from a community disproportionately impacted by the enforcement of cannabis prohibition;

*Draft – Subject to Change*

(ii)     a minority-owned business;

(iii)    a women-owned business;

(iv)     a distressed farmer; or

(v)      a service-disabled veteran owned business.

(2)      that any person seeking to contribute to sole control of the applicant must hold at least 1%

equity share in the business.

(b)      If sole control of the applicant is held by a woman who is also a minority-group member

or women who are also all minority group members, the applicant may qualify as a minority-

owned business, a women-owned business, or both.

(c)      Request for information.  An applicant must provide any information requested by the

Office to determine eligibility as a social and economic equity applicant.

(d)      Individuals from communities disproportionately impacted by the enforcement of

cannabis prohibition. An applicant seeking to qualify as an individual from a community

disproportionately impacted are required to meet the following requirements:

*Draft – Subject to Change*

(1)    proof of ownership and sole control over the applicant by one (1) or more individuals from communities disproportionally impacted as set forth in subdivision (e) of this section; and

(2)    documentation to show that one (1) or more individuals that have an ownership interest in the business have resided in a community disproportionately impacted for an aggregate of five (5) of the first eighteen (18) years of their life or an aggregate of seven (7) years of their life. The Office may take into consideration a break in residency due to, the following factors including, but not limited to, incarceration, education, illness, foster care, custodial matters, and homelessness, in determining whether an applicant meets the residency requirement.

(e)    For the purposes of determining whether an area is a community disproportionately impacted, the Office may review geographic areas such as, precincts, zip codes, neighborhoods, political subdivisions, and any other geographic area for:

(1)    history of arrests;

(2)    number of convictions;

(3)    law enforcement procedures, protocols and practices;

(4)    allocation of law enforcement resources;

*Draft – Subject to Change*

(5)    children removed from the home by Child Protective Services, or equivalent child protective services for out-of-state jurisdictions, due to:

(i)    a parent/caretaker's marihuana use or arrest;

(ii)    school suspension records;

(iii)    high school attainment;

(6)    deportation records for marihuana offenses; or

(7)    any other impacts as determined by the Office reflecting relative disparate enforcement of cannabis prohibition laws during a certain period of time in a certain geographic area.

(f)    Minority-Owned Business. An applicant seeking to qualify as a minority-owned business shall provide:

(1)    proof of ownership and sole control by one (1) or more minority group members who have an ownership interest in the business as set forth in section 121.2 of this Title; and

(2)    at least one (1) of the following:

(i)    proof of a state MWBE certification, on the basis of being a minority-owned business; or

*Draft – Subject to Change*

(ii)     a sworn declaration that reports the applicant's qualifications to be true and accurate and made under the penalties provided by law that:

*(a)*     one (1) or more members of a minority group who are citizens or permanent resident aliens of the United States of America:

*(1)*     have an ownership interest in the business; and

*(2)*     qualify as minority group members as defined in the Cannabis Law; and

*(b)*     includes a statement that providing false information shall be grounds for action against the applicant or licensee including, but not limited to, the denial, suspension, cancellation or revocation of a license.

(g)     Women-owned Business. An applicant seeking to qualify as a women-owned business shall provide:

(1)     proof of ownership and sole control by one (1) or more women   who have an ownership interest in the business as set forth in section 121.2 of this Title; and

(2)     at least one (1) of the following:

*Draft – Subject to Change*

(i)      proof of a state MWBE certification, on the basis of being a women-owned business; or

(ii)      a sworn declaration that reports the applicant's qualifications to be true and accurate and made under the penalties provided by law that:

*(a)*      one (1) or more members of a woman group who are citizens or permanent resident aliens of the United States of America:

*(1)*      have an ownership interest in the business; and

*(2)*      qualify as a women owned business as defined in the Cannabis Law ; and

*(b)*      includes a statement that providing false information shall be grounds for action against the applicant or licensee including, but not limited to, the denial, suspension, cancellation or revocation of a license.

(h)      Distressed Farmer. An applicant seeking to qualify as a distressed farmer shall provide:

(1)      proof of ownership and sole control by one (1) or more members who have an ownership interest as set forth in section 121.2 of this Title; and

(2)      proof that the applicant fulfills at least one (1) of the following requirements:

*Draft – Subject to Change*

(i)      For an owner of a small farm: where the farm meets the small farm classification as defined in the Cannabis Law; and

(ii)     Such farm:

*(a)*    filed a Schedule F tax return;

*(b)*    filed other tax form(s) demonstrating revenues below the qualifying threshold as established therein; and

*(c)*    documentation of operating losses during the last three (3) years.

(3)      For a small farm operator, where:

(i)      the farming operations of the operator seeking to qualify under the subpar meets the small farm classification as defined in section 87 of the Cannabis Law;

(ii)     the operator is a small farm producer, which means:

(*a*)    an individual who is involved in making decisions for the farm operation involving planting, harvesting, livestock management, and marketing

*Draft – Subject to Change*

(*b*)    may be the owner, a member of the owner's household, a hired manager, a tenant, a renter, or a sharecropper.

(iii)    documentation that the social and economic equity applicant is a small farm producer, as demonstrated by, including, but not limited to:

(*a*)    local, state, and federal tax documents;

(*b*)    paystubs or proof of payroll;

(*c*)    an employment agreement;

(*d*)    a contracting agreement;

(*e*)    a rental or sharecropping agreement; and

(*f*)    any other documentation demonstrating such relationship.

(iv)    proof of membership in a group historically underrepresented in farm ownership as such group or groups may be defined by the Board, as provided by a sworn declaration that one or more of the members qualify as member of a group or groups identified by the Board and that shall include a statement that providing false information shall be grounds for action including, but not limited to, the denial, suspension, cancelation or revocation of a license.

126

*Draft – Subject to Change*

(i)    Service-disabled veteran owned business. An applicant seeking to qualify as a service-disabled veteran owned business shall provide:

(1)    proof of ownership and sole control by one (1) or more members who have an ownership interest as set forth in section 121.2 of this Title; and

(2)    certification from the New York State Office of General Services Division of Service-Disabled Veterans' Business Development (DSDVBD). In the event that a business does not receive certification from the DSDVBD prior to the filing of any application, the Office may temporarily accept the following document as a conditional certification:

(i)    DD214(s) and/or NG214(s) with Line of Duty Report U.S. Veterans Administration documentation of service-connected disability rating which shall be dated within one (1) year of the date DSDVBD receives the DSDVBD Certification Application and shall demonstrate a service-connected disability rating of at least ten percent (10%). Any such conditional certification shall be valid for sixty (60) days pending full certification from the DSDVBD and may be extended in the Office's sole discretion.

(j)    Small Business Qualification. An applicant seeking to qualify as a minority-owned business or a women-owned business shall submit the following documents to demonstrate that it is a small business:

*Draft – Subject to Change*

(1)    if it has been in operation for a time greater than or equal to three (3) years, including, but not limited to:

(i)    quarterly payroll reports from the last three (3) years; and

(ii)    any other information that demonstrates that the entity is a small business as requested by the Office;

(2)    if it has been in operation for a time less than three (3) years, it shall submit:

(i)    a sworn declaration that reports the following information relating to its business enterprise to be true and accurate and made under the penalties provided by law that it is a small business as defined in this subdivision, and such declaration shall include a statement that providing false information shall be grounds for action including, but not limited to, the denial, suspension, cancelation or revocation of a license; and

(ii)    documentation of small business operations including, but not limited to:

*(a)*    any and all gross quarterly receipts;

*(b)*    by-laws; and

*(c)*    proof that the business has no more than and will not exceed 300 employees.

*Draft – Subject to Change*

(k)      Extra Priority. A person whom demonstrates that they are an individual from a community disproportionately impacted by the enforcement of cannabis prohibition may receive extra priority if they have an income lower than eighty percent (80%) of the median income of the county in which the applicant resides; and was convicted of a marihuana-related offense prior to the effective date of the Marihuana Regulation and Taxation Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Marihuana Regulation and Taxation Act, was convicted of a marihuana-related offense.

(1)      For purposes of this subdivision, median income is defined as the median dollar amount per household in each county, as based on the overall income distribution for the county, from lowest to highest income.

(2)      An applicant seeking to qualify for extra priority shall provide proof of residency, income, and conviction, as prescribed by the Board.

**§ 121.2 Ownership and Sole Control Minimums.**

(a)      An applicant seeking to qualify as a social and economic equity applicant shall submit documents sufficient to demonstrate ownership and sole control by an individual or group of individuals who are from a community disproportionately impacted, members of a minority group, women, service-disabled veterans or distressed farmers as defined in the Cannabis Law and as qualified in section 121.1 of this Title including, but not limited to, the following:

*Draft – Subject to Change*

(1)     by-laws;

(2)     delegations of authority or resolutions of the Board of Directors, if applicable;

(3)     any and all incorporation documents that describe all shares of stock or other securities, statements, agreements or memoranda of understanding issued during the time of incorporation or organization or at any time thereafter that remain in full force and effect at the time of application or in response to a demand from the Office;

(4)     quarterly payroll records filed with the New York State Department of Labor, or equivalent agencies outside of New York to demonstrate the size of the workforce;

(5)     comparison of employee and executive compensation;

(6)     comparison of executive compensation and shareholder compensation or proceeds; and

(7)     any other information requested by the Office for determining ownership and sole control.

(b)     If an applicant seeking to qualify as a social and economic equity applicant is unable to provide documentation required in subdivision (a) of this section, the Office may permit the applicant to  submit corporate governance policies within thirty (30) days of the filing of their application, to reflect the authority and sole control requirements.

*Draft – Subject to Change*

(c)     If, at any time after a social and economic equity applicant has been granted a license, the Office determines that the sole control requirement is violated, the Office may institute an action to suspend, cancel, or revoke such license, provided the Office provides an opportunity to cure.


**§ 121.3 Continuing Duty to Disclose and Failure to Disclose Notification.**

(a)     Social and economic equity applicants shall have a continuing duty to disclose any material changes in the information provided to the Office, as required in this Part for the duration of the license. The Office will endeavor to identify all social and economic equity qualifying licensees, regardless of whether such licensee applied as a social and economic equity applicant.


(b)     Any changes that would impact a social and economic equity licensee's status shall require notice to the Office and prewritten approval of the Board.


(c)     Failure to notify the Office of any material change in the information provided may provide sufficient grounds for enforcement action against the licensee, pursuant to Part 133, including, but not limited to, suspension, revocation, or denial of any license.


(d)     Whistleblower, Complaint and Recourse.


(1)     If at any time any owner, director, investor, board member or employee of a social and economic equity licensee has reason to believe that the business failed to disclose any material

changes to the information provided to the Office, including changes to status as a business owned by an individual from a community disproportionately impacted, minority-owned business or women-owned business, service-disabled veteran owned business or distressed farmer, and status in ownership and control, such person may notify the Office for consideration of any enforcement action.

(2)    Any such person that notifies the Office for consideration of any enforcement action pursuant to this subdivision shall be given the full protection of Article 20-C of the Labor Law.

## § 121.4 Commitment to Social and Economic Equity.

(a)    An applicant or licensee, as defined in section 118.1 of this Title, shall be required to demonstrate their commitment to the social and economic equity goals of the Cannabis Law as part of the application process. Such commitment may be demonstrated by the design and implementation of a community impact plan.

(1)    A community impact plan shall show an applicant's or licensee's plan for how the applicant or licensee will benefit communities and individuals from communities that were disproportionately impacted by the enforcement of cannabis prohibition, including, but not limited to:

(i)    identification of the community or communities and/or individuals disproportionately impacted that the applicant or licensee plans to benefit;

*Draft – Subject to Change*

(ii)     a description of:

*(a)*     the benefits that the applicant or licensee will provide to the community or individuals disproportionately impacted including, but not limited to, workforce opportunities, community resources, education, and other community building programs;

*(b)*     the scale or size of the disproportionately impacted target beneficiaries;

*(c)*     the plan for implementation, including, but not limited to actions, activities and engagements that will be performed by the applicant or licensee and frequency of engagement with the community or individuals disproportionately impacted;

(iii)     a demonstrated need of the proposed benefit to the community and individuals disproportionately impacted, including, but not limited to, economic and social impact;

(iv)     identifiable resources the applicant or licensee will use to execute the plan, including, but not limited to:

*(a)*     by written agreement, a demonstrable partnership or relationship with a community-based organization or other association;

*(b)*     estimated expenses, if any, the applicant or licensee will incur to execute the proposed plan and its activities;

*Draft – Subject to Change*

*(c)*      the applicant's or licensee's demonstrated ability, knowledge, expertise or experience; and

*(d)*      any other proof of community engagement.

(v)      a description of the applicant's or licensee's strategy to measure, track, and record the performance and execution of the plan that identifies qualitative and quantitative metrics, and includes frequency of tracking such metrics;

(vi)      a statement by the applicant or licensee supporting its ability to execute on the proposed plan as described in the application based on the suitability and appropriateness of the metrics the applicant or licensee will use to measure the success of the proposed plan; and the nexus described between the plan's desired outcome, implementation strategy, and the applicant's or licensee's demonstrated ability to execute the plan; and

(vii)      any other requirements for a community impact plan as determined by the Board.

(b)      Any person, vendor, contractor, entity or individual knowingly engaged in business with an enterprise revealed to be fraudulently qualified as social and economic equity licensee may be permanently barred from receiving a license from the Office after investigation.

## § 121.5 **Social and Economic Equity Application.**

*Draft – Subject to Change*

(a)    <u>An</u> applicant seeking to qualify as a social and economic equity applicant shall submit an application for social and economic equity status. If the applicant fails to satisfy any of the status requirements, the Office will issue a deficiency notice to the applicant.

(b)    A social and economic equity application shall have the stipulated number of days described in the deficiency notice to cure the deficiencies, detailed in the deficiency notice.

(c)    Applications that are deficient after an opportunity to cure will not be considered.

(d)    <u>A social and economic equity application, for which an attempted remedy was made during the period of opportunity to cure, that has received a negative determination of their social and economic equity status, may request from the Office a reconsideration of such determination within thirty (30) days.</u>

## § 121.6 Severability.

If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

*Draft – Subject to Change*

A new Part 123, titled License Specific Authorizations, Requirements and Prohibitions, is added to read as follows:

Part 123

License Specific Authorizations, Requirements and Prohibitions

**Part 123 - License Specific Authorizations.19, Requirements and Prohibitions.**

**§ 123.1 Nursery Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.2 Nursery Operations.**

**§ 123.3 Cultivator Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.4 Cultivator Operations.**

**§ 123.5 Processor Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.6 Processor License Facility Operations.**

**§ 123.7 Distributor Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.8 Distributor Operations.**

**§ 123.9 Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.10 Retail Dispensary Operations.**

**§ 123.11 Microbusiness Ownership, Interests, Business Authorizations and Prohibitions.**

*Draft – Subject to Change*

**§ 123.12 Microbusiness Operations.**

**§ 123.13 Cooperative and Collective Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.14 Cooperative Operations.**

**§ 123.15 Registered Organization Adult-Use Cultivator Processor Distributor Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.16 Registered Organization Adult-Use Cultivator Processor Distributor Operations.**

**§ 123.17 Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.18 Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Operations.**

**§ 123.19 Delivery Ownership, Interests, Business Authorizations and Prohibitions.**

**§ 123.20 Delivery Operations.**

**§ 123.21 Severability.**

**§ 123.1 Nursery Ownership, Interests, Business Authorizations and Prohibitions.**

*Draft – Subject to Change*

(a)      A nursery may produce, package, label, and distribute clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture, and cannabis seeds only to a duly licensed nursery, cultivator, cooperative or collective, microbusinesses, ROND or ROD.

(b)      A nursery may only propagate mature cannabis plants for use in the production of clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture, and cannabis seeds or for sale to other nurseries for the production of clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture, and cannabis seeds.

(c)      A nursery shall not hold a retail dispensary, on-site consumption, or delivery license.

(d)      A nursery may also hold a cultivator, cooperative or collective, microbusiness, ROND or ROD license.

(e)      A nursery or its true party of interest may be a true party of interest in a cultivator, processor, distributor, cooperative or collective, microbusiness, ROND or ROD license.

(f)      A nursery may only hold one (1) nursery license, but may engage in licensed activities at multiple premises, and their true parties of interest are not restricted in the number of nursery licenses in which they have an interest.

(g)      A nursery or its true party of interest may have a goods and services agreement with an adult-use cultivator, processor, distributor, cooperative or collective, microbusiness, ROD, and

*Draft – Subject to Change*

ROND licensee, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(h)    In addition to any other restrictions or prohibitions in this Title, including, but not limited to, Part 124 of this Title, no nursery licensee or its true party of interest shall be permitted to hold a direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in an adult-use retail dispensary, on-site consumption, delivery, registered organization, or cannabis laboratory licensee or permittee where a nursey license is held by a ROD, the licensee and its true parties of interest shall be subject to the true parties of interest requirements set forth for the ROD license.

## § 123.2 Nursery Operations.

(a)    A nursery shall:

(1)    maintain an active Nursery Grower Certificate of Registration from the New York State Department of Agriculture and Markets Division of Plant Industry.

(2)    only distribute clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture or cannabis seeds to a licensee authorized to sell cannabis products to consumers if any such plants are under two (2) feet in height;

*Draft – Subject to Change*

(3)    use any mature cannabis plants only for seed production and, unless the nursery licensee is a licensed cultivator or processor such plants, shall, after using such plants in the production of the aforementioned goods, either:

(i)    sell or transfer such plants to another licensee authorized to use such plants after the seeds have been removed; or

(ii)    manage and dispose of such plants thereafter pursuant to section 125.11 of this Title;

(4)    document all information related to production and genetic sourcing of clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture or cannabis seeds, which shall be made available for review by the Office upon request;

(5)    tag each established lot of immature cannabis plants in a manner as described in subdivision (a) of section 123.4 of this Title;

(6)    package each clone, seedling, immature cannabis plant, cloned propagation material, tissue culture or cannabis seed distributed to a licensee for sale to consumers in a sealed container in accordance with requirements of Part 128 of this Title which pertain to that product;

(7)    sell clones, seedlings, immature cannabis plants, cloned propagation material, tissue culture, or cannabis seeds with a written guarantee that to the licensee's knowledge, the plants

*Draft – Subject to Change*

sold do not harbor known cannabis diseases such as Hop Latent Viroid (HpLvd), Cannabis

Cryptic Virus, or other common cannabis diseases and pests; and

(8)    be authorized to sell agricultural products used specifically for the planting, propagation,

and cultivation of cannabis by licensed adult-use cultivators, microbusinesses, cooperatives or

collectives, ROND or ROD.

(b)    A nursery is prohibited from:

(1)    distributing for retail sale any mature cannabis plants or immature cannabis plants that

are two (2) feet or taller to a licensee authorized to sell cannabis products to consumers;

(2)    producing clones, seedlings, immature cannabis plants, cloned propagation material,

tissue culture or cannabis seeds in a nursery area that is larger than authorized pursuant to section

120.3 of this Title;

(3)    selling or transferring any cannabis to any person that is not a licensee;

(4)    selling or distributing any clones, seedlings, immature cannabis plants, cloned

propagation material, tissue culture, cannabis seeds or other agricultural products with known

pest issues.

*Draft – Subject to Change*

(c)      A nursery shall meet all requirements of this Title related to regenerative agriculture, agricultural inputs and on-premises identification that apply to cultivators including, but not limited to, subdivisions (d), (e), and (f) of section 123.4 of this Title.

**§ 123.3 Cultivator Ownership, Interests, Business Authorizations and Prohibitions.**

(a)      A cultivator may engage in the following licensed activities:

(1)      acquire, possess, cultivate, trim, harvest, dry, and cure cannabis at its licensed premises;

(2)      sell cannabis only to licensees authorized to process cannabis, which includes a duly licensed processor, microbusiness, cooperative or collective, ROD, ROND, or a cannabis research licensee;

(3)      transfer cannabis to a processor for processing without relinquishing ownership of that cannabis; and

(4)      if such cultivator also holds a processor license, purchase cannabis from another cultivator for processing; and

(5)      purchase clones, seedlings, cloned propagation material, tissue culture, cannabis seeds, and other immature cannabis plants, including mother plants, from a nursery.

*Draft – Subject to Change*

(b)      A cultivator that has a processor license may apply for and obtain one (1) distributor license.

(c)      A cultivator or its true party of interest may be a true party of interest in a nursery, research, processor, distributor, cooperative or collective, microbusiness, ROD, or ROND license.

(d)      No person shall be a true party of interest in more than one (1) adult-use cultivator license, or in an adult-use cultivator license and a cooperative or collective, microbusiness, ROD, or ROND license, provided, however, a true party of interest in an adult-use cultivator license may simultaneously be a passive investor in any number of adult-use cultivators, cooperatives or collectives, microbusinesses, RODs, or ROND, if such true party of interest complies with all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(e)      A cultivator, or its true party of interest, may have a goods and services agreement with an adult-use nursery, cultivator, processor, distributor, cooperative or collective, microbusiness, ROD, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control and true party of interest requirements.

(f)      In addition to any other restrictions or prohibitions in this Title, including, but not limited to, Part 124, no cultivator or its true party of interest is permitted to have any direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and

services agreement with, or by any other means, in an adult-use retail dispensary, on-site consumption, delivery, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee.

## § 123.4 Cultivator Operations.

(a)     Immature cannabis plants.

(1)     A cultivator shall assign a lot plant tag to each established lot of immature cannabis plants. The tag shall have at a minimum the cultivar name and lot name or code. A lot of immature cannabis plants under a single lot plant tag shall be uniform in cultivar and contain no more than 100 individual immature cannabis plants at any one time.

(2)     A lot plant tag shall be visible and within clear view of an individual standing next to the immature cannabis plant lot and be kept free from dirt and debris.

(3)     Each immature cannabis plant in the lot shall be labeled with a lot unique identifier and placed contiguous next to one another to facilitate identification of the lot unique identifier by the Office, or instead of labeling each immature cannabis plant in the lot, the lot shall be fully separated from other lots of immature or mature cannabis plants. In such cases, an individual immature cannabis plant does not need to be labeled with the corresponding lot unique identifier but this information must be tracked and maintained in the licensee inventory managament system.

*Draft – Subject to Change*

(4)    Within three (3) calendar days of receiving or acquiring an immature cannabis plant, a cultivator shall assign a plant tag belonging to the cultivator in accordance with paragraph (3) of this subdivision.

(5)    A plant tag shall be applied to each individual cannabis plant as specified in this subdivision at the time the plant is moved to the designated canopy area or begins flowering.

(b)    Mature cannabis plants.

(1)    A mature cannabis plant shall be tagged with a plant tag. A plant tag shall be attached to the main stem at the base of each plant, placed in a position so it is visible and within clear view of an individual standing next to the mature cannabis plant, and kept free from dirt and debris.

(2)    A cultivator is prohibited from removing the plant tag from the mature cannabis plant to which it was attached and assigned until the plant is harvested or disposed of.

(c)    Harvested cannabis plants.

(1)    Harvested plants that are hanging, drying, or curing shall be assigned a unique harvest batch name, which shall be recorded in the licensee's inventory tracking system and placed within clear view of an individual standing next to the harvested batch. The assigned harvest batch name shall match the name that is in the licensee's inventory tracking system, and the harvest batch name attached to the physical batch shall be the same.

*Draft – Subject to Change*

(2)    Each harvest batch shall be assigned a tag or label and recorded in the licensee's inventory tracking system that can be traced back to the immature plant lot.

(3)    For harvested plants held in containers, the harvest batch name shall be affixed to the container holding the harvested batch.

(4)    If harvested plants are held in multiple containers, the harvest batch name and lot unique identifier shall be affixed to each of the containers. Additionally, each unit within a container shall be labeled with the harvest batch name and applicable lot unique identifier. All containers with the same lot unique identifier shall be placed contiguous to one another to facilitate identification by the Office.

(d)    Regenerative agricultural practices. A cultivator shall take steps to further the promotion of biodiversity and shall make evidence of these practices available to the Office upon request, by implementing methods such as the following, as appropriate to the cultivation methodologies and context:

(1)    intercropping;

(2)    crop rotation;

(3)    planting, or promotion of native plants;

(4)    providing habitat for native animals;

146

*Draft – Subject to Change*

(5)     planting or promoting specific species that promote native pollinator activities;

(6)     protecting native waterways through maintaining wild farm edges and removing invasive species;

(7)     creating on-farm compost or locally sourcing organic compost to improve soil fertility; or

(8)     other methods that promote biological diversity as approved by the Office.

(e)     Agricultural inputs.

(1)      A culivator shall only allow pesticides to be applied on the licensed premises by a person certified by the New York State Department of Environmental Conservation as a pesticide applicator or technician, or by an individual who is a pesticide apprentice acting in accordance with 6 NYCRR section 325.10, unless otherwise provided for in guidance which may be issued by the Office.

(2)     The Office may issue guidance which determines general use pesticides approved for private application in cannabis cultivation. Only general use pesticides approved by the Office for private application in cannabis cultivation may be applied on the licensed premises of a cannabis cultivator by a person who is not certified by the New York State Department of

*Draft – Subject to Change*

Environmental Conservation as a pesticide applicator or technician or is not an individual who is

a pesticide apprentice acting in accordance with 6 NYCRR section 325.10.

(3)    A cultivator shall record any agricultural inputs used during cultivation, including, but

not limited to, beneficial insects, pesticides, fertilizers, soil amendments, and other plant

protection products. Such records shall be made in the licensee's inventory tracking system

pursuant to section 125.8 of this Title.

(f)    On-premises based identification.

