

New York
**Social And Economic Equity Plan**

NEW YORK STATE | Office of Cannabis Management

# New York
# Social And Economic  Equity Plan

Letter from Executive Director                                    3
Letter from Chief Equity Officer                                  4
Acknowledgements                                                  5

**I. INTRODUCTION**                                               **6**
Legislative Mandate                                               7
Key Terms                                                         8
Applying an Equity Framework                                      10
At a Glance: What is Intersectionality?                           11

**II. BACKGROUND**                                                **12**
Approaches to Social Equity                                       13
Challenges to Social Equity                                       15

**III. NEW YORK CANNABIS PROGRAMS**                               **19**
Equity Community Roundtables                                      20
Current Social & Economic Equity Initiatives                      28
The Legacy of Prohibition in New York                             31
Equity in Access to Medical Cannabis                              38
Business Support in New York State                                40
Regional Economic Development                                     45

**IV. SUMMARY RECOMMENDATIONS**                                   **51**
Market Architecture                                               52
Access and Business Viability                                     58
Community and Consumer Engagement                                 67
**Conclusion**                                                    **69**

# Letter from Executive Director

When New York State enacted the Marijuana Regulation and Taxation Act (MRTA), it stood as the most progressive cannabis legalization bill in the nation. The bill included key provisions expunging past cannabis convictions, dedicating revenue to community improvement, and a directive to prioritize those who normally have been left out and left behind of sizable government generated economic development projects.

The design of this market was included in that bill. The MRTA laid out an approach that tried to incorporate lessons learned from other states who have ended prohibition in their own jurisdictions but left to this team the heavy work of filling out the true blueprint to making New York's cannabis market the most equitable, and successful, cannabis market in the nation.

This living document represents the path forward for New York. It is a strategic plan to realize the goals of the MRTA, to bring economic activity to every corner of the State, and to set a new example of what intentional policymaking looks like. This Social and Economic Equity Plan does not run from New York's past relationship with cannabis. It contextualizes it and provides the State with achievable steps to repair the harm that has been done and prepare the State to be a national leader in the space.

I am proud of the work of the Office to date and look forward to bringing the innovative strategies identified in this plan to life.

Equity is not a thing. It is the thing.

*Chris Alexander*
Executive Director
New York State Office of Cannabis Management

# Letter from Chief Equity Officer

Harlem's native son, James Baldwin, once wrote, "People who imagine history flatters them are impaled on their history like a butterfly on a pin and become incapable of seeing or changing themselves or the world." And so, it is in the spirit of breaking free from our long-held narratives that New York embarks upon a new chapter of cannabis legalization to reach higher, more equitable heights.

New York's landmark cannabis law provides the foundation upon which a better future can be built. It provides the structure for redressing the long-standing injustices and inequities created by the unequal enforcement of cannabis prohibition and informs the work to come.

Cannabis legalization represents more than a shift in New York's drug policies — it heralds the end the era of "Jim Crow policing"[1] against Black and brown communities that have been devastated by decades of disproportionate drug possession arrests and mass incarceration. Yet, the burgeoning legal cannabis market is increasingly at risk of abandoning the racial justice values that drove the initial calls for legalization.

Nationwide, it is estimated that Black cannabis entrepreneurs account for just five percent of industry ownership.[2] In many ways, demographic disparities in ownership reflect and reinforce America's persistent and insidious racial wealth gap — the cumulative result of centuries of institutional and systemic racism. If New York is to chart a different course, it must adopt radically different approaches to rolling out the legal market.

As Chief Equity Officer, I have committed to building a fair, inclusive, and equitable foundation for the New York market. One where everyday New Yorkers and their families can become self-sufficient stakeholders in this new legal industry and work together to build a national model for reform with community reinvestment, equity, and justice at the forefront.

This Social and Economic Equity Plan is the result of the insight, expertise, and ongoing dedication of Office personnel, as well as their partnership with community stakeholders from across the state. It provides a roadmap to a cannabis market that reflects the state's renowned spirit of enterprise, rich diversity and agricultural roots. The grim history of cannabis prohibition in New York won't stand in the way of progress. Rather, it will shape new systems and policies designed to deliver racial and economic justice for generations of New Yorkers.

---

***Damian Fagon***
Chief Equity Officer
New York State Office of Cannabis Management

[1] Herbert. B. (2010, February 1). Jim Crow Policing The New York Times. https://www.nytimes.com/2010/02/02/opinion/02herbert.html
[2] See Mathew Swinburne, & Kathleen Hoke, State Efforts to Create an Inclusive Marijuana Industry in the Shadow of the Unjust War on Drugs, 15 J. Bus. & Tech. L. 235 (2020) available at https://digitalcommons.law.umaryland.edu/jbtl/vol15/iss2/3 (discussing the racial disparities in ownership and economic opportunity within the legal cannabis market).

# Acknowledgements

This report was developed with stakeholder engagement. The Office consulted community partners in New York as well as industry experts with extensive experience supporting cannabis social equity initiatives across the country.

**Community Partners:** Akbar Self Help, Albany 518 SNUG, Asian Cannabis Roundtable, Bellport Hagerman East Patchogue Alliance, Inc., Black Farmers United, Black Veterans for Social Justice, CannaBronx, Cornell Cooperative Extension, Harlem Business Association, Ibero American Action League, Inc., Local 338 RWDSU/UFCW, Mothers on the Move, New York Women's Chamber of Commerce, Office of General Services Division of Service-Disabled Veterans' Business Development, The Upstate New York Black Chamber of Commerce, Trinity Alliance Inc., Universal Hip-Hop Museum, Urban League of Long Island, Veterans in Economic Transition Conference, Victory Temple Fellowship Church, Women Grow.

**Industry Experts:** Cristina Buccola, Darrin Chandler, Dasheeda Dawson, Edgar Cruz, Toni Forge, Tye Hodson, Kika Keith, Marie Montmarquet, Jessica Strange, Shaleen Title, Chaney Turner, Wally Wong, Hilary Yu.

With many thanks to the New York State Division of Criminal Justice Services, the Dormitory Authority of the State of New York, the New York Regional Economic Development Councils, and the Empire State Development agency for their insight, feedback and data which inform portions of this report.

**Special Thanks** to Governor Kathy Hochul, Assembly Majority Leader Crystal Peoples-Stokes, Senator Liz Krueger, Senate Majority Leader Andrea Stewart-Cousins, and Assembly Speaker Carl Heastie for championing the historic legislation that made this work possible.

© All Rights Reserved.

# Legislative Mandate

Pursuant to the Cannabis Law,[3] the Cannabis Control Board is charged with the creation and implementation of a social and economic equity plan in consultation with the Chief Equity Officer and Executive Director, and after receiving public input. (N.Y. CANBS § 87(1)) The goals of the plan include the promotion of racial, ethnic, and gender diversity when issuing licenses and the promotion of diversity in commerce, ownership and employment, and opportunities for social and economic equity in the regulated cannabis industry.

The promotion of social and economic equity in the cannabis industry is a central mission of both the Board and the Office. The New York Social and Economic Equity (NYSEE) Plan presents the strategy for advancing that mission. The NYSEE Plan is a living strategic document that will be adjusted and amended to reflect New York's evolving cannabis landscape.

The NYSEE Plan consists of four sections. Part I is an introduction to the Plan. Part II provides relevant background information, with particular emphasis on the national landscape of cannabis markets and the various forms that social equity programs have taken. Part III examines current initiatives and business support services, among other programs, to illustrate New York's present approach to social equity. This section also details the public input communicated to the Office and used to generate this Plan. Part IV contains a list of recommendations made by the Chief Equity Officer to the Board and the Office.

---

[3]Chapter 92 of the Laws of 2021

I.

# INTRODUCTION



*Images by: Wanda Barbot*

# Key Terms

For the purposes of the New York Social and Economic Equity (NYSEE) Plan, the following key terms will be referred to:

**Accelerator** refers to a cannabis training program that provides intensive learning and mentorship experiences that solidify and expand on a licensee's or applicant's advanced cannabis experience and skill.

**Board** refers to the Cannabis Control Board of New York State.

**Cannabis** refers to all parts of the plant of the genus Cannabis, whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination. Cannabis does not include hemp, cannabinoid hemp or hemp extract or any drug products approved by the federal Food and Drug Administration.

**Cannabis Advisory Board (CAB)** refers to the State Cannabis Advisory Board which operates within the Office of Cannabis Management. It is responsible for collaborating with the Cannabis Control Board and the Executive Director to provide guidance and make recommendations regarding the use of medical cannabis, adult-use cannabis, and cannabinoid hemp and hemp extract throughout the state. Additionally, it governs and administers the New York State Community Grants Reinvestment Fund in accordance with Section 99-kk of the State Finance Law.

**Communities Disproportionately Impacted (CDI)** refers to, but is not limited to, a certain geographic area that has a history of arrests, convictions, and other law enforcement practices, such as, but not limited to, precincts, zip codes, neighborhoods, and political subdivisions, reflecting a disparate enforcement of cannabis prohibition during a certain time period, when compared to the rest of the state. The Board shall, with recommendations from the Advisory Board, the Chief Equity Officer and Executive Director, issue guidelines to determine how to assess which communities have been disproportionately impacted and how to assess if someone is a member of a community disproportionately impacted.

**Distressed Farmer** refers to: (a) a New York state resident or business enterprise, including a sole proprietorship, partnership, limited liability company or corporation, that meets the small farm classification developed by the Economic Research Service of the United States Department of Agriculture, has filed a schedule F with farm receipts for the last three years, qualifies for an agriculture assessment and meets other qualifications defined in regulation by the Board to demonstrate that they operate a farm operation as defined in section three hundred one of the agriculture and markets law and has been disproportionately impacted, including but not limited to incurring operating losses, by low commodity prices and faces the loss of farmland through development or suburban sprawl and meets any other qualifications as defined in regulation by board; or (b) a New York state resident or business enterprise, including a sole proprietorship, partnership, limited liability company or corporation, that is a small farm operator and a member of a group that has been historically underrepresented in farm ownership and meets any other qualifications as defined in regulation by board.

**Equity** refers to fair treatment, access to opportunity, and advancement for all.

**Incubator** refers to a business development and training program which provides direct support in the form of counseling services, education, small business coaching, financial planning, compliance assistance and physical infrastructure to qualified applicants and/or licensees.

**Legacy operator** refers to a longstanding participant in the unregulated market of cannabis or marihuana whose operations predate legalization on March 31, 2021.

**Marihuana or marijuana** refers to the previously utilized term for cannabis in New York State law prior to the passage of the Cannabis Law.

**Minority-owned business** refers to a business enterprise, including a sole proprietorship, partnership, limited liability company or corporation that is:

- at least fifty-one percent owned by one or more minority group members;
- an enterprise in which such minority ownership is real, substantial and continuing;
- an enterprise in which such minority ownership has and exercises the authority to control independently the day-to-day business decisions of the enterprise;
- an enterprise authorized to do business in this state and independently owned and operated; and
- an enterprise that is a small business.

**Minority group** member refers to a United States citizen or permanent resident alien who is and can demonstrate membership in one of the following groups:

- Black persons having origins in any of the Black African racial groups;
- Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin, regardless of race;
- Native American or Alaskan native persons having origins in any of the original peoples of North America; or
- Asian and Pacific Islander persons having origins in any of the far east countries, southeast Asia, the Indian subcontinent, or the Pacific islands.

**The Office** refers to the Office of Cannabis Management.

**Registered organization** refers to an entity that is registered under Article 3 of the Cannabis Law that is authorized to manufacture and dispense medical cannabis in New York State.

**Social and economic equity** (SEE) refers to policies specifically made by the Office of Cannabis Management to achieve the goals and address categories set forth in the Cannabis Law.

**Service-disabled veterans** mean persons qualified under article seventeen-B of the executive law.

**Social and economic groups** (SEE groups) refer to, in the aggregate, distressed farmers, individuals from communities disproportionately impacted, minority-owned businesses, service-disabled veterans, and women-owned businesses.

**Two-tier market** is a reference to the economic design that separates the adult-use cannabis industry into a supply tier and a retail tier.

**Women-owned business** refers to a business enterprise, including a sole proprietorship, partnership, limited liability company or corporation that is:

- at least fifty-one percent owned by one or more United States citizens or permanent resident aliens who are women;
- an enterprise in which the ownership interest of such women is real, substantial and continuing;
- an enterprise in which such women ownership has and exercises the authority to control independently the day-to-day business decisions of the enterprise;
- an enterprise authorized to do business in this state and independently owned and operated; and
- an enterprise that is a small business.

INTRODUCTION

# Applying an Equity Framework

The term **equity means the fair treatment, access to opportunity, and advancement for all.** The principle of equity recognizes that the objective of fair treatment can only be achieved through the identification and elimination of barriers that prevent the full participation of some groups.[4] Equity is the key to prosperity. The nation's total Gross Domestic Product (GDP) would have been $3.1 trillion more in 2019 without the racial wealth gap – making every community stronger.[5]

Equity is a distinct and separate term from social equity and social and economic equity, although common discourse often uses these terms interchangeably. Equity is sharing resources based on the needs of the individual to create a level foundation. Social equity acknowledges systemic inequalities affecting certain communities and offers sociopolitical and economic solutions that provide opportunity and financial empowerment for those subject to unequal conditions. Social and economic equity refers specifically to policies made by the Office to achieve the goals laid out in the Cannabis Law.

A commitment to equity is an acknowledgement that there are communities that have been historically marginalized and harmed. While diversity guarantees the presence of various identities at the table, equity considers and provides the support needed to foster inclusive participation.

The Board and the Office recognize that in order to truly achieve our social equity objectives, those objectives must be directly connected to the ways in which we do our work. To ensure an equitable cannabis industry, the Board and the Office are committed to the following equity pillars:

- Bringing to life an industry that gives small, independent businesses an opportunity to compete.
- Building relationships and trust within the communities most impacted through educational and social programming.
- Investing resources including grants, loans, and technical assistance to equip SEE groups with the support needed to thrive in the New York State cannabis market.
- Educating communities on their rights in accordance with the Cannabis Law and regulations.
- Collecting data and evolving programming to adapt to the equity needs of the industry.

[4]Bard College (2020). Principles of Equity at Bard College. Cce.bard.edu. https://cce.bard.edu/about/principles-of-equity/
[5]Federal Reserve Bank of San Francisco. (2021. April 7). $3 Trillion a Year and Growing: Potential Economic Gains from Equity [Review of $3 Trillion a Year and Growing: Potential Economic Gains from Equity]. Federal Reserve Bank of San Francisco. https://www.frbsf.org/our-district/about/sf-fed-blog/3-trillion-a-year-potential-economic-gains-from-equity/

# WHAT IS INTERSECTIONALITY? AND HOW DOES IT IMPACT CANNABIS POLICY?

**INDIVIDUALS HAVE MULTIPLE IDENTITIES** based on several factors, such as ethnicity, age, ability, culture, religion, sexual orientation, and gender. As a result, personal and community experiences with cannabis differ due to how these identities intersect.

**FOR EXAMPLE,** A Black individual from a designated CDI may lack adequate access to safe housing, comprehensive education, and financial resources due to how public institutions respond to compunding factors of their race, gender, and socioeconomic status.

**Note:** They may also have negative attitudes and perceptions towards cannabis due to over-policing in their neighborhood and the arrests of close relatives.



**Cannabis Equity Matrix**

Cannabis

Experiences that have shaped relationships and attitudes towards cannabis

System of prohibition enforced by public institutions

OCM Policy

Intersectionality of Identity
*Race, Gender, Ability, etc*

Public Institutions
*Safety, Housing, Education, etc*

Access to Resources



When we make policy and program decisions, we need to **consider the cannabis equity matrix, shown above, to better understand and meet the needs of New Yorkers.**

When we fail to acknowledge this, we risk building more barriers to true equity in cannabis.

## HERE ARE 3 DEFINITIONS TO HELP YOU UNDERSTAND AN INTERSECTIONAL FRAMEWORK:



**EQUITY** is fair treatment, access to opportunity, and advancement for all.



**SOCIAL EQUITY** refers to the programs and policies, both within New York State and other states that acknowledges systemic barriers and provides support to uplift and encourage participation from marginalized groups.



**SOCIAL AND ECONOMIC EQUITY** refers to policies specifically made by the Office of Cannabis Management to achieve the goals laid out in the Cannabis Law.


Office of Cannabis Management

# II.
# BACKGROUND



*Images by: Augustus Battaglia*

As states across the country end cannabis prohibition within their jurisdictions and begin the work of developing legal cannabis markets, it has become clear that states must do more to diversify the industry. Less than half of the 38 U.S. states that have legalized cannabis for medical-use or adult-use have social equity programs. These states have been criticized for failing to provide adequate access to licensure and long-term support for those most adversely impacted by cannabis prohibition.

Legal markets that do establish a social equity framework are generally focused on reducing entry barriers for applicants by providing licensing priority, technical training, and funding to those who qualify for social equity status. This section will highlight some approaches to social equity that have been implemented across the nation and their efficacy in ensuring that the cannabis industry is just and equitable from seed to sale.

## Approaches to Social Equity

### *Clear the Pathway to Licensure*

All states that have legalized the sale of cannabis require business owners to obtain licenses before entering the market. In general, license types are classified based on the specific market function of the cannabis business. These include cultivation, processing, and retail licenses among others. Because obtaining a license is required to participate in legal markets, the design of a state's licensing system has a significant impact on social equity outcomes.

Making it easier for businesses owned and operated by underrepresented groups to secure operating licenses is the most direct approach to increasing diversity in the cannabis industry. This effort is often guided by a designation made during the licensing process that identifies a given applicant as a member of an underrepresented group whose representation the state seeks to increase.

