

# NEW YORK STATE
## OFFICE OF
## CANNABIS MANAGEMENT
# ANNUAL REPORT

2023

INNOVATION

ACCESS

OPPORTUNITY

SAFETY

EDUCATION

EQUITY & INCLUSION

# Table of Contents

Table of Contents .................................................................................................................ii

List of Tables ......................................................................................................................iii

List of Figures ....................................................................................................................iii

Letter from the Chair of the Cannabis Control Board .......................................................iv

Letter from the Executive Director ....................................................................................v

Executive Summary ...........................................................................................................vii

Introduction .......................................................................................................................1

Licensing ............................................................................................................................5

Social and Economic Equity .............................................................................................11

Enforcement ......................................................................................................................15

Economic and Fiscal Impacts............................................................................................18

Public Health and Safety ...................................................................................................23

Compliance.........................................................................................................................38

Medical Cannabis Program................................................................................................40

Stakeholder Engagement and Outreach.............................................................................46

Laws, Regulations, and Guidance......................................................................................51

Administration....................................................................................................................54

Recommendations ..............................................................................................................56

Appendices.........................................................................................................................61

# List of Tables

Table 1: List of State Agencies Partnering with the Board and Office ........................................ 4
Table 2: Summary of Registered Organizations, by Year Registered or Renewed..................... 5
Table 3: Summary of Registered Organizations Licensed as RONDs or RODs in 2023............. 6
Table 4: Summary of Cannabinoid Hemp License and Permit Applications, as of September 30, 2023 ........................................................................................................................................... 7
Table 5: Summary of Adult-Use Cannabis License Applications as of September 30, 2023 ....... 9
Table 6: Medical Cannabis Revenue by Type and by NYS Fiscal Year..................................... 18
Table 7: Cannabinoid Hemp Revenue by Type and by NYS Fiscal Year................................... 19
Table 8: Adult-Use Cannabis Revenue by Type and by NYS Fiscal Year................................. 19
Table 9: Public Education Materials Published in 2023.............................................................. 28
Table 10: Adult Use Cannabis Product Testing October 1, 2022 – September 30, 2023 .......... 35
Table 11: Medical Cannabis Product Testing October 1, 2022 – September 30, 2023.............. 36
Table 12: Number of Registered Practitioners by Profession Type as of September 30, 2023 . 40
Table 13: Cannabis Workforce Development Sessions.............................................................. 48
Table 14: Roadmap to Adult-Use Cannabis License Applications Sessions.............................. 49
Table 15: Regulatory Packages Effectuated in 2023................................................................. 52
Table 16: List of Current Contracts Between the Office and Partners........................................ 54
Table 17: List of Current Memoranda of Understanding Between the Office and Partners........ 55

# List of Figures

Figure 1: NYS Cannabis Retail Storefront Sales Growth by Month as of December 9, 2023 (Preliminary estimate)............................................................................................................... 20
Figure 2: Share of Sales by Product Category as of December 9, 2023 (Preliminary estimates) .................................................................................................................................................. 21
Figure 3: Total Cannabis Product Units Sold by Product Category as of December 9, 2023 (Preliminary estimates) ............................................................................................................. 21
Figure 4: Why Buy Legal Campaign Assets, Safer Products Image Creative ............................ 24
Figure 5: Why Buy Legal Campaign Assets, Supporting the Foundation of a Socially Equitable Industry Image Creative.............................................................................................................. 25
Figure 6: Why Buy Legal Campaign Assets, Reinforcing the Importance of Safe Storage Image Creative...................................................................................................................................... 25
Figure 7: Why Buy Legal Campaign Assets, What to Expect at a Licensed Adult-Use Dispensary Image Creative............................................................................................................................ 26
Figure 8: Diagram of NYS's Cannabis Data Monitoring Plan .................................................... 29
Figure 9: Percentage and Number of Medical Cannabis Products Dispensed by Form from October 1, 2022 – September 30, 2023..................................................................................... 41

**NEW YORK STATE | Cannabis Control Board**

# Letter from the Chair of the Cannabis Control Board

Dear Governor Hochul, Leader Stewart-Cousins, Speaker Heastie, and all New Yorkers,

It is with great honor that I deliver to you the second annual report on the activities of the New York Cannabis Control Board and the Office of Cannabis Management.

On March 31, 2021, the Marihuana Regulation and Taxation Act (MRTA) was passed, legalizing adult-use cannabis for New Yorkers aged 21 years and older. In the Spring of 2022, Governor Hochul launched the Seeding Opportunity Initiative, providing local farmers with the opportunity to plant the first legal cannabis seeds for our budding new industry.

By the end of the year, we opened the first licensed adult-use dispensary in New York history, owned and operated by Housing Works in New York City. In 2023, the Cannabis Control Board held 10 in-person Control Board meetings, approved nearly 1,000 licenses across varying license types, and welcomed the general public to attend, share remarks, and hear directly from State leadership, with virtual, accessible options as well. This fall, New York's legal cannabis industry continued onward by opening general licensing to the public and igniting the largest licensed market expansion to date. The Cannabis Control Board is excited to learn more about these new applicants and local entrepreneurs ready to bring new enterprises to our industry in 2024.

New York has taken tremendous strides in developing a newly renovated Medical Cannabis Program that addresses patients' concerns and ensures that just as our adult-use market progresses, our medical capabilities will move forward in lockstep. The State continues to expand the number of educational resources for all communities and provide new pathways for the public to become knowledgeable about the benefits of our licensed cannabis market.

Despite all the challenges, including ongoing litigation and concerns about the proliferation of unlicensed shops, we can affirm that the Office of Cannabis Management and its commitment to implementing rules and regulations that uphold the high equity standard outlined within the MRTA, has never wavered. Additionally, I would like to congratulate the Cannabis Advisory Board and their work in beginning the vital reallocation process of using tax revenue from licensed cannabis sales to reinvest in our local communities.

All this hard work is only the beginning of what's to come.

Thank you for your steadfast commitment and partnership as we build the first equity-centered adult-use cannabis market in the country.

Sincerely,

*Tremaine Wright*

Tremaine Wright
Chair, Cannabis Control Board

**NEW YORK STATE | Office of Cannabis Management**

# Letter from the Executive Director

Dear Governor Hochul, Leader Stewart-Cousins, Speaker Heastie, and all New Yorkers,

This year, the Office of Cannabis Management (Office) evolved from a brand-new state agency to a fully operational cannabis regulatory body. Our team continues to rapidly increase as we surpass over 160 employees. Every day, we work diligently to create and implement adult-use regulations that prioritize equity while laying the foundation for a new legal cannabis industry that benefits small and medium-sized operators. The foundation of this new legal cannabis industry is also built on the regulations and guidance for permitting laboratories to conduct testing of adult-use products and for setting laboratory testing standards, making safer, tested products available to New Yorkers.

In October, the general licensing application window opened to the public, allowing all New Yorkers the opportunity to apply for an adult-use license for the first time in our state's history. We launched a statewide community outreach tour dedicated to educating communities about the application process, and shared how licensed cannabis will affect their local municipalities. In just eight weeks, our External Affairs team traveled across every region of New York, hosting over 20 community events, and made themselves available to answer any questions from the public.

New York is building a licensed cannabis market unlike anything we have ever seen before. Although we have encountered adversity, we have known all along that the Marihuana Regulation and Taxation Act created a legal cannabis industry that disrupts the status quo for the better. Education and awareness remain pivotal for the Office as we combat the stigma of cannabis, influenced by over 100 years of cannabis prohibition.

The Office began accepting applications to increase the amount of research involving cannabis. I am proud to announce that we are pushing forward in research and can't wait to share new information as it is developed.

The Office has also worked on efforts to modernize and streamline the Medical Cannabis Program. In October 2022, Medical Home Cultivation regulations were adopted, allowing patients or their caregivers to cultivate cannabis at home for medical use. In March 2023, the Office introduced changes that allow for the auto-registration of patients after they are certified for medical cannabis by their healthcare provider.

Our team remains focused on fulfilling the equity goals outlined in New York's Cannabis Law. We work hard every day to provide and distribute easy-to-use, responsive, and informative resources online, in-person, and directly to communities across the state.

There is so much more work being done here that I did not highlight and still, so much more to do. We are two years into this experiment, and already, we have launched the most diverse and equitable cannabis market in the nation. At the start of the year there were approximately 20 Black-owned dispensaries across the entire country. New York just opened 12 more.

While not all licenses we have issued are operationalized yet, we have issued over 700 licenses to largely social and economic equity entrepreneurs. These are small family businesses that are independently owned and operated and in a great position to succeed. And even with a minimal

**NEW YORK STATE Office of Cannabis Management**

footprint, the market had already generated over $137 million in retail sales by early December and that number will continue to grow.

We thank you for your continued partnership, support, and commitment to ensuring that New York State lives up to the values and opportunities imbued in the Marihuana Regulation and Taxation Act.

Sincerely,

Chris Alexander
Executive Director, Office of Cannabis Management

# Executive Summary

**The Office of Cannabis Management: By the Numbers**

- ☐ Nearly 6,200 Licenses, Permits, and Registrations issued or provisionally approved in State Fiscal Years 2022-2023 and 2023-2024
    - o 279 Adult-Use Conditional Cultivator Licenses
    - o 40 Adult-Use Conditional Processor Licenses
    - o 463 Conditional Adult-Use Retail Dispensary Licenses
    - o 5,404 Cannabinoid Hemp Licenses and Permits
    - o 10 Registered Organizations approved, 1 renewal pending
- ☐ 41 Adult-Use Retail Dispensaries open for business
- ☐ 60 Cannabis Growers Showcases approved
- ☐ Over $137 million in retail sales[1]
- ☐ Over 3.5 million units sold
- ☐ Nearly $16.3 million in revenue in State Fiscal Year 2022-2023
- ☐ Over $16.6 million in revenue by the mid-point of State Fiscal Year 2023-2024
- ☐ 369 enforcement inspections of illicit operations
- ☐ 11,600 pounds of illicit products seized
- ☐ $56 million street value of products seized
- ☐ 6,934 Adult-Use License applications received
- ☐ 932 field hours of compliance inspections
- ☐ Over 121,900 patients registered with the Medical Cannabis Program

**Report Highlights**

*Fostering Social and Economic Equity*

- ☐ Social and economic equity is central to all of the Office of Cannabis Management's efforts. In order to begin the work of repairing decades of over-criminalization and disproportionate enforcement of cannabis prohibition – especially in Black and Brown communities – the Office is hard at work ensuring that those harmed are given an equitable chance to participate and thrive in the new legal New York State (NYS) cannabis industry. To guide this work, the Board in consultation with the Office, released the New York Social and Economic Equity (NYSEE) Plan which outlines the Office's approach for developing a legal cannabis market based on the principles of equity, small business access, workforce support, regenerative local economic development, consumer education, and uplifting those most harmed by prohibition.
- ☐ The Board, in consultation with the Chief Equity Officer, Executive Director, and the Cannabis Advisory Board (CAB), issued guidelines in the NYSEE Plan to define what constitutes a community disproportionately impacted (CDI) by the enforcement of cannabis prohibition. The CDI designation will be used to help identify individuals who can be, among others, prioritized for social and economic equity (SEE) licenses. The Office analyzed marihuana-related arrest records across four decades to determine the arrest rates for the State as a whole and for local census tracts. Where the local arrest rate substantially exceeded the State's arrest rate, the Office designated the area as a CDI.

---

[1] Retail sales as of December 9, 2023

The CDI census tracts demonstrate that approximately one quarter of NYS's population experienced three quarters of the marihuana-related arrests over the last four decades.

### Expanding Opportunities in the Adult-Use Market

- On October 4, 2023, the licensing applications for adult-use cultivator, adult-use processor, adult-use distributor, adult-use retail dispensary, and adult-use microbusiness license types became available on the New York Business Express platform. This was the first application window for general adult-use cannabis licensing launched in the State. By the close of the submission deadline on December 18, 2023, the Office received 6,934 applications for adult-use licenses. Future application windows for licenses such as nursery, delivery, cooperative or collective, and on-site consumption are anticipated.
- As a first-in-the-nation initiative, the Cannabis Growers Showcase (CGS) allowed licensed cannabis growers and processors to promote their products at market-style events where consumers could purchase New York state grown cannabis products. CGSs were launched in August 2023, and significantly expanded retail access in the State to people in areas not previously served by retail dispensaries. At the close of the CGS application window on December 1, 2023, 60 CGSs were approved by the Office, involving 75 Adult-Use Conditional Cultivator (AUCC), 19 Adult-Use Conditional Processor (AUCP), and 12 Conditional Adult-Use Retail Dispensary (CAURD) licensees. These events were held in over 40 New York cities and towns, and generated $4.8 million in revenue by the end of November.
- As retail storefront sales rose month over month in 2023, from $2.2 million in January to $18.8 million in November, a picture of the scale of demand across New York has emerged. Rising sales are a reflection of growing momentum for New York's budding market: as consumers came to regulated retailers, they were able to access a wide range of diverse products. In 2023, the market has generated over $137 million in retail sales.

### Expanding the Medical Cannabis Program

- Access to care for cannabis patients continues to grow under New York State's Medical Cannabis Program: the number of health care providers grew from nearly 3,900 in 2022 to 4,200 in 2023. Over 121,900 patients were registered as of September 30, 2023.
- Medical Cannabis Program regulations were approved by the Board in February 2023. The adoption of these regulations streamlined patient access by implementing a new auto-registration process. Patients who are certified by their health care provider for medical cannabis are now automatically registered, allowing them to go directly to a medical cannabis dispensary to purchase medical cannabis without having to register.
- The Medical Cannabis Program regulations also address energy and environmental requirements, enhanced packaging and labeling requirements, a framework for registering additional organizations to cultivate and dispense cannabis, and other standards to promote health and safety of patients and workers in the cannabis industry.
- To further inform policy and program developments that expand and facilitate access to medical cannabis, the Office deployed a survey to patients and healthcare providers in the Medical Cannabis Program to assess and learn from their experiences.
- Outreach events were conducted throughout the year to educate patients and health care providers about the Medical Cannabis Program.
- The Office has implemented two new programs, the Medical Cannabis Ambassador Program and the Medical Cannabis Advisory Council. These programs will leverage the

expertise of certifying practitioners to develop clinical guidance documents and educate the medical community about how to treat patients with medical cannabis.

*Protecting Public Health and Safety*

- □ New enforcement legislation was signed in May 2023, providing additional enforcement power to the Office and the Department of Taxation and Finance (DTF) to enforce the new regulatory requirements, close stores engaged in the illegal sale of cannabis, and increase civil and tax penalties for those violations. The Office implemented a new operational model of enforcement beginning in June, and since then through December 15, 2023, inspectors conducted 369 inspections, including 103 re-inspections, of locations believed to be selling cannabis without being duly licensed. As a result of these inspections, 305 notices of violation/ orders to cease have been issued and over 11,600 pounds of illicit products with an estimated street value of more than $56 million has been seized. The Office continues to build enforcement capacity by recruiting needed staff.
- □ After Office review and recommendation, the Board approved 16 independent laboratories in NYS to conduct medical cannabis and adult-use cannabis testing. For the time period of October 1, 2022, through September 30, 2023, over 5,700 lots of cannabis products (2,500 lots of medical and 3,200 lots of adult use) were tested and the results reviewed by the Office, to ensure product consistency, accurate potency labeling, and that the products did not contain harmful levels of contaminants. The Office introduced the requirement for independent cannabis product sample collection for laboratory testing in July, providing for unbiased sample collection to further strengthen NYS testing standards.
- □ Cannabinoid Hemp Regulations were filed on an emergency basis in July 2023 and permanently adopted in December 2023 to address the immediate threat posed by the proliferation of intoxicating cannabinoid hemp products and to protect public health and safety and the welfare of consumers in NYS. Rules include limits on the amount of THC and cannabinoids that can be sold in different hemp products.
- □ Keeping New Yorkers safe on the road, and preventing impaired driving, is a critical priority for the Office (See CAN Law §10(3)). In 2023, 24 Advanced Roadside Impaired Driving Enforcement Trainings were conducted by the Governor's Traffic Safety Committee (GTSC) with support from the Office, training 832 officers in necessary skills to identify impaired driving. Additionally, five Drug Recognition Expert (DRE) Schools were held by GTSC with support from the Office, adding 83 newly certified DRE officers to the force and bringing the number of active DRE-Certified Officers in NYS to 424.
- □ In April 2023, the Office launched NYS's second statewide adult-use cannabis public education campaign, *Why Buy Legal*. This primarily digital campaign aimed to reach existing and potential cannabis consumers 21 years and older, with important messages about finding safer, tested cannabis products available in the regulated market, supporting the foundation of an equitable industry featuring local small businesses, what to expect in a regulated dispensary, and the importance of safely storing cannabis products. Overall, the campaign earned over 250 million impressions, over 659,000 clicks to the Office's website for more information, and prompted 41 million video completions. An estimated additional 8 million exposures to messages were generated through non-digital, out-of-home placements.
- □ The Office is committed to educating the public about cannabis and the NYS cannabis program and policies so that New Yorkers can make informed decisions about the role cannabis can have in their lives. Public education materials were developed in various formats, from rack cards to booklets to videos and were available in multiple languages, making the Office's messages accessible to as many New Yorkers as possible. Topics

included a guide to safer cannabis consumption, how to read a lab Certificate of Analysis and an adult-use product label, and an introduction to the endocannabinoid system. Materials are disseminated on the Office's website and across its social media channels.

☐ The Office continues to implement its plan for public health and safety data monitoring to ensure the Office has access to the data needed to measure and monitor emerging trends in the critical priorities highlighted in the CAN Law and the Marihuana Regulation and Taxation Act (MRTA), such as underage consumption, traffic safety, and preventing accidental exposure and overconsumption of cannabis (See CAN Law §86(2) and MRTA §51 which adds Section 99-jj to the State Finance Law which establishes a NYS Drug Treatment and Public Education Fund which would, amongst other things, expend monies towards the development and implementation of a statewide public health campaign focused on the health effects of cannabis and legal use, including the aforementioned key priorities). The Office's Incident Reporting Form collects information regarding adverse events, business complaints, and product complaints, streamlining responses requiring enforcement, recalls, or other actions.

☐ Cannabis Research License regulations were adopted in August 2023, allowing licensed researchers to produce, process, purchase, and/or possess cannabis to test chemical potency and composition levels of cannabis, to conduct clinical investigations of cannabis-derived drug products, to conduct research on the efficacy and safety of administering cannabis as part of medical treatment, and to conduct genomic or agricultural research. As researchers are licensed, NYS will gain a wider grasp on the scope of cannabis research being proposed and performed.

☐ As of September 30, 2023, Office compliance staff spent a total of 932 hours in the field carrying out specialized on-site inspections of licensee facilities. Office staff continues to monitor licensees for compliance with statutory and regulatory requirements, educate licensees about the ongoing requirements of licensure, answer compliance related questions, and monitor licensee operational activities to help protect health and safety.

☐ The Office issued a contract to BioTrack to develop an inventory tracking system to track the movement of cannabis products from the specific site at which the plant was grown to the customer, monitoring movement from seed to sale. The Office is working to roll-out the system implementation as new licenses are approved into 2024.

## Supporting Licensees

☐ The Cannabis Compliance Training and Mentorship (CCTM) Program assisted experienced cannabis cultivators and food and beverage processors to transition to a well-regulated adult-use cannabis market. This program aimed to grow and diversify the pipeline of farmers and processors preparing to participate in NYS's adult-use cannabis industry. In 2023, there were over 240 participants, including 94 legacy cultivators and 42 legacy processors, and 83 participants qualified as distressed farmers, 2 as service-disabled veterans, and 10 as both distressed farmers and service-disabled veterans.

☐ The CAURD Accelerator provides each retailer with intensive training and mentorship, including the comprehensive, individualized, hands-on assistance that new entrepreneurs need to succeed in the highly competitive retail cannabis market. This program has given licensees the opportunity to enter the adult-use market from the outset with specialized educational opportunities to ensure their long-term success and competitiveness.

☐ In support of the goal set forth in the CAN Law that SEE licenses comprise 50% of all adult-use licenses awarded by the Board, the adult-use cannabis license applications released on October 4, 2023, provide applicants interested in becoming SEE applicants the opportunity to submit supplementary information as part of the application process to

determine their eligibility (See CAN Law §10(2)). Additional funding opportunities will be available for community organizations to provide free application assistance services to qualifying SEE applicants.

☐ Licensing is the cornerstone of a well-regulated legal market. During the period of April 1, 2022, to September 30, 2023, the Office received or processed nearly 6,000 applications for cannabinoid hemp licenses and permits and approved over 5,400 of those applications. As of September 30, 2023, the Office reviewed nearly 400 applications for AUCC and AUCP licenses and the Board approved 319 of those applications. As of that date, the Office also received over 900 applications for CAURD licenses, and of those submitted, 463 were issued a license or provisionally approved, including 453 qualifying businesses and 10 not-for-profit entities. Provisionally approved CAURD applicants must complete the post-selection application process, receive a final license certificate, and complete an on-site compliance inspection before beginning adult-use retail sales. By the end of 2023, there were 41 adult-use cannabis retail dispensaries open for business across New York.

*Revenue*

☐ In State Fiscal Year (SFY) 2022-23, cannabis tax, application fee, and license fee revenue totaled nearly $16.3 million, with the Medical Cannabis Program generating over $11.6 million, the Cannabinoid Hemp Program generating nearly $1.1 million, and the Adult-Use Cannabis Program generating nearly $3.6 million.

☐ By the mid-point of SFY 2023-2024, cannabis revenue has totaled over $16.6 million, with the Medical Cannabis Program generating over $4.3 million, the Cannabinoid Hemp Program generating over $560,000, and the Adult-Use Cannabis program generating over $11.7 million.

*Administration*

☐ Over the course of 2023, the Office recruited and hired 46 full-time equivalent staff (FTE) bringing the total agency staff to 162 FTEs as of December 31, 2023.

☐ At the close of 2023, the Office has three locations, the previously established offices in Albany and New York City, and a new office in Buffalo.

☐ In compliance with the Governor's Executive Order 22, and as part of the Office's commitment to sustainability and decarbonization efforts, the Office secured a fleet of both fully electric and hybrid vehicles.

☐ In 2023, the Office completed and filed nine assessments of public comment. Ten regulatory packages were effectuated, with over 650 pages detailing the rules for a strong foundation for regulation of New York's cannabis industry.

☐ To support adherence to the CAN Law, regulations, and related policies, the Office has issued over 30 key guidance documents this year.

# Introduction

**Summary of Cannabis Legalization in New York State**

Beginning in the 1930s, concerted efforts across the United States, led by legislators and public opinion leaders, sought to convince the public that cannabis posed a threat to society, urging prohibition.[2] What followed were federal and state laws that made cannabis the primary target in America's drug war, driving significant impacts on social justice and community well-being, with acutely disproportional effects on Black and Hispanic communities.[3] Meanwhile, existing laws were ineffective in reducing or curbing cannabis use and allowed an illicit market to thrive, which posed a threat to public health and hindered efforts to deter minors from accessing and using cannabis. Despite a growing body of evidence that cannabis offers health benefits, existing laws restricted research and slowed efforts to build scientific knowledge about the plant's therapeutic potential.

Following several attempts to reform New York State's (NYS) cannabis laws, the 2014 Compassionate Care Act became NYS's first cannabis legalization measure, creating the State's Medical Cannabis Program. Dispensaries first opened in January 2016, providing New Yorkers who were suffering from certain serious conditions with access to medical cannabis. Two years into NYS having an active, regulated Medical Cannabis Program, the State called for an assessment of the potential impact of regulating cannabis for adult use in NYS during the 2018 Enacted Budget. The NYS Department of Health (DOH) was directed to evaluate the health, public safety, and economic impact of legalizing cannabis. The findings recommended a regulated adult-use cannabis market, paving the way for the passage of the Marihuana Regulation and Taxation Act (MRTA). The MRTA that established our State's CAN Law was signed into law on March 31, 2021, legalizing adult-use cannabis in NYS and consolidating all cannabis-related programs and functions under one newly created state entity. The CAN Law created a new Office of Cannabis Management (Office) governed by a Cannabis Control Board (Board) to comprehensively regulate adult-use cannabis, medical cannabis, and cannabinoid hemp (See CAN Law §§ 7 and 8). This effort began in earnest in September 2021 when Governor Kathy Hochul appointed members to the Board and the Executive Director of the Office. The Board's inaugural meeting was held October 5, 2021, during which it appointed the Office's first cohort of staff, officially creating the Office.

