UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

VALENCIA AG, LLC

                              Plaintiff,        Docket No. 24-00116

v.                                                         **DECLARATION OF DIRECTOR OF POLICY IN OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION**

NEW YORK STATE CANNABIS CONTROL BOARD; NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT; TREMAINE WRIGHT; CHRIS ALEXANDER; ADAM PERRY; JESSICA GARCIA; JENNIFER JENKINS; HOPE KNIGHT; AND DAMIAN FAGON,

                              Defendants.

John Kagia, on the date noted below and pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under the penalty of perjury under the laws of the United States of America:

1.    I am currently employed by the New York State ("NYS") Office of Cannabis Management ("Office") and my position is Director of Policy. In this position, my duties and responsibilities include, but are not limited to, identifying and defining the strategic priorities for New York's legal cannabis industry, working closely with industry stakeholders to address issues impacting market efficiency and public health outcomes, and developing data-driven insights into the growth, performance, and evolution of the state's cannabis market to inform future program decisions.

2.    Prior to joining the Office, I was the Chief Knowledge Officer of New Frontier Data, the leading cannabis industry research and business intelligence company, where I spent a decade leading research into all aspects of the global cannabis economy. During my tenure, New Frontier Data delivered groundbreaking insights into a wide range of issues, including but not

limited to the drivers of legalization, the market dynamics in the medical, adult use, and hemp sectors, the evolution in consumer preferences and behavior, the state of cannabis finance and investment, trends in product innovation, the interplay between legal and illicit markets, and the regulatory factors that influence the performance of legal markets.

3.      Prior to joining New Frontier Data, I worked as a market analyst and management consultant to high-performing clients in the technology, federal civil and defense, and not-for-profit sectors. Working closely with clients to address their driving strategic priorities, I delivered insights to inform new product development, strengthen competitive market positioning, adapting to disruptive innovation, and strategies for improving client engagement and retention.

4.      My statements herein are based on my personal knowledge, derived from my position as Directory of Policy at the Office, and relevant materials consisting of the exhibits and authorities cited herein.

5.      I submit this Declaration in support of the Defendants' opposition to Plaintiff's request for a Preliminary Injunction.

Harm to Adult-Use Applicants[1]

6.      The Office received nearly 6,900 license applications during the adult use application window which ran from October 4 to December 18, 2023. Of these, the Office received

---

[1] Although it is unclear whether Plaintiff is seeking to enjoin the Conditional Adult Use Retail Dispensary (CAURD) program, any injunction that would prevent the continued awarding of final CAURD licenses would: be financially ruinous for prospective dispensary operators (many of whom have committed all the resources at their disposal to prepare for their launch); create an extremely high risk of financial loss and bankruptcy for many CAURD provisional licensees; and create significant uncertainty and risk for provisional licensee employees who would have no assurance of when an injunction may be lifted, allowing them to resume their training and employment. Any such uncertainty would force new employees to choose whether to leave and seek alternative employment or hold out hope that the lawsuit will be quickly and affirmatively resolved, enabling them to proceed with the roles they aspired to in the industry.

4,304 applications for retail businesses, 1,320 applications for microbusinesses, 537 for processors, 366 for cultivators, and 350 for distributors. Among those who applied, approximately 1,450 retailers and 401 microbusiness applied by the November 17 deadline with a storefront location secured by either a lease or deed. Applying with a property secured with a lease or deed was a condition for being included in the drawing for a non-provisional, or final license, while those without properties will be included in a drawing for a provisional license.

7. The requirement that applicants for final licensure have a property secured by lease or deed was intended to identify prospective licensees who are most likely to operationalize quickly, in order to meet the Office's priority goal to expand retail access as fast as possible given the supply issues and illicit market issues discussed below. The nearly 1,900 retail and microbusiness applicants in the November Queue who applied for these final licenses are paying rent or mortgages (or retaining fees for leases conditioned on the award of a license) would be acutely harmed by an injunction as they do not yet know if they have been selected for licensure. For applicants with conditional leases, many set the conditional period for three to six months, which means their conditional leases will expire at the end of the first quarter of 2024 going into the beginning of the second quarter of 2024. These applicants will either need to execute final leases or give up the locations after the conditional period ends. Similarly, for applicants who signed final leases but who do not yet know whether their locations meet the requirements for licensure, a timely determination from the Office on the suitability of their location is critical to minimize their carrying costs on locations that may not work.

