UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VALENCIA AG, LLC,

                             *Plaintiff*,

        -against-

                                  5:24-CV-116
                                (GTS/TWD)

CHRISTOPHER ALEXANDER,
in his official capacity as Executive Director
of the New York Office of Cannabis Management;
TREMAINE WRIGHT, in her official capacity as
Chairperson of the New York Cannabis Control Board,

                         *Defendants*.

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6).**

                                        LETITIA JAMES
                                        Attorney General of the State of New York
                                        *Attorney for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT..................................................................................................1

STATEMENT OF FACTS………………………………………………………………..3

    A.  Statutory and Regulatory Framework under the Cannabis Law…………………………..3

    B.  Prioritized Consideration of SEE Applications Submitted Between October 4, 2023 and December 18, 2023………………………………………………………………………..6

    C.  Plaintiff's Application and the Randomized Review Process……………………………9

STANDARD OF REVIEW………………………………………………………………...11

ARGUMENT…………………………………………………………………………………14

POINT I:       PLAINTIFF LACKS STANDING TO CHALLENGE NEW YORK'S LICENSING REQUIREMENTS …………………………………………………..14

    A.  Plaintiff lacks standing because it would not be considered for a license in the November Queue even absent defendants' alleged unconstitutional acts……………………………15

    B.  Plaintiff lacks standing to seek relief related to future licensing rounds or application fees, or alternatively, any claim is not yet ripe……………………………………………………19

    C.  Plaintiff lacks standing to seek the broad declaratory and injunctive relief requested………………………………………………………………………………….23

POINT II:     PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT………………………………………………………………..26

CONCLUSION.................................................................................................................... 34

i

# TABLE OF AUTHORITIES

## CASES

Albright v. Oliver, 510 U.S. 266 (1994)……………………………………………………13

Ashcroft v. Iqbal, 556 U.S. 662 (2009)…………………………………………………13, 26

Bazinett v. Pregis LLC, No. 1:23-CV-790 (MAD/ML), 2024 WL 1116287 (N.D.N.Y. Mar. 14, 2024)…………………………………………………………………………………………..12

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)……………………………13, 14, 33, 34

Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212 (2d Cir. 2004)…………………………………………………………………………13, 27

Deadwiley v. New York State Office of Children & Family Servs., 97 F. Supp. 3d 110 (E.D.N.Y. 2015)…………………………………………………………………………………………..11

Do No Harm v. Pfizer Inc., 96 F.4th 106 (2d Cir. 2024)………………………………………...16

Doyle v. U.S. Dep't of Homeland Sec., 959 F.3d 72 (2d Cir. 2020)……………………………23

Fisher v. Rome Ctr. LLC, No. 22-cv-0685, 2022 WL 16949603 (N.D.N.Y. Nov. 15, 2022)…...23

Goe v. Zucker, 43 F.4th 19 (2d Cir. 2022)……………………………………………………….4

Hayden v. County of Nassau, 180 F.3d 42 (2d Cir. 1999)………………………………17, 24, 34

Hershey v. Goldstein, 938 F. Supp.2d 491 (S.D.N.Y. 2013)……………………………………9, 27

Hollingsworth v. Perry, 570 U.S. 693 (2013)……………………………………………….....25

Honadle v. Univ. of Vermont, 56 F. Supp. 2d 419 (D. Vt. 1999)…………………………….....34

Jackson v. Onondaga County, 549 F.Supp.2d 204 (N.D.N.Y. 2008)………………………….....12

Jarvis v. Cuomo, No. 14-cv-1459(LEK/TWD), 2016 WL 278934 (N.D.N.Y. Jan. 21, 2016)…..16

Jaufman v. Levine, 2007 WL 2891987 (N.D.N.Y. 2007)………………………………………13

J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107 (2d Cir. 2004)……………………...12, 16, 18

Kearns v. Cuomo, 981 F.3d 200 (2d Cir. 2020)…………………………………………….....25

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991)……………………………………...30

Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992)………………………………………14, 17, 19, 24

Makarova v. United States, 201 F.3d 110 (2d Cir.2000)…………………………….……….11

Matter of Friendly Flower 1 Inc. v. New York State Cannabis Control Bd., Index No. 901180-24 (Sup. Ct. Feb. 26, 2024)………………………………………………………………….…….29

Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167 (2d Cir. 2008)………………….……..12

Natural Res. Def. Council v. Johnson, 461 F.3d 164 (2d Cir. 2006)……………………….…12

Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682 (2d Cir. 2013)…………………………...19

Obanya v. Select Portfolio Servicing, Inc., No. 14-cv-5255, 2016 WL 11265648 (E.D.N.Y. Aug. 23, 2016)………………………………………………………………………………9, 27

Onondaga Hilltop Homes, Inc. v. Syracuse Housing Auth., No. 12-cv-626, 2013 WL 992127 (N.D.N.Y. Mar. 13, 2013)……………………………………………………………..9, 27

Razi Sch. v. Cissna, 519 F. Supp. 3d 144 (E.D.N.Y.)…………………………………...12

Simeone v. T. Marzetti Co., No. 21-cv-9111, 2023 WL 2665444 (S.D.N.Y. Mar. 28, 2023)…..13

Singleton v. Fifth Generation, Inc., No. 15-cv-474, 2016 WL 406295 (N.D.N.Y. Jan. 12, 2016)………………………………………………………………………………………13

SM Kids, LLC v. Google LLC, 963 F.3d 206 (2d Cir. 2020)……………………………...14

Territory of Alaska v. Am. Can Co., 358 U.S. 224, 79 S.Ct. 274, 3 L.Ed.2d 257 (1959)………..4

Ulloa v. Mid Hudson Valley Fed. Credit Union, Nos. 10-cv-132, -356, -345, 2011 WL 66050 (N.D.N.Y. Jan. 10, 2011)………………………………………………………………...16

Weser v. Glen, 190 F. Supp. 2d 384 (E.D.N.Y. 2002)………………………………………17, 34

**STATUTES**

9 NYCRR §§ 120.1-120.9…………………………………………………………………..24

9 NYCRR §120.1(c)…………………………………………………………………………32

9 NYCRR § 120.4(c)……………………………………………………………………….5, 8

9 NYCRR § 120.7……………………………………………………………………………5

9 NYCRR § 120.7(b)………………………………………………………………………32

9 NYCRR § 120.13(d)…………………………………………………………………24, 33

9 NYCRR § 121.1(d)-(k)…………………………………………………………………5

Fed. R. Civ. P. 11(b)(3)………………………………………………………………30, 31

Fed. R. Civ. P. 12(b)(1)………………………………………………1, 11, 12, 14, 25

Fed. R. Civ. P. 12(b)(6)……………………………………………1, 2, 12, 26, 27, 34

N.Y. Canbs. § 2………………………………………………………...………………3

N.Y. Canbs. § 3……………………………………………………………..………..3

N.Y. Canbs. § 3(50)………………………………………………………………31

N.Y. Canbs. §§ 7-11…………………………………………………………………3

N.Y. Canbs. § 10(2)……………………………………………………………24, 31

N.Y. Canbs. § 10(17)……………………………………………………………24

N.Y. Canbs. § 13(1)…………………………………………………………………3

N.Y. Canbs. § 61-89……………………………………………………………………3

N.Y. Canbs. § 63(3)…………………………………………………………………5

N.Y. Canbs. § 64(1)………………………………………………………………31, 32

N.Y. Canbs. §§ 73-75……………………………………………………………31, 32

N.Y. Canbs. § 87(1)……………………………………………………………4, 5, 31, 32

N.Y. Canbs. § 87(2)……………………………………………………………4, 10, 31

N.Y. Canbs. § 87(3)……………………………………………………5, 6, 9, 10, 27

N.Y. Canbs. §§ 87(1)-(4)………………………………………………………...24

N.Y. Canbs. § 88………………………………………………………………………4

U.S. Const. art. III, § 2……………………………………………………………..14

**SESSION LAWS AND LEGISLATIVE MATERIALS**

2022 N.Y. Sess. Laws c. 18, § 3……………………………………………………………22

2023 N.Y. Sess. Laws c. 56, pt. UU, §§ 8-20……………………………………………22

2023 N.Y. Sess. Laws c. 135, § 1………………………………………………………..22

2023 N.Y. Sess. Laws c. 647, § 1………………………………………………………..22

2023 S.B. 7998A……………………………………………………………………………22

2023 S.B. 5346……………………………………………………………………………..22

2023 S.B. 7528……………………………………………………………………………..22

2023 S.B. 8463……………………………………………………………………………..22

2023 S.B. 1682……………………………………………………………………………..22

2023 S.B. 1023……………………………………………………………………………..22

2023 S.B. 8305/2023 A.B. 8805……………………………………………………………22

Defendants Chris Alexander and Tremaine Wright ("Defendants"), respectfully submit this memorandum of law, together with the accompanying Declaration of Aimee Cowan, in support of their motion to dismiss plaintiff's Amended Complaint ("AC") pursuant to Fed. R. Civ. P. 12(b)(1), based on lack of standing, and 12(b)(6), for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiff Valencia AG, LLC applied to the Office of Cannabis Management ("Office") for a microbusiness cannabis license. Amended Complaint ("AC"), ECF No. 33, ₱ 6. It initially filed a Complaint on January 24, 2024 (ECF No. 1), and subsequently filed a motion for preliminary injunction February 7, 2024. ECF No. 9. Following defendants' opposition to plaintiff's motion for injunctive relief (ECF No. 30), plaintiff withdrew its motion. ECF No. 31. Plaintiff then filed its AC on March 13, 2024. ECF No. 33.