(1)    A cultivator shall:

(i)    have an on-premises based identification system that allows the cannabis and cannabis

product to be tracked back to the licensee and specific cultivation site, to the block and bed level

or similar identification, and tracked forward throughout the supply-chain to the next distribution

point;

(ii)    be able to link harvested cannabis by batch number or harvest date to the cultivation

records. Such data shall be made available to the Office upon request;

*Draft – Subject to Change*

(iii)    have an on-premises based identification system which shall be able to integrate with the seed-to-sale inventory tracking system used by the Office; and

(iv)    if applicable, have an indoor or mixed-light cannabis cultivation facility that shall satisfy energy and environment standards established by the Office and meet all applicable environmental laws, regulations, permits and other applicable approvals including, but not limited to, those related to water quality and quantity, wastewater, solid and hazardous waste management, and air pollution.

(2)    A cultivator shall adopt and use additional energy management practices as determined by the Board, the Office, and any applicable agencies or departments. Cultivators shall maintain and provide the following information at the request of the Office, in a format determined by the Office:

(i)    energy consumption by source (monthly, including consumption and demand);

(ii)    water consumption (gallons per month);

(iii)    on-site generation (monthly);

*Draft – Subject to Change*

(iv)    cannabis yield by dry weight (annual) for the previous 12-month period and for each month of the 12-month period, excluding stalks, stems, and fan leaves;

(v)    waste (pounds per month); and

(vi)    any other information as determined by the Office to assist with energy and resource usage reporting.

(3)    Cultivators shall use a resource manager to track energy consumption metrics, as approved by the Office, and report utility and energy bills, together with cannabis yield data, to the Office upon request.

(4)    Cultivators shall comply with all requirements set forth by the Board and as set forth in Part 125 of this Title, including, but not limited to, energy and environmental requirements for lighting and HVAC, and any other requirements of the Office.

(g)    Cannabis drying**.** A cultivator shall:

(1)    maintain any drying areas in a manner that ensures the areas are clean, well-ventilated, and free from condensation, sewage, dust, dirt, toxic chemicals or other contaminants when used to dry cannabis;

*Draft – Subject to Change*

(2)     ensure all buildings used for drying provide adequate environmental controls to prevent harmful growth of bacteria or mold and are of adequate size to properly dry the volume of cannabis produced;

(3)     maintain record of proposed staggered harvests and harvest periods ;

(h)     A cultivator may operate only in the canopy tier in which it is authorized to operate pursuant to its license.

(i)     Conditional Cultivator License. A conditional cultivator licensed pursuant to section 68-c of the Cannabis Law is subject to all rules and regulations in this Title applicable to a cultivator.

**§ 123.5 Processor Ownership, Interests, Business Authorizations and Prohibitions.**

(a)     A processor may acquire, possess, process and sell cannabis from a licensed cultivator to duly licensed processors or distributors. Authorized processing activities vary by the processing license type.

(b)     A processor may process cannabis grown by a cultivator without taking ownership over that cannabis.

(c)     A processor may only enter into branding or white labeling agreements with its true parties of interest, or another licensee, provided that such licensee is not otherwise prohibited therefrom pursuant to this Title.

*Draft – Subject to Change*

(d)     A processor may hold one (1) distributor license.

(e)     A processor may purchase mature cannabis from a nursery if the cannabis was grown for seed production and the seeds have been removed.

(f)     A processor shall only conduct those activities specified on its application, whether on an initial or amendment application, that have been approved by the Office or Board for such processor.

(g)     A processor may not be a true party of interest in another processor. A true party of interest of a processor may, however, be a true party of interest in a cultivator, processor, distributor, cooperative or collective, microbusiness, ROD, or ROND license.

(h)     A processor, or its true party of interest, may have a goods and services agreement with an adult-use cultivator, processor, distributor, cooperative or collective, microbusiness, ROD, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(i)     In addition to any other restrictions or prohibitions in this Title, including, but not limited to, Part 124, no processor or its true party of interest is permitted to have any direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in an adult-use retail dispensary, on-site

*Draft – Subject to Change*

consumption, delivery, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee.

(j)    A conditional processor licensed pursuant to section 69-a of the Cannabis Law is subject to all rules and regulations in this Title applicable to a processor. A conditional processor determined to be in good standing by the Office shall, upon submitting any necessary forms required by the Office and upon payment of any applicable fees, be permitted to transition to a processor license.

(k)    A conditional processor shall be given priority by the Office in review of its application for a processor, and if applicable a distributor license under this Part.

## § 123.6 Processor License Facility Operations.

(a)    Good manufacturing practices.

(1)    All cannabis and cannabis product processing shall be in accordance with good manufacturing practice (GMP) standards, pursuant to either Part 111 or Part 117 of Title 21 of the Code of Federal Regulations, as applicable for the type of cannabis or cannabis product being processed or as otherwise determined by the Office.

(2)    A licensee who is authorized to conduct certain processing activities as determined by the Office shall establish compliance with GMP standards by submitting to the Office proof of a qualified third-party GMP audit, of the licensee's extraction and/or manufacturing processes as

153

*Draft – Subject to Change*

applicable, to the satisfaction of the Office, within one (1) year of commencing licensed

operations. The Office shall issue future guidance determining and authorizing qualified third-

party GMP auditors.

(3)      A licensee who is processing and required by the Office, shall maintain proof of current

GMP certification for the duration of the license and make such certification readily available to

the Office upon request.

(b)      General requirements. A processor shall:

(1)      maintain all designated processing areas in accordance with general sanitary practices as

set forth in section 125.7 of this Title;

(2)      assign a lot unique identifier, and batch number on all cannabis and cannabis products,

which allows for complete traceability of all cannabis and cannabis products processed during a

specific period of time and under similar conditions;

(3)      comply with all packaging and labeling standards in Part 128 of this Title;

(4)      maintain, and make available to the Office upon request, processing, packaging, labeling

and production batch records, including records of all ingredients and materials used in the

processing of each lot of cannabis or cannabis product, and any other applicable records required

by Part 125 of this Title;

*Draft – Subject to Change*

(5)      develop and maintain written standard operating procedures for all processing activities to ensure homogeneity and consistency of cannabis products, including, but not limited to, development of a master manufacturing record containing standards for product purity, strength, and composition for each type of cannabis product produced. Common plan types include a GMP Plan, Quality Assurance Plan, or Hazard Analysis and Critical Control Points (HACCP) Plan.

(c)      Requirements for extraction. Unless otherwise approved in writing by the Office, a processor authorized to perform extraction may only use the methods, equipment, solvents, gases, and mediums set forth in this section and approved on the processor's application and shall be conducted only in a manner exhibiting minimal risks to worker safety and public health.

(1)      All extraction processes and activities shall:

(i)      be conducted by employees trained in the operation of the extraction equipment to be utilized, as well as the emergency plan for incidents and any hazards associated with chemicals, ingredients, solvents, or processes used;

(ii)      demonstrate control of all sources of ignition, and occur in a spark-free environment where appropriate for the type of extraction method used;

(iii)      ensure proper ventilation;

*Draft – Subject to Change*

(iv)     have ongoing equipment monitoring and maintain a record of regular maintenance of equipment based on equipment specifications;

(v)      follow all applicable state and local fire, safety and building codes, regulations, laws and guidance related to the use and storage of solvents, including, but not limited to, maximum quantities to be held onsite; and

(vi)     have evidence of the purity of any chemical solvents used and make any certificate of analysis for the solvents or other documentation evidencing such purity readily available to employees and to the Office upon request.

(2)      Unless a processor obtains prior written approval from the Office, extraction shall only be conducted using the following methods:

(i)      mechanical extraction methods;

(ii)     a professional grade, closed-loop $CO_2$ extraction system that is of a supply equivalent to food or beverage grade of at least 99.5% purity;

(iii)    ethanol or alcohol based, provided that all ethanol or alcohol used shall be of a grade that meets or exceeds specifications of official compendiums as defined in section 321 of Title 21 of the United States Code (USC);

*Draft – Subject to Change*

(iv)    a volatile solvent or hydrocarbon extraction method, provided that the method:

*(a)*    utilizes a commercial, professional grade closed-loop system designed to recover the solvent; and

*(b)*    utilizes the following permissible volatile solvent-based or hydrocarbon extraction substances, which shall be accompanied by a certificate of analysis which establishes that said substances have a minimum purity level of 99%:

*(1)*    Butane;

*(2)*    Propane; or

*(3)*    any other volatile solvent or hydrocarbon with prior written approval by the Office prior to use;

(v)    For all proposed volatile solvent-based or hydrocarbon extraction, a processor shall submit to the Office, prior to receiving approval to commence extraction operations at a processing facility, documentation which demonstrates, to the satisfaction of the Office, the following additional requirements for all designated extraction equipment, rooms, or other areas where volatile solvents used for extraction are handled or stored:

*Draft – Subject to Change*

*(a)*    final certification letter from a licensed professional engineer or registered architect which certifies the completed installation of a professionally designed, commercially manufactured extraction system, that is compliant with all applicable state or local fire, safety or building codes;

*(b)*    a letter from the municipal jurisdiction's fire marshal, or their designee, stating that a final inspection of the facility has been conducted and that the processor has demonstrated compliance with all applicable fire codes and/or regulations; and

*(c)*    a certificate of occupancy, or equivalent document, from the local building official that all permits for extraction related rooms or areas have been closed as applicable.

(d)    Allowable cannabis and cannabis product types. A processor may produce the following types of cannabis or cannabis products for sale:

(1)    topicals;

(2)    edibles, that are not in shapes considered to be attractive to individuals under twenty-one (21) as defined in Part 128 of this Title, including, but not limited to:

(i)    capsules;

(ii)    beverages;

*Draft – Subject to Change*

(iii)    tablets;

(iv)    tinctures;

(v)    baked goods;

(vi)    gummies; or

(vii)    chocolates;

(3)    vaporization cartridges or single-use pens;

(4)    concentrates such as shatters, waxes and resin;

(5)    cannabis flower products, including, but not limited to, whole flower, ground flower, shake and pre-rolls;

(6)    cannabis extracts for intermediary sale; and

(7)    any other cannabis product type or form, except for the prohibitions in subdivision (e) of this section, with prior written approval of the Office which, following written submission by the processor and a review process by the Office of the proposal, including, but not limited to, review of proposed manufacturing processes, methods of administration and any other factors

*Draft – Subject to Change*

which assess risk to public health and safety, is determined in writing by the Office to be suitable as a product for retail sale.

(e)     Prohibitions and prohibited product types. A processor is prohibited from processing any cannabis products which:

(1)     contain liquor, wine, beer, cider or meet the definition of an alcoholic beverage as defined in section 3 of the Alcohol Beverage Control Law;

(2)     contain tobacco or nicotine;

(3)     exceed the maximum total THC per serving and per package limits set forth in paragraph (1) of subdivision (f) of this section;

(4)     are attractive to individuals under twenty-one (21) years of age pursuant to Part 128 and 129 of this Title;

(5)     contain synthetic cannabinoids and/or cannabimimetic agents, as defined in subdivision (g) and subdivision (h) of schedule I of section 3306 of the Public Health Law;

(6)     contain any artificially derived phytocannabinoids;

(7)     require manufacture under sterile conditions;

*Draft – Subject to Change*

(8)      are considered a potentially hazardous food as defined by 10 NYCRR section 14-1.31;

(9)      contain any non-phytocannabinoid ingredient that would increase potency, toxicity, or addictive potential, or that would create an unsafe combination, known or unknown, with other psychoactive substances. This prohibition shall not apply to products containing naturally occurring caffeine, such as coffee, tea, or chocolate;

(10)     are manufactured by application of phytocannabinoid concentrate or extract to commercially available candy or snack food items without further processing of the product. Commercially available candy or snack food items may be used as ingredients in a cannabis product, provided that they are used in a way that renders them unrecognizable as the commercially available items, and the label, including the ingredient list, does not note that the final cannabis product contains the commercially available item;

(11)     are in the shape of, or imprinted with the shape, either realistic or caricature, of a human being, animal, insect, or fruit, or is otherwise attractive to individuals under the age of twenty-one (21) as defined in Part 128 of this Title; or

(12)     are in the form of an injectable, inhaler, suppository, transdermal formulations, or any other disallowed form, as determined by the Office, including a form allowed solely for medical cannabis use, unless otherwise authorized by the Office.

*Draft – Subject to Change*

(f)    Requirements for all cannabis products. All cannabis products processed for distribution for retail sale shall:

(1)    if in the form of an orally ingested product, conform to the product potency limit of 10 milligrams (mg) total THC per serving, and 100 mg total THC per package, provided, however, that tinctures shall conform to the product potency limit of 10 mg total THC per serving, and 1,000 mg total THC per package.

(2)    not contain less than 85% or more than 115% of the concentration of total THC, CBD, or any other phytocannabinoid and terpene content as listed on the cannabis product label and reflected on the cannabis product laboratory testing certificate of analysis. Any cannabis product not meeting this requirement shall be relabeled with the accurate phytocannabinoid and terpene content, provided that all other laboratory testing results comply with Part 130 of this Title, and the maximum serving requirements in paragraph (1) of this subdivision without further product remediation, unless otherwise authorized by the Office;

(3)    be prepackaged, and not added to food or any other consumable products at the point of retail sale;

(4)    be shelf stable, unless otherwise approved in writing by the Office, provided that nothing in this provision shall prohibit a processor from storing non-cannabis components or ingredients under refrigeration until use in product manufacturing;

*Draft – Subject to Change*

(5)      unless otherwise approved by the Office, except for cannabis, contain only ingredients which are appropriate for the cannabis product type and are, unless otherwise required to be pharmaceutical grade based on the product type, at a minimum, food grade, meaning the ingredient is generally recognized as safe (GRAS) or meets internationally recognized standards for the purity and identity of food ingredients;

(i)      unless otherwise approved by the Office, except for cannabis, cannabis products, or terpenes, no ingredient or component shall be used in the manufacturing of an edible cannabis product unless that ingredient or component is permitted by the United States Food and Drug Administration (FDA) for use in food or food manufacturing, as specified in Substances Added to Food in the United States, available at https://www.accessdata.fda.gov/scripts/fdcc/index.cfm?set=FoodSubstances, or is Generally Recognized as Safe (GRAS) pursuant to sections 201(s) and 409 of the Federal Food, Drug, and Cosmetic Act;

(ii)      unless otherwise approved by the Office, except for cannabis or terpenes, topical cannabis products shall only contain ingredients permitted for cosmetic manufacturing in accordance with Title 21, Code of Federal Regulations, Part 700, subpart B (section 700.11 et seq.);

(iii)      unless otherwise approved by the Office, cannabis products intended to be inhaled shall only contain cannabis, cannabis concentrate, terpenes, rolling paper, pre-roll filter tips, or ingredients permitted by the United States Food and Drug Administration as an "inactive

163

ingredient" for inhalation, as specified in the United States Food and Drug Administration Inactive Ingredients Database; and

(iv)    the Office may determine, in guidance, additional standards related to the ingredients which may be used in cannabis products, and such standards may include, but not be limited to, the identification of ingredients which may only be appropriate for certain product forms or the establishment of certain quality metrics which must be met by specific ingredients in order to be used in cannabis products;

(6)    have a date of expiration for unopened product and a use by date for opened product established by available stability data from stability studies initiated by the licensee or from a reputable outside source, for the cannabis product form. Each processor that is labeling cannabis products in their final form to be sold to a consumer shall possess stability data for each cannabis product being labeled which supports any unopened package date of expiration or opened package use by date on the cannabis product's respective label. All stability data shall be made available to the Office upon request;

(i)    The processor shall complete any stability testing of a cannabis product, requested by the Office, to demonstrate the ongoing stability of the product produced over time.

(ii)    For stability testing of unopened cannabis products, each cannabis product shall retain a total THC and CBD concentration in milligrams per single serving that is consistent with paragraph two (2) of this subdivision. If the product no longer retains a consistent concentration

*Draft – Subject to Change*

of total THC and CBD pursuant to paragraph one (1) of this subdivision, the product shall be deemed no longer suitable for sale and shall be destroyed pursuant to section 125.11 of this Title.

(7)    except for cannabis flower products, have the total number of servings in the cannabis product determined and displayed. For cannabis edible products or products intended for oral ingestion, products that consist of more than a single serving shall be either:

(i)    if the cannabis product is in solid form, the product shall be scored or otherwise delineated by the processor to indicate one serving;

(ii)    if the product is not in solid form, the product shall be packaged in a manner such that a single serving is readily identifiable or easily measurable and the package is resealable; or

(iii)    if the product is a cannabis beverage product, the product shall not have more than a single serving per package, provided, however, multiple cannabis beverage products can be sold together.

(8)    if such products, other than cannabis flower products, contain multiple servings which are not individually wrapped, premeasured, separated, or delineated, shall include a measuring device such as a measuring cap, cup, or dropper with the product packaging, which shall be provided with the cannabis product. Hash marks on the package shall not qualify as a measuring device;

*Draft – Subject to Change*

(9)    if vaporized or inhaled, meet the following additional requirements:

(i)    if the product is vaporization oil that cannot be separated from the associated vaporization device, the vaporization device shall have internal or external temperature controls to prevent combustion and have a heating element made of inert material such as glass, ceramic or stainless steel and not plastic or rubber;

(ii)    except for botanically derived terpenes, ingredients used in vaporized or inhaled cannabis products shall be pharmaceutical grade unless otherwise approved by the Office;

(iii)    ingredients used in vaporized or inhaled cannabis products shall not include:

*(a)*    synthetic terpenes;

*(b)*    polyethylene glycol (PEG);

*(c)*    vitamin E acetate;

*(d)*    medium chain triglycerides (MCT oil);

*(e)*    medicinal compounds;

*(f)*    illegal or controlled substances;

*Draft – Subject to Change*

(g)    artificial food coloring;

(h)    benzoic acid;

(i)    diketones; and

(j)    any other compound or ingredient as determined by the Office;

(iv)    vaporized or inhaled cannabis products cannot exceed more than ten (10) percent total terpenes; and

(v)    licensees shall maintain records with full information on the source of all botanically derived terpenes, which shall include any cannabis derived terpenes, used in vaporized or inhaled cannabis products and provide this information to the Office upon request; and

(vi)    vaporized or inhaled cannabis products shall not be flavored if such flavor is:

(a)    menthol or any type of mint;

(b)    cotton candy;

(c)    bubble gum;

*Draft – Subject to Change*

*(d)*    candy;

*(e)*    clove;

*(f)*    vanilla;

*(g)*    chocolate;

*(h)*    ice cream or gelato;

*(i)*    soda;

*(j)*    cereal;

*(k)*    dessert;

*(l)*    a concept flavor; or

*(m)*    another flavor that is attractive to individuals under twenty-one (21), as determined by the Office.

*Draft – Subject to Change*

(10)    except for flower products, be homogenous, with phytocannabinoid content evenly distributed throughout the cannabis product. Unless otherwise approved by the Office, a cannabis product shall not be considered homogenous if the concentration of total THC and CBD in milligrams per single serving for representative sampling submitted for testing, pursuant to Part 130 of this Title, is not within twenty-five (25) percent of the mean concentration of total THC and CBD in milligrams per single serving for that submitted lot with the exception that, for products with a specified total THC and CBD concentration less than two (2) milligrams per single serving, the concentration of each sample for that low concentration phytocannabinoid shall be within 0.5 milligrams per serving of the mean concentration; and

(11)    be identified and categorized in a processor's inventory tracking system, including, but not limited, to information detailing the milligrams of total THC in the cannabis product, to ensure compliance with Article 20-C of the Tax Law.

(g)    Cannabis product quality plans, master manufacturing records and batch product records.

(1)    A processor shall implement and maintain a written product quality plan for each type of cannabis product it manufactures. The product quality plan shall address the risks and hazards associated with the premises and the manufacturing process that, if not properly mitigated, may cause the cannabis product to be adulterated or misbranded, may cause harm to individuals involved in the process, or may cause the cannabis product to fail laboratory testing or quality assurance review and shall include the following:

*Draft – Subject to Change*

(i)    a comprehensive assessment of the overall manufacturing process, including all steps from component intake through transfer of product from the premises;

(ii)    evaluation of the potential risks associated with each manufacturing step, which includes evaluation of potential risks to individuals completing the manufacturing step and potential risks to cannabis product quality that could be introduced during manufacturing operations including, but not limited to, physical, biological, microbiological or chemical hazards, or process failures that may lead to product contamination, allergen cross-contact, packaging errors, labeling errors, or other errors affecting cannabis product quality; and

(iii)    identification of preventive measures necessary to mitigate each potential risk identified, methods to evaluate the effectiveness of the preventive measure and any action to take if a preventive measure was unsuccessful.

(2)    a processor shall develop, maintain and follow a written master manufacturing protocol for each unique formulation of cannabis product manufactured, and for each batch size, to ensure uniformity in finished batches and across all batches produced. The master manufacturing protocol shall include the following:

(i)    the name and intended phytocannabinoid content of the cannabis product to be manufactured;

*Draft – Subject to Change*

(ii)    a complete list of all ingredients to be used and the weight or measure of each ingredient, which may include the ability to adjust the weight or measure of phytocannabinoid-containing ingredients in order to account for the variability of phytocannabinoid content in cannabis;

(iii)    the identity and weight or measure of each ingredient that will be declared on the ingredients list of the cannabis product, if different than above;

(iv)    the expected yield of the finished manufactured cannabis product, based upon the quantity of ingredients or packaging to be used in the absence of any loss or error in actual production, and the maximum and minimum percentages of expected yield beyond which a deviation investigation of a batch will be necessary;

(v)    a description of packaging and a representative label, or a cross-reference to the location of the actual or representative label, which may be maintained electronically;

(vi)    the expected number of packages and labels to be used, if the cannabis product will leave the manufacturing premises in final form;

(vii)    written instructions for each point, step, or stage in the manufacturing process; and

(viii)    written instructions for any action to mitigate risks identified in the product quality plan.

*Draft – Subject to Change*

(3)    Processors shall develop, maintain and follow, a written batch production record for every batch of a cannabis product manufactured, which shall include any batch specific remediation or relabeling. The batch production record shall:

(i)    accurately follow the appropriate master manufacturing protocol, and each step of the protocol shall be performed in the production of the batch;

(ii)    document complete information relating to the production and control of each batch, including, but not limited to:

*(a)*    lot number, or batch number as applicable, of the finished batch of cannabis product, and unique identification numbers or barcodes of all cannabis used in the batch as captured by the inventory tracking system of record;

*(b)*    specific equipment and processing lines used in producing or remediating the batch;

*(c)*    the identity and weight or measure of each component used;

*(d)*     the actual yield and the percentage difference from expected yield at appropriate phases of manufacturing as identified in the master manufacturing protocol;

*(e)*    the actual results obtained during any monitoring operation, if the product quality plan identifies any monitoring needed to ensure product safety at a specific manufacturing step;

*Draft – Subject to Change*

*(f)*        the date and time of when each step of the master manufacturing protocol was

performed, and the initials of the person(s) performing each step;

*(g)*        an actual or representative label or other identification of the label to be used for the

cannabis product;

*(h)*        the actual quantity of the packaging and labels used, and the difference from the expected

number to be used, if the cannabis product will leave the manufacturing premises as a final

cannabis product;

*(i)*        documentation that quality control personnel reviewed the batch production record,

including all required monitoring operations, test results for components, if applicable, and

finished batches of cannabis product, and either approved and released, or rejected, the finished

cannabis product, including any remediated, repackaged or relabeled cannabis product;

*(j)*        documentation, at the time of performance, of any investigation identified in the product

quality plan or master manufacturing protocol, including investigations into deviations from the

expected yield or package and label count.

(iii)        contain actual values and observations, as appropriate, during verification activities and

be accurate and legible and be created concurrently with performance of the activity

documented; and

*Draft – Subject to Change*

(iv)    include sufficient detail to provide a history of work performed, including the date each step was performed, and the signature, electronic signature, or initials of the employee performing the activity.

(4)    product quality plans, master manufacturing protocols and batch records shall be readily available for employee reference and made readily available to the Office upon request.

(h)    Cannabis product testing.

(1)    Prior to a cannabis product being distributed, a licensee authorized to process shall test a representative sample of cannabis products in accordance with required sampling protocols pursuant to Part 130 of this Title and determined by the Office and maintain a certificate of analysis for all lots of cannabis product tested for a period of five (5) years from the date of expiration.

(2)    All cannabis product testing shall be consistent with acceptable limits as determined by the Office, pursuant to Part 130 of this Title.

(3)    The licensee shall retain a subset of each lot of cannabis product to allow for testing in the future if requested by the Office, as follows:

*Draft – Subject to Change*

(i)      retained samples shall be stored unopened as indicated on the label pursuant to Part 128 of this Title and in the original packaging;

(ii)     retained samples shall be readily identifiable as belonging to its specific lot; and

(iii)    the quantity retained shall be a number of representative samples to allow for complete testing of the product at least two (2) times and shall be retained by the processor for at least thirty (30) days following the date of expiration, or longer if directed by the Office.

(i)      Cannabis product quarantine and remediation.

(1)      any cannabis product lot not meeting the minimum testing standards for contaminants, shall be rejected and destroyed by the licensed processor pursuant to section 125.11 of this Title, except that a cannabis product lot that has not met the minimum testing standards for contaminant testing may be remediated and repurposed provided that:

(i)      the licensee must notify the Office of their intention to remediate or repurpose a cannabis product prior to initiating the remediation or repurposing process;

(ii)     the cannabis products shall be resubmitted for laboratory testing in a manner set forth in subdivision (j) of this section; and

(iii)    after completing the required analyses of a representative sample obtained from a remediated or repurposed cannabis lot, the laboratory shall report the results to the Office in the

*Draft – Subject to Change*

manner set forth in Part 130 of this Title.

(2)    a cannabis product lot may only be remediated or repurposed for extraction once. If the lot fails to meet minimum testing standards for contaminants after the remediation or repurposing process, the entire lot shall be destroyed by the licensed processor pursuant to section 125.11 of this Title.