This designation is then accompanied by benefits, which often include reduced or waived application and/or licensing fees. In Michigan, for example, fee reductions can range between 25 and 80 percent. While efforts to reduce the cost of securing and maintaining a cannabis license is a meaningful step towards increasing economic diversity in the industry, the broader absence of access to start-up capital for social equity applicants renders these reductions relatively ineffective in achieving their stated objectives.

The benefits attached to social equity designations may also include exclusive access to a limited number of licenses, subject to a state's overall licensing strategy. States have set up numerous complex mechanisms for issuing these highly sought-after licenses. Lotteries and merit-based applications are the two most common methods.

The qualified lottery process allows the random distribution of licenses to applicants who meet a set of minimum requirements but excludes any evaluation of a given applicants ability to operationalize a license. In a lottery licensing scheme, states have either given social equity applicants more chances to win in a predetermined lottery round or have created social equity exclusive lottery pools to achieve the same objective.

In contrast, merit-based scoring relies on a single rubric to evaluate applicants against one another, ultimately awarding licenses to the applicant with the greatest overall score. Applicants with the most capital or relevant operational experience are most often favored in merit-based selection procedures. In several states, merit-based scoring system afford social equity applicant's additional points on their license application for their designation.

**Affording equity applicants with a clear pathway to licensure in either licensing scheme has proven to be only part of the solution.**

## *Business Development Supports*

Business development support and incubation are two more hands on approaches to achieving social equity in the cannabis industry. Incubators typically encompass training and technical support services resulting in niche knowledge transfer. Support from a business development standpoint has proven effective in other industries and it has been significantly relied on within the cannabis industry. States have either crafted their own direct support frameworks or have incentivized non-government entities to develop frameworks to support less-resourced operators. These programs vary in their intensity, depth, and reliance on experienced cannabis businesses to mentor entrepreneurs in small batches.

Some jurisdictions reward cannabis applicants who 'incubate' verified social equity applicants. Applicants in Oakland, for example, were able to incubate equity businesses in order to expedite their own licensing timeline. They must, however, provide equity applicants with three years of free rent, a minimum of 1,000 square feet for business operations, and any required security. Under this model, social equity applicants receive startup funding and space.

Another common approach to incubation is the development of training programs by non-profit organizations. These models usually offer intensive courses on starting a cannabis business. Topics include policy, regulations, financial advising, seed-to-sale software, and real estate. While non-profits providing general introduction to cannabis operations provide social equity applicants and licensees with an advantage over those without any incubation experience, they commonly only provide a superficial introduction to the intensive curriculum required to run a processing, manufacturing, or retail business. The more the incubators are tailored to specific license types, the more effective their support systems are for new cannabis business owners.

**The private sector largely dominates the incubation space. These programs offer multi-weeklong intensive courses on starting a cannabis business.**

The private sector largely dominates the incubation space. These programs offer multi-weeklong intensive courses on starting a cannabis business. Private businesses outside state-incentivized programs can provide license-specific training in the incubation system, funding, mentoring, and technical training. However, they often do so in exchange for equity in the incubator participant's business. These models of incubation provide the rigor and mentorship necessary to train a new business owner, but often result in larger businesses taking a disproportionate share of equity in smaller businesses.

## Challenges to Social Equity

*General Market Architecture*

In the early years of adult-use cannabis legalization, states regulating cannabis for the first time issued single licenses that authorized a single entity to cultivate, process, and sell cannabis at retail. The authorization for a business to engage in all parts of the cannabis supply chain or to be vertically integrated has had significant reverberations in the development of those markets. Vertical integration is now a key feature of any market's architecture, and it has become a significant factor in determining the outcomes of a state's cannabis licensing scheme and ability to promote social equity. Vertical integration is permitted in most legal cannabis markets, with some states mandating that all licensed entities be vertically integrated and control the business from "seed to sale."

The costs associated with launching and operating a vertically integrated cannabis company are exceptionally high, limiting access to the market to those who are most capitalized. There is also a significant demand placed on an operator to be able to secure adequate land and commercial space to operate a vertical business. This requirement exacerbates existing systemic inequities.

An additional consequence of unchecked vertical integration is the elimination of competition in the marketplace due to the burden on a licensee to prioritize their own products. The lack of specialization under forced vertical integration limits product availability and incentivizes bulk, middle-spectrum cannabis over premium craft cannabis.

*Lack of Resources and Investment*

The inability of licensees and applicants to obtain capital from traditional financial institutions is a significant barrier to achieving social equity. Due to federal prohibition, commercial banks and lending institutions have been extremely hesitant to provide standard cannabis business services. While there have been a few success stories, the cost of establishing compliance systems to reduce exposure has resulted in financial institutions directing their limited services available to the more well-resourced cannabis businesses. While many financial institutions have flatly refused to serve the industry, an increasing number have declared their intention to fully enter the cannabis market and invest heavily in operations and systems to serve cannabis customers. However, in the absence of clear federal government guidelines on how financial institutions can provide services, the industry will continue to be underserved relative to other sectors of the economy.

Legal cannabis markets, including New York, have made efforts to encourage state-chartered banks to carry the load, and cannabis industry operators have worked to alleviate these institutions' concerns. However, due to fear of federal scrutiny, financial institutions do not publicly advertise their services and provide little, if any, information on their websites. Because customers have limited ability to compare costs, banks can charge vastly different rates. Some banks charge more than $1,200 per month for a deposit account, while others charge a fraction of that amount.

**BACKGROUND**

Some states have addressed banks' reluctance to participate in the cannabis space by developing programs that provide targeted grants, low-interest loans, or loan underwriting to social equity licensees. Below are some examples of these programs:

- California allocated $15 million to help cities and counties implement social equity initiatives at the local level, with a portion of the funding going directly to licensees in the form of loans and grants, and the remainder to training programs and technical assistance.[6]
- As part of the Social Equity Cannabis Business Development Fund, social equity applicants in Illinois may apply for a low-interest loan to assist with the costs of launching and operating a cannabis business.[7]
- The City of Oakland has established the 'Elevate Impact Oakland' program that provides grants and 0% interest four-year loans to Oakland Verified Equity Applicants who meet the program criteria.[8]

### Undue Influence

Social equity licenses are often targeted by speculative capital due to the lack of accessible capital from traditional financial institutions. Investors, funds and large businesses actively seek out social equity licensees for acquisition in jurisdictions where these licenses can be easily transferred. To prevent predatory recruitment, certain states, including New York, have rules that limit the sale or transfer of social equity licenses.

Some exploitative efforts have included partnership or management agreements with terms that:

- Severely dilute the applicant's or owner's ownership stake
- Reserve management rights and decisions exclusively for the equity partner or management company, as opposed to the equity owner
- List inequitable profit distribution and exorbitant above-line fees and rents
- Contain forced sale provisions that trigger the sale of the business to an equity partner for a predetermined amount of money, which is frequently significantly less than the business's actual value
- Demand supermajorities for key decisions, thereby stripping the equity owner of management control
- Divest the social equity individual or individuals of any intellectual property created during the partnership for the management company's benefit
- Mandate that the financial partner holds the lease, allowing the partner to evict the equity owner.

BACKGROUND

[6]MJBizDaily Staff. (2021, March 16). California awards $15 million more in cannabis social equity grants [ Review of California awards $15 million more in cannabis social equity grants ]. MJBizDaily. https://mjbizdaily.com/california-awards-15-million-more-in-cannabis-social-equity-grants/
[7]Vermont S. 25: The Bill to Strengthen Cannabis Equity Provisions Summary | Heady Vermont. (2021, August 10). https://headyvermont.com/vermont-s-25-the-bill-to-strengthen-cannabis-equity-provisions-summary/
[8]Elevate Impact Oakland – Oakland Equity Loan Program. (n.d.). Retrieved April 28, 2023, from https://www.elevateimpactoakland.com/

However, predatory acquisition schemes are not the only questionable activity that has undermined the goals of social equity programs. Federal law enforcement officials on both coasts have acted in response to alleged pay-to-play schemes involving cannabis business licenses. In California, where cannabis licensing corruption has been a problem since the rise of storefronts, many officials have called for the formation of a statewide task force to investigate extortion and bribery. Municipalities with fewer licenses and additional business restrictions are more likely to engage in pay-to-play schemes. Local retail cannabis bans in the majority of California jurisdictions are believed to have encouraged pay-to-play schemes in neighboring jurisdictions.[9]

In Canada, the Alcohol and Gaming Commission of Ontario (AGCO) has targeted pay-to-play schemes in connection with the sale of retail consumer data to large producers and brands, resulting in a prohibition on inducements between licensed producers and retailers. The AGCO defines inducements as payments that are "given with the purpose to promote or increase the sale of a particular brand or product by the licensee or their employees."

In recent years, licensed retailers have called attention to the widespread circumvention of anti-inducement regulations and unfair practices by large producers and brands.[10] The Cancel Kickbacks campaign has alleged that retailers and producers are falsely and illegally characterizing inducement transactions as payments for the sale of "data for business intelligence purposes." In practice, such schemes advantage larger producers and retailers with the financial means to increase market share. Retail chains with the leverage to request these payments can deploy them to subsidize price wars that the smaller independent retailers cannot match.

Such scenarios pose a substantial risk to small and medium-sized cannabis retailers and cultivators. Payments for market data can be used to subsidize discounts and loss leader pricing strategies by larger retailers. Smaller producers may have limited access to product listings and shelf space due to their inability to make these payments. This dynamic sets up a stacked deck that favors the larger participants, paving the way for a handful of dominant firms to monopolize the market.

### *Local Control*

In addition to the distinctions between state market structures, there is significant variation regarding regulations around local control. To date, more than half of the states that have legalized adult-use cannabis allow local jurisdictions to opt-in or opt-out of the adult-use market. Of note, these standards frequently offer exemptions for existing medical operators. States such as Arizona, Connecticut, Illinois, Michigan, and Massachusetts prevent localities from passing opt-in or other land use laws that prohibit adult-use operations of existing medical operators.

Opt-in and opt-out clauses impact market access and can diminish first mover advantages for social equity licensees by decreasing the availability of compliant properties, while boosting first-mover advantages for existing operators with opt-in/opt-out exemptions. Nearly 40% of counties and municipalities in California and 50% in New York have opted-out of cannabis retail sales. Opt-outs in New York, however, represent just under 25% of the statewide population.

In general, these actions restrict access to applicants, particularly those with limited experience in municipal lobbying and community outreach, shield existing illicit operators from legal competition, and inflate the value of cannabis licenses in surrounding areas.

[9]Elmahrek, A., Vives, R., Lopez. R. J., & St John, P. (2023, January 10). New details of corruption in Southern California weed licensing. - Los Angeles Times. Los Angeles
[10]Updates to Cannabis Standards Clarify Inducement Rules | Alcohol and Gaming Commission of Ontario. (2022, February). www.agco.ca. https://www.agco.ca/blog/cannabis/feb-2022/updates-cannabis-standards-clarify-inducement-rules

### The Timing of Market Entrance

In states such as Illinois and Massachusetts, the rollout of adult-use markets has historically favored already operational cannabis companies due to their establishment before social equity initiatives are introduced. This first-in-line priority transition for certain operators has suggested that the timing of market entrance is a key factor in the success of efforts to promote and preserve equity.

Failure to recognize the value of first mover advantage is another significant reason why social equity efforts across the nation have not always been as successful as intended. A cannabis business that enters the market early enjoys a significant competitive advantage at the market's inception. In states where medical cannabis operators have gained an early foothold in emerging adult-use markets, businesses have leveraged their established cannabis infrastructure and cash flow to secure funding at advantageous rates.

While opt-in/opt-out licensing provisions and artificial license caps can act as barriers for social equity licensees entering the adult-use space at the onset of legalization, the extent to which states permit existing medical operators to seamlessly transition into the adult-use space can be a complex and defining variable for the success of cannabis social equity initiatives.

BACKGROUND



III.

# NEW YORK CANNABIS PROGRAMS

*Images by: Herb Barbot*

# Equity Community Roundtables

As required by Section 87 of the Cannabis Law, the NYSEE Plan must be developed in consultation with the Chief Equity Officer, the Executive Director, and guided by public input to actively promote applicants from communities disproportionately impacted by cannabis prohibition and to promote racial, ethnic, and gender diversity among those who qualify as a minority- or women-owned business, distressed farmer, or service-disabled veteran when issuing licenses for cannabis-related activities for adults. N.Y. CANBS § 87(1).

In carrying out the responsibility to ensure relevant public input, the Office's NYSEE and External Affairs teams organized a series of equity community roundtables to gather information from the various community groups that are most likely representative of the CDIs, minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans. The team engaged with community stakeholders representing each SEE group in both upstate and downstate regions of the state.

Community organizations recruited participants for roundtable sessions to ensure the integrity of the process. Roundtables consisted of discussions regarding representation, equity, and approaches the Office could use to increase cannabis industry participation from target populations. This section describes some of the information provided by each group to the Office.

### *Methodology*

Roundtables were organized with the support of non-profit community organizations. Each SEE group was responsible for recruiting approximately 25 participants to discuss a range of topics including the history and enduring effects of harmful enforcement practices, opportunities in the legal industry for impacted communities, and ways to increase industry participation and ownership among these groups.

In partnership with host organizations, the team hosted and moderated a total of 18 events, of which 15 were in-person. To gain a full picture of equity programs and industry trends across the cannabis landscape, additional virtual roundtables were held with social equity cannabis entrepreneurs and advocates from other states, unionized cannabis workers from New York's medical cannabis program, and New York's Regional Economic Development Councils (REDCS). Participants answered questions based on their lived experiences and those that were most pertinent to their SEE group. The discussions were guided by a facilitator and responses were anonymized and recorded by a scribe. To ensure a representative sample of the populations specified in the Cannabis Law, demographic information was requested but not required. The roundtables lasted approximately two hours and concluded with a group sharing session in which participants provided the NYSEE team with direct feedback.

NY CANNABIS PROGRAMS

20

Throughout the roundtable sessions, **over 400 New York residents offered valuable insight and constructive solutions based on their lived experiences and identified barriers to accessing economic opportunities that their communities have historically encountered.** In addition, dozens of participants described in detail the psychological and economic toll that the disproportionate enforcement of cannabis prohibition has had on their lives and on their communities. This section covers the feedback and insights gathered during these roundtable sessions, which will inform the policies and programs to be implemented by the Office.





*Minority-Owned Business and Women-Owned Business*

Minority and women-owned businesses in the United States face similar but distinct barriers to success. Community members' input underscored the numerous economic, market, and institutional barriers, many of which are associated with racial and gender discrimination. Access to capital can be particularly difficult for these groups, resulting in undercapitalized opportunities and unsatisfied market demands.

NY CANNABIS PROGRAMS

Also problematic are institutional barriers, as these businesses frequently operate within systems that favor larger incumbent corporations, which are primarily owned and operated by white men.

Minority-owned businesses and women-owned businesses are more likely to operate small businesses rooted in their communities, making their success vital to the local economy and market diversity.[11] Programs that provide opportunities for success can be developed to assist these businesses. Empire State Development has certified over 9,700 minority- and women-owned business enterprises (MWBE) in New York State, and there is potential for additional support for cannabis-related businesses.[12]

Recommendations from minority-owned businesses included:

- Create a pathway for legacy operators to transition to the regulated market.
- Minority-owned businesses are often small businesses. To have a fair shot at this industry, small businesses should be given a chance to compete alongside larger businesses.
- Create a directory of ancillary businesses that are not "plant-touching" and thus are not required to have a license to support the generation of economic activity across a broader ecosystem.



> **People trust community legacy dealers, we should utilize them to make connection to community.**
>
> **– Rochester, NY**

Recommendations from women-owned businesses included:

- Develop messaging and campaigns that empower and amplify women business owners across all sectors in the cannabis industry. Women have been overlooked and under resourced in the male-dominated industry.
- Create opportunities for women to network and share new developments about the industry. This includes creating a database that feature women owners and their products.
- Create a guide for branding, packaging, and labeling in accordance with NYS regulations to assist owners with compliance.

### Service-Disabled Veterans and Service-Disabled Veteran-Owned Businesses

The state of New York is home to more than 1,000 certified Service-Disabled Veteran-Owned Businesses (SDVOBs), the majority of which are small businesses.[13] Service-disabled veterans frequently face multiple obstacles when launching and operating a business, such as limited access to capital, difficulty navigating technological systems, and maintaining a competitive edge in a market that is constantly evolving.

Recommendations from service-disabled veterans included:

- Provide representation on the cannabis advisory board. Veterans expressed the importance of sharing their perspectives and having representation that understands their needs.
- Expand access to medical cannabis in their local communities. Many veterans use cannabis medicinally to assist with relief of chronic pain, PTSD, and depression and travel across state lines to access cannabis.
- Offer a mentoring program for veterans focused on security, training others, and logistics across the cannabis supply chain.