**Summary of Cannabis Control Board and Leadership Appointments**

*Cannabis Control Board*

Tremaine Wright, Chair of the Board, is a former member of the New York State Assembly who, thereafter, served as the first Director of the Division of Financial Services Statewide Office of Financial Inclusion and Empowerment.

---

[2] Dolce, J. (2017). Brave New Weed: Adventures into the Uncharted World of Cannabis. Germany: Harper Wave.
[3] Schneiderman, E. (2013). A Report On Arrests Arising From The New York City Police Department's Stop-And-Frisk Practices. New York State Office of the Attorney General. https://chicagodefender.com/wp-content/uploads/sites/4/2013/11/oag_report_on_sqf_practices_nov_2013.pdf

Adam W. Perry, Board Member, is a partner at Hodgson Russ LLP, where he focuses on employment litigation, and has represented nonprofits, government agencies, and businesses in state and federal courts.

Jessica García, Board Member, is Assistant to the President of the Retail, Wholesale and Department Store Union, a national labor union representing workers along the food supply chain, as well as workers in non-food retail and healthcare.

Jennifer Gilbert Jenkins, PhD, Board Member, is an Associate Professor of Agricultural Science at the State University of New York (SUNY) Morrisville whose work focuses on growing cannabis for grain, fiber, and flower. She was appointed to the Board in January 2023.

Hope Knight, Board Member, is the President, CEO and Commissioner of Empire State Development, NYS's economic development agency, where she is dedicated to policies that advance sustainable and inclusive economic growth. She was appointed to the Board in July 2023.

## Former Board Members

Jen Metzger served on the Board from October 2021 through December 2022.

Reuben R. McDaniel, III served on the Board from October 2021 through June 2023.

## Executive Leadership at the Office

Chris Alexander, Executive Director, was appointed by Governor Kathy Hochul in September 2021. In this role, Mr. Alexander is charged with overseeing the implementation of the CAN law, the building out of the Office, and directing the development of internal policies and external rules and regulations.

Patrick McKeage, First Deputy Director, is charged with managing agency operations and leading operational staff as well as managing priority projects for the Office.

Stanley De La Cruz, Director of Executive Operations, is responsible for the Office's long-term production workflow management systems and supports special projects as directed by the Executive Director.

Mary Adelaja, Manager of Executive Operations and Chief Diversity Officer, provides support to the Executive Director and leads the Office's diversity recruitment efforts, including development of the Strategic Plan for Diversity and Inclusion for the agency.

Damian Fagon, Chief Equity Officer, appointed by the Board in June 2022, oversees the social and economic equity initiatives laid out in CAN Law §12.

Linda Baldwin, General Counsel to the Office and Counsel to the Board, appointed by the Board in January 2023, leads the Office of General Counsel to support the Office's programs, legislative and regulatory agenda, and compliance and enforcement efforts.

Nicole Rosa, PharmD, Director of Health and Safety, appointed by the Board in December 2021, oversees product quality and safety, compliance, customer service for medical cannabis program

patients and practitioners, and research to protect the health and safety of cannabis consumers, licensees, and medical cannabis patients in NYS.

John Kagia, Director of Policy, appointed by the Board in August 2022, leads the team responsible for policy development and implementation, including development of research and data systems to monitor industry performance and the Office's educational public health campaigns.

Amanda Wilson, Director of Administration, is responsible for planning, developing, and supervising the operations of the Administration team, and managing the team responsible for overseeing the IT, Budget, and Human Resources portfolios of the Office.

Jessica Woolford, Director of Communications, leads the Office's press and digital teams, ensuring timely, responsive, and up-to-date information is shared with stakeholders and New Yorkers across the State via the Office's public-facing channels, in the media, and online.

*Former Executive Leadership*

Axel Bernabe, former Chief of Staff and Senior Policy Director, led development of the adult-use regulations and development of agency policy priorities before leaving the Office in September of 2023.

Jason Salmon, former Director of External Affairs, led the Office's efforts to educate New Yorkers about the adult-use cannabis licensing opportunities as well as the benefits for communities to support legal cannabis businesses.

**Cannabis Advisory Board**

The NYS Cannabis Advisory Board (CAB) is a multidisciplinary group of experts from across NYS tasked with providing guidance to the Board and Office on a range of issues related to adult-use cannabis, medical cannabis, and cannabinoid hemp programs. The roles and functions of the CAB are mandated by Section 14 of the CAN Law. The CAB is comprised of 13 voting members— seven appointed by the Governor, three appointed by the Temporary President of the NYS Senate, and three appointed by the Speaker of the Assembly— and non-voting ex officio members representing eight state agencies (see Appendix A for a list of CAB members). To effectively execute the duties and responsibilities of the CAB, the following standing subcommittees were established:

- Community Grants Reinvestment
- Social and Economic Equity
- Health, Safety, and Research
- Cannabis Industry and Market

In addition to providing guidance and feedback on the State's cannabis program, the CAB is also charged with governing and administering the NYS Community Grants Reinvestment Fund, reinvesting tax revenue from adult-use cannabis sales to those communities most impacted by over-policing and cannabis prohibition.

**Legislative Mandate**

Pursuant to Cannabis Law (CAN Law), the Cannabis Control Board (Board) is responsible for creating and implementing a comprehensive regulatory framework for medical and adult-use

cannabis and cannabinoid hemp in the State of New York. The following report is issued pursuant to Section 10(17) of the CAN Law which provides, in relevant part, that the Board shall have duties including: "[t]o draft and provide an annual report on the effectiveness of this chapter." "Such report shall be published on the Office [of Cannabis Management]'s website and presented to the Governor, the Majority Leader of the Senate and the Speaker of the Assembly, no later than January first, two thousand twenty-three and annually thereafter" (CAN Law § 10(17)(h)).

## Purpose and Scope of the Report

This report describes progress and accomplishments to date by the Board and the Office regarding implementation of the CAN Law. The structure of this report is informed by the components required by the CAN Law §10(17) and the key functions of the Office. Activities described herein cover the period of January to December 2023. Data included in the report are the most recent available as of September 30, 2023, unless stated otherwise.

## Contributors to the Report

This report was prepared in consultation with partner state agencies that have supported the Board and the Office's implementation efforts (Table 1). Memoranda of Understanding (MOU) have been established with many of these agencies, where applicable, to provide support through trainings, data collection and reporting, and staff.

**Table 1: List of State Agencies Partnering with the Board and Office**

| Partner State Agencies | |
|---|---|
| Department of Agriculture and Markets | Dormitory Authority of the State of New York |
| Department of Civil Service | Empire State Development |
| Department of Environmental Conservation | Office of Addiction Services and Supports |
| Department of Health | Office of Children and Family Services |
| Department of Labor | Office of General Services |
| Department of Motor Vehicles | Office of Information Technology Services |
| Department of State | Office of Mental Health |
| Department of Taxation and Finance | Office of the Attorney General |
| Division of Budget | State Liquor Authority |
| Division of Criminal Justice Services | New York State Police |

# Licensing

The Office is charged with issuing licenses for businesses to participate in NYS's medical cannabis, cannabinoid hemp, and adult-use cannabis programs. Licensing staff process and review applications to ensure that applicants meet eligibility criteria and that the applications submitted for licensure are complete and accurate. Technology projects initiated in 2023 helped streamline licensing processes and improved customer service by reducing manual procedures and improving accuracy.

**Medical Cannabis Registered Organizations**

Registered Organizations (ROs), as licensed under CAN Law Article 3, are responsible for manufacturing and dispensing medical cannabis in NYS. When the MRTA was signed into law in March 2021, it included provisions that increased the number of dispensing facilities a RO may operate from four to eight, provided however, the first two additional sites beyond the original four sites must be in medically underserved or unserved geographic locations as determined by the Board (see Health Equity and Access under the Medical Cannabis Program section of this report for more information about medically underserved or unserved geographic locations). During 2023, an additional RO was added and approved for a single dispensary location, but has not begun operations as of the publishing of this report. The registrations for nine of the original ten ROs were renewed in 2023 allowing for continued operations. Table 2 shows a summary of current ROs, and Appendix B-1 provides a list of the ROs' approved medical dispensary locations.

**Table 2: Summary of Registered Organizations, by Year Registered or Renewed**

| Registered Organizations | Year Registered/ Renewed | | | | |
|---|---|---|---|---|---|
| | 2015 | 2017 | 2019 | 2021 | 2023 |
| Columbia Care NY, LLC | X | X | X | X | X |
| Etain, LLC | X | X | X | X | X |
| MedMen, Inc. | X | X | X | X | |
| PharmaCann of New York, LLC | X | X | X | X | X |
| Vireo Health of New York, LLC | X | X | X | X | X |
| Citiva Medical, LLC | | X | X | X | X |
| Curaleaf NY, LLC | | X | X | X | X |
| Fiorello Pharmaceuticals, Inc. | | X | X | X | X |
| NYCANNA, LLC | | X | X | X | X |
| Valley Agriceuticals, LLC | | X | X | X | X |
| Hudson Health Extracts | | | | | X |

*Registered Organization Participation in the Adult-Use Cannabis Market*

The CAN Law allows for the transition of an existing RO from operating as a strictly medical RO licensed under CAN Law Article 3 to an adult-use Registered Organization with Dispensing (ROD) or Registered Organization Non-Dispensing (ROND) licensed under Article 4. ROD are eligible to co-locate medical and adult-use sales at up to three of an RO's dispensaries (Co-located Dispensaries). Those Co-located Dispensaries are subject to the regulations set forth in Section 123.18 and Section 113.7 of Title 9, which define additional requirements for Co-located

Dispensaries and how to apply for additional RODs. The Office began accepting applications on October 4, 2023. Registered Organizations must be in good standing with the Office and have four operational medical dispensing sites to apply for a ROD or ROND license. The following information, including but not limited to, must be submitted to the Office: a community impact plan, an energy and environmental plan, and a medical patient prioritization plan. Six ROs were approved by the Board for a ROD and/or ROND license (Table 3). Upon payment of the special license fee, RODs are approved to begin adult-use operations on or after December 29, 2023.

**Table 3: Summary of Registered Organizations Licensed as RONDs or RODs in 2023**

| Registered Organizations | License Type Approved | |
|---|---|---|
| | ROND | ROD |
| Columbia Care NY, LLC | X | X |
| Curaleaf NY, LLC | | X |
| Etain, LLC | | X |
| NYCANNA, LLC | | X |
| PharmaCann of New York, LLC | | X |
| Valley Agriceuticals, LLC | X | X |

*Registered Organization Expansion Application*

On October 31, 2023, the Board opened the application window for new ROs to apply to participate in the medical cannabis market as mandated by the MRTA.[4] This application process represents the first opportunity for those interested to apply for a registration since the original medical cannabis applications window was opened by DOH in 2015. The Office seeks to expand the medical market and increase patient access. Per the CAN Law, the Board must give registrations to RO applicants when it is in the public interest to do so. RO applicants may demonstrate their ability to serve the public in various ways, including (1) demonstrating cultural, linguistic, and medical competence, (2) providing affordable products for patients, (3) adhering to fair labor practices, (4) protecting environmental sustainability, and (5) meeting diversity, equity, and inclusion goals, amongst other things (See CAN Law § 35(3)). By expanding the medical market, the Board and the Office are prioritizing patient needs by licensing ROs committed to serve them. The application period closed on December 19, 2023.

**Cannabinoid Hemp Licensing and Permitting**

The Office regulates hemp products used or marketed for its cannabinoid content, such as CBD. It requires anyone who is processing, manufacturing, or selling cannabinoid hemp to obtain a license or permit from the Office to do so. To support the growth of the cannabinoid hemp industry in NYS, the Office added a new license and permit in April 2023. The Cannabinoid Hemp Farm Processor license allows smaller farmers a mechanism to manufacture and sell cannabinoid hemp flower products from hemp they cultivated; the license is valid for up to one year. The Cannabinoid Hemp Temporary Retail Permit allows for the temporary retail sale of cannabinoid hemp products to consumers online, at farmer's markets, vendor shows, and other temporary retail locations; this permit is valid for up to three months. Distributor permits and retail licenses are renewed annually while processor licenses are renewed every two years. As of September 30, 2023, there were 60 active processor licenses, 5 active farm processor licenses, 432 active

---

[4] "In coordination with the chief equity officer the board shall register additional registered organizations to provide services to unserved and underserved areas of the state." (N.Y. CANBS § 35(9)).

distributor permits, 3,301 active retailer licenses, and 22 active cannabinoid hemp temporary retail permits. Table 4 shows a statewide summary of cannabinoid hemp licensing and permitting activity, and Appendix C provides the same data stratified by County.

**Table 4: Summary of Cannabinoid Hemp License and Permit Applications, as of September 30, 2023**

| State Fiscal Year | Application Status | Processors | Farm Processors | Distributors | Retailers | Temporary Retailers | Total |
|---|---|---|---|---|---|---|---|
| SFY 4/1/22-3/31/23 | Pending Applications Prior to Reporting Period | 13 | 0 | 112 | 682 | 0 | 807 |
| | Applications Submitted During the Reporting Period | 48 | 1 | 418 | 2,778 | 0 | 3,245 |
| | Applications Approved During the Reporting Period | 25 | 0 | 442 | 3,222 | 0 | 3,689 |
| | Applications Denied During the Reporting Period | 0 | 0 | 1 | 1 | 0 | 2 |
| | Applications Voided During the Reporting Period | 13 | 0 | 3 | 21 | 0 | 37 |
| | Pending Applications at the Close of the Reporting Period | 23 | 1 | 84 | 216 | 0 | 324 |
| SFY 4/1/23-9/30/23 | Pending Applications Prior to Reporting Period | 23 | 1 | 84 | 216 | 0 | 324 |
| | Applications Submitted During the Reporting Period | 13 | 4 | 174 | 1,659 | 51 | 1,901 |
| | Applications Approved During the Reporting Period | 5 | 5 | 160 | 1,509 | 36 | 1,715 |
| | Applications Denied During the Reporting Period | 0 | 0 | 0 | 0 | 0 | 0 |
| | Applications Voided During the Reporting Period | 5 | 0 | 30 | 43 | 6 | 84 |
| | Pending Applications at the Close of the Reporting Period | 26 | 0 | 68 | 323 | 9 | 426 |

The Office adopted new regulations for cannabinoid hemp products which were passed as emergency regulations to protect public health and safety by, amongst other things, limiting the THC content of cannabinoid hemp products and ensuring consumers are not misled by product marketing. The emergency regulations included rules limiting the total THC and cannabinoid levels and established a minimum allowable CBD:THC ratio in cannabinoid hemp products, prohibiting the sale of cannabinoid hemp products containing over 0.5 milligrams of total THC per serving to individuals under the age of twenty-one, revising current laboratory testing for cannabinoid hemp products, and updating packaging, labeling, marketing, and advertising requirements for cannabinoid hemp products.

Litigation was commenced on these emergency regulations under case title *North Fork Distribution, Inc., et al. v. New York State Cannabis Control Board, et al.,* which challenged only

the emergency nature of the process utilized to adopt the regulations under State Administrative Procedures Act. The litigation did not challenge the content of these regulations. In the meantime, the Office completed an assessment of public comment on the same regulations filed on a non-emergency basis, and those regulations were effectuated in December 2023.

**Adult-Use Cannabis Licensing**

The Conditional Cannabis Cultivation and Processing Bill was signed in February 2022 by Governor Hochul to provide the opportunity for farmers in New York to receive the first licenses to grow adult-use cannabis. The application period for Adult-Use Conditional Cultivators (AUCC) closed December 31, 2022, and processing of submitted applications continued into 2023. Eligible applicants were required to provide proof that they cultivated hemp under the Department of Agriculture and Markets' (AGM) Industrial Hemp Program for two of the previous four calendar years (2018-2021) and the applicants were required to be in good standing with AGM. The Office received over 330 applications for AUCC licenses. As of September 30, 2023, 279 AUCC licenses have been issued by the Board.

The application window for Adult-Use Conditional Processor (AUCP) licenses ran from June to August 2022. Eligible applicants were required to have applied for a Cannabinoid Hemp Processor license from the Office prior to January 1, 2021, and were required to be issued that license before being issued a license as an AUCP. The Office received 55 applications for AUCP licenses and 40 have been approved by the Board.

The application window for Conditional Adult-Use Retail Dispensary (CAURD) licenses ran from August to September 2022. CAURD licensees are New York's first legal adult-use retail dispensaries and these stores are operated by those most impacted by the enforcement of the prohibition of cannabis. The CAURD license prioritizes individuals who are justice-involved, meaning either they or an eligible family member were convicted of a marihuana-related offense in NYS, and non-profit organizations who serve justice-involved individuals and communities disproportionally impacted by cannabis prohibition. The CAURD license positioned justice-involved individuals to make the first sales of adult-use cannabis in NYS with products grown by New York farmers. As of September 30, 2023, the Office received over 900 applications for CAURD licenses, and of those submitted, 463 have been issued a license or provisionally approved, including 453 qualifying businesses and 10 not-for-profit entities. These provisionally approved CAURD applicants must complete the post-selection application process, receive a final license certificate, and complete an on-site compliance inspection before beginning adult-use retail sales.

There were multiple lawsuits, including Article 78 proceedings, brought against the Office that challenged the CAURD program, including *Variscite NY One, Inc., v. The New York State Cannabis Control Board, et al., Coalition for Access to Regulated and Safe Cannabis v. The New York State Cannabis Control Board, et al.,* and *Carmine Fiore, et al. v. The New York State Cannabis Control Board, et al.,* each of which resulted in significant delays of issuing licenses because of court ordered injunctions against the Office. Such litigations were resolved and the Office was able to move forward with continuing the CAURD program at the end of 2023.

Table 5 shows the statewide summary of adult-use cannabis licensing activity as of September 30, 2023, and Appendix D provides the same data stratified by county.

**Table 5: Summary of Adult-Use Cannabis License Applications as of September 30, 2023**

| State Fiscal Year | Application Status | License Type | | | |
|---|---|---|---|---|---|
| | | AUCC | AUCP | CAURD | Total |
| SFY 4/1/22-3/31/23 | Pending Applications Prior to Reporting Period | 126 | N/A | N/A | 126 |
| | Applications Submitted During the Reporting Period | 212 | 55 | 904 | 1,171 |
| | Applications Provisionally Approved During the Reporting Period (CAURD only) | N/A | N/A | 59 | 59 |
| | Licenses Issued During the Reporting Period | 279 | 40 | 7 | 326 |
| | Applications Denied During the Reporting Period | 0 | 0 | 0 | 0 |
| | Pending Applications at the Close of the Reporting Period | 59 | 15 | 838 | 912 |
| SFY 4/1/23-9/30/23 | Pending Applications Prior to Reporting Period | 59 | 15 | 838 | 912 |
| | Applications Submitted During the Reporting Period | 0 | 0 | 0 | 0 |
| | Applications Provisionally Approved During the Reporting Period (CAURD only) | N/A | N/A | 380 | 380 |
| | Licenses Issued During the Reporting Period | 0 | 0 | 17 | 17 |
| | Applications Denied During the Reporting Period | 0 | 0 | 0 | 0 |
| | Pending Applications at the Close of the Reporting Period | 59 | 15 | 441 | 515 |

## *Adult-Use Cannabis License Applications*

On October 4, 2023, the licensing applications for adult-use cultivator, adult-use processor, adult-use distributor, adult-use retail dispensary, and adult-use microbusiness license types became available on the New York Business Express platform. The submission deadline for adult-use license applications closed at 5:00 PM EST on December 18, 2023. During the application window, currently operational AUCCs and AUCPs were also able to apply to transition to full, non-conditional licenses. For retail dispensary and microbusiness applicants that applied with proof of control over their proposed licensed premises, there was an expedited application window that closed at 5:00 PM EST on November 17, 2023. The retail dispensary and microbusiness application window remained open after November 17, 2023, until 5:00 PM EST on Monday, December 18, 2023, for applicants that applied after November 17, or applied for provisional licensure.

The adult-use cannabis license applications were comprised of several parts which included: the Primary License Application, the social and economic equity (SEE) Certification, the True Parties of Interest (TPI) Disclosures, and the Location and Operations Section. Upon review and approval by the Board, licenses will be awarded to cultivators, processors, distributors, microbusinesses, and retail dispensaries in early 2024 for participation in NYS's legal adult-use market. This was

the first application window for general adult-use cannabis licensing launched in the State. Future application windows for licenses such as nursery, delivery, cooperative or collective, and on-site consumption are anticipated. By the close of the submission deadline on December 18, 2023, the Office received 6,934 applications for adult-use licenses—372 cultivator, 538 processor, 351 distributor, 4,324 retail, and 1,349 microbusiness licenses. The adult-use cannabis license applications provide those interested in applying for SEE certification the opportunity to submit supplementary information as part of the application process to determine their eligibility. As of December 18, 2023, 3,826 applicants were seeking to be certified as a SEE candidate.

**Licensee Owner and Employee Demographics**

Per the CAN Law, the Board is required to collect and report data about the demographics of the owners and employees of businesses licensed, permitted, or registered by the Board (See CAN Law §10(17)). This information was collected from those who applied for a Cannabinoid Hemp license or permit in 2023, and data as of September 30, 2023, are provided in Appendix E. In addition, demographic data for the ROs' owners and employees were collected by the Office in 2023 and are provided in Appendix E. In December 2023, the SUNY Rockefeller Institute for Government conducted an analysis of the data.[5] This information for Adult-Use licensees will be collected upon license application or renewal, depending on the license type, in 2024 and thereafter, per the CAN Law.

---

[5] Registered Organizations' Owner and Employee Demographics Report:
http://cannabis.ny.gov/rockefeller-report

# Social and Economic Equity

Social and economic equity are integral components of NYS's comprehensive cannabis regulatory framework. The goal is to establish a robust program that actively promotes participation in the new industry while ensuring it is representative and equitable.

**Social and Economic Equity Plan**

The New York Social and Economic Equity (NYSEE) Plan outlines an approach for developing a legal cannabis market based on the principles of equity, small business access, workforce support, regenerative local economic development, consumer education, and uplifting those most harmed under prohibition. On May 11, 2023, the Board voted to approve the Office's NYSEE Plan.[6]

The purpose of the NYSEE Plan is to identify, describe, and broadcast the Office's policy priorities related to social and economic equity. Pursuant to the CAN Law, the Board is charged with the creation and implementation of a social and economic equity plan in consultation with the Chief Equity Officer and Executive Director, and after receiving public input (See CAN Law § 87(1)). The promotion of social and economic equity in the cannabis industry is a central mission of both the Board and the Office. The NYSEE Plan presents the strategy for advancing that mission.

The objective of the NYSEE Plan is to promote diversity in commerce, ownership, and employment in the new regulated cannabis industry. In addition, the CAN Law directs the NYSEE Plan to determine licensing designations that support the goal of awarding 50% of adult-use cannabis licenses to SEE applicants. The NYSEE Plan is the outcome of the collective insight, expertise, and ongoing dedication of Office staff. It is a result of collaborative efforts with more than 400 community stakeholders from across the State, engaged through community roundtable events. Roundtable events represented social and economic equity groups identified in CAN Law—individuals from communities disproportionately impacted (CDI)s, minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans (SDV) (See CAN Law §§2 and 3). Participants had the opportunity to speak directly to the Office and share their unique perspectives about representation, equity, and strategies to increase cannabis industry participation from each SEE priority population. These events enabled public input to help inform development of the NYSEE Plan and the cannabis regulations formulated by the Office.

To ensure an equitable cannabis industry, the Board and the Office are committed to the following equity pillars:

- Bringing to life an industry that gives small, independent businesses an opportunity to compete.
- Building relationships and trust within the communities most impacted by prohibition through educational and social programs.
- Investing resources including grants, loans, and technical assistance to equip NYSEE groups with the support needed to thrive in the NYS cannabis market.
- Educating communities about how to engage in the industry in accordance with the laws and regulations.

---

[6] NYSEE Plan: https://cannabis.ny.gov/new-york-social-and-economic-equity-plan

☐ Collecting data to develop responsive and adaptive programming that meets the equity needs of industry participants.