8. An injunction precluding the processing and awarding of licensees would keep this group of applicants in limbo as they wait to hear if they can move forward with preparing the location for cannabis operations, or if they will need to cancel their leases or find a different use

for the property. Without a timely determination on the suitability of their locations, these applicants will incur significant costs on locations that may not ultimately work, draining valuable resources and negatively impacting their future ability to operationalize.

9.  The total applicant pool from October through December is comprised of approximately 75% social and economic equity (SEE) applicants, including service-disabled veterans, distressed farmers, individuals from communities disproportionately impacted by cannabis prohibition, women- and minority-owned businesses, groups specifically designated for consideration under cannabis law. These applicants overlap to a high degree with many applicants indicating on applications that they qualify for more than one SEE group.

Harm to Farmers

10. There are currently 277 Adult Use Conditional Cultivators. These licensed cannabis growers produced over 200,000 pounds of cannabis biomass in 2022 and an estimated additional 260,000 pounds in 2023. These producers, who laid the foundation of the adult use program, have built their operations with the capacity to serve the hundreds of retailers and microbusinesses expected to be licensed and operational in the first half of 2024.

11. Operating with the knowledge that the Office expects to issue approximately 250 Adult Use retail licenses and 110 microbusiness licenses from the November Applications who are applicants with storefronts ready to operationalize and accept product, cultivators and processors have incurred significant expenses to ramp up production, purchase packaging, test their products, and engage prospective distribution partners.

12. Many licensed producers grew their cannabis outdoors, limiting them to a single harvest a year, compared to producers in greenhouses or indoors, whose control over the production environment allows them to produce multiple harvests in a calendar year. For New

York's outdoor growers, a single harvest generally means that they only earn income from cannabis once each year, after their harvest, making it critically important to their livelihood to secure a return on their investment as quickly as possible once their product is ready for sale.

13. With the outdoor harvest taking place between October and November, plus a few weeks to cure, test, and package the product, licensed growers were ready to sell their harvest at the close of 2023 going into 2024.

14. An injunction that prevents the Office from issuing retail licenses to the ready November Applicants will have cascading implications across the supply chain. In a market poised for $1 billion to $2 billion in legal retail sales in 2024, the state's cannabis suppliers are sitting on hundreds of millions of dollars of product ready to ship to the retailers and microbusinesses that are expected to come online beginning in early 2024. The carrying costs of that inventory, and the impact on growers who live off the once-a-year post-harvest sale of their product would prove a devastating financial blow to many of the state's suppliers.

15. Additionally, microbusinesses are a vital sell-through channel for adult use cultivators. Microbusinesses are permitted to purchase up to 500 pounds of cannabis from adult use cultivators. This authorization was created in consideration of the time it will take a microbusiness to build, operationalize, and complete their first harvest out of a new cultivation facility, enabling the microbusiness to begin their brand-building and product development with biomass that is already available in the market. The purchase allowance also serves as a risk mitigator in the event that a microbusiness experiences a crop failure or smaller than anticipated harvest. Purchasing from cultivators also enables the microbusinesses to expand their product diversity by supplementing their genetics with cannabis grown by other producers.

16. If all 110 non-provisional microbusiness licenses targeted for award in the November application window were to purchase the maximum allowable volume, it would equal 55,000 pounds of biomass – nearly one-quarter of the total cannabis cultivated in 2022. At a conservative $300 per pound, microbusinesses alone could account for cultivator sales exceeding $16 million. An injunction on cultivator sales to microbusinesses will significantly compound the financial pressure on adult use cultivators who have been anticipating microbusinesses as a key sell-through channel.

Harm to Product Value and Quality

17. Any delays to producers' ability to sell the product can also impact product quality and value. As a botanical, the quality of cannabis flower products degrades over time, impacting the value of their product. The longer the product remains unsold after its peak ripening, the less valuable it becomes. For example, a cannabis harvest valued at $1,000 per pound at harvest, may lose 25% or more of the value if it remains unsold within six months, and 50% or more of its value if unsold within 12 months. For growers who are unable to invest in the highest quality product storage solutions, the degradation in product quality can be even more acute.

18. An injunction would not just impact the ability for the growers to monetize their harvest, it will also lower the earnings because their products will be less valuable over time. Furthermore, the lack of capital will make it harder for these producers to invest in the 2024 growing season, the planning for which begins in the first quarter of the year, potentially impacting product availability in late 2024 going into 2025.