Plaintiff's AC alleges that the Office's licensing requirements violate the Equal Protection Clause of the United States Constitution because defendants developed, implemented, and administered "laws regulations and procedures that discriminate and grant preferential treatment to cannabis license applicants based on their race and/or sex." AC ₱ 75. Plaintiff seeks a declaratory judgment and a permanent injunction, along with attorneys' fees. Id. at p. 15.

Plaintiff's AC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff's AC should be dismissed pursuant to Rule 12(b)(1) because plaintiff lacks standing to bring the present suit, which deprives this Court of subject-matter jurisdiction to hear the case. First, as documents already provided in this case (and reattached to this motion) demonstrate, none of plaintiff's injuries are fairly traceable to any alleged preference given to minority-owned or women-owned businesses in the ordering or reviewing of applications for a cannabis license, nor is plaintiff's alleged injury redressable by its proposed relief. Even if every

1

minority-owned and women-owned business with a more favorable position in the application Queue were removed (which would indisputably undo any purported extra favor given to those applicants), plaintiff would still be positioned too unfavorably in the Queue to be considered for a license in the foreseeable future. Second, plaintiff lacks standing to seek injunctive relief based on its intention to re-apply for a license in the future because there are no future application windows currently planned and any alleged injury from how the Office or Cannabis Control Board ("Board") might act during a future hypothetical window is not concrete and imminent enough to create standing to sue at this time.  Third, plaintiff lacks standing to seek broad declaratory and injunctive relief because plaintiff has not alleged with particularity that it has been, or would be, injured by any consideration of race or gender in the Cannabis Law, Board and Office regulations, and Board and Office policy and practices.

Plaintiff's AC should be dismissed pursuant to Rule 12(b)(6) because it has not plausibly alleged facts giving rise to a violation of the Equal Protection Clause. Plaintiff has not plausibly alleged that defendants actually took any action to give greater weight to the applications of minority-owned and women-owned businesses than it gave to other applicants, nor has plaintiff plausibly alleged that defendants intend to selectively issue licenses to only minority-owned or women-owned businesses. Indeed, plaintiff's allegations conflict with statements in multiple documents plaintiff attaches to the Amended Complaint. Moreover, a host of judicially noticeable public records demonstrate that State officers and employees have repeatedly explained, including in sworn declarations to this Court, that no additional weight was given to SEE applications and all applications will be evaluated the same way. In other words, plaintiff had the exact same chance as SEE applicants, including minority-owned and women-owned businesses, of being randomly assigned an early position in the application queue for consideration for

available licenses. These documents include detailed explanations about how the queue was randomized and implemented. Plaintiff's bare assertions to the contrary and citations to ambiguous provisions of law with respect to how prioritizing SEE applications can be achieved and guidance documents produced before the queue was created fail to plausibly allege that defendants actually gave greater weight to SEE applications or that multiple State officers lied to the public and committed perjury in this case to cover up that fact.

Accordingly, plaintiff's Amended Complaint should be dismissed.

## STATEMENT OF FACTS

### A. Statutory and Regulatory Framework under the Cannabis Law

In 2021, the New York Legislature concluded that the State's existing laws criminalizing marihuana and their enforcement had "resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit an otherwise law-abiding citizen's ability to access housing, employment opportunities, and other vital services." N.Y. Canbs. § 2. To correct these effects, the Legislature passed the Marihuana Regulation and Taxation Act ("MRTA"), which codified New York's Cannabis Law. The Cannabis Law legalizes adult-use cannabis and regulates the growing, processing, distribution, and sale of cannabis within the State. N.Y. Canbs. §§ 3, 61-89.

Article II of the Cannabis Law establishes the Cannabis Control Board and the Office of Cannabis Management, which are responsible for implementing and enforcing the Cannabis Law within the State. N.Y. Canbs. §§ 7-11. The Cannabis Law vests broad authority in the Board, authorizing it to "perform such acts, prescribe such forms and propose such rules, regulations and orders as it may deem necessary or proper to fully effectuate the provisions" of the Cannabis Law. N.Y. Canbs. § 13(1). The Cannabis Law requires the Board to create a social and economic equity

3

plan ("SEE Plan"). N.Y. Canbs. § 87(1); see also Ex. A to AC. The law sets a non-mandatory "goal" of awarding 50% of available licenses to five[1] groups identified by statute:

    (a)  individuals from communities disproportionately impacted by the enforcement of cannabis prohibition;

    (b)  minority-owned businesses;

    (c)  women-owned businesses;

    (d)  minority and women-owned businesses, as defined in paragraph (d) of subdivision five of this section;

    (e)  distressed farmers, as defined in subdivision five of this section; and

    (f)  service-disabled veterans.

N.Y. Canbs. § 87(2). These five groups of applicants are referred to in the Cannabis Law as social and economic equity applicants ("SEE applicants"). N.Y. Canbs § 87(1)-(2); see also Ex. A to AC at 40, 54, 58-59. The legislators made clear that the fifty percent goal is not a requirement. See, ECF No. 30-2, NY Assembly Debate on 2021 NY Assembly Bill A 1248-A, Mar. 30, 2021, at 58 (comment of Assembly member Crystal Peoples-Stokes recognizing that the 50% goal is "not a requirement, not a mandate").[2] Nor does the law mandate how licenses should be allocated between the five groups of SEE applicants. Cannabis Law § 87(2). The Cannabis Law requires the Board to collect demographic data on cannabis business owners and to publish the data in its annual report. N.Y. Canbs. § 88.

      In this context of the SEE Plan, the Office and the Board are required to "actively promote" certain applicants by, among other things:

> prioritizing consideration of applications by applicants who are from communities disproportionately impacted by the enforcement of cannabis prohibition or who qualify as a minority or women-owned business, distressed farmers, or service-disabled veterans.

---

[1] Although there are six groups listed, group (d) is simply a combination of groups (b) and (c), and not a distinct group.

[2] Courts may take judicial notice of legislative history. See, Goe v. Zucker, 43 F.4th 19, 29 (2d Cir. 2022), cert. denied sub nom. Goe v. McDonald, 143 S. Ct. 1020, 215 L. Ed. 2d 188 (2023)(citing Territory of Alaska v. Am. Can Co., 358 U.S. 224, 226-27, 79 S.Ct. 274, 3 L.Ed.2d 257 (1959)).

Cannabis Law § 87(1). The law does not define the words "actively promote" or "prioritizing" and leaves the determination of how to do so to the discretion of the Office.

In addition, the SEE Plan must give "extra priority" to any applicant that:

> a.     is a member of a community disproportionately impacted by the enforcement of cannabis prohibition;
> b.     has an income lower than eighty percent of the median income of the county in which the applicant resides; and
> c.     was convicted of a marihuana-related offense prior to the effective date of this chapter, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of this chapter, was convicted of a marihuana-related offense.

N.Y. Canbs. § 87(3). The law does not define "extra priority."

The Cannabis Law leaves it to the Board to create regulations regarding the qualifications for each SEE applicant group. N.Y. Canbs. § 87(1). The Board adopted Part 121 of the Adult-Use Regulations which lays out the qualifications for applicants to demonstrate they are part of one or more of the SEE applicant groups, and also those eligible for extra priority as set forth in Cannabis Law § 87(3). See 9 NYCRR § 121.1(d)-(k).

Part 120 of the Adult-Use Regulations provides broad discretion to the Office and the Board with respect to how applications will be reviewed and selected for licenses (which include SEE applications and licenses). See 9 NYCRR § 120.7. The Cannabis Law requires the Board to "waive or reduce fees" for SEE applicants. N.Y. Canbs. § 63(3). Consistent therewith, the Adult-Use Regulations allow applicants to pay a reduced fee by 50% if the applicant qualifies as a SEE group applicant, a reduced fee if the applicant demonstrates need for financial assistance, and a reduced fee by 40% if the applicant contracts with another licensee who is a SEE applicant. 9 NYCRR § 120.4(c).

Section 87 of the Cannabis Law requires that the SEE Plan be created with the input of the public. Cannabis Law § 87(1). The SEE Plan details the public engagement and input that informed

the SEE Plan and the implementation of the goals stated, discussing the organization of equity community roundtables that were used to gather information from the various community groups that were most likely representative of the communities disproportionately impacted ("CDI"s), minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans. Ex. A to AC at 20-28. With this input from the public, the SEE Plan explains that "social and economic equity" is a term of art that the Office and Board interpret as "policies made by the Office to achieve the goals laid out in the Cannabis Law." Ex. A to AC at 10.

The Office provides "extra priority" of consideration to those applicants who indicated they qualified for such treatment based on prior cannabis conviction, income, and CDI status, as required by Cannabis Law §87(3). Microbusiness license applicants who are graduates of a 10-week mentorship and training program, the Cannabis Compliance Training and Mentorship Program ("CCTM"), also receive a guaranteed chance of having their application reviewed.  Ex. A to AC at 30.

**B.  Prioritized Consideration of SEE Applications Submitted Between October 4, 2023 and December 18, 2023.**

Based on the legislators' intent, as well as the broad authority the Board and the Office have pursuant to the Adult Use Regulations regarding application and licensure, the Office and the Board have prioritized consideration of SEE applications submitted between October 4, 2023 to December 18, 2023 in the following ways.