(3)    when a failed cannabis product lot is not remediated or reprocessed in any way it cannot be retested. Any subsequent testing results produced without remediation of the failed lot will not supersede the initial regulatory testing results.

(j)    A processor shall not package any other good in the same package as a cannabis product, unless such good complies with all requirements of section 129.3 of this Title and is:

(1)    a rechargeable vaporization device that is closed system, has internal or external temperature controls to prevent combustion, and has a heating element made of an inert material such as glass, ceramic or stainless steel and not plastic or rubber;

(2)    a measuring device such as a measuring cup, cap, or dropper;

(3)    matches; or

(4)    otherwise approved by the Office.

*Draft – Subject to Change*

**§ 123.7 Distributor Ownership, Interests, Business Authorizations and Prohibitions.**

(a)      A distributor may acquire, possess, distribute, and sell cannabis products.

(b)      A distributor may acquire cannabis products from any duly licensed processor or a microbusiness, cooperative or collective, ROD or ROND.

(c)      A distributor may only sell cannabis products to another duly licensed adult-use retail dispensary, a ROD, or on-site consumption licensee.

(d)       A distributor shall not be prohibited from transporting or warehousing cannabis products for another distributor or conducting activities related to any of the foregoing as determined by the Office.

(e)      A distributor or its true party of interest may be a true party of interest in a cultivator, processor, distributor, cooperative or collective, ROD, or ROND license.

(f)      A distributor, or its true party of interest, may have a goods and services agreement with an adult-use cultivator, processor, distributor, cooperative or collective, ROD or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(g)      In addition to any other restrictions or prohibitions in this Title, including, but not limited to, Part 124, no distributor or its true party of interest is permitted to have any direct or indirect

*Draft – Subject to Change*

interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in an adult-use retail dispensary, on-site consumption, microbusiness, delivery, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee.

### § 123.8 Distributor Operations.

(a)      A distributor shall:


(1)      comply with Article 20-C of the Tax Law, as well as other applicable provisions of law.


(2)       transport only cannabis products between adult-use cannabis licensees; and between the licensed premises of an adult-use cannabis facility for purposes of distributing the cannabis products;


(3)      including its employees, who possess or transport cannabis products upon the public highways, roads or streets of the state, shall have in their possession invoices or manifests for such cannabis products. Such invoices or manifests shall show the name and address of the seller, the name and address of the purchaser, the quantity, product type and brands of the cannabis products being distributed, and the name and address of the person who has or shall assume the payment of the tax or the tax paid or payable. The absence of such invoices or manifests shall be presumptive evidence that the tax imposed by Article 20-C of the Tax Law on cannabis products has not been paid and is due and owing.

*Draft – Subject to Change*

(4)       maintain transaction records of all cannabis product purchased and distributed to distributors, retail dispensaries, or on-site consumption premises and send such records to the Office's inventory tracking system, real-time, in a manner determined by the Office. Such records shall provide enough detail to independently determine the taxability of each sale, the tax liability for each cannabis product sold and the amount of tax payable by the distributor.

(i)       detailed information required for each sales transaction including, but not limited to:

*(a)*       individual cannabis product item(s) sold;

*(b)*       selling price;

*(c)*       tax due;

*(d)*        method of payment;

*(e)*       employee completing the sales transaction:

*(f)*       a device used to complete a sales transaction that may be a combination of software and hardware;

*(g)*        sales transaction number;

*Draft – Subject to Change*

*(h)*     date and time of the sale; and

*(i)*     the name, address and license number of the retail dispensary or on-site consumption premises.

(ii)     a distributor, retail dispensary and on-site consumption premises shall be offered a receipt of their purchase which shall include, but not be limited to:

*(a)*      the name, address, and license number of the distributor;

*(b)*     the date and time of sale;

*(c)*     the form and the quantity of cannabis products and any other items sold; and

*(d)*     the first name and the first letter of the last name of the employee completing the sale.

(5)     keep and maintain upon the licensed premises adequate books and records to demonstrate the distributor's actual cost of doing business, using accounting standards and methods regularly employed in the determination of costs for the purpose of federal income tax reporting, for the total operation of the distributor. Such books, records, and invoices shall be kept for a period of five (5) years and shall be available for inspection by the Office.

*Draft – Subject to Change*

(6)      a distributor shall comply with any fees, maximum margins, price posting requirements, and any policies related to market competition and license availability restrictions determined by the Office.

(b)      In addition to the requirements set forth in subdivision (a) of this section, a distributor shall not:

(1)      transport cannabis products to an adult-use cannabis retail dispensary or on-site consumption premises for purposes of retail sale unless it is licensed as a distributor pursuant to the Cannabis Law and this Title;

(2)      transport cannabis products to a retail dispensary or on-site consumption premises unless the retail dispensary or on-site consumption premises holds a valid and current license as a retail dispensary or on-site consumption premises respectively;

(3)       accept, sell, transfer, distribute, or agree to sell, transfer or distribute, any cannabis product unless it is in a retail package and labeled pursuant to Part 128 of this Title, provided any unlabeled cannabis product in the possession of a distributor shall be deemed illicit cannabis as defined in section 136 of the Cannabis Law and may be subject to the penalties described in the Cannabis Law, Part 133 of this Title, and any other penalties or sanctions as determined by the Board, including, but not limited to, cancellation, suspension, or revocation of a license and imposition of fees, civil penalties and any other penalty;

*Draft – Subject to Change*

(4)    accept, sell, transfer, distribute, or agree to sell, transfer or distribute, any cannabis product that has not been tested pursuant to Part 130 of this Title as indicated by a certificate of analysis;

(5)    furnish or cause to be furnished to any licensee, any exterior or interior sign, printed, painted, digital or otherwise, unless authorized by the Office.

**§ 123.9 Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.**

(a)    A retail dispensary may acquire cannabis products from any licensee authorized for distribution of such products.

(b)    A retail dispensary may acquire seedlings and immature plants from any licensee authorized as a nursery once adult-use home cultivation is authorized by the Board.

(c)    A retail dispensary may possess, sell and deliver cannabis products and cannabis paraphernalia.

(d)    A retail dispensary may sell cannabis products and cannabis paraphernalia to cannabis consumers.

(e)    A retail dispensary may operate a limited retail consumption facility pursuant to the operating requirements in this Title.

*Draft – Subject to Change*

(1)      Prior to operating a limited retail consumption facility:

(i)      an applicant or licensee shall request approval in a form and manner determined by the Board that may include, but not be limited to, information in sections 125.1 and 125.2 of this Title related to the consumption facility; and

(ii)      the Board may require an applicant or licensee update, alter, or amend their submission prior to approving a licensee's request to operate a limited retail consumption facility;

(2)      A retail dispensary's licensed premises shall not contain a consumption facility that is not a limited retail consumption facility notwithstanding, however, a retail dispensary may temporarily add a consumption facility to its premises pursuant to section 120.19 of this Title.

(3)      A licensee approved to operate a limited retail consumption facility shall pay a fee of $3,000, in addition to the fee for their adult-use retail dispensary upon approval, and shall pay an equal fee upon application for license renewal, unless the licensee's limited retail consumption facility is on the same road and within 200 feet of the center of the nearest public housing facility entrance, in which case the $3,000 fee described in this subdivision shall not apply; and

(4)      A limited retail consumption facility shall be deemed a type of adult-use on-site consumption premises for purposes of determining compliance with Article 13-E of the Public Health Law.

*Draft – Subject to Change*

(f)    Sales of cannabis products shall only be executed by licensees authorized to conduct sales of cannabis to consumers. Any person found to be selling cannabis unlawfully may be subject to penalties and fines pursuant to the Cannabis Law and Part 133 of this Title.

(g)    A retail dispensary or its true party of interest may also be true parties of interest in a delivery license.

(h)    No person shall be a true party of interest in more than three (3) adult-use retail dispensary licenses, or in an adult-use retail dispensary and delivery or on-site consumption license, provided, however, a true party of interest in a retail dispensary may simultaneously be a passive investor in any number of retail dispensary, delivery, and on-site consumption licenses, if such true party of interest complies with all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(i)    A retail dispensary or its true party of interest may have a goods and services agreement with an on-site consumption or delivery license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

*Draft – Subject to Change*

(j)      In addition to any other restrictions or prohibitions in this Part, no adult-use retail

dispensary or its true party of interest is permitted to hold a direct or indirect interest, including

by being a true party of interest, passive investor, or having a goods and services agreement with,

or by any other means, in an adult-use cultivator, processor, distributor, cooperative or collective,

microbusiness, ROD, ROND, registered organization registered under Article 3 of the Cannabis

Law, or cannabis laboratory licensee or permittee, or any person outside of New York State,

otherwise licensed to conduct the activities authorized under such licenses, registrations, and

permits.

## § 123.10 Retail Dispensary Operations.

(a)      A retail dispensary shall be a physical brick and mortar store in New York State with

posted hours of operation to be authorized to sell cannabis products and related items to cannabis

consumers by in-person sale, over the internet or via a digital application pursuant to this Title.

(b)      The retail dispensary may operate a drive-thru service window or pre-order pick-up lanes

for individuals using ground transportation, with prior written approval from the Office and in

compliance with all applicable state and local laws, rules, and regulations.

(c)      Retail dispensary supervision and staffing requirements include, but are not limited to,

the following:

(1)      No employee shall be the employee in charge of more than one retail dispensary at the

same time; and

*Draft – Subject to Change*

(2)      The following activities are to be performed by and overseen by the retail dispensary's employee in charge:

(i)      the proper conduct of the employees of the retail dispensary;

(ii)     the immediate supervision and management of the retail dispensary during hours of operation;

(iii)    opening and closing the facility;

(iv)     activities of retail dispensary employees;

(v)      inventory and delivery acceptance;

(vi)     recordkeeping and maintenance of files subject to audit or inspection by the Office;

(vii)     employee training and compliance with state and local laws and regulations;

(viii)   maintaining and providing to the Office, upon request, an up-to-date retail dispensary staffing plan for staff involved in activities related to the sale of cannabis products.;

(ix)    notifying the Office of the termination of an employee for diversion of cannabis product or theft of currency within 24 hours of the termination;

(x)    notifying the Office of any change of information required to be reported to the Office;

(xi)    the turning away of individuals who present a risk to the public; and

(xi)    any other activity determined by the Office.

(3)    No employee shall be required to enter a limited retail consumption facility to conduct the duties of their job unless the employee agrees to this condition at time of hiring and such agreement is noted by the employee in charge in the licensee's records. Licensees shall accommodate all reasonable requests from employees to alter the terms of such agreement and, in the event an employee notifies the Office or Board that their reasonable request was not accommodated, the licensee shall alter the terms of such agreement if the Board deems such request to have been reasonable. Failure by the licensee to comply with these requirements may result in suspension, revocation, and/or a civil penalty pursuant to Part 133 of this Title.

(d)    Verification of identification and proof of age for retail dispensaries.

(1)    No retail dispensary shall sell, deliver, or give away or cause or permit or procure to be sold, delivered, or given away any cannabis or cannabis product to any individual, actually or seemingly under the age of twenty-one (21) years of age or any visibly intoxicated individual.

187

*Draft – Subject to Change*

(2)      Retail dispensary staff shall inspect the individual's identification and determine the individual's age to validate that the individual is twenty-one (21) years of age or older. Valid identification and proof of age shall include:

(i)      a valid driver's license or non-driver identification card issued by the New York State Department of Motor Vehicles, the federal government, any United States territory, commonwealth or possession, the District of Columbia, a state or local government within the United States or a provincial government of the dominion of Canada;

(ii)     a valid federal, state, or local government identification, including IDNYC, stating the individual's age and a photograph of the individual's face;

(iii)    a valid passport issued by the United States government or any other country;

(iv)    a consular identification card; or

(v)     an identification card issued by the armed forces of the United States.

(3)     The retail dispensary employee may perform a transaction scan of the individual's identification as a precondition to the sale of any cannabis product.

*Draft – Subject to Change*

(4)     On-line orders, telephone orders or other means of orders not made in person for cannabis products shall include an attestation that the individual ordering is twenty-one (21) years of age or older. The retail dispensary employee who transports the cannabis product shall obtain verification of the identity and the age of the cannabis consumer at the point of delivery by viewing or scanning a document described in this Part before providing the cannabis product to the cannabis consumer. If the individual placing the order will not be the individual accepting the order, the individual placing the order shall attest that the individual accepting the order is over twenty-one (21) years of age and that individual shall provide verification of identity and age at the time of accepting the delivery or dispensing. Both individuals' identities shall be recorded in the licensees' point-of-sale system.

(5)     A retail dispensary may not acquire or record cannabis consumer personal information without consent, unless this information is typically acquired in a sales transaction, which can include the cannabis consumer's age.

(e)     Cannabis Product Sales Requirements.

(1)     A retail dispensary will be operational and available to sell cannabis products to cannabis consumers only during their designated hours of operation as provided in the application for a license or in the retail dispensary operating plan. Retail dispensaries may operate within the business hours stipulated in section 119.2 of this Title, unless operating hours are otherwise specified by the jurisdiction in which the business operates.

(2)     The retail dispensary shall:

*Draft – Subject to Change*

(i)      post, visible to consumers, its hours of operation in a conspicuous location inside each retail dispensary premises;

(ii)      post, visible to consumers, any and all signs or posted placards required by the Office, including posting of the adult-use retail dispensary license issued by the Office and allowable possession and purchase limits, in a conspicuous location inside the retail dispensary premises;

(iii)      only offer for sale cannabis products, cannabis paraphernalia, or cannabis merchandise with the licensee's brand. Such provision shall not preclude the sale of cannabis merchandise with the brand of a trade association.  The Office may establish additional items in future guidance. Cannabinoid hemp products may only be provided, however, when the retail dispensary has obtained a cannabinoid hemp retailer license pursuant to Article 5 of the Cannabis Law;

(iv)      offer for sale or provide containers to consumers for the secure storage of cannabis that lock and are child resistant pursuant to Part 128 of this Title;

(v)      utilize an inventory tracking system pursuant to section 125.8 of this Title, with the capability of compiling a retail dispensary's cannabis product inventory, transaction data and tax liability as prescribed by the Office. The retail dispensary's system shall be compatible and capable of reporting the data to the Office on a real time basis; and

*Draft – Subject to Change*

(vi)    conduct a monthly analysis of its inventory tracking system to determine that no software has been installed that could be utilized to manipulate or alter inventory or sales data and that no other methodology has been employed to manipulate or alter data. The use of any means to willfully underreport or overreport sales or manipulate inventory is prohibited and subject to penalties pursuant to Part 133 of this Title.

(3)    A retail dispensary may display, in secure, locked cases, samples of each cannabis product offered for sale. Authorized employees may remove samples from the display case and provide it to the cannabis consumer for inspection, provided the cannabis consumer may not consume or otherwise use or remove the sample from the retail dispensary.

(4)    Cannabis products shall only be sold by authorized employees of the retail dispensary who shall be twenty-one (21) years of age or older if interacting with cannabis consumers.

(5)    A retail dispensary shall be in a location consistent with distance requirements in Part 119 of this Title or as determined by the Board.

(f)    Cannabis Product Sales Transactions Requirements.

(1)    Each sales transaction record shall be sent to the Office's inventory tracking system, real-time, in a manner determined by the Office and provide enough detail to independently determine the taxability of each sale and the amount of tax due and collected. Detailed information required for each sales transaction includes, but is not limited to, the:

*Draft – Subject to Change*

(i)      individual item(s) sold including the form and the quantity of cannabis products and any other items sold;

(ii)     selling price;

(iii)    tax due including a separate delineation for each retail tax imposed on adult-use cannabis pursuant to Article 20-C of the Tax Law;

(iv)     method of payment;

(v)      first name and the first letter of the last name of the employee completing the sales transaction;

(vi)     device that was used to complete a sales transaction that may be a combination of software and hardware;

(vii)    unique identifier for the sales transaction; and

(viii)   date and time of the sale;

(2)      A cannabis consumer shall be offered a receipt of their purchase including, but not limited to:

*Draft – Subject to Change*

(i)     the name, address, and license number of the retail dispensary;

(ii)    the date and time of sale;

(iii)   the form and the quantity of cannabis products and any other items sold;

(iv)    the first name and the first letter of the last name of the employee completing the sale, and the delivery licensee's license number fulfilling the sale, if applicable; and

(v)     the tax paid including a separate delineation for each tax imposed on adult-use cannabis pursuant to Article 20-C of the Tax Law;

(3)     Cannabis products purchased by a cannabis consumer may be placed into an exit package pursuant to Part 128 of this Title.

(4)     Nothing in this section shall prevent a retail dispensary employee from refusing to sell cannabis product if, in their judgment, doing so could endanger the health or safety of the cannabis consumer.

(g)     Retail Dispensary Prohibitions. A retail dispensary shall not:

*Draft – Subject to Change*

(1)     violate distance requirements pursuant to section 119.4 of this Title, or the Cannabis

Law;

(2)     conduct or transact business at a retail dispensary under a name which contains as a part

thereof the words "drugs", "medicines", "drug store", "apothecary", "pharmacy", or similar terms

or combination of terms, or in any manner by advertisement, circular, poster, sign or otherwise

describe or refer to the licensed premises, or describe the type of service or class of products sold

by the retail dispensary, by the terms "drugs", "medicine", "drug store", "apothecary", or

"pharmacy". A retail dispensary name shall comply with the requirements in Part 129 of this

Title;

(3)     prominently display cannabis products or cannabis paraphernalia or cannabis

merchandise or any packaging or labeling that could reasonably be mistaken for a cannabis

product in a storefront window or other similar location that makes the product or paraphernalia

easily visible to individuals utilizing the public thoroughfare on which the dispensary is located;

(4)     sell or otherwise dispense any cannabis product later than the product date of expiration

or use by date marked on the label, however, when the cannabis product is identified as an

outdated product, the secure segregation and holding of such product beyond its date of

expiration or use by date for disposal shall not be deemed a violation of this paragraph;

(5)     dispense or otherwise sell cannabis products from a vending machine or allow such a

vending machine to be installed at the interior or exterior of the premises of the retail dispensary;

194

*Draft – Subject to Change*

(6)    abandon the licensed premises without surrendering the license to the Board and making appropriate arrangements for the disposal of cannabis products;

(7)    sell cannabis products obtained through the use of, or accept a sale of cannabis products from, any business that does not hold a license in New York State pursuant to Article 4 of the Cannabis Law;

(8)    provide cannabis samples to a cannabis consumer, other than to allow inspection of the product prior to purchase;

(9)    allow employees under twenty-one (21) years of age to have direct interaction with individuals inside a licensed retail dispensary;

(10)    engage in cannabis processing, manufacturing, or compounding at the retail dispensary;

(11)    knowingly sell, deliver, or give away to a cannabis consumer:

(i)    any amount of cannabis product which they know would cause the cannabis consumer to be in violation of the Cannabis Law or possession limits established by Article two hundred twenty-two of the Penal Law;

*Draft – Subject to Change*

(ii)　　any cannabis product, cannabis paraphernalia, or cannabis merchandise if the cannabis consumer is unable to produce valid proof of government-issued identification and age confirming that they are twenty-one (21) years of age or older;

(iii)　　cannabis products if the cannabis consumer or the public would be placed at risk. This includes, but is not limited to, the cannabis consumer engaging in daily transactions that exceed the legal possession limits or that create a risk of diversion;

(iv)　　food, beverage, or personal care item that is not a cannabis product;

(v)　　any product that contains nicotine; and

(vi)　　alcoholic beverage as defined in section 3 of the Alcohol Beverage Control Law.

(12)　　make recommendations to a cannabis consumer who is also a medical cannabis patient if the patient's dosing recommendation is "Per Pharmacist Consultation" and that patient presents their patient certification, issued pursuant to Part 113 of this Title, at the retail dispensary, without disclosing to the cannabis consumer that they are not a pharmacist. Further, any patient who presents a valid medical cannabis patient certification shall be provided a list of the nearest registered organization dispensing facilities;

(13)　　solicit or receive an order for, keep or expose for sale, or keep with intent to sell any cannabis product or cannabinoid hemp product to a cannabis consumer by means of any vehicle

*Draft – Subject to Change*

or wheeled frame used for transporting objects, for carrying goods and materials, including, but not limited to a cart, car, van, truck or trailer;

(14)    place back into stock of any retail dispensary or re-dispense cannabis product which is returned by a cannabis consumer. The returned product shall be quarantined for disposal pursuant to section 125.9 of this Title;

(15)    sell any form or type of cannabis product not 120.2ed by this Title;

(16)    sell any cannabis product that has not passed quality assurance laboratory testing pursuant to Part 130 of this Title;

(17)    sell any cannabis product for which the required tax pursuant to Article 20-C of the Tax Law has not been paid;

(18)    sell any cannabis product that does not meet the packaging and labeling requirements in Part 128 of this Title;

(19)    advertise or market any cannabis or cannabis products not in compliance with Part 129 of this Title;

*Draft – Subject to Change*

(20)     allow the consumption of any cannabis product by employees, individuals or cannabis

consumers, including any smoking or vaping, in any area of the licensed premises except a

consumption facility;

(21)      pay for marketing or promotion through a third-party platform, marketplace, or

aggregator that lists cannabis products for sale;

(22)     contract with a third-party offering two or more of the following services:  point of sale,

payment processing, inventory tracking, or e-commerce, unless such provider offers readily

accessible integration of the same functionality to independent alternative service providers for

each service offered pursuant to this provision; or

(23)     fulfill any order placed or otherwise acquired from the retail dispensary's purported

website on a third-party marketplace or aggregator where other retail dispensary licensees are

listed, or visa-versa.

(h)     Exceptions. Nothing in this section shall prohibit:

(1)     delivery of cannabis products into a town, city or village that, by local law, prohibits the

establishment of a retail dispensary; and

*Draft – Subject to Change*

(2)      delivery of cannabis products into a local jurisdiction beyond the prohibited hours for retail dispensary sales in such jurisdiction provided the delivery occurs within the hours of operation set forth in this section.

(i)      Cannabis Consumer Education.

(1)      The retail dispensary shall be required to make available to cannabis consumers, including to consumers who place delivery orders, certain public health and other educational materials provided or required by the Office.

(2)      Consumer education materials may not make health claims regarding cannabis or cannabis products.

(3)      Consumer education materials shall be made available for inspection by the Office upon request.

(j)      Storage Requirements. All cannabis products shall be stored in accordance with section 125.3 of this Title.

(1)      A retail dispensary shall store working stock of cannabis products locked behind a counter or other barrier to ensure a cannabis consumer does not have direct access to the cannabis products.

*Draft – Subject to Change*

(2)     Retail dispensaries shall have policies and procedures in place for the handling and storage of cash at the retail dispensary and for transportation of cash to financial institutions to prevent theft, loss and associated risks to the safety of employees, retail customers and the general public.

(k)     Delivery Service. Retail dispensaries providing delivery service shall have a written delivery service plan available for inspection by the Office. Delivery of cannabis products to a cannabis consumer shall be conducted pursuant to section 123.20 of this Title and Part 125 of this Title;

(l)     Product Returns and Recalls.

(1)     All recalls shall be conducted pursuant to section 125.9 of this Title, unless the retail dispensary is otherwise directed by the Office.

(2)     Retail dispensaries shall establish written policies and procedures to monitor, track and resolve complaints, cannabis product returns and quality assurance concerns.

(m)     Pricing.

(1)     A retail dispensary shall designate the price of each cannabis product or item sold by attaching to or otherwise displaying immediately adjacent to each such item displayed in the interior of the licensed premises where sales are made a price tag, sign or placard setting forth

*Draft – Subject to Change*

the price at which each such item is offered for sale at the dispensary. Pricing shall also be included on any menu accessible to cannabis consumers.

(2)    The price of all cannabis products and items offered for sale on the internet to prospective cannabis consumers shall be available on any internet website or digital application of the retailer.

(3)    No retail dispensary shall refuse or fail to make product pricing available to cannabis consumers upon request including quoting pricing to a prospective cannabis consumer by telephone or other means of communication.

(4)    When the retail dispensary displays a cannabis product price, it shall also display, separately, but in a similar font size or manner to the price, the total cost of the item which includes all taxes that would be paid by the consumer on the cannabis product or item.

(n)    Cannabinoid hemp products in an adult-use retail dispensary.

(1)    Adult-use retail dispensaries who sell cannabinoid hemp product to a cannabis consumer shall comply with the applicable requirements of Part 114 of this Title including obtaining a cannabinoid hemp retail license.

*Draft – Subject to Change*

(2)      Cannabinoid hemp flower products clearly labeled or advertised for the purposes of smoking, or in the form of a cigarette, cigar, or pre-roll, or packaged or combined with other items designed to facilitate smoking may be sold at a retail dispensary.

(o)      Limited Retail Consumption Facility.

(1)      A limited retail consumption facility shall be a type of consumption facility that is located, regardless of whether the facility is indoors:

(i)       within the boundaries of the same parcel as the associated dispensary; or

(ii)      within the boundaries of a parcel which is contiguous with the parcel containing the associated dispensary.

(2)      Cannabis products sold at a limited retail consumption facility may not be rolled, packed, split, infused, mixed, or otherwise prepared by a licensee or any persons affiliated with the licensee, including, but not limited to, the licensee's employees;

(3)      A limited retail consumption facility shall not charge an entry fee, cover, or other similar fee for special events, provided however, such facility may charge such fee in association with an event, including but not limited to cannabis events pursuant to section 120.19 of this Title;

(4)      A limited retail consumption facility shall not have a point of sale within the facility;

202

*Draft – Subject to Change*

(5)    A limited retail consumption facility shall not allow an adult-use nursery, cultivator, processor, distributor, cooperative or collective, microbusiness, ROD, ROND, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee or any true party of interest of any of the aforementioned to advertise at the facility through use of a brand representative;

(6)    The Office may limit the number of cannabis events at a limited retail consumption facility in future guidance;

(7)    A limited retail consumption facility shall comply with the requirements of Part 125 of this Title which pertain to a consumption facility; and

(8)    A limited retail consumption facility shall comply with any other requirements as determined by the Board.