[11] U.S. Census Bureau. (2021, February 22). Percentage of Employer Firms by Size of Firm [ Review of Percentage of Employer Firms by Size of Firm ]. United States Census Bureau. https://www. census.gov/library/visualizations/2021/comm/employer-firms.html
[12] Minority & Women's Business Development | Empire State Development. (2016, October 26). Esd.ny.gov. https://esd.ny.gov/doing-business-ny/mwbe
[13] New York State Office of General Services. (2022). Division of Service-Disabled Veterans' Business Development Annual Report [ Review of Division of Service-Disabled Veterans' Business Development Annual Report ]. https://ogs.ny.gov/system/files/documents/2023/01/2022-sdvob-report.pdf



**We're not looking for a handout but a hand up. We served and protected and come back to a changed environment with no support.**



**– Brooklyn, NY**

### Distressed Farmers

The resilience of New York State's food supply relies on a thriving agricultural sector. However, distressed farmers face several obstacles in operating productive farms. The rising cost of land, which is exacerbated by suburban sprawl, is one of the greatest obstacles for all farmers, making it increasingly difficult for them to enter and remain in the market. Additionally, consolidation within the agricultural sector, evolving nutritional demands, and increasing global competition have compressed commodity prices, making it more difficult for small and medium sized businesses to compete against the largest operators. This is reflected in the 2017 National Agriculture Statistics Service report, which indicates that 18,465 farms out of 33,438, or 55%, reported net losses.[14]

Farmers of color face additional obstacles in acquiring the necessary capital and resources for success. Long-standing racial discrimination has made it difficult for them to access financing and resources, thereby reducing their market competitiveness. In New York, less than 2% of farms are operated and/or owned by farmers of color. Consequently, it is essential to address these systemic issues to ensure that farmers of color have equal access to the resources and support they need to thrive.[15]

Recommendations from distressed farmers included:

* Create opportunities for resource sharing including equipment, supplies, commercial space, land, and skill sharing. Resource sharing has been critical in the survival of many farms across the state.
* Allow cooperative operations where multiple farms can grow on one license to relieve burdensome processes and provide the opportunity to share knowledge and labor.
* Provide cannabis education to help defy stigma and connect cannabis with agriculture to secure greater support for cannabis businesses in the agriculture community.
* Support research and education on how to grow and market craft cannabis.
* Create space for community gardens to be utilized in the industry.
* Facilitate the creation of market opportunities by connecting farmers with processors and others along the supply chain.
* Instill worker protections to guard against abuses at the workplace including wage theft, sexual assault and more.

### Individuals from Communities Disproportionately Impacted

The enforcement of cannabis prohibition has had devastating effects on numerous communities, which continue to endure the repercussions of the state's legacy of harsh drug laws. Decades of excessive policing and systemic arrest and incarceration rates have disproportionately harmed

[14]National Agriculture Statistics Service. (2017). Table 5. Net Cash Farm Income of the Operations and Producers: 2017 and 2012 [ Review of Table 5. Net Cash Farm Income of the Operations and Producers: 2017 and 2012 ]. https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_State_Level/New_York/st36_1_0005_0006.pdf
[15]Diversity and Racial Equity Working Group Report. (2021). https://agriculture.ny.gov/system/files/documents/2021/08/diversityracialequityreport_1.pdf

NY CANNABIS PROGRAMS

the financial, economic, and psychological well-being of these communities, as well as their families.

Cannabis prohibition's negative impacts have only widened pre-existing disparities in public investment, educational attainment, public health outcomes, and wealth creation in CDIs relative to the rest of the state.



> **Once you start putting in all stipulations, they showing and proving just what I've been saying for the last year- I lost the love of my life, my kids, I lost my son to this.**

**– Albany, New York**

The criminalization of cannabis has also had ripple effects on families as well. Children whose parents have been incarcerated due to cannabis-related offenses are more likely to experience economic and social hardship.[16] The identification of these communities is central to the restorative justice framework of the Cannabis Law. The Office is responsible for identifying CDIs and establishing certification criteria for members from those communities to receive prioritization in licensing and several other benefits.

Recommendations from individuals from communities disproportionately impacted include:

- Host "Know Your Rights" education for members of these communities so they know what protections they have under the law. This includes appointing community liaisons and supports for civic engagement.
- Create safe spaces for community members to share experiences, concerns, and ideas. CDIs want to have open and continued dialogue with regulators.
- Develop community-based virtual and onsite incubation and cannabis education opportunities for CDIs and other small business owners hoping to enter or transition into the adult-use industry from these communities.
- Establish retail operations connected to the community through assessment of community needs and wants and create ownership opportunities and jobs for existing legacy operators.



> **Your local weed man was so helpful to learning in places that are underserved by legal dispensaries (medical)... Their knowledge is invaluable and should be promoted.**

**– East Patchogue, NY**

- Educate other community leaders who are natural conduits of information including public officials, city/state agencies, and local leaders.
- Prioritize language access services for both printed materials and events to ensure the Office is communicating inclusively. This includes utilizing interactive media (YouTube, Instagram, etc.) beyond the Office's website to explain legal jargon and regulations.

---

[16] Reed, D., & Reed. E. (1997). Children of Incarcerated Parents [ Review of Children of Incarcerated Parents]. Social Justice, 24(3), 152–169.

NY CANNABIS PROGRAMS

*Most Discussed Topics*

Some topics of concern spanned across all the social and economic equity groups. The most discussed topics were:



**Top Primary Discussion Topics (%)**

| Topic | % | Count |
|---|---|---|
| GENERAL GOVERNMENT POLICY | 8% | 197 |
| OCM INFORMATION | 9% | 237 |
| EQUITY | 9% | 243 |
| EDUCATION | 10% | 255 |
| FINANCES | 10% | 264 |
| BARRIERS TO BUSINESS | 11% | 281 |
| REPRESENTATION | 12% | 319 |
| ARRESTS / CRIMINAL JUSTICE / POLICING | 14% | 371 |
| COMMUNITY | 17% | 433 |

**Finances.** Finance-related discussions have centered around two primary issues: the need for capital and the threat of predatory practices. SEE groups highlighted financial obstacles and expressed uncertainty regarding how small businesses will ever be able to access sufficient capital to launch a legal operation. They expressed concern regarding license application and maintenance fees being excessively high and the lack of access to capital due to federal prohibition. Additionally, certain SEE groups, specifically women- and minority-owned businesses, stressed the utility of networks in breaking into the financing space. These networks provide a central place where individuals can seek capital with minimal stigmatization around them or their business idea.

All SEE groups were also concerned about being exploited in several market sectors, including real estate, legal services, banking, accounting, and capital raising. Roundtable data revealed the frequency with which industry "consultants" overcharge business owners and misappropriate company information. Business owners shared concerns that exploitative partnerships may eventually lead to their exclusion from business ownership. All SEE groups commented on having previously been victims of predatory lending and gender and racial discrimination.

 **The narrative around cannabis has evolved because the narrative around who uses it has evolved.** 

**– Albany, New York**

**Representation.** Numerous SEE groups spoke at great lengths about the importance of representation. They addressed stigmas associated with cannabis consumption and industry involvement, including negative examples most frequently associated with minority communities. While it was understood that this stigma originates from a historic miseducation on cannabis and can stem from numerous sources including friends, family, and the general public, they felt strongly that the Office continue the work of re-educating communities in order to better prepare them to receive cannabis businesses. Participants acknowledged a recent shift in media representation of cannabis use to include a more diverse group of cannabis consumers, which has helped reduce the stigma in general, but still notice the lack of representative examples of cannabis business ownership.

The SEE groups view adult-use markets as an opportunity for the Office to be intentional with the communities most impacted by cannabis prohibition. They expressed the importance of highlighting examples of business ownership among minorities in the industry in dispelling historic stigmas and inspiring community members to participate in the legal marketplace.

The SEE groups also recognized that New York's distinct cultural and ethnic diversity and authenticity could be a benefit to business operators and that the State should allow space for that culture to be celebrated. Participants advocated for direct representation within government to better reflect and address the needs of their communities.

**Access to Information.** SEE groups emphasized the need for the Office to be a centralized source of cannabis-related information. The lack of access to information for certain communities has often meant a lack of efficacy for those programs designed to benefit them and a guarantee that others would fill the void with less accurate information. Of particular interest is the publication of information announcing government programming, available funding and research opportunities. To increase accessibility of information released by the Office, participants emphasized the need for information to be disseminated in plain language through a variety of media formats, such as video, audio, in-person, and digital resources.

**Criminal Justice.** A significant number of participants described traumatic prior interactions with law enforcement and the long-term impacts of these interactions on their mental health, family cohesion, and professional advancement. Individuals who were directly criminalized due to cannabis explained how difficult reentry can be for the formerly incarcerated and advocated for cannabis tax revenue to be used for reentry support services. Participants also made clear that highlighting criminal justice reforms included in New York's new Cannabis Law could incentivize confidence in the State's commitment to equity in licensing and employment in the cannabis industry.

> **People come to New York to get a brand experience – New York leads culture**
>
> **– Harlem, NY**

**Community.** For many SEE groups, the success of their business endeavors is contingent on the support they receive from the community. Numerous participants described the limited resources in their communities. However, they highlighted the resilience offered by community-based networks and the sharing of resources.

NY CANNABIS PROGRAMS

Participants highlighted the advantages of collaboration over competition and urged the Office to develop policies that could foster a more collaborative market. Business-owner participants stated that there is a symbiotic relationship between small businesses and their communities, and that the government should protect these relationships, especially as larger operators enter the industry. Participants want to ensure that there are opportunities for community reinvestment and empowerment, such as tax revenue going to programs for youth, mental health, and education, and that licenses and locations are prioritized in communities most impacted by cannabis prohibition.

**Education.** Education-related discussions largely centered on the accessibility of education and suggestions for future initiatives. The SEE groups emphasized the importance of accessible education for both young people and adults to maximize learning and community support. They advocated for education and resources in their local communities, provided through a variety of online and offline experiential learning opportunities. Instructional subject recommendations include cannabis education, financial or business literacy, public awareness campaigns, and workforce development programs.

**General Government Policy.** Business owners were concerned about the Office potentially over-regulating the legal market and pushing operators back into the legacy market. This includes the timing of regulations and uncertainty around requirements. Participants recommended the state assist directly with compliance trainings. They also highlighted the need for non-criminal enforcement efforts to protect licensed operations and consumers.

Participants were generally mistrustful of New York State's commitment to equity and instead believe that the Office and State are primarily motivated to generate revenue. CDIs were particularly pessimistic about the cannabis industry because many other industries feature capital-intensive start-up costs and financial barriers to entry. They expressed concern that the government will impose financial and regulatory restrictions that will limit their participation. Many participants were pleased that the Office took the time to visit their communities and speak directly with them and emphasized the need for a continued dialogue so that programs and policies can adapt and change when they are failing to achieve intended results.



It takes a community to save a community

– Harlem, NY

Numerous participants voiced concerns about the security of legal cannabis businesses. To best prepare business owners to secure their businesses and assets, participants recommended the adoption of clear, stringent regulations on surveillance and security. In addition, participants advocated for direct, specific packaging and labeling guidelines for cannabis flower and products.

**Barriers to Business.** Access to capital was the top concern for successfully operating a business in the adult-use industry. Both business owners and CDIs were uncertain as to how small businesses will ever have access to sufficient capital to launch a legal business. Farmers, small business owners, and medical practitioners all raised the need for training across all license types to ensure OSHA compliance and worker safety.

NY CANNABIS PROGRAMS

Another topic frequently raised was the excessive paperwork and documentation required to enter the industry. For new business owners, paperwork, and lack of access to guidance regarding licensing and startup information was cited as a problem, particularly for cultivation and processing licenses. Small and minority business owners are concerned about being left behind or exploited by consultants and partners. Lastly, various participants also suggested that efforts to alleviate cannabis taxation should prioritize SEE groups in order to lessen the financial burden and encourage their participation in the marketplace.

## Current Social & Economic Equity Initiatives

New York has already taken significant steps to develop an equitable cannabis market and to prepare entrepreneurs to enter the industry. The Office has implemented a first in the nation license and two training programs as well as a social equity fund, to bolster social equity applicants' and licensees' chances of success.

 **Equity and justice would look like the opportunity to have generational wealth.** 

**– Westbury, NY**

### Conditional Adult-Use Retail Dispensary (CAURD) License

The Office began accepting applications for Conditional Adult-Use Retail Dispensary (CAURD) license in August 2022. The CAURD license prioritizes individuals who are justice-involved, meaning they or an eligible family member have been convicted of a marijuana-related offense in New York State. The CAURD license was additionally made available to non-profit organizations that serve justice-involved individuals and communities disproportionately impacted by cannabis prohibition.

The CAURD license positioned justice-involved individuals to make the first sales of cannabis for adult-use in New York State with products grown by New York farmers. The Office received more than 900 license applications for CAURD. There have been 166 provisional approvals to date, including 156 qualified businesses and 10 non-profit organizations. To begin adult-use retail sales, these provisionally approved CAURD applicants must pass the post-selection application process and be approved by the Board. On December 29, 2022, the first CAURD licensee began operations and made the first retail sale of cannabis for adult-use in the state of New York.

### CAURD Accelerator

The CAURD Accelerator provides each conditional retailer with intensive training and mentoring. The program, which is funded and administered by the Office, provides the comprehensive, hands-on assistance that new entrepreneurs need to succeed in the highly competitive retail cannabis market. The program includes approximately forty distinct workshops, consultations with finance specialists, and one-on-one mentoring. Other adult-use markets have developed their own social equity programs to offer business supports comparable to the CAURD Accelerator program. The Office will continue to replicate these programs, with an emphasis on cannabis compliance, marketing, and financial literacy training. The CAURD program has given licensees the opportunity to enter the adult-use market from the outset with specialized educational opportunities to ensure their long-term success and competitiveness.

The CAURD Accelerator provides CAURD licensees with comprehensive and highly individualized training services. The detailed education, coupled with one-on-one mentoring and strategy sessions with specialized consultants, will significantly improve the CAURD licensee's ability to avoid exchanging equity in their business for expert advice. The CAURD Accelerator will go far beyond education and mentoring; consultants will also provide individualized strategy sessions and document deliverables that each licensee can incorporate into their business formation within 60-90 days. The Accelerator offers 20 weeks of online evergreen content (courses twice per week) and weekly contact with mentors and/or specialized consultants.

The curriculum consists of recorded courses, online quizzes, workbooks with lesson plans and standard operating procedures (SOPs), and suggested reading material.

Consultant deliverables include:

1. *Finance and Financial Strategy.* A tool that assists licensees in understanding their business and investor-friendly financial models. Licensees will undergo the exercise of understanding their margins and expanding their financial literacy, which is one of the greatest obstacles operators face when attempting to raise capital from investors.
2. *Cannabis Retail Marketing.* Workshops on brand storytelling and marketing techniques, as well as training on tech stacks and workbooks for digital marketing platforms and standard operating procedures.
3. *Compliance Strategy.* Synthesize current and evolving regulations, support business development strategy, and review management service agreements, fundraising, and compliance documents.
4. *Operations.* Provide best practice process flows for retail operations, inventory planning, merchandising/assortment, pricing, merchandising, training, etc. Curate the tech stack options and negotiate group pricing discounts for all CAURD license holders who qualify.

The Office is tasked with establishing a vast network of community incubators to facilitate SEE groups' access to licensure, as well as providing direct support in the form of counseling services, education, small business coaching, financial planning, and compliance assistance. The Office will retain the CAURD Accelerator curriculum, and all related written materials produced through the program as a foundation for future business development programming for social and economic equity licensees.

This type of collaboration allows states to closely monitor incubation practices, eliminating the risk of predatory private programs, while relying on expert cannabis business owners and educators to develop and transfer curriculum to social equity entrepreneurs.

NY CANNABIS PROGRAMS

### New York Social Equity Cannabis Investment Fund

In 2022, Governor Hochul proposed, and the Legislature enacted, the NY Social Equity Cannabis Investment Fund.  The Fund, a public-private partnership, provides much needed start-up support for justice-involved cannabis dispensary licensees.  The $200 million fund is seeded with $50 million in State funds, to be repaid from tax revenue generated by cannabis sales, and $150 million in private investment.  Limited access to capital for cannabis dispensary licensees has proven to be a significant stumbling block in this nascent industry, especially for social equity cannabis entrepreneurs. In New York State, justice-involved licensees, disproportionally impacted by the draconian Rockefeller Drug Laws, have an opportunity to receive necessary support in the acquisition and build-out of dispensaries.

With little to no start-up capital, participating CAURD licensees receive a turn-key cannabis dispensary in an optimum retail location.  The licensee pays back the Fund's investment over time.  This approach is intended to provide participating CAURD licensees with the best possible opportunity to succeed, overcome the unjust treatment of the past, and create generational wealth. Learning from other states' experiences, the Governor created the Fund and leveraged the finance, procurement, design and construction expertise of the Dormitory Authority of the State of New York (DASNY) to help manage the process.

### Cannabis Compliance Training and Mentorship Program

The Cannabis Compliance Training and Mentorship (CCTM) Program is a 10-week virtual training program designed to train three cohorts of trainee/mentees: legacy cultivators, traditional farmers, and a combined cohort of legacy processors and traditional food and beverage processors. Licensed cultivators and processors serve as mentors for 241 participants under a curriculum developed by the Office in collaboration with SUNY Morrisville and Cornell University professors, and the curriculum is rounded out with lectures from accountants and attorneys with cannabis experience. The CCTM program is intended to expand and diversify the pipeline of cultivators and processors preparing to participate in the New York cannabis market.

This training program began in January of 2023. The courses and technical trainings are supported by the State University of New York, SUNY Morrisville, Cornell University, the Office, holders of Adult-Use Conditional Cultivator (AUCC) and Adult-Use Conditional Processor (AUCP) licenses (as part of the requirements of their conditional license to assist in the creation of a pathway into the cannabis industry). Each participant will complete 17-21 webinars with topics ranging from Cannabis Business Accounting, Labor Laws, Agricultural Human Resources, and Environmental Controls to Plant Genetics, Plant Pathology, Track and Trace, Lab Testing, Recall Plans, and Good Manufacturing Practices. In addition, each CCTM participant has been paired with an AUCC or AUCP so they can engage on a more personal level and achieve a deeper learning about establishing a business in a regulated marketplace.