**Identifying Communities Disproportionately Impacted by Prohibition**

The identification of CDIs is central to the restorative justice framework of the CAN Law. Section 87 of the CAN Law defines a CDI as "a history of arrests, convictions, and other law enforcement practices in a certain geographic area, including, but not limited to, precincts, zip codes, neighborhoods, and political subdivisions, reflecting disparate enforcement of cannabis prohibition during a specific time period relative to the rest of the state" (CAN Law § 87(5)(g)). The Board, in consultation with the Chief Equity Officer, Executive Director, and the CAB, issued guidelines in the NYSEE Plan, to determine how to assess which communities have been disproportionately impacted. The Office worked with the Division of Criminal Justice Services (DCJS) to better understand the state's history of arrests and to help identify CDIs.

The Office analyzed cannabis-related arrest records from 1980 to 2021 by race, ethnicity, felony, misdemeanor, and the place of residence of an individual at the time of their arrest. Utilizing the arrest data and data from decennial census surveys, the Office was able to determine the arrest rates for the State as a whole and for local census tracts. Where the local arrest rate substantially exceeded the State's arrest rate, the Office designated the area as a CDI. The CDI census tracts demonstrate that approximately one quarter of NYS's population experienced three quarters of the arrests over the last four decades.

An interactive map of CDIs is available on the Office's website to help potential applicants determine if they qualify as a SEE applicant as an individual from a CDI.[7] The maps described herein only indicate where CDIs exist within NYS. Out-of-state applicants applying for CDI status must demonstrate that their community experienced arrest rates substantially exceeding their state's arrest rates. Such applicants must submit documentation demonstrating that the census tract they resided in out of state was disproportionately impacted under prohibition as compared to the rest of that state.

**Expungement and Record Sealing**

The Office is committed to ensuring that all New Yorkers impacted by marihuana-related offenses are made aware of the process currently underway to expunge and seal their convictions. The MRTA provided for the automatic expungement of certain marihuana-related convictions by the Office of Court Administration (OCA) and DCJS. This does not require filing any motions or paying any fees. The following convictions are included:

- Penal Law Section 221.05 Unlawful Possession of Marihuana in the Second Degree
- Penal Law Section 221.10 Unlawful Possession of Marihuana in the First Degree
- Penal Law Section 221.15 Criminal Possession of Marihuana in the Fourth Degree
- Penal Law Section 221.20 Criminal Possession of Marihuana in the Third Degree
- Penal Law Section 221.35 Criminal Sale of Marihuana in the Fifth Degree
- Penal Law Section 221.40 Criminal Possession of Marihuana in the Fourth Degree
- Penal Law Section 222.10 Restrictions on Cannabis Use
- Penal Law Section 222.15 Personal Cultivation and Home Possession of Cannabis
- Penal Law Section 222.25 Unlawful Possession of Cannabis
- Penal Law Section 222.45 Unlawful Sale of Cannabis.

---

[7] CDI Information and Interactive Map: https://cannabis.ny.gov/communities-disproportionately-impacted

If the only controlled substance involved in a particular case was concentrated cannabis, then convictions for the following offenses will also be automatically expunged:

- Penal Law Section 240.36 Loitering in the First Degree
- Penal Law Section 220.03 Criminal Possession of a Controlled Substance in the Seventh Degree
- Penal Law Section 220.06 Criminal Possession of a Controlled Substance in the Fifth Degree.

Over 400,000 convictions are eligible for expungement. The law gives OCA and DCJS two years to expunge and then seal those convictions. As of September 30, 2023, a total of 202,189 convictions have been sealed under this process. As a result of the marihuana-related offense being their only conviction, 24,400 individuals no longer have a NYS criminal record barring them from seeking employment, housing, or professional licensure.

While waiting to be sealed, convictions are suppressed. Suppressed convictions no longer appear during a criminal background check or when an individual applies for employment, with the exception of police officer or peace officer, or professional licensure requiring a fingerprint-based criminal background check. As of September 30, 2023, 107,633 eligible convictions for violations of Article 221 of the NYS Penal Law (PL 221 listed above) have been suppressed. Suppression of these convictions has resulted in approximately 11,000 individuals with no NYS criminal history. Eligible suppressed convictions are being processed on a rolling basis to be expunged and sealed.

No person in NYS remains incarcerated for solely a marihuana-related offense now eligible for expungement.

## Business and Pre-Business Support

*Cannabis Compliance Training and Mentorship Program*

Per the CAN Law, there must be an active promotion of applicants from communities disproportionately impacted by cannabis prohibition and promotion of racial, ethnic and gender diversity when issuing licenses – which includes mentoring potential applicants to grow and diversify the pipeline of farmers and processors preparing to participate in NYS's adult-use cannabis industry (See CAN Law §87(1)). Further, the Conditional Cannabis Cultivation Bill (Chapter 18 of the Laws of 2022) directed the Office to focus on cultivation and processing mentorship. In response to this mandate, the Cannabis Compliance Training and Mentorship Program (CCTM) was developed, a 10-week virtual training program designed to train three cohorts of trainees and mentees: legacy cultivators, traditional farmers, and a combined cohort of legacy processors and traditional food and beverage processors. The program launched in January of 2023, consisting of a series of structured webinars focusing on commercial cannabis cultivation, commercial cannabis processing, agribusiness management, and regulatory compliance. The courses and technical trainings were developed by the Office in collaboration with SUNY Morrisville and Cornell University professors, with additional lectures from accountants and attorneys with cannabis experience. Of the 241 total CCTM participants, 43% were from diverse racial backgrounds, and 26% were female. The cohort was an engaged group, with a notable program completion rate of 97.5%. The CCTM program concluded in late April 2023.

### CAURD Accelerator Program

The CAURD Accelerator provided retailers with intensive training and mentorship, including the comprehensive, individualized, hands-on assistance that new entrepreneurs need to succeed in the highly competitive retail cannabis market. To provide this expertise, the Office partnered with Our Academy, a non-profit workshop, mentorship program, and open education resource for cannabis equity applicants, operators, and others impacted by the War on Drugs. The optional program includes approximately 40 distinct workshops, consultations with finance specialists, and one-on-one mentoring. The Office will retain the CAURD Accelerator curriculum, and all related written materials produced through the program as a foundation for future business development programming for social and economic equity licensees.

### Technical Assistance for License Applications

With the opening of the adult-use cannabis license applications on October 4, 2023, the Office identified an urgent need to provide SEE applicants with technical assistance to complete the intensive application process. The Office identified the following objectives: strategic network support, collaborative partnerships, training and development, resource dissemination, and additional support and funding for community partners.

The Office created the Cannabis Hub and Incubator Program (CHIP) SEE Application Assistance to fill this need. To provide these services and facilitate support, the Office engaged and strategically collaborated with key community stakeholders, referred to as Technical Assistance Providers (TAPs). The primary objective of these collaborations was to have TAPs render pro-bono application assistance to SEE qualified applicants both in-person and virtually. TAPs included over 75 individuals from 25 organizations across NYS, including community-based organizations, academic institutions, non-profits, law firms, and accounting firms. As of December 31, 2023, the CHIP SEE Application Assistance Program has reached over 650 applicants across New York. Comprehensive training sessions were conducted in late September to ensure optimal partner readiness for the October application window. Partner training included a series of instructional sessions, each lasting two hours, focused on SEE eligibility and walking through the application process–transforming TAPs into specialists on this subject. Other resources included a Frequently Asked Questions (FAQ) document, curated resource guides, and guides about specific subjects that the Office noted were frequently encountered in previous application rounds, such as true parties of interest, location changes, LLC acquisition procedures, and more.

The TAP network is the first iteration of an ongoing effort to provide application and continuous technical support to SEE individuals, both pre-licensure and post-licensure.

# Enforcement

Enforcement staff investigate complaints about cannabis-related activities, involving either licensees or unlicensed entities, and, if appropriate, take enforcement action. New enforcement legislation signed in May 2023 provided enforcement power to the Office and Department of Taxation and Finance (DTF) to enforce against unlicensed businesses, close stores engaged in the illegal sale of cannabis, and increase civil and tax penalties for those violations up to $20,000 per day. Specifically, the revisions to the law:

- Empowered the Office to take enforcement actions against businesses selling cannabis without the required license, including so-called "sticker shops" and other similar unlicensed businesses selling cannabis;
- Bolstered the enforcement authority of the Office, allowing it to conduct regulatory inspections of all businesses selling and giving away cannabis, including selling and giving away cannabis in indirect ways, and to inspect these businesses by using a court order if the businesses do not allow the Office to conduct an inspection;
- Empowered the Office to seize cannabis found in unlicensed cannabis businesses;
- Empowered the Office to seek court-ordered injunctions, closing orders, and the removal of commercial tenants to ensure unlicensed cannabis businesses cannot continue operating in violation of state law, and to incentivize landlords to make sure that their tenants are acting in compliance with the state law;
- Directed the Office to continue its work informing the public of the risks of patronizing unlicensed cannabis businesses, and to encourage cannabis consumers to instead patronize the State's growing legal market;
- Established that selling cannabis and cannabis products without a license is a class A misdemeanor;
- Empowered DTF to conduct regulatory inspections of businesses selling cannabis to determine if the appropriate taxes have been paid, and to issue fines and penalties when they have not;
- Established a new tax fraud crime for when a cannabis business willfully fails to collect or remit required cannabis taxes, or knowingly possesses for sale any cannabis on which tax was required to be paid but was not paid; and
- Provided for commencement of removal of commercial tenants for unlicensed cannabis retail sale under the Real Property Actions and Proceedings Law.

To continue expanding enforcement efforts, building the capacity of the Enforcement team continues to be a high priority of the Office. The first civil service test for Cannabis Enforcement Investigators was administered in April 2023. The Office has since recruited investigators using the established hiring list generated from the civil service test. The civil service test is just the first step in the investigator hiring process. Once investigator candidates are identified through the test results, they must pass a physical, an agility test, a psychological test, and a thorough background investigation before being offered a position.

During the period of October 1, 2022, to June 5, 2023, prior to implementation of the 2023 enforcement legislation, the Office received 1,275 complaints, which resulted in more than 200 cease and desist letters. Following the enactment of the new enforcement legislation, the Office implemented a new operational model of enforcement in June of 2023. As of December 15, 2023, OCM Enforcement, working together with DTF Investigations Division, had conducted over 369 inspections, including 103 re-inspections of locations believed to be selling cannabis without the

required license. As a result of these inspections, 305 notices of violation/ orders to cease were issued and over 11,600 pounds of illicit products with an estimated street value of $55 million were seized. As of December 15, 2023, $1,312,500 in fines had been levied against unlicensed operators following decisions issued through the administrative hearing process.

In Fall 2023, the Office implemented an application to better track enforcement efforts from issuance of the notice of violation through to administrative hearings. Beginning with this report, the Office is required to submit a report about the enforcement actions taken by the Office and DTF to the Legislature on January 1, 2024, and annually thereafter, and to post the report publicly on its website.

Local and State law enforcement agencies, including local police and sheriff departments, as well as the Attorney General's Office, are critical partners in interacting with unlicensed businesses and ending their illegal operations, which can pose a risk to public health and safety. The Office coordinates with these agencies when conducting inspections, and routinely has uniformed officers or deputies on scene outside the locations while enforcement inspections are underway. The Office and DTF began their first joint inspections authorized by the May 2023 enforcement legislation on June 6-7, 2023, in New York City with the inspection of 11 retail dispensaries. Inspections have since remained active and ongoing. Whenever a business is found to be selling cannabis without a license, the Office issues a Notice of Violation and Order to Cease Unlicensed Activity.

The Office and DTF have continued an aggressive schedule implementing their new enforcement authority against unlicensed cannabis retail operations. By the end of 2023, inspections had been conducted in all regions of New York: Western (Buffalo/ Niagara); Central (Rochester, Syracuse, Utica, Ithaca); Southern Tier; Capital Region; North Country; Lower Hudson Valley; New York City; and Long Island. In addition to the initial inspections carried out as described above, the Office and DTF conducted re-inspections of locations that had been issued notices of violations during their initial inspection. These re-inspections occur to determine if the location is continuing to operate in defiance of a cease order or if they have in fact ceased their illegal conduct. Those locations found to be operating contrary to the original cease order are identified so that higher level fines can be assessed.

In 2023, the Office, working with the Office of the Attorney General, was also successful in obtaining injunctive relief in three actions filed pursuant to Section 16-a, a new section of the Cannabis Law that authorizes a Supreme Court to grant emergency injunctive relief and padlock unlicensed cannabis retail locations and/or enjoin egregious unlicensed business activity. In each case, the Office requested and received an emergency padlock order from the Supreme Court, enabling the Office to shut down a total of 8 persistently non-compliant unlicensed cannabis retail locations.

The first case shut down an unlicensed business operating out of eight locations across Wayne, Cayuga, and Oswego Counties. Each location was found to be operating in clear violation of a previous cease order issued by the Office's Enforcement Team and the Office was able to obtain restraining orders and closure orders from the Wayne County Supreme Court. These orders allowed the Office to physically padlock the locations and shut them down. These closure actions were a perfect example of the growing state and local partnerships that have been developing across the state in the area of enforcement of unlicensed cannabis retail activity. For example, the Wayne County Sheriff's Office was instrumental in the safe completion of the Office's inspections and assisted greatly in identifying the locations which were operating in defiance of

our cease orders. When the closing orders were obtained, the Sheriff again made deputies available to assist in the execution of the orders.

Since this first successful case, the Office has continued to work with the NYS Attorney General's Office on these important emergency relief actions, and has secured additional restraining orders and closure orders for illicit operators in Ontario and Kings Counties. As in the first case, the owners of these locations continued to operate in defiance of numerous orders to cease illegal operations, which had been issued by Office Investigators during regulatory inspections.

By taking decisive action against unlicensed cannabis businesses, New York State is making significant strides towards shutting down unlawful and unlicensed cannabis operations that jeopardize public safety, consumer well-being, and the integrity the State's legal cannabis market.

# Economic and Fiscal Impacts

**Tax, Application Fee, and Fine Revenue**

Revenue collected by the Office and by taxes first cover reasonable operational costs to administer the program, including support mechanisms for social and economic equity applicants, and other enumerated priorities to implement the law. The remaining revenue is contributed to the NYS Cannabis Revenue Fund, established by the MRTA and administered by the CAB. The Medical Cannabis Trust Fund, established in State Finance Law, also contributes 45% of its moneys to the NYS Cannabis Revenue Fund. The total NYS Cannabis Revenue Fund will be split three ways: 1) 40% to Education; 2) 40% to Community Grants Reinvestment Fund; and 3) 20% to Drug Treatment and Public Education Fund.

*Medical Cannabis*

The last renewal period for ROs was in July 2023. RO application fees are $10,000, and if approved, registration fees are $200,000 per registration period (two years). The current registrations will expire in two years with the next renewal due in July 2025. Table 6 outlines the revenue generated by the Medical Cannabis Program for the previous NYS fiscal year and the first half of the current NYS fiscal year.

**Table 6: Medical Cannabis Revenue by Type and by NYS Fiscal Year**

|  | 4/1/2022-3/31/2023 | 4/1/2023-9/30/2023 |
|---|---|---|
| *Application and Registration Fees* | | |
| Application Fees | $ 0 | $ 100,000 |
| Relocation Fees | $1,000 | $ 2,000 |
| Total | $1,000 | $ 102,000 |
| *Fines Collected* | | |
| Total | $ 0 | $ 0 |
| *Tax Revenue* | | |
| Total | $ 11,629,000 | $ 4,237,000 |
| *Total Medical Cannabis Revenue* | | |
| Total | $ 11,630,000 | $ 4,339,000 |

*Cannabinoid Hemp*

The cannabinoid hemp processor license is for a two-year period, while distributor permits, retail licenses, and farm processor licenses are renewed annually. Temporary retail permits are valid for up to three months. As of September 30, 2023, the Office has permitted or licensed over 5,400 entities that produce, distribute, or sell cannabinoid hemp products, costing $300 to $3,500 per license or permit, depending on type, with the exception of the temporary retail permit that costs $25 per month (Table 7).

**Table 7: Cannabinoid Hemp Revenue by Type and by NYS Fiscal Year**

| | 4/1/2022-3/31/2023 | 4/1/2023-9/30/2023 |
|---|---|---|
| **Application Fees** | | |
| Processor | $ 65,100 | $ 10,500 |
| Farm Processor | $ 400 | $ 1,600 |
| Manufacturing | $ 1,500 | $ 4,500 |
| Distributor | $ 114,300 | $ 50,100 |
| Retailer | $ 897,900 | $ 495,000 |
| Temporary Retailer | $ 0 | $ 2,800 |
| Total | $ 1,079,200 | $ 564,500 |
| **Fines Collected** | | |
| Total | $ 0 | $ 0 |
| **Total Cannabinoid Hemp Revenue** | | |
| **Total** | **$ 1,079,200** | **$ 564,500** |

*Adult-Use Cannabis*

Prior to the opening of the adult-use cannabis license applications in October 2023, conditional licensees and laboratory permits made up all of the Office's adult-use application and license fee revenue.[8] Table 8 provides adult-use cannabis revenue by type for the previous NYS fiscal year and the first half of the current NYS fiscal year.

**Table 8: Adult-Use Cannabis Revenue by Type and by NYS Fiscal Year**

| | 4/1/2022-3/31/2023 | 4/1/2023-9/30/2023 |
|---|---|---|
| **Application Fees*** | | |
| AUCC | $ 614,000 | $ 0 |
| AUCP | $ 90,000 | $ 18,000 |
| CAURD | $ 1,640,000 | $ 0 |
| Laboratory Permits | $ 16,000 | $ 0 |
| Total | $ 2,360,000 | $ 18,000 |
| **Fines Collected** | | |
| Total | $ 0 | $ 0 |
| **Tax Revenue** | | |
| Total | $ 1,223,000 | $ 11,702,000 |
| **Total Adult-Use Cannabis Revenue** | | |
| **Total** | **$ 3,583,000** | **$ 11,720,000** |

*Does not include application fees collected for October 4, 2023, adult-use application window*

**Cannabis Sales**

Facilitating retail sell-through is critical to stabilizing and securing the supply chain—it is estimated nearly 87,000 pounds in total biomass equivalent were sold by the beginning of December, nearly 72,000 through retail storefronts and an additional 3,500 through CGSs. As sales rose month over

---

[8] Link to Adult-Use Application and Licensing Fee Schedules: https://cannabis.ny.gov/au-license-fees

month in 2023 and eventually surpassed $5 million a week, a picture of the scale of demand in NYS emerged. Retail storefront sales have totaled nearly $133 million year to date (YTD), which combined with $4.8 million in CGS revenue totals over $137 million in retail sales for NYS (Figure 1). Rising sales are a reflection of the momentum that built as consumers came to regulated retailers, where they were able to access diverse products. Flower and vaporizers lead sales, comprising 31% and 27% of sales, respectively; however, of the estimated 3.57 million units sold by early December, edibles lead the way comprising over a quarter of units sold (Figures 2 and 3).



* Data current through December 9, 2023

**Figure 1: NYS Cannabis Retail Storefront Sales Growth by Month as of December 9, 2023 (Preliminary estimate)**



**Figure 2: Share of Sales by Product Category as of December 9, 2023 (Preliminary estimates)**



**Figure 3: Total Cannabis Product Units Sold by Product Category as of December 9, 2023 (Preliminary estimates)**

*Cannabis Growers Showcases*

As a first-in-the-nation initiative, the Cannabis Growers Showcase (CGS) allowed licensed cannabis growers and processors to promote their products at market-style events where consumers could purchase New York state grown cannabis products. Licensed AUCC, AUCP, and CAURD businesses who have been approved by the Office partner to host a CGS. These events were permitted to take place in various locations including standalone, temporary retail locations; licensed retail dispensary locations; licensed conditional cultivator or processor locations; or other approved event locations where the predominant population was expected to be of legal age to consume cannabis.

Launching this initiative required support from across the agency. The Office facilitated two virtual town halls about CGS—one session was targeted toward licensees and the other intended for municipalities. During these townhalls, the Office provided an overview of the CGS concept, information on the application process, and provided answers to live questions on CGS. CGS applications were reviewed by the Office to assess for compliance with the requirements set forth in the published guidance.

CGS was launched in August 2023 and significantly expanded retail access in the State to people in areas not previously served by retail dispensaries. At the close of the CGS application window on December 1, 2023, 60 CGS were approved by the Office, involving 75 AUCC, 19 AUCP, and 12 CAURD licensees. These events were held in over 40 New York cities and towns and generated $4.8 million in revenue by the end of November.

The temporary CGS initiative sunset in December 2023, and the Office plans to use findings and lessons learned for future event permits.

# Public Health and Safety

When the MRTA legalized cannabis in NYS, it shifted NYS's cannabis policy from a law enforcement framework to a holistic framework that aims to protect public health and safety. Through a sophisticated quality assurance regulatory structure that includes standards for production and manufacturing, strict product testing, labeling, packaging, and advertising; public education campaigns and materials; monitoring outcomes and emerging public health issues; research; and partnerships with public health and community stakeholders, the Office works to ensure products are safer for consumers and that products and businesses do not target youth.

## Public Education Campaigns

In April 2023, the Office launched NYS's second statewide adult-use cannabis public education campaign, *Why Buy Legal*. With a goal of reaching existing and potential consumers 21 years and older, the State invested $2.5 million to reach New Yorkers statewide with important messages emphasizing the potential health risks associated with purchasing cannabis products from unlicensed businesses and explaining why regulated cannabis products are safer. The Office partnered with the Office of Media Services within the NYS Office of General Services (OGS) to develop the campaign branding and creative; OpAD Media, a MWBE firm, to assist with media strategy and to purchase advertising space across digital and out-of-home placements; and Whitman Insight Strategies (WINS) to provide qualitative research including focus group testing of the campaign messages and creative assets.

*Why Buy Legal* was primarily a digital campaign, with public service announcements (PSA) in both English and Spanish, targeting adult-use cannabis or potential cannabis consumers 21 years old and over. To enhance credibility, the campaign highlighted adult-use licensees across the supply chain as the primary narrators to illustrate messaging such as improved access to tested and safer products, supporting the foundation of an equitable industry featuring local small businesses, what to expect in a regulated dispensary, and the importance of safely storing cannabis products. One primary goal of the campaign was to drive consumers back to the Office website to access consumer resources providing information about how to find legal dispensaries in NYS and tips about how to safely consume cannabis.

Highlights from the key messages are included further below and *Why Buy Legal* video playlists in both English and Spanish can be found on the Office's YouTube Channel.

Overall, the *Why Buy Legal* campaign earned over 250 million impressions, over 659,000 clicks, and prompted 41 million video completions. It is estimated over 8 million additional exposures to messages were generated through non-digital, out-of-home placements. Of the $2.5 million spent on the campaign, 83% was allocated to digital and social PSAs, where messages had the most tailored reach to cannabis consumers or potential consumers. Following the launch of *Why Buy Legal*, the Office organized community activations across the state to engage cannabis consumers and the broader community near licensed dispensaries. These events included presentations, dispensary tours, and tabling sessions by the Office to generate awareness of newly opened licensed dispensaries and the benefits of the regulated market.

In 2022, the Office launched its first statewide campaign, *Cannabis Conversations*. The Cannabis Conversations Final Report, consisting of findings from that public education campaign, is available on the Office's website.[9]

*Safer Products*

Only cannabis products that have passed laboratory testing standards may be sold at medical or adult-use retail dispensaries, ensuring that regulated cannabis products available in the medical or adult-use market are safer to consume than unregulated products. Products available at licensed dispensaries are accurately labeled for potency and free of potentially harmful levels of contaminants such as mold, pesticides, and heavy metals. Accurate potency on labels in the regulated market also provides consumers with better guidance, reduced risk of overconsumption, and a starting point, especially for new cannabis consumers, on how cannabis may affect them. Consumers purchasing from the regulated market have the ability to choose tested products containing the desired cannabinoid profile and potency. Products from the unregulated market can mislead consumers by containing amounts of active ingredients, such as THC or CBD, that differ from what the product is marketed to have. Additionally, unregulated products may have harmful ingredients added to them. New York's medical and adult-use cannabis regulations impose high standards on licensees to promote quality and safety, such as good manufacturing practices, good sanitary practices, packaging and labeling requirements, and the prohibition of harmful ingredients. Among the four key message topics, the 'Safer Products' image creative drove the most comments across Facebook/Instagram and Twitter.