19. Finally, the illegality of cannabis under federal law means legal cannabis cannot be transported or sold outside of the state where it was produced. Consequently, for New York's licensed producers, it means the only outlet for their cannabis products is licensed retailers in New

York. An injunction preventing the advancement of retail and microbusiness stores would leave these producers with no alternative places to sell their products.

Harm Related to Property Owners and Landlords

20. New York's commercial real estate market was acutely disrupted by the COVID-19 pandemic. Researchers estimate the pandemic and subsequent work-from-home trend stimulated an estimated "52% decline the value of New York City's office stocks, since the start of 2022," a trend that is "likely to persist and result in long-run office valuations that are 49.2% below pre-pandemic levels." *See* Gupta, Arpit, "Work From Home and the Office Real Estate Apocalypse," Dec. 2, 2023, attached hereto as **Exhibit A**.[2] This trend equates to $664.1 billion of value destruction in the sector.

21. As the real estate industry works to adapt to these dramatic changes to the market, the legal cannabis industry presents a bright opportunity. With over 1,000 retail storefronts expected to be licensed in 2024, plus several hundred producer licenses for cultivators, processors, distributors, and microbusinesses, prospective cannabis businesses have spent months scouting for properties and negotiating leases. Additionally, due to zoning restrictions for retail businesses, including mandated distances from schools, houses of worship, and public youth facilities, prospective licensees have been willing to pay significant premiums on the subset of properties that are appropriately zoned for cannabis retail. 9 NYCRR § 119.1.

22. Any injunction that would keep these businesses from being able to operationalize would introduce uncertainty to these real estate agreements by making it more difficult for

---

[2] https://deliverypdf.ssrn.com/delivery.php?ID=80911706910102509308010012009302307400008503705902102412
4066098030008025090089012110060097037059060026020103004126027114112109025086030014047009025123
0730050001240040050330090931051230641160281150901271030681230251040970750700310860671050300
99068001088&EXT=pdf&INDEX=TRUE

7

prospective operators to pay the rent on properties that are not operational. Landlords would then have to decide whether to keep the tenant and defer rent, or incur the costs of removing the tenant and risk the property sitting vacant as they try to find a replacement. The expansion of the legal cannabis market was poised to be a bright spot in a commercial real estate sector facing acute headwinds. However, an injunction will create uncertainty and risk for lessors, and may fuel hesitance to lease to the cannabis industry, thereby making it more challenging for prospective licenses to secure qualifying retail properties moving forward.

Harm From the Unchecked Illicit Market

23. Licensed dispensaries and microbusinesses displace the illegal stores that have risen to take advantage of the absence of legal supply since the traditional penalties related to possession and sale had been eliminated or reduced. New York State is already faced with an illicit market growing and thriving since the passage of the Marihuana Regulation and Taxation Act ("MRTA"), with unlicensed businesses posing as licensed businesses.

24. Through a coordinated effort along with several agencies and local police departments, the State has been working diligently to enforce against a growing number of illicit cannabis dispensaries. The illicit cannabis market is serious concern for New Yorkers, as these businesses are not adhering to the strict public health and safety regulations outlined in the legal adult-use cannabis program. These businesses often sell cannabis product that has not been tested by third-party Office-licensed laboratories for potential contaminants, may contain harmful additives, have potentially unknown potency levels, and often target their marketing and advertising in a manner that is appealing to children. The sale of cannabis outside of a licensed and regulated framework creates a public health and safety problem for the communities where these illicit cannabis businesses operate.

25. In the period following the passage of the Cannabis Law, the number of unlicensed dispensaries in New York City alone has grown to an estimated 1,500, with many more across the rest of the state. The proliferation of unlicensed dispensaries was recognized as major problem during the FY2023-24 budget cycle, in the context of which the Legislature and Governor amended the Cannabis Law and Tax Law to give the Office of Cannabis Management and the Department of Taxation and Finance additional enforcement authority over unlicensed dispensaries and to increase the penalties against those businesses as well. *See* Chapter 56 of Laws of 2023. Since the expanded enforcement powers were granted by the legislature, the Office's Enforcement unit has conducted hundreds of inspections of unlicensed operations and seized millions worth of product. *See NYS Office of Cannabis Management Inaugural Enforcement Report 2023*, attached hereto as **Exhibit B**.[3]