First, the Office conducted <u>outreach.</u> As an initial matter, the SEE Plan recognized that the lack of access to information, excessive paperwork and documentation specifically required for SEE individuals to prove their SEE status when applying for licensure, and restrictions imposed solely on SEE licensees, may discourage SEE individuals from participating in the cannabis marketplace as business owners. Ex. A to AC at 26, 58. The SEE Team held community roundtable

events with SEE stakeholders across New York State from October 2022 to December 2023 to encourage and increase submissions of SEE applications for the Office's consideration. Ex. A to AC at 20-21, 25. The SEE Team also conducted significant outreach through educational events regarding applications and licensure. See Off. of Cannabis Mgmt, Annual Report 46-50 (2023) ("2023 Annual Report")[3]. Specifically, the SEE team conducted several public-facing SEE application sessions from October through December 2023. Id. at 49. The team prepared online and print materials aimed at educating applicants about how to apply for licenses, as well. See, e.g., Ex. B to AC; Ex. C to AC at 23-37; Off. of Cannabis Mgmt., Roadmap to AU Applications: Social and Economic Equity (SEE) (Dec. 5, 2023)[4]; Off. of Cannabis Mgmt., How to Obtain Proof of Address to Qualify as a Member of a Community Disproportionately Impacted[5]; Off. of Cannabis Mgmt., How to Get Documents Proving a Conviction for a Marihuana-Related Offense[6]. Although the outreach was geared towards potential SEE applicants, all potential applicants were welcome to attend informational sessions or make use of informational documents. The SEE Team also collaborated with community-based organizations and academic institutions to offer technical assistance providers to applicants through the Cannabis Hub & Incubator Program ("CHIP"). Ex. A to AC at 63-64; 2023 Annual Report at 14.

Second, the Office created low-burden applications. The SEE Plan recognized that cannabis licensing regimes that required applicants to submit various plans for evaluation, such as

---

[3] https://cannabis.ny.gov/system/files/documents/2023/12/annual-report-2023-final.pdf
[4] https://www.youtube.com/watch?v=97qPATHkjPY. The Office further publicly posted several "Roadmap to AU applications" on LinkedIn to provide further support and guidance. See e.g., https://www.linkedin.com/posts/new-york-state-office-of-cannabis-management_nycannabis-roadmaptoau-activity-7128116477550845952-ajIv?utm_source=share&utm_medium=member_desktop; https://www.linkedin.com/posts/new-york-state-office-of-cannabis-management_upcoming-roadmap-to-au-events-week-of-11-activity-7129173437909987328-9WP8?utm_source=share&utm_medium=member_desktop
[5] https://cannabis.ny.gov/system/files/documents/2023/09/how-to-prove-address-to-qualify-as-a-member-of-a-community-disproportionately-impacted.pdf
[6] https://cannabis.ny.gov/system/files/documents/2023/09/how-to-get-proof-of-conviction-documents_0.pdf

standard operating procedures, technical documents, financial plans, or personnel experience, are often prohibitively expensive and favor applicants who can afford to pay third-party consultants to produce top-scoring documents.  Ex. A to AC at 57-59. Such applications often result in inequitable outcomes for other applicants, particularly SEE applicants. As such, New York's adult-use application platform was designed to be accessible and easy for applicants to use, rather than require applicants to hire and pay consultants to draft numerous plans for an application. The principle of low-burden applications was applied to <u>all</u> applicants, although they were specifically created to eliminate obstacles that would disproportionately impact SEE applicants.

Third, the Office offered <u>lowered application fees.</u> To further assist all interested SEE applicants in filing applications, the Board reduced application fees for all SEE applicant groups consistent with the requirements of the Cannabis Law and Regulations discussed above. In addition to SEE applicants, reduced fees are available to anyone who needs financial assistance and any applicant that partners with a SEE applicant. 9 NYCRR § 120.4(c).[7]

The Office's intent in creating these procedures was to eliminate barriers that would disproportionately prevent certain groups of potential cannabis business owners from applying for licenses, thereby ensuring that individuals who would qualify as SEE applicants were able to apply for licenses in the first place and would likely be qualified candidates for licenses. <u>See</u> Ex. A to AC at 58-59; <u>see also</u> Transcript at 8, Dec. 8, 2023 Meeting of Cannabis Control Bd.[8] The Office has made clear in a variety of publicly available documents, along with sworn declarations, that it did <u>not</u> implement any measures that would cause SEE applicants to be processed or awarded

---

[7] https://cannabis.ny.gov/system/files/documents/2024/03/ccb-aucc-license-fee-waiver-reso-3-22-24_0.pdf; https://www.governor.ny.gov/news/governor-hochul-announces-licensing-fees-waivers-cannabis-cultivators#:~:text=Governor%20Kathy%20Hochul%20today%20announced,dispensaries%20and%2031%20micro business%20licenses.

[8] https://cannabis.ny.gov/system/files/documents/2023/12/ocm-december-2023-transcript.pdf

licenses before non-SEE applicants, measures that would give SEE applicants higher or quicker chances in being considered for licenses, measures that would make a SEE applicant more likely to qualify for a license (e.g., a "thumb on the scale" or bonus points), or any other measures that would impact how SEE applications were reviewed and analyzed relative to non-SEE applications. See, e.g., Roadmap to AU Applications at 27:32-29:40 (outlining benefits of SEE applicant status and not suggesting they receive extra weight in the random assignment of position in the Queue); Off. of Cannabis Mgmt., Post-Application Process & See Applicant Prioritization[9] at 16:19-17:04, 17:34-18:33, 18:42-20:04 (Jan. 16, 2024)[10]; Decl. of Jodi Bryon ("Bryon Decl.") ¶¶ 6-11, ECF No. 30-7. In other words, every application filed (except for those based on N.Y. Canbs. § 87(3) extra priority or CCTM applications), whether from a SEE applicant or non-SEE applicant, was treated identically by the Office, with an identical chance of being selected for review for a license and with identical chances of being awarded a license.

## C. Plaintiff's Application and the Randomized Review Process

The application window for all license types (retail, microbusiness, cultivator, distributor, etc.) and for all applicant types (non-SEE, SEE, and extra priority) opened on October 4, 2023. Ex. C to AC at 1; Ex. E to AC at 1. The application window for applicants seeking a microbusiness or retail license with proof of control over a proposed premises from which they intend to operate closed on November 17, 2023 ("November Applications"). Ex. C to AC at 5. The application

---

[9] The document attached as Exhibit D to the AC and incorporated into the AC by reference is a set of screenshots taken from this video, Post-Application Process & See Applicant Prioritization. See Ex. D to AC at 1. The entire video, available on the Office's official Youtube channel, is thus properly considered in resolving this motion to dismiss as the complete version of an attachment to the AC. See Hershey v. Goldstein, 938 F. Supp.2d 491, 492 n.1 (S.D.N.Y. 2013) (considering video on motion to dismiss because portion of video was attached and incorporated by reference into complaint); Obanya v. Select Portfolio Servicing, Inc., No. 14-cv-5255, 2016 WL 11265648, at *1 n.1 (E.D.N.Y. Aug. 23, 2016) ("Plaintiff's amended complaint attaches documents regarding the subject Property. Where these exhibits were incomplete, the complete public documents were accessed [by the court]."); Onondaga Hilltop Homes, Inc. v. Syracuse Housing Auth., No. 12-cv-626, 2013 WL 992127, at *1 & n.1 (N.D.N.Y. Mar. 13, 2013) (relying on page of contract missing from copy attached to complaint but attached to motion to dismiss).
[10] https://www.youtube.com/watch?v=otbO2ktJvHY

window for applicants who applied after November 17, 2023, or for a provisional license without proof of control over a premises, closed on December 18, 2023 ("December Applications"). Ex. C to AC at 5.

On December 7, 2023, the Office used a computer program to randomly sequence the November Applications for microbusiness and retail dispensary licenses to create the order in which the Office reviews the applications. See Ex. E to AC at 1; Post-Application Process at 15:50-16:40. The queueing program, or code, randomly sequenced all microbusiness applications regardless of whether they were SEE applications or non-SEE applications. Ex. E to AC at 1; Post-Application Process at 15:50-16:40. Said another way, applications for a microbusiness license (or retail dispensary license) did not receive any particular treatment in the review order on the basis that such applications indicated that they were seeking SEE certification. This can be seen by the randomized nature of the resulting Queue that the Office published, which includes a roughly random dispersion of SEE applicants throughout the entire list.[11] See Ex. E to AC at 2-36.

The November Applications are reviewed in the order they were assigned in the queue until the number of licenses that the Office intends to issue is reached, which is currently anticipated to be 110 licenses for microbusinesses. Ex. C to AC at 5-6. Because there were more applications for microbusiness licenses than the number of licenses the Office intends to issue for the November Applications, it is possible that not all applications will be reviewed before all licenses are issued. See Ex. C to AC at 2, 5-6; Ex. D to AC at 5; Post-Application Process at 8:40-8:43.