## § 123.11 Microbusiness Ownership, Interests, Business Authorizations and Prohibitions.

(a)    A microbusiness shall engage in cultivation and at least one (1) of the following additional activities authorized by the Cannabis Law for a microbusiness:

(1)    processing;

(2)    distribution; or

*Draft – Subject to Change*

(3)      retail sale.

(b)      If authorized through the application process, whether on an initial or an amended application, a microbusiness may:

(1)      sell cannabis to a processor;

(2)      sell cannabis products to a distributor;

(3)      sell cannabis products it has cultivated or processed to consumers;

(4)      sell cannabis products via delivery to consumers;

(5)      purchase cannabis flower;

(6)      send cannabis or cannabis products to a processor for processing without relinquishing ownership of that cannabis or cannabis product; and

(7)      operate a consumption facility.

(c)      A microbusiness shall not be a true party of interest in a cultivator, processor, cooperative or collective, ROD, or ROND license, provided however a true party of interest in a

204

*Draft – Subject to Change*

microbusiness may by a true party of interest in a cultivator, processor, cooperative or collective, ROD, or ROND license.

(d)      No person shall be a true party of interest in more than one (1) microbusiness license, or in a microbusiness license and an adult-use cultivator, cooperative or collective, ROD, or ROND license provided, however, a true party of interest in a microbusiness may simultaneously be a passive investor in any number of microbusiness, cultivator, cooperative or collective, ROD, or ROND licenses, if such true party of interest complies with all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(e)      A microbusiness or its true party of interest may have a goods and services agreement with an adult-use cultivator, processor, cooperative or collective, microbusiness, ROD, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(f)      In addition to any other restrictions or prohibitions in this Title, including, but not limited to, Part 124, no microbusiness or its true party of interest is permitted to have any direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in an adult-use retail dispensary, on-site consumption, delivery, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee.

*Draft – Subject to Change*

**§ 123.12 Microbusiness Operations.**

(a)      A microbusiness shall:

(1)      comply with all rules, regulations, and policies applicable to a cultivator in a tier with the same canopy size as the microbusiness;

(2)      unless otherwise set forth in this section, comply with all requirements imposed by the Cannabis Law and this Title on licensed adult-use cultivators, processors, distributors, and retailers to the extent the microbusiness engages in such activities.

(3)      if authorized to cultivate by the Board on the licensee's application, cultivate with one (1) of the following types of cultivation: outdoor, mixed light, indoor, or a combination of outdoor with mixed light. The microbusiness may cultivate within a specified type of cultivation as approved by the Board on the licensee's application. The maximum canopy for each type of cultivation, unless otherwise approved by the Office, shall be the canopy limits set out in paragraph (1) of subdivision (c) of section 120.3 of this Title;

(4)      be permitted to purchase up to 500 pounds of cannabis, or the extract equivalent, per calendar year from a duly licensed cultivator, microbusiness, cooperative or collective, ROD or ROND;

(5)      be permitted to, in the case of a significant crop failure as defined by the Office, and written approval from the Office, purchase additional cannabis or cannabis extract up to a quantity sufficient to replace that failed crop;

*Draft – Subject to Change*

(6)      if authorized to process by the Board on the licensee's application, process no more than 1,700 pounds of biomass per year, unless the biomass is cultivated solely by the microbusiness exclusively at its licensed premises;

(7)      if authorized to distribute by the Board on the licensee's application, distribute only their own cannabis products to retail dispensaries or on-site consumption premises;

(8)      if authorized to conduct retail sales by the Board on the licensee's application, sell only their own cannabis products to consumers; and

(9)       be authorized to have its retail premises in a location separate from the premises where it is cultivating or processing cannabis, provided, however:

(i)      the retail premises complies with all other zoning and operational requirements for retail dispensary licensees;

(ii)      for licensees in a city with over one million (1,000,000) persons, the retail premises is located in the same county as the cultivation and if applicable processing premises; and

(iii)      for licensees outside of a city with over one million (1,000,000) persons, the retail y premises is located within 25 miles of the cultivation and if applicable processing premises.

*Draft – Subject to Change*

(b)      A microbusiness shall not purchase more than 500 pounds of cannabis biomass or extract equivalent cultivated by a cultivator unless the microbusiness suffered a significant crop failure, as defined by the Office, and received prior written approval by the Office.

## § 123.13 Cooperative and Collective Ownership, Interests, Business Authorizations and Prohibitions.

(a)      A cannabis cooperative or collective shall have the same authorizations and prohibitions as adult-use cultivators, processors, and distributors, as provided in Part 123 of this Title, to the extent the cannabis cooperative or collective engages in such activities, notwithstanding that:

(1)      a cannabis cooperative or collective is not limited in the number of processing premises it may operate, provided that additional application and licensing fees may apply for each premises over two (2) premises; and

(2)      a cannabis cooperative or collective is not limited in the number of cultivation premises it may operate, provided that total combined canopy does not exceed that maximum allowed pursuant to the applicable license tier and that additional application and licensing fees may apply for each premises over six (6) premises.

(b)      A member of a cannabis cooperative or collective shall not be a member of more than one (1) cannabis collective.

*Draft – Subject to Change*

(c)     A member of a cannabis cooperative or collective is a true party of interest of the cannabis collective.

(d)     In addition to any other restrictions or prohibitions in this Title, including, but not limited to Part 124, no cannabis cooperative or collective or its true party of interest is permitted to have any direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in an adult-use retail dispensary, on-site consumption, or delivery licensee.

(e)      No person shall be a true party of interest in more than one (1) adult-use cooperative or collective, or in an adult-use cooperative or collective and an adult-use cultivator, microbusiness, ROD, or ROND license. Provided, however, a true party of interest in a cooperative or collective may simultaneously be a passive investor in any number of adult-use cooperatives, or collectives cultivators, processor, distributor, microbusinesses, RODs, or RONDs, if such true party of interest complies with all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(f)     A cooperative or collective licensed under this Title shall be organized as either a cooperative, a traditional collective or a limited collective.

(g)     A cooperative shall be organized pursuant to New York State Cooperative Corporation Law.

*Draft – Subject to Change*

(h)    A traditional collective shall have:

(1)    all voting rights held exclusively by members that contribute to the traditional collective primarily with labor. Such members shall:

(i)    each have one (1) vote;

(ii)    comprise no less than a two-thirds majority of the governing body;

(iii)    maintain a controlling interest of the traditional collective at all times;

(iv)    own no less than 51% of the equity of the traditional collective at all times;

(v)    not have their capital or interest subordinated to the capital or interest of any other member group or shareholders; and

(vi)    own and control the traditional collective; and

(2)    its profits, earnings, and losses distributed to members based on labor and not based on capital investment.

(i)    A limited collective shall:

*Draft – Subject to Change*

(1)    have at least ~~51%~~ two-thirds of its voting rights in the aggregate held by members who contribute to the collective primarily with labor. Such members shall:

(i)    not have their capital contributions proportionately tied to voting rights;

(ii)    comprise a majority of the governing body;

(iii)    receive distributions from the limited collective based on their labor contributions;

(iv)    receive no less than 51% of profits and distributions, provided shareholders exist and are receiving distributions;

(v)    own no less than 51% of the equity of the limited collective at all times; and

(vi)    own and control the traditional collective;

(2)    permit member contributions to consist of tangible or intangible personal property, or any other benefit to the collective, including, money, labor, services, promissory notes, agreements to contribute, and contracts to be performed, unless otherwise provided by the collective's internal rules;

*Draft – Subject to Change*

(3)    permit, before determining the amount of profits, its governing body to set aside a portion of profits to create or accumulate: a capital reserve; reasonable reserves for specific purposes, such as expansion or replacement of capital assets; or education, training, and information;

(4)    permit distributions to be made in any form, including cash, capital credits, and allocated patronage equities;

(5)    permit distributions to shareholders to be based on their capital contributions; and

(6)    generate returns for members and shareholders based on profitability, distributions on profitable asset sales, refinancing, or through a liquidity event.

(i)    A cannabis cooperative or collective shall have no fewer than five (5) members that contribute primarily with labor.

(j)    The Office may request documentation and other support evidence to verify the validity of the applicant's cooperative or collective formation as described in the Cannabis Law, regulations, and guidance issued by the Office.

(k)    All traditional or limited collectives shall be certified and recommended by a national trade association that has been listed in guidance by the Office.

*Draft – Subject to Change*

(l)      No cooperative, traditional collective, or limited collective licensee shall amend their cooperative or collective eligibility type, as described in 123.13, without the express approval by the Office.

## § 123.14 Cooperative and Collective Operations.

(a)      A cannabis cooperative and collective shall, unless otherwise set forth in this section, comply with all requirements imposed by the Cannabis Law and this Title on licensed adult-use cultivators, processors, and distributors to the extent the cannabis cooperative and collective engages in such activities;

(b)      A cannabis cooperative and collective shall notify the Office of any changes in its membership within 30 days of such change.

## § 123.15 Registered Organization Adult-Use Cultivator Processor Distributor Ownership, Interests, Business Authorizations and Prohibitions.

(a)      No person shall be a true party of interest in more than one (1) ROND license, or in a ROND license and an adult-use cultivator, cooperative, microbusiness, or ROD license, provided, however, a true party of interest in a ROND may simultaneously be a passive investor in any number of ROND, cultivator, cooperative, microbusiness, or ROD licenses, if such true party of interest complies with all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

*Draft – Subject to Change*

(b)    A ROND or its true party of interest may have a goods and services agreement with an adult-use cultivator, processor, distributor, cooperative, microbusiness, ROD, or ROND license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(c)    In addition to any other restrictions or prohibitions in this Part, no ROND or its true party of interest shall be permitted to hold a direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in an adult-use retail dispensary, on-site consumption, delivery, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee.

## § 123.16 Registered Organization Adult-Use Cultivator Processor Distributor Operations.

(a)    A licensed ROND shall:

(1)    unless otherwise set forth in this section, comply with all requirements imposed by the Cannabis Law and this Title on licensed adult-use cultivators, processors, and distributors to the extent the ROND engages in such activities;

(2)    comply with all requirements for registered organizations pursuant to Part 113 of this Title and Article 3 of the Cannabis Law and all policies and procedures in association with the administration of a registration for a registered organization;

*Draft – Subject to Change*

(3)    maintain a medical patient prioritization plan, which shall be made available to the Office upon request. The medical patient prioritization plan shall include, but is not limited to:

(i)    monthly sales volume data for each of the last twelve (12) months, broken down by registered dispensing site;

(ii)    maintenance of sufficient medical cannabis product to support the greater of, the highest monthly sales volume generated by the applicant in the last twelve (12) months, or a minimum threshold set annually by the Board, based on the anticipated medical cannabis demand for that year and the number of registered organizations in operation;

(iii)    an attestation that the ROND shall have products in different concentrations and dosage forms available to certified patients at all times, including, but not limited to:

(*a*)    at least one (1) product that has a higher ratio of tetrahydrocannabinol (THC) to cannabidiol (CBD);

(*b*)    at least one (1) product that has a higher ratio of CBD to THC;

(*c*)    at least one (1) product that has an equivalent ratio of THC to CBD; and

(*d*)    seeds or immature plants for medical home cultivation pursuant to Part 115 of this Title; and

(iv)     any other requirements as determined by the Office.

(b)     A ROND shall not:

(1)     have more than 100,000 square feet of canopy, unless otherwise authorized by the Board in writing;

(2)     be registered under Article 3 of the Cannabis Law;

(3)     begin new construction or major renovations on any indoor cultivation area or facility, unless authorized by the Board in writing; and

(4)     contract with a laboratory permitted pursuant to Part 130 of this Title for voluntary testing services, unless otherwise authorized by the Office.

(c)     A registered organization shall hold a ROD or ROND license to sell adult-use cannabis or cannabis products.

**§ 123.17 Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Ownership, Interests, Business Authorizations and Prohibitions.**

(a)     No person shall be a true party of interest in more than one (1) ROD license, or in a ROD license and an adult-use cultivator, cooperative, microbusiness, or ROND license, provided,

however, a true party of interest in a ROD license may simultaneously be a passive investor in any number of ROD, cultivator, cooperative, microbusiness, or ROND licenses, if such true party of interest complies with all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(b)     A ROD or its true party of interest may have a goods and services agreement with an adult-use cultivator, processor, distributor, cooperative, microbusiness, ROD, and ROND, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(c)     In addition to any other restrictions or prohibitions in this Title, no ROD or its true party of interest is permitted to hold a direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in an adult-use retail dispensary, on-site consumption, delivery, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee.

**§ 123.18 Registered Organization Adult-Use Cultivator Processor Distributor Retail Dispensary Operations.**

(a)     A licensed ROD shall:

(1)     comply with all requirements imposed by the Cannabis Law and this Title on licensed adult-use cultivators, processors, distributors, and retail dispensaries to the extent the ROD engages in such activities, unless otherwise provided for in this section;

*Draft – Subject to Change*

(2)    comply with all requirements for registered organizations pursuant to Part 113 of this Title and Article 3 of the Cannabis Law and all policies and procedures in association with the administration of a registration for a registered organization;

(3)    dedicate a minimum of 50% of shelf space available for adult-use product cultivated and processed by licensees that are not RODs until January 1, 2025, and 40% of shelf-space available for adult-use product cultivated and processed by licensees that are not ROD, thereafter, as measured by total units in inventory on a 30-day rolling average;

(4)    co-locate its medical and adult-use dispensaries;

(5)    if co-locating more than one (1) dispensing site, have at least one (1) co-located dispensing site outside of New York, Kings, Bronx, Queens, Richmond, Nassau, Suffolk, and Westchester counties;

(6)    be subject to the same prohibitions set forth in subdivision (b) of section 123.16 of this Title;

(7)    cultivate and process adult-use cannabis;

(8)    maintain a medical patient prioritization plan which shall be made available to the Office upon request and include:

*Draft – Subject to Change*

(i)      all requirements set forth in paragraph (2) of subdivision (a) of section 123.16 of this Title; and

(ii)     policies and procedures that clearly explain how the licensee shall maintain enough medical cannabis product at each co-located facility to support the greater of:

(*a*)    the highest sales volume generated by that facility in the last 12 months; or

(*b*)    a minimum threshold set annually by the Board, based on the anticipated medical demand for that year and the number of registered dispensing sites in operation;

(9)      provide a separate medical consultation area within their dispensing sites;

(10)     have separate lines and access areas for certified patients and their caregivers;

(11)     establish priority service or express lanes inside their co-located dispensary locations for registered patients; and

(12)     have pharmacists available pursuant to Part 113; and

(13)     comply with the Americans with Disabilities Act (ADA) standards.

*Draft – Subject to Change*

(b)     A licensed ROD shall not:

(1)     have more than 100,000 square feet of canopy, unless otherwise authorized by the Board in writing;

(2)     begin new construction or major renovations on any indoor cultivation area or facility unless authorized by the Board in writing;

(3)     process more than 80,000 pounds of biomass, or the equivalent amount of cannabis extract or cannabis product, per year, if the ROD has purchased more than 25,000 pounds of cannabis or cannabis product at wholesale from another licensee in that calendar year;

(4)     contract with a laboratory permitted pursuant to Part 130 of this Title for voluntary testing services, unless otherwise authorized by the Office;

(5)     contract with another ROD or any of its true parties of interest for distribution of cannabis or cannabis products;

(6)     substitute adult-use cannabis product, should the licensee experience an unexpected shortage of medical cannabis products;

(7)     have more than three (3) co-located dispensaries;

*Draft – Subject to Change*

(8)    have more than one (1) co-located facility in the same county or borough as any of its other licensed or registered dispensing sites;

(9)    locate any co-located adult-use dispensary premises in a location prohibited under the Cannabis Law or this Title;

(10)    operate a consumption facility;

(11)    be registered as a registered organization under Article 3 of the Cannabis Law; and

(12)    be granted authorization to open:

(i)    the licensee's first co-located store before December 29, 2023; and

(ii)    the licensee's second and third co-located stores before June 29, 2024.

(c)    A registered organization shall hold a ROD or ROND license to sell adult-use cannabis or cannabis products.

**§ 123.19 Delivery Ownership, Interests, Business Authorizations and Prohibitions.**

(a)    A delivery licensee shall be authorized to deliver cannabis products that have been ordered and paid for by a cannabis consumer prior to delivery from a licensee authorized for the retail sale of cannabis to a cannabis consumer.

*Draft – Subject to Change*

(b)      A delivery licensee or its true party of interest may also be true parties of interest in a retail dispensary or an on-site consumption license.

(c)      No person shall be a true party of interest in more than one (1) delivery license, or in a delivery license and retail dispensary or on-site consumption license, provided, however, a true party of interest in a delivery license may simultaneously be a passive investor in any number of delivery, retail dispensary, and on-site consumption licenses, if such true party of interest complies with all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(d)      A delivery licensee or its true party of interest may have a goods and services agreement with an on-site consumption or retail dispensary license, subject to all restrictions governing such relationships, including, but not limited to, undue influence, control, and true party of interest requirements.

(e)      In addition to any other restrictions or prohibitions in this Part, no delivery license or its true party of interest is permitted to hold a direct or indirect interest, including by being a true party of interest, passive investor, or having a goods and services agreement with, or by any other means, in a cultivator, processor, distributor, cooperative, microbusiness, ROD, ROND, registered organization, or cannabis laboratory licensee or permittee.

*Draft – Subject to Change*

**§ 123.20 Delivery Operations.**

(a)        Delivery licensees and licensees authorized for and providing delivery of cannabis products to consumers shall have a written delivery plan available for inspection by the Office.

(b)        Delivery licensees shall comply with the relevant requirements set forth in Part 125 of this Title.

(c)        Delivery licensees shall not:

(1)        conduct sales of adult-use cannabis or medical cannabis;

(2)        accept cannabis or cannabis products from any person other than a licensee authorized for the retail sale of cannabis;

(3)        deliver cannabis to any location outside of New York State;

(4)        deliver cannabis to anyone inside of a motor vehicle;

(5)        deliver cannabis products to anyone other than the individual detailed in the order and only upon verifying the identity and age of the individual pursuant to subdivision (d) of section 123.10 of this Title;

*Draft – Subject to Change*

(6)    deliver cannabis or cannabis products to anywhere other than residential properties, including short and long-term residences and private businesses anywhere in New York State, and shall not deliver cannabis to:

(i)    public buildings;

(ii)    public spaces including parks;

(iii)    community centers;

(iv)    any school grounds;

(v)    day-care centers; or

(vi)    houses of worship.

(7)    have a total of more than twenty-five (25) individuals, or the equivalent thereof, providing full-time paid delivery services to cannabis consumers per week under one license;

*Draft – Subject to Change*

(8)    allow any employee providing delivery services on behalf of a licensee authorized for the retail sale of cannabis to leave the premises of a licensee authorized for the retail sale of cannabis with any cannabis products before having received at least one (1) delivery order from a licensee authorized for the retail sale of cannabis;

(d)    Employees providing delivery services on behalf of a delivery licensee or licensee authorized for the retail sale of cannabis shall not:

(1)    purchase cannabis products from a licensee authorized for the retail sale of cannabis and obtain reimbursement from the individual receiving the delivery;

(2)    solicit orders from potential consumers;

(3)    possess more than:

(i)    $20,000 of cannabis products in the aggregate at any time in an enclosed vehicle; or

(ii)    $5,000 of cannabis products in the aggregate at any time in a non-enclosed vehicle, including, but not limited to, bikes and scooters, or while traveling on foot.

*Draft – Subject to Change*

(e)    At least 30% of the value of cannabis products in the possession of a delivery employee's vehicle or, if traveling by foot, on their person, shall be ordered and paid for by a cannabis consumer before the delivery employee leaves the licensed location. For the purposes of this section, the value of cannabis products shall be determined using the current retail price of all cannabis products carried by, or within the delivery vehicle of, the delivery employee. This provision shall become effective after January 1, 2025.

(f)    Employees providing delivery services for a delivery licensee or licensee authorized for the retail sale of cannabis shall maintain an updated shipping manifest, pursuant to section 125.10 of this Title, reflecting current inventory in possession of the delivery employee after every order is delivered.

(g)    Retail dispensary delivery employees shall not work concurrent shifts to provide delivery services for multiple retail dispensary licensees.

**§ 123.21 Severability**.

If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

*Draft – Subject to Change*

A new Part 124, titled General Business Requirements and Prohibitions, is added to read as follows:

Part 124

General Business Requirements and Prohibitions

**Part 124 - General Business Requirements and Prohibitions.**

**§ 124.1 Undue Influence and Incentives.**

**§ 124.2 Terms of Sale.**

**§ 124.3 Goods and Services Agreements.**

**§ 124.4 Agreements Creating Financial or Controlling Interest.**

**§ 124.5 Contracting Requirements.**

**§ 124.6 Subsidiaries.**

**§ 124.7 Receivership.**

**§ 124.8 Severability.**

**§ 124.1 Undue Influence and Incentives.**

(a)      No person shall enter into any agreement which would cause undue influence over a licensee, as set forth in this Part. Nothing herein shall be construed as prohibiting the placing and accepting of orders for the purchase and delivery of cannabis or cannabis products that are made

*Draft – Subject to Change*

in accordance with usual and customary or common business practices and that are otherwise in compliance with this Title.

(b)     Licensees shall only enter into agreements with third-party platforms, marketplaces, or aggregators that:

(i)     sign and submit the Office's Confidentiality and User Agreement or other agreement as required by the Office, if such third-party accesses, extracts, or otherwise relies on the transmission of data from the State's seed to sale track and trace system;

(ii)    when advertising or listing a cannabis product, list all licensees authorized for the retail sale of such cannabis products;

(iii)   provide open read and write application programming interface access for all data points in a point of sale or track and trace system;

(iv)    when aggregating, compiling, anonymizing, or otherwise exhausting data derived from consumer interactions with a licensee, receive explicit opt-in from the licensee to establish such a data sharing agreement, and no standard software agreement by a third-party platform, marketplace, or aggregator shall include any default data usage rights for the technology provider, other than system usage data used to tune third-party system performance and database optimization in compliance with these regulations; and

*Draft – Subject to Change*

(v)      for all digital interactions with a potential cannabis consumer:

*(a)*      only display, sort, or order cannabis products, or paraphernalia as part of a search result, browse grid, or other digital interface based on objective, consumer-oriented criteria, such as time to deliver to the consumer; available delivery times; product form; distance in miles from the retail dispensary; or independent and verified consumer reviews; and

*(b)*      redirects from the third-party marketplace or aggregator to a domain or web-based interface hosted via a platform that supports search engine optimization or SEO credits accruing to the domain of a licensee authorized for retail sale of cannabis, before the price of adult-use cannabis products are displayed.

(c)      No licensee shall list cannabis products on a third-party platform, marketplace, or aggregator, that:

(i)      does not allow for any licensed distributor, who is willing and in good standing, to be listed as an option for logistics and transportation purposes,

(ii)      does not allow customers to negotiate fees for such services directly with such distributors, or

(iii)      requires the exclusive use of such third-party platform, marketplace, or aggregator for the listing or the distribution of cannabis products.

*Draft – Subject to Change*

(d)      No licensee shall enter into an agreement with a goods and services provider, including but not limited to a third-party aggregator or marketplace, point of sale provider, payments service provider, payments processor, inventory tracking system, customer loyalty program, or seed to sale tracking system, that conditions the sale or lease of one product or service on the consumer's agreement to take a separate product or service.

(e)      No nursery, research license, cultivator, processor, distributor, microbusiness, cooperative, ROD, or ROND shall, directly or indirectly, advance to any licensee authorized for the retail sale or delivery of cannabis or cannabis products to consumers, and no licensee authorized for the retail sale of cannabis or cannabis products to consumers shall receive money or a benefit equivalent to the value of money under an agreement or by means of any other business practice or arrangement such as:

(1)      gifts;

(2)      discount, except as permitted in this section;

(3)      customer loyalty programs;

(4)      loans of money;

(5)      premiums;

*Draft – Subject to Change*

(6)      rebates;

(7)      royalties;

(8)      free cannabis product of any kind, except as permitted by this section;

(9)      preferential shelf space or displays; and

(10)    treats or services of any nature whatsoever, except:

(i)      a discount that is not more than one percent for payment on or before 10 days from date of shipment of such cannabis; or

(ii)      such agreements and services as are authorized in this section or which may be authorized by a license issued pursuant to the Cannabis Law.

(f)      Licensees are prohibited from requiring the purchase of other products or services by other licensees as a condition of a transaction of cannabis or cannabis products. Products and services include, but are not limited to, other cannabis or cannabis products or brands, merchandise, cannabis paraphernalia, property, software or applications, or services.

*Draft – Subject to Change*

(g)     A nursery, cultivator, processor, microbusiness, cooperative, distributor, ROD, or ROND may provide free samples of cannabis products to negotiate a sale to a retail dispensary or on-site consumption licensee premises that does not currently carry the cannabis product being sampled. Such licensees shall abide by any sample limits set by the Office and shall record the amount, transfer, and receipt of each cannabis product sample in the licensee's inventory tracking system in accordance with pursuant to the requirements set forth in section 125.8 of this Title. The sample shall be clearly labeled as a "retailer sample" and recorded and tracked on a transport manifest. The receiving licensee shall receive the "retailer sample" in the inventory tracking system prior to sampling the cannabis product. All other packaging and labeling requirements in this Title shall apply. The retailer sample may be useable by the retailer and employees of a retailer but shall not be sold or given away to cannabis consumers.