NY CANNABIS PROGRAMS

# Legacy of Cannabis Prohibition in New York

Legislative introduction to "The Marijuana Reform Act of 1977" as passed by the New York State Senate and Assembly, and signed by the Governor Hugh Carey:

**The legislature finds that arrests, criminal prosecutions, and criminal penalties are inappropriate for people who possess small quantities of marijuana for personal use. Every year, this process needlessly scars thousands of lives and wastes millions of dollars in law enforcement resources, while detracting from the prosecution of serious crimes.**

**– Chapter 360 of the Laws of New York, "Crimes and Offenses – Possession and Sale of Marijuana"**[17]

### *Historical Context*

Despite the legislative intent above, cannabis prohibition in New York has left a long-standing impact on the lives of many residents. ***Between 1980 and 2021, cannabis offenses were the primary charge in over 1.3 million arrests, 245,000 convictions, and 345,000 violations in the state.***[18]

The origins of cannabis prohibition stretch back to the early 1900s, when the Harrison Narcotics Act of 1914 began taxing drugs. Next, the racially motivated Marijuana Tax Act was then passed in 1937, initiating an unofficial government ban on cannabis. Later, the Controlled Substances Act of 1970 passed, which classified cannabis as a schedule 1 "dangerous" substance at the federal level. And finally, following the lead from the federal government, New York State passed the Uniform Controlled Substances Act in 1973, which classified marijuana as a Schedule I drug, at the state level, meaning it was considered to have high potential for abuse and had no accepted medical use.[19]

New York State also enacted the Rockefeller Drug Laws in 1973, which mandated harsh penalties for drug offenses, including lengthy prison terms for even minor and non-violent offenses. These laws, named after then-Governor Nelson Rockefeller, were part of a larger political trend in the 1970s to enact policies to combat a drug epidemic, which had become synonymous with crime. This law had a disproportionate impact on communities of color, who were frequently the target of aggressive policing tactics such as "Stop and Frisk" in New York City.

The Marijuana Reform Act of 1977 cited above was New York's first recognition that the collateral consequences of a cannabis conviction were too far reaching and were not proportionate to the crime of cannabis use. The law, intended to prevent the limited personal use of cannabis from being criminalized created what would come to be known as the 'public-view loophole' wherein a person would not be subject criminal consequences should they personally possess cannabis on their person or in the home but be subject to those consequences should their possession be in the public view.

The combination of the creation of the 'public-view loophole' with the later implementation of "stop-and-frisk" practices in municipalities across the State led to a massive increase in low-level cannabis possession arrests and convictions.

[17] Breasted, M. (1977, June 30). Carey signs marijuana measure reducing penalty for possession. The New York Times. Retrieved from https://www.nytimes.com/1977/06/30/archives/carey-signs-marijuana-measure-reducing-penalty-for-possession carey.html

[18] New York State Division of Criminal Justice Services, Computerized Criminal History System (September 2022). This includes all fingerprintable arrests, regardless of conviction, for NYS Penal Law Article 221 as the most serious charge in an arrest event and follows each arrest through the criminal justice process. The violations data only includes convictions for arrests that started as a fingerprintable misdemeanor or felony charge. It does not include convictions for violations that began as a violation because they did not require fingerprints to be taken.

[19] Slaughter, J. B. (1988). Marijuana prohibition in the United States: history and analysis of failed policy. Columbia Journal of Law and Social Problems, 21(4), 417-474.

In 2013, the practice of "stop-and-frisk", in its application by the New York City Police Department, was deemed unconstitutional by a federal judge. Courts cited the significant racial disparities of those being encountered by law enforcement and the lack of efficacy in the program's stated goals of uncovering illegal firearms. The program was effective, however, in identifying how many New Yorkers of color were in possession of small amounts of cannabis. Also in 2013, the New York State Attorney General's (AG) Civil Rights Bureau released a report on the arrests resulting from Stop and Frisk, concluding that the consequences of the open arrest, such as loss of employment or housing, compelled individuals to plead guilty, and that the cost of lawsuits alleging violations by NYPD officers increased significantly.[20]

There was commonly held belief that low-level cannabis arrests contributed to public safety.[21] However, according to a 2017 study by Dr. Harry Levine, Professor of Sociology at the City University of New York Queens College, 76 percent of those arrested for marijuana possession the year before had never been convicted of a crime, dispelling the commonly held belief that minor marijuana arrests get serious offenders off the street.[22]

The collateral consequences of the increase in cannabis arrests and convictions not only meant for an individual the loss of employment, housing, access to education, difficulty maintaining a professional license, or even adopting a child, but also impacted the family and community the individual belonged to.[23] On top of the emotional strain of having a family member in the criminal justice system, these individuals, who are incidental to the arrest itself, can become single-income households and struggle to meet basic needs.

While most people arrested for cannabis-related offenses did not spend extensive time in jail due to the concentration of enforcement on low-level conduct, the collateral consequences identified above were significant. Certainly, individuals are impacted, but families and communities are as well.[24] And since the arrests were so pervasive and systemic, they are a significant structural factor contributing to economic inequality.[25]

New York has taken the initiative to provide restorative justice not only to individuals through remedies such as record expungement, but also to the affected communities. Identifying which communities qualify as having been disproportionately impacted by cannabis prohibition will anchor the ongoing rollout of New York's legal market and community reinvestment.

### *Communities Disproportionately Impacted (CDI) Background*

Section 87 of the Cannabis Law defines a CDI as "a history of arrests, convictions, and other law enforcement practices in a certain geographic area, including, but not limited to, precincts, zip codes, neighborhoods, and political subdivisions, reflecting disparate enforcement of cannabis prohibition during a specific time period relative to the rest of the state." (N.Y. CANBS § 87(5)(g))

Article 221 of the New York State Penal Law was the section of the Penal law that detailed criminal consequences of certain conduct related to the possession, use, and sale of marihuana.[26]

[20] Schneiderman, E. (2013). A report on arrests arising from the new york city police department's stop-and-frisk practices. https://ag.ny.gov/pdfs/OAG_REPORT_ON_SQF_PRACTICES_NOV_2013.pdf
[21] Harry Levine, Unjust and Unconstitutional: 80,000 Jim Crow Marijuana Arrests in Mayor de Blasio's New York, (New York: Marijuana Arrest Research Project and Drug Policy Alliance, 2017)
[22] Harry Levine, Unjust and Unconstitutional: 80,000 Jim Crow Marijuana Arrests in Mayor de Blasio's New York, (New York: Marijuana Arrest Research Project and Drug Policy Alliance, 2017)
[23] Howell, B. (2009). Broken Lives from Broken Windows: The Hidden Costs of Aggressive Order-Maintenance Policing. Ssrn.com. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1611269
[24] Babe Howell, "Broken Lives from Broken Windows: The Hidden Costs of Aggressive Order-Maintenance Policing," New York University Review of Law & Social Change 33(2009); Richard Glen Boire, Life Sentences: Collateral Sanctions Associated with Marijuana Offenses (Center for Cognitive Liberty & Ethics, 2007).
[25] Babe Howell, "Broken Lives from Broken Windows: The Hidden Costs of Aggressive Order-Maintenance Policing," New York University Review of Law & Social Change 33(2009); Richard Glen Boire, Life Sentences: Collateral Sanctions Associated with Marijuana Offenses (Center for Cognitive Liberty & Ethics, 2007).
[26] New Marihuana Law NY CourtHelp. (n.d.). Nycourts.gov. Retrieved May 4, 2023, from https://nycourts.gov/courthelp/Criminal/marihuanaLaw.shtml#:~:text=Article%20221%20of%20the%20New%20York%20State%20Penal

NY CANNABIS PROGRAMS

To better understand the way in which history of arrests might help identify a CDI, the Office worked with the New York State Division of Criminal Justice Services (DCJS) to obtain data.

The Office analyzed Article 221 arrest records from 1980 to 2021 by race, ethnicity, felony, misdemeanor, and the place of residence of an individual at the time of their arrest. Residential address records were geocoded into latitudinal and longitudinal coordinates and assigned to the corresponding census tract, which typically contains 1,200 to 8,000 people, enabling comparison of arrest data among populations that are relatively similar.


**Coming from a CDI, my life was impacted because of the years I spent in prison for marijuana conviction, lost wages and countless number of fines.**


– Brooklyn, NY

### *Case Study – Mapping Manhattan*

In order to visualize the impact of prohibition, the below highlights the residential addresses of those arrested under New York State Penal Law Article 221 between 1980 and 2021. For the purposes of this plan, a case study of Manhattan is presented.

The dataset contains 163,442 geocoded arrest records, illustrating the total number of arrests made of individuals who lived in Manhattan between 1980 and 2021.



| Continuous Gradient Count Of Arrests 1980 - 2021 | |
|---|---|
| 1st Percentile | |
| 25th Percentile | |
| 50th Percentile | |
| 75th Percentile | |
| 100th Percentile | |

Using the above map as a case study, we can see residential addresses of those who were arrested for cannabis offenses. The higher concentrations of individuals are strayed in red. The sample map of Manhattan shows that those arrested for New York State Penal Law Article 221 between the years of 1980–2021 largely resided in the neighborhoods of Hamilton Heights, Sugar Hill, Harlem, East Harlem, and Washington Heights. In addition, there are concentrations of individuals in the neighborhoods of Two Bridges, Manhattanville, and the Lower East Side.

Two additional maps show the concentration of arrests in two separate years, thirty years apart. Arrests in Manhattan in 1980 alone total 1,204 and in 2010 alone total 7,350, a 500% increase. The difference in total arrest numbers and neighborhoods targeted indicate a change in concentration of activities over time.

## STACKED VIEW



NY CANNABIS PROGRAMS

*Race and Ethnicity in Arrests*

The Office estimates that out of 1.3 million cannabis-related arrests, 57 percent of those arrested were Black individuals and 25 percent were Hispanic individuals.[27] The staggering racial disparities in cannabis arrests in New York's criminal justice system directly contributed to longstanding economic disparities.[28] Despite extensive research indicating that Whites use cannabis at a higher rate than Blacks,[29] most of these arrests involved Black New Yorkers. **Black New Yorkers were 15 times more likely to be arrested for marijuana than their White counterparts. Hispanic New Yorkers were 7.5 times more likely than their non-Hispanic White counterparts.**[30] See Appendix A-2 for raw data on cannabis-related arrests by race and ethnicity over time in the state of New York.



**Total NYS PL 221 Arrests Over Time by Race and Ethnicity**

**ALL PL 221 ARREST BY RACE AND ETHNICITY**

NY CANNABIS PROGRAMS

[27]Source: New York State Division of Criminal Justice Services, Computerized Criminal History System (September 2022). This includes all fingerprintable arrests, regardless of conviction, for NYS Penal Law Article 221 as the most serious charge in an arrest event and follows each arrest through the criminal justice process.
[28]Sutton, M. (2021, March 17). New Report Shows Persistent Racial Disparities and Economic Impacts in Marijuana Arrests Across New York [Review of New Report Shows Persistent Racial Disparities and Economic Impacts in Marijuana Arrests Across New York]. Drug Policy Alliance. https://drugpolicy.org/press-release/2021/03/new-report-shows-persistent-racial-disparities-and-economic-impacts-marijuana
[29]Section 1 PE Tables – Results from the 2020 National Survey on Drug Use and Health: Detailed Tables, SAMHSA, CBHSQ. (2020). www.samhsa.gov. https://www.samhsa.gov/data/sites/default/files/reports/rpt35323/NSDUHDetailedTabs2020v25/NSDUHDetailedTabs2020v25/NSDUHDetTabsSect1pe2020.htm
[30]Source: New York State Division of Criminal Justice Services, Computerized Criminal History System (September 2022). This includes all finger printable arrests, regardless of conviction, for NYS Penal Law Article 221 as the most serious charge in an arrest event and follows each arrest through the criminal justice process.

## *Convictions*

**Out of the 1.3 million cannabis-related arrests from 1980 to 2021, just over 245,000 resulted in a conviction for a misdemeanor or a felony. Of those 245,000, 62% of those convicted were Black and 21% were Hispanic.** See Appendix A-3 for raw data on cannabis-related convictions by race and ethnicity over time in the state of New York.



**Total NYS PL 221 Convictions Over Time by Race and Ethnicity**

## ALL PL 221 CONVICTIONS BY RACE AND ETHNICITY



## Reduced Lifetime Earnings

Reduced lifetime earnings resulting from a conviction for cannabis-related offenses have been disproportionately borne by those already living in poverty. These earnings losses exacerbated preexisting economic disparities between Black, Hispanic, and White communities. Although staggering, these losses do not include the secondary costs of involvement in the criminal justice system, such as the earnings lost by a family when a parent must leave work to care for a child during a partner's incarceration, the money spent on court costs and criminal justice debt, the cost of transportation to visit loved ones in prison, or the cost of a private attorney.

**The Office estimates that from 1980 and 2021, cannabis-related misdemeanor and felony convictions resulted in lost lifetime earnings of approximately $31 billion,** with Black and Hispanic individuals accounting for roughly $25 billion or 83 percent of those loses.[31] The average lifetime earnings for those convicted of a felony but not imprisoned for it are reduced by 22 percent, while those convicted of a misdemeanor are reduced by 16 percent.[32]

## Cost of Cannabis Arrests

The costs associated with a cannabis arrest include police time for transporting arrestees to the police station, processing the suspect during intake, submitting seized cannabis as evidence, fingerprinting, and photographing suspects, conducting criminal background checks, and completing related paperwork. The time of prosecutors, public defenders, bailiffs, and other administrative work may be factored into judicial expenses.[31]

**Between 1980 and 2021, the Office estimates that out of the 1.3 million cannabis-related arrests,**

# 57%
were Black

# 25%
were Hispanic

*Note: According to the 2020 census, Hispanic individuals made up 19.5% and Black individuals made up 17.6% of the NYS population.*

**The Office estimates that from 1980 to 2021, the State spent over $1.24 billion enforcing cannabis prohibition.**

NY CANNABIS PROGRAMS

[31]Craigie, T.-A., Grawert, A., Kimble, C., & Stiglitz, J. (2020). Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality [ Review of Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality ]. https://www.brennancenter.org/our-work/research-reports/conviction-imprisonment-and-lost-earnings-how-involvement-criminal 63,000 Workers. The New York Times.
[32]Drug Policy Alliance. (2011, March). $75 Million a Year The Cost of New York City's Marijuana Possession Arrests [ Review of $75 Million a Year The Cost of New York City's Marijuana Possession Arrests ]. http://marijuana-arrests.com/docs/75-Million-A-Year.pdf

# Equity in Access to Medical Cannabis

The Cannabis Law requires that the Office identify areas throughout the state that are medically unserved and underserved. These regions have concentrations of health-related issues and are medically underserved by traditional healthcare. They are also unserved or underserved by medical cannabis dispensaries.

## Methodology

The Office used a health disadvantage score to identify unserved and underserved areas. The health disadvantage score is derived from seven variables: population-provider ratio, population over 65 years old, uninsured rate, low birth weight, premature deaths, household disability rate, and travel time to healthcare. Of note, five out of seven of these variables (population over 65 years old, uninsured rate, low birth weight, premature deaths, household disability rate) are also recognized by the state Department of Health as health indicators as well.[33] By ranking census tracts, the relative advantage of these health indicators was analyzed. The order of tracts is determined by percentiles. The values for the percentile rank range from 0 to 1, with values closer to 1 indicating greater disadvantage. Census tracts with a health disadvantage score in the 85th percentile (600 out of 4,919 in the state) are considered unserved or underserved.

## Identified Areas

Based on their percentile rank, the maps below depict which census tracts are deemed health disadvantaged. The 600 census tracts in the state with a health disadvantage score of at least 85 percent are highlighted in purple. In addition to the state maps, page [A-4] of the Appendix contains a list of all health-disadvantaged census tracts.[34]







# Business Support in New York State

The Office and Board are dedicated to developing and prioritizing business support services for NYSEE applicants, licensees, and small businesses in the legal marketplace. Through training and mentoring, populations with limited access to capital can still succeed. The Office can also collaborate with New York State's already comprehensive business support network to ensure support reaches all corners of the State. The Office's incubator program initiatives will be supported by fees derived from the transition of registered organizations to the adult-use market. This section identifies additional work being done by the Office to support entrepreneurs.

### Financing: Loans and Grants

As long as cannabis remains illegal under federal law, the industry faces obstacles in obtaining loans and utilizing conventional banking services. Most financial institutions are unwilling or unable to assume the risks associated with lending capital to cannabis-related businesses. These risks fall into two broad categories: unease regarding federal oversight and concern regarding the default of loans made to under-collateralized businesses in emerging markets. This makes it difficult for business owners with fewer assets to obtain debt at competitive interest rates.

Social equity applicants are forced to use high-interest lenders or forgo capital improvements, leaving low-income entrepreneurs to pay exorbitant interest. However, government can mitigate some of the risks financial institutions face when investing in the sector, and New York regulators can lead the way in developing innovative solutions for this market.

The Office is addressing small, NYSEE-owned cannabis businesses' banking issues by encouraging banks and credit unions to enter the legal cannabis market to increase competition, lower costs, and improve services for cannabis-related businesses (CRBs). The Office has met with financial institutions for several months to provide clarity and resources for entering the legal cannabis market. Consequently, several banks and credit unions have begun accepting CRB customers. To reduce financial institution risk and encourage commercial loans to NYSEE-owned businesses, the Office is drafting proposals for underwriting loans for qualified NYSEE applicants. Following 2023 development, comprehensive loan programs are expected to launch in 2024.

### Training Programs and Technical Assistance

In addition to financing, individuals who qualify for social equity programs require technical assistance to both navigate the complex licensing process and to learn how to build and operate a regulated cannabis business. Courses in financial literacy, business plan development, administrative skills, regulatory compliance, human resources, sales projections, customer acquisition, and agricultural and cultivation practices are offered by several states as part of their social equity programs. Those who qualify for social equity programs have typically borne economic burdens and have had less access to capital, so training programs that assist these individuals in acquiring the skills necessary to thrive in the legal market are essential to any equity program. These programs have the additional advantage of boosting investor confidence in a company's likelihood of success.

NY CANNABIS PROGRAMS

Typically, training programs fall under one of three programmatic umbrellas: workforce development, business services, or incubation. There may be curriculum overlap in each of these support types, but the overarching objective of each program type is to simplify access to the legal market for small and equity business owners who wish to become competitive license holders in the adult-use supply chain.