**Figure 4: Why Buy Legal Campaign Assets, Safer Products Image Creative**

*Supporting the Foundation of a Socially Equitable Industry*

By purchasing regulated adult-use cannabis products, consumers invest in individuals and communities disproportionally impacted by cannabis prohibition who have shaped the existing cannabis culture, nonprofit organizations widening their impact and service, and in the Community Reinvestment Fund which gives back to the communities that were most harmed by prohibition. A cornerstone of the *Why Buy Legal* campaign was elevating the voices of licensed operators and focusing on transparency in the supply chain from seed to sale. Out of all assets, this creative

---

[9] *Cannabis Conversations* Final Report: https://cannabis.ny.gov/cannabis-conversations-final-report

had the strongest click through rate and the strongest video completion rate in 30 second duration creative assets.



**Figure 5: Why Buy Legal Campaign Assets, Supporting the Foundation of a Socially Equitable Industry Image Creative**

*Reinforcing the Importance of Safe Storage*

*Why Buy Legal* builds off the Office's previous public education campaign *Cannabis Conversations'* messaging around safe storage of cannabis and cannabis products. *Why Buy Legal* campaign PSAs re-emphasized the importance of preventing accidental consumption of cannabis by young people and pets by storing cannabis products out of sight and out of reach. Safe storage performed the best in streaming audio, on Instagram in both English and Spanish, and strongest on Snapchat. Snapchat's performance echoes the *Cannabis Conversations* experience with great reach and performance among parents and pet owners on the platform.



**Figure 6: Why Buy Legal Campaign Assets, Reinforcing the Importance of Safe Storage Image Creative**

*What to Expect at a Licensed Adult-Use Retail Dispensary*

Purchasing from a licensed adult-use retail dispensary provides the consumer with individualized guidance and tailored education about each cannabis product's profile and recommended serving sizes. These efforts within the regulated market are aimed at minimizing the risk of excessive cannabis consumption and its associated adverse effects. PSAs feature trained dispensary workers, often referred to as "budtenders," who serve as models for how retail dispensaries can help customers navigate product choices and provide essential information to ensure a safer consumer experience.

There was a slightly higher click through rate on the 'Supporting the Foundation of a Socially Equitable Industry' and 'What to Expect at a Licensed Adult-Use Dispensary' PSAs compared to the 'Safer Products' and 'Safe Storage' PSAs.



**Figure 7: Why Buy Legal Campaign Assets, What to Expect at a Licensed Adult-Use Dispensary Image Creative**

*Focus Group Testing*

Before the *Why Buy Legal* campaign was released in April 2023, WINS conducted a series of focus groups to assess the efficacy of the campaign creative assets and messaging. Partnering with a third-party for message testing was an essential step to reduce bias and leverage expertise in market research. By engaging with New Yorkers firsthand, the Office was able to better understand public attitudes and behaviors around cannabis and facilitate a rich evaluation of messaging to assess and improve impact and resonance.

In February and March of 2023, WINS conducted ten virtual focus groups with participants representative of NYS's population in terms of geography, race, and ethnicity in order to hear from a variety of perspectives. Participants for four focus groups were selected as General Population New Yorkers, four focus groups included participants selected among Black New Yorkers, and two focus groups included participants selected among Spanish-language New Yorkers, for whom Spanish is the predominant language spoken at home.

All participants were adults over the age of 21, self-identified current cannabis consumers and/or indicated that they would consider purchasing adult-use cannabis from a dispensary in the next year. Findings from the *Why Buy Legal* focus groups suggested safety is top-of-mind for New Yorkers and is a huge motivator for purchasing cannabis through a regulated market; consumers want to purchase product that is manufactured in a regulated environment with clear product labelling regarding potency and dosage; New Yorkers want to hear the voices of those who are building this industry; and New Yorkers resonate with messaging that speaks to the community impact and the effect that legalization can have at the community level.

*Public Educational Materials*

This year, the Office developed *The Guide to Safer Cannabis Consumption* as a resource to empower and inform adults (21 years of age or older) who consume or are considering consuming cannabis as part of the adult-use cannabis market in NYS. The purpose of the guide is to break down the basics of cannabis and educate the public about key health and safety aspects of cannabis, including the components of cannabis, what cannabis does in the body, and tips to reduce risk and avoid potential unwanted effects.

To provide consumers with an overview of cannabis product lab testing requirements in NYS, the Office published *How to Read a Lab Certificate of Analysis for Your Cannabis Product in New York.* This guide explains to consumers why lab testing is important, what is included in cannabis product laboratory testing results, and how to read a Certificate of Analysis found on regulated cannabis products. By understanding how to read a Certificate of Analysis, consumers are empowered to make informed choices about purchasing safer cannabis products.

To educate new adult consumers about recognizing a regulated adult-use cannabis product, the Office developed the *How to Read an Adult-use Cannabis Label in New York* fact sheet. This fact sheet provides consumers with information about how to recognize what is in their product, processor information, looking for quality assurance information on their product, warning labels, and tips for using and storing cannabis products.

These and other educational materials are available for download in multiple languages on the Office's website (Table 9), and information and links to these education resources were disseminated across the Office's social media channels.[10]

---

[10] Public Education Materials: https://cannabis.ny.gov/adult-use-information

**Table 9: Public Education Materials Published in 2023**

| Title | Description |
|---|---|
| The Guide to Safer Cannabis Consumption | *A booklet resource about adult-use cannabis for cannabis consumers* |
| How to Read a Lab Certificate of Analysis for Your Cannabis Product | *A fact sheet on what is included and how to understand an adult-use cannabis product's laboratory testing results* |
| How to Read an Adult-Use Cannabis Label | *A detailed description on how to read the label of an adult-use cannabis product that meets New York's packaging and labeling requirements* |

*Cannabis Education Mini-Series*

The Office is committed to educating the public about cannabis and the NYS cannabis program and policies. This year the Office aimed to create multiple educational resources to reach both certified patients and adult-use cannabis consumers that reside in NYS and around the country to ultimately help consumer understanding while protecting public health and safety and supporting equity licensees as well.

To accomplish this, a digital video series was produced highlighting subject matter experts across the Office and breaking down the fundamentals of cannabis and cannabis consumption. The video series was launched in December 2022 across digital social media platforms and YouTube in the form of TikTok/Instagram Reel-style explanatory videos allowing for high engagement and utilization of videos, articles, and pictures in the background. Topics highlighted in these videos include: the endocannabinoid system, cannabis products and serving sizes, and the history of cannabis in New York.

The endocannabinoid system video '*OCM presents the Endocannabinoid System*' provides an introduction to how the body processes cannabis and information about how chemical components in the cannabis plant affect the body. The video about cannabis products and serving sizes, '*OCM presents: Cannabis Products and Serving Sizes*' educates about cannabis product forms including edibles, inhalables, and topicals, and provides recommendations for safer cannabis consumption. The video '*There is no progress without accountability*' explains the history of cannabis in NYS, vividly portrays the historical usage of cannabis prior to prohibition, highlights the disproportionate impact of prohibition on black and brown communities in NYS, and outlines the proactive steps the Office is taking to rectify past injustices by prioritizing social and economic equity. These videos can be found on the Office's YouTube Channel.

**Public Health Data Monitoring**

Cannabis legalization is expected to have wide-reaching effects and require a broad, diverse tapestry of data sources to assess the full impact legalization will have on public health and safety, particularly on certain priority populations. The Office is implementing a robust data monitoring plan with a variety of sources that range from population-based surveys to healthcare data to

sales data (Figure 8). Identified data sources address the critical priorities highlighted in CAN Law, such as underage use, traffic safety, impacts on pregnancy and breast/chestfeeding, and preventing accidental cannabis consumption or overconsumption (e.g., when a child ingests a cannabis product, or someone consumes more cannabis than they intended) (See CAN Law § 86(2) and MRTA § 51 which adds Section 99-jj to the State Finance Law which establishes a NYS Drug Treatment and Public Education Fund which would, amongst other things, expend monies towards the development and implementation of a statewide public health campaign focused on the health effects of cannabis and legal use, including the aforementioned key priorities). As seen in Figure 8, ongoing collaboration with multiple state agencies and other partners is critical to accessing data needed to monitor public health and safety outcomes. The Office continues to build and maintain the infrastructure needed to implement the data monitoring plan by establishing necessary data use agreements with partners, and by prioritizing funding and support to the partners who administer these data sources.



**Figure 8: Diagram of NYS's Cannabis Data Monitoring Plan**

*Knowledge, Attitudes, and Behaviors Survey*

The Office contracted with WINS to develop and implement a survey of NYS adults that measures respondents' knowledge, attitudes, and behaviors related to cannabis consumption, and the new regulated adult-use market. The objective of the survey was to help inform the Office's development of future campaigns and educational materials, with a clear and informed understanding of public perception. Respondents were also shown assets from past campaigns to measure awareness, recall, and impact of previous campaign efforts. The survey was fielded in August 2023 in both English and Spanish and recruited 1,000 adults, ages 21 and older, that were representative of NYS's adult population based on age, race, ethnicity, and county of residence.

Results showed that a majority of New Yorkers are aware that cannabis is legal for adults (67%), but there is still more than a third who could not accurately describe the state of legalization in NYS. Most New Yorkers have heard about cannabis in the news recently (59%), mainly regarding the CAN Law and what is legal or licensed and unlicensed dispensaries.

There is room for more public education, however, as there remains confusion about what legalization specifically means in individuals' lives—knowing the specifics about for whom, when, and where it is legal to possess or consume. There remains a similar familiarity gap when it comes to the social and economic equity implications of legalization—half or more of New Yorkers are not aware of social and economic equity provisions of CAN Law, such as the Community Grants Reinvestment Fund or prioritization for SEE applicants for licensure consideration (See State Finance Law §99-kk and CAN Law §87). These findings underscore the role communications and messaging can play in going beyond awareness to educate people about what legalization means to them and why it matters, and further emphasize the importance of continued education and campaigns from the Office.

Nearly two in three New Yorkers think it is important that cannabis products sold in NYS are sold by licensed dispensaries. The most common reasons people cited for purchasing from a licensed source were safer, tested, and higher-quality products. Barriers to purchasing from licensed dispensaries were concerns about price and convenience of locations. Meanwhile, evidence suggests respondents are mistaken about whether they have purchased from a licensed versus an unlicensed establishment. It is critical to continue public education efforts to inform people about how to find and verify licensed dispensaries and products.

Two in five people reported they have never heard of the Office before. Those who identified as cannabis consumers were more likely to recall PSAs from the Office than non-consumers who are inherently less engaged with cannabis topics. However, regardless of consumption behaviors, New Yorkers expressed strong levels of interest and importance in key topics being communicated by the Office, with impaired driving earning the highest proportion of respondents expressing interest and importance, ahead of safe storage, safer products, and what to expect at a dispensary. Finding new methods to reach and engage the public, particularly non-consumers, will help disseminate these messages that are important to all New Yorkers.

### Public Health and Safety Initiatives

Improving public health and safety requires strong and comprehensive partnerships with a variety of stakeholders. The Office continues to establish partnerships and identify areas for collaboration with external partners, including routine communication between the Office and DOH, AGM, the Office of Addiction Services and Supports (OASAS), the Office of Mental Health (OMH), Department of Environmental Conservation (DEC), and other local governments and state agencies. Continuing to build on and maintain regular avenues for communication and information sharing allows the Office to more holistically address public health and safety related to cannabis.

### Traffic Safety

Traffic Safety is an important social determinant to consider as part of the comprehensive regulatory framework of adult-use cannabis programs. The Office continues to establish measures to promote safer driving practices and increase traffic safety efforts in a manner that protects the public health and safety of all New Yorkers. In 2023, the Office joined the Governor's Traffic Safety Committee (GTSC). Representation on the GTSC solidified ongoing collaboration

with the GTSC, the entity primarily responsible for coordinating and managing NYS traffic safety campaigns for the past 25 years.

As a top priority of the Office, a MOU was established with the NYS Department of Motor Vehicles (DMV) to expand capacity for cannabis-specific support staff to assist with continued coordination efforts to expand the Drug Evaluation and Classification program's Advance Roadside Impaired Driving Enforcement (ARIDE) and Drug Recognition Expert (DRE) trainings across the State.

The ARIDE training coordinated by the GTSC is a two-day prerequisite to the DRE course that trains law enforcement officers to observe, identify, and articulate the signs of impairment related to drugs or alcohol (or a combination of both) in order to reduce the number of impaired driving incidents, serious injuries, and fatal crashes. ARIDE aims to train officers to observe unique indicators of impairment from a substance other than alcohol, which is not a standard part of academy training for law enforcement. As a prerequisite to DRE training, ARIDE is an essential part of expanding the number of law enforcement trained as DREs as well as increasing general awareness and knowledge among law enforcement on driving while impaired. Officers trained in ARIDE who do not pursue DRE training still gain critical knowledge and training necessary to partner with a DRE when further investigation of impairment is present. The Office continues to fund one full-time employee to manage and promote annual ARIDE trainings held statewide.

The MRTA authorized, where appropriations were available, increasing DRE training to help law enforcement maintain safety on the State's roadways (See MRTA §60). A DRE is a police officer trained to recognize impairment in drivers under the influence of drugs other than, or in addition to, alcohol. A DRE is skilled in detecting and identifying persons under the influence of substances and in identifying the category or categories of drugs causing the impairment and ruling out medical causes of erratic driving. DREs complete training that has been approved by the National Highway Traffic Safety Administration and the International Association of Chiefs of Police. NYS has been participating in the DRE program since 1987. The Office has funded the expansion of the DRE program during the first two years of operations from agency funding.

In 2023, 24 ARIDE Trainings were conducted by the GTSC with support from the Office, training 832 officers in necessary skills to identify impaired driving. Additionally, five DRE Schools were held by GTSC with support from the Office, adding 83 newly certified DRE officers to the force and bringing the number of active DRE-Certified Officers in NYS to 424. Until new technologies to detect cannabis impaired driving are developed and deployed, education and the use of DREs continue to be the most effective measures in addressing impaired driving related to cannabis.

### *Adult-Use Packaging and Labeling & Marketing and Advertising Training for Licensees*

The Board approved adult-use packaging, labeling, marketing, and advertising regulations which became effective on March 22, 2023.[11] These rules establish parameters for the packaging, labeling, marketing, and advertising of adult-use cannabis products and businesses to ensure products are safer for consumers and do not target underage consumers. Such public health and safety provisions include requiring child resistant and tamper-evident packaging, defining mandatory warnings on labels and advertising, requiring clearly labeled serving sizes and potency

---

[11] Link to regulations: www.cannabis.ny.gov/regulations

on products, and prohibiting packages, labels, or advertisements from being attractive to those under 21 years old.

The regulations are the primary rules that all licensees must follow to remain compliant with the CAN Law. To educate licensees about these product requirements, the Office created a training series consisting of five videos focused on the packaging and labeling of NYS adult-use cannabis products. The video modules specifically address packaging requirements, labeling requirements, and sustainability requirements for adult-use products, as well as respond to questions solicited in advance of video recording. The training was disseminated to licensees and uploaded to the Office website.[12] To supplement the training, licensees were also provided the Packaging and Labeling & Marketing and Advertising Guidance for Adult-Use Licensees to assist in compliance. The guidance document included examples, FAQs, and a checklist for the different required components of the package and label.

*Responsible Workforce Training*

With the NYS cannabis market rapidly evolving, there is an increasing need for a well-informed and educated workforce. The adult-use cannabis regulations establish a requirement that the cannabis workforce, including all persons performing activities under a licensed cannabis business, must complete Responsible Workforce Training (9 NYCRR § 125.5). This training has four distinct components:

1. A Cannabis Product Safety and Responsibility course developed by the Office which focuses on protecting health and safety in the regulated cannabis industry;
2. A Cannabis Workforce Responsibility course developed by the NYS Department of Labor (DOL);
3. At least two hours of training provided by a licensee that is intended to assist in training the particular activities specified by their license; and
4. An implicit bias training provided by a licensee.

The Cannabis Product Safety and Responsibility course aims to communicate key facts about cannabis products to help protect consumer safety; break down key points of the laws and regulations that will impact the workforce's daily operations; and safeguard against misinformation. The course videos, additional learning resources, and attestation for record keeping will launch in early 2024.

*Safety Reporting and Monitoring*

To protect public health and safety, it is critical to identify and monitor for emerging cannabis-related injuries or syndromes that require immediate response via recalls, public education, cease and desist orders, regulations, or similar measures. The Office implemented an online Incident Reporting Form in January 2023 to collect information related to an adverse event, an enforcement matter, or a general product complaint—making the nature of what can be potentially reported rather diverse.[13] All information submitted is encrypted, stored securely, and is fielded by the relevant programmatic area within the Office. Action steps by the Office are determined by the nature of the incident reported. Individuals also have the option to upload photos of a reported product, which can be helpful in determining whether the product originated from a licensed

---

[12] NYS Adult-Use Cannabis Packaging and Labeling training:
https://www.youtube.com/watch?v=Zwrxkzknf94&list=PLkA6fwCcLgWIfWginiMxDB11Ze_hP1u9q
[13] Incident Reporting Form: https://cannabis.ny.gov/report-an-incident

dispensary or the unregulated market. The form is publicly available via the Office's website and it has been promoted widely via social media, presentations, public education materials, community engagement sessions, and email correspondences out of the Office. As of December 15, 2023, the Office received a total of 4,222 submissions via the Incident Reporting Form, consisting of:

- ☐ 70 Adverse events
- ☐ 4,027 Concerns about a cannabis business
- ☐ 125 Concerns about a cannabis product.

Adverse events are incidents related to the use of medical or adult-use cannabis products or devices submitted to the Office using the Incident Reporting Form. By tracking these adverse events, the Office can identify correlations between reported products and their potential for public health risks. There have been 70 adverse events reported using the Incident Reporting Form from January 1, 2023, to December 15, 2023, and can be broken down as follows:

- ☐ 44 incidents were reported from entities that are not regulated by the Office. These events were referred to enforcement.
- ☐ 14 incidents were reported about products purchased at regulated medical and adult-use dispensaries and were reviewed, dispensary staff were contacted, or the respondent was contacted for further information.
- ☐ 12 incidents were reported with inadequate details and did not offer sufficient information to determine product source or provide enough information to follow up with the respondents. These incidents were determined to not require enforcement oversight, and they were assessed by the Office as requiring no further action.

Poison Centers—and the data they collect—are another critical first-line source for the early detection of defects or issues in products, packaging, or labeling that are impacting public health and safety. Poison centers also contribute to monitoring and addressing unintentional consumption and unintentional overconsumption by young children and youth. NYS has two poison centers, the NYC Poison Center and the Upstate New York Poison Center, that field calls from the public, health care providers, and government agencies to provide general information about substances and to advise after a known or suspected exposure. The Office has established an ongoing partnership with the two NYS poison centers to regularly share information or emerging issues and work together to ensure staff have the most current information about cannabis and available products. This included collaborating on a health education webinar series with the poison centers and the NY Children's Environmental Health Center in Spring 2023, informing health educators about cannabis, particularly the impacts on teens and young children. In 2023, the Office also established mechanisms to access and monitor poison center data on an ongoing basis.

### Product Recalls

The Office implemented a standardized process for handling recalls of cannabis and cannabinoid hemp products. Recalls can be initiated by either the Office or the licensee when a potential safety or quality issue is identified. Having a well-defined recall process maintains consumer trust and ensures consumer protection and product integrity by swiftly removing affected products from the market that may pose risks or have quality issues. A webpage was created to provide information about the recall process to the public and regulated parties.[14]

---

[14] Recalls webpage: https://cannabis.ny.gov/recalls

The Office conducts audits of adult-use and medical cannabis products. Audits are done as part of site visits, as well as individually as issues are identified. These audits monitor and ensure compliance with packaging and labeling regulations, safety standards, and adherence to guidance. As of December 15, 2023, there has been one recall issued by the Office.

**Laboratory Oversight**

Laboratory testing of medical and adult-use cannabis products ensures certified patients and cannabis consumers have access to safer cannabis products that are absent contaminants of concern such as microorganisms, metals, mycotoxins, and growth regulators, or are at least below regulatory limits. The MRTA and CAN Law mandated the transfer of cannabis laboratory testing oversight functions from DOH to the Office (See MRTA § 6-b which required the expeditious transfer of the oversight of medical use of cannabis and cannabinoid hemp and hemp extract from the Commissioner of Health to the Board and CAN Law §§82 and 105 establishing rules for laboratory testing for adult-use and cannabinoid hemp products). Before that time, DOH had the authority to certify laboratories under Title 10 of New York Codes, Rules, and Regulations (10 NYCRR), but that authority was limited to testing medical cannabis only. Upon assuming responsibility for cannabis laboratory testing oversight, the Office drafted 9 NYCRR Part 130: Cannabis Laboratories Regulations to address all requirements for permitting cannabis laboratories, as well as testing requirements for both medical and adult-use cannabis. The proposed and revised regulations were released for public comment in 2022. Regulations were officially adopted on March 22, 2023.

The Office released an application for cannabis laboratories and laboratory sampling firms in August 2022, where interested laboratories were encouraged to apply to ensure adequate laboratory testing capacity for NYS's cannabis programs. The application window for cannabis laboratories remained open until March 31, 2023. As of September 30, 2023, 16 laboratories[15] were permitted by the Board based on the Office's recommendation and 12 sampling firms[16] were approved by the Office.

The Office created a webpage providing information about cannabis testing, cannabis laboratories and cannabis sampling firms, application forms, evidence-based final product testing requirements, and guidance documents to support interested commercial laboratories and sampling firms, as well as guidance documents to help clarify laboratory testing requirements for AUCCs and AUCPs.[17]

**State Reference Lab**

The Wadsworth Center was established as the state reference lab in April 2023, via a MOU between the Office and DOH. The duties of the state reference lab include, but are not limited to, testing of fraudulent, inaccurate, or compromised adult-use and medical cannabis and cannabinoid hemp products, method development, and assisting the Office as subject matter experts. Also, through the MOU, the Office is providing funding to DOH, to update and purchase additional testing equipment for testing of cannabis products. The DOH began testing samples collected through the Office's enforcement and compliance efforts in July 2023.

---

[15] Permitted Laboratories: https://cannabis.ny.gov/cannabis-laboratories#permitted-laboratories
[16] Approved Sampling Firms: https://cannabis.ny.gov/sampling-firms#approved-sampling-firms
[17] Cannabis Laboratories & Sampling Firms Webpage: https://cannabis.ny.gov/laboratories-and-sampling-firms

**Laboratory Quality Assurance**

To promote product quality and safety, quality assurance is one of the Office's oversight roles, including providing quality assurance subject matter expertise and establishing and amending regulatory testing limits and standards based on current evidence and best practice.

The Office has multiple resources related to quality assurance to support laboratories and sampling firms and has included this information on the Office's website. These efforts include:

☐ Quality System Standards for cannabis testing to provide consistency across all cannabis testing laboratories, to define requirements, specifications, guidelines, and characteristics for services provided by cannabis testing laboratories, and to ensure compliance with CAN Law § 82(6) and 9 NYCRR Part 130.

☐ Sampling Guidance to ensure all cannabis sampling firms use consistent sampling procedures and that samples are a statically significant representation of each cannabis product batch or lot when sampling from any licensee pursuant to the CAN Law or anyone authorized to cultivate medical cannabis or adult-use cannabis pursuant to the Penal Law § 222.15.

☐ Performing regulatory on-site audits of permitted laboratories to ensure effective implementation of its quality system for planning and assessing work performed by a laboratory regulatory audit, and for conducting required quality assurance and quality control procedures to promote and maintain the accuracy and reliability of test results. The Office began auditing labs in March 2023.

Other quality assurance activities include review of all testing results for each lot of final cannabis product produced to ensure product consistency, accurate potency labeling, and that contaminant results are within approved limits. Table 10 depicts a summary of adult use cannabis product testing from October 1, 2022, through September 30, 2023, during which 86.79% of adult use product lots submitted for laboratory testing had passing results. The remaining 13.21% failed due to the presence of contaminants as noted in Table 10 below. Of the lots that failed contaminant testing, the majority (89.65%) were for unextracted flower products.