26. These actions have played a critical role in asserting the state's commitment to addressing the illicit market. However, enforcement alone cannot combat the illicit market. A widely accessible, cost-competitive legal market is the most effective antidote to the illicit market. Indeed, research has shown that, all else being equal, consumers will show a strong preference for the legal market when they have access to both legal and illicit options. *See* Amlung, Michael, "Availability of Legalized Cannabis Reduces Demand for Illegal Cannabis Among Canadian Cannabis Users: Evidence from a Behavioural Economic Substitution Paradigm." December 6, 2018, attached hereto as **Exhibit C**.[4]

27. A delay to the rollout of the legal retail will enable these illicit store operators to become more entrenched, further putting public health and safety at risk. The products sold within these stores are not produced in New York's legal market and not tested to the State's product

---

[3] https://cannabis.ny.gov/system/files/documents/2023/12/2023-enforcement-report-final.pdf
[4] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6964395/pdf/41997_2018_Article_160.pdf

quality standards. The illicit shops do not collect cannabis excise or retail taxes, undermining a key source of tax revenue for investment in education and community-based programs. Additionally, these illicit retailers often sell to minors, a group who are at acute risk of negative health and life outcomes from early onset cannabis use.

28. An injunction against microbusinesses would negatively impact the state's enforcement efforts as microbusinesses are anticipated to be key drivers of innovation in New York's legal market. While microbusinesses are strictly capped on the size of their cultivation facilities, they are one of only two vertically integrated licensees in New York's market (Companies authorized to sell medical cannabis can also be vertically integrated). Microbusinesses are authorized to grow, process, distribute, and sell cannabis, as well as operate a consumption facility. As a craft-style licenses, microbusinesses will be key to providing high-quality indoor and greenhouse grown, craft cannabis. With most of cannabis sold in New York being currently produced outdoors, the craft indoor cannabis from microbusinesses will be an important supplement to the portfolio of legal products on the market and will serve as a key element in challenging the indoor cannabis being sold in the proliferating illicit stores. Any delay to issuing microbusiness licenses would therefore undermine the state's efforts to combat the illicit market by delaying the creation of novel and craft products that will draw consumers from the unregulated market to the legal one.

29. Any injunction which delays the retail rollout would undermine the state's urgent public health priority of combatting the storefront-based illicit market. These effects would not only be felt during the injunction, but would also extend well after because consumers will routinize purchases from the unlicensed storefronts. This increases the cost of consumer capture

for legal businesses and slows the rate at which consumers transition from unlicensed to licensed retailers compared to markets which do not have well-established illicit storefronts.

Harm Related to Tax Revenue

30. Also, with each passing day, the slowdown in legal sales of cannabis is depriving the State and localities of anticipated tax revenue from sales of legal and tested cannabis, which is intended to be used for expenditures related to education, public health initiatives, and enforcement of unlicensed activities. One of the major justifications for the legalization of cannabis was to use the cannabis tax revenue generated from sales to further public policy goals. The MRTA earmarked cannabis tax revenue to three broad buckets: 1) 40% to the New York State Community Grants Reinvestment Fund to be used to reinvest in communities harmed by cannabis prohibition, 2) 40% to be directed to the state's lottery fund for public school funding, and 3) 20% to the New York State Drug Treatment and Public Education Fund to be used for substance use treatment and education programs.

31. There are currently 75 operating adult-use cannabis dispensaries across the State. The State has collected millions of dollars in cannabis tax revenue from the CAURD dispensaries which opened in 2023, collecting approximately $1.5 million in the first quarter of 2023 and approximately 3.5 million in the second quarter of 2023. Additionally, local governments receive a 4% local tax from cannabis sales that occur in their jurisdictions and can be used at the discretion of the local municipalities. Further delays in the rollout of retail will bolster the existing illicit cannabis market where no tax is collected and reduce the State's opportunity to use the cannabis tax revenue for the public policy goals set forth in the MRTA.

Not in the Public Interest

32. Based on the above, an injunction is not in the public interest. Rather it is in the interest of one limited liability corporation.

33. The harm to the public must be weighed against the fact that Plaintiff cannot show how it would be harmed if an injunction is not granted. Plaintiff is not seeking to enjoin the already existing cannabis retailers in the market but is instead seeking to restrain potential future competitors. As such, Plaintiff appears to be seeking to advance its own interests over the interests of others, who also are competing for an opportunity to enter in to the new, legal cannabis market.

Dated: New York, New York
March 5, 2024

/s/ _____
John Kagia

Digitally signed by John Kagia
Date: 2024.03.05 12:04:07 -05'00'