Plaintiff's application was part of the November Applications and was submitted as a

---

[11] The random nature of the list is all the more apparent when considering that all individuals who qualified for "extra priority" and actually did receive extra weight in the prioritization of the list are individuals from communities disproportionately impacted by cannabis prohibition, see Cannabis Law § 87(3)(a), which means that they appear in the Queue document with the label "SEE Applicant," see Cannabis Law § 87(2)(a) (listing individuals from communities disproportionately impacted by cannabis prohibition as a category of SEE applicant).

non-SEE microbusiness application. AC ¶¶ 57-59. Plaintiff's application position is number 2042 in the November Queue. Bryon Decl., ⫽ 16; Ex. E to AC at 33. Because the November Queue includes microbusiness applications and retail applications, adjusting the queue to reflect only microbusiness applications results in Plaintiff being in position 373 in the November Queue relative to only other microbusiness applicants. Bryon Decl. ¶¶ 13-17.[12]

Of the microbusiness applications ahead of Plaintiff in the review order, 246 are SEE applicants. Id. at ⫽ 17. Of those applicants, 127 indicated that they qualify as minority or women-owned businesses ("MWOB") only and no other SEE group. Id. Significantly, even if all such 127 applications were removed, Plaintiff would only advance to position 246. Id. Consequently, it is currently unlikely that Plaintiff's application would reach the review threshold even if there were no minority- or women-owned businesses in the queue, given that the Office anticipated issuing only 110 licenses for microbusinesses from the November Applications. Id. ⫽ 18. Notably, of the first 110 microbusiness positions in the review queue (i.e. those most likely to get the 110 licenses being made available initially), only 21 of those positions are applications in which the applicant indicated that they qualify as a minority-owned or women-owned business only and no other SEE group. Id. ⫽ 19.

**STANDARD OF REVIEW**

A case is properly dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." Deadwiley v. New York State Office of Children & Family Servs., 97 F. Supp. 3d 110, 114 (E.D.N.Y. 2015) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000));

---

[12] Defendants provide this information and the information in the next paragraph about plaintiff's position in Queue as part of its motion to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Accordingly, defendants may refer to, and the Court may rely on, materials outside of the complaint. See infra pp. 14-25.

Fed.R.Civ.P. 12(b)(1)). "Once challenged, the burden of establishing jurisdiction rests with the party asserting that it exists. The party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence, that the court has subject matter jurisdiction." Id. In reviewing a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." Bazinett v. Pregis LLC, No. 1:23-CV-790 (MAD/ML), 2024 WL 1116287, at *2 (N.D.N.Y. Mar. 14, 2024)(citing J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004) (citation omitted).

A Rule 12(b)(1) motion may also be fact-based and rely on evidence beyond the pleadings, in which case a plaintiff must present controverting evidence unless defendant's evidence is "immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." Razi Sch. v. Cissna, 519 F. Supp. 3d 144, 148 (E.D.N.Y.), aff'd sub nom. Nouritajer v. Jaddou, 18 F.4th 85 (2d Cir. 2021). In applying Rule 12(b)(1), while "'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" Id., citing Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (quoting Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006). Additionally, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but ... may not rely on conclusory or hearsay statements contained in the affidavits." Id., citing J.S. ex rel. N.S, 386 F.3d at 110.

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Jackson v. Onondaga County, 549 F.Supp.2d 204, 211 (N.D.N.Y. 2008); Fed.R.Civ.P. 12(b)(6).   When addressing a motion to dismiss under this Rule, the Court accepts as true all of the factual allegations in the

complaint and draws inferences from those allegations in the light most favorable to the plaintiff. Jaufman v. Levine, 2007 WL 2891987, at *5 (N.D.N.Y. 2007)(citing Albright v. Oliver, 510 U.S. 266, 268 (1994)). This presumption of truth, however, does not extend to legal conclusions. See, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citation omitted).

In considering a motion to dismiss, a Court may consider, in addition to the complaint, "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). The court may also take judicial notice of, and consider, "matters of public record," including agency decisions, documents issued by an agency, and other information and material retrieved from an agency's official website. Singleton v. Fifth Generation, Inc., No. 15-cv-474, 2016 WL 406295, at *2-*3 (N.D.N.Y. Jan. 12, 2016) (collecting cases); Simeone v. T. Marzetti Co., No. 21-cv-9111, 2023 WL 2665444, at *1-*2 (S.D.N.Y. Mar. 28, 2023). And a court may take judicial notice of documents filed in a court of law. Blue Tree Hotels, 3669 F.3d at 217.

In order "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft, 556 U.S. at 677-78 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" Id. (quoting Twombly, 550 U.S. at

557). Ultimately, where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." Twombly, 550 U.S. at 550.

## ARGUMENT

**POINT I:** **PLAINTIFF LACKS STANDING TO CHALLENGE NEW YORK'S LICENSING REQUIREMENTS**

Plaintiff's complaint should be dismissed pursuant to Rule 12(b)(1) because plaintiff lacks standing. Article III, Section 2, Clause 1 of the Constitution limits federal court jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. Standing to sue is "an essential and unchanging part of the case-or-controversy requirement." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Article III standing consists of three elements. Lujan, 504 U.S. at 560. First, a plaintiff must have suffered an actual injury to a cognizable interest. Id. An injury in fact is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent. Id. Second, the plaintiff must show a causal link between the harm and the conduct at issue. Id. This means that the injury must be fairly traceable to the challenged action and not the result of the independent action of some third party. Id. And third, it must be probable that a favorable verdict will redress the harm. Id. A federal court lacks jurisdiction to consider an action in which the plaintiff cannot demonstrate standing. See SM Kids, LLC v. Google LLC, 963 F.3d 206, 210 (2d Cir. 2020).

Here, plaintiff lacks standing in at least three ways. First, plaintiff cannot demonstrate it has standing because plaintiff's position in the queue is too low to be considered even if no minority- or women-owned SEE applicants had even applied for microbusiness cannabis licenses. Second, plaintiff does not have standing to enjoin future licensing rounds, which plaintiff has not plausibly alleged are imminent or that the same standards will apply. Third, plaintiff does not have standing for the broad declaratory and injunctive relief it has requested.

**A.**   **Plaintiff lacks standing because it would not be considered for a license in the November Queue even absent defendants' alleged unconstitutional acts**

Plaintiff's AC does not allege that there is a causal connection between defendants' allegedly unconstitutional actions and plaintiff's alleged injury. Nor could plaintiff do so. As plaintiff's own documents demonstrate, it is nearly at the bottom of the November Queue of applicants. See Ex. E to AC at 33. And as defendants have previously demonstrated in the form of sworn affidavits filed in this case, even if every minority-owned business and women-owned business who qualified as a SEE applicant were removed from the November Queue, plaintiff would still not be high enough in the November Queue to likely be considered for one of the 110 available licenses estimated to be issued by defendants. Decl. of Jodi Bryon ("Bryon Decl.") ¶¶ 16-18, ECF No. 30-7.[13] In other words, plaintiff cannot demonstrate that any treatment that defendants allegedly gave to minority-owned and women-owned businesses caused plaintiff not to receive a microbusiness license because even if plaintiff was only in the Queue with applicants who did not qualify as minority-owned or women-owned businesses, plaintiff would likely still not receive a license.

Specifically, the Director of Data and Systems for the Office provided a sworn declaration explaining that plaintiff was randomly assigned to position 373 among microbusiness applicants in the November Queue. Bryon Decl. ¶¶ 7, 12, 16. Of the 372 microbusiness applicants ahead of plaintiff, 246 are SEE applicants, but only 127 applicants are SEE applicants based only on being a minority-owned business or a woman-owned business. Id. ¶ 17. Accordingly, if every minority-owned business and woman-owned business that plaintiff alleges was ranked above plaintiff because of some unfair extra favor was removed from the Queue, plaintiff would still only be in

---

[13] A copy of this declaration is also attached to this motion.

position 246. With only 110 licenses estimated to be available, plaintiff would not receive a license if it were in position 246 in the Queue. Id. ¶ 18. Accordingly, plaintiff cannot demonstrate an imminent injury caused by any alleged unconstitutional act of defendants.

This Court is permitted to rely on defendants' previously filed affidavit when considering a motion to dismiss for lack of subject-matter jurisdiction. Jarvis v. Cuomo, No. 14-cv-1459(LEK/TWD), 2016 WL 278934, at *2 (N.D.N.Y. Jan. 21, 2016); Ulloa v. Mid Hudson Valley Fed. Credit Union, Nos. 10-cv-132, -356, -345, 2011 WL 66050, at *3 (N.D.N.Y. Jan. 10, 2011) (relying on defendants' affidavit attached to motion to dismiss to conclude subject-matter jurisdiction was lacking); Razi Sch., 519 F. Supp. 3d at 148; J.S. ex rel. N.S., 386 F.3d at 110. Indeed, as the Second Circuit recently reasoned in Do No Harm v. Pfizer Inc., 96 F.4th 106, 120-21 (2d Cir. 2024), when a plaintiff moves for a preliminary injunction, it "subject[s] itself to the heightened burden of demonstrating standing under a summary judgment standard," and plaintiff thus should not be allowed to survive a motion to dismiss for lack of standing based purely on its pleading because that would "amount to *reversing* the case to a *prior* stage" of litigation. Id. at 121. So too here: plaintiff opened the door to factual development by both parties when it moved for a preliminary injunction. It now bears the burden of overcoming the evidence adduced to prove by a preponderance of the evidence that it has standing to sue.