(h)     A nursery, cultivator, processor, microbusiness, cooperative, distributor, ROD, or ROND may provide retailers or on-site consumption licenses and their employees with cannabis merchandise of nominal value as determined by the Office. These items can only bear the brand of a licensee. The items may not be forwarded on and given to retail customers, through purchase or giveaway.

(i)     Retail advertising specialties. A cultivator, processor, microbusiness, cooperative, distributor, ROD, or ROND may provide retail dispensary, delivery, ROD, or on-site consumption licensees with retail advertising specialties. The total value of all retailer advertising specialties furnished by a licensee to a retailer may not exceed $200 per brand in any one calendar year per licensee, and licensees cannot pool or combine their dollar limitations to

*Draft – Subject to Change*

exceed the threshold. The value of a retail advertising specialty is the actual cost of the item to the manufacturer or wholesaler who initially purchased it. Transportation and installation costs are excluded. Records verifying the cost of retail advertising specialties provided to each dispensary shall be made available for inspection at the request of the Office.

(j)      No nursery, cultivator, processor, microbusiness, cooperative, distributor, ROD, or ROND shall provide category management services to retailers, including, but not limited to:

(1)      dictating the placement of products at retail by any means, including, but not limited to, by providing a retailer with planograms, or other suggested shelf schematics related to the store layout;

(2)      conditioning the purchase of one product or product category on the purchase of another product or product categories; and

(3)      offering slotting, shelving, and other preferential practices.

(k)      Licensees are prohibited from giving away or distributing promotional items such as branded or unbranded merchandise to cannabis consumers except as provided for by Part 129 of this Title.

(l)      Any person who, under the definitions in this Title, would be considered a true party of interest of an entity, and who is permitted to conduct activities which are authorized for a

*Draft – Subject to Change*

licensee under the Cannabis Law, shall be subject by the true party of interest requirements for that license type.

### § 124.2 Terms of Sale.

(a)    Licensees engaged in distribution shall:

(1)    execute written contracts between parties for all transactions related to the purchase of cannabis products, regardless of license type;

(2)    sell cannabis and cannabis products, or cannabis merchandise or cannabis paraphernalia, at prices indicative of their true value when sold without any other products, terms, or services;

(3)    not discriminate, directly or indirectly, in price, payment terms, or discounts for time of payment or in discounts on quantity of merchandise sold, except as permitted by this Part;

(4)    be permitted to offer volume-based discounts on cannabis and cannabis products, provided that such discounts are offered to all licensed purchasers; and

(5)    not require or offer exclusivity provisions in goods or services contracts, including, but not limited to, prohibiting a licensee from having their own e-commerce application or platform and

*Draft – Subject to Change*

(6)       not refuse to sell any brand of cannabis or cannabis product to any person authorized to purchase such brand of cannabis or cannabis product from such licensee at market value or based on price disclosures authorized by the Board if the purchaser pays cash therefor, and except as herein provided.

(b)       Distributors, cooperatives, microbusinesses, ROND or ROD, shall sell cannabis products to any person authorized for retail adult-use cannabis sales willing to pay cash for such cannabis products, provided, however:

(1)       checks shall not be from third parties;

(2)       checks drawn on the account of a licensee authorized for retail sale shall not be post-dated; and

(3)       distributors, microbusinesses, cooperatives, ROD, or ROND shall not be required to accept checks drawn on a retail dispensary's account.

(c)       Distributor, microbusiness, cooperatives, ROD, or ROND licensees may, but are not required to, accept payment on credit from licensees authorized for retail sales, provided:

(1)       payment terms comply with this Part; and

*Draft – Subject to Change*

(2)    retail dispensaries and on-site consumption licenses purchasing cannabis products on credit pay their balance due within thirty (30) days, unless otherwise approved by the Board.

(d)    Distributors, microbusinesses, cooperatives, RODs, or RONDs shall:

(1)    report retailers who are delinquent in payment for cannabis products to the Office; and

(2)    not sell cannabis products on credit to any retailer reported and found by the Office to have a delinquent payment due, as provided in this section.

(e)    Delinquent List.

(1)    Distributor, microbusiness, cooperative, ROD, or ROND licenses shall , on or before the respective notification dates, as determined by the Office, for each retail dispensary license, give written notice of default, by first class mail or by such other method as contemplated or permitted by or under the applicable agreement, to all such licensees therein who have failed to make payment to them on or before their final payment date for cannabis products sold or delivered to them during a credit period ending on their final payment date. No retail licensee shall be placed in default if the distributors, microbusinesses, cooperatives, ROD, or ROND has issued an account credit to the licensee, which after application to all debts owed by the retail dispensary licensee, is equal to or greater than the amount of the default. Any such retail dispensary licensee receiving a notice of default shall not thereafter purchase cannabis products, except for by paying with cash, until such time as the Office determines that their name shall not

*Draft – Subject to Change*

be published on the delinquent list as provided in subdivision (d) of this section, or until such time as the Office permits sales or deliveries to them as provided in subdivision (g) of this section. Each such distributor, microbusiness, cooperative, ROD, or ROND is hereby required to file with the Office, on or before each notification date, copies of the notices sent by them to all delinquent retail dispensary licensees as required in this subdivision, and in addition, if the Office shall so require, a written list setting forth the names and addresses of all such delinquent licensees. The Office, in its discretion, may extend for a period not exceeding three (3) days, the date for giving written notice of default to delinquent retail dispensary licensees and extend for three (3) days, the date for filing with the Office the copies of notices sent to such licensees and/or the written list of delinquent retail dispensary licensees as required in this subdivision. The Office, in its discretion, may limit the documents to be filed to those relating to licensees who are to be added or deleted from the default list and direct that distributors, microbusinesses, cooperatives, ROD, or ROND maintain copies of all other documents required under this section for future inspection by the Office.

(2)      The Office shall, as soon as practicable after each notification date, compile and publish and furnish each distributor, microbusiness, cooperative, ROD, and ROND licensed under this Title, a list, to be designated on the delinquent list containing the names and addresses of all retail dispensary licensees who have been reported by distributors, microbusinesses, cooperatives, ROD, or ROND pursuant to the provisions of this section as having failed to make payment as required by this section for cannabis products sold or delivered to them, and no such distributors, microbusinesses, cooperatives, ROD, or ROND, on or after the fifth (5th) day after the receipt of such delinquent list, shall knowingly, willfully, or intentionally sell or deliver any

*Draft – Subject to Change*

cannabis to any such licensee whose name appears on such list, except for cash, until such time as the name of such licensee is removed therefrom, except as hereinafter permitted.

(3)    The receipt of a delinquent list by a distributor, microbusiness, cooperative, ROD, or ROND shall constitute knowledge of the names of the retail dispensaries licensees who have failed to make payment for cannabis as required by this section.

(4)    The Office may publish the delinquent list on its website; provided, however, that full access shall be restricted to those distributors, microbusinesses, cooperatives, ROD, or ROND licensed under this Title and access to their specific status shall be provided to retail dispensaries licensed under this Title. Such publication shall be considered receipt thereof by all distributors, microbusinesses, cooperatives, ROD, or ROND.

(f)    In the event that any dispute shall exist between any distributor, microbusiness, cooperative, ROD, or ROND and a retail dispensary licensee to whom they shall have sold cannabis products, either as to the fact of payment or as to the amount due for such cannabis products or as to the quantity of the cannabis products sold or delivered, which dispute cannot be resolved between them, the Office is hereby authorized to receive statements from each of the parties to such dispute as to the facts and circumstances thereof and to determine whether or not a retail dispensary licensee is delinquent and should be included on the appropriate delinquent list.  The licensee may appeal this determination and request a hearing pursuant to Part 133.

*Draft – Subject to Change*

(g)    The Office, in the case of a retail dispensary licensee who has made payment for cannabis products, or on good cause shown, may permit sales or deliveries to any retail dispensary licensee who has received notice of default, or who is named on any delinquent list, on terms other than for cash, but within the limitations of this section, prior to the publication of the next appropriate delinquent list.

(h)    The Board may impose any penalty or condition otherwise authorized by this section in the case of any such retail dispensary licensee who fails or refuses to liquidate and pay unpaid balance becoming due under this subdivision.

(i)    Nothing herein contained shall be construed to require any cultivator, processor, distributor, microbusiness, cooperative, ROD, or ROND to extend credit to any retail dispensary licensee nor to restrain any distributor, microbusiness, cooperative, ROD, or ROND from enforcing by legal action or otherwise, payment of any sum or sums of money due or alleged to be due to any such distributor, microbusiness, cooperative, ROD, or ROND for cannabis sold or delivered to any such retail dispensary licensee.

(j)    The Office is hereby authorized to do such acts, prescribe such forms, and make such orders as it may deem necessary or proper to fully effectuate the provisions of this section, including, but not limited to, the changing of any date on which any act or function pursuant to this section is to be performed by any licensee or by the Office.

(k)    The Board may revoke, cancel, or suspend any license issued pursuant to this Title for:

*Draft – Subject to Change*

(1)    actions in violation of any of the provisions of this section;

(2)     making a false statement in any disclosures filed pursuant to this section; or

(3)    failing or refusing in any manner to comply with any of the provisions of this section.

## § 124.3 Goods and Services Agreements.

(a)    Exempt Agreements. The following agreements shall not be presumed to create a controlling interest or undue influence in a licensee; apparent or actual conflicts of interest; or an availing interest in the license by a non-licensee or person who is not a true party of interest in such license. A person may provide goods and services across licenses.

(1)    General providers of goods and services. Exempt goods and services agreements, may include, but are not limited to, accounting, license application preparation, record-keeping, cleaning and janitorial, leasing equipment, architect services, security, legal services, government relations (registered lobbyist), construction, heating, ventilating, air conditioning, refrigeration, plumbing, lighting, office supplies, and provision of non-cannabis goods from unlicensed persons.

(2)    Landlords.  A person may be a landlord to licensees across multiple licenses. If the landlord becomes a true party of interest in a license, they are subject to the requirements of the true parties of interest for that license type.

*Draft – Subject to Change*

(3)      Financiers and financial institutions.  A person may be a financier or financial institution across multiple licenses. If the financier or financial institution becomes a true party of interest in a license, they are subject to the prohibitions of true parties of interest for that license type. Principal repayment shall be excluded from any calculation of fees paid to a financier or financial institution in a calendar year.

(b)      Non-exempt agreements.

(1)      Non-exempt agreements, include, but are not limited to, agreements for the provision of consulting, advisory, or strategic services related to the licensee's cultivation, processing, distributing, or selling of cannabis or cannabis products.

(2)      Any person providing non-exempt goods and services pursuant to a non-exempt agreement that is not based on a flat fee, including, but not limited to, agreements based on business performance, revenues, royalties, or profits, shall be prohibited from having any goods and services agreement with a licensee in a separate licensing tier.

(c)      Stacking Agreements. Where a person has multiple goods and services agreements, whether exempt or non-exempt, with a licensee, the value of the payments made under such agreements shall be combined for purposes of determining whether a person has a financial or controlling interest, and the combined agreements shall be held to the strictest prohibitions of each of those individual agreements.

*Draft – Subject to Change*

**§ 124.4 Agreements Creating Financial or Controlling Interest.**

(a)       The Office reserves the right to review any agreement between a licensee and a third

party or between two licensees. A person will be deemed to be a true party of interest by virtue

of their financial or controlling interest in a license where it enters into any agreement that:

(1)       compels a licensee to promise not to purchase or sell cannabis, cannabis products, or

other goods, services, or materials to or from applicants, licensees, or other businesses;

(2)       is not bargained for between the parties in an arms-length transaction;

(3)       does not include the ability for either party to terminate the agreement with due notice;

(4)       generates a share of revenue paid by a licensee in excess of the greater of:

(i)       10% of gross revenue of such applicant or licensee,

(ii)      50% of net profit of such applicant or licensee, or

(iii)     $250,000, in one calendar year based on actual or anticipated annual performance; or

*Draft – Subject to Change*

(5)    Where a goods and services provider violates the financial interests and controlling conduct prohibitions set forth in this Part, the Office may terminate that party's interest in the license and recommend a civil penalty to be imposed by the Board and collected by the Office.

(d)    A goods and services provider under this section shall be a true party of interest to the license to which it is providing such goods or services if, over the course of a calendar year, they receive the right to or actual payment from the licensee, exceeding the greatest of:

(1)    10% of a licensees' gross revenues;

(2)    50% of a licensees' GAAP net profits;

(3)    $250,000; or

(4)    if such person qualifies as a true party of interest by any other means in this Part.

## § 124.5 Contracting Requirements.

(a)    Adult-use licensees are prohibited from contracting out or subcontracting with a person or entity performing any function or activity directly involving the licensed activities authorized for that license type, including, but not limited to, cultivating, processing, distributing, or selling cannabis or cannabis products; provided however, licensees may contract out executive

management services so long as all non-management activities arising from, or related to, such contract or subcontract are carried out by employees of the licensee.

(b)    Adult-use licensees may contract with a person or entity performing a function or activity ancillary to the licensee's licensed activities, including, but not limited to, accounting, record-keeping, architectural services, construction, heating, ventilating, air conditioning, refrigeration, plumbing, cleaning and janitorial, lighting, security, software, and legal services, and other exempt goods and services.

(c)    Adult-use licensees shall retain the right to audit, or use a third-party to audit, goods and services agreements with third parties.

**124.6 Subsidiaries.**

(a)    Any subsidiary of an applicant or a licensee or of a subsidiary of an applicant or licensee shall:

(1)     be a wholly owned subsidiary where total control is held by and 100% of the shares are owned by the licensee;

(2)    transfer or accrue to the licensee the following:

(i)    communications from the Office;

*Draft – Subject to Change*

(ii)     enforcement proceedings;

(iii)    information related to compliance with the rules and regulations of the license; and

(iv)    any requirement, obligations, or liabilities to the license imposed under this Part or at the request of the Office or Board.

(3)     be named and identifiable as subsidiary to the licensee according to a naming convention that includes but is not limited to:

(i)     The legal name of the licensee, notwithstanding the corporate formation of the licensee or subsidiary;

(ii)    A number indicating the sequential order in which it was created; and

(iii)   The term subsidiary or sub.

**124.7 Receivership.**

(a)     An individual may be appointed as receiver, representative, executor, administrator, guardian, conservator, trustee, or assignee, to temporarily operate the licensed business on the licensed premises for a period of time determined by the Office in cases of death, disability, bankruptcy, insolvency, receivership, assignment for the benefit of creditors, shareholder or LLC

*Draft – Subject to Change*

member disputes, or other exceptional circumstances rendering one or more owners incapable of performing the duties of a licensee. Such appointee shall be at least twenty-one (21) years of age.

(b)      Such appointee shall not be permitted to conduct licensed activities without the express authorization by the Office, which may be granted upon submission and approval of a written request for the authority to temporarily conduct licensed activities. Such written request shall include information or disclosures required by the Office, including but not limited to name, valid ID, phone number, mailing address, email address, social security number, the name of the person on whose behalf the appointee is appointed, proof that such appointee is the legal receiver, representative, executor, administrator, guardian, conservator, trustee, or assignee, and any direct or indirect interests held by that appointee in a cannabis license, registration or permit.

(c)      Authorization to conduct licensed activities by such appointee is conditioned on compliance with these regulations, including but not limited to restrictions on ownership and other interests, approval by the Office, and such authorization shall not constitute a guarantee of license issuance or renewal by the Board.

(d)      Any licensee or person who files, or against whom is filed, any action or proceeding, or who seeks an appointment, as set forth in subdivision (a) of this section 124.7(a) above is required to serve the Office with original notice of the action or proceeding and provide the Office with opportunity to be heard regarding the appointment. Such notice shall be provided to

246

*Draft – Subject to Change*

employees upon commencement of such proceeding for a receivership.  A licensee surrendering its license shall provide its employees any lawfully required warnings of closures and layoffs.


**§ 124.8 Severability**. If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

*Draft – Subject to Change*

A new Part 125, titled General Operating Requirements and Prohibitions, is added to read as follows:

Part 125

General Operating Requirements and Prohibitions

**Part 125 - General Operating Requirements and Prohibitions**

**§ 125.1 Energy and Environmental Standards.**

**§ 125.2 Site, Operating, and Environmental Plans.**

**§ 125.3 Security and Storage of Cannabis.**

**§ 125.4 Employee Requirements and Obligations.**

**§ 125.5 Responsible Workforce Training.**

**§ 125.6 Worker Health and Safety Standards.**

**§ 125.7 Sanitary Facility, Equipment, and Handling Standards.**

**§ 125.8 Inventory and Tracking.**

**§ 125.9 Quarantine and Recalls.**

**§ 125.10 Transport of Cannabis and Cannabis Products.**

**§ 125.11 Management of Cannabis and Other Waste.**

**§ 125.12 Inspections and Audits.**

**§ 125.13 General Record Keeping Requirements.**

**§ 125.14 Processing Samples for Internal Quality Control.**

*Draft – Subject to Change*

**§ 125.15   Limited Retail Consumption  Facility, Exception Area, and Microbusiness Consumption Facility Operations.**

**§ 125.16 Licensed Premises Verification Tools.**

**§ 125.17 Severability.**

**§125.1 Energy and Environmental Standards.**

(a)        Odor Control Standards.

(1)      A licensee shall use acceptable odor mitigation technology in all consumption facilities, exception areas, nursery areas, propagation areas, or canopy areas that are indoors or in mixed light; processing facilities; or storage areas to mitigate odors to minimize impacts off-site. Acceptable odor mitigation technology includes, activated carbon filtration, vapor-phase systems, or other mitigation technology approved by the Office. The Office shall be authorized to identify additional odor mitigation technology in future guidance.

(b)      Horticultural Lighting Equipment Standards.

(1)      A nursery, tier 1 cultivator, tier 2 cultivator, cooperative, or microbusiness licensee shall use horticultural lighting equipment with a PPE of at least 1.7 μmol/J measured at the lamp. A nursery, tier 1 cultivator, tier 2 cultivator, cooperative, or microbusiness licensee shall meet applicable horticultural lighting equipment standards prior to the second license renewal.

(2)      A tier 3 cultivator, tier 4 cultivator, tier 5 cultivator, ROD, or ROND licensee shall use horticultural lighting equipment with a PPE of at least 2.2 μmol/J measured at the lamp. A tier 3

*Draft – Subject to Change*

cultivator, tier 4 cultivator, tier 5 cultivator, ROD, or ROND licensee shall meet applicable

lighting standards prior to the first license renewal.

(c)    Heating, Ventilation, and Air Conditioning (HVAC) and Dehumidification Standards.

(1)    HVAC Standards. A nursery, cultivator, cooperative, microbusiness, ROD, or ROND

licensee authorized to cultivate indoors, cultivate in mixed light, operate a nursery area indoors,

or operate a nursery area in mixed light shall, unless the licensee has a written plan for managing

refrigerant leaks and disposal that has been approved by the Office, use HVAC and refrigeration

equipment which uses a refrigerant with a twenty-year global warming potential of 10 or less.

(2)    Dehumidification Standards. A nursery, cultivator, cooperative, microbusiness, ROD, or

ROND licensee shall only use dehumidification equipment, including in drying areas, that is one

of the following:

(i)    stand-alone dehumidifiers that have a minimum integrated energy factor of 1.77 L/kWh

for product case volumes of 8.0 cubic feet or less, and a minimum integrated energy factor of

2.41 L/kWh for product case volumes greater than 8.0 cubic feet;

(ii)    an integrated HVAC system with on-site heat recovery designed to fulfill at least 75% of

the annual energy for dehumidification reheat;

*Draft – Subject to Change*

(iii)     a chilled water system with on-site heat recovery designed to fulfill at least 75% of the annual energy for dehumidification reheat; or

(iv)     a solid or liquid desiccant dehumidification system for system designs that require dewpoint of 50°F or less.

(3)     A nursery, tier 1 cultivator, tier 2 cultivator, cooperative, or microbusiness licensee shall meet applicable HVAC and dehumidification standards prior to the second license renewal.

(4)     A tier 3 cultivator, tier 4 cultivator, tier 5 cultivator, ROD, or ROND licensee shall meet applicable HVAC and dehumidification standards prior to the first license renewal.

(d)     Energy Standards.

(1)     A nursery, cultivator, cooperative, microbusiness, ROD, or ROND licensee authorized to cultivate indoors, cultivate in mixed light, operate a nursery area indoors, or operate a nursery area in mixed light shall install and use at least one interval meter sufficient to capture and track the energy usage in all areas where licensed activities are conducted.

(2)     A tier 3 cultivator, tier 4 cultivator, tier 5 cultivator, cooperative, ROD, or ROND licensees authorized to cultivate indoors shall use technologies for the primary source of energy that do not involve on-site combustion of fossil fuels. It is acceptable for such licensee's emergency back-up system to be technology that involves the on-site combustion of fossil fuels.

*Draft – Subject to Change*

Acceptable alternatives to fossil fuel-based systems include, but are not limited to, ground-source (geothermal) systems or air-source heat pump systems. A tier 3 cultivator, tier 4 cultivator, tier 5 cultivator, cooperative, ROD, or ROND shall meet this requirement prior to the first license renewal.

(e)     Water Standards. A nursery, cultivator, cooperative, microbusiness, ROD, or ROND licensee authorized to cultivate shall only utilize water for cultivation or in a nursery area, except for water that is used for drip irrigation and subsurface irrigation, that has levels of total coliform present consistent with 10 NYCRR Subpart 5-1 as tested by an environmental laboratory certified by the New York State Department of Health.

(f)     Indoor Air Quality Standards. A retail dispensary or microbusiness licensee authorized to operate a  consumption facility or an on-site consumption licensee authorized to operate an exception area, shall, unless the indoor area's ventilation system has been approved by the Office to provide sufficient ventilation based on the facility's maximum capacity, during times of smoking and vaping, utilize air quality monitor(s) or particle counter(s) or similar technology sufficiently capable of accurately measuring the real-time number of fine particles in all indoor areas of the limited retail consumption facility in which individuals may smoke or vape cannabis products.

*Draft – Subject to Change*

(1)      Unless approved otherwise by the Office, air quality monitors or particle counters or other similar technology sufficiently capable of accurately measuring the real-time number of fine particles shall be:

(i)      capable of measuring concentrations of fine particles up to at least 2,000 microns per cubic meter (or µg/m³) within ten percent accuracy;

(ii)      used according to the manufacturer's specifications to create a number of measurements that will accurately determine the average daily concentration of fine particles, based on the size of the indoor area(s) and the strength of the monitors or counters; and

(iii)      meet any other requirements as determined by the Office; and

(2)      In all indoor areas of the consumption facility or exception area in which individuals may smoke or vape, a licensee shall utilize, alone or in combination, physical barriers, ventilation systems, technology, or other methods sufficient to:

(i)      prevent the transfer of visible smoke or vapor between the area of the consumption facility or exception area and the indoor area of the same building, indoor area of neighboring buildings, and any outdoor area of nearby businesses—such as restaurant patios—which are available to patrons of such nearby business at the same time that smoking or vaping is occurring at the consumption facility or exception area, provided that such neighboring areas do not also comprise a   consumption facility or exception area;

*Draft – Subject to Change*

(ii)      reduce the presence of fine particles in all indoor areas of the consumption facility or exception area such that, beginning on the sixty-first day after the  consumption facility or exception area began operating, the average twenty-four hour concentration of fine particles per cubic meter of air in all indoor areas in which individuals may smoke or vape is less than 500 for at least 90% of the days the consumption facility or exception area operates within a given calendar month, unless the indoor area's ventilation system has been approved by the Office to provide sufficient ventilation based on the maximum capacity of the consumption facility or exception area or the licensee has been otherwise approved in writing by both the Board and the municipality in which the consumption facility or exception area is located to allow greater concentrations of fine particles; and

(iii)      measure the concentration of fine particles within all indoor areas of the consumption facility or exception area in which individuals may smoke or vape through one of the following methods:

*(a)*      using technology that automatically calculates the average concentration of fine particles per cubic meter of air measured over a twenty-four hour period;

*(b)*      using technology that measures the concentration of fine particles per cubic meter of air for specific period of time and calculating a twenty-four hour average by measuring the concentration of fine particles per cubic meter of air for a period of no less than five minutes at least once per hour during each of the consumption facility or exception area's hours of

*Draft – Subject to Change*

operation. A licensee using this method may calculate the twenty-four hour average using reasonable data regarding the typical concentration of fine particles per cubic meter of air when the limited retail consumption facility is not open to consumers and would not be required to measure the concentration of fine particles during each hour the consumption facility is closed to consumers; or

*(c)*      any other method approved by the Office; and

(3)      The Office shall have the authority to require a licensee to update, alter, or amend the specific technology used to monitor indoor air quality, or their placement, at any time if it has reason to believe the air quality is being inaccurately measured.

(g)      The Office shall have the authority to issue industry advisories pursuant to subdivision 12 of section 11 of the Cannabis Law, pertaining to the energy and environment standards. Such advisories shall be adhered to by the licensee.