### Workforce Development Programs

Workforce development programs provide individuals with the skills and training they need to access good jobs in growing sectors. **As the cannabis industry continues to grow, related workforce development programs should emphasize career matching, training and education on cannabis skills, and resume development.** Many state workforce development programs rely on federal funding, creating a barrier to providing certain cannabis-specific education and job matching. State funding, administered through the Office or other New York agencies, can support the workforce initiative by sponsoring and partnering with cannabis education, career exploration, and skills training nonprofits.

The Office has supported the development of the NYS Cannabis Workforce Initiative, a partnership between Cornell University and the Workforce Development Institute that provides cannabis-specific education and training to job seekers. This ten-week program, partially funded by New York State, teaches dispensary, processing, and cultivation workers about legal cannabis. The course introduces workers to cannabis opportunities, terminology, and what to expect with daily work in each sector. Programs that expand on these foundational initiatives will further lower the barrier to entry to New York State's cannabis workforce. For example, a robust job matching program can connect employers and future employees, and then track their short- and long-term successes.

In states with mature cannabis markets, legalization has created an appreciable number of jobs both at licensed businesses and at companies providing ancillary products and services. A 2022 jobs report estimated a total of more than 428,000 jobs in the US were supported by the cannabis industry thus far.[35] With New York's recent launch into the adult-use market, it is anticipated that the legal market will generate 108,000 jobs across the state when cannabis markets are fully established.[36]

Additionally, the Office continues to support New York State Department of Labor's (NYSDOL) Cannabis Employment and Education Development (CEED) Unit which connects people with cannabis industry jobs and helps businesses thrive in New York. Through Coursera, NYSDOL offers free online courses to unemployed New Yorkers, including many courses that teach skills directly related to the cannabis field. The NYSDOL CEED Unit connects cannabis-trained job seekers to a variety of employment opportunities, including with cannabis licensees. The Office will continue to support NYSDOL's workforce programs, ensuring they meet the needs of cannabis licensees and ancillary businesses throughout the supply chain.

NY CANNABIS PROGRAMS

---

[35] Barcott, B., & Whitney, B. (2021, February 16). The US cannabis industry now supports 321,000 full-time jobs. Leafly. https://www.leafly.com/news/industry/cannabis-jobs-report
[36] CannabizTeam Worldwide. (2022). Tri-State 2022 Cannabis Industry Salary Guide [Review of Tri-State 2022 Cannabis Industry Salary Guide]. In CannabizTeam Worldwide. CannabizTeam Worldwide. https://cannabizteam.com/tri-state-cannabis-industry-salary-guide/

The best workforce development programs offer additional services to help job seekers access upskilling and on-the-job training. Workforce development programs with support services often work with participants in the early months after placement in a job, internship, or training program. Cannabis companies can be incentivized to support the state's workforce development goals by providing on-the-job training with an emphasis on upskilling, hiring a certain percentage of individuals from underserved communities, or providing their training curriculums to workforce development nonprofits to scale their impact. The Office will continue to encourage these connections and will collaborate with community-based organizations that already provide basic business or workforce services to expand their capacity and oversee their curriculum and service model.

### Business Support and Wraparound Services

When business support services are combined with workforce development and incubation, social equity initiatives can empower a diverse and skilled workforce and promote a flourishing industry. Traditionally, individuals who qualify for social equity status have had less access to capital and, as a result, fewer opportunities to receive technical business education through traditional business education pipelines. By providing professional training and technical assistance to first time operators, state-supported business services can bridge this gap. Financial literacy programs, management and sales training, accounting, and other support services would be essential for not only applicants, but to individuals aspiring to management and executive-level positions as well.

The Office continues to collaborate with government and academic partners to provide cannabis-specific business services by leveraging existing infrastructure.  This includes the New York City Department of Small Business Services for entrepreneurial development and community colleges for business curriculum. By expanding on existing services, the Office can reach more people in less time.

There are several business support services that already exist in New York which could serve as foundational infrastructure for future cannabis specific business service training. For example, there are 22 not-for-profit Entrepreneurship Assistance Centers (EACs) across the state.[37] These centers offer programs that assist new and aspiring entrepreneurs in nurturing basic business development and management skills through instruction, training, one-on-one counseling, technical assistance and support services to individuals who have recently started their own business or are interested in starting a business, and to strengthen the operation of these firms during the first few years of development. These centers also offer assistance for businesses applying to become a certified minority or women owned business.

### New York State Incubator Program

Cannabis business incubation encompasses a variety of services designed to advance opportunity across the broadest spectrum of social equity applicants and licensees. A well-designed incubator program offers a continuum of entry points into the industry, spanning the entire supply chain with services tailored to meet an entrepreneur where they are in the business formation process.

[37] Entrepreneurship Assistance Centers | Empire State Development. (2019, May 2). Esd.ny.gov. https://esd.ny.gov/entrepreneurship-assistance-centers

NY CANNABIS PROGRAMS

By providing access to technical expertise, guidance, and support, incubators have the potential to not only promote innovation in the cannabis industry, but also stimulate sustainable business development in local communities. Moreover, by leveraging shared resources and collaborating closely with local governments, they can contribute to hyperlocal job creation, economic mobility, and instill greater sense of pride by unlocking a community's unseen entrepreneurial talents.

As described previously, the Office has taken initial steps to accelerate and incubate cannabis businesses through the CCTM and CAURD Accelerator programs, but these initiatives are just the beginning of efforts to deliver a comprehensive and scalable incubation program for the entire state. To meet the needs of all the state's incubator cohorts, the program must be able to assist businesses at varying stages of development and work for each unique type of cannabis supply chain license.

Empire State Development has designated ten Innovation Hot Spots, one for each of New York's economic development regions, as well as twenty Certified Business Incubators.[38] These types of intensive training services are traditionally provided to small businesses. To ensure the success of a robust social equity initiative in New York, it will be essential to develop additional investment strategies, models, and graduated formulas to support cannabis businesses post-launch.

The Office has begun the work of developing the NYSEE Incubator program. A primary function of the NYSEE incubator program will be to develop and foster support mechanisms and linkages between the Office, incubator participants, and external stakeholders including local educational institutions, foundations, investors, and local business leaders. Acting as a central hub for organizing and managing a broad range of local stakeholders, the incubator can catalyze hyperlocal market innovations and collaborations. The NYSEE incubator may also facilitate the identification and testing of new models for community-based small business development that incorporate the values of distinct communities across the state.

Cannabis startups will require a comprehensive range of training and mentoring services from the application and ideation phase through development, launch and into the first few years of operation. The inclusion of direct financial support in the form of grants, loans, and private equity investment may enhance these initiatives. Incubation during a business's development phase will help refine the enterprise concept, and supportive financing during the first years of operation will provide stability and reduce risk in the eyes of investors.

Additionally, a community-integrated incubator model could deter the problematic or predatory conduct of conventional, investor-driven business incubation. An incubation model tailored to the goals of the New York cannabis market will feature sustainable economic models around small business ownership, such as cooperatives, worker-ownership, community crowdfunding, collective marketing initiatives, and other hyperlocal business development initiatives.

NY CANNABIS PROGRAMS

[38] Regional Economic Development Councils. (2022). REDC Round 12 Programs [Review of REDC Round 12 Programs]. https://regionalcouncils.ny.gov/sites/default/files/2022-11/REDC_Round_12_Award_Booklet.pdf

## *Brick and Mortar Facilities*

Given the cultural and geographic diversity of New York, the Office has committed to the development of physical incubation facilities that will provide visibility, accessibility, and engagement with the host community. The vision is a model for a community-based business hub that provides customized assistance to incubator participants as well as programming, facilities, and services that benefit the host community.

The following are the essential design elements.

- State-of-the-art facilities, which can include farm sites, greenhouses, and indoor facilities for cannabis cultivation, enabling the highest quality production using an extensive array of innovative production techniques (Indoor, Indoor using living soil and innovative lighting technologies, regenerative outdoor production at scale, and mixed light greenhouse production).
- Good Manufacturing Practices (GMP)-certified R&D test kitchen and small to medium scale production facilities for edible and infused cannabis products. The infrastructure's potential could be maximized if the facilities could also be used by non-cannabis food and beverage businesses.
- Small scale extraction and production equipment that is GMP-certified for a wide range of products, such as cannabis extracts, handcrafted products such as hash, pre-rolled products, vapes, rosin, resin, etc.
- Classrooms featuring educational resources, community access points that include spaces for community gatherings, wellness events, and celebrations.
- Additional space for community activities, such as Pitch Events, Internal and External Networking Events, and future Community Roundtables.
- Curriculums and standard operating procedures (SOPs) detailing regenerative agricultural practices and sustainable cannabis production methods such as closed loop systems that can reduce reliance on external inputs, drive operational efficiencies, increase profits and end-product quality.



# Regional Economic Development

Developing a prosperous cannabis industry in New York requires recognizing and adapting to the unique characteristics of each region of the State. Government interventions that adopt a strategic, coordinated approach to the development of a new legal cannabis market will be better positioned to compete nationally and generate value in support of a dynamic, sustainable economy.

Sustained, multisector regional partnerships make economic transformation possible. The development of New York's legal market must be consistent with regional long-term economic development plans, consider local realities and make use of existing infrastructure and overlapping development initiatives.

There are ten regional economic development councils (REDCs) in the State of New York. Each region boasts unique geographical, social, and industrial assets that embody the makeup of the state. Since its inception in 2011, the REDC Initiative has awarded over $7.5 billion to more than 9,200 projects across the state through a competitive process to spur job creation based on regional priorities.[39] Further enhancing the state's downtown areas as well as smaller town and hamlet centers is made possible through the Downtown Revitalization Initiative (DRI) and the NY Forward Program.[40] Community planning and state funding combine to provide each focused area the tools necessary to modernize and optimize their downtown areas.

As New York recovers from the COVID-19 pandemic, a reinvestment in a skilled workforce, enhanced wraparound services, and a focus on sustainable practices are essential. The cannabis industry will follow suit. Traditional public sector services supporting business and commerce at the local level can be of assistance to cannabis businesses if they are informed of cannabis-specific challenges and modified accordingly.

The Office consulted with regional leaders and reviewed the annual reports of each REDC to determine regional strengths, weaknesses, and potential for growth. It will be essential to align tradable industries with their respective cannabis license type and business model, given that New York's legal market will reach every corner of the state.

Agriculture, tourism, advanced manufacturing, brownfield revitalization, and warehouse and distribution were identified as top priorities across the state. However, each region recognizes that workforce development, wraparound services, education, and economic and social equity are essential for economic growth in these sectors. Meaningful economic development initiatives necessitate substantial and long-term government and private sector investments.

Effective economic development strategies draw on clustering strategies to concentrate related resources, institutions, businesses in a specific field. To successfully integrate these industries into New York's new cannabis market, a timely and adequate commitment to workforce development, wraparound services, education, sustainability, and equity policy will be essential.

## Agriculture & Agribusiness
*Related licenses: Cultivator, nursery, processor, microbusiness, cooperative, hemp*

Agriculture is one of the most important commercial sectors in New York State. Nearly 23% of the state's land area is utilized by approximately 36,000 farms producing a variety of goods, including cannabis.However, only 1.3% of New York's agricultural producers identify as BIPOC.[41] Through the implementation of cannabis cultivation for adult use, cannabis agribusiness will seek to increase this proportion by a measurable amount. Important components of this initiative will include access to land, capital, grant programs, and best management practices.

In regions with extensive rural land, such as Western New York, the Southern Tier, the North Country, and the Finger Lakes, policies may allow farming families and communities to retain their land and achieve greater financial stability. Under the guidance of sustainable practices such as organic, regenerative, and integrated pest management, they may apply for cannabis cultivator, nursery, microbusiness, or cooperative licenses. Due to its vast agricultural terrain and proximity to Cornell University, a global leader in agricultural education, the Southern Tier has the potential to become a cannabis agricultural training center.

Shared goals of environmental resilience, sustainability, and accessibility have all contributed to an increase in the popularity of urban farming. Community gardens, green roofs, vertical farming, and aquaponics have all demonstrated their economic viability. Urban cannabis cultivation in New York's major cities can provide previously underserved areas with jobs, training opportunities, upskilling, and economic vitality. The benefits of urban agriculture and community gardens include food sovereignty, personal development, education, and environmental stewardship.[42]

Value-added agriculture refers to the process of increasing the value of primary agricultural commodities through manufacturing and/or production. Due to its emphasis on localized, small-scale production of high-quality goods, this method has gained popularity in recent years. As the legal market matures, value-added cannabis products may develop as exclusive to certain regions of New York State.

## Tourism
*Related licenses: Retail dispensary, on-site consumption, delivery, cultivator, microbusiness, cooperative, processor (brand)*

New York's adult-use cannabis market expansion strategically complements the state tourisms natural, historic, and cultural assets.  Historic sites, unique landmarks, diverse urban centers, sporting events, natural wonders, and beautiful landscapes are found throughout New York State.

Adult-use cannabis will have a significant impact on tourism and spending in the region via on-site consumption sites, like craft breweries and wineries in the region. These small business archetypes correspond to the Mid-Hudson regions and the state of New York's shifting emphasis on value-added industries. Small farm incomes and economic viability have grown in recent years as a result of agritourism and value-added agricultural product sector. Cannabis-related agritourism has already proven to be a profitable industry in other legal markets.

[41] Diversity and Racial Equity Working Group Report. (2021). https://agriculture.ny.gov/system/files/documents/2021/08/diversityracialequityreport_1.pdf
[42] Community Gardens Task Force 2023 Report. (2023). https://agriculture.ny.gov/system/files/documents/2023/02/communitygardenstaskforcereport.pdf

NY CANNABIS PROGRAMS

Cannabis is projected to drive agritourism in multiple regions of the state. **Craft cannabis varietals grown in New York's wide ranging fertile soil will build regional identifiers and foster interregional competition that will drive product diversification and overall quality.** Like California's Emerald Cup and Oregon's Grower's Cup, statewide cannabis cups are likely to launch and provide further opportunities in events, marketing and planning.

### The Role of New York City
*Related licenses: Retail dispensary, on-site consumption, delivery, microbusiness, processor (brand)*

New York City is ideal for small batch, craft, and social equity cannabis businesses due to its sophisticated consumers, diverse internal market potential, and robust tourism industry. The city's reputation as a global shopping destination will boost entrepreneurship, product innovation, and market growth.

Tourism is a significant economic contributor to New York City, accounting for 7.2% of private sector employment and 4.5% of private sector wages. Tourists spent $52 billion on lodging, food, drink, recreation, retail, local transportation, and air travel in 2021. In 2025, 70 million tourists will visit New York City.[43] Commuters and tourists provide cannabis businesses with a distinct audience that can expand their brand's visibility and reputation beyond the city limits.

Diversity and multiculturalism are key drivers of innovation and economic performance in New York City. Empirical results are clear that the increased size of cities and their diversity are strongly associated with increased output, productivity, and growth. As one of the most ethnically diverse cities in the United States, it has one of the highest percentages of foreign-born residents, resulting in a vast array of knowledge and opportunities for combining existing knowledge. Immigrant and multiethnic business owners can expand markets and contribute to the development of cannabis processes and the commercialization of novel innovations.

Additionally, the success and global impact of the city's cannabis market and innovation ecosystem will be directly attributable to the skill and diversity of its residents. Through diasporic networks, immigrant and multicultural business owners can drive additional upstream and downstream markets, aiding in the innovation and commercialization of new cannabis products.

### Advanced Manufacturing
*Related license: Processor, microbusiness, cooperative*

Advanced manufacturing is one of New York State's most in-demand industries, generating cutting-edge technology to enhance products and procedures. As the regulated cannabis market in other states has matured, an increasing number of consumers have sought out products requiring more complex manufacturing or processing.

Cannabis processing refers to the extraction, compounding, infusion, manufacturing, preparation, holding, storing, packaging, and labeling of cannabis products.[44] Standard procedures in cultivation, processing, extraction, infusion, packaging, warehousing, and distribution of cannabis are optimized and modernized within this sector. In addition, there are significant opportunities for innovation with industrial hemp including food, biofuels, building materials, bioplastics, clothing, and packaging. New York is well positioned to lead innovation in the emerging hemp sector.

[43] Empire State Development. (2021). Esd.ny.gov. https://esd.ny.gov/sites/default/files/Economic-Impact-of-Visitors-in-New%20York-2021-Central-New-York.pdf
[44] California. D. of C. C.-S. of. (n.d.). Manufacturing. Department of Cannabis Control. https://cannabis.ca.gov/licensees/manufacturing/

NY CANNABIS PROGRAMS

As this sector is a key driver of many regional economies, there is a need for a trained and upskilled workforce in advanced manufacturing. The current workforce faces impending retirement cliffs and hiring gaps due to training, education, and experience. Given the need for low- and middle-skilled labor, advanced manufacturing is viewed as a driver of workforce development.

### Brownfield Revitalization
*Related license: hemp*

A brownfield site is any real property where a contaminant is present at levels exceeding soil safety limits,[45] or other health-based or environmental standards adopted by the NYS Department of Environmental Conservation.[46]

The cannabis sativa plant can play a key role in the environmental revitalization of brownfields across New York State via phytoremediation. Phytoremediation is a cost-efficient plant-based remediation approach that utilizes the plant's ability to absorb harmful metals, forever chemicals, and other contaminants from the land and air.[47] Planted hemp can remove toxins deep within the soil of certain designated brownfield sites.[48]

**While communities across New York have experienced health consequences of environmental contamination, areas with high concentrations of brownfield sites stand to benefit the most from the use of hemp, both for remediation as well as the expanded development opportunities that revitalization of a site allows.**

New York City has more than 7,000 properties subject to mandatory environmental study and management. It is estimated that 40% of these properties are chronically vacant and/or contaminated.[49] These sites have left a devastating impact on adjacent property values, public and environmental health, safety, and aesthetics. The use of green plants such as cannabis will eliminate blight and stabilize contaminated soil, air and groundwater and allow for redevelopment on once undesirable plots of land.