**Table 10: Adult Use Cannabis Product Testing October 1, 2022 – September 30, 2023**

| Total Number of Cannabis Product Lots Submitted for Testing | Total/Percent of Submitted for Testing Failed |
|---|---|
| 3218 | (425 Failed Lots) 13.21% |

| Failed Lots - Product Type Tested | Total/Percent of Failed Lots Submitted for Testing (425) |
|---|---|
| Unextracted | (381 Lots) 89.65% |
| Extracted | (44 Lots) 10.35% |

| Failed Lots - Top Three Contaminants | Total/Percent of Failed Lots Submitted for Testing (425) |
|---|---|
| Aspergillus | (285) 67.06% |
| Metals | (101) 23.76% |
| Other* | (39)  9.18% |

* Moisture content, Water Activity, Yeast and Mold (extracted products), and Homogeneity

Table 11 depicts a summary of medical cannabis product testing from October 1, 2022, through September 30, 2023, during which 95.99% of medical cannabis product lots submitted passed testing. The remaining 4.01% failed due to the presence of contaminants as noted in Table 11 below. There is a difference in failure rates between medical and adult use cannabis product testing primarily due to the environment in which the cannabis is grown. Medical cannabis products are grown in an indoor controlled environment.

**Table 11: Medical Cannabis Product Testing October 1, 2022 – September 30, 2023**

| Total Number of Cannabis Product Lots Submitted for Testing | Total/Percent of Submitted for Testing Failed |
|---|---|
| 2544 | (102 Fail Lots) 4.01% |

| Failed Lots - Product Type Tested | Total/Percent of Failed Lots Submitted for Testing (102) |
|---|---|
| Unextracted | (88 Lots) 86.27% |
| Extracted | (14 Lots) 13.73% |

| Top Three Contaminants | Total/Percent of Failed Lots Submitted for Testing (102) |
|---|---|
| Total Bacteria / Total Yeast and Mold | (78) 76.47% |
| Moisture Content | (14) 13.73% |
| Metals | (10)  9.80% |

**Cannabis Research**

The CAN Law requires the Board to establish a Cannabis Research License that permits a licensee to produce, process, purchase and/or possess cannabis to test chemical potency and composition levels of cannabis, to conduct clinical investigations of cannabis-derived drug products, to conduct research on the efficacy and safety of administering cannabis as part of medical treatment, and to conduct genomic or agricultural research (See CAN Law §38). In response, the Office drafted 9 NYCRR Part 132, the Cannabis Research License regulations, which were adopted into the State register on August 9, 2023. As of September 13, 2023, researchers can apply for a Cannabis Research License which will allow researchers to study the effects of cannabis and grant NYS a greater part in understanding all the aspects of cannabis as it relates to efficacy and safety.

With a Cannabis Research License, researchers will have more efficient access to cannabis and cannabis products through NYS pathways, which may alleviate some of the federal barriers. Licensees will also be able to cultivate their own cannabis or contract with other licensees, permittees, or registrants of the Office to obtain cannabis product for research purposes. Researchers may also dispense cannabis or cannabis products directly to research participants by registering as a designated caregiver facility.

The Office has put resources into seeking feedback from researchers and relevant stakeholders throughout the State to understand the types of cannabis research being conducted or seriously contemplated. A Request for Information (RFI) was issued to assess the anticipated resources needed to optimize and simplify the research process as well as understand what is important to continue the development of the State's impactful research programs, resources, and regulations.

Additionally, respondents were asked to identify the specific obstacles, whether state or federal, that impact their ability to conduct cannabis research.

RFI responses were received from various research entities, including academic institutions, medical centers, non-profits, small businesses, laboratories, and research organizations. The research being performed or planned is multi-disciplinary and includes, but is not limited to, genomic, pre-clinical, analytical, agricultural, and human observational studies. Many of the respondents shared similar research challenges and resource needs. Funding to advance research efforts was identified to be the most crucial need among respondents. Many respondents require more clarity on the discrepancies between state and federal guidelines.

The Office has developed guidance documents to ensure that Cannabis Research License applicants and licensees have the resources they need to mitigate the challenges they have experienced performing research within the State and understand their responsibilities as researchers. These documents include a FAQ, a Flowchart, and a Cannabis Research Guidance document.[18]

---

[18] Cannabis Research Page: https://cannabis.ny.gov/research

# Compliance

Once a license is issued, licensees must comply with relevant laws, rules, regulations, and other requirements while engaging in licensed activities. In addition to responding to daily inquiries from licensees, the Office conducts inspections and audits to educate licensees regarding areas of non-compliance, allowing them an opportunity to initiate corrective action and remain in good standing both for the protection of public health and safety and for the protection of licensees' businesses. With cannabis products on the shelves and available to consumers, compliance monitoring is critical to protect health and safety of consumers.

One way the Office ensures and assists licensees to comply with all requirements is through visual inspections of licensed facilities. Visual inspections can be in-person on-site visits, or via remote technology, and are primarily unscheduled for the Office to document typical daily operations and ensure activities are in accordance with the type of license. Scheduled inspections are also conducted to reinspect, either due to corrective actions needed following an initial or previous visit, or as a result of licensee changes that necessitate further inspection. Additionally, planned inspections may be conducted for licensees during the pre-operational phase to ensure dispensaries meet the minimum standards. Compliance inspections include but are not limited to, product quality monitoring, assessment of equipment and technologies employed, and review of applied processing methods, as well as licensee documentation practices. For some licensees, such as processors who perform extraction using volatile solvents, these inspections are required before any licensed activity can begin. Following the completion of an inspection, the Office will issue a Statement of Findings as required in regulation. This Statement of Findings will summarize all findings of the inspection. This requires licensees to make corrective actions and submit a corrective action plan to the Office for review and approval. Licensees are held to rules and requirements that mandate licensees and their staff to engage in licensed activities safely and that high-quality cannabis products are available to consumers; inspections validate that these rules and regulations are being followed. During the 2023 inspection cycle, compliance staff spent a total of 932 hours in the field carrying out specialized on-site inspections of licensee facilities statewide. These on-site inspection hours are in addition to time spent responding to office-based compliance monitoring activities such as responding to licensee inquiries and reviewing licensee operational document submissions.

In addition to on-site inspections of licensed facilities and premises, desk audits are also performed to ensure compliance with all requirements through a review of submitted reports, documents, and product packaging. Licensees are required to maintain plans that explain how the licensee will conduct the authorized activities, as well as reports of the output of those activities. The Office will request and review these plans on a rolling basis and these submitted plans require licensees to set procedures for operations. Requiring licensees to submit plans and reports that pertain to their operating requirements promotes licensee awareness of these requirements and ultimately compliance with them. Timely reporting also supports licensees in maintaining accurate business records and staying in compliance. For example, CAURD desk audits may include reviews of floorplan layout, dispensary build out, and weekly sales inventory once in operational status, while cultivator and processor desk audits may address policies and procedures, product quality plans, batch records, manifests for receiving cannabis or supplying to retailers, inventory reporting and lab testing. Following all reviews, the Office will issue a Statement of Findings to notify licensees of any noncompliance issues.

**Inventory Tracking**

Currently, licensees that cultivate, process, and sell adult-use cannabis are required to maintain an electronic traceability system that traces cannabis products back to their original source. Licensees are required to submit reportable inventory tracking metrics that are used to monitor the volume of products moving through the supply chain and take further action in the event of a recall. These metrics are the same information that licensees will be required to report to the Office, using the State seed to sale system's application programming interface (API) once it is implemented.

BioTrack was selected as the vendor to build the State's seed to sale system and roll out is anticipated in early 2024. The Office will use data that licensees transmit to its seed to sale system via API to monitor activities with cannabis and cannabis products and assess for potential compliance issues and provide information needed to identify products within the supply chain if there is a recall. When it is live, the State's seed to sale system will aggregate licensee data and allow Office staff to—at the click of a button—track a cannabis plant from the moment it is grown to the moment it is sold to a consumer in its final form.

# Medical Cannabis Program

The Medical Cannabis Program was established in 2014 with the signing of the Compassionate Care Act. Eighteen months later, in January 2016, the program was implemented, affording eligible NYS residents with qualifying medical conditions the opportunity to purchase medical cannabis safely and under the supervision of trained practitioners. Following the framework established within the CAN Law Article 3, the Office has taken significant steps to expand the existing Medical Cannabis Program.

The Medical Cannabis Program regulations, adopted on February 22, 2023, included changes that would allow patients to be automatically registered with the Office upon certification. On March 20, 2023, these changes went into effect in the Medical Cannabis Data Management System (MCDMS), which is used by practitioners to certify patients. To streamline the certification process, registry ID cards are no longer required and instead, the practitioner will print a patient certification, which includes the patient's registry ID and scannable barcode to be used immediately at a medical dispensary. To encourage environmental sustainability, plastic registry ID cards are no longer distributed; rather, registrations can be accessed on a personal smartphone, downloaded, and printed at home, or accessed at medical dispensaries via tablet.

A certified patient may designate up to five caregivers to assist them in obtaining, possessing, cultivating, and administering medical cannabis. Caregivers are now able to be added any time after the patient is auto-registered, and caregivers are automatically registered for patients under 18 years of age or patients who are otherwise unable to consent. Since implementation of auto-registrations in March, 72,809 patients and 35 caregivers have been auto registered, benefiting from the streamlined process. As of September 30, 2023, the total number of certified patients was 121,904 and there were 10,856 caregivers registered with the Medical Cannabis Program.

The types of providers who can certify patients for the medical use of cannabis was expanded with CAN Law to include anyone who is licensed, registered, or certified by NYS to prescribe controlled substances to humans in NYS. This expanded the types of practitioners who could participate to include dentists, midwives, and podiatrists. Table 12 below depicts the types of providers certifying patients for the use of medical cannabis in NYS as of September 30, 2023. Total registered practitioners increased from 3,878 in 2022 to 4,200 in 2023.

**Table 12: Number of Registered Practitioners by Profession Type as of September 30, 2023**

| Profession Type | Count | Percent |
|---|---|---|
| Dentist | 17 | 0.40% |
| Medicine | 2533 | 60.31% |
| Midwife | 12 | 0.29% |
| Nurse Practitioner | 1418 | 33.76% |
| Podiatrist | 10 | 0.24% |
| Registered Physician Assistant | 210 | 5.00% |
| **Total** | **4,200** | |

Patient access to the Medical Cannabis Program is supported by allowing additional qualifying conditions. Practitioners utilize their clinical discretion to certify patients for any condition for which

they think their patients may benefit. Among active patient registrations, the most common primary condition providers certify patients for continues to be "Other" (50.9%) as discussed more fully immediately below, although its frequency decreased from 2022 (59.1%). Opioid alternative for pain (15.8%) increased from last year to be the second-most common medical condition (10.6% in 2022). The next most common conditions both remained at levels comparable to in 2022: post-traumatic stress disorder (PTSD) (11.4%) and cancer (10.7%) (see Appendix B-2).

Of active patient registrations within the "Other" category: 80.3% of patients had chronic pain alongside another condition documented by the practitioner on their certification, a decrease from last year (93.8%). Patients with anxiety as the condition documented by the practitioner on the certification increased from 3.4% last year to 16.8%. The remaining 2.9% of patients had conditions that were neither chronic pain nor anxiety as the condition documented by the practitioner on their certification. When combining patients who had chronic pain in the "Other" category and patients who were certified for "Opioid Alternative," 56.4% of all registered patients are using medical cannabis as a treatment for pain. Enhancements to the MCDMS are in development to improve data collection about conditions and gain more specificity about "Other" conditions.

Allowing medical cannabis products with dosages above 10mg of THC per dose provides a more cost-effective means for patients that require increased dosages to treat their conditions. This allows patients to purchase lower quantity of product rather than taking multiple doses of a 10mg THC product to reach their therapeutic dose. Additional changes were made to the Medical Cannabis Program to allow for more variety of product types to fit patient's needs and has further expanded the available options for patients. The routes of administration still remain oral/sublingual, inhaled, and topical. Figure 9 depicts the percentage of each type/route of medical cannabis products dispensed.



**Figure 9: Percentage and Number of Medical Cannabis Products Dispensed by Form from October 1, 2022 – September 30, 2023**

**Patient and Practitioner Survey**

In June 2023, two surveys were deployed via email to Medical Cannabis Program practitioners and patients to assess and understand the experiences and needs of practitioners and patients who currently or have in the past participated in the Medical Cannabis Program. Results have been used to develop more informed clinical outreach and engagement strategies for our program participants.

The practitioner survey collected 265 responses, 87% of whom currently certify patients in the NYS Medical Cannabis Program and 13% of whom have certified patients in the past but currently do not. The survey was designed to better understand the impact of cannabis medicine in patient populations and address the challenges certifying practitioners face when providing quality cannabis care. Practitioners were asked to provide information about their clinical practice area, therapeutic applications and health implications of cannabis, efficacy of available cannabis education, cost and frequency of certification office visits, and challenges to participating in the Medical Cannabis Program. Findings suggest that practitioners believe in the therapeutic actions of cannabis medicine and have witnessed patients improve symptoms of medical conditions with cannabis treatment.

While practitioners affirmed the efficacy of cannabis medicine, they also shared challenges of the Medical Cannabis Program including: the expense of cannabis products, limited insurance coverage, and lack of widespread high quality cannabis education and research.

The patient survey was designed to capture a range of data that could assist in the evaluation of patient participation and experiences with the Medical Cannabis Program. The patient survey collected 10,781 responses from medical cannabis patients, 95% of whom are currently active patients in the Medical Cannabis Program and 5% of whom are inactive, including patient demographics, (e.g., age, gender, household income), length of time in the program, and clinical condition associated with their cannabis certification. To better understand the impact of cannabis medicine, survey questions were included that asked patients to describe their cannabis consumption patterns, associated health outcomes and side effects. To capture any challenges that patients face in connection with the Medical Cannabis Program, questions were included that evaluated medical cannabis costs, geographic accessibility to medical dispensaries, and experiences with healthcare providers.

Patient survey responses affirmed the medical efficacy of cannabis and identified challenges to participating in the Medical Cannabis Program, namely the prohibitive cost of medical cannabis products, the lack of geographic accessibility to medical cannabis dispensaries, and the need for more widespread cannabis education.

**Medical Cannabis Program Clinical Outreach and Engagement**

As the Office continues to expand its outreach to healthcare professionals across NYS and grow the Medical Cannabis Program, engagement with health care practitioners with expertise in treating patients with medical cannabis is critical. These experienced practitioners are best suited to educate their peers about medical cannabis as the scientific knowledge base continues to expand. To provide a platform for these experts, the Office developed the Medical Cannabis Advisory Council (MCAC) and the Medical Cannabis Ambassador Program (MCAP). The Office released applications for both of these programs on November 2, 2023.

The purpose of the MCAC is to assist with the development of resources for practitioners, including clinical guidance documents that evaluate the current scientific literature and make data-driven recommendations for medical cannabis treatment protocols, and to make recommendations to the Office to improve the Medical Cannabis Program for patients and practitioners. The MCAC will be composed of thirteen members across clinical specialties who have participated in the Medical Cannabis Program as either certifying practitioners or dispensary pharmacists. The MCAC selection process included an application that evaluated practitioners' participation in the Medical Cannabis Program and experience conducting educational outreach about medical cannabis. The MCAC members are selected based on their ability to contribute to the goals of the MCAC and provide diverse perspectives. The MCAC members will serve a term of two years.

The Office launched the MCAP to engage certifying practitioners interested in serving as ambassadors for the Medical Cannabis Program. The objective of the MCAP is to develop a cohort of certifying practitioners to assist with the training and education of their clinical colleagues to become knowledgeable about the endocannabinoid system, cannabis science, cannabis pharmacology, cannabis patient care, and the medical cannabis regulatory framework under the Medical Cannabis Program. These ambassadors will provide the tools needed for practitioners to actively participate in their patient's cannabis related care.

**Medical Cannabis Program Community Outreach & Events**

Through digital and in-person channels, information was communicated to the public about how to participate in the Medical Cannabis Program as well as the latest research and scientific evidence regarding cannabis' medicinal therapeutic effects. The Office expects to hold additional virtual and in-person sessions on an ongoing basis.

- March 7th – NYS Medical Program 101 Overview – *Webinar*
    - Conducted a live webinar for the general public. Explored the following learning objectives – (1) What is cannabis, understanding the Medical Cannabis Program, participating in the Medical Cannabis Program, (2) information about medical dispensaries, (3) home cultivation for medical cannabis patients, and (4) additional resources about where to find information about the Medical Cannabis Program.
- May 10th – Ovarian Cancer Support Group Outreach Event – *In-person*
    - Conducted a presentation for the Ovarian Cancer Support Group about the Medical Cannabis Program including how to participate as a patient. Led a Q&A to answer questions about medical cannabis and logistics of the program.
- June 7th – NYS Pain Society Outreach Event – *Webinar*
    - Conducted a webinar for the NYS Pain Society. Explored the following learning objectives—(1) Participating in the Medical Cannabis Program, (2) home cultivation for medical cannabis patients, (3) product forms in NYS, (4) understanding the endocannabinoid system, (5) understanding the potential physiological effects of cannabis, (6) exploring the availability of high-quality cannabis research—and answered questions.
- September 13th – East Harlem Community Health Committee – *Webinar*
    - Lead a webinar presenting (1) information about the Medical Cannabis Program, (2) the potential physiological effects of cannabis, (3) the availability of high-quality cannabis research, and (4) the rights and protections afforded to those who participate in the program for the East Harlem Community Health Committee composed of medical community-based organizations serving East Harlem.

☐ September 19th – Cannabis Care – *Social Media Live Event*
  o Moderated a social media live event with two certifying practitioners, Dr. Grace Forde and Dr. Trusha Shah, who specialize in pain management. Facilitated a conversation about medical cannabis' therapeutic potential in assisting patients with pain management.
☐ November 7th – NYS Osteopathic Medical Society – *Webinar*
  o Conducted a webinar for the NYS Osteopathic Medical Society. Explored the following learning objectives—(1) participating in the Medical Cannabis Program as a practitioner, (2) rights and protections afforded to practitioners and patients, (3) cannabis product forms in NYS, (4) understanding the endocannabinoid system, (5) understanding the potential physiological effects of cannabis, (6) exploring the availability of high-quality cannabis research—and answered questions.
☐ November 28th, December 12th – Albany Senior Housing – *In-person*
  o Conducted an educational presentation on the Medical Cannabis Program for residents of Albany Senior Housing.
☐ December 19th – NYS Society of Physicians' Assistants – *Webinar*
  o Conducted a webinar for the NYS Society of Physicians' Assistants. Explored the following learning objectives— (1) participating in the Medical Cannabis Program as a practitioner, (2) rights and protections afforded to practitioners and patients, (3) cannabis product forms in NYS, (4) understanding the endocannabinoid system, (5) understanding the potential physiological effects of cannabis, (6) exploring the availability of high-quality cannabis research—and answered questions.

The Office has implemented a more streamlined way for clinicians and community members to request program speakers and informational presentations about the Medical Cannabis Program by including a link to a request form on our website that captures their contact information, event details, comments and any relevant documents related to their request.

### Health Equity and Access

Providing communities equal access to medical cannabis is a vital strategy to support health equity in NYS. The CAN Law requires that the Office identify areas across the state that are medically unserved and underserved (See CAN Law §35(8)). These regions have concentrations of health-related issues and are medically underserved by traditional healthcare. They are also unserved or underserved by medical cannabis dispensaries. The Office used a health disadvantage score to identify unserved and underserved census tracks derived from seven variables: population-provider ratio, population over 65 years old, uninsured rate, low birth weight, premature deaths, household disability rate, and travel time to healthcare provider. Of note, five out of seven of these variables (population over 65 years old, uninsured rate, low birth weight, premature deaths, household disability rate) are also recognized by NYS DOH as indicators of health disadvantage as well. Census tracts with a health disadvantage score in the 85th percentile (600 out of 4,919 in NYS) are considered unserved or underserved.[19]

During the last year, the Office has undertaken efforts at the systemic and practice levels to confront health disparities, including 1) identifying medically underserved and unserved communities across the State; 2) engaging with medically-focused community-based

---

[19] For more information about unserved and underserved areas of the State, visit Unserved & Underserved | Office of Cannabis Management (ny.gov)

organizations in underserved and unserved communities; 3) enacting several new health equity-focused requirements for ROs seeking to expand; and 4) mapping health-distressed neighborhoods.

**Pharmaceutical Internships**

The Office executed an agreement with the Albany College of Pharmacy and Health Sciences to provide an elective rotation for the college's experiential education program. These are unpaid experiences that are a requirement for the pharmacy student's graduation. This program allows the Office to help educate future licensed health care professionals about cannabis regulation and how they can consider this in their daily practice after graduation.

# Stakeholder Engagement and Outreach

Implementing CAN Law and creating equitable industry regulations requires input from a broad spectrum of stakeholders. In their work this year, the Board and Office have continued to engage and build relationships with NYS agencies, local governments, nonprofit organizations, faith-based organizations, community boards, and many individuals who are interested in building New York's legalized cannabis industry. The focus of these efforts this year has been to:

- Build awareness of the Board, Office, and CAB;
- Enhance communication and awareness to support implementation of both existing and new initiatives launched by the Board and Office, such as the Cannabis Growers Showcases or the Medical Cannabis Program;
- Explain the two-tier market structure of the State's adult-use cannabis market and the nine types of adult-use licenses;
- Explain local municipality engagement as part of the licensing process, such as the Notification to Municipalities;
- Engage with potential applicants about available industry opportunities and providing information and support for the adult-use cannabis license applications;
- Identify and engage stakeholders that have existing relationships with potential licensees;
- Interface with and respond to inquiries from a diverse array of stakeholders and constituents (constituent correspondence);
- Work with the press to boost awareness and coverage of new initiatives and critical Office and Board messaging and communications; and
- Listen to stakeholders and use their feedback to inform the Board and Office's efforts.

**Intergovernmental Affairs**

Consistent communication and partnership across local governments and state government agencies is vital for the successful implementation of the CAN Law. The Office and Board worked closely with municipal and county governments throughout the past year: attending key meetings hosted by local government officials, presenting workshops for local government officials at annual meetings of the New York State Association of Counties (NYSAC) and New York Conference of Mayors (NYCOM) and answering questions at local community board meetings.

The Office continues to provide those key entry points with community boards and municipalities, while maintaining relationships with other local governments to continue to answer their questions. Many government officials have been interested in the way tax revenues from adult-use cannabis sales are divided, the public health safeguards that ensure cannabis products will not be available to individuals under the age of 21, licensing, and enforcement efforts to address unlicensed cannabis stores.

The Office regularly receives questions from local government officials about the implementation of the CAN Law. Local governments and the decisions they make regarding zoning and local ordinances shapes the way that New Yorkers cultivate, process, buy, sell, and consume cannabis. Staff assist local government officials in understanding relevant law and regulations and help answer questions that arise while making these important decisions. This year, the Office has received an increase in inquiries from local zoning boards, villages, towns, and cities about proposed regulations, licensing, allowances under the State's law and regulations, and relevant processes associated with the regulations. Staff also address questions received about new

programs introduced in the State and arrange meetings to educate municipalities and local governments across the State and other stakeholders about these new programs. Staff also worked closely with state and local elected officials to coordinate and amplify announcements about dispensary openings in their respective communities.

Other state agencies have been valuable partners in implementing the CAN Law. State agencies have partnered with, and assisted, the Office and Board by reviewing drafted regulations, entering into data use agreements, and connecting potential applicants and other stakeholders with the Office and Board. Interagency meetings are also held regularly to inform other NYS agencies about new programs, address changes, and answer their questions. Additionally, New York is an active member of the Cannabis Regulators Association and has used the experiences of cannabis regulators from other states to inform the implementation of the CAN Law here at home.

### Legislative Affairs

The Office's Legislative Affairs staff is responsible for managing the execution of the Office's legislative and public policy agenda, fostering communication with the State Legislature and relevant NYS agencies, and acting as the primary liaison and point of contact for the NYS Senate, Assembly, and the Governor's Office.

Staff are responsible for identifying, analyzing, and tracking all legislation before the State Legislature that could impact the State's cannabis programs. The legislative affairs staff are also tasked with providing briefings and participating in meetings with state elected officials related to Board and Office policies, processes, and initiatives and assisting NYS legislative offices with constituent issues and questions related to the Office and CAN Law. Through their work, staff cultivate relationships with NYS elected officials, staff, policy makers, governmental bodies, and leaders. This year, staff participated in in-person education and outreach events, visited licensee sites, and attended dispensary openings throughout the State.

### Community Affairs

The Office's Community Affairs staff focuses on building and growing relationships with New Yorkers across the State, particularly in communities that have been disproportionately impacted by the policies of cannabis prohibition, to ensure the work of the Office reflects the diverse experiences and needs of communities across the state. Through outreach events, Community Affairs staff focused on connecting with the public and providing an avenue for potential licensees to ask questions and share their feedback on different Office initiatives.