Plaintiff's allegations as to standing in the AC do nothing to challenge the reality that plaintiff's alleged injury—not receiving a microbusiness cannabis license, see, e.g., AC ¶¶ 3, 67—is not caused by any alleged actions by defendants to favor applicants on the basis of race and sex. Plaintiff first argues that the "high number of SEE applicants that received preferential treatment made it more likely that Valencia would receive a relatively low ranking." AC ¶ 65. As an initial matter, plaintiff does not allege that preference given to all SEE applicants is unconstitutional,

16

only minority-owned and women-owned businesses. <u>See, e.g.</u>, AC ¶¶ 2-3. And if all minority-owned and women-owned businesses were removed from the Queue, plaintiff would still not be anywhere near the positions currently being considered for a license. <u>See</u> Bryon Decl. ¶¶ 16-18. In other words, plaintiff's alleged injury—the inability to get a microbusiness license in the foreseeable future—is inevitable absent some change by the Board from its previously communicated position, notwithstanding defendants' alleged treatment of minority-owned and women-owned applicants. Plaintiff thus cannot demonstrate that its injury was caused by any alleged unconstitutional act of defendants.

Plaintiff also alleges that its unfavorable position in the Queue is "attributable to OCM and the Board's repeated announcements promising favor, preference, and priority to SEE applicants." AC ¶ 66. But here again, this does not demonstrate causation because if all of the minority-owned and women-owned businesses were not in the Queue, plaintiff's position still would not be high enough to receive a license. Its low position is thus only attributable to the number of other applicants who, according to plaintiff, "do not identify as New York's preferred race or sex." AC ¶ 3. Moreover, it is well settled that plaintiff lacks standing to assert claims against defendants for alleged injuries caused by the independent acts of third parties, including the decision of other business owners to apply for a cannabis license. <u>Lujan</u>, 504 U.S. at 560. And plaintiff has not alleged (and could not successfully allege) that defendants' announcements that the Office would prioritize SEE applicants are unconstitutional. Indeed, binding precedent in this circuit holds that a government body does not violate the Equal Protection Clause when it takes measures "to diminish the adverse impact" on minority candidates applying for a benefit. <u>Hayden v. County of Nassau</u>, 180 F.3d 42, 48-49 (2d Cir. 1999); <u>see also Weser v. Glen</u>, 190 F. Supp. 2d 384, 399 (E.D.N.Y. 2002). As defendants have already explained, they prioritized applications from all

categories of SEE applicants (which includes, but is not limited to, minority-owned businesses and women-owned businesses) by taking just these kinds of constitutionally permissible measures, including conducting outreach to SEE applicants, holding informational sessions, reducing the burden applications would cause to applicants, and collaborating with organizations and academic institutions to offer technical assistance to SEE applicants. Decl. of Damian Fagon ("Fagon Decl.") ¶¶ 42-44, ECF No. 30-10. Plaintiff would have no basis to suggest that publicly announcing defendants were taking these constitutionally permissible steps would somehow be unconstitutional.[14] Finally, plaintiff's bare assertion that minority-owned or women-owned businesses applied because their owners believed they would get some additional favoritism in consideration of their applications is insufficient to rise to the level of plausibility and thus is not entitled to credit on a motion to dismiss pursuant to Rule 12(b)(1). See, e.g., J.S. ex rel. N.S., 386 F.3d at 110.

Accordingly, plaintiff is demonstrably wrong that it will not receive a microbusiness license in the current round of applications "[b]ecause of the favor and preference given by OCM officials to applicants based on race and sex." AC ¶ 67. Rather, as defendants' affidavits show—affidavits which were publicly filed and provided to plaintiff and plaintiff's counsel prior to the signing and filing of the Amended Complaint—plaintiff's alleged injury is not caused by any alleged unconstitutional act taken by defendants. Rather, plaintiff's injury is caused by more people wanting licenses than there are microbusiness licenses currently available and being randomly assigned a very unfavorable number in the Queue.

---

[14] Plaintiff seemingly suggests that defendants lied or intended to deceive SEE applicants about the nature of the priority they received. See AC ¶ 66. Defendants did no such thing. See Fagon Decl. ¶¶ 42-44. But even if defendants' words were interpreted as deceptive, deceiving businesses to voluntarily apply for licenses does not violate the Fourteenth Amendment's guarantee of equal protection. And plaintiff certainly has not made any plausible allegation that such conduct is unconstitutional.

*Plaintiff* bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists and it cannot satisfy that burden here because it lacks standing. However, if the Court has any question about whether plaintiff might have standing, it should allow a period of limited jurisdictional discovery solely on the standing question. This would ensure judicial economy and preserve the time and money of the parties by quickly resolving the factual question whether plaintiff's alleged injuries are inevitable even absent minority-owned and women-owned applicants in the Queue.

**B.    Plaintiff lacks standing to seek relief related to future licensing rounds or application fees, or alternatively, any claim is not yet ripe**

Perhaps recognizing that plaintiff would not receive a microbusiness license in the current Queue even if this Court issued all of plaintiff's requested relief, plaintiff's Amended Complaint also seeks relief regarding future applications and future licensing windows. Specifically, plaintiff alleges plaintiff is "qualified, ready, willing, able, and plans to reapply in subsequent application windows" in the future and that plaintiff's future license application will be subjected to race-based and gender-based consideration when reviewing applications and awarding licenses. AC ¶¶ 68-70. But plaintiff does not allege—and could not allege, much less demonstrate—either that such future application windows are imminent or that the statutory and regulatory frameworks, along with the Office and Board's policies and practices, will be the same in any such future application round. Accordingly, plaintiff fails to demonstrate that any alleged injury is "actual and imminent" from any future licensing window, and thus plaintiff lacks standing. Lujan, 504 U.S. at 560. Moreover, any claim plaintiff may have as a result of an alleged injury from a future application window is not yet ripe. Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 687 (2d Cir. 2013) (claim must present a real, substantial controversy, not a mere hypothetical question in order to be ripe).

Here, plaintiff's AC does not allege, and could not allege, that the Office will imminently open another application window. That is because the Office currently has no definite plan about when such a window might open, if it opens at all. Indeed, as the Office has made clear in guidance documents, "[f]uture application windows will conduct a . . . market analysis and will make available additional licenses to continue to adjust and adapt to the needs of the market." Ex. C to AC at 3. At present, the Office is in the midst of reviewing and processing applications and awarding cannabis licenses from the November and December Queues, which include thousands of applicants for hundreds of licenses of multiple different types, Ex. C to AC at 2, along with continuing to assist licensees who received earlier Conditional Adult-Use Retail Dispensary (CAURD) licenses to open their doors to customers. Altogether, CAURD licensees and the recipients of adult-use retail dispensary licenses and microbusiness licenses from both the November and December Queues will constitute nearly 1700 legal cannabis retailers in the State. See Ex. C to AC at 2 (Office estimates that 500-1000 retail dispensary licenses and 220 microbusiness licenses will be awarded from the November and December Queues); Off. of Cannabis Mgmt., Press Release, New York State Office of Cannabis Management Announces Cannabis Growers Showcase Program and Issues 212 New Provisional Retail Licenses to Supercharge Cannabis Retail Market (July 19, 2023)[15] (Office has issued 463 provisional CAURD licenses to date).[16] The Office and Board will be focused on the process of issuing the currently available licenses for a significant period of time because, as of April 24, 79 of 220 microbusiness licenses have been awarded and 118 of 1000 adult-use retail licenses have been awarded. See Off. of Cannabis Mgmt., No. 2024-66, Resolution to Issue Certain Adult-Use Cannabis Licenses (Apr.

---

[15] https://cannabis.ny.gov/system/files/documents/2023/07/7-19-2023-press-release.pdf
[16] https://cannabis.ny.gov/system/files/documents/2023/07/ccb-caurd-provisional-license-approvals-7-19-23_0.pdf; see also, https://cannabis.ny.gov/system/files/documents/2023/08/ccb-meeting-minutes-7.19.23.pdf

11, 2024)[17]; Off. of Cannabis Mgmt., No. 2024-60, Resolution to Issue Certain Adult-Use Cannabis Licenses (Mar. 22, 2024)[18]; Off. of Cannabis Mgmt. No. 2024-53, Resolution to Issue Certain Adult-Use Cannabis Licenses (Feb. 16, 2024)[19]. Once the licenses are awarded, it will also take time for many of these dispensaries to open before the Office can assess the current lawful cannabis market in New York and determine what additional license types and how many may be needed to meet market needs.[20] In short, it is far from clear whether or when additional licensing windows may open, but any such windows are not definite or imminent at this time. Accordingly, plaintiff lacks standing to seek to enjoin any actions of the Office in a future microbusiness application window that, at this time, is purely hypothetical. And any such claim is not yet ripe and should not be considered by this Court unless and until an actual application window is announced.

Further, plaintiff does not, and cannot, plausibly allege that the Office and Board's current regulations, policies, and practices will be in effect in any hypothetical future application window. Since the Office's creation in 2021, its regulations and procedures have regularly undergone changes in response to community and stakeholder feedback, evolving best practices based on the Office's experience rolling out programs, relevant judicial decisions, legal guidance, and data and feedback from other states that have also recently legalized cannabis. See, e.g., Amendments to Medical Cannabis Regulations (effective Dec. 13, 2023)[21]; Amendments to Adult-Use Cannabis Regulations (effective Mar. 27, 2024)[22]; Amendments to Cannabinoid Hemp Regulations

---

[17] https://cannabis.ny.gov/system/files/documents/2024/04/ccb-resolution-adult-use-licenses-4-11-24.pdf

[18] https://cannabis.ny.gov/system/files/documents/2024/03/ccb-resolution-adult-use-licenses-3-22-24.pdf

[19] https://cannabis.ny.gov/system/files/documents/2024/02/ccb-resolution-adult-use-licenses-reso-2-16-24_0.pdf

[20] See, Ex. C to AC at Question #3.