## § 125.2 Site, Operating, and Environmental Plans.

(a)      Site plan. A licensee shall document, implement, and maintain a site plan, which shall be made available to the Office upon request, consisting of the following information:

(1)      activities performed in each area of the licensed premises;

*Draft – Subject to Change*

(2)    details of all parcel boundaries, including, but not limited to, physical boundaries, roads, and water crossings of the property;

(3)    sanitary facilities, as applicable;

(4)    perimeter dimensions of property and any facilites on-premises where licensed activities are taking place or cannabis or cannabis products are being stored;

(5)    entrances and exits to both the property and premises;

(6)    a nursery, cultivator, cooperative, microbusiness, ROD, or ROND licensee shall also include in the site plan the following additional information, as applicable:

(i)    canopy area, including aggregate canopy square footage if the areas are noncontiguous. All unique areas separated by identifiable boundaries shall be clearly described and labeled in the premises diagram. Plant bed diagrams noting canopy square footage shall be kept up to date with the Office;

(ii)    propagation area;

(iii)    nursery area;

(iv)    pesticide and agricultural chemical storage area;

256

*Draft – Subject to Change*

(v)      drying area;

(vi)     harvest storage area;

(vii)    a description of any lighting used in canopy, propagation, and nursery areas which includes the wattage, photosynthetic photon efficacy, and placement;

(viii)   other activities or other licensed areas. Such nursery, cultivator, cooperative, microbusiness, ROD, or ROND licensee shall keep all areas used for adult-use cannabis operations, including any growing, harvesting, drying, or storage areas, separate and distinct from any area designated for hemp cultivation authorized under the Department of Agriculture and Markets; and

(7)      a nursery, cultivator, cooperative, processor, microbusiness, ROD, or ROND licensee shall also include in the site plan designated areas for:

(i)      packaging;

(ii)     composting, if on-site; and

(iii)    storing secure cannabis waste;

*Draft – Subject to Change*

(8)    a consumption facility or exception area shall also include in the site plan the following additional information:

(i)    areas of the licensed premises where cannabis products are being consumed with a clear delineation of:

*(a)*    all areas of the consumption facility or exception area which do not permit smoking or vaping;

*(b)*    all areas of the  consumption facility or exception area which are indoors; and

*(c)*    if the consumption facility is a limited retail consumption facility located on a parcel separate from the associated dispensary, the contiguous parcel boundaries;

(ii)    details of all boundaries between the consumption facility or exception area and other areas of the licensed premises;

(iii)    photographs, or other descriptions as approved by the Office, of all openings or means of entrance or passageway for persons or things between the consumption facility or exception area and all other areas of the licensed premises or any other premises which abuts the consumptionfacility or exception area; and

(9)    any outdoor signs authorized pursuant to section 129.4 of this Title; and

258

*Draft – Subject to Change*

(10)      any other designated areas as determined by the Office.

(b)      Operating plan. A licensee shall document, implement, and maintain an operating plan that shall, at a minimum, consist of the applicable written operating procedures, an employee handbook, and the following information in this section. A licensee shall make the operating plan available to the Office immediately upon request.

(1)      Written operating procedures. The operating plan shall consist of written operating procedures which shall include, but not be limited to, procedures to:

(i)      deter theft and prevent loss of cannabis and cannabis products;

(ii)      ensure access to restricted areas of the licensed premises is restricted to only the individuals authorized to access these areas;

(iii)      prevent loitering and ensure that only individuals engaging in activity expressly, or by necessary implication, permitted by the Cannabis Law and this Title are allowed to remain on the premises of the licensee;

(iv)      handle, store, and transport cash;

(v)      monitor and track quality assurance concerns and complaints and to recall cannabis products pursuant to section 125.9 of this Title;

*Draft – Subject to Change*

(vi)      identify workforce training needs on an annual basis and requiring ongoing training of each full-time employee for a minimum of four (4) hours per year, or the equivalent for employees that are less than full-time of the following training:

*(a)*      occupational health and safety training for all employees in addition to other rquired training, from a traning vendor approved by the Office which shall be in the worker's dominant language, where possible;

*(b)*      hazard communication training which must include:

*(1)*      an explanation of the labels received on shipped containers and the workplace labeling system used by their employer.

*(2)*      the safety data sheet, including, the order of information and how employees can obtain and use the appropriate hazard information.

*(c)*      proper use of chemicals or material that require the use of a respirator, consistent with Title 29 Code of Federal Regulations section 1910.134;for employees working with chemicals or materials

*(d)*      for nursery, cultivator, processor licensees:

*Draft – Subject to Change*

*(1)*     materals handling;

*(2)*     hazard communications;

*(3)*     proper use of personal protective equipment;

*(4)*     procedures for reporting and addressing health and safety concerns at minimum;

*(e)*     for delivery, retail dispensaries, and on-site consumption licensees:

*(1)*     preventing workplace violence;

*(2)*     procedures for reporting and addressing workplace violence incidents or concerns;

(vii)     maintain an alcohol-free, drug-free, and smoke-free workplace, except for smoking or vaping which occurs within a limited retail consumption facility;

(viii)     manage and dispose of chemicals that are considered hazardous waste;

(ix)     manage, recycle, and dispose of all waste, including cannabis waste, in a manner that demonstrates best practices by minimizing waste generation and maximizing the reuse and recycling of waste pursuant to section 125.11 of this Title; and

*Draft – Subject to Change*

(x)       any other procedures as determined by the Office.

(2)       A nursery, cultivator, cooperative, microbusiness, ROD, or ROND licensee authorized to cultivate shall include additional written operating procedures to:

(i)       prepare soil or growing media using compost or other recycled organics as a component when appropriate;

(ii)       prevent and control pests using integrated pest management (IPM) principles that are adequate for the facility type and size;

(iii)       store pesticides in an area consistent with label requirements and to control access to pesticides;

(iv)       apply agricultural inputs in a manner that uses only the minimum amount necessary, preventing undesirable drift (including drift due to wind) of inputs to nearby water or other plants, and only applying pesticides when pollinators are not present;

(v)       use compost or other recycled organics as a component of growing media when appropriate;

(vi)       prevent and manage potentailly hazardous spills, including spills of agricultural inputs; and

*Draft – Subject to Change*

(vii)    any other procedures as determined by the Office.

(3)    A processor, microbusiness, ROD, or ROND licensee authorized to process shall include additional written operating procedures to:

(i)    find and obtain specific cannabis product quality plans, master manufacturing records, and batch product records, if these plans and records are not contained within the operating plan;

(ii)    properly operate equipment used in processing activities and handle and dispose of chemical solvents or other materials used in extraction, if applicable;

(iii)    use chemicals and solvents in a manner consistent with safety data sheets; and

(iv)    prevent and manage potentially hazardous spills.

(4)    A retail dispensary, microbusiness, ROD, or on-site consumption licensee authorized to conduct retail sales of cannabis products shall include additional written operating procedures to:

(i)    complete the responsibilities described in paragraph (2) of subdivison (c) of section 123.10 of this Title;

(ii)    sell cannabis products to consumers in a manner that demonstrates compliance with paragrpah (1) of subivision (f) of section 123.10 of this Title;

263

*Draft – Subject to Change*

(iii)      prevent sales to consumers where there is a risk to their health or safety, underage or illegal sales of cannabis products, or any other criminal activity within the licensed premises;

(iv)      maintain access to the dispensary by individuals with physical disabilities, which may include, but are not limited to, procedures to use specific tools to ease communication between employees in point of sale areas and retail customers that are deaf or blind, procedures to make an American Sign Language interpreter available to retail customers during specific hours, procedures to ensure individuals with mobility impairments can more easily access the dispensary, or any applicable laws regarding accessibility for those with physical disabilities;

(v)      remain compliant with applicable local law, such as those pertaining to odor, noise, use of the sidewalk or other public thoroughfares which abut the premises, Fire Codes, and maximum capacity;

(5)      A retail dispensary, microbusiness, ROD, or delivery licensee authorized to deliver cannabis products to consumers, shall include additional written operating procedures to deliver cannabis products to consumers in a manner that demonstrates complaince with section 123.20 of this Title; and

(6)      A retail dispensary or microbusiness authorized to operate a  consumption facility or an on-site consumption licensee authorized to operate an exception area shall include written operating procedures to:

*Draft – Subject to Change*

(i)      mitigate the risk of impaired driving, which may include, but are not limited to:

*(a)*      a twenty-four (24) hour no-tow policy; or

*(b)*      partnerships with public transportation agencies or ride share providers to offer free or discounted rides to consumers to and from the licensed premises;

(ii)      prevent overconsumption of cannabis products, which may include, but are not limited to, time limits, serving size limits, or other policies;

(iii)      control access to the areas of the licensed premises which comprise a consumption facility, which shall use an employee or agent of the licensee to restrict entry to the facility or another method approved by the Board of controlling access to the facility;

(iv)      maintain all technology used in meeting indoor air quality standards, including changing air filters in a manner consistant with manufacturer specifications;

(v)      ventilate indoor areas, during times of smoking and vaping, which shall include:

*(a)*      A description of all ventilation system(s) and air quality monitor(s) used;

*(b)*      the number of air changes per hour caused by such system(s); and

*Draft – Subject to Change*

*(c)*      the filter and filtration system used by such system(s);

(vi)     procedures to sanitize any cannabis paraphernalia available for consumer use in the consumption facility or exception area; and

(vii)     procedures to remain compliant with applicable local law, such as those pertaining to odor, noise, use of the sidewalk or other public thoroughfares which abut the premises, Fire Codes, and maximum capacity; and

(7)     Employee Handbook. The operating plan shall consist of an employee handbook which shall be available to the licensee's employees at all times. The Employee Handbook shall include, but not be limited to, information:

(i)     that is tailored for the licensee's employees and clearly delineates the employee roles and responsibilities in implementing the written operating procedures contained within the operating plan;

(ii)     related to the safer consumption of cannabis products including, at a minimum, the physical effects of cannabis on the human body based on the phytocannabinoids present; recognizing signs of impairment; the onset of intoxicating effects depending on product form or type; strategies for consumers to more safely store and dispose of cannabis products; the appropriate responses in the event of overconsumption; and risks of cannabis use and over-use, including cannabis use disorder;

*Draft – Subject to Change*

(iii)    related to employee safety, including shutdown and emergency procedures which, for processor, microbusiness, cooperative, ROD, or ROND licensees authorized to extract using solvents, shall include specific information related to safe extraction, fire prevention, and response in the event of a fire;

(iv)    to assist employees in compliance with inventory tracking requirements and operation of the licensee's inventory tracking systems;

(v)    to ensure employees allow investigation or inspections, as described in section 125.12 and 133 of this Title, to occur; and

(vi)    on how to access current laws, rules, and regulations, and any guidance or policy documents issued by the Office; and

(8)    Additional information**.** The operating plan shall also include:

(i)    A list that include the first and last name and employee ID number, or other similar unique identifier, of all employees authorized to access any surveillance room(s);

(ii)    an equipment list, which shall include, at a minimum, a list of all equipment used in a nursery area or in the cultivation or processing of cannabis, equipment used in the sanitization of cannabis paraphernalia used by consumers in a consumption facility or exception area, and

*Draft – Subject to Change*

equipment, including filters, used to maintain the air quality of any consumption facilities or exception areas;

(iii)    description of manufacturer's requirements for maintenance and records of maintance for all equipment on the equipment list that is used to meet energy and environmental standards;

(iv)    a list of all sanitizing agents used to maintain equipment used in the cultivation, processing, distribution, transportation, storage, and sale of cannabis or cannabis products;

(v)    safety data sheets for all pesticides used and for all hazardous chemicals and solvents used in processing

(vi)    records of all mock recalls the licensee has conducted; and

(vii)    any other information required by the Office.

(c)    Energy and Environmental Plan. Licensees shall document, implement, and maintain an energy and environmental plan, which shall be updated and submitted to the Office in the following manner.

(1)    Prior to an application for licensure being deemed complete for filing with the Office pursuant to section 120.5 of this Title, applicants shall provide the following information as their Energy and Environmental Plan:

*Draft – Subject to Change*

(i)       A confirmed receipt of a submitted utility service request application;

(ii)      A description of all water sources that shall be used in the cultivation or processing of cannabis or cannabis products;

(iii)     A statement that the licensee's operations will not be inconsistent with, and will not interfere with the attainment of, the statewide greenhouse gas emissions limits established in Article 75 of the Environmental Conservation Law;

(iv)      If the applicant is seeking a processor, microbusiness, cooperative, ROD, or ROND license that authorizes the packaging and labeling of cannabis products, an Environmental Sustainability Product Packaging Plan which describes a retail packaging sustainability program pursuant to Part 128 of this Title; and

(v)       Evidence that the proposed premises meets, or will meet prior to beginning operations, all applicable standards for odor control and indoor air quality which apply to any consumption facilities or exception areas.

(2)       Prior to beginning operations, a licensee shall update its Energy and Environmental Plan by:

269

*Draft – Subject to Change*

(i)      submitting evidence that the licensee's operations will meet or exceed energy and environmental standards as set forth in this Part that apply to the licensee upon beginning operations; and

(ii)      submitting a description of the specific equipment or technologies the licensee shall use to meet or exceed applicable energy and environmental standards as set forth in this Part and a statement that the licensee shall meet each energy and environmental standard it does not yet meet prior to the effective date for that specific standard pursuant to section 125.1 of this Title; and

(3)      Prior to an application for license renewal being deemed complete for filing with the Office pursuant to section 120.5 of this Title, applicants for renewal may be required to provide an updated Energy and Environmental Plan. Nursery, cultivator, cooperative, microbusiness, ROD, or ROND licensees authorized for cultivation may be required to submit data collected pursuant to section 123.4 of this Title, including but not limited to energy tracking and regenerative agriculture practices.

## § 125.3 Security and Storage of Cannabis.

(a)      General Requirements. A licensee shall implement sufficient security measures to deter diversion, theft, or loss of cannabis and cannabis products, theft, or loss of cash, prevent unauthorized entrance into areas containing cannabis or cannabis products, and to ensure the safety of the licensee's employees and the general public. Unless otherwise approved by the

*Draft – Subject to Change*

Office, such security measures taken by the licensee shall include, but not be limited to, the following:

(1)    positively identifying individuals who are not employees of the facility and are seeking access to the premises to limit access solely to individuals twenty-one (21) years of age or older;

(2)    implementing and maintaining a security plan which may be included within the licensee's operating plan and shall include a description of the security measures to:

(i)    prevent unauthorized access to the licensed premises by unauthorized persons and protect the physical safety of employees;

(ii)    deter theft or loss of cannabis and cannabis products;

(iii)    prevent loitering and ensure that only individuals engaging in activity expressly or by necessary implication permitted by the Cannabis Law and this Title are allowed to remain on the premises of the licensee;

(iv)    lock all perimeter doors and windows; and

(v)    provide for safe cash storage and handling, and transportation of cash to financial institutions; and

*Draft – Subject to Change*

(3)      securing all entrances to the licensed facility to prevent unauthorized access;

(4)      ensuring that both the inside, and the outside perimeter of the licensed facility are sufficiently illuminated to facilitate surveillance;

(5)      maintaining trees, bushes, and other foliage outside of the licensed premises so as to prevent a person from concealing themselves from sight; and

(6)      any other requirements provided in this section, and as determined by the Office.

(b)      Storage. Cannabis and cannabis products shall be stored in a secure, locked safe, vault, or other approved equipment or location within the licensed premises to prevent diversion, theft or loss, and in such a manner, as to protect against physical, chemical and microbial contamination, and deterioration of the cannabis and cannabis products as follows:

(1)      all safes, vaults or any other approved equipment or areas used for the cultivation, processing, and/or storage of cannabis or cannabis products shall be securely locked and protected from entry, except for the actual time required to remove or replace cannabis and cannabis products;

(2)      keys shall not be left in the locks or stored or placed in a location accessible to individuals who are not authorized to access cannabis or cannabis products;

272

*Draft – Subject to Change*

(3)     security measures, such as combination numbers, passwords or biometric security systems, shall not be accessible to individuals other than those specifically authorized to access cannabis or cannabis products;

(4)     a separate secure area shall be designated for temporary storage of any cannabis or cannabis product that requires disposal;

(5)     cannabis and cannabis products within storage areas shall be kept out of plain sight and not visible from a public place outside of the licensed premises without the use of binoculars, optical aids, or aircraft; and

(6)     access to cannabis and cannabis product storage areas and areas within the licensed facility where security equipment and recordings are stored shall be restricted to:

(i)     authorized licensee personnel;

(ii)     employees of the Office or its authorized representatives;

(iii)     emergency personnel responding to an emergency; and

(iv)     other individuals authorized by the licensee for the sole purpose of maintaining the operations of the facility.

*Draft – Subject to Change*

(c)      Security System. All facilities operated by a licensee where cannabis or cannabis products are stored or handled shall have a security system to prevent and detect diversion, theft or loss utilizing commercial grade equipment, which shall, at a minimum, include:

(1)      a perimeter alarm that communicates with an internal designee and a third-party commercial central monitoring station when intrusion is detected;

(2)      video camera surveillance in all areas, except in areas where cannabis consumers are consuming cannabis, that may contain cannabis or cannabis products, all surveillance areas or rooms and at all points of entry and exit, and in any parking lot, which shall be appropriate for the normal lighting conditions of the area under surveillance. Video camera surveillance shall meet the following additional requirements:

(i)      video cameras shall be directed at all safes, vaults, sales areas, and any other areas where cannabis and cannabis product, as applicable, is cultivated, harvested, processed, prepared, stored, handled, transferred, or sold and for the purpose of securing cash;

(ii)      video cameras shall be positioned at entry and exit points, and at each point-of-sale area, to allow for the capture of clear and certain identification of any person entering or exiting the facility or at the point-of-sale;

(iii)      video cameras shall have the ability to immediately produce a clear color still photo from any camera image (live or recorded);

*Draft – Subject to Change*

(iv)    video recordings shall allow for the exporting of still images in an industry standard image format (including .jpeg, .bmp, and .gif). Exported video shall have the ability to be archived in a proprietary format that ensures authentication of the video and guarantees that no alteration of the recorded image has taken place. Exported video shall also have the ability to be saved in an industry standard file format that can be played on a standard computer operating system;

(v)    video cameras shall include a date and time stamp embedded on all recordings. The date and time shall be synchronized and set correctly, measured in accordance with the United States National Institute Standards and Technology standards and shall not significantly obscure the picture;

(vi)    video cameras shall produce continuous recordings during hours of operation and at any time that cannabis or cannabis product is handled, and motion activated recordings at all other times, from all video cameras, which the licensee shall make available via remote access or login credentials for immediate viewing by the Office or the Office's authorized representative upon request. All recordings shall be retained for at least 60 days;

(vii)    licensees shall make an unaltered copy of video camera recording(s) to the Office upon request;

*Draft – Subject to Change*

(viii)    if a licensee is aware of a pending criminal, civil or administrative investigation or legal proceeding for which a recording may contain relevant information, the licensee shall retain an unaltered copy of the recording until the investigation or proceeding is closed or the entity conducting the investigation or proceeding notifies the licensee that it is not necessary to retain the recording, but in no event for less than 60 days; and

(ix)    the physical media or storage device on which surveillance recordings are stored shall be secured in a manner to protect the recording from tampering or theft; and

(3)    a failure notification system that provides an audible, text, or visual notification of any failure in the security system. The failure notification system shall provide an alert to the licensee's designated representative(s) within five (5) minutes of the failure, either by telephone, email, or text message;

(4)    the ability for the security alarms and video surveillance system to remain operational during a power outage for a minimum of eight (8) hours;

(5)    limiting access to any surveillance areas and keeping all on-site surveillance rooms locked. A licensee shall make available to the Office or the Office's authorized representative, upon request, a current list of authorized employees who have access to any surveillance room;

(6)    keeping all locks, storage and security equipment in full operating order and shall test and inspect such equipment at regular intervals, not to exceed 30 calendar days from the previous

*Draft – Subject to Change*

inspection and test. Records of security tests shall be maintained for five (5) years and made available to the Office upon request; and

(7)    outdoor areas designated for cannabis cultivation shall implement the video surveillance requirements as set forth in this Part, which shall be operating for no less than the three-week period preceding a harvest, as well as at all times while drying, curing, storing or disposing of cannabis. To ensure that outdoor areas are not readily accessible to unauthorized individuals and to prevent and detect diversion, theft or loss of cannabis, cultivation security measures shall, based on tier of the outdoor cultivator, include the following:

(i)    a perimeter security fence or perimeter breach detection device, unless otherwise approved by the Office, designed to prevent unauthorized entry with signs notifying observers that it is a Limited Access Area; fencing shall:

(*a*)    be constructed of metal or another similarly secure material;

(*b*)    measure at least eight (8) feet from the ground to the top;

(*c*)    have support posts that are securely anchored; and

(*d*)    meet the requirements of the relevant municipal code provisions; and

(ii)    use commercial-grade, nonresidential locks;

*Draft – Subject to Change*

(iii)    motion activated floodlights, which may face away from the canopy, or other technology, such as motion activated night vision cameras, which provide sufficient visibility in darkness; and

(iv)    controlled point of access.

(8)    The Office shall issue future guidance determining appropriate security measures for outdoor nursery areas and based on cultivator tier size, for outdoor canopy areas in the period preceding a harvest and for drying, storage, and disposal areas at all times.

(d)    Employee and Visitor Identification. Employees, visitors, and other persons at licensed premises, including persons engaged in the transportation of cannabis or cannabis products, shall be required to provide identification to the Office, or other authorized enforcement official upon request.

(1)    All licensees and employees on the licensed premises shall be required to hold and properly display an identification badge, issued by the licensee, at all times, while on the licensed premises or when engaged in the transportation of cannabis or cannabis products. The identification badge shall include, at a minimum, the following information:

(i)    employee's first and last name;

(ii)    employee's photograph;

*Draft – Subject to Change*

(iii)    licensee's legal name; and

(iv)    licensee's license number as issued by the Office;

(2)    Non-employee visitors to the licensed premises, other than cannabis consumers, shall be required to hold and properly display an identification badge issued by the licensee at all times while on the licensed premises.

(3)    The licensee shall maintain a visitor log of all persons, other than employees, cannabis consumers visiting a retail dispensary, permitted cannabis laboratories or laboratory sampling firms, emergency personnel responding to an emergency, or any other persons as determined by the Office, that shall be maintained on the licensed premises for a period of five (5) years and be made readily available to the Office upon request. The log shall include the following information:

(i)    the full name of each visitor, as well as the company the individual works for entering the licensed premises;

(ii)    the time of arrival;

(iii)    time of departure; and

*Draft – Subject to Change*

(iv)    purpose of the visit.

(e)    Incident Reporting. A licensee shall notify the Office in a manner prescribed by the Office, of any breach of security or other incident set forth in this section immediately and, in no instance, more than twenty-four (24) hours following discovery of the security breach or incident.

(1)    Notification to the Office shall be provided for the following incidents:

(i)    discovery of inventory discrepancies;

(ii)    diversion, theft, or loss of any cannabis or cannabis product;

(iii)    any criminal action involving or occurring on or in the licensed premises;

(iv)    any suspicious act involving the cultivation, processing, distribution, or sale of cannabis or cannabis products by any person;

(v)    unauthorized destruction of cannabis or cannabis products;

(vi)    any loss or unauthorized alteration of records related to cannabis or cannabis products;

*Draft – Subject to Change*

(vii)    an alarm activation or other event that requires response by public safety personnel, including, but not limited to, local law enforcement, police and fire departments, public works or municipal sanitation departments, and municipal inspectional services departments, or security personnel privately engaged by the licensee;

(viii)   the failure of any security alarm system, or video surveillance, due to a loss of electrical power or mechanical malfunction that is expected to last more than eight (8) hours;

(ix)    a significant motor vehicle crash that occurs while transporting or delivering cannabis products and would require the filing of an accident report with the New York State Department of Motor Vehicles;

(x)     any other breach of security; and

(xi)    any other event that may compromise public health and/or safety including the health and safety of the workforce at the licensed premises;

(2)     The licensee shall, within 10 calendar days of any incident in paragraph (1) of this subdivision, submit an incident report in a form and manner determined by the Office which details the circumstances of the incident, any corrective action taken, and confirmation that the appropriate law enforcement authorities were notified.

(3)    All documentation related to an incident shall be maintained by a licensee for not less than five (5) years or the duration of an open investigation, whichever is longer, and made available to the Office and law enforcement authorities within their lawful jurisdiction upon request.

## § 125.4 Employee Requirements and Obligations.

(a)    Licensees shall not employ anyone under the age of eighteen (18) years of age. Any employee eighteen (18) years of age or older but under twenty-one (21) years of age may not deliver cannabis products to consumers or have direct interaction with customers inside a licensed retail dispensary or consumption facility or exception area.

(b)    Licensees shall use due diligence to ensure that all employees possess the necessary education and training for the duties they will be assigned.

(c)    The act, omission, or failure of an agent, officer, representative, or other person acting for or employed by a licensee, within the scope of their employment or position, shall in every case be deemed the act, omission, or failure of the licensee.

## § 125.5 Responsible Workforce Training.

(a)    Licensees shall provide all managers, employees, contractors, volunteers, or persons otherwise performing activities under a licensee's authorizations, within 30 days of starting to perform licensed activities and at no cost to the recipient, a Responsible Workforce Training,

*Draft – Subject to Change*

which shall consist of required elements and be made available in English and the primary language of all recipients.

(b)     Licensees shall provide an abbreviated version of this training to employees planned to be performing activities under a licensee's authorizations for fewer than 30 days, as appropriate. The Office shall issue future guidance pertaining to the appropriate abbreviation of Responsible Workforce Training for such individuals.

(c)     The Responsible Workforce Training shall include:

(i)     a Cannabis Product Safety and Responsibility course as determined by the Office;

(ii)     a Cannabis Workforce Responsibility course as determined by the Office;

(iii)     implicit bias training or cultural competency training that lasts at least one (1) hour; and

(iv)     at least two (2) hours of other training intended to assist employees in conducting the license's licensed activities in a manner which protects employee and public safety.

(d)     Trainings shall happen during the employee's work hours and the licensee shall pay the employee their usual rate of pay while completing any required training.

*Draft – Subject to Change*

(e)      Licensees shall provide the written operating procedures and employee handbook from the licensee's Operations Plan to employees during Responsible Workforce Training. The written operating procedures and employee handbook shall be made available at the licensed premises to employees at all times.