### Warehouse & Distribution Logistics
*Related licenses: cultivator, nursery, processor, distributor*

Distribution will play a crucial role in the rollout of adult-use cannabis in New York State. It is one of the most complex and capital-intensive cannabis supply chain services. In many regions of the state, warehousing is one of the most in-demand services and will be essential to providing consumers with a wide range of products, both plant touching and non-plant touching. Western New York, Southern Tier, Mohawk Valley, Long Island, and the Capital Region will likely serve as the primary distribution and storage hubs for cannabis products. Along New York's major highways, including I-90, I-87, and I-88, there is room for strategic expansion of warehouses and storage units.

[45] US EPA, O. (2019, June 26). Brownfields and Public Health. US EPA. https://www.epa.gov/brownfields/brownfields-and-public-health
[46] Environmental Cleanup & Brownfields - NYS Dept. of Environmental Conservation. (n.d.). www.dec.ny.gov. Retrieved May 1, 2023, from https://www.dec.ny.gov/chemical/brownfields.html#:~:text=A%20brownfield%20site%20is%20any%20real%20property%20where
[47] Yan, A., Wang, Y., Tan, S. N., Yusof, M. L. M., Ghosh, S., & Chen, Z. (2020, April 30). Phytoremediation: A Promising Approach for Revegetation of Heavy Metal-Polluted Land [Review of Phytoremediation: A Promising Approach for Revegetation of Heavy Metal-Polluted Land]. https://www.frontiersin.org/articles/10.3389/fpls.2020.00359/full
[48] Placido, D. F., & Lee, C. C. (2022). Potential of Industrial Hemp for Phytoremediation of Heavy Metals. Plants, 11(5), 595. https://doi.org/10.3390/plants11050595
[49] Brownfields - Mayor's Office of Sustainability. (2023). www.nyc.gov. Retrieved May 1, 2023, from https://www.nyc.gov/site/sustainability/initiatives/brownfields.page#:~:text=New%20York%20City%20has%20over%203%2C000%20vacant%20commercial

As New York's adult-use product selection grows, **warehouse and distribution services will affect nearly every license type.** Cultivators need storage between harvesting, curing, and shipping to retailers and processors. A climate-controlled cannabis unit must monitor temperature, humidity, sunlight, and oxygen. Improper cannabis product storage can cause the development of mold and degradation of cannabinoids and terpenes. New York will continue to invest in specialized, sustainable warehousing because adult-use and medical licensees require a clean, secure place to store inventory and processors need space for raw ingredients and equipment.

Distributors, B2B delivery facilitators, and storage facilities must invest in robust security systems throughout the cannabis supply chain to safely transport cash as banking restrictions persist. To reduce inefficiencies and meet the Office's sustainability goals, cannabis delivery and distribution services must optimize truck delivery routes.

NY CANNABIS PROGRAMS

IV.
# SUMMARY RECOMMENDATIONS



The following recommendations are submitted by the Chief Equity Officer to the Board and to the Office.  They provide a roadmap for the development of a legal cannabis market founded on the principles of shared prosperity, small business access, workforce equity, local community development, consumer satisfaction, and uplifting those most harmed under prohibition.



SUMMARY RECOMMENDATIONS

# Market Architecture

### *Protect New York's Two-tiered Market*

The Cannabis Law divides the market into two tiers: supply—consisting of cultivation, processing, and distribution; and retail—consisting of retail dispensaries, on-site consumption lounges, and delivery licensees. This division is based on a prohibition on operators in one tier having a direct or indirect stake in another. This system, modeled after the alcohol industry, allows small, independent businesses to enter the cannabis market and compete with larger, more established companies.

In practice, an independent, autonomous retail tier and robust antitrust provisions will provide NYSEE businesses and brands a level playing field for gaining market share and building long-term value. While the Cannabis Law sets the framework for a tiered supply chain, the regulations significantly clarify the limitations on crossing tiers in order to promote competition, protect against undue influence, and prevent market concentration. A competitive market will also provide consumers with more options, better service, and lower prices, as well as fairer opportunities for small businesses and entrepreneurs to compete.

Although the objective of the tiered market is to reduce the trend of corporate consolidation and boost competition, it does not guarantee that monopolization will not occur.[50] It must be supported with ongoing monitoring and enforcement to ensure that the market remains competitive. In 2022, Rebecca Kelly Slaughter, then-Commissioner of the Federal Trade Commission (FTC), made the case that enforcement agencies should view antitrust laws as "a tool for combating structural racism" by prioritizing competition enforcement in highly concentrated industries where people of color are underrepresented. Slaughter argues that when employing antitrust tools, agencies such as the FTC may choose to reinforce or deconstruct racial biases.[51]

**In practice, antitrust law is intended to help mitigate harm caused by anti-competitive conduct.**

To date, early operators with access to capital, capable of sustaining significant losses in order to gain long-term market power, have become increasingly dominant across the legal cannabis industry. This creates a feedback loop that strengthens their ability to corner newer markets, stifle competitive pressures, and limit the impact of social equity initiatives. It has also driven states to intentionally construct their regulatory framework to ensure the concentration of corporate and private power and disable democratic participation in the cannabis economy.

In a fair and competitive market, greater efficiency and equity go hand in hand. Market concentration and vested interests will make New York's nascent industry less dynamic and less capable to achieve the State's broader equity goals.  A foundation of inclusion over incumbency will ensure New York develops a dynamic, innovative and equitable cannabis market.

[50] Title, Shaleen, Bigger is Not Better: Preventing Monopolies in the National Cannabis Market (January 26, 2022). Ohio State Legal Studies Research Paper No. 678, Drug Enforcement and Policy Center, 2022
[51] "Antitrust at a Precipice". Remarks of Commissioner Rebecca Kelly Slaughter. As Prepared for Delivery GCR interactive: Women in Antitrust November 17, 2020

The participation and success of NYSEE licensees requires a competitive landscape in which both small businesses and multistate operators can flourish. Antitrust law is indispensable to ensuring a level playing field, protecting consumers from price discrimination, and several other critical economic safeguards. In any economic system built on legacy social constructs that favor incumbents, antitrust laws play a critical role in ensuring a level playing field for all market participants. The Office and the Board must commit themselves to the development and adoption of pragmatic antitrust regulations that can reduce barriers to entry, promote a rich diversity of ownership, and improve market access for smaller, independent entities.

The Office's efforts to promote competition and prevent monopolization must center on what New York's communities and consumers want. The Cannabis Law's ambitious social and economic equity goals can only be realized with the successful implementation and protection of the two-tier system.

### *Maintain Proactive Enforcement and Oversight of Ownership Rules*

The True Party of Interest (TPI) framework is designed to protect the integrity of the two-tier cannabis market and establish procedures for monitoring and enforcing the vertical and horizontal ownership restrictions. TPI identifies persons and entities with a direct or indirect stake in a license. Establishing effective procedures for tracking and confirming compliance with the cannabis law's ownership restrictions is an essential component of building an equitable, level playing field.

This work entails requiring licensees to provide periodic reports on ownership arrangements, management-service agreements, and vendor contracts, as well as conducting regular compliance inspections and financial audits. In recognition of the numerous ways in which multi-level ownership structures have been deployed to establish "social equity in name only" in other jurisdictions, TPI includes in the license every individual who appears on the ownership structure at each level of ownership.

Ensuring compliance with TPI requirements is necessary for safeguarding the independence and autonomy of NYSEE licensees. The adult-use regulations empower the Office to take various actions, such as suspending, canceling, or revoking a license, debarring a person from licensure, and denying license renewal or changes, when a licensee or its true parties of interest fail to comply with ownership or interest rules, whether directly or indirectly.

> " **A woman-owned business is fully owned and operated by women, not fronted by men.** "
>
> – New York, NY

SUMMARY RECOMMENDATIONS

## *Strengthen Protections Against Predatory Practices*

Across the legal landscape, social equity applicants and licensees frequently form partnerships with investors and businesses and formalize multilevel ownership structures through complex operating agreements. These are often referred to as management service agreements (MSAs). It has become more prevalent for such arrangements to conceal the true ownership or control of a licensed entity.

NYSEE applicants are required by New York's regulations to demonstrate "sole control" by NYSEE-qualifying individuals or groups, i.e., that they exercise authority over the business and have a significant influence on day-to-day decisions. It is prohibited for anyone other than the NYSEE applicant to control a majority of voting rights or retain the authority to remove the applicant. This measure is intended to protect applicants and licensees from predatory arrangements and to guarantee that they have the necessary autonomy over their businesses. Through its TPI and undue influence regulatory frameworks, New York prevents the most common predatory practices seen in MSAs and goods and services agreements.

In New York, MSA providers are considered to have some control over the licensee with whom they have entered into an agreement and are therefore considered to be a TPI. In some instances, social equity licensees may choose to partner with more seasoned service providers via goods and services agreements in order to put their licenses into operation. However, information asymmetries between sophisticated entities and new social equity market entrants often lead to predatory contractual arrangements.

Even beyond MSAs, improper contractual arrangements can impose liability, taxation, and insurance obligations on social equity license holders, in addition to unfavorable distribution terms. Certain goods and services agreements, for instance, may stipulate that a significant portion of a social equity retailer's "shelf space" be reserved for products from the management services contractor or another designated entity, potentially limiting the availability of the social equity licensee's own products or the visibility of more in-demand brands. Such arrangements can be detrimental to social equity licensees' market competitiveness and their long-term viability.

To address this issue, the Office requires all licensees to disclose any material changes to the information provided at licensure, including certain goods and services agreements or contracts with contractors who provide administrative, operational, financial, advisory, real property, and/or consulting services for compensation. Additionally, licensees are required to provide a list of all contract parties. The Office's regulations should prohibit agreements for goods and services that are excessively extractive or predatory, or that promote undue influence between licensing tiers. Combined, ownership and disclosure requirements aim to protect NYSEE market participants from exploitation and increase transparency.

### Promote Responsible Data Ownership and Use

Digital platforms offer cost savings, and a larger consumer base and tracking data can assist small cannabis retailers in making better business decisions. However, when these platforms retain exclusive rights to operators' data or deploy "Pay to Play" advertising and sponsorship schemes that favor large brands, they can be detrimental to small businesses and inhibit fair competition. This challenge parallels the food and beverage industry. In the case of restaurants, third-party digital platforms can leverage an establishment's consumer data to scale their own business, transforming restaurants into fulfillment centers for online orders. Such practices can result in digital monopolies and impede fair market competition, especially when it comes to the onset of an emerging industry, such as cannabis.

The Office can prohibit default data usage agreements and service "bundling" agreements to address these concerns. Such restrictions can limit the market power of third-party platforms, fostering a more dynamic digital marketplace for consumer-accessible brands and products. In addition, the Office can establish safeguards regarding the monetization of consumer data in order to prevent larger, well-capitalized operators from circumventing undue influence protections on retailers.

### Pace Licensing Roll-Out to Ensure Market Stability

The stability of the New York cannabis market is crucial to the success of NYSEE licensees, who frequently lack the financial resources to withstand the typical market volatility of new legal markets. The Board and the Office can support market stability along the entire supply chain in several ways.

First, the Board must carefully consider the rate at which cultivation and retail licenses are issued due to their outsized impact on wholesale prices, product availability, and the growth of the market. Second, in order to create a fair and equitable cannabis market, it is essential to avoid artificial restrictions on licenses or "caps" that can impede broad social equity and SME market participation. Less restrictive licensing frameworks enable more businesses to enter the market, thereby increasing competition, product innovation, and consumer satisfaction.

Accordingly, the Office should assess and recommend licensing windows to the Board based on the ratio of total licensed canopy square footage to the total available retail shelf space. To ensure the largest number of market participants, the Board should prioritize the issuance of cultivation licenses for lower canopy tiers. Those cultivators who prove most adept at delivering a consistent, high-quality product, while utilizing most of their allotted canopy, will have opportunities to expand to higher canopy tiers. Thus, the cultivation sector grows sustainably over time, and an operator's ability to scale is determined by their ability to meet the needs of New York consumers at scale.

 **Larger companies can wait out any dips in the market. Smaller companies without capital can't do that.** 

– New York, NY

A measured roll-out of New York's market will be a key differentiator for New York from other legal states. By adopting a methodical approach to licensing, the Office could better guard against market crashes due to oversupply, distressed asset purchases and wholesale price volatility while delivering the highest-quality products at competitive prices.

### Safeguard Cannabis Workers from Monopsony Power

Antitrust cases typically focus on sellers in product markets, but comparable issues also arise in labor markets, where companies with market power can leverage their bargaining position to their advantage as labor purchasers. Employers may be hesitant, for example, to offer competitive wages or benefits in a labor market where there are few employers. In such markets, collusion can also be easier, allowing a handful of actors to manipulate prices or wages at the expense of competitors.

This problem is common across the cannabis industry and especially pronounced in economically distressed rural communities where a small number of employers may dominate the labor market.[52] In regions with low labor market power, even a small increase in the unemployment rate leads to a significant decline in wage growth.[53] To combat this challenge and maintain a more equitable relationship between cannabis businesses and their workers, solutions can be derived from two broad policy categories: pro-competition and pro-worker policies.

The Office is already focused on creating a competitive marketplace. Pro-worker policies can facilitate interactions between employers and employees that are more equitable. The Cannabis Law mandates licensees to enter into a "labor peace agreement", allowing unions to organize all licensed business employees without interference. Medical cannabis workers in New York benefit from regionally competitive wages and job security, thanks in large part to effective union representation. The Office should establish minimum standards for labor peace agreements to ensure that licensees are prepared to be organized when workers or a bonafide labor union decide to organize.

### Social & Economic Equity Assessment Tool

The experiences of legal states demonstrate that even minor regulatory amendments and modifications can have long-lasting, destabilizing effects on the development of legal markets. To prevent this, the Office should create and execute a comprehensive social and economic equity assessment tool to determine the impact of any new or revised cannabis regulations, guidance, or rulemaking. This proactive approach is crucial for preserving the social and economic equity goals of the Cannabis Law and sustaining a prosperous cannabis market over the long term.

[52] Burya, A., Mano, R. C., Timmer, Y., & Weber, A. (2022, September 19). Dominant Employers May Add to Unemployment in Rural US as Fed Raises Rates [Review of Dominant Employers May Add to Unemployment in Rural US as Fed Raises Rates]. IMF Blog. https://www.imf.org/en/Blogs/Articles/2022/09/16/dominant-employers-may-add-to-unemployment-in-rural-us-as-fed-raises-rates
[53] Burya, A., Mano, R. C., Timmer, Y., & Weber, A. (2022, September 19). Dominant Employers May Add to Unemployment in Rural US as Fed Raises Rates [Review of Dominant Employers May Add to Unemployment in Rural US as Fed Raises Rates]. IMF Blog. https://www.imf.org/en/Blogs/Articles/2022/09/16/dominant-employers-may-add-to-unemployment-in-rural-us-as-fed-raises-rates

## Market Architecture Performance Measurements

The best method for evaluating the success of New York's market architecture is to develop and measure competition, accessibility, and the presence of monopoly power. The Office should continually evaluate these criteria to determine if regulatory adjustments are needed. Evaluation criteria shall be broken down according to race, ethnicity, gender, and geographic identifiers, and shall include the following:

**Market Concentration:** Analyze the market share percentages of the largest licensed companies for across tiers, licenses and a range of product segments, such as flower and concentrates, among others. National market concentration measurement would be challenging, but inventory tracking and sales data can be used to perform this analysis at the state level.

**Market Growth:** Monitoring the rate of growth for any emerging industry is critical to ensuring that they operate within legal and ethical boundaries, protect consumers from harm, and promote fair competition, thereby fostering innovation and sustainable economic growth.

**Diversity of Ownership:** Compile, analyze and publish compressive data sets capturing cannabis license ownership, including partial participation, tracked by race, ethnicity, gender, sexual orientation and disability. The incorporation of license ownership classifications (NYSEE, non-NYSEE, microbusiness, delivery, etc.) and the proportion of revenue claimed by each category.

**Geographic Distribution:** Track geographic location of retail dispensaries, manufacturing facilities, and cultivation facilities to identify gaps in access, overconcentration, and any other issues early. Analyze rates of NYSEE participation through a regional lens to ensure equitable outcomes are evenly distributed across the state.

**Pricing Patterns:** Aggregate and analyze pricing patterns to determine whether evidence of below-cost predatory pricing or price fixing warrants further investigation and, if necessary, enforcement. In other cannabis markets, as well as many other industries, corporations set their prices too low to eliminate competition and increase prices in the future.

**Barriers to Entry:** Examining application and licensing statistics to determine if high barriers to entry limit competition, thereby suggesting that regulatory changes be considered. In addition to examining quantitative application and licensing data, the analysis could include qualitative feedback, such as interviews with applicants who abandoned their applications.

Even though some are outside the scope of Office regulations, licensing requirements, zoning restrictions, capital requirements and funding access, and regulatory compliance may all be relevant obstacles. For licensed retailers, the availability of product and any supply chain constraints could also be analyzed as an entry barrier.

SUMMARY RECOMMENDATIONS

# Access and Business Viability

Accessibility is essential to ensuring equitable outcomes in any emerging industry, as it shapes the depth of participation, investment, and the distribution of economic benefits. If it is difficult to enter a market due to high barriers to entry or limited opportunities, this may discourage investment and reduce the market's overall growth potential. In contrast, if the market is accessible and presents favorable conditions, it is more likely to attract investment and achieve sustainable growth over time, thereby enhancing the probability of success and an equitable distribution of economic opportunity.

The following recommendations aim to promote access and diverse participation in cannabis business ownership across the state. This strategy is built on top of a foundation of access-driven licensing, two-tiered market structure, and an emphasis on promoting small craft businesses that will enable a greater variety of voices and collective creativity.