#### *Cannabis Workforce Development*

In collaboration with the DOL and the NYS Cannabis Workforce Initiative (CWI), and in partnership with the New York City Housing Authority (NYCHA) and several other NYS public housing authorities, the Office's community affairs staff travel to communities throughout NYS, particularly to those disproportionately impacted by cannabis prohibition policies and public housing residents, to provide presentations about cannabis workforce development and job opportunities in the NYS cannabis industry. This initiative began in Spring 2023 (See Table 13).

The CWI is a collaboration between the NYS School of Industrial & Labor Relations at Cornell University and the Workforce Development Institute. In addition to housing authorities, meetings were held in a variety of public gathering spaces like, community centers, gymnasiums, and libraries. Topics discussed by Office staff included the establishment of the new cannabis market,

license types available, and previous experience requirements for each license type. The DOL provided information to attendees about available resources for resume writing, interviewing, and transferrable skills. The CWI staff also provided information about free trainings offered and supports available to NYS residents. This initiative concluded in August 2023; however, it will be offered on an ongoing basis in the future due to high stakeholder interest following the sessions held this year. The Office plans to expand future sessions to other venues across the state.

**Table 13: Cannabis Workforce Development Sessions**

| Date | City | Location | Housing Authority |
|------|------|----------|-------------------|
| March 15 | Schenectady | Steinmetz Homes | Schenectady Public Housing Authority |
| March 28 | Albany | Albany Public Library | Albany United Tenants |
| April 26 | Rochester | MLK Center City | N/A |
| April 27 | Syracuse | Toomey Abbott Towers | Syracuse Housing Authority |
| May 3 | Binghamton | Phelps Mansion | N/A |
| May 18 | Troy | Capital District Educational Opportunity Center | N/A |
| May 23 | Brooklyn | Bushwick House | NYCHA |
| May 31 | Brooklyn | Cooper House | NYCHA |
| June 5 | Hudson | Hudson Central Fire Station | N/A |
| June 17 | Brooklyn | Emmanuel Baptist Church | N/A |
| June 22 | East Harlem | Johnson Houses | NYCHA |
| June 23 | Bronx | Community Board 12 | N/A |
| July 27 | Brooklyn | Red Hook Houses | NYCHA |
| August 29 | Queens | Redfern Houses | NYCHA |
| September 7 | Yonkers | The Ross F. Calcago Houses | Municipal Housing Authority for City of Yonkers |

### *Centering Lived Experience—Community Roundtable Events*

As part of formative work for the NYSEE Plan, the Office partnered with community organizations to host 18 community roundtable events. These events were an opportunity for intimate conversations between the Office and individuals most likely representative of the social and economic equity groups identified in CAN Law—individuals from CDIs, minority-owned businesses, women-owned businesses, distressed farmers, and SDVs (See CAN Law §§87(2) and (3)). Approximately 400 participants were recruited across all events. Community input was used to inform development of the NYSEE Plan. After publishing the NYSEE Plan, the Office has been returned to communities to present the NYSEE Plan, and demonstrate that the Office listened, acknowledged, and acted on the information that was discussed. The Office plans to continue these important conversations to inform social and economic equity policy in NYS.

### *"Rules of the Road"*

Office staff developed "Rules of the Road," a training for all provisional CAURD licensees to attend during the first week following approval of their provisional license. This interactive, virtual training provides important information to licensees as they move forward with starting their licensed business, including completing the licensure process, best practices when working with the Office,

localities, and other NYS agencies, compliance requirements, and resources and guidance available through the Office. The training served as an opportunity for licensees to ask the Office and DASNY any questions they may have. Following each webinar, a recording of the training and training materials were shared with participants.

*Raising Awareness about Proposed Regulations*

Office staff traveled across NYS to inform the public about the release of proposed cannabis regulations, what they entail, and to educate community members about the opportunity to submit public comments, tips on writing an effective public comment, and how to send them to the Office.

*Pathways to Licensing: "Roadmap to Adult-Use Cannabis License Applications"*

In October 2023, the Office launched the "Roadmap to Adult-Use Applications" statewide tour to provide guidance on how the application process works, requirements to apply for each license type, information about how to receive application assistance for prospective social and economic equity applicants and answer any questions in real time from potential applicants about the application. Events were held in every region of the State, and the Office also provided virtual events for individuals to participate. Five virtual events and 16 in-person events were conducted in 2023 (Table 14).

**Table 14: Roadmap to Adult-Use Cannabis License Applications Sessions**

| Date | City | Location |
| --- | --- | --- |
| October 10 | Harlem | Adam Clayton Powell Jr. State Office Building |
| October 12 | Albany | Albany Public Library |
| October 14 | Westchester | NewRO Studios |
| October 17 | Farmingdale | CNTR Ballroom A |
| October 18 | Queens | CUNY School of Law Auditorium |
| October 23 | Bronx | Bronx Library Center |
| October 26 | Syracuse | Syracuse Southwest Community Center |
| October 30 | Ithaca | Tompkins County Public Library |
| November 1 | Brooklyn | Medgar Evers College, CUNY Dining Room |
| November 1 | Rochester | Central Library of Rochester & Monroe County |
| November 2 | Buffalo | Northland Workforce Training Center |
| November 8 | Newburgh | Newburgh Youth Build |
| November 9 | Utica | Utica Public Library |
| November 9 | Centereach | Middle Country Public Library |
| November 14 | Schenectady | Schenectady County Public Library |
| November 16 | Plattsburgh | Clinton County Mental Health |

*Faith-based Coalition*

The Office initiated monthly meetings with a faith-based coalition to discuss needs across communities, stigma surrounding cannabis, and what legalization means for their communities.

In these meetings, faith leaders expressed interest in supporting entrepreneurs in their community and sought to understand how revenue would be reinvested into their communities.

As the Office facilitates the conversation, faith leaders are developing a report, to be submitted to the CAB, outlining their recommendations for how revenue should be utilized. The first meeting was held in Fall 2022 and meetings have continued virtually on a monthly basis, with two in-person sessions held in Buffalo and Harlem in 2023. More in-person sessions are planned in 2024. The Office will continue to be intentional about engaging with the faith-based community and continue to develop these relationships through conversation and collaboration.

**Social Media and Digital Outreach**

In addition to in-person outreach through meetings, presentations, roundtable discussions, and other events, the Office regularly connects with New Yorkers through social media and digital platforms. The Office maintains an active, informative, and engaging presence across social platforms such as Facebook, Instagram, LinkedIn, Twitter, and YouTube. Staff ensure real-time posting of Board and CAB meetings, effectively amplifying regulatory updates and news across various social media platforms. To engage with individuals interested in the CAURD program, the Office created a four-part informational video series about how the public can participate in the program. The Office facilitated live social media discussions with community partners, focusing on best practices for CAURD to address current industry challenges. Furthermore, the Office dedicated efforts to amplify the voices of advocates within the cannabis industry, highlighting their work during significant events such as Black History Month and Pride Month.

# Laws, Regulations, and Guidance

The CAN Law is the foundation upon which the State's medical cannabis, adult-use cannabis, and cannabinoid hemp programs are built. This year, the Office continued to work towards achieving the goals laid out in the CAN Law by drafting and issuing regulations and guidance.

**Laws**

*AUCC / AUCP Extender Legislation*

On June 1, 2023, Governor Kathy Hochul signed into law Chapter 135 of the Laws of 2023, extending certain authorities for AUCCs and AUCPs for an additional year. The extension gave AUCCs the ability to continue to minimally process cannabis flower products and both AUCCs and AUCPs the ability to continue to distribute cannabis products until June 1, 2024. This extended the original bill, previously signed in February 2022, that first created the AUCC and AUCP licenses.

*Enforcement Legislation*

On May 3, 2023, Governor Hochul signed into law Chapter 56 of the Laws of 2023, Part UU, to increase civil and tax penalties for the unlicensed and illicit sale of cannabis in NYS. The new legislation provides additional enforcement power to the Office and the DTF to enforce the new regulatory requirements, by closing unlicensed operators engaged in the illegal sale of cannabis across NYS. This legislation also makes it a crime to sell cannabis and cannabis products without a license, holding owners or operators of unlicensed cannabis retailers responsible. Previously, only store clerks completing the sale were culpable for the crime of unlicensed cannabis sales. The legislation also addresses the sale and/or gifting of cannabis from unlicensed stores and trucks.

*Vacatur Legislation*

On September 15, 2023, Governor Hochul signed into law Chapter 468 of the Laws of 2023 making technical corrections to the Criminal Procedure Law regarding the unlawful possession and sale of cannabis. The legislation amended the Criminal Procedure Law to make a technical change related to resentencing of former marihuana offenses not subject to automatic vacatur. With this change, §440.46-a(2)(b)(i) will now reference (2)(a)(ii) because it was written to allow people to apply for vacatur or a sentence reduction in the cases in which their original conviction is a lower-level offense. Under the previous version of the law, there was a question of whether people with lower-level offenses were eligible to apply for relief, and if they were, they could only get relief by demonstrating "severe and ongoing consequences" from their conviction.

**Regulations**

The CAN Law empowers the Board to issue regulations governing the rules of the State's cannabis industry (Table 15) (See CAN Law §§10 and 13). Regulations proposed or finalized this year have: provided the framework for the first adult-use retail dispensaries in NYS; created an auto-registration process to further simplify the registration of medical cannabis patients; created a pathway to allow researchers in NYS to produce, process, purchase, and/or possess cannabis for research purposes as outlined in the CAN Law §38; protected the health and safety of cannabinoid hemp consumers from the proliferation of intoxicating cannabinoid hemp products in

the marketplace; established the framework for laboratory permitting and oversight; and established violations, hearings, and enforcement actions related to unlicensed activities pursuant to the CAN Law §16-A. While the CAN Law determined the two-tier structure of the adult-use market, which ensures individuals with business interest in the growing or processing of cannabis do not have business interest in retail cannabis businesses, the regulations issued by the Board continue to lay out the specific rules that licensees must follow in the NYS cannabis industry to protect against the monopolization of the industry and promote small businesses (See CAN Law §§68, 69, 70, and 71 regarding two-tier adult-use market structure).

Collecting input from the public is a foundation of the regulatory process and a cornerstone of the Office's work. Pursuant to the New York State Administrative Procedures Act, before proposed regulations can be finalized, there must be an opportunity for the public to submit comments on the proposed regulations. Upon the filing of proposed regulations, the public has a 60-day window to comment on the proposed regulations. If the proposed regulations are revised, a second public comment period must be conducted, and the public has an additional 45-day window to provide comment. Comments received during these periods are included in an assessment of public comment filed in the NYS Register and available on the Office's website.

The Office recognizes the importance of effectively responding to public comments received, addressing community concerns, and ensuring that stakeholders are acknowledged. For example, the proposed Adult-Use Regulations completed two separate public comment periods over the course of 2023. Collectively, the Office and the Board received more than 4,000 distinct comments from approximately 550 individuals regarding the proposed Adult-Use Regulations.

Commenters, representing a broad spectrum of stakeholders, sought clarification on various provisions, proposed additional amendments, requested technical modifications, and shared their valuable opinions with both the Office and the Board. This robust and constructive feedback was pivotal in guiding the final version of all regulations associated with cannabis, solidifying the structure and paving the way for the expansion of the State's cannabis market.

**Table 15: Regulatory Packages Effectuated in 2023**

| Regulatory Packages | Effective Date |
|---|---|
| Part 113 - Medical Cannabis Regulations | February 22, 2023 |
| Part 114 - Cannabinoid Hemp Emergency Regulations | July 27, 2023 (emergency – effective for 120 days) |
| Part 114 - Cannabinoid Hemp Regulations | December 13, 2023 |
| Parts 118, 119, 120, 121, 123, 124, 125, 131 - Adult-Use Regulations: Adopted | September 27, 2023 |
| Parts 128 & 129 – Packaging, Labeling, Marketing and Advertising Regulations | March 22, 2023 |
| Part 130 - Cannabis Laboratory Regulations | March 22, 2023 |
| Part 132 - Cannabis Research License Regulations | August 9, 2023 |

| Regulatory Packages | Effective Date |
|---|---|
| Part 133 - Violations, Hearings, and Enforcement Emergency Regulations | April 6, 2023 (emergency – effective for 120 days) |
| Part 133 - Violations, Hearings, and Enforcement Emergency Regulations | August 4, 2023 (emergency – effective for 120 days) |
| Section 133.23 Actions Relating to Unlicensed Activities | June 6, 2023 (effective for 120 days) |

**Guidance**

In addition to the framework created by the CAN Law and clarified in regulations, the Office has issued or updated 32 key guidance documents this year covering topics including, but not limited to, terms and conditions for different license types, application frequently asked questions, True Party of Interest (TPI), social and economic equity certification criteria, retail dispensary location requirements, packaging and labeling of cannabis products, sampling and testing requirements, laboratory standards, and research requirements. These guidance documents further elaborate on the requirements of licensees and explain the specific requirements of conducting research, operating a cannabis business, or operating a cannabis laboratory. Guidance issued by the Office has offered technical clarity to licensees. Guidance documents and updates are posted to the Office website and licensees are notified via email.

# Administration

**Personnel**

The Office has continued to prioritize attracting and hiring a diverse, inclusive, and talented workforce to achieve its mission. To ensure a long-term roadmap for hiring, the Office has worked closely with Department of Civil Service to develop exams for newly created titles, such as the Investigative Specialist (Cannabis) series. The Office has also worked to utilize additional hiring mechanisms to broaden diversity and recruitment pools, such as temporary positions and the 55b/c Program. Over the course of 2023, the Office recruited and hired 46 full-time equivalent staff (FTE) bringing the total agency staff to 162 FTEs at the close of 2023.

**Facilities and Infrastructure**

The Office now has three locations across the state: Albany, New York City, and Buffalo.

The Office has also secured a fleet of vehicles that are used to perform on-site inspections, enforcement details, and other outreach events. Seventeen of those vehicles are fully electric, with four additional hybrid vehicles. The Governor's Executive Order 22 (EO22) establishes that light-duty and medium-duty fleet vehicles must be comprised of entirely zero emission vehicles (ZEV) by 2035 and 2040, respectively.[20] The Office is committed to sustainability and decarbonization efforts and is proactive in meeting EO22 requirements, having already established a 70% ZEV fleet.

**Contracts and Memoranda of Understanding**

The Office continues to foster relationships between other NYS agencies to ensure our mission is realized across NYS. Additionally, the Office has implemented many contracts and continues to work with vendors to provide services in mentoring applicants and licensees, tracking business operations, and standing up the Office's infrastructure. Table 16 details the current contracts in place and Table 17 details the current MOUs established.

**Table 16: List of Current Contracts Between the Office and Partners**

| Vendor | Contract ID | Description Of Services | Effective Dates | Total Amount |
|---|---|---|---|---|
| Key Merchant Services LLC | PS68914 | Electronic Payment, Cannabinoid Hemp | 3/1/22-12/20/29 | $45,000 |
| American Express Travel Related Services | PS69501 | Electronic Payment Vendor For License Applications | 3/1/22-12/20/29 | $21,000 |
| Bio-Tech Medical Software Inc | C030471 | Seed To Sale Tracking System | 5/1/22-5/31/23 | $2,000,000 |
| Bio-Tech Medical Software Inc | C004549 | Seed To Sale Tracking System | 12/8/22-12/8/27 | $1,199,900 |
| Cornell University | CM04068 | Cannabinoid Hemp Research Support | 1/1/22-9/30/23 | $1,000,000 |
| Dorsey & Whitney | T004704 | Outside Counsel | 6/20/23-6/19/24 | $49,999 |

---

[20] Executive Order 22: https://www.governor.ny.gov/sites/default/files/2022-09/EO_22.pdf

| Vendor | Contract ID | Description Of Services | Effective Dates | Total Amount |
|---|---|---|---|---|
| Google LLC | PM67982 | Cannabis Application System Support | 7/1/22-3/31/24 | $11,020,000 |
| Granicus LLC | PM67305 | Communication Support | 8/31/22-8/31/25 | $65,212 |
| Health Research Inc | C004697 | Public Health Survey Data | 4/1/22-3/31/23 | $75,000 |
| New York State Technology Enterprise: Cannabis Licensing System | PN691AB | Staffing Support | 11/15/21-12/30/24 | $250,000 |
| New York State Technology Enterprise: Seed to Sale | PN691AD | Staffing Support | 6/1/23-5/31/25 | $696,340 |
| OpAD Media Solutions LLC | PS68900 | Media Campaign Ad Placement | 4/13/23-5/31/23 | $5,000,000 |
| Our Academy | C004708 | CAURD Mentorship | 4/7/23-4/6/24 | $999,780 |
| Permanent Goods LLC | T004699 | Marketing And Communications | 1/1/23-12/31/23 | $40,000 |
| Salesforce | PM68178 | Communication Support | | $97,947 |
| Shaleen Title | S004526 | Social Equity Consultant | 7/19/22-1/18/24 | $24,975 |
| University Of Waterloo | T004675 | Cannabis Survey Data | 9/1/22 -8/31/23 | $44,772 |
| Whitman Insight Strategies LLC | C004696 | Marketing And Communications | 12/20/22-9/30/23 | $207,970 |
| Whitman Insight Strategies LLC | T004540 | Marketing And Communications | 4/5/22-4/5/23 | $49,991 |
| Worldpay LLC | PS68916 | Electronic Payment Adult-Use Licensing | 9/1/22-8/31/27 | |

**Table 17: List of Current Memoranda of Understanding Between the Office and Partners**

| Agency | Purpose | Fiscal |
|---|---|---|
| DOH – Wadsworth | Reference Lab | Yes |
| Gaming | Lottery Auditing for Licensing | Yes |
| Tax | Updates to their systems to collect tax revenues | Yes |
| DMV | DRE/ARIDE training, etc. | Yes |
| DOH-Policy | 4 positions related to data reporting | Yes |
| State Police | Data Sharing on Patients/Caregivers of the Medical Cannabis Program | No |
| SUNY Albany School of Public Health | Intern Placements | Yes |
| DCJS | Data Sharing | No |
| SUNY Morrisville | Training Programs for Cannabis Compliance | Yes |
| Rockefeller Institute | Data Sharing | Yes |
| OGS | LinkedIn Services for Posting Positions | Yes |

# Recommendations

The CAN Law creates a comprehensive regulatory structure to oversee the licensure, cultivation, production, distribution, sale, and taxation of medical cannabis, adult-use cannabis, and cannabinoid hemp in NYS. It encourages social and economic equity, protects public health and safety, and fosters economic development as key priorities of this regulatory structure. As a living piece of legislation, the CAN Law will require changes over time to meet evolving conditions and needs. Below are ten recommendations to support and strengthen the efforts already underway to achieve the purposes and intent of the CAN Law.

### #1      Continue to Update NYSEE Plan Based on Ongoing Community Input and Feedback

In 2023, the NYSEE Plan was released, defining the Office's priorities related to social and economic equity, including identification of communities disproportionately impacted by cannabis prohibition. We recommend that the Office continues to engage with stakeholders and updates the NYSEE Plan into the future, ensuring it is a living document that reflects the current environment and priorities.

### #2      Establish Additional Supports to Effectively Expand Enforcement Efforts

While some unlicensed cannabis shops may seem legitimate to consumers, they undermine NYS's ability to build a truly equitable market with the power to deliver new resources to schools and communities disproportionately impacted by cannabis prohibition statewide. The proliferation of unlicensed cannabis shops poses a public health threat given that products on their shelves are not tested, may come from out of state, and are too often packaged in a manner to attract youth. The Office continues to work closely with state and local partners to shut down these unlicensed cannabis shops. We recommend the continuation of these collaborative efforts, and that the Office use every tool possible to shut down these illegal operators.

The Office recommends the expanded application of available laws to establish a more efficient and effective administrative process for the Office and other law enforcement entities to close down unlicensed cannabis businesses. Additionally, we recommend the ability to levy higher upfront penalties against unlicensed cannabis businesses to be a stronger deterrent and not just a 'cost of doing business.'

### #3      Continue to Grow Efforts to Protect and Promote Public Health and Safety

We recommend maintaining investments in public education and closely monitoring outcomes related to public health and safety. These elements are vital within the Office's public health framework to address key priorities outlined in the CAN Law and the MRTA. These include preventing underage cannabis consumption, avoiding overconsumption, addressing cannabis use disorder, mitigating the impact of cannabis legalization on traffic safety, providing essential information to the public—especially consumers—to make informed decisions on cannabis consumption, and consistently monitoring the effects of cannabis legalization on public health and safety while identifying emerging issues (See CAN Law § 86(2) and MRTA § 51 which adds Section 99-jj to the State Finance Law which establishes a NYS Drug Treatment and Public Education Fund which would, amongst other things, expend monies towards the development and implementation of a statewide public health campaign focused on the health effects of cannabis and legal use, including the aforementioned key priorities).

Identifying emerging public health issues early is critical to responding to and mitigating their impacts. In turn, we recommend the establishment and ongoing development of capacity and systems for conducting syndromic surveillance to detect adverse events linked to cannabis or newly emerging cannabis-related conditions. This involves a continued commitment to adequately staffing this endeavor as well as the development of a new cannabis-related syndrome definition to systematically query emergency department and inpatient hospital data to monitor trends in real time.

Below are additional efforts to continue and expand in 2024 and beyond:

- We recommend continuing to promote traffic safety: including building on the successes of the ARIDE Trainings and DRE Schools.

- Monitoring compliance of licensees with regulatory requirements and guidance helps protect worker safety and promote availability of safer products for consumers. We recommend that staffing is adjusted to meet the growing number of licensees that compliance must support.

- We recommend ensuring permitted laboratories continue to promote consistent quality standards for laboratory testing of adult-use and medical cannabis products.

- To improve access to and availability of substance use disorder treatment programs, we recommend developing processes for distributing cannabis revenue available as part of the Drug Treatment and Public Education Fund.

- As part of continued efforts to mitigate the impacts of cannabis prohibition, we recommend protections be put in place that prevent postpartum people and their newborns from a drug screening without consent.

### #4    Address Gaps in Knowledge and the Evidence Base Related to Cannabis

Research is essential to advancing knowledge about cannabis and cannabis products for patients, consumers, practitioners, and other stakeholders. As a Schedule I controlled substance under federal law, federal laws and regulations only allow for limited cannabis research opportunities which often require burdensome steps to be completed by researchers. As regulated markets expand, there is a critical need to build upon available rigorous scientific evidence about the effects, safety, and impact of cannabis and cannabis products for medical and adult-use. We recommend continuing to contribute to the cannabis evidence base by disseminating publications using data at the Office's disposal and by coordinating efforts with other researchers across the State.

We recommend continuing to implement and maintain a comprehensive data strategy to establish critical infrastructure to acquire, organize, analyze, and deliver data to assess regulatory inputs against socioeconomic, public health and safety, and enforcement outcomes across NYS government and geographic regions. This will leverage data that supports evidence-driven cannabis policy, agency operations, ethical and transparent governance, and will support efforts to expand the cannabis evidence base.

**#5      Expand the Medical Cannabis Program**

Article 3 of the CAN Law provides a pathway for access to medical cannabis for patients who have any condition that may be helped by medical cannabis while comprehensively regulating the manufacture, sale, and use of medical cannabis to protect public health and safety. Particularly as the adult-use cannabis market continues to expand, we recommend continuing to prioritize the Medical Cannabis Program to reach patients who may be self-medicating with cannabis from sources that are not regulated or held to the same high-quality standards as the medical cannabis products manufactured by ROs in NYS. This could be achieved through the recommended strategies described below:

- Removing the legislative requirement that patients and designated caregivers register with the Office. While the Office and the Board did recently amend regulations to allow for "exemption" from filing the registration for patients and caregivers, patients are still considered to be "registered."

- Continued expansion of the Medical Cannabis Program to ensure efficiency and stability: including reciprocity between states where medical cannabis is legal, expanding the amount of medical cannabis a patient can purchase or possess, and removing taxes from medical cannabis and certain fees that can make participation prohibitive.

- Expanding access points and variety for patients by registering additional ROs and allowing the existing ROs to operate additional medical dispensing sites, in accordance with requirements that will be set forth in the CAN Law and Part 113 of Title 9.

- Continuing to build on medical cannabis education campaigns to ensure that certified patients and prospective participants are updated with medical cannabis product information and are educated about what they are consuming and what is most effective for their medical needs.