[21] https://cannabis.ny.gov/system/files/documents/2024/02/exprs-trms-amend-part-113-medical-cannabis-2-16-24.pdf

[22] https://cannabis.ny.gov/system/files/documents/2024/02/exprs-trms-amend-au-regs-feb-2024.pdf

(effective Dec. 13, 2023)[23]; Amendments to Adult-Use Cannabis Regulations (effective Sept. 27, 2023)[24]; Proposed and Revised Rulemaking and Regulatory History (All).[25] The Office is currently experiencing its first round of adult-use licensing, and it is reasonable to conclude that its regulations, policies, and practices will change in light of lessons learned during this first round of licensing. Moreover, as plaintiff itself acknowledges (see AC ¶¶ 20, 72), the Office treats the SEE Plan as an evolving document that it will continue to change in the face of changing circumstances. Given the Office's broad discretion in licensing,[26] there is no basis to think that the Office's practices in future licensing rounds will be identical to the practices that are currently operant, and any declaration or injunction relating to those policies is thus premature and unwarranted.

Indeed, even the MRTA itself has been subject to repeated amendments since it was first enacted. See, e.g., 2022 N.Y. Sess. Laws c. 18, § 3; 2023 N.Y. Sess. Laws c. 56, pt. UU, §§ 8-20; 2023 N.Y. Sess. Laws c. 135, § 1; 2023 N.Y. Sess. Laws c. 647, § 1. And numerous other proposed amendments to the MRTA have been previously proposed by the Legislature or are currently being considered. See, e.g., 2023 S.B. 7998A[27]; 2023 S.B. 5346[28]; 2023 S.B. 7528[29]; 2023 S.B. 8463[30]; 2023 S.B. 1682[31]; 2023 S.B. 1023[32]; 2023 S.B. 8305/2023 A.B. 8805 (signed by Governor Apr. 20, 2024)[33]. In light of these regular adjustments to a relatively new statute, it would be premature to assume that at the time of a future application window, the statute will require any particular

---

[23] https://cannabis.ny.gov/system/files/documents/2023/11/part-114-cannabinoid-hemp-regulations_1.pdf
[24] https://cannabis.ny.gov/system/files/documents/2023/09/exprs-trms-adopt-au-regs-9-12_0.pdf
[25] https://cannabis.ny.gov/proposed-revised-rulemaking-and-regulatory-history-all
[26] 9 NYCRR 120.7(c)
[27] https://legislation.nysenate.gov/pdf/bills/2023/S7998A
[28] https://legislation.nysenate.gov/pdf/bills/2023/S5346
[29] https://legislation.nysenate.gov/pdf/bills/2023/S75282
[30] https://legislation.nysenate.gov/pdf/bills/2023/S8463
[31] https://legislation.nysenate.gov/pdf/bills/2023/S1682
[32] https://legislation.nysenate.gov/pdf/bills/2023/S1023
[33] Please note, this bill is not yet available in the New York session laws. However, a copy is available here: https://legislation.nysenate.gov/pdf/bills/2023/A8805B.

actions of the Office and Board.[34] Plaintiff therefore cannot demonstrate that it is likely to suffer a concrete, imminent harm from how the MRTA will operate, or how it will be interpreted by the Board and Office in regulations, policies, and practices, in a future hypothetical application window. Plaintiff thus lacks standing at present to seek declaratory or injunctive relief related to a future application window, and any such claim is not yet ripe for consideration by this Court.

**C.     Plaintiff lacks standing to seek the broad declaratory and injunctive relief requested**

Finally, even if plaintiff could demonstrate an injury fairly traceable to defendants' actions that could be redressed by this Court (which plaintiff cannot), plaintiff lacks standing to seek the broad declaratory and injunctive relief requested in its Amended Complaint. Plaintiff requests that this Court issue a "declaration that the use of race in the New York Cannabis Law, CCB regulations promulgated thereunder, and OCM policies and practices violates the Fourteenth Amendment to the United States Constitution," a similar declaration with respect to "sex-based classifications," and a permanent injunction prohibiting defendants from "enforcing the race and sex preferences in the New York Cannabis Law, CCB regulations promulgated thereunder, and OCM policies and practices." AC at 15. But plaintiff cannot demonstrate, and indeed has not even attempted to allege, that *all* consideration of race or gender by defendants in any form is unconstitutional and has or would cause plaintiff injury.

As an initial matter, plaintiff does not allege that it was injured by any of defendants' pre-application programs, including community roundtables to learn about barriers that impede business owners who are women, minorities, or from certain disadvantaged backgrounds; outreach

---

[34] In particular, assuming that the statute at a hypothetical time in the future will require the Board and Office to act in a way that violates the Fourteenth Amendment would also run afoul of the canon of constitutional avoidance. See Doyle v. U.S. Dep't of Homeland Sec., 959 F.3d 72, 77 (2d Cir. 2020) (cautioning that courts should decline to decide "difficult but avoidable constitutional question[s]"); Fisher v. Rome Ctr. LLC, No. 22-cv-0685, 2022 WL 16949603, at *8 (N.D.N.Y. Nov. 15, 2022).

sessions to educate SEE applicants about cannabis licenses and how to apply; creation and provision of low-burden applications to make applying easier; and creation of certain programs to assist SEE applicants with their applications. Plaintiff and plaintiff's counsel were provided extensive sworn affidavits explaining these actions and programs before the Amended Complaint was filed, see Fagon Decl. ¶¶ 28-30, 36-47, and many of these actions and programs are explained in the Office's publicly available documents, including those attached to plaintiff's Amended Complaint, see Ex. A to AC at 20-30; Ex. B to AC at 3; OCM Post-Application Video 18:42-20:04; Office of Cannabis Management Announces First Cohort of Compliance Training & Mentorship Program.[35] Plaintiff does not allege that it was injured by any of these programs, and it thus lacks standing to challenge any of them.[36] Lujan, 504 U.S. at 560. Yet all of these actions and programs considered race and gender and were taken pursuant to provisions of the Cannabis Law and Board regulations related to the Law's focus on social equity and providing priority to SEE applicants. See, e.g., N.Y. Canbs. Law §§ 10(2), 10(17), 87(1)-(4); 9 NYCRR §§ 120.1-120.9.

Even among the provisions of law cited by plaintiff, plaintiff does not even attempt to allege that it has been injured by many of them, nor could it so demonstrate. For instance, plaintiff cites 9 NYCRR § 120.13(d), which states that SEE applicants whose application has been denied may, in the Office's discretion, be granted a provisional license and allowed to join a social and economic equity incubator program, and after completion of the incubator program may be allowed to reapply for a license. See AC ¶ 33. Plaintiff does not allege that this program has caused it any injury, much less an injury that somehow runs afoul of the Fourteenth Amendment. That

[35] https://cannabis.ny.gov/system/files/documents/2023/01/office-of-cannabis-management-announces-first-cohort-of-compliance-training-and-mentorship-program.pdf
[36] Plaintiff likewise cannot demonstrate an "invasion of a legally protected interest," which is a required element for Article III standing, Lujan, 504 U.S. at 560, because the programs described above fit within the category of removing obstacles that hinder certain marginalized groups from applying for a benefit that the Second Circuit has held to satisfy the Fourteenth Amendment, see Hayden, 180 F.3d at 48-49.

lack of a direct personal injury is fatal to plaintiff's standing. "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet [the standing] requirements." Kearns v. Cuomo, 981 F.3d 200, 207 (2d Cir. 2020) (quoting Hollingsworth v. Perry, 570 U.S. 693, 704 (2013)). The same analysis applies to plaintiff's citations to statutory provisions regarding SEE applicants' access to mentorship and incubator programs[37] and provisions about the use of land. See AC ¶ 26. Plaintiff makes no allegation that it has actually been injured by any of these provisions and thus lacks standing to seek declaratory or injunctive relief prohibiting their enforcement.

Moreover, plaintiff's Amended Complaint apparently requests declaratory and injunctive relief that would prevent any future use of race or gender that is not currently utilized by the Office or Board. Plaintiff has not demonstrated, and once again could not demonstrate, that it is likely to suffer concrete, imminent harm from yet-unknown considerations of race or gender as part of the cannabis program. Plaintiff's complaint thus falls far short of demonstrating standing to seek such unprecedented, broad relief.

For all of the above-stated reasons, plaintiff has failed to demonstrate that it has standing to maintain the present suit, and the Amended Complaint should be dismissed pursuant to Rule 12(b)(1). To the extent that the Court disagrees, the Court should allow a period of limited jurisdictional discovery to resolve any outstanding factual questions relevant to standing.