(f)      Licensees shall:

(1)      provide adequate supervision of staff, including trainees, by persons familiar with standard operating procedures for the relevant roles and activities;

(2)      ensure all staff have demonstrated capability in the activities for which they are responsible;

(3)      ensure all staff are fully trained on all standard operating procedures, including, but not limited to, security and emergency procedures and any procedures related to employee and public health and safety; and

(4)      have policies and procedures for identifying training needs on an annual basis and providing ongoing training of personnel, for a minimum of four (4) hours per year, to each full-time employee.

(g)      Licensees shall use only the specific Cannabis Product Safety and Responsibility course and Cannabis Workplace Responsibility course designated by the Office in Responsible

*Draft – Subject to Change*

Workforce Training and shall provide such licensee's own training or contract with third parties for training, pursuant to section 124.3 of this Title, to meet other training requirements in this Title.

(h)    all trainings required to be provided by licensees to all managers, employees, volunteers, or persons otherwise performing activities under a licensee's authorizations, under this section or otherwise by the Office, shall be free of charge to the recipient.

(i)    Training Verification.

(1)    Licensees shall demonstrate completion of Responsible Workforce Training by each required person.

(2)    Licensees shall keep records and shall make such records available upon request by the Office, as it relates to training, containing the following information, including, but not limited to:

(i)    trainee's name;

(ii)    trainee's first date of performing licensed activities; and

(iii)    the name and description of all trainings satisfactorily completed by trainee; and

(iv)    Copies of any certificates associated with the trainee's completion of the Cannabis
Product Safety and Responsibility course and Cannabis Workplace Responsibility course and a
page for signed and dated documentation demonstrating each employee's attestation of
completion of all Responsible Workforce Training modules.

**§ 125.6 Worker Health and Safety Standards.**

(a)    The licensee shall comply with all applicable federal, state, and local laws and
regulations related to worker training, safety, health, and pay including, but not limited to, all
labor laws, human rights laws, and anti-discrimination laws.

(b)    The licensee shall establish, maintain, and comply with a written alcohol-free, drug-free,
and smoke-free workplace policy.

(c)    All employees involved in the cultivation, processing, or distribution of cannabis and
cannabis products shall receive safety and hygiene training as determined by the Office. Signed
consent forms shall be obtained by the licensee from all employees involved in the application of
chemicals or other potentially hazardous materials, ingredients, or substances as part of their
work activities upon completion of the chemical application training, which shall include safe
usage and handling information.

(d)    Safety data sheets shall be maintained consistent with the Occupational Safety and Health
Administration (OSHA) standards pursuant to section 1910.1200 of Title 29 of the Code of
Federal Regulations.

*Draft – Subject to Change*

(e)    The licensee shall maintain an electronic record of any chemicals or other potentially hazardous materials, ingredients, or substances onsite that are used to conduct operations (such as chemicals for cleaning equipment, to control pests, or to perform extraction) and make available to all employees.

(f)    The licensee shall assess the workplace to determine if hazards are present, or are likely to be present, which necessitate the use of personal protective equipment.

(1)    Verify that the required workplace hazard assessment has been performed through a written certification that identifies the workplace evaluated;

(2)    Verify that the person certifying that the evaluation has been performed; the date(s) of the hazard assessment; and, which identifies the document as a certification of hazard assessment.

(g)    Personal protective equipment shall be assigned, consistent with OSHA standards pursuant to section 1910.132 of Title 29 of the Code of Federal Regulations, to all employees involved in the cultivation and processing of cannabis and cannabis products as applicable. Such personal protective equipment shall be in good working order, that properly fits each affected employee, as specified by the manufacturer.  A list of required personal protective equipment shall be kept on site for employees to reference.

*Draft – Subject to Change*

(h)     Employees working with chemicals or materials that require the use of respirators, consistent with OSHA standards pursuant to section 1910.134 of Title 29 of the Code of Federal Regulations, shall be trained in their proper use, and respirators shall be serviced and tagged to manufacturer's specifications.

(i)     Licensees shall install informational signs that provide clear instructions for material handling, equipment operation, and general safety information for all operations.

(j)     Licensee shall install warning signs in English and other appropriate languages for the employees of the licensee that shall be posted in all potential hazard areas as a public health protective measure.

(k)     Licensees shall install any additional signs or make available additional worker health and safety information as determined by the Office.

(l)     Emergency signage shall be posted in all work areas.

**§ 125.7 Sanitary Facility, Equipment, and Handling Standards.**

(a)     The licensee shall be responsible for the upkeep and maintenance of all facilities, containers, tools, contact surfaces, and equipment used in the cultivation, processing, distribution, transportation, storage, and sale of cannabis and cannabis products, and shall:

288

*Draft – Subject to Change*

(1)    have floors, walls, and ceilings constructed in such a manner that they may be adequately kept clean and in good repair;

(2)    utilize containers, tools, contact surfaces, and equipment that are designed and of such material and workmanship as to be adequately cleanable and designed, maintained, operated, and arranged as to protect against the physical, chemical, and microbial contamination and deterioration of cannabis and cannabis products and to protect the safety of all individuals on the licensed premises;

(3)    use containers that are food-grade, or of a similar standard as approved by the Office, for the storage of cannabis and cannabis products. Containers shall be clean, in good repair, and suitable for the established use;

(4)    maintain all facilities, areas, containers, tools, contact surfaces, and equipment, in a clean and sanitary condition to protect against contamination and protect the safety of all individuals on the licensed premises.;

(5)    maintain record of routine cleaning and sanitization of all facilities, containers, tools, contact surfaces, and equipment and make records readily available to the Office upon request;

(6)    provide adequate safety lighting in all cultivation, processing, distribution, storage, and sale areas, as well as areas where equipment, tools, containers, or contact surfaces are cleaned;

*Draft – Subject to Change*

(7)      provide sufficient space on the premises for placement of equipment and storage of

materials as is necessary for the maintenance of sanitary operations;

(8)      utilize appropriate environmental monitoring for temperature, ventilation, and humidity

where cannabis or cannabis products are handled or stored so as to protect cannabis and cannabis

products against physical, chemical, and microbial contamination and deterioration and to

protect the safety of all individuals on the licensed premises;

(9)      maintain records of pest management activities, including, but not limited to:

(i)      a map of all traps, types, and coding/numbering system for the traps, if applicable;

(ii)      a record of routine trap maintenance; and

(iii)      a record of any evidence of animal or insect presence including body parts, hair, or feces

in cannabis or cannabis product handling areas; and

(10)      properly remove and dispose of litter and waste so as to minimize the development of

odor and minimize the potential for the waste attracting and harboring pests;

(11)      store poisonous or toxic materials, insecticides, rodenticides, other pesticides, detergents,

sanitizers, caustics, acids, and other related cleaning or pest management compounds in separate

*Draft – Subject to Change*

areas from cannabis or cannabis products, in prominently and distinctly labeled containers in a manner that protects the safety of all individuals on the licensed premises; and

(12)    establish precautions to protect cannabis, cannabis products, non-cannabis components, contact surfaces, packaging materials, and any other equipment or materials that are used in processing against any potential contamination, by microorganisms or foreign substances.

(b)    Sanitary handling procedures. All licensees and their employees shall handle cannabis in a sanitary manner and comply with general sanitary requirements, including, but not limited to:

(1)    maintaining adequate personal cleanliness; and

(2)    washing and sanitizing hands thoroughly in an adequate hand-washing area before starting work, after each visit to a restroom, after handling contaminated material, eating, or at any other time when hands may have become soiled or contaminated.

(c)    Licensees shall ensure that all workers have access to hand washing and toilet facilities on the licensed premises and shall maintain such facilities in good working order and a clean and sanitary condition, maintaining records of regular cleaning and sanitizing of such facilities.

(1)    Handwashing facilities on the licensed premises shall be furnished with running water at a suitable temperature and such facilities shall be located in any cultivation or processing areas

*Draft – Subject to Change*

and any other areas on the licensed premises where good sanitary practices require employees to wash and sanitize their hands.

(2)      Signage shall be displayed in toilet facilities to remind workers to wash and sanitize hands. Sanitary areas in this section shall be marked in the licensee's site plan.

(d)      Plumbing shall be of adequate size and design, and adequately installed and maintained to carry sufficient quantities of water to required locations throughout the premises of the licensed entity. Plumbing shall properly remove sewage and liquid disposable waste from the premises of the licensed entity. There shall be no cross-connections between the potable and wastewater plumbing.

## § 125.8 Inventory and Tracking.

(a)      Licensees shall track all physical inventory of cannabis in an electronic real-time inventory tracking system as determined by the Office. The inventory tracking system shall be capable of showing any cannabis that has been released for sale, to allow for a total recall of all cannabis if necessary. The licensee shall:

(1)      accurately record all inventory in the inventory tracking system, including identification of base or starting material(s) used to create each batch or lot of cannabis or cannabis products;

(2)      maintain, in real-time, at a minimum, the following information, in the inventory tracking system:

*Draft – Subject to Change*

(i)       batch or lot unique identifiers for cannabis and cannabis products;

(ii)      a complete cannabis and cannabis product inventory, as well as inventory adjustments, from cultivation, processing, transport, laboratory testing, distribution, waste, sale, disposal, product return, or any other activity. The complete inventory shall include, as applicable, all seeds, plant tissue, seedlings, clones, plants, lots of useable cannabis or trim, leaves, other plant material, cannabis extract, cannabis products, and cannabis waste;

(iii)     for processors, any additives or ingredients used in the processing of cannabis;

(iv)     all samples sent to an independent testing laboratory, any sample of unused portion of a sample returned to a licensee, and the quality assurance test results in accordance with Part 130 of this Title;

(v)      all samples provided to another licensee as authorized by the Office;

(vi)     samples provided to the Office or their designee for quality assurance compliance review; and

(vii)    any other information as determined by the Office; and

(3)       utilize an inventory tracking system that is capable of integrating with the Office's seed-to-sale inventory tracking system of record in a form and manner as determined by the Office;

*Draft – Subject to Change*

(4)      physically tag or label all cannabis, cannabis products, cannabis extract, seeds, plant tissue, clone lots, seedlings, immature cannabis plants, and cannabis waste with the unique identifier generated by the inventory tracking system;

(5)      utilize a standard of measurement that is supported by the inventory tracking system to track all cannabis and cannabis product. A scale used to weigh product prior to entry into the inventory tracking system shall be approved for commercial use in accordance with New York State Bureau of Weights and Measures;

(6)       track, at a minimum, the following data elements for each activity performed with cannabis and cannabis products:

(i)      the type of cannabis or cannabis products;

(ii)      the weight, volume, or count of the cannabis or cannabis products;

(iii)      the date of activity;

(iv)      the lot unique identifier assigned to the cannabis or cannabis products;

(v)      the identification of the employee performing the action in the inventory tracking system;

*Draft – Subject to Change*

(vi)    the type of activity being performed; and

(vii)    any other information as determined by the Office; and

(7)    review the licensee's authorized users and remove any users who are no longer authorized to enter information into the inventory tracking system; and

(8)    record nursery and cultivation activities as follows:

(i)    record the following activities in the inventory tracking system within three (3) calendar days of occurrence:

*(a)*    planting of an immature cannabis plant lot;

*(b)*    moving immature cannabis plants to a designated canopy, flowering of an individual plant, or application of a plant tag to an immature cannabis plant;

*(c)*    destroying or disposing of an immature or mature cannabis plant;

*(d)*    harvesting of a mature cannabis plant, or portion thereof; and

*(e)*    application of pesticides.

*Draft – Subject to Change*

(ii)    report in the inventory tracking system for each harvested plant or portion thereof, or harvest batch:

*(a)*    the weight of each harvest batch, which shall indicate whether the weight is the wet weight or dry weight in the report;

*(b)*    the weight of cannabis waste associated with each harvest batch;

*(c)*    the unique name of the harvest batch;

*(d)*    the initiating date of the harvest. For purposes of this section, an initiating date of the harvest shall be the month, day, and year the first mature cannabis plants in the harvest batch were cut, picked, or removed from the soil or other growing media; and

*(e)*    the packaging and repackaging of cannabis or cannabis products.

(b)    Loss of System Access. If at any point a licensee loses access to the inventory tracking system for any reason, the licensee shall keep and maintain comprehensive records detailing all inventory tracking activities that were conducted during the loss of access.

(1)    Once access is restored, all inventory tracking activities that occurred during the loss of access shall be entered into the inventory tracking system.

(2)    A licensee shall document when access to the system was lost and when it was restored.

*Draft – Subject to Change*

(3)    A licensee shall not initiate transport for, receive, transfer or deliver any cannabis or cannabis products to another licensed entity until either such time as access is restored and all information is recorded into the inventory tracking system or such time the licensee is approved by the Office to conduct such activities during the loss of access.

(4)    Within three (3) calendar days of restored access, enter all licensed cannabis activity that occurred during the loss of access into the inventory tracking system.

(5)    Document the cause for loss of access, as well as the dates and times for when the loss occurred.

(6)    Document the dates and times for when access to the inventory tracking system was restored.

(c)    Initial Inventory. A licensee shall conduct an initial comprehensive inventory of all cannabis and cannabis product in the possession of the licensee, including cannabis available for cultivation, cannabis products for sale, immature and mature cannabis plants, and unusable cannabis, at the licensed premises on the date the licensee first engages in licensed activities.

297

*Draft – Subject to Change*

(1)    Inventory shall include damaged, defective, expired, or adulterated cannabis awaiting disposal, including the name, the quantity, and the reasons for which the cannabis licensee is maintaining the cannabis.

(2)    The initial comprehensive inventory shall be reported to the Office utilizing the inventory tracking system.

(d)    Licensees shall establish inventory controls and procedures and conduct comprehensive inventories of cannabis and cannabis products which shall include the following;

(1)     maintaining real-time inventory tracking;

(2)    conducting a monthly inventory audit of all cannabis and cannabis products;

(3)    conducting an annual inventory audit at least once every year from the date of the previous inventory; and

(4)    recording at a minimum, the following, in the inventory tracking system;

(i)    the name(s) and signature(s) or electronic signature(s) of employee(s) who conducted the inventory audit;

(ii)    the date of the inventory audit;

*Draft – Subject to Change*

(iii)    summary of inventory findings; and

(iv)    any other information as determined by the Office.

(e)    A licensee, upon becoming aware of any significant discrepancy(s) identified during an inventory audit, shall notify the Office no later than twenty-four (24) hours after discovery of the event in a manner prescribed by the Office. Upon comparison of the licensee's actual inventory to the licensee's anticipated inventory, as determined by the inventory tracking system, a significant discrepancy, for purposes of this subdivision, shall mean:

(1)    for a cooperative, tier 3 cultivator, tier 4 cultivator, tier 5 cultivator, ROD, or ROND licensee, a difference in the actual inventory compared to the anticipated inventory of two percent (2%) of the anticipated inventory or greater;

(2)    for a retail dispensary, delivery, or on-site consumption licensee, a difference in the actual inventory compared to the anticipated inventory of:

(i)    five (5) percent of the anticipated inventory or greater, if the inventory tracking system anticipated an inventory of 1,000 cannabis products or fewer; or

(ii)    two (2) percent of the anticipated inventory or greater, if the inventory tracking system anticipated an inventory of more than 1,000 cannabis products; or

299

*Draft – Subject to Change*

(iii)    for a nursery, tier 1 cultivator, tier 2 cultivator, distributor, processor, or microbusiness licensee, a difference in the actual inventory compared to the anticipated inventory of five percent (5%) of the anticipated inventory or greater, unless such licensee also holds a cooperative, tier 3 cultivator, tier 4 cultivator, tier 5 cultivator, ROD, or ROND license at the time the discrepancy is discovered, in which case a significant discrepancy shall mean a difference in the actual inventory compared to the anticipated inventory of two (2) percent of the anticipated inventory or greater;

(f)    A nursery, cultivator, processor, cooperative, ROD, ROND, or microbusiness licensee shall maintain records identifying each agricultural input used in a nursery area, propagation area, or canopy area and each ingredient used in processing. Records shall include:

(1)    the date of receipt;

(2)    the vendor's name and address;

(3)    the name of the ingredient or agricultural input;

(4)    the vendor's license, registration or other operating identification number, as applicable;

(5)    the grade of the ingredient or agricultural input, as applicable;

*Draft – Subject to Change*

(6)      the quantity received;

(7)      if an agricultural input, the active ingredients, purpose of use, application rate and date, and the name of the person applying the agricultural input;

(8)      if a pesticide that is not a general use pesticide that is approved by the Office for private application, the New York State Department of Environmental Conservation certification number of the person applying the pesticide; and

(9)      any other information determined by the Office.

## § 125.9 Quarantine and Recalls.

(a)      A licensee shall establish written policies and procedures to monitor and track all quality assurance concerns, and complaints from other licensees and consumers, including, but not limited to, procedures for rapid notification to the licensees' supply and distribution chain to recall any lot of cannabis or cannabis product when directed by the Office, or as deemed necessary by the licensee. Such procedures shall include notification to the Office within 24 hours of learning of a serious adverse event, quality assurance concern or initialing a recall.

(b)      Implemented written procedures for recalling cannabis product, whether initiated by the licensee or mandated by the Office, shall include:

*Draft – Subject to Change*

(1)      identification of factors that necessitate recall and personnel responsible for

implementing the recall procedures;

(2)      notification protocols, including a mechanism to notify the Office within 24 hours of

initiating a recall and to notify any licensee that supplied or received the recalled cannabis

product;

(3)      instructions to the general public and other licensees for the return or destruction of the

recalled cannabis or cannabis products; and

(4)      a requirement that all recalled products held by a licensee shall be held in quarantine until

the Office authorizes additional actions.

(c)      All inventories, policies and procedures and other documents required by this section

shall be maintained on the licensed premises and shall be made readily available to the Office

upon request.

(d)      A licensee shall not sell or transfer cannabis or a cannabis product that has been placed

on administrative hold by the Office, recalled, or ordered or otherwise required to be destroyed.

Such cannabis or cannabis products shall be stored securely and separate and apart from other

cannabis products while awaiting final disposition.

*Draft – Subject to Change*

(e)     A licensee shall not sell or a transfer cannabis product after the printed expiration date on the package.

### § 125.10 Transport of Cannabis and Cannabis Products.

(a)     Transport of cannabis and cannabis products to an authorized licensee or consumer shall only be performed by a licensee, licensee's authorized employee(s), or other party authorized under Cannabis Law.

(b)     A licensee shall ensure the safe and secure transport of any cannabis, or cannabis products, including the safety of those individuals transporting cannabis.

(c)     Employees transporting cannabis and cannabis products shall be at least 18 years of age, unless providing delivery of cannabis or cannabis products to a consumer, in which case employee shall be at least twenty-one (21) years of age. Such individual shall provide identification as an employee of a licensee or person authorized to transport cannabis, including the license number of the licensee for whom they are transporting cannabis or cannabis products, upon request by the Office or law enforcement.

(d)     Cannabis and cannabis products shall be transported in a manner that will protect the cannabis and cannabis products against physical, chemical, and microbial contamination, and deterioration.

*Draft – Subject to Change*

(e)      All cannabis and cannabis products shall be transported in a secure manner, in motorized

and unmotorized transportation owned, leased, or operated with an exclusive right to use and

operate by the licensee, including, but not limited to, a vehicle, trailer, bicycle, and motorcycle.

(1)      All transportation shall be equipped with the following:

(i)      temperature controls designed, maintained, and equipped as necessary to prevent the

cannabis and cannabis products from deteriorating during transport.

(ii)      a fully enclosed and locked box, container, or cage, which shall be used for the secure

transport of cannabis and cannabis products; and

(iii)      an operational Global Positioning System (GPS) device, for identifying the geographic

location of the transportation, either permanently or temporarily affixed to the transportation

while in operation. At all times, the originating licensee shall be able to identify the geographic

location of all individuals transporting cannabis and cannabis products and shall provide such

information to the Office upon request.

(2)      Transportation shall bear no signs, markings, or advertisements that would either identify

or indicate that the transportation is used to transport cannabis or cannabis products except for

identifying markings required by other applicable laws or regulations.

*Draft – Subject to Change*

(3)    A licensee shall make available to the Office, upon request, information regarding any motorized or non-motorized transportation including the vehicle's make, model, color, vehicle identification number, license plate number, and vehicle registration as applicable.

(4)    Transport of cannabis and cannabis products shall not be made through the use of an unmanned transportation, which shall include a drone.

(5)    For purposes of this Title, any transportation utilized to transport cannabis or cannabis products shall be considered an extension of the licensed premises and subject to inspection by the Office or authorized representative of the Office. Transportation may be stopped and inspected by the Office at any licensed premises, or while on route to an authorized licensee or consumer.

(f)    Cannabis and cannabis products being transported shall be in a sealed package, which shall not be opened during transport, in accordance with the requirements set forth in Part 128 of this Title.

(g)    Shipping manifests.

(1)    Prior to transporting any cannabis or cannabis products, a licensee or person authorized for the transport of cannabis or cannabis products shall generate a shipping manifest, which may be maintained electronically but can be displayed during transport upon request, and shall contain the purpose for the transport as follows:

305

*Draft – Subject to Change*

(i)      transport to or from a laboratory permitted in accordance with Part 130 of this Title;

(ii)     transport to or from an authorized licensee;

(iii)    transport for destruction or disposal pursuant to the requirements set forth in section 125.11 of this Title;

(iv)    transport from a licensee authorized for the retail sale of cannabis to a cannabis consumer pursuant to the requirements set forth in section 123.20 of this Title; or

(v)     for any other activity, as required pursuant to this Title, or by any other licensing authority recognized by the Office.

(2)      Licensees shall transmit a shipping manifest to any licensee, permittee, or other authorized party that will receive cannabis or cannabis products being transported. Shipping manifests shall be available for inspection at the request of the Office. The shipping manifest shall contain, at a minimum, the following information;

(i)      the name, physical address, lot or batch number, and license or permit number of the originating licensee or permittee;

(ii)     the name, physical address, and license number, if applicable, of the receiving party;

*Draft – Subject to Change*

(iii)    the unique identification numbers for all cannabis and cannabis products being

transported;

(iv)    the name, product type, and weight or count, as applicable, of cannabis or cannabis

products being transported;

(v)    the estimated date and time of departure from the licensed premises;

(vi)    the estimated date and time of arrival at each licensed premises or the cannabis

consumer's address;

(vii)    the driver's license number of the employee transporting the cannabis or cannabis

products if motorized transportation is being conducted by the licensee producing the shipping

manifest;

(viii)    the make, model, and license plate number of the motorized transportation if the transport

is being conducted by the licensee producing the shipping manifest; and

(ix)    any other information as determined by the Office.

(3)    With the exception of those samples being transported to a permitted laboratory for

testing, a certificate of analysis shall accompany cannabis products being transported for

*Draft – Subject to Change*

distribution to licensees authorized for the retail sale of cannabis. The certificate of analysis may be transmitted electronically to the receiving licensee.

(4)    Licensees authorized to conduct delivery to a cannabis consumer shall generate an invoice to the consumer, which may also be the consumer's receipt and shall include:

(i)    all information required to be on the consumer's receipt pursuant to paragraph (2) of subdivision (f) of section 123.10 of this Title;

(ii)    the name, address, and signature or electronic signature of the cannabis consumer;

(iii)    the first name and last initial and signature or electronic signature of each employee performing or accompanying the delivery of the cannabis products;

(iv)    the name and license number of the licensee conducting the delivery, if it is not the retail dispensary whose information is on the receipt; and

(v)    any other information as determined by the Office.

(5)    Employees conducting the transport of cannabis or cannabis products shall possess a copy of the shipping manifest, and invoice for delivery to consumers, at all times when transporting cannabis products and shall produce it to the Office, the Office's authorized representative or law enforcement official upon request.

*Draft – Subject to Change*

(6)      A licensee shall not void, modify, or change a shipping manifest or invoice after departing from the originating licensed premises, unless updating such manifest upon the fulfillment of a delivery order to reflect accurate inventory on the delivery operator, as authorized under this Part.

(7)      The licensee receiving and taking possession of cannabis or cannabis products shall ensure and verify that the cannabis or cannabis products being received and taken into possession for transport at the originating licensed premises are as described and accurately reflected in the shipping manifest.

(8)      The licensee shall not take into possession or transport:

(i)      any cannabis or cannabis products that are not on the shipping manifest; or

(ii)      any cannabis or cannabis products that are less than or greater than the amount reflected on the shipping or delivery manifest, unless a reconciliation process determined the cause of the discrepancy.

(9)      Licensees shall capture shipping manifest data in their inventory tracking system and make such data available to the Office's inventory tracking system in a manner determined by the Office.

*Draft – Subject to Change*

(10)    The licensee conducting the transport is responsible for any discrepancies between the shipping manifest and the cannabis and cannabis products in its possession during transport, and subject to any enforcement action related to such discrepancy.

(11)    Shipping manifests and any invoices shall be made readily available to the Office, for inspection upon request, for a period of five (5) years.

(h)    Employees of the licensee transporting cannabis and cannabis products shall:

(1)    not make any unnecessary stops in between destinations;

(2)    randomize transport times;

(3)    have the ability to communicate with employees at the licensed entity at all times that the vehicle contains cannabis and cannabis products;

(4)    only transport cannabis and cannabis products within the borders of New York State; and

(i)    Where a transport is attempted and not completed and the cannabis item remains in the possession of the employee conducting the transport, the employee shall return the cannabis or cannabis product to the licensed premises of the employee. The returned inventory may be restocked if the inventory is in a new, unopened condition and was handled in a manner that did not compromise the integrity of the cannabis or cannabis products; and

*Draft – Subject to Change*

(j)    Only licensees, or employees thereof, may be in any vehicle as it is being used to transport cannabis or cannabis products.