The equitable distribution of market power, the maintenance of open markets, and the protection of NYSEE licensees and New York consumers against anti-competitive environments are central tenets of the proposed framework and initiatives.

### *Reduce Barriers to Entry and Clear the Pathway to Licensure*

Achieving equity requires developing bold targeted strategies that eliminate barriers and expand opportunities. To encourage the participation of as many NYSEE applicants as possible, the Board and Office must maintain low application fees. Typically, state-specific, non-refundable application fees range between $1,000 and $25,000 to cover the initial regulatory costs associated with application evaluation. These non-refundable fees often pose a significant barrier to entry for applicants seeking social and economic equity.

> **" If you want to give someone something, you just give it to them. If there are all these hoops to jump though – is that restoration? "**
>
> **- Albany, NY**

First, the Office can reduce such barriers by providing qualified NYSEE applicants with substantial discounts on application and licensing fees, but more can be done.

Second, the Board and the Office should make provisional licensing available to NYSEE applicants and licensees and provide them sufficient time to be operationalized. A provisional licensing system can facilitate market access broadly by affording applicants the documentation to support any fundraising efforts and secure real estate.

SUMMARY RECOMMENDATIONS

58

Third, the Board and the Office must also be aware of additional costs that an application can generate. In some legal states, applicants are evaluated based on variables such as the quality of their proposed standard operating procedures, technical documents, financial plans, or personnel experience. These requirements are cost-prohibitive and should only be required when necessary. The applicants that can afford to pay third-party consultants to produce top-scoring documents without incoming revenue receive an unfair advantage over applicants who cannot. As a result, the licensing process may become inherently biased in favor of applicants with greater financial resources, creating inequitable outcome for other applicants.

Lastly, the Board and Office cannot provide all the assistance NYSEE applicants may require completing their applications. The Office should collaborate with community organizations and small business centers throughout the state to assist NYSEE-eligible applicants. The application process can be intimidating for aspiring entrepreneurs, particularly legacy operators who may be hesitant to transition into the legal industry. The Office should collaborate with existing regional support centers to provide applicants with the resources, documentation, and guidance needed to determine NYSEE status and navigate the application process to diversify the pipeline of market participants.

### Long-Term Value Creation

The greatest opportunity for long-term value creation in New York's cannabis market will come from brands, innovative consumer experiences, and distinct regional and cultural characteristics of a particular product or market. Cannabis brands generate long-term value through a variety of factors, including product differentiation, digital marketing, word of mouth, strategy, customer reviews, and the regulatory environment of the states in which they operate.

The likelihood of robust growth and market expansion beyond New York increases for cannabis brands that can build consumer loyalty and deliver high-quality products consistently. The Office and Board should work to support broad access and specialization in consumer-facing businesses to ensure that New York culture is authentically expressed in the legal market.

While financial capital is the most important form of capital in the cannabis industry, it is not the only type that can generate profits for businesses. Physical, human, industrial, social, and cultural capital can all be used to scale brands, grows, on-site consumption lounges, or retail stores. In the interest of a level playing field, the Office can develop policies and programs designed to help NYSEE operators in leveraging nonfinancial assets, such as cultural and social capital.[54]

In practice, cultural capital can provide businesses with a deeper understanding of the needs of a particular consumer market or community, which can inform marketing strategies and product development. This cultural insight should not only help NYSEE entrepreneurs connect more effectively with consumers, but it can also inform the development of distinctive New York cannabis brands and businesses that will elevate the state's legal market.

---

[54] Cultural capital refers to the various assets derived from a group's or an individual's cultural heritage and shared experiences. Social capital refers to the network of relationships people, groups and entities create, and which they rely on and use when they have a need.



## We need to utilize the stakeholders in our community that are organized to make these ideas a reality.



**– Syracuse, NY**

NYSEE licensees may also scale their businesses by leveraging social capital. Strong social networks can provide access to valuable resources and information, such as customers, suppliers, and funding for minority-owned small businesses. This can facilitate the development of credibility and trust among customers, investors, and other stakeholders, allowing for the formation of partnerships, the generation of sales, and the expansion of operations. In addition, social capital can foster a supportive community for NYSEE licensees, giving their owners a sense of belonging and the ability to overcome obstacles.

The Office should develop a variety of programs, policies and enabling regulations geared toward helping NYSEE entrepreneurs strengthen their networks, establish trust, and communicate their cultural credibility to consumers and their local communities.

### Support Collaborative and Collective Marketing Initiatives

The Board and the Office should advance policies that allow for the cultivation of such nonfinancial capital by NYSEE businesses. Collective marketing strategies, for example, are a great tool for empowering small businesses. Farmers regularly utilize collective marketing and have discovered that collaborating with other farmers to market their products, purchase their inputs, and coordinate their production techniques can increase their revenue and efficiency. A NYSEE certifying label for use by NYSEE businesses on packaging, storefronts, and marketing materials would allow for NYSEE businesses to be recognized by the consumer and take the place of a greater need for more substantial spends on marketing services.

The following collective marketing activities would be important contributors to the success of small, regional cannabis cultivators:

- Agreeing to cultivate the same cannabis strain to ensure uniform quality.
- Collaborating to improve quality in order to meet the demands of a specific market.
- Standardizing the weight and packaging of cannabis products may attract a higher price point.
- Group negotiations with distributors for the sale of greater quantities of goods can greatly increase the sale price.



**NYSEE label will be made available to certified licensees for the use on packaging, storefronts, and any other marketing materials. The office will release additional information authorizing the use of the label.**

The Office may draw on best practices learned from the Department of Agriculture and Markets' (AGM) "New York State Grown & Certified" Program where participating agricultural businesses receive a seal on their local, value-added products to indicate that goods have been inspected for commodity-specific safe food handling and environmental stewardship practices. AGM also informs consumers where they can purchase NYS Grown & Certified goods and promotes participating producers on its platforms.[55]

Coinciding with AGM's NYS Grown & Certified Program, the Taste NY Program highlights the quality, diversity, and economic impact of food and beverages grown, produced, or processed in New York State.[56] These partnering programs uplift fresh and local food, drinks and value-added products and appeal to New Yorkers and tourists alike. A special NYSEE label would not only inform consumers about quality, sustainably grown products but also that the company is a verified New York state product of the highest quality.

The Office can also support the establishment of cannabis farmers markets for microbusiness licensees across the state to promote community and small business empowerment as well as boost locally grown sales and brand recognition. There are currently 400 farmers markets, 250 farm stands, and 10 mobile markets under the supervision of the Department of Agriculture and Markets. AGM's Farmers Market Nutrition Program provides a live marketplace for farmers to sell their New York-grown products, thereby stimulating local economies and providing consumers with healthy, locally grown food. Following the same path as traditional farmers markets, cannabis farmers markets can connect microbusinesses with customers within and beyond their local community.

[55] Become a New York State Grown & Certified Producer. (n.d.). Certified.ny.gov. https://certified.ny.gov/
[56] Taste NY Homepage. (2013). Taste NY. https://taste.ny.gov/

SUMMARY RECOMMENDATIONS

The Office should continue to explore other programs and policies to assist NYSEE entrepreneurs in strengthening their networks, establishing trust, and communicating their cultural credibility within their respective communities. The Office should also simultaneously develop resources for NYSEE licensees seeking to protect and preserve the value of creative production through trademarks, copyrights, and equitable licensing terms. The protection of the New York cannabis market and the names of prospective New York-based appellations relies heavily on state-level intellectual property protections.

### *Develop Cooperative and Guild Incubation Program*

The Office should explore supporting the formation of regional and statewide cannabis guilds. Many businesses across the supply chain, especially those with limited resources, can scale their operations through guilds. Guilds enable small businesses to not only compete with big businesses, but also regularly win consumer loyalty. These types of partnerships leverage the power of numbers to promote awareness and protect the interests of subject matter expert (SME) cannabis brands, particularly NYSEE licensees. Regional and statewide cannabis guilds can instill a sense of pride in New York-grown cannabis brands and promote regional innovation and cohesion. Cannabis cooperatives have the potential for the same impact. These types of partnerships leverage strength in numbers, generate consumer awareness, and protect the interests of small cannabis brands, especially equity licensees.

### Cluster Cannabis-Related Resources, Institutions, Businesses, & Non-Profits

The Board and the Office should employ clustering strategies to concentrate related resources for cannabis initiatives. The presence of additional small businesses can benefit small-batch cannabis operations. Both clustering strategies and agglomeration can increase the efficiency in how natural resources and skilled labor are utilized. Clustering should not only occur within the cannabis industry but should also utilize the concentration of resources that already exists.

For instance, the Capital Region has successfully clustered the workforces of key industries, such as nanotechnology and education, while concurrently strategically investing in wraparound services. Consequently, the Capital Region may also be well positioned for a cluster of processor licenses, where the regional technology ecosystem can best support our licensees. Aligning initiatives and practices with regional priorities and geographic advantages may be crucial for the industrial composition of cannabis for adult use in New York.[57]

SUMMARY RECOMMENDATIONS

[57] Wasylenko, M. (2020). New York State Economic Status of Regions and Development Programs [ Review of New York State Economic Status of Regions and Development Programs]. https://surface.syr.edu/cgi/cgi/viewcontent.cgi?article=1159&context=ecn

### *Promote Equity in Cannabis Research and Innovation*

New York's investment in and advancement of cannabis research presents a significant opportunity to encourage and support the participation of the State's SEE groups, given their historical underrepresentation in said research.

These efforts may include the prioritization of funding for research led by equity stakeholders, the creation of partnership opportunities between independent research institutions and state institutions, and the sharing of data between the Office and institutions working on cannabis initiatives to reduce the cost of research. For the cannabis industry to be truly equitable, a cognitively diverse population should establish the research pillars about the plant's evolution. Therefore, the foundation of cannabis research and educational systems in New York should also be intentionally inclusive of those who have been historically most impacted by cannabis prohibition.

### *Promote the Registration of Additional Organizations*

The Cannabis Law states that additional registered organizations must be registered to expand access to medical cannabis. Such organizations are required to reflect the demographics of the state, represent communities that have been disproportionately impacted by cannabis prohibition, and be culturally, linguistically, and medically competent to serve unserved and underserved areas of the state. (N.Y. CANBS § 35(9)). The Office is to determine how to address these requirements in a manner that considers the state's economic, social, and public health needs. The Office should prioritize the registration of additional registered organizations to ensure the medical market is being diversified as work is being done to ensure representation in the adult-use program.

### *Increase Access to Meaningful Business Support Services*

The Cannabis Law requires the Board and the Office to support existing and soon-to-be licensees via business incubation, research and development, and community organization initiatives aligned with SEE objectives and strategies. The Office can leverage best practices and curriculum development from the CCTM and CAURD Accelerator program to inform incubation services for NYSEE retail and microbusiness licensees. The Board and the Office should also invest in physical spaces to provide these incubation services.

### *Community-Driven Development of Incubator Program*

Early and sustained participation from community stakeholders, along with effective data collection and information feedback, can infuse New York's cannabis industry with energy and a sense of proprietorship. In order to optimize resource allocation and avoid conflicting objectives and duplication of efforts, it is essential to survey existing business development priorities and strategies near designated incubator sites. This includes compiling information from the Office's surveys, Empire State Development and other state agency programs, local economic development organizations, chambers of commerce, and stakeholder input.

SUMMARY RECOMMENDATIONS

Incubator sites should be located in CDIs and underserved communities and should include the following:

- State-of-the-art cannabis cultivation facilities, including greenhouses, and indoor facilities employing innovative production techniques.
- GMP-certified R&D test kitchen and processing facilities equipped with extraction equipment for edible and infused cannabis product development.
- Community access points with space for community events as well as office space, conference rooms, shared break rooms and common areas. These spaces can be used to facilitate pitch events, networking events, and community roundtables to increase community engagement.

As the construction of the physical incubator should be a multi-year process that includes defining needs, developing processes, forming partnerships, selecting sites, developing a request for proposals for design and construction, and communicating the program's larger vision; more near-term supports should also be developed.

The Office should explore partnership models with existing EACs or small business service centers in New York State. EACs are housed within non-profit organizations that receive funding from Empire State Development to offer general business education. There are 22 such facilities in the state. The Office can leverage these services for cannabis businesses, including analyzing the feasibility of colocation of industry-specific training services.

Licensed operators could be a source for incubation as well. The Office should continue to pursue strategies to encourage on-site training and mentoring at existing licensed cannabis businesses so that prospective NYSEE applicants can benefit from their expertise and enthusiasm. By providing on-site training and mentorship, NYSEE entrepreneurs can acquire valuable knowledge and skills, while existing businesses contribute to the growth of the cannabis industry and form new partnerships. The Office should cover any related administrative costs and establish guidelines and monitoring programs to prevent exploitation.

The Office should also leverage the pre-existing curriculum and content from the CAURD Accelerator program to provide virtual training opportunities for NYSEE retail and microbusiness licensees. A more expansive Retail Accelerator program should be established, and existing content can be utilized to develop regional accelerators through a train-the-trainer model.

### *"Shared Kitchen" Model for Small-Batch Cannabis Manufacturing*

Shared kitchens allow entrepreneurs to hone their skills and produce goods without committing to the expense of operating a commercial kitchen on their own. The Office should work to provide comparable support systems for the development of cannabis processing and infusion operations on-site. Small, reproducible models of extraction and other processing should be developed for use by NYSEE participants, as well as independent, shared-use processing equipment and facilities once constructed.

 **There needs to be more resource sharing, like shared commercial kitchens, especially in the NYC. If there were shared commercial spaces that are to code, it's easier for small businesses to start up.** 

**– New York, NY**

SUMMARY RECOMMENDATIONS

## Underwrite Default and Loan Loss Risks for Commercial Lenders

The Board and Office must continue to encourage financial institutions to provide deposits, electronic transactions, point-of-sale system integration, and cash transfers. The Office should publish a directory of all banks and credit unions currently serving Cannabis Related Businesses (CRBs). To alleviate industry bottlenecks and build trust between commercial lenders and CRB borrowers, the Office could assume a portion of the risk associated with short-term loans to cannabis retailers and processors. Loan loss reserve programs are common in New York State and having the state take on a percentage of risk to encourage commercial lending to higher-risk borrowers is not without precedent.[58]

## Democratize Access to Cannabis Data Analytics, Market Intelligence & Quality Control

Studies have shown that companies that use data to make decisions have greater success.[59] By expanding access to market information, New York may assist SMEs and NYSEE operators in achieving their business goals. Market data can help them decide what products to sell, how to market them, and what business strategies to use. Relevant market data may include weighted average wholesale prices, consumer insights, purchasing patterns, and retail trends. Publicizing market data from sales can democratize access to the data and market intelligence businesses need to increase revenue and optimize spending. Evidence-based research should be undertaken to identify and communicate trends, developments, insights, and best practices in the local cannabis ecosystem.

## Develop Minimum Quality Standards for Cannabis Producers

Establishing minimum quality standards is a typical method for protecting the reputation of regional brands. These standards can aid in the establishment of regional brands and refute claims that the regional name is devoid of significance. However, because minimum quality standards have a significant impact on all industry stakeholders, any effort to create such standards should only be considered if it is based on a long-term consensus-building process that results in widespread stakeholder agreement. Over the long term, minimum standards may be an important tool, but it is unlikely that consensus will be reached on these standards for quite some time. Prior to the development of a cannabis grading system, it is impossible to consider minimum standards. The Office should monitor the evolution of cannabis grading standards over time and consider promotional initiatives related to the creation and implementation of standards.

SUMMARY RECOMMENDATIONS

[58]DFS Webinar Clean Energy Financing for Community and Regional Lenders in New York State. (2021). https://www.dfs.ny.gov/system/files/documents/2021/06/dfs-clean-energy-financing_20210610.pdf
[59]Stobierski, T. (2019, August 26). The advantages of data-driven decision-making | HBS online. Harvard Business School Online. https://online.hbs.edu/blog/post/data-driven-decision-making

## *Assess Market Performance with Equity-Driven Economic Indicators*

The disproportionate focus on total revenue as the primary metric for evaluating a state's legal industry obscures more than it reveals and may reframe legalization as a solely financial endeavor. This methodology disregards the distributional reach of cannabis revenues and conceals any potential negative effects on local communities and the environment. High annual revenue figures may also encourage "green rush"[60] speculative investments and decision-making, making it challenging for entrepreneurs and investors alike to determine the fair market value of the opportunity.

The evaluation of the cannabis market in New York must be based on the state's greatest assets, such as its innovation ecosystem, its immense ethnic, racial, and regional diversity, and its small and medium-sized businesses.  The Office should identify and publicize metrics that more precisely and comprehensively convey the impact and resilience of the market. By taking a more comprehensive approach to measuring the impact of the legal market, the Office will ensure that the market develops in accordance with the Cannabis Law's goals of equity, inclusion, environmental sustainability, and community well-being.

SUMMARY RECOMMENDATIONS

[60] Maximum Yield. (2021, November 18). Green Rush [ Review of Green Rush ]. Maximum Yield. https://www.maximumyield.com/definition/4986/green-rush

## Community and Consumer Engagement

There are two primary sources of value creation in every economy: production and consumption. The quality of the consumer experience is key and New York's cannabis economy must prioritize meeting the needs of its consumers.

New York is striving to create a consumer-driven marketplace built on a foundation of independent, autonomous "mom and pop" dispensaries that are singularly incentivized to respond to local consumer demand. This approach should encourage a more sustainable, efficient, and responsive supply chain in which the consumer represents the beginning of the process of all value creation. The Office can develop consumer engagement strategies aimed at generating greater awareness around their roles as curators and partners that are co-creating a more inclusive, collaborative and transparent cannabis economy.

The Office should encourage multilateral communication and the exchange of ideas with NYSEE stakeholders to strengthen equity-driven solutions and frameworks for the legal cannabis market. Furthermore, the Office should continue to develop public education campaigns intended to generate greater market participation from those communities yet to meaningfully participate in legal cannabis markets, whether due to exclusionary barriers locking them out as entrepreneurs or internalized stigma scaring them away as consumers.



> **When the hood's voice is louder than the academics, it's a beautiful thing.**

– Albany, NY

### Maintain Stakeholder Engagement

The cannabis industry in New York has a greater chance of success when all stakeholders, not just cannabis business owners, participate in the discussion. Sustainable, long-term solutions are not negotiated in silos or implemented from a top-down approach. New York must adopt a bottom-up strategy that empowers community voices in order to build and maintain a supply chain that is responsive and reflective of the populations it serves. This work entails bringing together stakeholders and building relationships that facilitate cross-sector collaboration.

From the initial community roundtables, the Office has gained a better understanding of the significant importance of the launch of this legal market, especially for those communities most harmed by prohibition and other stakeholders impacted by systemic disparities in economic opportunity, public health, and access to information. Critical to the success of equity-centered programs such as this are practices of equitable engagement that generate robust and collaborative dialogue with local communities.

To this end, the Office must continue to convene interactive community roundtable sessions using proven tools such as "The Spectrum of Community Engagement to Ownership."[61] Regular touchpoints with NYSEE stakeholders and community leaders can position the Office to adapt to evolving circumstances and potentially pivot programmatically if results prove ineffective at best

[61] Facilitating Power. (2021). The Spectrum of Community Engagement to Ownership [Review of The Spectrum of Community Engagement to Ownership]. https://movementstrategy.org/wp-content/uploads/2021/08/The-Spectrum-of-Community-Engagement-to-Ownership.pdf





Equitable community engagement delivers clarity about the purpose and desired outcomes of specific initiatives, shared definitions, boundaries regarding the feasibility of options due to budget or legal constraints, the relationship to other committees or processes, the role of stakeholders, and what they are empowered to do (e.g., provide input, make decisions). In addition to obtaining feedback on specific initiatives, it is a long-term commitment to determining what development and progress means to a given community. Through deeper engagement and information sharing with stakeholders, both parties can develop a shared understanding of the current challenges and opportunities confronting cannabis equity in New York, as well as determine what the communities want the Office to address.

### *Multilingual, Culturally Informed Public Education Campaigns*

The Office and Board should develop public education campaigns tailored to specific communities such as those most impacted by cannabis prohibition, immigrant populations, service-disabled veterans and legacy operators. The objective of these public outreach efforts is to encourage members of these communities to participate meaningfully in the cannabis marketplace as medical patients, consumers, employees, and community partners, as well as to reduce the plant's entrenched stigmas.

For example, many legacy entrepreneurs may feel they have the least to gain from legalization as the competitive pressure from legal operators increases. To encourage legacy operators' transition into the legal market and combat zero-sum perceptions, the Office should develop informational campaigns directed specifically at the legacy operators. By clarifying statutory intent, regulatory language, and clearly defining the path to licensure for legacy operators, the Office can expand the opportunities available to legacy businesses seeking to transition into the legal space.

SUMMARY RECOMMENDATIONS

Campaign materials and outreach should aim to reframe persistently negative perceptions of the cannabis plant. Cannabis has historical misconceptions regarding consumption and has been associated with criminality and negative racial and cultural stereotypes. Due to the pervasiveness of these stigmas, some SEE groups have been reluctant to consume cannabis or support local licensed businesses. New York now acknowledges that these associations are false and harmful to the equitable rollout of the industry.

Campaign materials should be accessible to non-English-speaking populations. In this industry, language accessibility cannot be a barrier to entry.

## Conclusion

This Plan represents the Board and Office's shared vision of a dynamic, equitable, and inclusive cannabis marketplace. The programs and policies outlined here lay the groundwork for an economically prosperous industry for all participants that acknowledges past harm, assesses the current landscape, and looks towards the future. New York must take seriously this momentous opportunity to build an industry centered on social, economic, and racial justice.

In time, New York will be the center of the national cannabis industry. As made evident by other states with legal cannabis industries, when cannabis markets are rolled out without an equity-first approach, entire segments of a state's population — particularly those most harmed by cannabis prohibition — will be barred from opportunities for upward mobility and wealth generation.

History compels us to get this right.

SUMMARY RECOMMENDATIONS

# APPENDIX



Direct Contributors                                                                          **A–1**
All PL 221 Arrest in New York State from 1976–2021 by Race and Ethnicity   **A–2**
All PL 221 Convictions in New York State from 1976–2021 by Race and Ethnicity   **A–3**
List of Unserved and Underserved Areas                                          **A–4**

**Appendix 1 Direct Contributors**

Direct contributors to the report include: Alexandria Lepech, A Tabatha Robinson, Tahirah Cook, Augustus Battaglia, Brian Farmer, Conor Quinn, Damian Fagon, James Rogers, Karen Patricio, Maureen Darby-Serson, Nevillene White, Osaze Wilson, Shaleen Title, and Cierra Smith.

APPENDIX

**Appendix 2**

## All PL 221 Arrests in NY State 1976-2021 by Level and Race

| Level | Misd | | | | | Felony | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Race | Asian/Indian | Black | Hispanic | White | Total | Asian/Indian | Black | Hispanic | White | Total |
| 1976 | – | 1 | – | – | 1 | – | – | – | 1 | 1 |
| 1977 | – | 6 | – | 9 | 15 | – | 3 | – | 7 | 10 |
| 1978 | – | 31 | 7 | 35 | 73 | – | 29 | 6 | 24 | 59 |
| 1979 | – | 214 | 46 | 214 | 474 | – | 177 | 22 | 194 | 393 |
| 1980 | 17 | 3,728 | 1,518 | 2,740 | 8,003 | 8 | 1,435 | 249 | 886 | 2,578 |
| 1981 | 65 | 5,636 | 1,774 | 2,824 | 10,299 | 15 | 1,728 | 372 | 1,019 | 3,134 |
| 1982 | 40 | 7,026 | 615 | 3,687 | 11,368 | 18 | 1,799 | 139 | 1,027 | 2,983 |
| 1983 | 44 | 8,272 | 112 | 4,427 | 12,855 | 16 | 1,833 | 10 | 1,051 | 2,910 |
| 1984 | 68 | 10,209 | 1,359 | 4,550 | 16,186 | 14 | 2,170 | 207 | 807 | 3,198 |
| 1985 | 99 | 11,500 | 4,084 | 3,658 | 19,341 | 19 | 1,627 | 290 | 680 | 2,616 |
| 1986 | 87 | 8,536 | 2,674 | 3,629 | 14,926 | 12 | 1,470 | 210 | 681 | 2,373 |
| 1987 | 84 | 7,619 | 2,335 | 3,674 | 13,712 | 11 | 1,110 | 193 | 564 | 1,878 |
| 1988 | 79 | 6,256 | 1,747 | 3,478 | 11,560 | 20 | 764 | 135 | 531 | 1,450 |
| 1989 | 35 | 5,179 | 1,415 | 2,877 | 9,506 | 12 | 665 | 140 | 583 | 1,400 |
| 1990 | 44 | 3,889 | 1,060 | 2,654 | 7,647 | 10 | 909 | 130 | 601 | 1,650 |
| 1991 | 60 | 3,443 | 779 | 2,291 | 6,573 | 21 | 823 | 103 | 747 | 1,694 |
| 1992 | 69 | 3,801 | 863 | 2,297 | 7,030 | 14 | 714 | 124 | 865 | 1,717 |
| 1993 | 55 | 4,929 | 1,189 | 2,403 | 8,576 | 14 | 812 | 159 | 848 | 1,833 |
| 1994 | 67 | 7,148 | 1,889 | 2,649 | 11,753 | 16 | 961 | 190 | 841 | 2,008 |
| 1995 | 124 | 8,797 | 2,892 | 3,482 | 15,295 | 18 | 1,128 | 203 | 899 | 2,248 |
| 1996 | 181 | 12,768 | 4,645 | 4,484 | 22,078 | 20 | 1,313 | 269 | 979 | 2,581 |
| 1997 | 293 | 17,404 | 7,837 | 5,796 | 31,330 | 19 | 1,506 | 302 | 981 | 2,808 |
| 1998 | 469 | 25,163 | 13,347 | 8,030 | 47,009 | 32 | 1,496 | 347 | 931 | 2,806 |
| 1999 | 506 | 25,379 | 14,628 | 7,965 | 48,478 | 23 | 1,424 | 410 | 945 | 2,802 |
| 2000 | 753 | 35,568 | 20,381 | 9,853 | 66,555 | 41 | 1,502 | 362 | 872 | 2,777 |
| 2001 | 658 | 29,310 | 15,117 | 8,634 | 53,719 | 30 | 1,211 | 333 | 932 | 2,506 |
| 2002 | 801 | 28,990 | 16,194 | 9,425 | 55,410 | 65 | 1,268 | 392 | 983 | 2,708 |
| 2003 | 632 | 26,121 | 14,493 | 8,761 | 50,007 | 52 | 1,096 | 408 | 865 | 2,421 |
| 2004 | 446 | 21,153 | 12,332 | 5,887 | 39,818 | 76 | 1,209 | 527 | 955 | 2,767 |
| 2005 | 614 | 22,681 | 12,858 | 5,427 | 41,580 | 55 | 1,195 | 504 | 821 | 2,575 |
| 2006 | 612 | 24,569 | 13,786 | 6,193 | 45,160 | 40 | 1,372 | 582 | 919 | 2,913 |
| 2007 | 886 | 28,879 | 16,691 | 7,038 | 53,494 | 38 | 1,601 | 695 | 943 | 3,277 |
| 2008 | 879 | 29,122 | 16,572 | 7,760 | 54,333 | 49 | 1,487 | 673 | 936 | 3,145 |
| 2009 | 969 | 32,167 | 18,662 | 8,233 | 60,031 | 42 | 1,511 | 627 | 963 | 3,143 |
| 2010 | 1,296 | 34,674 | 19,502 | 8,930 | 64,402 | 75 | 1,532 | 600 | 990 | 3,197 |
| 2011 | 1,558 | 33,122 | 19,813 | 9,656 | 64,149 | 75 | 1,305 | 551 | 941 | 2,872 |
| 2012 | 1,223 | 27,241 | 17,244 | 7,840 | 53,548 | 77 | 1,253 | 571 | 804 | 2,705 |
| 2013 | 1,106 | 21,056 | 14,349 | 5,762 | 42,273 | 72 | 1,024 | 512 | 802 | 2,410 |
| 2014 | 1,075 | 19,372 | 13,148 | 5,246 | 38,841 | 56 | 851 | 408 | 696 | 2,011 |
| 2015 | 743 | 13,897 | 9,195 | 3,880 | 27,715 | 66 | 758 | 333 | 634 | 1,791 |
| 2016 | 977 | 13,288 | 9,946 | 4,377 | 28,588 | 90 | 808 | 429 | 582 | 1,909 |
| 2017 | 957 | 13,761 | 9,941 | 4,321 | 28,980 | 100 | 884 | 458 | 571 | 2,013 |
| 2018 | 433 | 8,739 | 5,590 | 2,922 | 17,684 | 120 | 744 | 399 | 584 | 1,847 |
| 2019 | 127 | 3,269 | 1,592 | 1,223 | 6,211 | 107 | 640 | 318 | 380 | 1,445 |
| 2020 | 28 | 987 | 401 | 270 | 1,686 | 81 | 486 | 284 | 273 | 1,124 |
| 2021 | 20 | 350 | 139 | 65 | 574 | 31 | 157 | 114 | 108 | 410 |
| Total | 19,279 | 655,250 | 344,761 | 209,556 | 1,228,846 | 1,770 | 49,790 | 14,246 | 33,246 | 99,096 |

** This chart only includes arrests for which the arrested individual had on file a residential address in the state of New York.

APPENDIX

A–2

**Appendix 3**

## All PL 221 Convictions in NY State 1976–2021 by Level and Race

| Level | Misd | | | | | Felony | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Race | Asian/Indian | Black | Hispanic | White | Total | Asian/Indian | Black | Hispanic | White | Total |
| 1976 | – | – | – | 1 | 1 | – | – | – | – | – |
| 1977 | – | 5 | – | 5 | 10 | – | – | – | – | – |
| 1978 | – | 26 | 4 | 22 | 52 | – | 4 | – | 6 | 10 |
| 1979 | – | 230 | 41 | 181 | 452 | – | 21 | – | 44 | 65 |
| 1980 | 11 | 1,628 | 619 | 593 | 2,851 | 1 | 80 | 13 | 140 | 234 |
| 1981 | 24 | 2,397 | 721 | 672 | 3,814 | 1 | 98 | 22 | 175 | 296 |
| 1982 | 11 | 3,476 | 276 | 1,136 | 4,899 | 1 | 91 | 8 | 183 | 283 |
| 1983 | 16 | 3,994 | 26 | 1,517 | 5,553 | 3 | 126 | – | 139 | 268 |
| 1984 | 31 | 4,957 | 622 | 1,335 | 6,945 | 2 | 162 | 8 | 134 | 306 |
| 1985 | 35 | 5,361 | 1,768 | 783 | 7,947 | – | 123 | 7 | 153 | 283 |
| 1986 | 32 | 4,022 | 1,174 | 716 | 5,944 | 3 | 239 | 21 | 145 | 408 |
| 1987 | 25 | 3,365 | 925 | 742 | 5,057 | 4 | 144 | 22 | 116 | 286 |
| 1988 | 22 | 2,555 | 744 | 574 | 3,895 | 1 | 88 | 5 | 113 | 207 |
| 1989 | 13 | 2,254 | 583 | 585 | 3,435 | 1 | 64 | 12 | 108 | 185 |
| 1990 | 16 | 1,720 | 436 | 579 | 2,751 | – | 176 | 10 | 146 | 332 |
| 1991 | 25 | 1,646 | 255 | 589 | 2,515 | 3 | 139 | 17 | 185 | 344 |
| 1992 | 10 | 1,554 | 253 | 650 | 2,467 | 4 | 119 | 20 | 221 | 364 |
| 1993 | 18 | 1,753 | 270 | 699 | 2,740 | 1 | 120 | 22 | 182 | 325 |
| 1994 | 10 | 2,025 | 293 | 676 | 3,004 | 2 | 131 | 31 | 193 | 357 |
| 1995 | 15 | 2,261 | 414 | 709 | 3,399 | 3 | 158 | 26 | 229 | 416 |
| 1996 | 14 | 3,060 | 697 | 774 | 4,545 | 4 | 218 | 32 | 236 | 490 |
| 1997 | 33 | 3,706 | 1,090 | 848 | 5,677 | – | 174 | 33 | 239 | 446 |
| 1998 | 17 | 4,839 | 1,753 | 908 | 7,517 | 2 | 214 | 32 | 200 | 448 |
| 1999 | 34 | 5,663 | 2,181 | 949 | 8,827 | 5 | 166 | 43 | 183 | 397 |
| 2000 | 43 | 7,332 | 2,987 | 972 | 11,334 | 8 | 194 | 31 | 204 | 437 |
| 2001 | 37 | 5,952 | 2,390 | 979 | 9,358 | 11 | 160 | 26 | 197 | 394 |
| 2002 | 50 | 5,981 | 2,613 | 1,013 | 9,657 | 11 | 159 | 35 | 203 | 408 |
| 2003 | 57 | 5,331 | 2,400 | 925 | 8,713 | 17 | 104 | 33 | 198 | 352 |
| 2004 | 44 | 4,747 | 2,167 | 927 | 7,885 | 18 | 124 | 49 | 192 | 383 |
| 2005 | 59 | 4,461 | 1,917 | 725 | 7,162 | 9 | 131 | 41 | 178 | 359 |
| 2006 | 46 | 4,754 | 2,110 | 842 | 7,752 | 8 | 121 | 45 | 184 | 358 |
| 2007 | 51 | 5,670 | 2,459 | 945 | 9,125 | 7 | 127 | 49 | 177 | 360 |
| 2008 | 65 | 5,828 | 2,459 | 1,019 | 9,371 | 8 | 120 | 48 | 179 | 355 |
| 2009 | 60 | 6,186 | 2,732 | 1,042 | 10,020 | 7 | 117 | 47 | 195 | 366 |
| 2010 | 66 | 5,828 | 2,379 | 988 | 9,261 | 10 | 156 | 54 | 214 | 434 |
| 2011 | 64 | 5,111 | 2,265 | 944 | 8,384 | 19 | 120 | 34 | 197 | 370 |
| 2012 | 53 | 4,620 | 2,142 | 852 | 7,667 | 12 | 90 | 44 | 150 | 296 |
| 2013 | 39 | 3,415 | 1,760 | 743 | 5,957 | 12 | 71 | 34 | 146 | 263 |
| 2014 | 27 | 2,741 | 1,264 | 664 | 4,696 | 14 | 68 | 27 | 123 | 232 |
| 2015 | 32 | 1,817 | 773 | 547 | 3,169 | 8 | 63 | 34 | 94 | 199 |
| 2016 | 43 | 1,769 | 788 | 467 | 3,067 | 13 | 51 | 25 | 92 | 181 |
| 2017 | 40 | 1,622 | 666 | 513 | 2,841 | 5 | 50 | 19 | 81 | 155 |
| 2018 | 39 | 885 | 325 | 405 | 1,654 | 12 | 48 | 16 | 74 | 150 |
| 2019 | 29 | 352 | 123 | 194 | 698 | 17 | 22 | 14 | 30 | 83 |
| 2020 | 12 | 74 | 25 | 89 | 200 | 6 | 7 | 4 | 20 | 37 |
| 2021 | 3 | 10 | 3 | 21 | 37 | 1 | – | – | 4 | 15 |
| **Total** | **1,371** | **146,983** | **51,892** | **32,059** | **232,305** | **274** | **4,958** | **1,093** | **6,602** | **12,927** |

APPENDIX

A-3