- To expand access to the Medical Cannabis Program, we support insurance companies opting to cover medical cannabis products and recommend exploring opportunities for collaboration.

- We recommend an analysis of current Medical Cannabis Program data retrospectively to assess patient impact.

**#6      Support Robust Cannabis Markets Through Efficient Registration, Licensing and Permitting**

We recommend contracting with outside services to conduct background checks on license applicants' and owners' True Parties of Interest to help streamline licensing and enforcement efforts at the Office.

**#7      Continued Engagement with Legacy Market and Operators**

We recommend continuing efforts to engage legacy operators to seek licensure and use their experience in the cannabis industry by joining the regulated adult-use market to help facilitate the transition of NYS cannabis consumers from unregulated sources to regulated sources.

#8      Support Business and Markets

As cannabis is yet to be federally legal, businesses in the cannabis industry face financial and banking challenges that similar businesses in other industries do not. At the federal level, the Secure and Fair Enforcement Regulation Banking Act would provide legal protection to financial institutions that work with state-licensed cannabis businesses, addressing the risks of operating cannabis businesses on an all-cash basis. To further mitigate the impact of these financial and banking challenges, we make the following recommendations.

We recommend expanding the definition of crops and livestock to include cannabis, thus normalizing cannabis as a legitimate crop and allowing licensees who engage in cultivation to claim certain related expenses on their taxes.

To further support farmers as the foundation of the cannabis industry, we recommend exploring programs or solutions that help mitigate the unexpected challenges related to the cultivation of cannabis.

Under current NYS Law, only human persons may form a cooperative; however, the Office's vision for Adult-Use Cooperative licenses includes business entities involved in forming cooperatives. We recommend allowing business entities to form a cooperative, rather than limiting eligibility to individual human persons.

#9      Continue to Monitor Environmental Impacts and Encourage Innovative Sustainability Strategies

This year, the Board issued regulations which, among other things, require adult-use licensees and ROs to track and report several metrics related to their environmental impact. Licensees must report metrics such as the amount of packaging material they purchase to place cannabis products in, the amount of waste they generate from their actions, and the amount of water and energy they consume to cultivate cannabis. These regulations also create pathways through which licensees can collect product packaging from consumers to be sanitized and re-used. Additionally, these regulations establish a fee structure and licensing tiers that incentivize adult-use cultivators to choose a canopy type (i.e., outdoor or mixed light) which uses less energy than indoor cultivation. These regulations also set energy and environmental standards for factors such as lighting, HVAC, and water. All licensees and registrants must meet these standards as they relate to their authorized activities.

To continue the Board's efforts towards monitoring, communicating, and—ultimately—reducing the environmental impact of the cannabis industry, we recommend further action be taken to reduce barriers licensees face and assist them in achieving the goals of the Board.

We recommend analyzing data submitted by licensees and ROs to shed light on the actual impact of these businesses, and ensuring that information regarding their environmental impact, in aggregate, is shared publicly. The data will allow stakeholders to better understand the water and energy consumption of cannabis cultivation, the volume of cannabis packaging going into waste and recycling streams, the characteristics of the packaging material supply chain, and the impact of packaging on costs to licensees and consumers, thereby informing efforts to address environmental impact. This information will be used by the Office, the Board, and other stakeholders to assist licensees in identifying innovative strategies to meet energy and environmental standards and other requirements related to their environmental impact. We recommend identifying strategies to lessen the burden of achieving these environmental goals,

such as strategies that extend the lifecycle—and reduce the cost of—cannabis product packaging and labeling, and solutions that reduce the cost for small businesses to transition to, or obtain, energy-efficient equipment.

Additionally, licensees and waste management stakeholders have described challenges to incorporating environmentally sustainable practices and materials due to global supply chain issues and lack of technology and infrastructure at a sufficient scale. We recommend working with a variety of stakeholders to identify supply chain issues, improve municipal waste guidelines and infrastructure, and then implement strategies to overcome or address such concerns and innovate new strategies, allowing licensees to foster environmental sustainability in the industry.

Additionally, we recommend programs that expand access to recycling for both the waste generated by cultivators and processors and the packaging disposed of by consumers.

### #10    Opening Options for Home Cultivation

As of October 2022, certified patients or their designated caregiver aged 21 or older and living in NYS may cultivate medical cannabis at home. We recommend issuing regulations to authorize adult-use home cultivation so those age 21 or older and who are interested may legally and safely cultivate cannabis for personal use.

### #11    Recommendations at the Federal Level

As mentioned under Recommendation #8, the federal Secure and Fair Enforcement Regulation Banking Act would provide legal protection to financial institutions that work with state-licensed cannabis businesses, addressing some of the risks of operating cannabis businesses on an all-cash basis. We make the following additional recommendations at the federal level.

We recommend measures be taken at the federal level to address the relative lack of federal regulation and enforcement over cannabinoid hemp products due to how hemp is defined in the 2018 Farm Bill. Without federal oversight, states have developed their own unique approaches to mitigating the public health and safety concerns posed by intoxicating cannabinoid hemp products, leading to confusion and lawsuits throughout the country regarding which hemp-derived products can be sold state by state.

We recommend advocating for changes to federal laws to create less stringent requirements around cannabis research, including allowing any state licensed entity to provide cannabis for research being conducted within that same state. This would allow researchers access to additional sources for cannabis and more variety to select cannabis used in their studies beyond sources approved by the National Institute on Drug Abuse (NIDA). Limiting researchers to NIDA-approved cannabis sources is problematic due to concerns about the quality of cannabis from existing suppliers, limited supplier options, and because it inhibits the researcher's ability to study products currently available on the market that people are consuming for medical and adult-use.

# Appendices

Appendix A: Cannabis Advisory Board Membership ................................................................ 62
Appendix B: Medical Cannabis Program .................................................................................. 63
Appendix B-1: Medical Cannabis Registered Organizations and County of Approved Dispensary
Locations................................................................................................................................... 63
Appendix B-2: Patient Registrations by Age and Primary Qualifying Condition as of September
30, 2023 .................................................................................................................................... 64
Appendix B-3: Patients Registered as Terminally Ill by Age and Primary Qualifying Condition as
of September 30, 2023 .............................................................................................................. 65
Appendix B-4: Number of Registered Practitioners by County as of September 30, 2023 ........ 66
Appendix B-5: Number of Certified Patients by County as of September 30, 2023 .................. 67
Appendix C: Cannabinoid Hemp License and Permit Applications by County ........................... 68
Appendix D: Adult-Use Cannabis License Applications by County as of September 30, 2023 .. 77
Appendix E: Licensee Owner and Employee Demographic Summary........................................ 79
Appendix E-1: Registered Organization Owner and Employee Demographic Summary ........... 79
Appendix E-2: Cannabinoid Hemp Owner and Employee Demographic Summary .................. 80

**Appendix A: Cannabis Advisory Board Membership**

| Voting Members | |
|---|---|
| Joe Belluck, Esq., Chairman | Junella Chin, MD, Vice Chairwoman |
| Alejandro Alvarez | Ebro Darden |
| TheArthur A. Duncan, Esq. | Allan Gandelman |
| Garry Johnson | Nikki Kateman |
| Marc Ramirez | Sarah Ravenhall |
| Chandra Redfern | Armando Rosado |
| Peter Shafer | |
| **Non-Voting Member Agencies** | |
| Scott Wyner, Department of Agriculture and Markets | Dana Politis, Department of Labor |
| Kathleen R. DeCataldo Department of Education | Ruth Hassell-Thompson, Division of Homes and Community Renewal |
| Michelle Hinman, Department of Environmental Conservation | Chinazo Cunningham, Office of Addiction Services and Supports |
| Allan Clear, Department of Health | Suzanne Miles-Gustave, Office of Children and Family Services |

**Appendix B: Medical Cannabis Program**
**Appendix B-1: Medical Cannabis Registered Organizations and County of Approved Dispensary Locations**

| Registered Organization | County of Dispensary Location |
|---|---|
| Citiva Medical LLC | Chemung |
| | Dutchess |
| | Kings |
| | Richmond |
| Columbia Care NY LLC | Kings |
| | Monroe |
| | New York |
| | Suffolk |
| Curaleaf NY, LLC | Clinton |
| | Nassau |
| | Orange |
| | Queens |
| Etain, LLC | New York |
| | Onondaga |
| | Ulster |
| | Westchester |
| Fiorello Pharmaceuticals, Inc. | Monroe |
| | Nassau |
| | New York |
| | Saratoga |
| MedMen, Inc. | Erie |
| | Nassau |
| | New York |
| | Onondaga |
| NYCANNA, LLC | Erie |
| | Orange |
| | Queens |
| | Suffolk |
| PharmaCann of New York, LLC | Albany |
| | Bronx |
| | Erie |
| | Onondaga |
| Valley Agriceuticals, LLC | Kings |
| | Oneida |
| | Rockland |
| | Suffolk |
| Vireo Health of New York LLC | Albany |
| | Broome |
| | Queens |
| | Westchester |

Note: Hudson Health Extracts dispensary locations to be determined.

**Appendix B-2: Patient Registrations by Age and Primary Qualifying Condition as of September 30, 2023**

| Medical Condition | Patient Age in Years | | | | | | | | | Total | Percent Of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-5 | 6-12 | 13-17 | 18-30 | 31-40 | 41-50 | 51-60 | 61-70 | 71+ | | |
| Alzheimer's | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 5 | 64 | 73 | 0.06% |
| Amyotrophic lateral sclerosis (ALS) | 0 | 0 | 0 | 5 | 9 | 6 | 29 | 80 | 51 | 180 | 0.15% |
| Autism | 3 | 46 | 41 | 83 | 12 | 7 | 1 | 0 | 0 | 193 | 0.16% |
| Cancer | 3 | 18 | 20 | 241 | 584 | 1,277 | 2,415 | 3,748 | 4,721 | 13,027 | 10.69% |
| Dystonia | 0 | 0 | 0 | 7 | 8 | 7 | 7 | 10 | 9 | 48 | 0.04% |
| Epilepsy | 8 | 21 | 25 | 262 | 219 | 135 | 93 | 54 | 26 | 843 | 0.69% |
| HIV/AIDS | 0 | 0 | 0 | 20 | 88 | 74 | 136 | 106 | 28 | 452 | 0.37% |
| Huntington's disease | 0 | 0 | 0 | 1 | 3 | 0 | 3 | 6 | 2 | 15 | 0.01% |
| Inflammatory bowel disease | 0 | 4 | 12 | 461 | 511 | 481 | 308 | 227 | 115 | 2,119 | 1.74% |
| Multiple sclerosis | 0 | 0 | 0 | 47 | 220 | 352 | 347 | 266 | 79 | 1,311 | 1.08% |
| Muscular dystrophy | 0 | 2 | 0 | 0 | 6 | 7 | 11 | 10 | 4 | 40 | 0.03% |
| Neuropathy | 0 | 3 | 3 | 282 | 579 | 935 | 1,353 | 1,478 | 1,124 | 5,757 | 4.72% |
| Opioid alternative for pain that degrades health and functional capability | 1 | 0 | 8 | 1,968 | 3,412 | 3,718 | 3,924 | 3,750 | 2,455 | 19,236 | 15.78% |
| Other | 6 | 25 | 52 | 7,911 | 11,969 | 12,441 | 11,663 | 11,157 | 6,851 | 62,075 | 50.92% |
| Parkinson's disease | 0 | 0 | 0 | 0 | 8 | 17 | 53 | 159 | 249 | 486 | 0.40% |
| Post-traumatic stress disorder | 0 | 3 | 36 | 3,042 | 4,019 | 3,036 | 1,936 | 1,251 | 517 | 13,840 | 11.35% |
| Rheumatoid arthritis | 0 | 0 | 1 | 47 | 100 | 168 | 212 | 288 | 186 | 1,002 | 0.82% |
| Spinal cord nerve injury with intractable spasticity | 0 | 0 | 0 | 34 | 77 | 111 | 125 | 107 | 68 | 522 | 0.43% |
| Substance use disorder | 0 | 0 | 0 | 141 | 277 | 158 | 76 | 28 | 5 | 685 | 0.56% |
| **Total** | 21 | 122 | 198 | 14,552 | 22,101 | 22,931 | 22,695 | 22,730 | 16,554 | 121,904 | |
| **Percent Of Total** | 0.02% | 0.10% | 0.16% | 11.94% | 18.13% | 18.81% | 18.62% | 18.65% | 13.58% | | |

**Appendix B-3: Patients Registered as Terminally Ill by Age and Primary Qualifying Condition as of September 30, 2023**

| Medical Condition | Patient Age in Years | | | | | | | | | Total | Percent Of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-5 | 6-12 | 13-17 | 18-30 | 31-40 | 41-50 | 51-60 | 61-70 | 71+ | | |
| Alzheimer's | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 10 | 12 | 0.16% |
| Amyotrophic lateral sclerosis (ALS) | 0 | 0 | 0 | 4 | 4 | 5 | 25 | 71 | 42 | 151 | 1.95% |
| Autism | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| Cancer | 1 | 14 | 12 | 67 | 166 | 418 | 950 | 1,765 | 2,988 | 6,381 | 82.54% |
| Dystonia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0.01% |
| Epilepsy | 1 | 5 | 5 | 30 | 10 | 4 | 4 | 2 | 4 | 65 | 0.84% |
| HIV/AIDS | 0 | 0 | 0 | 0 | 5 | 3 | 7 | 10 | 0 | 25 | 0.32% |
| Huntington's disease | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 4 | 0.05% |
| Inflammatory bowel disease | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 2 | 2 | 7 | 0.09% |
| Multiple sclerosis | 0 | 0 | 0 | 0 | 2 | 4 | 5 | 11 | 6 | 28 | 0.36% |
| Muscular dystrophy | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0.03% |
| Neuropathy | 0 | 2 | 0 | 2 | 4 | 3 | 22 | 27 | 44 | 104 | 1.35% |
| Opioid alternative for pain that degrades health and functional capability | 0 | 0 | 0 | 2 | 2 | 4 | 6 | 15 | 32 | 61 | 0.79% |
| Other | 1 | 2 | 0 | 26 | 40 | 56 | 87 | 167 | 380 | 759 | 9.82% |
| Parkinson's disease | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 11 | 56 | 69 | 0.89% |
| Post-traumatic stress disorder | 0 | 0 | 0 | 4 | 7 | 5 | 6 | 7 | 20 | 49 | 0.63% |
| Rheumatoid arthritis | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| Spinal cord nerve injury with intractable spasticity | 0 | 0 | 0 | 1 | 1 | 3 | 1 | 5 | 2 | 13 | 0.17% |
| Substance use disorder | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| **Total** | 3 | 25 | 17 | 137 | 242 | 507 | 1,117 | 2,097 | 3,586 | 7,731 | |
| **Percent Of Total** | 0.04% | 0.32% | 0.22% | 1.77% | 3.13% | 6.56% | 14.45% | 27.12% | 46.38% | | |

**Appendix B-4: Number of Registered Practitioners by County as of September 30, 2023**



**Appendix B-5: Number of Certified Patients by County as of September 30, 2023**



**Appendix C: Cannabinoid Hemp License and Permit Applications by County**

| County* | License/Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Albany | Processor | 1 | | 1 | | | | | | | | | |
| Albany | Farm Processor | | | | | | | | | | | | |
| Albany | Distributor | | 3 | 3 | | | | | | | | | |
| Albany | Retail | 10 | 40 | 41 | | 1 | 8 | 8 | 25 | 30 | | | 3 |
| Albany | Temporary Retail | | | | | | | | | | | | |
| Allegany | Processor | | | | | | | | | | | | |
| Allegany | Farm Processor | | | | | | | | | | | | |
| Allegany | Distributor | | | | | | | | 1 | 1 | | | |
| Allegany | Retail | | 3 | 3 | | | | | 2 | 2 | | | |
| Allegany | Temporary Retail | | | | | | | | | | | | |
| Bronx | Processor | | | | | | | | | | | | |
| Bronx | Farm Processor | | | | | | | | | | | | |
| Bronx | Distributor | 5 | 18 | 17 | | | 6 | 6 | 5 | 5 | | 2 | 4 |
| Bronx | Retail | 36 | 168 | 189 | | 3 | 12 | 12 | 75 | 58 | | 2 | 27 |
| Bronx | Temporary Retail | | | | | | | | | | | | |
| Broome | Processor | | 3 | 1 | | | 2 | 2 | | | | 1 | 1 |
| Broome | Farm Processor | | | | | | | | | | | | |
| Broome | Distributor | 2 | 3 | 5 | | | | | | | | | |
| Broome | Retail | 7 | 28 | 30 | | | 5 | 5 | 14 | 13 | | 2 | 4 |
| Broome | Temporary Retail | | | | | | | | | | | | |
| Cattaraugus | Processor | | | | | | | | | | | | |
| Cattaraugus | Farm Processor | | | | | | | | | | | | |
| Cattaraugus | Distributor | | | | | | | | | | | | |
| Cattaraugus | Retail | 3 | 3 | 6 | | | | | 4 | 4 | | | |
| Cattaraugus | Temporary Retail | | | | | | | | | | | | |
| Cayuga | Processor | | 1 | 1 | | | | | | | | | |
| Cayuga | Farm Processor | | | | | | | | 1 | 1 | | | |
| Cayuga | Distributor | | | | | | | | | | | | |
| Cayuga | Retail | 3 | 1 | 4 | | | | | 4 | 2 | | 1 | 1 |
| Cayuga | Temporary Retail | | | | | | | | | | | | |
| Chautauqua | Processor | | | | | | | | | | | | |
| Chautauqua | Farm Processor | | | | | | | | 1 | 1 | | | |
| Chautauqua | Distributor | | 1 | 1 | | | | | | | | | |
| Chautauqua | Retail | 7 | 6 | 13 | | | | | 10 | 10 | | | |

| County* | License/ Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Chautauqua | Temporary Retail | | | | | | | | | | | | |
| Chemung | Processor | | | | | | | | | | | | |
| Chemung | Farm Processor | | | | | | | | | | | | |
| Chemung | Distributor | | 1 | | | | 1 | 1 | | | | | 1 |
| Chemung | Retail | 4 | 8 | 12 | | | | | 14 | 13 | | | 1 |
| Chemung | Temporary Retail | | | | | | | | | | | | |
| Chenango | Processor | | | | | | | | | | | | |
| Chenango | Farm Processor | | | | | | | | | | | | |
| Chenango | Distributor | 1 | | 1 | | | | | | | | | |
| Chenango | Retail | 1 | 2 | 3 | | | | | 2 | 2 | | | |
| Chenango | Temporary Retail | | | | | | | | | | | | |
| Clinton | Processor | | | | | | | | | | | | |
| Clinton | Farm Processor | | | | | | | | | | | | |
| Clinton | Distributor | | 1 | 1 | | | | | 1 | 1 | | | |
| Clinton | Retail | 1 | 8 | 9 | | | | | | | | | |
| Clinton | Temporary Retail | | | | | | | | 1 | | | | 1 |
| Columbia | Processor | | 2 | 1 | | | 1 | 1 | | | | 1 | |
| Columbia | Farm Processor | | | | | | | | | | | | |
| Columbia | Distributor | 1 | 3 | 4 | | | | | 1 | 1 | | | |
| Columbia | Retail | 4 | 3 | 7 | | | | | 7 | 6 | | | 1 |
| Columbia | Temporary Retail | | | | | | | | | | | | |
| Cortland | Processor | | | | | | | | 2 | 1 | | 1 | |
| Cortland | Farm Processor | | | | | | | | | | | | |
| Cortland | Distributor | | | | | | | | | | | | |
| Cortland | Retail | 3 | 1 | 4 | | | | | 1 | 1 | | | |
| Cortland | Temporary Retail | | | | | | | | | | | | |
| Delaware | Processor | | | | | | | | | | | | |
| Delaware | Farm Processor | | | | | | | | | | | | |
| Delaware | Distributor | | | | | | | | 1 | 1 | | | |
| Delaware | Retail | 1 | 3 | 3 | | 1 | | | 1 | 1 | | | |
| Delaware | Temporary Retail | | | | | | | | | | | | |
| Dutchess | Processor | | 2 | | | 1 | 1 | 1 | 4 | 2 | | | 3 |
| Dutchess | Farm Processor | | | | | | | | | | | | |
| Dutchess | Distributor | 1 | 8 | 7 | | | 2 | 2 | 1 | | | 1 | 2 |
| Dutchess | Retail | 7 | 45 | 49 | | | 3 | 3 | 36 | 31 | | 1 | 7 |
| Dutchess | Temporary Retail | | | | | | | | 4 | 2 | | | 2 |

| County* | License/ Permit Type | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
| Erie | Processor | 2 | 4 | 4 | | 1 | 1 | 1 | | | | | 1 |
| Erie | Farm Processor | | | | | | | | | | | | |
| Erie | Distributor | 2 | 9 | 9 | | | 2 | 2 | 6 | 6 | | 2 | |
| Erie | Retail | 22 | 82 | 99 | | 1 | 4 | 4 | 91 | 88 | | | 7 |
| Erie | Temporary Retail | | | | | | | | | | | | |
| Essex | Processor | | | | | | | | | | | | |
| Essex | Farm Processor | | | | | | | | | | | | |
| Essex | Distributor | | 1 | 1 | | | | | | | | | |
| Essex | Retail | | 4 | 4 | | | | | 3 | 3 | | | |
| Essex | Temporary Retail | | | | | | | | | | | | |
| Franklin | Processor | | | | | | | | | | | | |
| Franklin | Farm Processor | | | | | | | | | | | | |
| Franklin | Distributor | | 1 | 1 | | | | | | | | | |
| Franklin | Retail | 1 | 5 | 6 | | | | | 2 | 2 | | | |
| Franklin | Temporary Retail | | | | | | | | | | | | |
| Fulton | Processor | | 2 | 1 | | 1 | | | 1 | | | | 1 |
| Fulton | Farm Processor | | | | | | | | | | | | |
| Fulton | Distributor | | | | | | | | 1 | 1 | | | |
| Fulton | Retail | 3 | 5 | 8 | | | | | 5 | 3 | | 1 | 1 |
| Fulton | Temporary Retail | | | | | | | | | | | | |
| Genesee | Processor | | | | | | | | | | | | |
| Genesee | Farm Processor | | | | | | | | | | | | |
| Genesee | Distributor | | | | | | | | | | | | |
| Genesee | Retail | 2 | 3 | 4 | | | 1 | 1 | 1 | | | | 2 |
| Genesee | Temporary Retail | | | | | | | | | | | | |
| Greene | Processor | | | | | | | | | | | | |
| Greene | Farm Processor | | | | | | | | | | | | |
| Greene | Distributor | | | | | | | | | | | | |
| Greene | Retail | | 14 | 14 | | | | | 5 | 5 | | | |
| Greene | Temporary Retail | | | | | | | | | | | | |
| Hamilton | Processor | | | | | | | | | | | | |
| Hamilton | Farm Processor | | | | | | | | | | | | |
| Hamilton | Distributor | | | | | | | | | | | | |
| Hamilton | Retail | 1 | 1 | 2 | | | | | 2 | 2 | | | |
| Hamilton | Temporary Retail | | | | | | | | | | | | |
| Herkimer | Processor | | | | | | | | | | | | |

| County* | License/ Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Herkimer | Farm Processor | | | | | | | | | | | | |
| Herkimer | Distributor | | 1 | 1 | | | | | | | | | |
| Herkimer | Retail | 2 | 7 | 7 | | | 2 | 2 | 2 | 3 | | | 1 |
| Herkimer | Temporary Retail | | | | | | | | | | | | |
| Jefferson | Processor | | | | | | | | | | | | |
| Jefferson | Farm Processor | | | | | | | | | | | | |
| Jefferson | Distributor | | | | | | | | | | | | |
| Jefferson | Retail | 2 | 7 | 9 | | | | | 6 | 6 | | | |
| Jefferson | Temporary Retail | | | | | | | | | | | | |
| Kings | Processor | | 4 | | | 1 | 3 | 3 | | | | | 3 |
| Kings | Farm Processor | | | | | | | | | | | | |
| Kings | Distributor | 21 | 90 | 95 | | | 16 | 16 | 26 | 25 | | 5 | 12 |
| Kings | Retail | 113 | 357 | 437 | | 1 | 32 | 32 | 201 | 171 | | 2 | 60 |
| Kings | Temporary Retail | | | | | | | | 10 | 8 | | | 2 |
| Lewis | Processor | | | | | | | | | | | | |
| Lewis | Farm Processor | | | | | | | | | | | | |
| Lewis | Distributor | | | | | | | | | | | | |
| Lewis | Retail | | | | | | | | 1 | 1 | | | |
| Lewis | Temporary Retail | | | | | | | | | | | | |
| Livingston | Processor | | | | | | | | | | | | |
| Livingston | Farm Processor | | | | | | | | | | | | |
| Livingston | Distributor | | | | | | | | | | | | |
| Livingston | Retail | 4 | 5 | 8 | | | 1 | 1 | 9 | 8 | | 1 | 1 |
| Livingston | Temporary Retail | | | | | | | | | | | | |
| Madison | Processor | | 2 | 2 | | | | | | | | | |
| Madison | Farm Processor | | | | | | | | | | | | |
| Madison | Distributor | | 2 | 2 | | | | | | | | | |
| Madison | Retail | 1 | 7 | 7 | | | 1 | 1 | 5 | 4 | | 1 | 1 |
| Madison | Temporary Retail | | | | | | | | | | | | |
| Monroe | Processor | 3 | 2 | 4 | | 1 | | | 1 | | | | 1 |
| Monroe | Farm Processor | | | | | | | | | | | | |
| Monroe | Distributor | 2 | 7 | 8 | | | 1 | 1 | 7 | 7 | | 1 | |
| Monroe | Retail | 19 | 59 | 73 | | 1 | 4 | 4 | 64 | 62 | | 1 | 5 |
| Monroe | Temporary Retail | | | | | | | | 2 | | | 2 | |
| Montgomery | Processor | | | | | | | | | | | | |
| Montgomery | Farm Processor | | | | | | | | 1 | 1 | | | |

| County* | License/ Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Montgomery | Distributor | | | | | | | | | | | | |
| Montgomery | Retail | 1 | 2 | 3 | | | | | 4 | 4 | | | |
| Montgomery | Temporary Retail | | | | | | | | | | | | |
| Nassau | Processor | 1 | 2 | | | 1 | 2 | 2 | | | | 1 | 1 |
| Nassau | Farm Processor | | | | | | | | | | | | |
| Nassau | Distributor | 9 | 15 | 19 | | | 5 | 5 | 2 | 2 | | 2 | 3 |
| Nassau | Retail | 38 | 161 | 179 | | 1 | 19 | 19 | 74 | 70 | | 2 | 21 |
| Nassau | Temporary Retail | | | | | | | | 6 | 5 | | 1 | |
| New York | Processor | | 4 | | | 1 | 3 | 3 | | | | 1 | 2 |
| New York | Farm Processor | | | | | | | | | | | | |
| New York | Distributor | 10 | 45 | 45 | 1 | | 9 | 9 | 14 | 15 | | 2 | 6 |
| New York | Retail | 101 | 465 | 527 | 1 | 3 | 35 | 35 | 268 | 250 | | 7 | 46 |
| New York | Temporary Retail | | | | | | | | 2 | 1 | | | 1 |
| Niagara | Processor | 3 | 3 | 4 | | 1 | 1 | 1 | 1 | 1 | | | 1 |
| Niagara | Farm Processor | | | | | | | | | | | | |
| Niagara | Distributor | | 3 | 3 | | | | | 1 | 1 | | | |
| Niagara | Retail | 3 | 11 | 11 | | | 3 | 3 | 14 | 15 | | | 2 |
| Niagara | Temporary Retail | | | | | | | | | | | | |
| Oneida | Processor | | | | | | | | | | | | |
| Oneida | Farm Processor | | | | | | | | | | | | |
| Oneida | Distributor | 1 | 1 | 2 | | | | | 2 | 2 | | | |
| Oneida | Retail | 2 | 23 | 20 | | 1 | 4 | 4 | 16 | 15 | | 2 | 3 |
| Oneida | Temporary Retail | | | | | | | | 1 | | | | 1 |
| Onondaga | Processor | | | | | | | | 1 | | | | 1 |
| Onondaga | Farm Processor | | | | | | | | | | | | |
| Onondaga | Distributor | 1 | 9 | 8 | | | 2 | 2 | 4 | 5 | | | 1 |
| Onondaga | Retail | 4 | 43 | 45 | | | 2 | 2 | 40 | 37 | | 2 | 3 |
| Onondaga | Temporary Retail | | | | | | | | 7 | 5 | | 2 | |
| Ontario | Processor | | 2 | 2 | | | | | | | | | |
| Ontario | Farm Processor | | | | | | | | 1 | 1 | | | |
| Ontario | Distributor | | 1 | 1 | | | | | 1 | 1 | | | |
| Ontario | Retail | 5 | 15 | 18 | | | 2 | 2 | 15 | 16 | | 1 | |
| Ontario | Temporary Retail | | | | | | | | 1 | | | 1 | |
| Orange | Processor | | 4 | | | 2 | 2 | 2 | | | | | 2 |
| Orange | Farm Processor | | | | | | | | | | | | |
| Orange | Distributor | 2 | 5 | 6 | | | 1 | 1 | 2 | 2 | | 1 | |

| County* | License/ Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Orange | Retail | 15 | 65 | 72 | | | 8 | 8 | 32 | 29 | | 1 | 10 |
| Orange | Temporary Retail | | | | | | | | | | | | |
| Orleans | Processor | | | | | | | | | | | | |
| Orleans | Farm Processor | | | | | | | | | | | | |
| Orleans | Distributor | | | | | | | | | | | | |
| Orleans | Retail | 1 | | 1 | | | | | 4 | 3 | | | 1 |
| Orleans | Temporary Retail | | | | | | | | | | | | |
| Oswego | Processor | | | | | | | | | | | | |
| Oswego | Farm Processor | | | | | | | | | | | | |
| Oswego | Distributor | | | | | | | | | | | | |
| Oswego | Retail | 5 | 11 | 16 | | | | | 8 | 7 | | | 1 |
| Oswego | Temporary Retail | | | | | | | | | | | | |
| Otsego | Processor | | 1 | | | | 1 | 1 | | 1 | | | |
| Otsego | Farm Processor | | | | | | | | | | | | |
| Otsego | Distributor | | 1 | 1 | | | | | 1 | 1 | | | |
| Otsego | Retail | 1 | 4 | 5 | | | | | 8 | 8 | | | |
| Otsego | Temporary Retail | | | | | | | | | | | | |
| Putnam | Processor | | 1 | | | | 1 | 1 | | | | | 1 |
| Putnam | Farm Processor | | | | | | | | | | | | |
| Putnam | Distributor | | 1 | 1 | | | | | | | | | |
| Putnam | Retail | 1 | 9 | 10 | | | | | 9 | 7 | | | 2 |
| Putnam | Temporary Retail | | | | | | | | | | | | |
| Queens | Processor | | 2 | | | 1 | 1 | 1 | 1 | | | | 2 |
| Queens | Farm Processor | | | | | | | | | | | | |
| Queens | Distributor | 7 | 40 | 32 | | 1 | 14 | 14 | 12 | 13 | | 1 | 12 |
| Queens | Retail | 62 | 323 | 361 | | | 24 | 24 | 139 | 122 | | 3 | 38 |
| Queens | Temporary Retail | | | | | | | | 6 | 6 | | | |
| Rensselaer | Processor | | 2 | | | | 2 | 2 | | | | | 2 |
| Rensselaer | Farm Processor | | | | | | | | | | | | |
| Rensselaer | Distributor | 1 | | 1 | | | | | | | | | |
| Rensselaer | Retail | 6 | 13 | 17 | | | 2 | 2 | 11 | 11 | | | 2 |
| Rensselaer | Temporary Retail | | | | | | | | | | | | |
| Richmond | Processor | | | | | | | | | | | | |
| Richmond | Farm Processor | | | | | | | | | | | | |
| Richmond | Distributor | 4 | 7 | 10 | | | 1 | 1 | 3 | 3 | | 1 | |
| Richmond | Retail | 14 | 77 | 88 | | 2 | 1 | 1 | 42 | 37 | | 1 | 5 |

| County* | License/Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Richmond | Temporary Retail | | | | | | | | 1 | | | | 1 |
| Rockland | Processor | | | | | | | | 1 | | | | 1 |
| Rockland | Farm Processor | | | | | | | | | | | | |
| Rockland | Distributor | | 1 | 1 | | | | | 1 | 1 | | | |
| Rockland | Retail | 9 | 27 | 32 | | 1 | 3 | 3 | 16 | 15 | | 1 | 3 |
| Rockland | Temporary Retail | | | | | | | | | | | | |
| St Lawrence | Processor | | | | | | | | | | | | |
| St Lawrence | Farm Processor | | | | | | | | | | | | |
| St Lawrence | Distributor | | | | | | | | 1 | 1 | | | |
| St Lawrence | Retail | 2 | 4 | 6 | | | | | 8 | 8 | | | |
| St Lawrence | Temporary Retail | | | | | | | | 1 | 1 | | | |
| Saratoga | Processor | | | | | | | | | | | | |
| Saratoga | Farm Processor | | | | | | | | | | | | |
| Saratoga | Distributor | | 3 | 3 | | | | | 1 | 1 | | | |
| Saratoga | Retail | 5 | 25 | 26 | | | 4 | 4 | 17 | 17 | | 1 | 3 |
| Saratoga | Temporary Retail | | | | | | | | | | | | |
| Schenectady | Processor | 1 | | 1 | | | | | | | | | |
| Schenectady | Farm Processor | | | | | | | | | | | | |
| Schenectady | Distributor | | 4 | 3 | | | 1 | 1 | 3 | 2 | | | 2 |
| Schenectady | Retail | 5 | 17 | 22 | | | | | 23 | 21 | | 1 | 1 |
| Schenectady | Temporary Retail | | | | | | | | 1 | 1 | | | |
| Schoharie | Processor | | | | | | | | | | | | |
| Schoharie | Farm Processor | | 1 | | | | 1 | 1 | | 1 | | | |
| Schoharie | Distributor | | | | | | | | | | | | |
| Schoharie | Retail | | 3 | 3 | | | | | 4 | 4 | | | |
| Schoharie | Temporary Retail | | | | | | | | | | | | |
| Schuyler | Processor | | | | | | | | | | | | |
| Schuyler | Farm Processor | | | | | | | | | | | | |
| Schuyler | Distributor | | | | | | | | | | | | |
| Schuyler | Retail | 1 | | 1 | | | | | | | | | |
| Schuyler | Temporary Retail | | | | | | | | | | | | |
| Seneca | Processor | | | | | | | | | | | | |
| Seneca | Farm Processor | | | | | | | | | | | | |
| Seneca | Distributor | | | | | | | | | | | | |
| Seneca | Retail | 1 | 2 | 2 | | | 1 | 1 | 5 | 5 | | | 1 |
| Seneca | Temporary Retail | | | | | | | | | | | | |

| County* | License/ Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Steuben | Processor | | | | | | | | | | | | |
| Steuben | Farm Processor | | | | | | | | | | | | |
| Steuben | Distributor | | | | | | | | | | | | |
| Steuben | Retail | 1 | 2 | 3 | | | | | 2 | 2 | | | |
| Steuben | Temporary Retail | | | | | | | | | | | | |
| Suffolk | Processor | 1 | 4 | 2 | | 2 | 1 | 1 | | | | | 1 |
| Suffolk | Farm Processor | | | | | | | | | | | | |
| Suffolk | Distributor | 5 | 32 | 29 | | | 8 | 8 | 8 | 5 | | 3 | 8 |
| Suffolk | Retail | 53 | 252 | 289 | | 1 | 15 | 15 | 119 | 109 | | 1 | 24 |
| Suffolk | Temporary Retail | | | | | | | | 2 | 1 | | | 1 |
| Sullivan | Processor | | 1 | | | | 1 | 1 | | | | | 1 |
| Sullivan | Farm Processor | | | | | | | | | | | | |
| Sullivan | Distributor | | 3 | 3 | | | | | | | | | |
| Sullivan | Retail | 2 | 25 | 26 | | | 1 | 1 | 14 | 13 | | | 2 |
| Sullivan | Temporary Retail | | | | | | | | | | | | |
| Tioga | Processor | | | | | | | | | | | | |
| Tioga | Farm Processor | | | | | | | | | | | | |
| Tioga | Distributor | | | | | | | | | | | | |
| Tioga | Retail | | 5 | 5 | | | | | 3 | 3 | | | |
| Tioga | Temporary Retail | | | | | | | | | | | | |
| Tompkins | Processor | 1 | | 1 | | | | | | | | | |
| Tompkins | Farm Processor | | | | | | | | | | | | |
| Tompkins | Distributor | | 1 | 1 | | | | | | | | | |
| Tompkins | Retail | 1 | 7 | 8 | | | | | 7 | 5 | | | 2 |
| Tompkins | Temporary Retail | | | | | | | | 1 | 1 | | | |
| Ulster | Processor | | | | | | | | 1 | | | | 1 |
| Ulster | Farm Processor | | | | | | | | | | | | |
| Ulster | Distributor | 1 | 2 | 3 | | | | | 3 | 1 | | | 2 |
| Ulster | Retail | 15 | 63 | 76 | | | 2 | 2 | 25 | 20 | | | 7 |
| Ulster | Temporary Retail | | | | | | | | | | | | |
| Warren | Processor | | | | | | | | | | | | |
| Warren | Farm Processor | | | | | | | | | | | | |
| Warren | Distributor | | 1 | 1 | | | | | | | | | |
| Warren | Retail | 1 | 8 | 8 | | | 1 | 1 | 10 | 9 | | | 2 |
| Warren | Temporary Retail | | | | | | | | | | | | |
| Washington | Processor | | | | | | | | | | | | |

| County* | License/ Permit Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY | Pending Prior to SFY | Submitted During SFY | Approved During SFY | Denied During SFY | Voided During SFY | Pending at the Close of SFY |
| Washington | Farm Processor | | | | | | | | | | | | |
| Washington | Distributor | | | | | | | | | | | | |
| Washington | Retail | 5 | 8 | 10 | | 1 | 2 | 2 | 5 | 5 | | | 2 |
| Washington | Temporary Retail | | | | | | | | | | | | |
| Wayne | Processor | | | | | | | | | | | | |
| Wayne | Farm Processor | | | | | | | | | | | | |
| Wayne | Distributor | | 1 | 1 | | | | | 1 | 1 | | | |
| Wayne | Retail | 1 | 7 | 7 | | | 1 | 1 | 7 | 5 | | 1 | 2 |
| Wayne | Temporary Retail | | | | | | | | | | | | |
| Westchester | Processor | | | | | | | | | | | | |
| Westchester | Farm Processor | | | | | | | | | | | | |
| Westchester | Distributor | 6 | 14 | 16 | | | 4 | 4 | 3 | 4 | | 1 | 2 |
| Westchester | Retail | 40 | 161 | 189 | | 2 | 10 | 10 | 67 | 64 | | 3 | 10 |
| Westchester | Temporary Retail | | | | | | | | 2 | 2 | | | |
| Wyoming | Processor | | | | | | | | | | | | |
| Wyoming | Farm Processor | | | | | | | | | | | | |
| Wyoming | Distributor | | | | | | | | | | | | |
| Wyoming | Retail | | 2 | 2 | | | | | 1 | 1 | | | |
| Wyoming | Temporary Retail | | | | | | | | | | | | |
| Yates | Processor | | | | | | | | | | | | |
| Yates | Farm Processor | | | | | | | | | | | | |
| Yates | Distributor | | | | | | | | | | | | |
| Yates | Retail | | | | | | | | | | | | |
| Yates | Temporary Retail | | | | | | | | | | | | |
| Out of State | Processor | | | | | | | | | | | | |
| Out of State | Farm Processor | | | | | | | | | | | | |
| Out of State | Distributor | 30 | 79 | 96 | | 2 | 11 | 11 | 61 | 51 | | 8 | 13 |
| Out of State | Retail | 24 | 63 | 83 | | 1 | 3 | 3 | 50 | 41 | | 4 | 8 |
| Out of State | Temporary Retail | | | | | | | | 3 | 3 | | | |

* Note: County reflects business address, which may or may not be the same as their operating address(es).

**Appendix D: Adult-Use Cannabis License Applications by County as of September 30, 2023**

| Region | License Type | SFY 4/1/22-3/31/23 | | | | | | SFY 4/1/23-9/30/23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pending Prior to SFY | Submitted During SFY | Provisionally Approved During SFY (CAURD only) | Issued During SFY | Denied During SFY | Pending at Close of SFY | Pending Prior to SFY | Submitted During SFY | Provisionally Approved During SFY (CAURD only) | Issued During SFY | Denied During SFY | Pending at Close of SFY |
| Bronx | AUCC | 0 | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Bronx | AUCP | - - | 1 | - - | 0 | 0 | 1 | 1 | 0 | - - | 0 | 0 | 1 |
| Bronx | CAURD | - - | 46 | 7 | 0 | 0 | 39 | 39 | 0 | 12 | 2 | 0 | 25 |
| Brooklyn | AUCC | 0 | 2 | - - | 0 | 0 | 2 | 2 | 0 | - - | 0 | 0 | 2 |
| Brooklyn | AUCP | - - | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Brooklyn | CAURD | - - | 121 | 0 | 0 | 0 | 121 | 121 | 0 | 44 | 0 | 0 | 77 |
| Capital District | AUCC | 26 | 27 | - - | 46 | 0 | 7 | 7 | 0 | - - | 0 | 0 | 7 |
| Capital District | AUCP | - - | 9 | - - | 7 | 0 | 2 | 2 | 0 | - - | 0 | 0 | 2 |
| Capital District | CAURD | - - | 63 | 6 | 1 | 0 | 56 | 56 | 0 | 31 | 2 | 0 | 23 |
| Central NY | AUCC | 16 | 14 | - - | 28 | 0 | 2 | 2 | 0 | - - | 0 | 0 | 2 |
| Central NY | AUCP | - - | 5 | - - | 4 | 0 | 1 | 1 | 0 | - - | 0 | 0 | 1 |
| Central NY | CAURD | - - | 23 | 2 | 0 | 0 | 21 | 21 | 0 | 11 | 1 | 0 | 9 |
| Finger Lakes | AUCC | 12 | 20 | - - | 32 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Finger Lakes | AUCP | - - | 10 | - - | 6 | 0 | 4 | 4 | 0 | - - | 0 | 0 | 4 |
| Finger Lakes | CAURD | - - | 45 | 0 | 0 | 0 | 45 | 45 | 0 | 16 | 0 | 0 | 29 |
| Long Island | AUCC | 11 | 12 | - - | 13 | 0 | 10 | 10 | 0 | - - | 0 | 0 | 10 |
| Long Island | AUCP | - - | 5 | - - | 3 | 0 | 2 | 2 | 0 | - - | 0 | 0 | 2 |
| Long Island | CAURD | - - | 107 | 12 | 0 | 0 | 95 | 95 | 0 | 48 | 2 | 0 | 45 |
| Manhattan | AUCC | 0 | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Manhattan | AUCP | - - | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Manhattan | CAURD | - - | 231 | 13 | 3 | 0 | 215 | 215 | 0 | 106 | 2 | 0 | 107 |
| Mid-Hudson | AUCC | 24 | 45 | - - | 61 | 0 | 8 | 8 | 0 | - - | 0 | 0 | 8 |
| Mid-Hudson | AUCP | - - | 13 | - - | 10 | 0 | 3 | 3 | 0 | - - | 0 | 0 | 3 |
| Mid-Hudson | CAURD | - - | 78 | 0 | 0 | 0 | 78 | 78 | 0 | 44 | 0 | 0 | 34 |
| Mohawk Valley | AUCC | 11 | 19 | - - | 22 | 0 | 8 | 8 | 0 | - - | 0 | 0 | 8 |
| Mohawk Valley | AUCP | - - | 1 | - - | 1 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Mohawk Valley | CAURD | - - | 11 | 2 | 0 | 0 | 9 | 9 | 0 | 2 | 1 | 0 | 6 |
| North Country | AUCC | 1 | 10 | - - | 8 | 0 | 3 | 3 | 0 | - - | 0 | 0 | 3 |
| North Country | AUCP | - - | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| North Country | CAURD | - - | 12 | 3 | 0 | 0 | 9 | 9 | 0 | 3 | 1 | 0 | 5 |
| Queens | AUCC | 0 | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Queens | AUCP | - - | 1 | - - | 0 | 0 | 1 | 1 | 0 | - - | 0 | 0 | 1 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queens | CAURD | - - | 72 | 8 | 1 | 0 | 63 | 63 | 0 | 30 | 1 | 0 | 32 |
| Richmond | AUCC | 0 | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Richmond | AUCP | - - | 0 | - - | 0 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Richmond | CAURD | - - | 19 | 3 | 0 | 0 | 16 | 16 | 0 | 8 | 0 | 0 | 8 |
| Southern Tier | AUCC | 15 | 44 | - - | 47 | 0 | 12 | 12 | 0 | - - | 0 | 0 | 12 |
| Southern Tier | AUCP | - - | 4 | - - | 4 | 0 | 0 | 0 | 0 | - - | 0 | 0 | 0 |
| Southern Tier | CAURD | - - | 22 | 3 | 2 | 0 | 17 | 17 | 0 | 3 | 2 | 0 | 12 |
| Western NY | AUCC | 10 | 19 | - - | 22 | 0 | 7 | 7 | 0 | - - | 0 | 0 | 7 |
| Western NY | AUCP | - - | 6 | - - | 5 | 0 | 1 | 1 | 0 | - - | 0 | 0 | 1 |
| Western NY | CAURD | - - | 54 | 0 | 0 | 0 | 54 | 54 | 0 | 22 | 3 | 0 | 29 |
| **TOTAL** | **AUCC** | **126** | **212** | **- -** | **279** | **0** | **59** | **59** | **0** | **- -** | **0** | **0** | **59** |
| **TOTAL** | **AUCP** | **- -** | **55** | **- -** | **40** | **0** | **15** | **15** | **0** | **- -** | **0** | **0** | **15** |
| **TOTAL** | **CAURD** | **- -** | **904** | **59** | **7** | **0** | **838** | **838** | **0** | **380** | **17** | **0** | **441** |

Note: Adult-Use Conditional Cultivator (AUCC); Adult-Use Conditional Processor (AUCP); Conditional Adult-Use Retail Dispensary (CAURD)

**Appendix E: Licensee Owner and Employee Demographic Summary**
**Appendix E-1: Registered Organization Owner and Employee Demographic Summary**

| | Registered Organization Owners and Employees* |
|---|---|
| **Race** | |
| American Indian or Alaska Native (non-Hispanic) | 9 |
| Asian (non-Hispanic) | 76 |
| Black or African American (non-Hispanic) | 135 |
| Native Hawaiian or Other Pacific Islander (non-Hispanic) | 11 |
| White (non-Hispanic) | 1,024 |
| Hispanic or Latino | 263 |
| Some Other Race or Multiracial (non-Hispanic) | 96 |
| Undisclosed/Non-Responsive | 26 |
| **Total** | **1,640** |
| **Gender** | |
| Male | 1,005 |
| Female | 592 |
| Non-Binary | 0 |
| No Response | 43 |
| **Total** | **1,640** |

* Note: This reflects information about owners and employees collected from the 10 Registered Organizations registered in 2023.

**Appendix E-2: Cannabinoid Hemp Owner and Employee Demographic Summary**

|  | Cannabinoid Hemp Licensee Owners and Employees † |
|---|---|
| **Race** | |
| American Indian or Alaska Native | 90 |
| Asian | 858 |
| Black or African American | 313 |
| Native Hawaiian or Other Pacific Islander | 9 |
| White | 1,793 |
| Some Other Race or Multiracial | 0 |
| No Response | 1,454 |
| **Total** | **4,517** |
| **Ethnicity** | |
| Hispanic or Latino | 233 |
| Not Hispanic or Latino | 2,960 |
| No Response | 1,324 |
| **Total** | **4,517** |
| **Age** | |
| 21-34 | 1,083 |
| 35-44 | 1,274 |
| 45-54 | 641 |
| 55-64 | 1,047 |
| 65-74 | 195 |
| 75+ | 50 |
| No Response | 227 |
| **Total** | **4,517** |
| **Gender** | |
| Male | 3,168 |
| Female | 785 |
| Non-Binary | 6 |
| No Response | 558 |
| **Total** | **4,517** |

† Note: This reflects information about owners and employees collected from those Cannabinoid Hemp permitees/licensees who submitted an application for a permit or license in 2023, current as of September 30, 2023.