---

[37] Plaintiff also misunderstands these provisions. Race and sex do not determine eligibility for the Cannabis Compliance Training & Mentorship ("CCTM") program and the Cannabis Hub & Incubator Program ("CHIP"). Participation in that program is not based on race or gender (ECF No. 30-10, ¶¶ 44, 50) and the statutes plaintiff cites in support of this contention do not support that contention, either. For eligibility criteria for the CCTM and CHIP programs, see, https://cannabis.ny.gov/cannabis-compliance-training-mentorship-program-0; https://forms.office.com/pages/responsepage.aspx?id=6rhs9AB5EE2M64Dowcge59BTsrcoBZdAv0aJHMy9PbJUR UhPVERFTFo0OUVJUTFIR1daSThRVENXRi4u. None of the statutes cited exclude participation by male-owned businesses or non-minority owned businesses.

**POINT II:**    **PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

Plaintiff's Amended Complaint should also be dismissed pursuant to Rule 12(b)(6) for failure to plausibly state a claim that defendants violated the Equal Protection Clause of the Fourteenth Amendment. Specifically, plaintiff's Amended Complaint is composed of allegations that are almost entirely inconsistent with public documents provided by the Office, including those referenced and attached to the Amended Complaint, along with public records, including sworn declarations provided by Office employees in federal court—documents which plaintiff and plaintiff's counsel possessed and reviewed prior to filing the Amended Complaint. The Amended Complaint does not acknowledge the existence of these facts, nor does it allege any basis upon which it could assert a good-faith belief that these documents and declarations are false. And, to the extent plaintiff cites statutory provisions, regulations, or Office guidance documents to support its allegations, the provisions in these documents are at best ambiguous when read without context. In short, plaintiff fails to meet the requirement that the allegations in its complaint rise to the level of plausibility rather than mere possibility. Ashcroft, 556 U.S. at 677.

Plaintiff's Amended Complaint primarily alleges that defendants "give[] significant race- and sex-based preference in both the application and review process for obtaining a license to operate a cannabis business" in violation of the Equal Protection Clause. AC ¶ 2. Specifically, plaintiff alleges that the Office gave extra weight to SEE applicants (which includes, but is not limited to, minority-owned businesses and women-owned businesses) that gave these applicants more favorable numbers in the Queue for consideration for a license. See AC ¶¶ 35, 52, 53, 54. Plaintiff also alleges that defendants will selectively grant licenses on the basis of race and sex at some point in the future. AC ¶ 54.

Plaintiff's factual allegations are demonstrably wrong and thus the Amended Complaint should be dismissed pursuant to Rule 12(b)(6). Most significant, plaintiff's allegations are inconsistent with the documents attached to and incorporated by reference into the complaint. As explained above, see supra p. 9, n.9, plaintiff attached as Exhibit D to its AC screenshots from an official information video created and made publicly available by the Office. Accordingly, that entire video is properly considered as attached and incorporated by reference into the AC and may be relied on by this Court in resolving this motion to dismiss. See Blue Tree Hotels, 369 F.3d at 217; Hershey, 938 F. Supp.2d at 492 n.1; Obanya, 2016 WL 11265648, at *1 n.1; Onondaga Hilltop Homes, 2013 WL 992127, at *1 & n.1. And, as that video makes clear, all applications, regardless of whether the applicant was a SEE applicant or non-SEE applicant, were queued together randomly with no priority based on SEE-applicant status. Post-Application Process at 16:19-20:04.[38] Indeed, as the Policy Director of the Office makes clear in that video, only one group received extra weight in the Queue, and that was applicants who qualified for "extra priority" under Cannabis Law § 87(3). Post-Application Process at 18:42-20:04. Instead, as the video highlights, the benefit of being a SEE applicant was front-end assistance, as well as wraparound services available to licensees. Post-Application Process at 17:34-18:33. This information was plainly known to plaintiff and/or plaintiff's counsel at the time the Amended Complaint was filed. Indeed one of the screenshots attached to the Amended Complaint was taken during the portion of the video quoted above. Compare Ex. D to AC at 5 (displaying question from "Alex K." at the bottom of the screen), with Post-Application Process at 17:30-18:33 (same).

This information is further confirmed by the November Queue attached to the AC, which indicates that SEE applicants and non-SEE applicants are interspersed relatively proportionally

---

[38] https://www.youtube.com/watch?v=otbO2ktJvHY

throughout the list. <u>See</u> Ex. E to AC at 2-33. That document further notes which applicants received "extra priority": <u>Extra priority</u> SEE applicants (not *all* SEE applicants), CCTM applicants, and adult-use conditional cultivator applications for microbusiness licenses. Ex. E to AC at 36. If SEE applicants had actually been given review priority over non-SEE applicants, then all SEE applicants would appear in the Queue before all non-SEE applicants. Clearly that is not the case, as there are many non-SEE applicants that are higher in the review queue that SEE applicants. <u>See also supra</u> at pp. 9-11 (describing random nature of November Queue). And contrary to plaintiff's assertion that defendants will begin selectively granting licenses based on the race and sex of the applicant, multiple documents attached to and incorporated by reference into the AC expressly state that applications will <u>only</u> be considered based on being complete and correct and will be considered (and granted) in the order established by the Queue. <u>See</u> Post-Application Process at 16:38-17:01; Ex. C to AC at 6.

In addition, plaintiff's factual allegations are contrary to numerous judicially-noticeable documents, including both publicly available documents put out by the Office and sworn declarations previously submitted to this Court that were read by plaintiff's counsel prior to the submission of the Amended Complaint. In particular, the declaration of Jodi Bryon submitted in connection with plaintiff's earlier motion for a preliminary injunction lays out in detail how the November Queue was created, that all SEE applicants and non-SEE applicants were weighted the same in the random process without any extra preference given to SEE applicants (except for certain categories that are not challenged in plaintiff's complaint, including applicants who qualified for "extra priority" and microbusiness applicants who completed the Cannabis Compliance Training and Mentorship Program, neither of which considers race or gender). Bryon Decl. ¶¶ 6-13. And, confirming that minority-owned businesses and women-owned businesses did

not receive extra weight in the randomized ordering of the Queue, Bryon further attested that only

21 of the first 110 applicants for a microbusiness license in the November Queue are minority-

owned or women-owned businesses and do not qualify as any other SEE applicant group. Bryon

Decl. ¶ 19.[39] Likewise, the declaration of Damian Fagon attests that the Board and Office did not

give extra weight to the applications of minority-owned and women-owned businesses in the

ordering of the November Queue and that no statute or regulation requires them to do so. Fagon

Decl. ¶¶ 41-48, 52. A public announcement made by the Governor after the first adult-use

dispensary licenses from the November Queue were granted likewise recognized that the process

was randomized and did not weigh SEE applicants' applications more than non-SEE applicants'

applications. See Governor Hochul Announces Cannabis Control Board Approves More Than 100

Licenses and First Nonconditional Licensing Window (Feb. 16, 2024).[40] And other public

materials made by the Office are consistent with the representations made by the Office and the

Governor. See, e.g., Roadmap to AU Applications at 27:32-29:40 (outlining benefits of SEE

applicant status and not suggesting they receive extra weight in the random assignment of position

in the Queue); Transcript at 8, Dec. 8, 2023 Meeting of Cannabis Control Bd.[41]

Altogether, the above documents demonstrate that plaintiff's allegations about how

cannabis license applications were ordered and will be evaluated and awarded licenses (see AC

¶¶ 35, 52, 53, 54, 56, 65, 67) are not plausible, and these documents appear to raise questions

about whether plaintiff's counsel had a basis to certify that the allegations "have evidentiary

---

[39] A similar declaration was also sworn to by Jodi Bryon and filed in state court in connection with a separate suit. See Decl. of Jodi Bryon ¶¶ 3-11, Matter of Friendly Flower 1 Inc. v. New York State Cannabis Control Bd., Index No. 901180-24 (Sup. Ct. Feb. 26, 2024), NYSCEF No. 29.

[40] https://www.governor.ny.gov/news/governor-hochul-announces-cannabis-control-board-approves-more-100-licenses-and-first

[41] See also, https://cannabis.ny.gov/system/files/documents/2024/02/gmt20240216-160302_recording_transcript_notimecode.pdf

support or . . . will <u>likely</u> have evidentiary support after a reasonable opportunity for further investigation," Fed. R. Civ. P. 11(b)(3) (emphasis added). Moreover, even if this Court considers some (or, indeed, all) of the judicially-noticeable documents above not for their truth but merely to establish the fact that the statements in them were made, <u>see, e.g.</u>, <u>Kramer v. Time Warner Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991), the mere existence of these public documents renders the Amended Complaint facially implausible. Specifically, plaintiff does not allege in its Amended Complaint any facts that would make it <u>plausible</u> (1) that multiple Office officials intentionally misrepresented how SEE and non-SEE applications were queued and evaluated in official meetings and videos (many of which predate the initiation of the present suit), <u>see</u> Post-Application Process at 16:38-20:04; Roadmap to AU Applications at 27:32-29:40; Transcript at 8, Dec. 8, 2023 Meeting of Cannabis Control Bd; (2) that the Governor expressly lied in a public announcement published on her official website, <u>see</u> Governor Hochul Announces Cannabis Control Board Approves More Than 100 Licenses and First Nonconditional Licensing Window (Feb. 16, 2024)[42]; and (3) that a state official knowingly and intentionally committed perjury in this very case by filing a sworn declaration attesting that all applications from minority-owned businesses and women-owned businesses were treated identically in the November Queue as non-SEE applications including plaintiff's, <u>see</u> Bryon Decl. ¶¶ 6-19.

To be sure, <u>if</u> plaintiff were to allege facts raising a <u>plausible</u> inference that defendants gave extra weight in the randomized Queue to applications of minority-owned and women-owned businesses, and that multiple State officers and employees intentionally lied to the public and this Court to cover up the truth of how the Queue order was assigned, and <u>if</u> plaintiff's counsel were

---

[42]For February 2024 Board meeting minutes, see
https://cannabis.ny.gov/system/files/documents/2024/02/gmt20240216-
160302_recording_transcript_notimecode.pdf.

able to fulfill its obligation under Rule 11(b) of certifying that they had a basis to believe that these allegations would <u>likely</u> find evidentiary support during discovery, then plaintiff's complaint could survive a motion to dismiss. However, the Amended Complaint plaintiff has filed provides no such basis. Instead, the Amended Complaint relies on bare, unsupported assertions about the nature of defendants' licensing program and cites to a variety of statutes, regulations, and guidance documents that are at best ambiguous and might make it conceivable that defendants would have had statutory and regulatory authority to weigh applications differently. None of plaintiff's cited laws and documents cast any light on what defendants <u>actually did</u>, and even taken together, these documents fall far short of making it plausible (or establishing a reasonable-good faith belief on the part of plaintiffs' counsel) that multiple State officials repeatedly lied over the course of months to the public, to license applicants, and to this Court in sworn declarations about how defendants established the randomized November Queue.

For instance, plaintiff cites to a number of statutory and regulatory provisions that require the Board and the Office to "prioritize" SEE applicants, as well as guidance documents discussing this requirement. AC ¶ 11 (quoting Cannabis Law § 10(2)); <u>id.</u> ¶ 35 (citing Cannabis Law §§ 3(50), 10(2), 64(1), 73-75, 87(1)-(2)); <u>id.</u> ¶¶ 38, 40 (citing Ex. B to AC). But none of these provisions or guidance documents, or any other provision or guidance document plaintiff points to, define "prioritize." The implementation of these provisions is left to the discretion of the Board and Office, and allowed defendants to prioritize SEE applicants through front-end outreach and support rather than by giving SEE applications greater weight in the randomized queuing process. So too with statutory provisions and agency documents requiring that the granting of applications "promote social and economic equity applicants." AC ¶ 17 (citing Cannabis Law §§ 73-75); <u>id.</u> ¶¶ 18-19 (citing Cannabis Law § 87(1) and SEE Plan). This language is consistent with

31

defendants' approach of taking front-end measures to eliminate obstacles to SEE applicants filing applications, which thereby ensured that the applicant pool would contain a representative number of SEE applicants, and that random selection would yield a list that "promote[d] social equity applicants." See Cannabis Law §§ 73, 87(1); accord Ex. A to AC at 6.

Similarly, plaintiff cites provisions listing an applicant's SEE status as a criterion for consideration for a license. See AC ¶¶ 14-16 (citing Cannabis Law § 64(1)(a), (f)); id. ¶ 30 (citing 9 NYCRR § 120.7(b). But these provisions set no requirement that defendants give special preference in ordering or acceptance based on SEE status, only that the Board's regulations take this criterion into account. And although the Cannabis Law sets a goal that 50% of licenses be given to SEE applicants, see AC ¶¶ 21-22, 37, the statute and its legislative debates make clear this goal is non-binding, and the goal does not require any particular division between SEE applicant groups, many of which are not based on gender or race. See supra at pp. 3-4. Moreover, nothing in the statute purports to prevent defendants from achieving this non-mandatory goal by eliminating obstacles that would prevent SEE applicants from seeking licenses rather than by weighing SEE applications more heavily than non-SEE applications. Indeed, that is exactly what defendants have done. Likewise, plaintiff's reliance on 9 NYCRR 120.1(c), see AC ¶ 29, is misplaced because, at most, that provision would merely authorize the Board to limit acceptance of applications based in some unspecified way on "social and economic equity factors." The regulation does not require that the Board so limit its acceptances, nor does the regulation suggest that defendants have limited application acceptances or intend to do so.[43] Indeed, State officers and employees have expressly disavowed any such action.

_____

[43] Plaintiff's suggestion that the SEE Plan fails to adequately "disavow[]" lottery systems that give SEE applicants greater weight or higher scores when their applications are reviewed, AC ¶ 46, fails to support plaintiff's allegations about how the ordering of the November Queue occurred for the same reasons.

The only document cited in the AC that even comes close to suggesting that defendants intended to weigh SEE applicants' applications more favorably than non-SEE applicants is a single line in a guidance document attached to the AC which states that "[q]ualifying as multiple SEE categories will increase an applicant's chances in the random order queueing process." AC ¶ 44 (quoting Ex. C to AC). However, this document still fails to nudge plaintiff's allegations across the line from conceivable to plausible. See Twombly, 550 U.S. at 550. First, this line is ambiguous and, although inartfully worded, was intended to convey that an applicant should list all SEE groups for which it qualified so that if the Office concluded that the applicant did not meet the criteria for one SEE group, the applicant might still qualify as a SEE applicant through a different recognized group and thereby receive access to services like application support or alternative means of qualifying for a license, see, e.g., 9 NYCRR § 120.13(d). Office officials echoed this advice in clearer terms in subsequent forums. See, e.g., Post-Application Process at 17:35-18:23. Moreover, even if this Court accepted plaintiff's interpretation of Exhibit C, the quoted line only suggests that at a point in time before the November Queue was created, the Office and Board were considering giving greater weight to SEE applicants. However, the document provides no evidence about what the Office ultimately decided to do. The video incorporated into the Amended Complaint, see Post-Application Process at 16:38-20:04, along with judicially noticeable documents cited above, see, e.g., Bryon Decl. ¶¶ 5-13, were created after the November Queue was created and are thus the only evidence that sheds light on how the Board and Office ultimately acted. And as the exhibits to the Amended Complaint demonstrate, this is not the only way in which the Office's ultimate actions diverged from what the Office anticipated it would do when it issued its Q&A guidance document. Compare Ex. C to AC at 5 (stating that the Office anticipated separating applications into different pools based on type of

license sought and SEE status), with Ex. E to AC at 1-2 (stating that one queue was created for retail and microbusiness applications and for non-SEE and SEE applicants).

In short, the laws, regulations, and documents cited in the Amended Complaint at most make it possible that defendants could have chosen to give extra weight to SEE applications in the ordering process. But none of these cited laws, regulations, or documents make it plausible that defendants actually did give extra weight to SEE applications or actually will selectively issue licenses to SEE applicants at some time in the future. That is sufficient to dismiss the Amended Complaint pursuant to Rule 12(b)(6). Twombly, 550 U.S. at 556 (requiring "more than a sheer possibility that a defendant acted unlawfully"). Particularly in light of defendants' repeated public statements, including sworn court documents, averring that defendants gave no additional weight to SEE applications, that non-SEE applications and SEE applications had identical chances of being randomly selected for a favorable position in the November Queue, and that all applications will be reviewed and granted licenses based on the same requirements (which do not include consideration of race, gender, or SEE status), the Amended Complaint falls short of plausibly alleging any facts giving rise to a violation of the Equal Protection Clause.[44]

Accordingly, plaintiff has failed to state a cause of action under the Equal Protection Clause and its Amended Complaint should be dismissed.

## CONCLUSION

Defendants respectfully request that the Court dismiss plaintiff's AC in its entirety, with prejudice, and grant such other and further relief as it deems just and equitable.

---

[44] Plaintiff's complaint does not identify, describe, or assert a cognizable injury based on any of the actions actually taken by the Board and Office to prioritize SEE applicants. See supra at pp. 14-25. Any claim based on those actions is therefore not plausibly alleged with the specificity required. See Twombly, 550 U.S. at 556. In any event, these actions satisfy the Equal Protection Clause under existing binding Second Circuit precedent and are subject only to rational basis. See Hayden, 180 F.3d at 48-49; Weser, 190 F. Supp. 2d at 399; Honadle v. Univ. of Vermont, 56 F. Supp. 2d 419, 427-28 (D. Vt. 1999).

Dated: Syracuse, New York
     April 24, 2024

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*
300 S. State Street, Ste. 300
Syracuse, New York 13202
By: _____/s_____
Aimee Cowan
Assistant Attorney General, of Counsel
Bar Roll No. 516178
Telephone: (315) 448-4800
Fax: (315) 448-4853
Email: aimee.cowan@ag.ny.gov

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 24, 2024, she filed Defendants' motion to dismiss by electronically filing with the Clerk of the Court herein, using the CM/ECF system, which is understood to have sent notification of such filing electronically to the following:

David J. Hoffa, Esq.
Pacific Legal Foundation
3241 E. Shea Blvd. - Suite 108
Phoenix, AZ 85028

Joshua P. Thompson, Esq.
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814

Robert E. Purcell, Esq.
The Law Office of Robert E. Purcell, PLLC
211 West Jefferson Street, Suite 24
Syracuse, New York 13202

Dated:          Syracuse, New York
                April 24, 2024

                                LETITIA JAMES
                                Attorney General of the State of New York
                                Attorney for Defendants
                                300 S. State Street, Suite 300
                                Syracuse, New York 13202
                                By: _____/s_____
                                Aimee Cowan, Esq.
                                Assistant Attorney General
                                Bar Roll No. 516178
                                Telephone:     (315) 448-4800
                                Fax: (315) 448-4853
                                Email: aimee.cowan@ag.ny.gov