**§ 125.11 Management of Cannabis and Other Waste.**

(a)    A licensee shall dispose of any cannabis or cannabis product that is past its date of expiration, damaged, deteriorated, contaminated, or otherwise deemed not appropriate for the licensed activities. This includes any plant-based cannabis waste created as a by-product of cultivation or processing, such as plant waste contaminated with solvents, including, but not limited to butane, ethanol, propane, or any other solvent as determined by the Office.


(b)    All disposal of cannabis shall be conducted in compliance with all applicable state and local laws, rules, and regulations.


(c)    Cannabis waste, excluding stalks, stems, fan leaves, root balls, and soil media of the cannabis plant and cannabis products which contain batteries, glass, or other hazardous materials that cannot be ground or mixed, shall be rendered unusable, by grinding and mixing the cannabis plant waste with other ground materials, so the resulting mixture is at least 50% non-cannabis waste by weight. Any other method used to render cannabis unusable shall require prior written approval of the Office.


(1)    Licensees that are within 25 miles of an organic recycling facility and are a cooperative licensee, Tier 1 cultivator, Tier 2 cultivator, or Tier 3 cultivator shall not have their non-contaminated waste landfilled or combusted but shall be:

*Draft – Subject to Change*

(i)      composted on or off premises;

(ii)     used to produce energy through the process of anaerobic digestion; or

(iii)    used as an input for a licensee or a licensed third party in the manufacture of other products, including, but not limited to, paper, packaging, pet bedding, or through process of fermentation; and

(2)     Cannabis waste that will be processed in a composting facility or other organics recycler (anaerobic digester, etc.) can only be mixed with other organic waste that the receiving organics recycler can process effectively. The types of waste include, but are not limited to, food scraps, yard trimmings, manure, cannabis growing materials that do not need to be rendered unusable (stems, fan leaves, etc.). An off-site organics recycling facility is a recycling facility which is approved by the New York State Department of Environmental Conservation to accept the quantity of material proposed. On-site organics recycling shall follow operational procedures acceptable to the Office.

(3)     Cannabis waste that will be disposed in a solid waste management facility such as a combustion facility or a landfill may be mixed with any nonhazardous solid waste, including, but not limited to, paper waste, cardboard waste, plastic waste, soil, or sawdust, prior to disposal.

*Draft – Subject to Change*

(d)        Cannabis waste that has been rendered unusable pursuant to this Part may be disposed of using one of the following methods:

(1)        deliver cannabis waste to a New York State Department of Environmental Conservation. permitted solid waste management facility for final disposition. Examples of acceptable permitted solid waste facilities include:

(i)        compost, anaerobic digester, or other facility acting in accordance with the requirements of the New York State Department of Environmental Conservation for compostable mixed waste; or

(ii)        landfill, incinerator, or other facility acting in accordance with the requirements of the New York State Department of Environmental Conservation for non-compostable mixed waste; and

(2)        manage disposal on-site by the licensee in accordance with the requirements of the New York State Department of Environmental Conservation; or

(3)        use on-premises organic waste recycling methods through reintroduction of cannabis waste back into agricultural operation through methods including, but not limited to, tilling directly into agricultural land and no-till farming.

*Draft – Subject to Change*

(e)      A licensee who is using another entity to transport cannabis waste, shall maintain and make available to the Office upon request, the business name, address, contact person, and contact phone number of the permitted or registered New York State Department of Environmental Conservation waste transporter transporting the cannabis waste; and obtain documentation from the waste transporter transporting the cannabis waste that evidences subscription to a waste collection service.

(f)      A licensee who is self-transporting cannabis waste shall be subject to the following additional requirements:

(1)      the licensee or its employees shall be registered or permitted as a waste transporter pursuant to 6 NYCRR Parts 364 and 368;

(2)      self-transported cannabis waste shall only be transported by the licensee or its employees;

(3)      self-transported cannabis waste shall only be transported to a solid waste management facility that is permitted by the New York State Department of Environmental Conservation to accept cannabis waste; and

(4)      the licensee or its employee who transports the cannabis waste shall obtain for each delivery of cannabis waste a copy of a record, indicating the amount of cannabis waste transported to the permitted solid waste management facility or receipt from the permitted solid waste management facility.

*Draft – Subject to Change*

(g)     Liquid waste. Any chemical waste and wastewater generated during cannabis production and processing, including pesticides or hazardous waste, shall be disposed of in accordance with all applicable state and local laws, rules, and regulations.

(h)     Cannabis waste that is to be rendered unusable shall be maintained in a secured waste receptacle or secured area on the licensed premises until the time of disposal.

(i)     All exterior cannabis waste receptacles located on the licensed premises shall be locked and secured to prevent unauthorized access.

(j)     All cannabis waste disposed of shall be weighed, recorded, and entered into the inventory tracking system prior to mixing and disposal. Licensees shall maintain records of disposal for at least five (5) years, and made available to the Office for inspection, which shall include:

(1)     the form (or type) of cannabis or cannabis product being disposed;

(2)     the weight of the disposed cannabis material, the number of plants, or in the case of a cannabis product, the quantity of the cannabis product;

(3)     the batch or lot number, as applicable, of the cannabis or cannabis product;

*Draft – Subject to Change*

(4)    the first name and last initial and the signatures or electronic signatures of at least two (2) of the licensee's employees who witnessed the disposal; and

(5)    any other information as determined by the Office.

(k)    Use of cannabis waste that is not required to be rendered unusable as an input by the licensee or a third party in the manufacture of other products, such as paper, packaging, or pet bedding, or through the process of fermentation is permissible.

(l)    Cannabis waste that shall be rendered unusable shall not be sold.

## § 125.12 Inspections and Audits.

(a)    Licensed or permitted premises, regardless of the type of premises, and all records, including, but not limited to, financial statements and corporate documents, shall be subject to inspection or audit by the Office, by the duly authorized representatives of the Office, by any peace officer acting pursuant to their special duties, or by any police officer acting with cause or in accordance with an active investigation of a crime.

(b)    A licensee shall make themselves, or an agent thereof, available and present for any inspection or audit required by the Office. Such inspection or audit may include, but is not limited to, inspecting and ensuring that a licensee complies with all requirements of the Cannabis Law and all corresponding regulations.

*Draft – Subject to Change*

(c)      Any deficiencies identified by an inspection that is required by the Office shall be documented in a statement of findings by the Office and require that the licensee submit a written plan of correction in a format acceptable to the Office within thirty (30) calendar days of the issue date of the statement of findings. A plan of correction shall address all deficiencies or areas of noncompliance cited in the statement of findings and shall:

(1)      contain an assessment and analysis of the events and/or circumstances that led to the noncompliance;

(2)      contain a procedure addressing how the licensee intends to correct each area of noncompliance;

(3)      contain an explanation of how proposed corrective actions will be implemented and maintained to ensure noncompliance does not recur; and

(4)       contain the proposed date by which each area of noncompliance shall be corrected.

(d)      Any inspection finding which the Office determines jeopardizes the immediate health, safety, or well-being of the public or the licensee's workforce shall be deemed a critical deficiency and shall require immediate corrective action to remove the immediate risk. The licensee shall submit a preliminary corrective action plan to the Office within twenty-four (24) hours of notification by the Office of the critical deficiency.

*Draft – Subject to Change*

(e)      If the Office determines that the corrective action plan needs modification, the licensee

shall modify the plan until it is in its final form, as accepted by the Office;

(f)      Upon written approval of the Office, the licensee shall implement the plan of correction.

(g)      Failure by the licensee to comply with these requirements may result in suspension,

revocation, and/or a civil penalty pursuant to Part 133 of this Title.

(h)      Nothing herein shall limit the application of any other remedies or sanctions that are

available through local, state, and federal laws, and these rules.

## § 125.13 General Record Keeping Requirements.

(a)      A licensee shall keep and maintain records required by this Title, or any other applicable

federal or state rule or regulation, for at least five (5) years from the date of creation, unless a

shorter time is specified by the Office.

(b)      Records shall be made readily retrievable and available to the Office upon request.

(c)      Records shall account for all activities of the licensee, including, but not limited to:

(1)      architectural diagrams and floorplans of the licensed premises, including designation of

functional areas and square footage available;

*Draft – Subject to Change*

(2)     financial records, including, but not limited to, true parties of interest, bank statements, sales invoices, receipts, and any other records maintained for tax purposes;

(3)     personnel records, including each employee's full name, date of employment, date of termination of employment, if applicable, background check, if one was completed, and disciplinary actions;

(4)     training records including, but not limited to, the content of the training provided and the names of the employees who received the training;

(5)     any contracts regarding cannabis activity;

(6)     all records related to advertising and marketing;

(7)     standard operating procedures including, but not limited to, the licensee's operating plan;

(8)     laboratory testing results for each lot or batch of cannabis or cannabis product tested;

(9)     records of equipment used in cultivation and processing of cannabis, as well as equipment maintenance and upkeep records that include at a minimum:

(i)     the type of maintenance performed;

319

*Draft – Subject to Change*

(ii)     the name of the mechanic who performed the maintenance; and

(iii)    the date the maintenance was completed; and

(10)    policies and procedures that notify persons with disabilities of their rights under applicable federal and state laws and regulations and includes provisions prohibiting discrimination and providing reasonable accommodations;

(11)    policies and procedures demonstrating promotion of diversity in the workplace;

(12)    all other documents prepared or executed by or for the licensee in connection with the license; and

(13)    any other records required by the Cannabis Law, this Title, or as determined by the Office.

(d)     Records shall be legible and accurate. No person shall intentionally misrepresent or falsify records.

(e)     Records shall be stored in a secured area to ensure that the records are protected from debris, moisture, contamination, hazardous waste, and theft.

*Draft – Subject to Change*

(f)      A licensee shall make its premises, and all books, systems, and records available to the Office upon request.

(g)      The failure of the licensee to comply with the requirements set forth in this section may result in enforcement action, including, but not limited to, civil penalties and revocation of licensure.

## § 125.14 Processing Samples for Internal Quality Control.

(a)      Nursery, cultivator, processor, cooperative, microbusiness, ROD, or ROND licensees may provide quality control processing samples of cannabis or cannabis products directly to the licensee's owners or to employees who are at least twenty-one (21) years of age for the purpose of internal quality control and product development.

(b)      A quality control processing sample may not be consumed on the licensed premises, unless it is also a limited retail consumption facility.

(c)      A quality control processing sample may not be provided to, or resold to, another licensee or person.

(d)      Any quality control processing sample provided under this Part shall be recorded in the licensee's inventory tracking system. When providing an owner or employee a quality control processing sample, a licensee shall record the following in their inventory tracking system;

*Draft – Subject to Change*

(1)      the reduction in quantity of the total weight or item count as applicable for the cannabis or cannabis product lot;

(2)      the date and time the quality control processing sample was provided to the licensee owner or employee;

(3)      name of the owner or employee who provided the quality control sample; and

(4)      the name of the owner or employee who the sample was issued to.

(e)      A licensee shall only provide quality control processing samples of cannabis or cannabis product if such samples do not exceed:

(1)      seven (7) grams of cannabis per cultivar harvested in a 72-hour period; or

(2)      up to six (6) individual cannabis product units of sale per lot of cannabis product provided the units do not exceed an aggregate weight over 28 grams.

(f)      A licensee providing a quality control processing sample shall disclose to the individual receiving the quality control processing sample if the quality control processing sample has been tested by an independent laboratory permitted pursuant to Part 130 of this Title.

*Draft – Subject to Change*

**§ 125.15 Limited Retail Consumption Facility, Exception Area, and Microbusiness Consumption Facility Operations.**

(a)    No licensee that operates a consumption facility or exception area shall sell, deliver, or give away or cause or permit or procure to be sold, delivered or given away any cannabis product to any such person that a reasonable person would assume is intoxicated based on a visual assessment.

(b)    No licensee that operates a consumption facility or exception area shall sell, deliver, or give away or cause or permit or procure to be sold, delivered or given away any cannabis or cannabis product to any person under the age of twenty-one (21) years.

(c)    A licensee that operates a consumption facility or exception area shall:

(1)    submit reports in a form and manner as determined by the Office regarding the air quality in all indoor areas in which individuals may smoke or vape cannabis products;

(2)    post, distribute, make available to consumers, or otherwise utilize any consumer education materials in a manner as determined by the Office, including, but not limited to:

(i)    posting the text "WARNING: This is a cannabis smoking area for adults 21 years of age and older only. Occupants will be exposed to secondhand cannabis smoke. Smoking or vaping tobacco or tobacco products is not allowed in this area." in at least 72-point non-cursive font at

*Draft – Subject to Change*

all doors which permit ingress or egress between areas that allow smoking and vaping and areas that do not allow smoking and vaping;

(ii)     posting a licensed premises verification tool in accordance with section 125.16, or other similar material, in a form and manner as directed by the Office; and

(iii)    posting, distributing, making available to consumers, or otherwise utilizing other consumer education materials as determined by the Office;

(3)     ensure that any windows in indoor areas of the consumption facility or exception area shall remain closed while people are smoking or vaping, except windows which open to the exterior of the structure, do not open directly from the ground level of the structure onto a public thoroughfare, and can be opened without disrupting neighboring businesses or endangering public health and safety; and

(4)     ensure that any doors which permit ingress or egress between areas that allow smoking and vaping and areas that do not allow smoking and vaping shall remain closed while people are smoking or vaping except to the extent necessary to permit ingress and egress to and from areas of smoking or vaping; and

(5)     comply with any other requirements determined by the Office.

*Draft – Subject to Change*

(d)      During a consumption facility's hours of operation, and for sixty (60) minutes before and after a consumption facility's hours of operation, a licensee operating a consumption facility, including a limited retail consumption facility, shall:

(1)      ensure that no individual who is under twenty-one (21) years of age enters the consumption facility. Prior to allowing an individual entry into a consumption facility, the licensee or its authorized agent shall inspect an individual's identification and determine the individual's age to validate that the individual is twenty-one (21) years of age or older. Valid identification and proof of age shall include:

(i)      a valid driver's license or non-driver identification card issued by the New York State Department of Motor Vehicles, the federal government, any United States territory, commonwealth or possession, the District of Columbia, a state or local government within the United States or a provincial government of the dominion of Canada;

(ii)      a valid federal, state, or local government identification, including IDNYC, stating the individual's age and a photograph of the individual's face;

(iii)      a valid passport issued by the United States government or any other country;

(iv)      a consular identification card; or

(v)      an identification card issued by the armed forces of the United States;

*Draft – Subject to Change*

(2)    ensure all areas of the consumption facility are visible to, and monitored by, the licensee or the licensee's agent;

(3)    only allow a partially-consumed cannabis product, including prepared cannabis products, to leave the licensed premises if such partially-consumed product is within a retail package which meets the requirements of sections 128.2 and 128.3 of this Title and, if the package is no longer tamper evident as a result of being opened, an unbroken tamper evident seal has been affixed to the retail package;

(4)    utilize retail customer time limits, purchase limits, or other policies to prevent overconsumption of cannabis products and other public health and safety risks;

(i)    The Board may require a licensee update, alter, or amend these policies at any time if it learns of an increase in adverse events or other risks to public health and safety stemming from the location of a particular consumption facility.

(ii)    Such updates, alterations, or amendments may include, but are not limited to, requiring the licensee only allow the consumption of certain product forms or types or requiring the licensee only allow consumption at certain times;

(5)    only make available cannabis paraphernalia for use by consumers if such paraphernalia has been sanitized; and

*Draft – Subject to Change*

(6)      comply with any additional requirements as determined by the Office;

(e)      An Article 13-E Smoking or Vaping Exception licensee shall not allow any person to conduct the retail sale of cannabis products within the licensed premises except for when it is used for cannabis events as provided for in subdivision (g) of this section.

(f)      An Article 13-E Smoking or Vaping Exception licensee shall not store cannabis products, buy cannabis products, or conduct retail sales of cannabis products.

(g)      An exception area may be a licensed premises for cannabis events pursuant to section 120.19 of this Title. During the specific times in which any retail sale of cannabis products by any authorized person occurs at an exception area and for an additional period of sixty (60) minutes before and after the times in which sales occur, unless determined otherwise by the Office, an Article 13-E Smoking or Vaping Exception licensee shall ensure the exception area meets the requirements of subdivision (d) of this section.

(h)      A licensee operating a consumption facility or exception area shall not:

(1)      allow any adult-use cultivator, processor, distributor, cooperative, microbusiness, ROD, ROND, registered organization registered under Article 3 of the Cannabis Law, or cannabis laboratory licensee or permittee or any true party of interest of any of the aforementioned to advertise through use of a brand representative within the consumption facility or exception area,

*Draft – Subject to Change*

unless such representative is outdoors and cannot be easily seen from any public thoroughfare adjacent to the licensed premises and the consumption facility is not a limited retail consumption facility; or

(2)    violate any other requirements pertaining to a consumption facility or exception area, as determined by the Office.

(i)    If the Board learns of an increase in impaired driving stemming from the location of a particular consumption facility or exception area, the Board shall require the licensee to update, alter, or amend the licensee's efforts to prevent driving while intoxicated or take other actions including, but not limited to, limiting the products that may be sold at that premises.

(j)    The proper conduct of a consumption facility is essential to the public interest. Failure of a licensee to exercise adequate supervision over the conduct of a consumption facility poses a substantial risk not only to the objectives of the legalization of cannabis but imperils the health, welfare, and safety of the people of this State. It shall be the obligation of each person licensed pursuant to this Part to ensure that a high degree of supervision is exercised over the conduct of any consumption facilities at all times in order to safeguard against abuses of the license or privilege and violations of law. Each such licensee will be held strictly accountable for all violations that occur in the licensed premises and are committed by or suffered and permitted by any manager, agent or employee of such licensee.

*Draft – Subject to Change*

(k)      A licensee may hold recreational, social, artistic, charitable, cannabis and other events which comply with all applicable laws and regulations, including, but not limited to, Part 129 of this Title at a consumption facility or exception area.

(l)      Persons who allow the smoking or vaping of cannabis outside of an adult-use on-site consumption premises in violation of Article 13-E of the Public Health Law shall be subject to any penalties imposed by the enforcement officer, as such term is defined in section 1399-t of the Public Health Law;

(m)      Persons who allow the consumption of cannabis outside of an adult-use on-site consumption premises, without allowing the smoking or vaping of cannabis in violation of Article 13-E of the Public Health Law, may be subject to the penalties described in this Title and any penalties or sanctions as determined by the Board, including, but not limited to, cancellation, suspension, or revocation of a license and imposition of fees, civil penalties and any other penalty; and

(n)      The Office shall issue future guidance related to the conduct of consumption facilities and exception areas which may include but not be limited to further requirements for the cannabis products at a consumption facility or exception area and requirements for the conduct of a licensee and its agents within a consumption facility or exception area.

**§ 125.16 Licensed Premises Verification Tools.**

*Draft – Subject to Change*

(a)     To protect the health and safety of cannabis consumers, the Office may make available from time-to-time certain images, symbols, badges, posters, or other tools that are intended to be displayed to distinguish persons licensed pursuant to Article 4 of the Cannabis Law and their employees from other persons. Such tools may include, as determined by the Office, technology, such as a QR code, intended to assist in their purpose of distinguishing licensed persons from other persons and shall include, but not be limited to, the following:

(1)     A dispensary verification tool shall be displayed—and only be displayed—at a licensed retail dispensary and comply with the following requirements:

(i)     The dispensary verification tool shall not be altered in any way from the form and manner prescribed;

(ii)     The dispensary verification tool may be printed or displayed digitally but shall be displayed clearly, in plain sight, in good working order, and in a manner that does not overlap any other information, including outdoor signs pursuant to section 129.4 of this Title;

(iii)     The dispensary verification tool shall be of sufficient quality that the QR code can be easily read by a commonly used device, such as a smartphone, from at least three (3) feet away;

(iv)     The dispensary verification tool shall be displayed at eye level within three (3) feet, measured in a straight line horizontally, of the primary entrance of the retail dispensary that is available to the general public; and

*Draft – Subject to Change*

(2)    Other licensed premises verification tools which may be made available on the Office's website from time to time, deemed as licensed premises verification tools by the Office, and clearly indicate the persons authorized to display such tools.

(b)    A licensed premises verification tool shall not be displayed unless such display is authorized by the Board or Office.

(c)    A licensee shall ensure any licensed premises verification tools which pertain to its license type are in good working order and plainly visible at all times.

(d)    An exception to the provisions of subdivisions (a) through (c) of this section shall be applicable, provided that a landlord seeking to invoke this exception satisfies the following conditions:

(1)    The federal funding is explicitly reserved to and intended for such landlord;

(2)    Such funding is dispersed annually, or the disbursement occurs throughout one fiscal calendar year, not including any one-time payments;

(3)    Such landlord can provide written proof to the tenant that such funding was previously used and will continue to be used for the generally maintains of the property at issue; and

331

*Draft – Subject to Change*

(4)    It was not the intent of the federal government to fund a third party, and the landlord is merely an indirect beneficiary of said funding, such as a government-back mortgage.

For the purpose of this Title, tenant means a person who resides at a property owned or in possession of the landlord or a commercial tenant holding a license, registration or permit issued by the Board.


**§125.17. Severability**. If any provision of this Part or its application to any particular person or circumstance is held invalid, the remainder of this Part and its application to other persons and circumstances shall not be affected thereby.

*Draft – Subject to Change*

**Part 131. Severability and Reference Materials.**

(a)      Severability.

(1)      If any provision of this Title or its application to any particular person or circumstance is held invalid, the remainder of this Title and its application to other persons and circumstances shall not be affected thereby.

(2)      All conditional licensees shall comply with all adult-use license business and operation requirements and prohibitions as required by this Title. Adult-use regulations shall prevail should there be any conflict between the conditional regulations pursuant to Part 116 of this Title and adult-use business operations requirements and prohibitions.

(b)      Referenced Materials. Regulations included in Part 119, 120, 121, 123, 124 and 125 of this Title contain references to documents for information as to the standards to be met or guidelines and methodologies to be used in meeting the requirements of specific regulations. In addition, copies of referenced materials are available for public inspection and copying at the Albany office of the New York State Department of State.

**Table 1**

| Regulation | Referenced Material | Availability |
|---|---|---|
| **9 NYCRR Part/sec./etc.** | **CFR (Code of Federal Regulations) or other** | |
| 118.1(a)(44); 118.1(a)(79) | Environmental Conservation Law Article 33 | **** |

*Draft – Subject to Change*

| | | |
|---|---|---|
| 118.1(a)(73) | U.S. Securities and Exchange Commission, Financial Accounting Standards Board & Government Accounting Standards Board, Generally Accepted Accounting Principles | |
| 119.2(a)(6) | Public Health Law Article 13-E | **** |
| 119.2(a)(6) | 42 U.S.C. § 7401 et seq., also known as The Clean Air Act | *** |
| 121.3(d)(2) | Labor Law Article 20-C | **** |
| 123.4(f)(1) | 6 NYCRR § 325.2(b) | * |
| 123.4(f)(2) | 40 CFR § 152.52 | ** |
| 123.4(k)(9) | 10 NYCRR Subpart 5-1 | * |
| 123.6(a)(1) | 21 CFR Part 111 | ** |
| 123.6(a)(1) | 21 CFR Part 117 | ** |
| 123.6(c)(2)(iii) | 21 USC § 321 | * |
| 123.6(e)(5) | Public Health Law § 3306(h) and (g) | **** |
| 123.6(f)(8) | 10 NYRR § 14-1.31 | * |
| 123.6(f)(11); 123.8(a)(1); 123.8(a)(3); 123.10(f)(2)(v); 123.10(f)(11) 123.10(f)(1)(iii); | Tax Law Article 20-C | **** |

*Draft – Subject to Change*

| 125.1(c)(7)(vii) | 6 NYCRR Part 201 | * |
|---|---|---|
| 125.1(c)(7)(vii) | 6 NYCRR § 201-2.1(6)(9) | * |
| 125.1(c)(8)(i) | Chapter 106 Laws of 2019 § 7(2); also known as the New York State Climate Leadership and Community Protection Act. | ***** |
| 125.1(c)(8)(i) | Environmental Conservation Law Article 75 | **** |
| 125.5(d) | 29 CFR § 1910.1200 | ** |
| 125.5(f) | 29 CFR § 1910.132 | ** |
| 125.5(g) | 29 CFR § 1910.134 | ** |
| 125.10(f)(1) | 6 NYCRR Part 364 | ** |
| 125.10(f)(1) | 6 NYCRR Part 381 | ** |

\*  Electronic copies of New York Codes, Rules and Regulations (NYCRR) sections can be searched directly at:

https://govt.westlaw.com/nycrr/index?__lrTS=20190327201930309&transitionType=Default&contextData=%28sc.Default%29

\*\*  Any printed editions of the *Code of Federal Regulations* (CFR) can be obtained by calling the Superintendent of Documents, U.S. Government Printing Office, at (202) 512-1800.  Electronic copies of CFR sections may also be obtained at Government Printing Office (GPO) which contains the most recent revisions, can be searched directly at:  https://www.ecfr.gov/

\*\*\* Any printed editions of the *United States Code* (USC) can be obtained by calling the Superintendent of Documents, U.S. Government Printing Office, at (202) 512-1800. Electronic

*Draft – Subject to Change*

copies of CFR sections may also be obtained at Government Printing Office (GPO) which contains the most recent revisions, can be searched directly at: https://uscode.house.gov/

**** Electronic copies of New York State Law, including, but not limited to, Public Health Law, Vehicle and Traffic Law, Education Law, Mental Hygiene Law, Social Services Law may be searched directly under the Laws tab (which drops down to "Laws of New York") at:

http://public.leginfo.state.ny.us/lawssrch.cgi?NVLWO:

***** Electronic copies of New York State Chapter Law, may be searched directly under the Home tab (which drops down to allow you to select "Chapter No.") at:

http://public.leginfo.state.ny.us/navigate.cgi?NVMUO: